THE HONORABLE JOHN H. CHUN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | |
|---|---|
| SONNY JOYCE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON.COM, INC., ANDREW R. JASSY, JEFFREY P. BEZOS, BRIAN T. OLSAVSKY, DAVID A. ZAPOLSKY, and NATE SUTTON,<br><br>Defendants. | Case No.: 2:22-cv-00617-JHC<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY DEMAND |
| ASBESTOS WORKERS PHILADELPHIA WELFARE AND PENSION FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON.COM, INC., ANDREW R. JASSY, BRIAN T. OLSAVSKY, and DAVID FILDES,<br><br>Defendants. | Case No.: 2:22-cv-00934-JHC<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY DEMAND |

CONSOLIDATED CLASS ACTION  COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

| | |
|---|---|
| DETECTIVES ENDOWMENT ASSOCIATION ANNUITY FUND, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON.COM, INC., ANDREW R. JASSY, BRIAN T. OLSAVSKY, and DAVID FILDES,<br><br>Defendants. | Case No.: 2:22-cv-00950-JHC<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY DEMAND |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................2

II.  JURISDICTION AND VENUE ...........................................................6

III.  PARTIES .............................................................................................7

    A.  Plaintiffs ...................................................................................7

    B.  Defendants ................................................................................8

IV.  SUBSTANTIVE ALLEGATIONS ....................................................10

    A.  The Company and Its Business ...............................................10

        1.  The History of Amazon ................................................10

        2.  Amazon's Business Lines .............................................12

    B.  Amazon Exploited Its Third-Party Sellers in an Anticompetitive Manner ....................................................................................12

        1.  Amazon Misappropriated Third-Party Sellers' Data ...................15

        2.  Amazon Tied and Bundled Its Products to the Detriment of Third-Party Sellers ........................................................31

        3.  Amazon Exploited Its Power Over Third-Party Sellers ................40

        4.  Amazon Routinely Favored Its Own Private-Label Products to the Detriment of Third-Party Sellers ..........................................44

    C.  Amazon's Retail Model Has Long Relied on the Promise of Rapid Delivery .................................................................................49

        1.  Amazon Has Long Focused on "Delivering as Many Items as Fast as Possible" ......................................................50

        2.  2015-2017:  Amazon Announces and Expands Same-Day Delivery ......................................................................51

        3.  2018-2019:  Amazon Increases Its Already-Aggressive Focus on Rapid Delivery ................................................51

        4.  2019-2020:  As Competitive Pressures Mount, Amazon Invests Massively in Expanding Fast Delivery ..........................52

    D.  Amazon Aggressively Increases Its Fulfillment Capacity and Headcount During the Pandemic ...........................................56

        1.  Early 2020:  COVID-19 Causes a Massive Demand Surge ..........56

        2.  2020-2021:  Amazon Continues Its Aggressive Expansion, Which Defendants Justify as Necessary to Keep Competitors at Bay and Meet Existing Demand for Fast Delivery ......................................................................56

        3.  Analysts Covered the Expansion Favorably at the Time ..............63

E.   By Early 2021, Amazon Prepares to Overhaul Its Senior Management as Its Public Commitment to Expansion Continues.............65

F.   Amazon Executives Have Access to Real Time Data on Critical Details of the Company's Business and Rely on Such Data in Decision Making ...................................................................................67

G.   By July 2021 Defendants Knew that Amazon Had Overexpanded and Decided to Reverse Course ...................................................68

    1.   Defendants Assured Investors that Amazon's Continued Expansion was Justified by Demand for Fast Delivery................68

    2.   Even Before July 2021, Amazon Knew That Demand For Fast Delivery Began to Decline ....................................................72

    3.   Former Amazon Employees Confirm that Amazon Was Pulling Back on its Expansion Plans By April 2021 ....................74

    4.   Defendants Continued to Mislead Investors and Represent that Amazon was Expanding Capacity Despite the Substantial Pullback that Was Already Underway ......................77

    5.   Amazon Has Delayed or Canceled the Opening of Numerous Buildings .................................................................78

H.   The Truth Begins to Emerge About Amazon's Exploitation of Third-Party Sellers and Slowing Demand for Amazon's Fast Delivery..........................................................................................82

    1.   During the Class Period, the Truth Gradually Emerges that Amazon Exploited Its Third-Party Sellers .....................................82

    2.   On April 28, 2022, the Truth Begins to Emerge About Reduced Demand for Amazon's Fast Delivery ............................85

V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ...............90

A.   February 1, 2019 – Amazon Form 10-K and 2019 Forms 10-Q .............92

B.   April 11, 2019 – Amazon Form 8-K.........................................................95

C.   April 23, 2019 – the Company's Tweet....................................................97

D.   April 25, 2019 – Q1 2019 Earnings Call with Investors...........................97

E.   July 16, 2019 – House Judiciary Committee Testimony and the Aftermath ...............................................................................................99

F.   July 25, 2019 – Amazon's Q2 2019 Earnings Call.................................104

G.   October 24, 2019 – Amazon's Q3 2019 Earnings Call ..........................105

H.   January 31, 2020 – Amazon's Form 10-K..............................................107

I.   April 24, 2020 – Amazon Tweet.............................................................110

J.   May 15, 2020 – Amazon's Response to Subcommittee's May 1, 2020 Letter ...........................................................................................111

K. July 30, 2020 – Amazon's Q2 2020 Earnings Call...................................112

L. September 4, 2020 – Amazon's Response to Chairman Cicilline...........114

M. September 25, 2020 – Amazon's Official Website .................................114

N. October 6, 2020 – Amazon's Official Website........................................115

O. November 10, 2020 – Response to the European Commission's Preliminary Findings.................................................................................117

P. February 3, 2021 – Amazon's Form 10-K and Forms 10-Q...................118

Q. July 29, 2021 – Q2 2021 Earnings Call .................................................122

R. September 13, 2021 – Amazon's Official Website .................................125

S. October 28, 2021 – Amazon Press Release and Form 8-K ....................126

T. October 28, 2021 – Q3 2021 Earnings Call...........................................128

U. November 1, 2021 – Amazon's Response to Subcommittee's October 18, 2021 Letter .............................................................................130

V. February 3, 2022 – Amazon's Q4 2021 Earnings Call...........................132

W. February 3, 2022 Amazon Press Release and Form 8-K ........................135

X. February 4, 2022 – Amazon's Form 10-K .............................................136

Y. March 4, 2022 – Amazon's Official Website .........................................139

Z. April 14, 2022 – Letter to Shareholders.................................................140

VI. ADDITIONAL FACTS PROBATIVE OF SCIENTER.................................142

A. Amazon's Fulfillment Centers Are a Core Operation of the Company .................................................................................................143

B. Patent Inconsistencies Between Public Statements and Internal Happenings...............................................................................................144

C. Jassy Is a "Hands On" CEO Intimately Involved in the Company's Day-to-Day Issues....................................................................................145

D. Defendants Carefully Monitored and Tracked Data Related to Growth and Capacity .............................................................................146

E. The Abrupt Resignation of Clark Adds to the Strong Inference of Scienter .....................................................................................................147

F. The Existence of Numerous Governmental Investigations into Amazon Is Indicative of Scienter..............................................................148

G. Amazon's Steps to Cover Up Its Misdeeds Is Strong Evidence of Scienter .....................................................................................................150

H. A Pattern of Fraudulent Conduct Over a Significant Period of Time Is Indicative of Scienter...........................................................................152

I. Bezos' Autocratic Leadership Style Is Indicative of Scienter ................153

J. Amazon Is a Highly-Scrutinized Company .............................................154

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - iii -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

VII.     LOSS CAUSATION................................................................154

VIII.    AMAZON'S DISCLOSURE OBLIGATION UNDER THE SECURITIES
         LAWS ..................................................................................161

IX.      PRESUMPTION OF RELIANCE .......................................................163

X.       CONTROL PERSON ALLEGATIONS...............................................164

XI.      NO SAFE HARBOR—INAPPLICABILITY OF THE STATUTORY
         SAFE HARBOR ...................................................................166

XII.     CLASS ACTION ALLEGATIONS .................................................168

XIII.    CAUSES OF ACTION ..............................................................170

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS** - iv -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1.     Lead Plaintiffs Universal-Investment-Gesellschaft mbH, Universal-Investment-Luxembourg S.A., Menora Mivtachim Insurance Ltd., Menora Mivtachim Pensions and Gemel Ltd., The Phoenix Insurance Company, Ltd., and The Phoenix Provident Pension Fund Ltd. (collectively, "Lead Plaintiffs"), with named plaintiffs Asbestos Workers Philadelphia Welfare and Pension Fund and Detectives Endowment Association Annuity Fund (collectively with Lead Plaintiffs, "Plaintiffs") bring this action pursuant to Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, individually and on behalf of all other persons and entities, who purchased or otherwise acquired the publicly traded common stock of Amazon.com, Inc. ("Amazon" or the "Company") during the period between February 1, 2019 and April 28, 2022, inclusive (the "Class Period"), and were damaged thereby (subject to certain exclusions enumerated in ¶ 512, below) (the "Class").

2.     Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, *inter alia*, the independent investigation of Court-appointed Co-Lead Counsel Motley Rice LLC and Pomerantz LLP, and Additional Counsel Bernstein Litowitz Berger and Grossmann LLP and Barrack, Rodos & Basine. That investigation included review and analysis of, among other things:  (i) Amazon's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) research reports and advisories by securities and financial analysts; (iii) transcripts of Amazon's conference calls with analysts and investors; (iv) press releases, presentations, and media reports issued by and disseminated by the Company; (v) news reports and media concerning Amazon and other facts related to this action; (vi) data reflecting the price of Amazon common stock; (vii) communications with knowledgeable individuals, including former employees of Amazon; (viii) a Congressional report addressing Amazon's business practices relevant to this action and (ix) information readily available on the Internet. Counsel's investigation regarding the factual allegations concerned herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants (as defined herein) or are exclusively within their custody or control. Plaintiffs believe that further substantial

---

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** - 1 - 2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1    evidentiary support will exist for the allegations contained herein after a reasonable opportunity

2    for discovery.

3    **I.       INTRODUCTION**

4            3.      Headquartered in Seattle, Washington, Amazon is a global technology company

5    with multiple business lines, including its prominent e-commerce business.

6            4.      This securities fraud class action arises from two categories of misrepresentations:

7    (i) those concerning the way Amazon sells third-party merchandise and Amazon's own private-

8    label products on its e-commerce platform, and (ii) those pertaining to Amazon's over-expansion

9    of the infrastructure and fulfillment network for its e-commerce business.

10           5.      ***First***, on the Company's Amazon.com e-commerce platform, Amazon sells both

11   third-party merchandise and Amazon's own private-label products.  As the owner and operator of

12   the Amazon.com e-commerce platform, Amazon has access to certain non-public data of the third-

13   party sellers that use the Amazon.com platform.  On or around June 3, 2019, the U.S. House

14   Committee on the Judiciary (the "House Judiciary Committee") initiated a bipartisan investigation

15   into the state of competition online.  The investigation, led by the Subcommittee on Antitrust,

16   Commercial and Administrative Law (the "Subcommittee"), examined the business practices and

17   market dominance of Facebook, Google, Apple, and, of particular relevance, Amazon (the

18   "Subcommittee Investigation").

19           6.      During the course of the Subcommittee Investigation, the Subcommittee held

20   several oversight hearings in which various officers of the above referenced companies, including

21   their respective Chief Executive Officers ("CEOs"), offered witness testimony on topics such as

22   the effect of market power on the press, innovation, and privacy, and the market dominance of the

23   firms under investigation.  *See Online Platforms and Market Power* hearings before the

24   Subcommittee ("Subcommittee Hearings").

25           7.      After each of the hearings, members of the Subcommittee submitted questions for

26   the record to the witnesses.  The Subcommittee concluded in a written report, *inter alia*, that

27   Amazon had grown to be such a dominant force in the online retail market that it had monopoly

28   power over third-party sellers on its Marketplace.  Lawmakers also concluded that Amazon's dual

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 2 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

role selling products on its own website and running a Marketplace for third-party sellers "creates an inherent conflict of interest" that encourages Amazon to exploit its access to competing sellers' data and information.  It noted that Amazon publicly describes these sellers as "partners," but "behind closed doors, the company refers to them as 'internal competitors.'"

8.     Throughout the Class Period, Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Amazon engaged in anticompetitive conduct in its private-label business practices, including giving Amazon products preference over those of its competitors and using third-party sellers' non-public data to compete with them; (ii) the foregoing conduct exposed Amazon to a heightened risk of regulatory scrutiny and/or enforcement actions; and (iii) Amazon's revenues derived from its private-label business were in part the product of impermissible conduct and thus unsustainable.

9.     As the truth regarding Amazon's business practices with third parties came to light, the Company's share price declined precipitously.  On April 28, 2020, *CNBC* published an article reporting that Senator Josh Hawley had asked the U.S. Department of Justice ("DOJ") to open a criminal antitrust investigation into the Company regarding "predatory and exclusionary data practices to build a monopoly" in connection with reports that Amazon used third-party seller data to develop products for its private label business.  On this news, Amazon's stock price fell $61.92 per share, or 2.61%, to close at $2,314.08 per share on April 28, 2020.

10.     A few days later, on May 1, 2020, the first headline for a *Bloomberg* article titled "Amazon's Bezos Faces Call to Testify Before House Panel," went live at 10:34 a.m.  That article reported that the members of an antitrust panel for the House Judiciary Committee had requested that Defendant Bezos testify regarding concerns that Amazon used data from third-party sellers on its website to develop competing products, in contradiction to representations the Company previously made under oath to Congress in July 2019.  On this news, Amazon's stock price fell from $2,323.00 per share to close at $2,286.04, a decline of $36.96 per share or 1.59%.

11.     On July 23, 2020, *The Wall Street Journal* (hereinafter "*Wall Street Journal*") published an article titled "Amazon Met With Startups About Investing, Then Launched Competing Products," which reported, in relevant part, that Amazon had engaged in the practice

of making initial investments or meetings with start-ups for the purpose of securing their proprietary information before launching Amazon's own competing products. On this news, Amazon's stock price fell $113.36 per share, or 3.66%, to close at $2,986.55 per share on July 23, 2020.

12.     Then, on August 3, 2020, *Bloomberg* published an article titled "Amazon's Market Power to Be Investigated by New York AG." That article reported that the New York and California Attorneys Generals were joining an antitrust probe into Amazon being conducted by the Federal Trade Commission ("FTC"). That same day, *Business Insider* similarly reported that "Amazon is reportedly facing a new antitrust investigation into its online Marketplace led by the FTC and attorneys general in New York and California." *Business Insider* further stated that the joint probe related to Amazon's treatment of third-party sellers and competition with its own products. On this news, Amazon's stock price fell $52.79 per share, or 1.67%, to close at $3,111.89 per share on August 3, 2020.

13.     On October 6, 2020, following the publication of news reports discussing the above-referenced Subcommittee report, Amazon's stock price fell $99.24 per share, or 3.1%, to close at $3,099.96 per share on October 6, 2020.

14.     Then, *Wall Street Journal* published an article on April 6, 2022, entitled "SEC Is Investigating How Amazon Disclosed Business Practices." The article reported, *inter alia*, that the SEC's probe has been underway for more than a year and focuses on Amazon's disclosures regarding its use of third-party seller data for its own private-label business.

15.     On this news, Amazon's stock price fell $105.98 per share, or 3.2%, to close at $3,175.12 per share on April 6, 2022.

16.     ***Second***, prior to the onset of the pandemic in early 2020, a key priority for Amazon was providing customers with faster delivery times, including same-day delivery. To meet that goal, Amazon invested significant capital to aggressively expand its infrastructure and fulfillment networks. Fast delivery is, and has long been, fundamental to Amazon's retail model. As Amazon explains, it is a company focused on "delivering as many items as fast as possible." Amazon's value proposition to both its customers—and to investors—is significantly premised on its ability

1  to offer a cost-effective alternative to both brick-and-mortar stores and alternative online retailers.

2  That value is inherently linked to fast delivery.

3      17.    In addition, although Amazon reported substantial profits leading up to and

4  throughout much of the Class Period, the Company since its founding has invested in building

5  market share and capacity—even when doing so caused losses.  By 2019, after years of massive

6  profitability, investors expected continued success and growth.   Those expectations were

7  reinforced by the Company's public statements, including assurances that the short-term costs of

8  growing fulfillment capacity were justified by Amazon's overall business strategy, and that

9  investment in fulfillment infrastructure would fuel fast shipping, crowding out competitors, taking

10  market share and delivering future profit.  Yet by July 2021, Defendants and others at Amazon

11  knew the opposite: Amazon's fulfillment and high-speed delivery capacity had already grown far

12  beyond what could be justified based on that strategy, and had become a drag on profitability.  The

13  infrastructure expansion needed to be scaled back, imposing a massive financial hit to the

14  Company and reflecting a reversal of Defendants' Class Period statements regarding fulfillment

15  expansion.

16      18.    Throughout the Class Period, Defendants repeatedly and consistently told investors

17  that the Company's investments in expanding infrastructure and fulfillment network capacity were

18  sound and appropriate decisions for the long term.  For example, after the market closed on July 29,

19  2021, Defendant Olsavsky, Amazon's Chief Financial Officer, represented to investors that "a

20  significant amount of investment in our fulfillment network," "at a rapid rate," was needed to meet

21  "strong multiyear demand."  Olsavsky assured investors that "we have a lot of growth to do here,"

22  which is why the Company was "moving as quickly as possible" to grow.  On February 3, 2022,

23  Defendant Olsavsky represented that "we continue to see an increase in customer demand and

24  sales during the remainder of 2021" and "[w]e've invested significantly to keep pace with this

25  demand, including nearly doubling our operations capacity in the past two years, expanding our

26  fulfillment center footprint . . . ."

27      19.    These and similar statements made throughout the Class Period were false.  In

28  reality, Defendants knew or recklessly disregarded that the Company's infrastructure and

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 5 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

fulfillment network investments had already substantially outpaced Amazon's business needs, and that those investments were a massive, self-imposed, undue drain on Amazon's financial condition. Indeed, contrary to Defendants' public statements during the Class Period and as later confirmed by *Wall Street Journal*, by July 2021, Defendants implemented cutbacks to Amazon's fulfillment capacity without disclosing that critical information to investors.

20.     The truth emerged on April 28, 2022, when Amazon reported a $3.8 billion net quarterly loss—its first reported net quarterly loss since 2015. After months of falsely representing that Amazon's expansion of its e-commerce fulfillment network and infrastructure was necessary and appropriate, Defendants disclosed that Amazon was "no longer chasing physical or staffing capacity." Defendants disclosed $6 billion of "incremental costs" to Amazon, including $2 billion due to "overcapacity" in the Company's "fulfillment and transportation network." Defendants further disclosed that they "expect[ed] the expected effects of these . . . to persist for the next several quarters as we grow into this capacity."

21.     On this news, the price of Amazon stock fell $406.30 per share, or more than 14%, from a close of $2,891.93 per share on April 28, 2022, to close at $2,485.63 per share on April 29, 2022.

22.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Amazon's stock, when the truth began to come to light, Plaintiffs and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

23.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as Amazon maintains its headquarters in this District and many of the acts and transactions that constitute violations of law complained of herein, including

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 6 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  the dissemination to the public of untrue statements of material fact, occurred and/or were directed

2  in substantial part in this District.

3      26.    In connection with the acts alleged in this Complaint, Defendants, directly or

4  indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

5  to, the mails, interstate telephone communications, and the facilities of the national securities

6  markets.

7  **III.    PARTIES**

8      **A.    Plaintiffs**

9      27.    Lead Plaintiff Universal-Investment-Gesellschaft mbH is an investment company

10 based in Frankfurt am Main, Germany, which manages assets of approximately 763 billion Euros.

11 As reflected in the Certification previously filed with the Court (ECF No. 29-1), Universal's funds

12 purchased Amazon common stock at artificially inflated prices during the Class Period and

13 suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

14     28.    Lead Plaintiff Universal-Investment-Luxembourg S.A. is an investment company

15 based in Grevenmacher, Luxembourg, which manages assets of approximately 167 billion Euros.

16 As reflected in the Certification previously filed with the Court (ECF No. 29-1), Universal

17 Luxembourg's funds purchased Amazon common stock at artificially inflated prices during the

18 Class Period and suffered damages as a result of Defendants' violations of the federal securities

19 laws alleged herein.

20     29.    Lead Plaintiff Menora Mivtachim Insurance Ltd. ("Menora Insurance") and

21 Menora Mivtachim Pensions and Gemel Ltd. ("Menora Pensions & Gemel" and, collectively with

22 Menora Insurance, "Menora") is an affiliate of Menora Mivtachim Holdings Ltd., a holdings

23 company based in Ramat Gan, Israel.  It is among Israel's largest insurance and finance groups,

24 with more than $70 billion in assets under management.  As reflected in the Certifications

25 previously filed with the Court (ECF No. 35-3), Menora purchased Amazon common stock at

26 artificially inflated prices during the Class Period and suffered damages as a result of Defendants'

27 violations of the federal securities laws alleged herein.

28

**CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS** - 7 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

30.     Lead Plaintiff The Phoenix Insurance Company, Ltd. ("Phoenix Insurance"), the principal branch of Phoenix Holdings Ltd. ("Phoenix Holdings"), is a leading Israeli insurance company, and provides insurance products and services including life insurance, long-term savings, pension, and provident funds, general insurance, and healthcare insurance. Phoenix Insurance has over $10 billion in assets under management. The Phoenix Provident Pension Fund Ltd. ("Phoenix Pension" and, collectively with Phoenix Insurance, "Phoenix") is wholly owned by Phoenix Holdings and has extensive experience in pension and provident fund management, and manages NIS 55 billion in assets for more than 800,000 customers. As reflected in the Certifications previously filed with the Court (ECF No. 35-3), Phoenix purchased Amazon common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

31.     Named Plaintiff Asbestos Workers Philadelphia Welfare and Pension Fund ("Asbestos Workers") is a multi-employer defined benefit union pension fund based in Philadelphia, Pennsylvania. As set forth in the attached Certification, *see* Ex. A, Asbestos Workers purchased shares of Amazon common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

32.     Plaintiff Detectives Endowment Association Annuity Fund ("Detectives") is a multi-employer defined benefit union pension fund based in New York, New York. As set forth in the attached Certification, *see* Ex. B, Detectives purchased shares of Amazon common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

**B.     Defendants**

33.     Defendant Amazon is a multinational technology company with multiple business lines, including e-commerce services and distribution, website development and hosting, inventory and supply chain management, and fulfillment and logistics. Amazon is a Delaware corporation with its principal corporate offices in Seattle, Washington. The Company's common stock trades on the Nasdaq Global Select Markets ("NASDAQ") under the ticker symbol "AMZN." As of

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 8 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  April 20, 2022, Amazon had approximately 508.72 million shares of common stock outstanding,

2  owned by at least hundreds or thousands of investors.[1]

3     34.     Defendant Jeffrey P. Bezos ("Bezos") founded Amazon in 1994 and has served as

4  Executive Chair since July 2021.  He has served as Chair of the Board since 1994 and previously

5  served as CEO from May 1996 until July 2021, and as President from 1994 until June 1999 and

6  again from October 2000 to July 2021.

7     35.     Defendant Andrew R. Jassy ("Jassy") is the current President, CEO, and Director

8  of Amazon.  He has held these positions since July 5, 2021.  Since joining Amazon in 1997, Jassy

9  has held numerous leadership roles across the Company.  He previously served as Senior Vice

10 President of Amazon Web Services ("AWS") from its inception in April 2006 until April 2016,

11 when he became the CEO of AWS.  He was the CEO of AWS until July 2021 when he succeeded

12 Bezos as the President and CEO of Amazon.

13    36.     Defendant Brian T. Olsavsky ("Olsavsky") has served as Senior Vice President and

14 Chief Financial Officer of Amazon since June 2015.  He served as Vice President, Finance for the

15 Global Consumer Business from December 2011 to June 2015, and has held numerous financial

16 leadership roles across Amazon with global responsibility since April 2002.

17    37.     Defendant David A. Zapolsky ("Zapolsky") has served as Senior Vice President,

18 General Counsel, and Secretary since May 2014.  From September 2012 to May 2014, he held the

19 title of Vice President, General Counsel, and Secretary and, between April 2002 and September

20 2012, he was the Vice President and Associate General Counsel for Litigation and Regulatory

21 matters.

22

23

24  [1]  On June 6, 2022, a previously announced split of Amazon common stock took effect.  Pursuant
25 to the stock split, each outstanding share of Amazon common stock was divided into 20 shares.
Throughout this Complaint, references to the market price of Amazon common stock and to the
26 number of shares outstanding reflect the (pre-split) numbers and values at the time.  Currently,
Amazon has more than 10.1 billion shares of common stock outstanding.  The share prices
27 referenced herein accurately state the stock's market prices at the relevant time, but many sources
for stock prices are "split adjusted" and accordingly show those prices as if the split had already
28 happened—*i.e.*, one-twentieth of the actual then-current price.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 9 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

38.     Defendant Nate Sutton ("Sutton") is Amazon's Associate General Counsel, Litigation & Regulatory, and has held this position since December 2016.

39.     Defendant David Fildes ("Fildes") has served as Head of Investor Relations of Amazon since June 2017.  He joined Amazon in October 2011, serving as Senior Manager of Investor Relations until April 2015.  He became the Director of Investor Relations in May 2015 and held that title until June 2017.

40.     Defendants Bezos, Jassy, Olsavsky, Zapolsky, Sutton, and Fildes are collectively referred to hereinafter as the "Individual Defendants" and, together with Amazon, as the "Defendants."  The Individual Defendants directly participated in the management of Amazon's operations, including its accounting and reporting functions, had the ability to and did control Amazon's financial reporting, and were privy to confidential information concerning Amazon and its business, operations, and financial statements, as alleged herein.  They were also involved in drafting, reviewing, publishing, and/or disseminating the false and misleading financial statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued, and approved or ratified these misstatements in violation of the federal securities laws.

IV.    **SUBSTANTIVE ALLEGATIONS**

   A.    **The Company and Its Business**

         1.    **The History of Amazon**

41.     Founded by Jeff Bezos in 1994, Amazon is now one of the largest companies in the world.  Its history is a story of relentless growth, acquisition, expansion into new business lines, and driving competitors out of markets through aggressive price-cutting.  As described in author Brad Stone's book, *The Everything Store:  Jeff Bezos and the Age of Amazon*, detailing Amazon's growth and developments, Bezos used the Internet's infinite space to create "the merchandiser's dream of the everything store—a store with infinite selection."  A drive for efficiency and scale has allowed the Company to drive down prices and offer discounts and free shipping to customers, further driving growth.  Over time, the Company has grown to rival Internet giants like Alphabet and Apple.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 10 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

42.     The Company began as an online bookstore in Seattle, with Bezos and his employees working out of his garage.  Amazon went public in 1997 at $18 a share, with a valuation of $300 million.  During the dot-com boom of the late 1990s, Amazon expanded into selling CDs, DVDs, electronics, and toys.  After mastering what Stone's book called "the physics of its own complex distribution network," the Company further expanded into clothing, jewelry, sporting goods, automotive parts, and endless other categories of goods, becoming the country's largest online retailer.

43.     In 1999, Amazon patented the ability to purchase an item online with a single click of the mouse, encouraging customers to buy more with even greater convenience.  Also in 1999, Amazon launched its third-party-seller marketplace, now known as the Marketplace, where third parties can sell new or used goods through Amazon.  The Marketplace is at issue in this action.

44.     In 2003, Amazon launched Amazon Web Services, licensing its platform to other e-commerce sites and positioning the Company as a business-to-business technology company.  This cloud hosting business is currently one of the Company's biggest revenue drivers.

45.     In 2005, the Company launched Amazon Prime, a subscription-based loyalty program that (at launch) included free two-day shipping on any order.  Amazon has since offered deliveries through Prime that includes delivery speeds as fast as same-day.  With more than 100 million members worldwide, Prime is considered one of Amazon's most valuable assets.

46.     Amazon has both introduced many of its own products, including the Kindle e-reader and smart-speaker Echo devices using the Company's Alexa virtual personal assistant, and has also made multiple acquisitions over the last 15 years to expand the breadth and depth of its business offerings, including buying the grocery chain Whole Foods Market.

47.     Amazon reached a $1 trillion market cap in September 2018, driven in large part by investor enthusiasm for growing profits tied to its ever-expanding retail and delivery footprint.  In 2019, the Company had nearly 700,000 employees, 288 million square feet of real estate, and accounted for nearly half of online retail in the United States.  Currently, Amazon has a market cap of $1.3 trillion, reported 2021 revenue of $386 billion and profits of $21 billion, and 1.6 million employees.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 11 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

### 2. Amazon's Business Lines

48.     Amazon operates an enormous range of businesses, including cloud services, e-commerce and distribution, fulfillment and logistics, entertainment, television and film production, and groceries.  Through its Amazon.com e-commerce and fulfillment platforms, the Company offers products to retail consumers from 1.7 million businesses.  Its membership program, Amazon Prime, offers free delivery and access to Prime Video, Amazon Music, Amazon Photos, Prime Wardrobe, Prime Reading, and grocery delivery.  Amazon sells groceries and prepared foods through its ownership of Whole Foods Market and its Amazon Go stores and Amazon Fresh online grocery platform.

49.     Amazon's vast array of consumer offerings is founded on its delivery and logistics systems, which includes its network of warehouses; Amazon Air, a fleet of aircraft; a fleet of vans for "last mile" delivery; Prime Air, a network of drones; and Amazon Scout, a fully-electronic unmanned delivery vehicle system.

### B. Amazon Exploited Its Third-Party Sellers in an Anticompetitive Manner

50.     As set forth below, Defendants misrepresented and failed to disclose the Company's exploitation of third-party sellers on Amazon's website, such as Amazon's misappropriation of third-party seller's data for its own benefit.  By way of background, Amazon introduced its Marketplace platform in 2000, offering a centralized website through which third-party sellers could sell their goods, which it called "Fulfilled by Amazon" ("FBA").  Third-party sellers increasingly availed themselves of Amazon's centralized FBA Marketplace as Amazon became a ubiquitous online seller of goods, replacing individual websites across the Internet.

51.     Amazon's third-party sellers sell their products on the Amazon Marketplace and pay fees to Amazon.  On the Amazon Marketplace, consumers can buy items directly from the Company or they can purchase from independent third-party sellers offering their own products for sale.  However, in exchange for giving the parties access to its platform to sell their products, Amazon gathered sales data from those third parties and used it to introduce its own competing products.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 12 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

52.     Former Amazon employees have confirmed that Amazon used sales data gleaned from the Company's Marketplace as a sales platform to obtain an anticompetitive and unfair advantage in competing with other sellers on the platform.  As reported in *The Capitol Forum* on November 5, 2018, an Amazon employee speaking on the condition of anonymity revealed, "[e]verybody [at Amazon] has access to all the seller data," including "who purchased what, what products were selling."  This Amazon employee further explained that Amazon employees can "data mine all the best-selling products and go make a private label."

53.     As noted elsewhere herein, an April 23, 2020 *Wall Street Journal* report confirmed that Amazon, through its executives, intentionally violated corporate policies that had were meant to create a wall between the Company's private-label business and its Marketplace business.  Based on interviews with former Company employees, *Wall Street Journal* reported that the use of data obtained through Amazon's Marketplace was common practice and discussed openly in meetings the employees attended.  Moreover, executives had access to data containing proprietary information that they used to research best-selling items Amazon was interested in competing with.

54.     The reporting by *Wall Street Journal*—and other media outlets—laid bare Amazon's systemic improper and anticompetitive practices, including its treatment of third-party sellers.  It was thus hardly surprising when Congress opted to investigate, among other issues, how Amazon was utilizing competitively sensitive information about competitors' products to boost its own retail activities, at the expense of the third-party sellers on its Marketplace.

55.     In June 2019, the House Judiciary Committee initiated a bipartisan investigation into the state of competition online, spearheaded by the Subcommittee.  As part of a top-to-bottom review of the market, the Subcommittee examined the market dominance of Amazon, Apple, Facebook, and Google (and their business practices) to determine how their power affects the U.S. economy and democracy in general.  Over the course of its investigation, the Subcommittee held seven congressional hearings; reviewed nearly 1.3 million internal documents and communications from the investigated companies; analyzed submissions from 38 antitrust experts; and conducted interviews with more than 240 market participants, former employees of the

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 13 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

investigated firms, and other individuals.  Only a small amount of the internal Amazon documents reviewed by the Subcommittee are publicly available.[2]

56.  A year after initiating the investigation, the Subcommittee received testimony from Defendant Bezos.  The Subcommittee pressed for answers about Amazon's business practices and the extent to which Amazon has exploited, entrenched, and expanded its power over digital markets in anticompetitive and abusive ways.  According to the Subcommittee, Bezos's answers were often evasive and non-responsive.

57.  On October 2, 2020, the Subcommittee released an initial report finding that Amazon exploited third-party sellers on its platform.[3]  The Subcommittee published its final report in July 2022.[4]  The Subcommittee's investigation uncovered substantial evidence that Amazon (i) routinely exploited the third-party sellers on its platform; (ii) routinely misappropriated third-party seller data in order to manufacture and market its own private-label products; (iii) engaged in self-preferencing whereby it directed customers to its own products as opposed to third party sellers; and (iv) tied and bundled its products by forcing third-party sellers to pay for fulfillment and logistics services in order to have a chance to compete on the platform and get preferential treatment in search rankings and the "Buy Box."  The Buy Box is displayed prominently on Amazon and allows customers to add items from a specific retailer directly into their shopping carts.  Winning the Buy Box is key for Marketplace sellers as the vast majority of transactions are conducted through the Buy Box.[5]

58.  Amazon downplayed the Subcommittee's findings, stating that:

> All large organizations attract the attention of regulators, and we welcome that scrutiny.  But large companies are not dominant by definition, and the presumption that success can only be the result of anti-competitive behavior is simply wrong.

---

[2]  https://judiciary.house.gov/online-platforms-and-market-power/amazon-documents.htm.

[3]  The House Committee on the Judiciary, Investigation of Competition in Digital Markets https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf?utm_campaign=4493-519 (Oct. 2, 2020).

[4]  https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf.

[5]  European Commission, Antitrust: Commission opens investigation into possible anti-competitive conduct of Amazon, https://ec.europa.eu/commission/presscorner/detail/en/IP_19_4291 (July 17, 2019).

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 14 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

And yet, despite overwhelming evidence to the contrary, those fallacies are at the core of this regulatory spit-balling on antitrust.  This flawed thinking would have the primary effect of forcing millions of independent retailers out of online stores, thereby depriving these small businesses of one of the fastest and most profitable ways available to reach customers. For consumers, the result would be less choice and higher prices.  Far from enhancing competition, these uninformed notions would instead reduce it.[6]

59.     Throughout the Class Period, Amazon denied any wrongdoing, telling investors, for example, that:  "***We helped independent sellers compete against our first-party business*** by investing in and offering them the very best selling tools we could imagine and build"; "***[Amazon] do[es] not use any of that specific seller data in creating our own private brand products.***"; "***We do not favor . . . products that use FBA over others***"; and "***[o]ur algorithms, such as the buy box, is [sic] aimed to predict what customers want to buy . . . [a]nd we apply the same criteria whether you're a third-party seller or Amazon to that*** because we want customers to make the right purchase regardless of whether it's a seller or Amazon."

### 1.      Amazon Misappropriated Third-Party Sellers' Data

60.     The Subcommittee found that one of the ways in which Amazon treats third-party sellers unfairly centers on Amazon's asymmetric access to and use of third-party seller data.[7] During its investigation, the Subcommittee uncovered significant evidence that Amazon leverages its access to third-party sellers' data to identify and replicate popular and profitable products from among the hundreds of millions of listings on its Marketplace.[8]  Armed with the third-party competitors' data, Amazon:  (1) copies the product to create a competing private-label product;[9] or (2) identifies and sources the product directly from the manufacturer to free ride off the seller's

---

[6]  Annie Palmer, Jordan Novet, Amazon bullies partners and vendors, says antitrust subcommittee, CNBC  (Oct. 6,  2020)  https://www.cnbc.com/2020/10/06/amazon-bullies-partners-and-vendors-says-antitrust-subcommittee.html.

[7]  Innovation and Entrepreneurship Hearing at 5 (statement of Stacy Mitchell, Co-Dir., Inst. for Local Self-Reliance).

[8]  *See, e.g.*, Interview with Source 158 (July 2, 2020); Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary (July 22, 2020) (on file with Comm.).

[9]  *See, e.g.*, Interview with Jason Boyce, Founder & CEO, Avenue7Media (Sept. 15, 2020).

efforts, and then cuts that seller out of the equation.[10]  As the Institute for Local Self-Reliance's Stacy Mitchell told the Subcommittee, "Amazon's power as a gatekeeper allows it to maintain a God-like view of the transactions of rival businesses and customers, and use this data to move into new markets with a built-in advantage."

61.   The Company claims that third-party listings far outnumber Amazon's first-party listings.[11]  In a 2018 shareholder letter, Defendant Bezos wrote, "Third-party sellers are kicking our first-party butt. Badly."[12]  In response to a question from the Subcommittee, however, Amazon admitted that by percentage of sales—a more telling measure than listings—Amazon's first-party sales are significant and growing in a number of categories.  For example, in books, Amazon owns 74 percent of sales, whereas third-party sellers account for only 26 percent of sales.[13]  At the category level, it does not appear that third-party sellers are "kicking" Amazon's first-party "butt."

---

[10] *See, e.g.*, Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary (July 22, 2020) (on file with Comm.).

[11] *Id*. at 303.

[12] Jeff Bezos, 2018 Letter to Shareholders, THE AMAZON BLOG: DAY ONE (Apr. 11, 2019), https://blog.aboutamazon.com/company-news/2018-letter-to-shareholders.

[13] CEO Hearing at 304 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

Amazon is poised to overtake its third-party sellers in several categories as its first-party business continues to grow:



**Third-Party vs. First-Party Listings
and Sales on Amazon**[14]

62.     Amazon claimed in response to questions from the Subcommittee to Bezos that it has taken and continues to take steps "to protect seller data by instituting its voluntarily-adopted Seller Data Protection Policy, which prohibits Amazon Retail teams from using non-public seller-specific data to compete against third-party sellers."[15]  However, an internal Amazon document from 2014, titled "Frequently Asked Questions," indicates that Amazon was aware that the Seller Data Protection Policy had significant loopholes.  For example, the document indicates that even seller-specific data can be used for "strategic business decision at the category level or above."[16]

63.     Following up on public reporting and information collected during the investigation evidencing that Amazon was abusing its access to third-party sellers' data, Representative Pramila Jayapal (D–WA) asked Defendant Sutton about this precise issue at a Subcommittee hearing in

---

[14]  *Id*. at 303–04.

[15]  Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00142724 (on file with Comm.); CEO Hearing at 281 (response to Questions for the Record of Jeff Bezos, CEO, Amazon. com, Inc.).

[16]  Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00221869 (June 30, 2014) (on file with Comm.).

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 17 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

July 2019.  Defendant Sutton testified unequivocally that "We do not use [third-party sellers'] individual data when we're making decisions to launch private brands."[17]

64.  *Wall Street Journal* reported on April 23, 2020, that executives in Amazon's private-label division "had access to data containing proprietary information that they used to research bestselling items they might want to compete against, including on individual sellers on Amazon's website."[18]  According to the sources, "[i]f access was restricted, managers sometimes would ask an Amazon business analyst to create reports featuring the information . . . including one who called the practice 'going over the fence.'"[19]  In other cases, "supposedly aggregated data was derived exclusively or almost entirely from one seller."[20]  Thus, while Amazon claimed that it did not use individual third-party seller data, it could still gain critical information from a third-party seller by combining its data with another much smaller seller and gleaning all the information it needed from this supposedly "aggregated" data.  *Wall Street Journal* staff conducted interviews with more than 20 former employees and at least one current employee of Amazon's private-label business and also reviewed Amazon documents for the report.[21]  The employees relayed that Amazon's use of individual third-party seller's data was a "common practice that was discussed openly in meetings they attended."[22]  According to the sources, pulling data on competitors, including individual sellers, for example, was "standard operating procedure" when making products such as electronics, suitcases, sporting goods, or other lines.[23]  "We knew we shouldn't," said one former employee who accessed the data and described a pattern of using it to launch and

---

[17]  Innovation and Entrepreneurship Hearing at 42 (statement of Nate Sutton, Assoc. Gen. Couns., Competition, Amazon.com, Inc.).

[18]  Dana Mattioli, Amazon Scooped Up Data from Its Own Sellers to Launch Competing Products, WALL ST. J. (Apr. 23, 2020), https://www.wsj.com/articles/amazon-scooped-up-datafrom-its-own-sellers-to-launch-competing-products-11587650015.

[19]  *Id.*

[20]  *Id.*

[21]  *Id.*

[22]  *Id.*

[23]  *Id.*

benefit Amazon products.  "But at the same time, we are making Amazon branded products, and we want them to sell."[24]

65.     Amazon claimed that it was using only "aggregated" data—data compiled from a multitude of third-party sellers, but even this later representation was misleading.  In many instances, the "aggregated" data actually derived exclusively or almost entirely from one seller.[25] In one case, for example, Amazon employees reportedly used non-public sales data about a third-party seller of car-trunk organizers named Fortem to develop an Amazon private-label version of the very same product.[26]  Fortem accounted for 99.95% of total sales in the car-trunk organizer product category.  But because Fortem did not account for 100% of total sales, Amazon employees were allowed to misappropriate Fortem's confidential information.  In other instances, if there was only one seller of an item, and Amazon was selling returned or damaged versions of that item through its Amazon Warehouse Deals clearance account, Amazon considered that "aggregate" data—and hence permissible for its employees to use.[27]

66.     In a written statement issued in response to the *Wall Street Journal* article, Amazon said only that "we strictly prohibit our employees from using nonpublic, seller-specific data to determine which private label products to launch."[28]

67.     In light of the April 2020 *Wall Street Journal* report, the Subcommittee requested that Bezos testify to address the possibility that Defendant Sutton had misled Congress.[29]  Despite

---

[24]  *Id.*

[25]  *Id.*

[26]  *Id.*

[27]  *Id.*

[28]  *Id.*

[29]  Letter from Hon. Jerrold Nadler, Chair, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chair, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. Joe Neguse, Vice Chair, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. Pramila Jayapal, Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. On the Judiciary, Hon. Ken Buck, Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. On the Judiciary & Hon. Matt Gaetz, Member, Subcomm. on Antitrust, Commercial and Admin. Law

---

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 19 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

numerous references to them in Amazon's internal documents, Bezos claimed to be unaware of these practices.  According to Bezos, "Amazon first learned about the alleged violations of Amazon's voluntarily adopted Seller Data Protection Policy recently reported in *The Wall Street Journal* from *The Wall Street Journal*."[30]

68.     Representative Ken Buck (R–CO) similarly raised this issue with Defendant Bezos, stating, "I'm concerned that you've used Amazon's dominant market position to unfairly harm competition.  We've heard from a number of companies that Amazon uses proprietary data from third-party companies to launch its own private-label products."[31]     Later in the hearing, Representative Kelly Armstrong (R–ND) described this as an "important issue," and asked whether "Amazon is conducting an internal investigation into the use of third-party data," to which Defendant Bezos answered in the affirmative.

69.     In October 2020, approximately six months after Amazon said that it had initiated the investigation,[32] the Company informed the Committee of its completion.[33]  According to Amazon's Vice President of Public Policy, Brian Huseman, "Amazon's records of past data queries related to the two products cited in *The Wall Street Journal* report show that a single former employee pulled and analyzed only aggregate data for both products in compliance with the Seller

---

of the H. Comm. on the Judiciary, to Jeff Bezos, CEO, Amazon.com, Inc. (May 1, 2020) (on file with Comm.).

[30]  CEO Hearing at 280 (response to Questions for the Record of Jeff Bezos, CEO, Amazon. com, Inc.).

[31]  *Id*. at 121 (question of Rep. Ken Buck (R–CO), Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[32]  Amazon Public Policy (@amazon_policy), TWITTER (Apr. 24, 2020, 3:36 p.m.), https://twitter.com/amazonlpolicy/status/1253769684425625601.

[33]  Letter from Brian Huseman, Vice President, Pub. Pol'y, Amazon.com, Inc., to Hon. Jerrold Nadler, Chair, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chair, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. Jim Jordan, Ranking Member, H. Comm. on the Judiciary (Oct. 4, 2020) (on file with Comm.).

---

Data Protection Policy."[34]   But that claim is at odds with the evidence uncovered by the Subcommittee.[35]  For example, in a submission to the Subcommittee, a former employee said:

> In 2010, I started working on the Amazon marketplace team . . . . It was widely known that many (10+) of my peers were running very successful [third-party] accounts, where they were pulling private data on Amazon seller activity, so they could figure out market opportunity, etc.  Totally not legitimate, but no one monitored or seemed to care.[36]

70.     Referring to accessibility of third-party seller data, the same individual told the Subcommittee, "It's a candy shop, everyone can have access to anything they want," and added, "There's a rule, but there's nobody enforcing or spot-checking.  They just say, don't help yourself to the data . . . it was 'wink, wink don't access."[37]

71.     As reported in its final July 2022 report, the Subcommittee also interviewed another third-party seller who described how Amazon uses a request for proof of authenticity to collect proprietary information about a seller's business.  According to the seller, Amazon will submit a product authenticity claim to sellers, forcing the retailer to submit their original sales receipts as proof that the items are authentic.[38]  Although a seller is supposed to be able to black out price information, sometimes the platform will reject a submission on the basis that it is an "altered document."[39]  With insight into the seller's costs and supplier, combined with its knowledge of the seller's retail price among a virtually unfathomable amount of other data, Amazon Retail can easily replicate the seller's listing to offer a competing product.

---

[34] *Id.*

[35] *See* Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary (July 22, 2020) (on file with Comm.) (describing a member's experience in which Amazon allowed a distributor to sell a product for about a year, "then went out and replicated the product and began selling their own branded product, terminating the distributor . . . . Amazon became the winner and the distributor was left empty handed.").

[36] Submission from Source 91, to H. Comm. on the Judiciary (Sept. 16, 2020) (on file with Comm.).

[37] *Id.*

[38] Interview with Source 154 (July 2, 2019).

[39] *Id.*

---

72.     One former third-party seller and retired U.S. Marine told the Subcommittee about several instances—over seventeen years—when Amazon had leveraged his work, undercut him on price, and eventually drove him out of business.  In each instance, he had to change his business model after Amazon took over the Buy Box[40] for his listings, "killing" his sales.[41]  On at least two different occasions, his company did all the legwork to create a new, top-selling product or product line, as well as creating the product listings, only to have Amazon copy the idea and offer a competing product.  Amazon used different tactics each time, but the result was always the same: Amazon profited from his work and made it impossible for him to fairly compete.[42]

73.     As part of his last attempt to sell on Amazon, his business created its own line of table game products with a unique design and color palette.  Once these products became top sellers, Amazon again swooped in to reap the rewards of his work.  Amazon copied his designs, down to the color palette, and started selling their competing products at unsustainable prices. Ultimately, he exited his seller business, gave up on trying to bring new products to consumers, and founded a consulting agency for Amazon sellers.[43]

74.     In addition to its private-label business, Amazon also uses third-party seller data to benefit its Amazon Retail business, where the Company functions more like a retailer.  At the Subcommittee's July 29, 2020 hearing, Chair David N. Cicilline (D–RI) asked Defendant Bezos about this conduct, recounting the story that a former third-party seller shared with the Subcommittee:

> During this investigation, we have heard so many heartbreaking stories of small businesses who sunk significant time and resources into building a business and selling on Amazon, only to have Amazon poach their best-selling items and drive them out of business.

---

[40]  The Subcommittee explains how the Buy Box works:  "When a shopper lands on a product detail page, Amazon chooses one seller whose details appear in the Buy Box—the white box on the right-hand side of the page.  When a customer clicks on the 'Add to Cart' button, the sale goes to the seller in this box."  https://www.govinfo.gov/content/pkg/CPRT-17HPRT47832.pdf at 209.

[41]  Interview with Jason Boyce, Founder & CEO, Avenue7Media (Sept. 15, 2020).

[42]  *Id.*

[43]  *Id.*

---

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 22 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

So I want to talk to you about one company that really stood out from the rest. I want you to pay close attention to how they described your partnership, Mr. Bezos. We heard from a small apparel company that makes and sells what they call "useful apparel" for people who work on their feet and with their hands, like construction workers and firefighters.

This particular business discovered and started selling a unique item that had never been a top seller for the brand. They were making about $60,000 a year on just this one item. One day, they woke up and found that Amazon had started listing the exact same product, causing their sales to go to zero overnight. Amazon had undercut their price, setting it below what the manufacturer would generally allow it to be sold so that, even if they wanted to, they couldn't match the price.[44]

75.     In addition to collecting data relating to sales, Amazon can also reverse engineer third-party sellers' cost structures through the tools that it offers sellers to track profits, costs, ad spend, and other expenses, as well as fulfillment services through FBA. An internal Amazon document made public recently by the Subcommittee shows that Amazon can use its FBA service as an avenue to identify popular third-party seller items and gather competitively sensitive information about them.[45] Defendant Olsavsky was copied on this correspondence.[46] Thus, FBA provides another avenue for Amazon to access competing sellers' third-party data.

76.     The Subcommittee is not the only governmental body that investigated Amazon and found evidence of theft and other misconduct by Amazon *vis-à-vis* its third-party sellers. The European Commission ("EU" or the "Commission") also began scrutinizing Amazon about its treatment of third-party sellers as far back as September 2018.[47]

77.     On July 17, 2019, the EU issued a press release announcing that it had opened a formal antitrust investigation to assess whether Amazon had breached the Commission's

---

[44] CEO Hearing at 116 (question of Rep. David N. Cicilline (D–RI), Chair, Subcomm. On Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary), https://www.govinfo.gov/content/pkg/CHRG-116hhrg41317/html/CHRG-116hhrg41317.htm (July 29, 2020).

[45] *See, e.g.*, *id.* at AMAZON–HJC–00207035 to –00207036 (Sept. 19, 2013) (on file with Comm.) ("On the top selling Owl necklace . . . we should go deep and see what we can learn including how much it would costs [sic] to manufacture this?").

[46] *Id.*

[47] https://techcrunch.com/2020/11/10/europe-lays-out-antitrust-case-against-amazons-use-of-big-data/.

---

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 23 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

competition rules by using non-public data from independent retailers who sell on its Marketplace.[48]

78.     The Commission announced that, "[a]s part of its in-depth investigation," it would look into:

- the standard agreements between Amazon and marketplace sellers, which allow Amazon's retail business to analyse and use third party seller data.  In particular, the Commission will focus on whether and how the use of accumulated marketplace seller data by Amazon as a retailer affects competition; and

- the role of data in the selection of the winners of the 'Buy Box' and the impact of Amazon's potential use of competitively sensitive marketplace seller information on that selection.   The 'Buy Box' is displayed prominently on Amazon and allows customers to add items from a specific retailer directly into their shopping carts. Winning the 'Buy Box' seems key for marketplace sellers as a vast majority of transactions are done through it.[49]

79.     As part of their investigation, EU regulators obtained a massive data set from Amazon—covering over 80 million transactions and more than 100 million product listings on its European marketplaces—to analyze how its business uses merchant data.[50]

80.     On November 10, 2020, news agencies reported that, as a result of its investigation, the Commission laid out a first set of antitrust charges against Amazon focused on its dual role as a platform for other sellers but also a retailer itself on its own platform—and its cumulative use of third party merchant data to underpin Amazon's own retail decisions.[51]   Competition chief Margrethe Vestager said the Commission's preliminary conclusion was that Amazon abused its

---

[48] European Commission, *Antitrust: Commission opens investigation into possible anti-competitive conduct of Amazon*, https://ec.europa.eu/commission/presscorner/detail/en/IP_19_4291 (July 17, 2019).

[49] *Id.*

[50] *Id.*

[51] https://techcrunch.com/2020/11/10/europe-lays-out-antitrust-case-against-amazons-use-of-big-data/.

market position in France and Germany, its biggest markets in the European Union, via the Company's use of big data to "illegally distort" competition into online retail markets.[52]

81.     Vestager explained that Amazon has, "for example, access to data on the number of ordered and shipped units of sellers' products, revenues on the marketplace, the number of visits to sellers' offers, information relating to shipping—including the past performance of the seller, the consumers' claims on the sellers' products including the activated guarantees," and said that "Amazon gets this data from every seller, every listed product, every purchase on its platform."[53] Vestager said that "Amazon is data driven.  It's a highly automated company—where business decisions are based on algorithmic tools.  Our investigation shows that very granular, real-time business data relating to third party sellers' listings and transactions on the Amazon platform systematically feed into the algorithm of Amazon's retail business.  It is based on these algorithms that Amazon decides what new products to launch, the price of each individual offer, the management of inventories, and the choice of the best supplier for a product."[54]

82.     The EU also concluded that Amazon had accumulated the business data of more than 800,000 active sellers in the European Union, covering more than one billion products, thus putting individual sellers on its platform who did not have access to that information trove at a huge disadvantage.[55]

83.     Reached for comment, Amazon's spokesperson vociferously disagreed with the Commission's assessment that Amazon uses data from third-party sellers on its platforms to benefit Amazon's own business, stating:  "We disagree with the preliminary assertions of the European Commission and will continue to make every effort to ensure it has an accurate understanding of the facts."[56]

---

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 25 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

84.     In response to the Commission's investigations, Amazon eventually agreed to take several remedial actions.  Specifically, as CNN reported on July 14, 2022, Amazon offered that day to change its business practices in Europe in order to address concerns over its use of non-public third-party seller data.[57]  Under the proposed changes, Amazon has offered not to use data gathered from third-party sellers for its own retail decisions, such as determining what products to sell under Amazon's private label.[58]

85.     A separate investigation conducted by *Reuters* corroborates the wrongdoing uncovered by the Subcommittee and the EU.  On October 13, 2021, *Reuters* reported that a review it conducted of internal Amazon documents shows that the Company ran a systematic campaign of creating knockoffs and manipulating search results to boost its own product lines in India, one of the Company's largest growth markets.[59]  *Reuters* reviewed thousands of pages of internal Amazon documents, including emails, strategy papers and business plans in preparation for its report.[60]

86.     The documents *Reuters* reviewed reveal how Amazon's private-brands team in India secretly exploited internal data from Amazon.in, Amazon's India website, to copy products sold by other companies, and then offered them on its platform.[61]  The employees also drummed up sales of Amazon private-brand products by rigging Amazon's search results so that the Company's products would appear, as one Amazon 2016 strategy report for India put it, "in the first 2 or three . . . search results" when customers were shopping on Amazon.in.[62]

87.     The internal documents also show that Amazon employees studied proprietary data about other brands on Amazon.in, including detailed information about customer returns, in order

---

[57] Amazon offers concessions to resolve EU antitrust probes, https://www.cnn.com/2022/07/14/tech/amazon-concessions-eu-antitrust (July 14, 2022).

[58] *See* https://ec.europa.eu/competition/antitrust/cases1/202229/AT_40462_8414012_7971_3.pdf.

[59] *See* https://www.reuters.com/investigates/special-report/amazon-india-rigging.

[60] *Id.*

[61] *Id.*

[62] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 26 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

to identify and target goods—described as "reference" or "benchmark" products—and "replicate" them.[63]  As part of that effort, the 2016 internal report laid out Amazon's strategy for a brand the Company originally created for the Indian market called "Solimo."[64]  The Solimo strategy, according to Amazon, was simple: "use information from Amazon.in to develop products and then leverage the Amazon.in platform to market these products to our customers."[65]  The Solimo project in India has had international impact, with numerous of Solimo-branded health and household products being offered for sale on Amazon's U.S. website, Amazon.com.[66]

88.    The 2016 report also shows that Amazon employees working on the Company's own products, known as private brands or private labels, planned to partner with the manufacturers of the products targeted for copying, because they learned that those manufacturers employ "unique processes which impact the end quality of the product."[67]  The report, entitled "India Private Brands Program," stated that:  "It is difficult to develop this expertise across products and hence, to ensure that we are able to fully match quality with our reference product, we decided to only partner with the manufacturers of our reference product."  It termed such manufacturer expertise "Tribal Knowledge."[68]

89.    *Reuters* reported that the internal Amazon documents it reviewed showed for the first time that manipulating search results to favor Amazon's own products, as well as copying other sellers' goods, were part of a formal, clandestine strategy at Amazon—and that high-level executives were told about it.  The documents showed that at least two Amazon executives reviewed the India strategy—Senior Vice Presidents Diego Piacentini, who has since left the Company, and Russell Grandinetti, who currently runs Amazon's international consumer

---

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 27 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

business.[69]  Grandinetti also served as Senior Vice President of Kindle Content at Amazon.com, Inc., reporting directly to Defendant Bezos.[70]  During the Class Period, Grandinetti also reported at least directly to Jeff Wilke, CEO of Amazon's Worldwide Consumer business, who in turn reported directly to Bezos.[71]  Grandinetti and Defendant Olsavsky were also part of the elite Amazon S Team, a very small, close-knit senior leadership team of Amazon executives who worked closely with Amazon's CEO, Bezos, on all important matters affecting the Company.[72]

90.   As with other allegations of wrongdoing, Amazon flatly denied *Reuters*' accounts, stating in a written response to the article that "We believe these claims are factually incorrect and unsubstantiated."[73]  Amazon insisted that it "strictly prohibits the use or sharing of non-public, seller-specific data for the benefit of any seller, including sellers of private brands."  The Company further claimed that the way it displays search results does not favor private-brand products.  "We display search results based on relevance to the customer's search query, irrespective of whether such products have private brands offered by sellers or not."[74]

91.   An internal audit report reviewed by *Politico* shows that Amazon's senior leadership knew at least as early as 2015 that numerous employees had access to sensitive third-party seller data.  In an article published on April 30, 2021, *Politico* reported that an internal Amazon audit report seen by *Politico* squarely warned Amazon's senior leadership in 2015 that 4,700 members of its workforce working on its own sales had unauthorized access to sensitive third-party seller data on the platform.[75]

---

[69] *Id.*

[70] https://www.justice.gov/sites/default/files/atr/legacy/2013/07/18/px-0835.pdf.

[71] https://www.cnbc.com/2017/11/28/who-are-amazons-top-executives.html.

[72] *See* https://www.seattletimes.com/business/amazon/whos-in-charge-at-amazon-moves-on-secretive-s-team-signal-tech-giants-priorities/.

[73] https://www.reuters.com/investigates/special-report/amazon-india-rigging/.

[74] *Id.*

[75] https://www.politico.eu/article/amazon-seller-data-company-sales/.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 28 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

92.     According to the audit report, top management at Amazon, including Jeff Wilke, the Company's number-two executive until he left the Company in March of 2021, and Defendant Zapolsky knew that insufficiently robust access restrictions meant scores of insiders could inappropriately access seller-specific data.[76] "Permissions are not adequately restricted, making it possible for unauthorized users to view Seller-specific information such as performance history and authentication keys, edit inventory levels and pricing, and manage returns," the report stated.[77] The audit noted that Amazon left its "spoofer access" tool, a digital tool that makes improper use of third-party data possible, wide open to unauthorized access by employees across the world— including in China—to access and modify sensitive information.[78]

93.     The report also underscored that an earlier internal audit had identified similar failings in 2010.[79] In other words, Amazon had done little to nothing to address the issue.

94.     An Amazon spokesperson responded to *Politico*'s revelations in generic terms, saying that like all companies, it audits its policies for compliance and makes improvements based on its findings.[80] "This includes Amazon's internal seller data protection policy, which limits the use of seller data."[81]

95.     *Politico* noted that "Amazon has long denied reports that employees access data on individual sellers to develop competing products."[82]

96.     Amazon is also the subject of investigations by the FTC and the SEC.  On June 1, 2019, *The Washington Post* reported that the FTC planned to investigate Amazon as part of a

---

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 29 -
2:22-CV-00617-JHC

broader investigation into the large technology companies.[83]   This followed an earlier announcement that the FTC had established a special task force to monitor the big tech companies and to investigate "any potential anticompetitive conduct in those markets, and tak[e] enforcement actions when warranted."[84]   According to Gene Kimmelman, the president of Public Knowledge, a Washington-based consumer advocacy group:  "This should be a wake-up call to both Google and Amazon to behave themselves because it at least shows that the Justice Department and FTC are thinking about them."[85]

97.   In June 2019, Vox also reported that the FTC had started questioning some of Amazon's competitors about its business practices, including how Amazon is competing against its own sellers, according to someone briefed on the discussions.[86]

98.   *Bloomberg* reported that FTC investigators began interviewing Amazon's third-party sellers in September 2019 as part of a "sweeping probe" to determine whether Amazon is using its market power to hurt competition.[87]   Reportedly, several attorneys and an economist have been conducting interviews that typically last about 90 minutes.[88]   According to Michael Kades, who spent 20 years at the FTC, the length of the interviews and the manpower devoted to examining Amazon point to a serious inquiry rather than investigators merely responding to complaints and going through the motions:  "Early in an investigation, that's a sign of staff doing a serious job," Kades said.  "They're spending lots of time with witnesses and trying to really

---

[83]  Tony Romm, *Amazon could face heightened antitrust scrutiny under a new agreement between U.S. regulators*, Wash. Post (June 1, 2019) https://www.washingtonpost.com/technology/2019/06/02/amazon-could-face-heightened-antitrust-scrutiny-under-new-agreementbetween-us-regulators/.

[84]  *Id.*

[85]  *Id.*

[86]  Jason Del Rey, Amazon may soon face an antitrust probe. Here are 3 questions the FTC is asking about it., Vox (June 4, 2019), https://www.vox.com/recode/2019/6/4/18651694/amazon-ftc-antitrust-investigation-prime.

[87]  Spencer Soper & Ben Brody, *Amazon Probed by U.S. Antitrust Officials Over Marketplace*, Bloomberg (Sept. 11, 2019), https://www.bloomberg.com/news/articles/2019-09-11/amazon-antitrust-probe-ftc-investigators-interview-merchants.

[88]  *Id.*

understand what they're saying."[89]   According to reports, regulators are skeptical that shoppers and suppliers have real alternatives to Amazon.[90]

99.    On April 6, 2022, *Wall Street Journal* disclosed that the "SEC Is Investigating How Amazon Disclosed Business Practices."  The article reported, in relevant part, that the SEC "is probing how the technology giant . . . handled disclosures of its employees' use of data from sellers on its e-commerce platform."  The SEC requested emails and communications from several senior Amazon executives.

### 2.    Amazon Tied and Bundled Its Products to the Detriment of Third-Party Sellers

100.    There is a strong link between Amazon Marketplace and Amazon's Fulfillment by Amazon (FBA) program, Amazon's paid logistics service.  A draft Q&A for Defendant Olsavsky before a 2018 earnings call explained the connection between Prime and FBA:  "Prime and FBA reinforce each other—they are inextricably linked.  FBA adds Prime eligible selection. Prime member growth and purchasing habits attract sellers to FBA."  As the Subcommittee found, Amazon used its dominance in each of these markets to strengthen and reinforce its position in the other.

101.    As Amazon's e-commerce business has grown, the Company has also developed a significant logistics business providing fulfillment and delivery services to third-party sellers through its FBA program.  Nearly 85 percent of the top 10,000 Amazon Marketplace sellers reportedly rely on this program to fulfill and deliver their orders. Third-party sellers that use FBA keep their inventory in Amazon's fulfillment centers.[91]

---

[89] *Id.*

[90] *Id.*

[91] The House Committee on the Judiciary, Investigation of Competition in Digital Markets, https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf (July 19, 2022).

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 31 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

102.    As the Company describes it, Amazon's FBA program combines warehousing, packing, and shipping services, and most importantly, access to Prime customers.[92]  A recent consumer survey indicated that 75 percent of Amazon Prime customers specifically search for products flagged as Prime-eligible.   As a result, as the Online Merchant's Guild told the Subcommittee, many sellers will "say that without Prime you are dead."  For a seller's products to obtain the Prime badge, which is essential to making sales on the platform because it boosts search rankings and the ability to get the Buy Box, a seller must either qualify for Amazon's Seller Fulfilled Prime ("SFP") program or use Amazon's FBA service.  On August 18, 2020, Amazon informed sellers of changes to SFP, which rendered it an entirely impractical option for most sellers (by forcing them to meet intense targets for one- and two-day delivery and have nationwide delivery coverage).[93]  Even before this change, only a very small percentage of sellers could meet the onerous eligibility requirements for SFP (there were just 200 total).[94]  This means that paying for FBA is functionally the only way for sellers to get the Prime badge for their product listings.[95]

103.    Due to a lack of alternatives, third-party sellers have no choice but to purchase fulfillment services from Amazon.  More than 73 percent of all Marketplace sellers worldwide reportedly rely on FBA services.[96]  Numerous third-party sellers told the Subcommittee that they felt they have no choice but to pay for FBA to maintain a favorable search result position, to reach

---

[92] Fulfillment by Amazon, AMAZON, https://sell.amazon.com/fulfillment-by-amazon.html (last visited Oct. 4, 2020).

[93] Pascal, The Seller Fulfilled Prime Team, Important Updates to Seller Fulfilled Prime, AMAZON SERVS. SELLER FORUMS (Aug. 18, 2020), https://sellercentral.amazon.com/forums/t/important-updates-to-seller-fulfilled-prime/682240.

[94] *See, e.g.*, Interview with Jason Boyce, Founder & CEO, Avenue7Media, LLC (Sept. 15, 2020) ("It used to be possible, but hard, to be a Seller Fulfilled Prime seller.  There were only 200 sellers that were able to meet the requirements.  What's changing recently is that they used to allow you to have the Prime badge in certain regions, but now they say you need the Prime badge nationally, i.e., you need to have multiple warehouses across the country plus ship on Saturdays, etc.").

[95] Regan McPhee, How to Sell on Amazon Prime in 2020, JUNGLESCOUT (May 27, 2020), https://www.junglescout.com/blog/how-to-sell-on-amazon-prime/.

[96] *See* J. Clament, Fulfillment by Amazon (FBA) Usage Among Top Marketplace Sellers Worldwide 2017–2018, STATISTA (Jan. 7, 2020), https://www.statista.com/statistics/1020046/global-fba-usage-top-amazon-sellers/.

Amazon's more than 112 million Prime members, and to win the Buy Box—through which the vast majority of Amazon sales are made.[97]  Given that FBA is effectively the only way for sellers to get a Prime badge, this indicates that Amazon does favor sellers who use FBA over those who do not for both its search rankings and the Buy Box.[98]

104.    In response to concerns about Amazon tying a seller's ability to make sales on its platform to participation in FBA, Amazon offered contradictory statements.   In the Subcommittee's July 16, 2019 hearing, Representative Lucy McBath (D–GA) asked Defendant Sutton, whether Amazon "privilege[d] vendors who use Amazon Fulfillment Services over those who chose not to."[99]  Defendant Sutton asserted that Amazon "do[es] not favor . . . products that use FBA over others."[100]  He also falsely stated that Fulfillment by Amazon is not a factor in Amazon's ranking algorithm.[101]

105.    At the Subcommittee's July 29, 2020 hearing, Representative Mary Gay Scanlon (D–PA) asked Defendant Bezos about whether there is a connection between a seller's use of FBA and its ability to win the Buy Box.[102]  In response, Defendant Bezos claimed that the Buy Box may "indirectly"  favor products that can be shipped with Prime.[103]  Bezos claimed that it is in the best interest of consumers for sellers to use the FBA and that Amazon "does not consider profitability

---

[97] *See, e.g.*, Submission from Source 43, to H. Comm. on the Judiciary, 30 (Oct. 26, 2019) (on file with Comm.).

[98] The House Committee on the Judiciary, Investigation of Competition in Digital Markets, https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf (July 19, 2022).

[99] Innovation and Entrepreneurship Hearing at 50 (question of Rep. Lucy McBath (D–GA), Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary),            https://www.govinfo.gov/content/pkg/CHRG-116hhrg39901/html/CHRG-116hhrg39901.htm.

[100] *Id.*

[101] *Id.* at 499 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Couns., Competition, Amazon.com, Inc.).

[102] CEO Hearing at 161 (question of Rep. Mary Gay Scanlon (D–PA), Vice Chair, H. Comm. on the Judiciary).

[103] *Id.* (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

---

as part of the Featured Merchant Algorithm."[104]   Documents reviewed by the Subcommittee, however, indicate that Amazon has, in fact, used profitability to Amazon—also referred to internally as "contribution profit" or "CP"—as a factor in awarding the Buy Box.[105]

106.   Furthermore, Amazon's own documents, revealed by the House Judiciary Committee, show that it has considered FBA participation for purposes of determining the Buy

---

[104] *Id*. at 282 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[105] Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00141750 (Mar. 25, 2010) (on file with Comm.).

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 34 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Box winner.[106]  An Amazon document that sets forth pricing rules for a pilot program favors third-party sellers that use FBA over those who do not for awarding the Buy Box:

<b>INTERNAL PRICING STRATEGY DOCUMENT</b>[107]

| From: | Wales, Chance |
| To: | VanDuine, Jason |
| Sent: | 3/25/2010 11:26:35 AM |
| Subject: | RE: SIGN OFF REQUESTED: Pre-WBR Follow-up: Healthcare Pricing Strategy |

ok

**From:** VanDuine, Jason
**Sent:** Thursday, March 25, 2010 9:46 AM
**To:** Wales, Chance
**Cc:** VanDuine, Jason
**Subject:** SIGN OFF REQUESTED: Pre-WBR Follow-up: Healthcare Pricing Strategy
Chance – please sign off (or provide fdbk) before I send to Doug.
Jason

Doug,
You had asked me to help you understand the 'size of the issue' with regards to diverted product as well as clarification on pricing rules/matching for the image competitor simulation in the Healthcare category. Some current data (from February):

1. The top 25 negative CP ASINs in Health & Beauty (all image ASINs) accounted for $265k in negative CP, 46k units and $1.6M in product revenue.
2. The diverted product ASINs (8 of the top 25) accounted for $109k in negative CP (41% of ttl), 14k units (31% of ttl) and $366k (21% of ttl) in product revenue.
3. Babycare products accounted for 14 of the top 25 ASINs (13 diaper and 1 wipe ASIN) and the remaining 3 ASINs are vendor or operational cost issues that are being addressed.
4. The image competitor pilot in Healthcare will address 6 of the 8 ASINs referenced in #2 (it will not address Align and All – both in Nutrition & Wellness)

We do not plan any manipulation to pricing rules in the Healthcare category other than the setting of number of image ASINs to zero.
Use cases (for Pricing Rules): using Prilosec as the example (CP neutral = $27)

| Ref # | Use Case | Amazon Landed Cost | Comp Box Price | Comp Shipping Cost | Comp Landed Price | Amazon Match Price | Non-Prime (1% pad to FBA, 2% pad to 3P) | Prime (5% pad) |
|---|---|---|---|---|---|---|---|---|
| 1 | Walmart (Image Competitor) | $27.00 | $28.00 | $0.97 | $28.97 | $28.00 | Amzn wins buy box | Amzn wins buy box |
| 2 | DAB Nutrition (3P) + FBA | $27.00 | $26.50 | $0.00 | $26.50 | $27.00 | 3P wins buy box | Amzn wins buy box |
| 3 | DAB Nutrition (3P) + no FBA | $27.00 | $26.50 | $0.00 | $26.50 | $27.00 | Amzn wins buy box | Amzn wins buy box |
| 4 | AlltheTimeWholesale + no FBA | $27.00 | $22.00 | $4.50 | $26.50 | $27.00 | Amzn wins buy box | Amzn wins buy box |

The primary change coming is that we will now lose the buy box if 3P merchants continue to price below CP neutral (we will stop at CP neutral unless matching to an image competitor). As long as Prilosec is priced below $27 landed price (excluding buffers), we will lose the buy box. Currently, the lowest landed is under $20.
Estimated impact (based on simulation completed by the Pricing team) is a 6% negative impact on Healthcare category growth and a $.74/unit positive impact on CP. Using OP2 as the base, this would translate to ($750k) in revenue loss and ($775k) gain in CP. We will begin the pilot in April and will measure results on a weekly basis (with highlights in the pre-WBR as appropriate).
If you have any further questions, please let me know.
Jason

107.    One third-party seller provided the Subcommittee with evidence that Amazon favors sellers who participate in Amazon's fulfillment program over sellers who do not.  The seller set up an experiment where he sold the same product, one self-fulfilled and the other fulfilled through FBA, and ran different test cases.[108]  The seller found that, "Even when the consumer price of the self-fulfilled order was reduced and sold for a lower price (7% lower) than the FBA

---

[106]  *Id*. at AMAZON–HJC–00142724.

[107]  Prepared by the Subcommittee based on Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00141750 (Mar. 5, 2010) (on file with Comm.).

[108]  Submission from Source 43, to H. Comm. on the Judiciary, 29 (Oct. 26, 2019) (on file with Comm.).

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 35 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

offer, the FBA still 'won' the 'Buy Box.'"[109]  The seller indicated that, without this favorable treatment for FBA, it would not choose to use FBA, as it found Amazon's fulfillment service was often slower and less reliable than self-fulfillment.[110]

108.    Although Defendant Bezos told the Subcommittee that Fulfillment by Amazon "is probably the greatest invention that we ever created for sellers," and that "it's working for sellers," information that the Subcommittee reviewed indicated that the opposite is true.[111]  One third-party seller told the Subcommittee, "We use both FBA and self-fulfillment, [and] all of our negative comments are on items shipped through FBA."[112]  According to another seller that uses FBA, at one point, Amazon decided to change the packaging on her products from cardboard boxes to padded envelopes, causing damage to her products in transit.  When the items started arriving at her customers' homes in a damaged state, this caused a surge of negative reviews and requests for returns.  When she asked Amazon to remove these bad reviews, which were caused by FBA's shipping methods, Amazon refused.[113]

109.    A competing online marketplace described to the Subcommittee how Amazon's FBA program makes it more difficult to compete with Amazon, stating, "[T]hrough anticompetitive strategies and practices by Amazon, many . . . sellers are being pulled into Amazon's tied marketplace-and-ecommerce-fulfilment ecosystem in a manner that makes them not only less independent but directly dependent on Amazon."[114]  It further explained that, because of Amazon's dominance in online commerce, "Even sellers who sell on other marketplaces are pushed into FBA, because it is the only practicable way to obtain sales on the Amazon

---

[109]  *Id.*

[110]  *Id.*; *see also* Interview with Source 920 (July 14, 2020); Interview with Source 100 (July 24, 2020).

[111]  CEO Hearing at 161 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[112]  Interview with Source 89 (July 22, 2020).

[113]  Interview with Source 149 (Feb. 26, 2020).

[114]  Submission from Source 11, to H. Comm. on the Judiciary, 1 (Oct. 14, 2019) (on file with Comm.).

marketplace."[115]   In addition to the Subcommittee's investigation, described more fully below, antitrust enforcement agencies are currently investigating Amazon for tying these two services together.[116]

110.    The Subcommittee is not the only independent body that found Amazon has engaged in such misconduct.  On April 16, 2019, the Italian Competition Authority announced it was launching a probe of Amazon over concerns that the Company was giving sellers using its logistics service a better chance to appear on the Buy Box.[117]  Competition Authority officers carried out inspections, with the support of the Special Antitrust Unit of the Guardia di Finanza, at some of Amazon's premises.[118]

111.    Eventually, news outlets announced on December 9, 2021 that the Italian regulators hit Amazon with a €1.1 billion fine for promoting its own logistics, or fulfillment, service that ships and delivers packages, on its Italian platform to the detriment of third-party sellers who did not use it.[119]  The misconduct dated from at least 2016.[120]  Based on its investigation, the Italian regulator found that third-party sellers who do not use Amazon's fulfillment service are excluded from "a set of advantages essential for obtaining visibility and better sales prospects."[121]  Those included had better access to Amazon's "most loyal and high-end customers" who use Amazon

---

[115] *Id.* at 2.

[116] *See, e.g.*, Press Release, It. Competition Auth., Amazon: Investigation Launched on Possible Abuse of a Dominant Position in Online Marketplaces and Logistic Services (Apr. 15, 2019), https://en.agcm.it/en/media/press-releases/2019/4/A528   (announcing   the   launch   of   an investigation into whether "Amazon would unduly exploit its dominant position in the market for e-commerce platforms intermediary services in order to significantly restrict competition in the e-commerce logistics market, as well as—potentially—in the e-commerce platform market, to the detriment of final consumers.").

[117] *Id.*

[118] *Id.*

[119] https://www.france24.com/en/europe/20211209-italy-slaps-amazon-with-%E2%82%AC1-1-billion-fine-for-abusing-dominant-market-position.

[120] *Id.*

[121] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 37 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Prime, the Company's loyalty program.[122]  The regulator concluded that "Amazon has artificially combined two distinct services:  the presence on the platform at remunerative conditions (possibility of not being subject to the evaluation of one's own performance, of offering products with the Prime label, of selling during special events and of having a high chance of winning the BuyBox) and the FBA service for the fulfillment of orders—in order to create an illicit incentive to purchase FBA, in the absence of alternative ways of accessing the same advantages, apart from the use of FBA."[123]

112.   Additionally, the regulator found that a tough performance measurement system is reserved for sellers who do not use Amazon's logistics system, which can lead, if failed, to suspension of the seller's account.[124]

113.   In light of this misconduct, the regulator directed Amazon to grant sales privileges and visibility to all third-party sellers who meet fair and non-discriminatory standards for fulfillment, and to decide and publish such standards.[125]

114.   Once again, Amazon denied any misconduct, stating that "We strongly disagree with the decision of the Italian Competition Authority."  "The proposed fine and remedies are unjustified and disproportionate," the Company said in a statement.[126]  Amazon said it would appeal the ruling, asserting that signing up for the fulfillment service was not obligatory and that vendors already access to Amazon Prime customers in Italy through other platforms.[127]

115.   On November 10, 2020, the European Commission also announced that it opened a second formal investigation into the possible preferential treatment of Amazon's own retail offers

---

[122]  *Id.*

[123]  https://www.competitionpolicyinternational.com/the-italian-competition-authoritys-decision-in-the-amazon-logistics-case-self-preferencing-and-beyond/.

[124]  https://www.france24.com/en/europe/20211209-italy-slaps-amazon-with-%E2%82%AC1-1-billion-fine-for-abusing-dominant-market-position.

[125]  *Id.*

[126]  https://www.law.com/international-edition/2021/12/15/italian-competition-judgment-against-amazon-shows-the-future-of-big-tech-regulation-in-europe/.

[127]  *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 38 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

and those of marketplace sellers that use Amazon's FBA.[128]   In particular, the Commission announced it was investigating whether the criteria that Amazon sets to select the winner of the "Buy Box" and to enable sellers to offer products to Prime users, under Amazon's Prime loyalty program, lead to preferential treatment of Amazon's retail business or of the sellers that use Amazon's logistics and delivery services.[129]   According to Vestager, "The Buy Box is essential. It prominently shows you offers for one single seller of a chosen product with the possibility for the consumer to purchase it directly.  So winning the Buy Box is crucial for the marketplace sellers as it seems that more than 80% of all transactions on Amazon are channeled through it."[130]

116.   In response to the European Commission's investigation, Amazon eventually agreed to take several remedial actions.  Specifically, on July 14, 2022, Amazon offered to change its business practices in Europe to address its alleged bias in granting sellers access to its Buy Box and its Prime program.[131]  Amazon has offered to treat all sellers equally when determining which product to feature in the Buy Box.[132]  As part of the Buy Box concession, Amazon proposed to offer a second seller placement in the Buy Box, which could potentially boost visibility for more sellers.[133]  Amazon also made several commitments related to sellers' relationships with Amazon Prime, and said sellers under its Prime label would be able to use any shipping carrier they desire rather than Amazon's own fulfillment services.[134]

---

[128]  European Commission, *Antitrust: Commission sends Statement of Objections to Amazon for the use of non-public independent seller data and opens second investigation into its e-commerce business practices*,  https://ec.europa.eu/commission/presscorner/detail/en/ip_20_2077  (Nov. 10, 2020).

[129]  *Id.*

[130]  https://techcrunch.com/2020/11/10/europe-lays-out-antitrust-case-against-amazons-use-of-big-data/.

[131]  *Amazon    offers    concessions    to    resolve    EU    antitrust    probes*, https://www.cnn.com/2022/07/14/tech/amazon-concessions-eu-antitrust (July 14, 2022).

[132]  *Id.*

[133]  *Id.*

[134]  *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 39 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

### 3.      Amazon Exploited Its Power Over Third-Party Sellers

117.      Amazon's dual role as an operator of its Marketplace that hosts third-party sellers, and a seller in that same Marketplace, creates an inherent conflict of interest.  This conflict incentivizes Amazon to exploit its access to competing sellers' data and information, among other misconduct.  Knowing that investors were acutely focused on these issues, Defendants made numerous materially false and misleading statements throughout the Class Period to alleviate any concerns about its business practices.

118.      In its July 2022 final report on competition in the digital marketplace summarizing the investigation, the Subcommittee concluded that Amazon routinely "employ[ed] strong-arm tactics" against third-party sellers on its platforms.[135]  To investors, Amazon described third-party sellers as "partners."  But Amazon's internal documents that the Subcommittee reviewed show that, behind closed doors, the Company refers to them as "internal competitors."

119.      Indeed, while Amazon has referred to third-party sellers on its Marketplace as "partners" and "customers," numerous small- and medium-sized third-party sellers told the Subcommittee that Amazon bullied and mistreated them for its own benefit.  The Online Merchants Guild, a trade association representing the interests of sellers engaged in online commerce, stated that it had "seen Amazon use their position of strength to take advantage of sellers."[136]

120.      As Stacy Mitchell, Co-Director of the Institute for Local Self-Reliance, noted during the Subcommittee's hearing on Innovation and Entrepreneurship, "Among the most egregious examples of Amazon's arbitrary treatment of sellers are its abrupt suspensions of their accounts, frequently made without explanation." Once Amazon suspends a seller's account or delists its products, the business is left with largely ineffective remedies as they watch their sales

---

[135]  The House Committee on the Judiciary, Investigation of Competition in Digital Markets, https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf (July 19, 2022).

[136]  Submission from Online Merchants Guild, to H. Comm. on the Judiciary 3 (Oct. 29, 2019) (on file with Comm.).

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 40 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

disappear.  Sellers shared with the Subcommittee their experience that communications to Amazon's Seller Support Central generally prompt automated, unhelpful responses, which may be entirely unrelated to the specific case, question, or concern raised by the seller.

121.    Over the course of the investigation, the Subcommittee heard from numerous sellers who described abusive tactics or mistreatment by Amazon in a variety of circumstances. For example, at the Subcommittee's January 17, 2020 hearing, CEO and Founder of PopSockets David Barnett testified about Amazon's bullying tactics, which he said were enabled by "the asymmetry in power between Amazon and its partners."[137]  He stated that after the two companies decided on a minimum price at which Amazon would sell PopSockets, Amazon sold the products for a lower price and then demanded that PopSockets pay for the lost margin.[138]  As a result, PopSockets decided to end its relationship with Amazon Retail.[139]   When PopSockets communicated this to Amazon, its response was, "No, you are not leaving the relationship."[140] PopSockets did sever its relationship with Amazon Retail for a period of time, but reestablished it about a year later.[141]  Mr. Barnett estimates that, in 2019, his company incurred losses of $10 million in revenue when he stopped selling to Amazon Retail and Amazon blocked one of his authorized distributors from selling on the Marketplace.[142]

122.    The Subcommittee learned about numerous other instances of Amazon strong-arming its third-party sellers.  One such company that conducts business with multiple divisions of Amazon described how the platform leveraged its dominance in e-commerce to force acceptance of certain terms and conditions during negotiations over a different part of its

---

[137]  Competitors Hearing at 22 (statement of David Barnett, CEO & Founder, PopSockets LLC), https://www.congress.gov/116/chrg/CHRG-116hhrg40788/CHRG-116hhrg40788.pdf.

[138]  *Id*. at 20.

[139]  *Id*.

[140]  *Id*. at 17.

[141]  *Id*. at 20-21.

[142]  *Id*. at 4.

---

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 41 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

business.[143]  According to this company, Amazon knows the power they have as a retailer.  In the midst of negotiations, Amazon repeatedly referenced its power to destock the company's products on Amazon.com as a "bargaining chip to force terms" unrelated to retail distribution on the company.[144]

123.    Book publishers likewise described Amazon's exploitation of its asymmetric power dynamic with its third-party sellers.  According to one publisher, "Amazon has used retaliation . . . to coerce publishers to accept contractual terms that impose substantial penalties for promoting competition" with Amazon's rivals.[145]  The publisher added that the platform's retaliatory conduct shows "Amazon's ability and willingness to leverage its market power to prevent publishers from working effectively with rival e-book retailers and, thereby, maintain and enhance its dominance in e-book distribution."[146]

124.    Amazon's retaliatory tactics against publishers include removing the "buy"' button, which blocks a customer's ability to purchase a publisher's current titles;[147] and removing the "pre-order" button, which eliminates the ability for a consumer to pre-order a publisher's forthcoming titles.[148]  Another form of retaliation that Amazon reportedly engaged in was falsely showing publishers' titles as out of stock or with delayed shipping times.[149]

---

[143]  Interview with Source 148 (Aug. 26, 2020).

[144]  *Id.*

[145]  Submission from Source 17, to H. Comm. on the Judiciary, 13 (Nov. 14, 2019) (on file with Comm.).

[146]  *Id.* at 3 (Sept. 22, 2020) (on file with Comm.).

[147]  *See, e.g.*, David Streitfeld, Amazon Pulls Thousands of E-Books in Dispute, N.Y. TIMES: BITS (Feb. 22, 2012), https://bits.blogs.nytimes.com/2012/02/22/amazon-pulls-thousands-of-ebooks-in-dispute/?hpw.

[148]  *See, e.g.*, Polly Mosendz, Amazon Blocks Pre-orders of Hachette Books, THE ATLANTIC (May 23, 2014), https://www.theatlantic.com/business/archive/2014/05/amazon-blacklists-hachettebooks/371545/.

[149]  *See, e.g.*, David Streitfeld, Writers Feel an Amazon-Hachette Spat, N.Y. TIMES (May 9, 2014), https://www.nytimes.com/2014/05/10/technology/writers-feel-an-amazon-hachette-spat.html.

125.    The Subcommittee described a third-party's complaint against Amazon as follows: "From the third-party retailers' perspective, Amazon Marketplace is like Hotel California, a lovely place to start or expand an online retail business, but check out from Amazon Marketplace and you can quickly find your business in bankruptcy."[150]  Additional comments from sellers that the Subcommittee interviewed include, "We're stuck.  We don't have a choice but to sell through Amazon,"[151] and, referring to Amazon, "They've never been a great partner, but you have to work with them."[152]

126.    In another example, a third-party bookseller told the Subcommittee that Amazon delisted 99 percent of his business's inventory in September 2019.[153]  The bookseller requested that Amazon return its products, which were stored in Amazon's warehouses.[154]  As of July 2020, Amazon had returned only a small fraction of the bookseller's inventory and continued to charge him storage fees.[155]  Amazon blocked the bookseller both from selling its products on its Marketplace and from retrieving its inventory, precluding the seller from trying to recover some of his losses by making sales through another, albeit smaller, channel.  At the Subcommittee's July 29, 2020 hearing, Representative Lucy McBath (D–GA) presented the bookseller's story to Defendant Bezos, who responded that this treatment is "not the systematic approach that [Amazon] take[s]."[156]  However, evidence the Subcommittee collected through extensive seller interviews shows that Amazon's poor treatment of sellers is not isolated to a handful of incidents—a fact

---

[150]  Class Action Complaint at 20, *Frame-Wilson v. Amazon.com*, Inc., No. 20–cv–00424 (W.D. Wash. Mar. 9, 2020).

[151]  Interview with Source 150 (July 11, 2020).

[152]  Interview with Source 151 (July 2, 2020).

[153]  Interview with Source 125 (July 7, 2020).

[154]  *Id*.

[155]  *Id*.

[156]  CEO Hearing at 113 (statement of Jeff Bezos, CEO, Amazon.com, Inc.), July 29, 2020 https://www.govinfo.gov/content/pkg/CHRG-116hhrg41317/html/CHRG-116hhrg41317.htm.

supported both by public posts on Amazon's Seller Central forum,[157] as well as pleas for help routinely sent directly to Defendant Bezos.[158]

127.    Amazon third-party sellers are also precluded from pursuing their claims against Amazon in court and are instead forced into arbitration through forced and binding arbitration clauses.[159]  This puts them at a tremendous disadvantage.  Between 2014 and 2019, even as the number of Amazon sellers continued to grow by hundreds of thousands per year, only 163 initiated arbitration proceedings.[160]  Because sellers are generally aware that the process is unfair and unlikely to result in a meaningful remedy, they have little incentive to bring an action.[161]

### 4.    Amazon Routinely Favored Its Own Private-Label Products to the Detriment of Third-Party Sellers

128.    By virtue of its role as an intermediary in the Marketplace, Amazon can give itself favorable treatment relative to competing sellers.  It has done so through its control over the Buy Box, as well as by granting itself access to data and tools that are off-limits to third-party sellers.  Most recently, there have been reports that Amazon has given preferential treatment to its own non-essential products over competitors' non-essential products during the global pandemic.

---

[157] *See, e.g.*, iNOVATECHiMEDICAL, Inventory Being Held Hostage by Amazon for 3 Months, AMAZON   SERVS.   SELLER   FORUMS   (Apr. 8,   2020,   10:30   p.m.), *https://sellercentral*.amazon.com/forums/t/inventory-being-held-hostage-by-amazon-for-3-months/607892.

[158] *See* Josh Dzieza, Prime and Punishment: Dirty Dealing in the $175 Billion Amazon Marketplace,   VERGE   (Dec. 19,   2018), https://www.theverge.com/2018/12/19/18140799/amazonmarketplace-scams-seller-court-appeal-reinstatement ("Emailing the richest man in the world is actually the standard method of escalating an Amazon seller appeal.  It's called a Jeff Bomb, or . . . a Jeff Letter."); Interview with Chris McCabe, Founder, ecommerceChris LLC (Dec. 30, 2019) ("Out of desperation, some sellers try to email Jeff Bezos directly."); Submission from Source 125, to H. Comm. on the Judiciary (Jan. 27, 2020) (on file with Comm.); Submission from Source 150, to H. Comm. on the Judiciary (Aug. 16, 2017) (on file with Comm.).

[159] Amazon Services Business Solutions Agreement, https://sellercentral.amazon.com/help/hub/reference/external/G1791?locale=en-US.

[160] The House Committee on the Judiciary, Investigation of Competition in Digital Markets, https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf (July 19, 2022).

[161] *Id.*

129.    One tool that Amazon Retail uses to benefit its own business is Amazon Vine, a review-generating program.[162]    In interviews the Subcommittee conducted with market participants, many sellers said that good reviews are critical for a product to be successful online.[163] Accordingly, sellers aim to obtain as many positive reviews as possible early in a product's life cycle.   At one time, it was permissible for Amazon sellers to provide incentives such as free samples to reviewers.   However, in 2016, it was reported that some sellers were generating fake reviews.[164]  In response to these reports, Amazon announced that it would ban incentivized reviews except for those obtained through its own incentivized review program, Amazon Vine.[165]   As a result, sellers lost access to this program, regardless of whether they were engaged in bad conduct or not.

130.    For many years, including after the incentivized-reviews ban, the Amazon Vine program was not available to third-party sellers, while Amazon continued to enjoy the program's ability to "minimize marketing costs associated with generating awareness early in a product's lifecycle," among other benefits.[166]  An Amazon internal document described other advantages of the program as "[d]riv[ing] conversion and sales with more insightful reviews on detail pages," and "contribute[ing] to higher order counts and sales."[167]

---

[162]  Innovation and Entrepreneurship Hearing at 509 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Couns., Competition, Amazon.com, Inc.).

[163]  *See, e.g.*, Interview with Source 125 (July 7, 2020) (explaining that the inability to move customer reviews from Amazon to other marketplaces is a barrier to use of other marketplaces, due to the importance of customer feedback for seller reputation).

[164]  Elizabeth Weise, Amazon Bans "Incentivized" Reviews, USA TODAY (Oct. 3, 2016), https://www.usatoday.com/story/tech/news/2016/10/03/amazon-bans-incentivized-reviews/91488702/.

[165]  *Id*.

[166]  Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00146732 (Dec. 14, 2017) (on file with Comm.); Spencer Soper, Amazon Doles Out Freebies to Juice Sales of Its Own Brands, BLOOMBERG NEWS (Oct. 16, 2018), https://www.bloomberg.com/news/articles/2018-10-16/amazon-doles-out-freebies-to-juice-sales-of-its-own-brands.

[167]  Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00146732 (Dec. 14, 2017) (on file with Comm.); *see also id*. at AMAZON–HJC–0059576 (Nov. 22, 2010) (describing the program as "[g]reat for new product launches—good for seeding").

131.   By both banning incentivized reviews and excluding third-party sellers from the Amazon Vine program, Amazon allocated to itself a significant marketing advantage over the other businesses with which it competes on its platform.

132.   Amazon's dual position as both operator and seller on its Marketplace also provides it with the ability to disadvantage competitors that seek to sell or advertise on its platform.  One way that Amazon does this is by limiting certain rivals' ability to buy Amazon.com search advertising—ads that present products at the top of the search results when consumers enter specific search terms or a product name.  As *Wall Street Journal* reported on September 20, 2020, although "search advertising is a lucrative part of the company's business," Amazon "won't let some of its own large competitors buy sponsored-product ads tied to searches for Amazon's own devices."[168]

133.   *Wall Street Journal* also reported that Roku, Inc. "can't even buy [ ] Amazon ads tied to its own products."[169]  Consistent with this report, a competitor of Amazon that manufactures voice-enabled devices told the Subcommittee that Amazon prohibited it from buying ads on Amazon.com.[170]  The competitor expressed concerns about the harm this could cause consumers, who may be confused or deceived when they receive ads promoting Amazon products even when they specifically search for a competitor's product on Amazon.com.[171]

134.   The Subcommittee's investigation also uncovered internal Amazon documents showing that Amazon's executives have long understood the competitive advantage Amazon wields due to the Company's control over search advertising on Amazon.com.  In an internal email that became public when the Subcommittee released its final report in July 2022, described an ad

---

[168]  Dana Mattioli et al., Amazon Restricts How Rival Device Makers Buy Ads on Its Site, WALL ST. J. (Sept. 22, 2020), https://www.wsj.com/articles/amazon-restricts-advertisingcompetitor-device-makers-roku-arlo-11600786638.

[169]  *Id.*

[170]  Interview with Source 148 (Aug. 26, 2020).

[171]  *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS   - 46 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

block against Groupon and other "deal site ecommerce competitors,"[172] an Amazon executive wrote that "Groupon is blocked+let's keep a clear line on this.  No deal site ecommerce competitors allowed to advertise on amazon.x sites."[173]

135.    Similarly, an email also made public recently by the Subcommittee shows high-level Amazon executives discussing the possibility of implementing an ad block against Diapers.com, saying:

> Do we really think it is ok that Diapers.com flipped from selling on the platform to being a large scale user of Product Ads totally unscrrutinized [sic]?  I don't . . . . We're under no obligation to allow them to advertise on our site.  I'd argue we should block them from buying Product Ads immediately or at minimum price those ads so they truly reflect the opportunity cost of a lost diaper buyer (or to reflect the true value of a new customer to such a competitor[]).[174]

136.    The executive suggested that Amazon should maintain a "watch list" of strategic competitors and set up "[a]n automatic trigger when a merchant on [the] watch list . . . attempts to launch a significant quantity of product ads—with escalated approval required to allow their ads to launch."[175]

137.    Based on discussions with Company employees, *Wall Street Journal* reported that Amazon ultimately implemented a plan of this type.  Amazon employees involved in advertising decisions said the policies for dealing with competing device makers are a deliberate part of Amazon's strategy for promoting its own products.  *Wall Street Journal* reporters also spoke with executives at rival companies and advertising firms, and those sources confirmed Amazon's practice of limiting the ability of its competitors to promote their own products.

138.    For example, Amazon competitor Roku, an entity that was competing directly with the Amazon Fire TV, was blocked from buying ads on Amazon.[176]  Netgear, a large manufacturer

---

[172] Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00129156 (Dec. 14, 2017) (on file with Comm.).

[173] *Id.*

[174] *Id.* at AMAZON–HJC–00065094 (May 28, 2009) (on file with Comm.).

[175] *Id.*

[176] *Id.*

of Wi-Fi routers, was blocked from buying search ads keyed to Amazon's own brand of router. The same is true of Facebook and its inability to buy sponsored ads using Amazon Echo-related keywords due to a competing product, and Arlo, a competitor to Ring, which is unable to buy keywords related to Ring.[177]

139.    According to the *Wall Street Journal* article, "Tier 1 Competitors" are blocked from buying certain ads and employees are allegedly instructed to "mark any discussion of this practice . . . with 'privileged and confidential' to evade regulators."[178]

140.    Once again, Amazon denied these allegations, claiming that employees are instructed to mark emails as privileged only when seeking legal counsel.  In response to a request for comment, Amazon also refused to directly address the question of whether or not it impedes its rivals' marketing.

141.    Amazon also unfairly discriminated against third-party sellers during the global pandemic by using the pandemic as a pretext to delay shipments of its competitors' products.  In March 2020, Amazon announced that it would begin temporarily delaying shipments of all non-essential products from its warehouses, regardless of whether they were sold by Amazon or by competing third-party sellers.[179]  The Company claimed it was doing so to better serve customers in need while also helping to ensure the safety of warehouse workers.  The effect of this change was to block third-party sellers of items that Amazon designated "nonessential" from shipping new inventory using Fulfillment by Amazon.

142.    However, Amazon exempted itself from this policy and continued to ship non-essential items sold by Amazon Retail from its warehouses.  According to a survey of Amazon workers conducted by Change to Win between April 29 and May 9, 2020, located by the Subcommittee, workers reported that Amazon had "continued to ship non-essential items such as

---

[177]  *Id.*

[178]  Dana Mattioli et al., *Amazon Restricts How Rival Device Makers Buy Ads on Its Site*, WALL ST. J. (Sept. 22, 2020), https://www.wsj.com/articles/amazon-restricts-advertisingcompetitor-device-makers-roku-arlo-11600786638.

[179]  CEO Hearing at 286–87 (response to Questions for the Record of Jeff Bezos, CEO, Amazon. com, Inc.).

hammocks, fish tanks, sex toys, and pool floaties."[180]  More than two-thirds of fulfillment center workers reported that 50 percent or more of the items they handled during this period were non-essential.  Based on the survey results, Change to Win concluded that "Amazon has continued to place workers in danger of contracting COVID–19 in order to ship non-essential goods."[181]  A number of market participants that the Subcommittee interviewed also indicated that Amazon prioritized shipping its own items over those sold by third-party sellers.[182]  As revealed in the Subcommittee's July 2022 report, Bezos eventually admitted that Amazon did give preferential treatment to its own products for a period of time, but claimed it was "unintentional."[183]

## C.      Amazon's Retail Model Has Long Relied on the Promise of Rapid Delivery

143.    Fast delivery is, and has long been, fundamental to Amazon's retail model.  As Amazon explains, it is a company focused on "delivering as many items as fast as possible."  Amazon's value proposition to both its customers—and to investors—is significantly premised on its ability to offer a cost-effective alternative to both brick-and-mortar stores and alternative online retailers.  That value is inherently linked to fast delivery.

144.    In addition, although leading up to and throughout much of the Class Period Amazon reported substantial profits, the Company since its founding has invested in building market share and capacity—even when doing so caused losses.  By 2019 after years of massive profitability, investors expected continued success and growth.  Those expectations were

---

[180]  CHANGE TO WIN, AMAZON COVID–19 WORKER SURVEY DATA BRIEF 3 (2020), https://static1.squarespace.com/static/5d374de8aae9940001c8ed59/t/5ec67b15a155792a0f9ef435/1590065963743/Amazon-Worker-COVID-19-Data-Brief.pdf.

[181]  *Id.*

[182]  *See, e.g.*, Submission from Source 91, to H. Comm. on the Judiciary (Sept. 16, 2020) ("When we looked at Amazon private-label products during April/early May, they were almost all available for immediate Prime delivery, while comparable national brands were not able to get the same shipment times.  Definitely preference was given to many Amazon private-label products during times of 'essential'/'non-essential' classification."); Interview with Source 152 (Sept. 18, 2020).

[183]  CEO Hearing at 287 (response to Questions for the Record of Jeff Bezos, CEO, Amazon. com, Inc.) ("After instituting these changes, Amazon became aware that shipments of certain Amazon devices that did not fall into the priority categories had been inadvertently included in the list of products with faster delivery promises.  This was unintentional.").

reinforced by the Company's public statements, including assurances that short-term costs of growing fulfillment capacity were justified by market demand for fast delivery, and that investment in fulfillment infrastructure would fuel fast shipping, crowd out competitors, take market share, and deliver future profits. Yet by July 2021, Defendants and others at Amazon knew the opposite: Amazon's fulfillment and high-speed delivery capacity had grown too much and too fast and needed to be scaled back, imposing a massive financial hit to Amazon.

### 1. Amazon Has Long Focused on "Delivering as Many Items as Fast as Possible"

145.    In 2005, Amazon launched its Amazon Prime membership service, through which the Company offered free two-day shipping to its retail customers at a time when such quick delivery times were "virtually unheard of." Amazon's promise of free two-day delivery fueled substantial growth and in large part enabled Amazon to become the retail giant it is today. When Amazon Prime launched, it set Amazon apart from its major retail competitors, such as Walmart, Target, and Costco. As Amazon stated in response to an inquiry from *Vox*, reported on April 24, 2019, "Prime offers the fastest way to receive items for free." Although the Prime membership comes with many benefits, "Prime customers pay for—and expect—quick, free shipping."

146.    Amazon's aggressive focus on growth through faster shipping and increased fulfillment capacity continued. In 2004, 10 years after Amazon was founded, its annual revenue was just under $7 billion. By 2011, Amazon Prime subscriptions were increasing significantly, with membership doubling less than two years later to an estimated 10 million subscribers. At that point, Amazon was committed to making rapid delivery a critical part of its brand, from two-day, to one-day, and eventually same-day delivery in many markets. To facilitate that rapid delivery, an extensive fulfillment network became the lynchpin of Amazon's business model. An April 2020 report, "Mapping Amazon: Where the Online Giants Locates Its Warehouses and Why," reported that, "[t]o execute rapid delivery, Amazon couldn't get away with only a handful of warehouses. It had to locate warehouses in many markets where the greatest number of Prime households are located." The strategy was effective for several years. In 2014, "Amazon became

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 50 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

the fastest company ever to reach $100 billion in annual sales."  By 2018, Amazon's revenue reached almost $233 billion.

### 2.    2015-2017:  Amazon Announces and Expands Same-Day Delivery

147.    Amazon and its senior management have been focused on increasing delivery speeds for years.  For example, on May 28, 2015, Amazon forever changed online delivery by announcing free same-day delivery in 14 major cities across the United States.  Describing affordable same-day delivery as the "Holy Grail" of online shopping, the *LA Times* noted that, "[a]lthough every retailer would like to offer same-day delivery, few have the infrastructure in place to handle such a complex undertaking or the sales volume to make it worth it."  A year later, Amazon expanded same-day delivery to 27 metro areas and announced a new air cargo network. In a March 9, 2016 press release, Dave Clark, Amazon's then-Senior VP of Worldwide Operations, explained that the Company "add[ed] 20 planes to ensure air cargo capacity to support one and two-day delivery for customers" for its "ultra-fast delivery promises."  And in 2017, Bezos announced that Amazon was preparing a drone delivery service to get orders to customers within 30 minutes.  Since then, Amazon has continued to prioritize increasing the speed and reach of its retail delivery services, including through Amazon Prime.  Indeed, as Amazon explained in a June 2, 2017 press release, as the Company has opened new fulfillment centers in order to facilitate faster delivery to retail customers, the "[m]ost important[]" factor has been whether the locations of new sites would "improve Prime benefits with faster shipping speeds for customers."

### 3.    2018-2019:  Amazon Increases Its Already-Aggressive Focus on Rapid Delivery

148.    By 2018, 100 million people were using Amazon's Prime service, in large part due to its promise of reliable and free two-day shipping.  According to a survey by market-research firm The Diffusion Group, 79% of Prime members said that free two-day shipping was the "primary reason" they subscribed to Amazon Prime.  Yet at the time, Amazon was not always able to meet customer expectations with its two-day delivery and, as *Vox* reported on April 24, 2019, the Company faced the problem of "weaning Prime users off the near-instantaneous shipping they've come to expect."  For example, by the winter of 2018, it was "undeniable that Amazon

delivery [was not] as seamless as it used to be." As Fast Company reported on December 19, 2018, "Complaints about slow Prime shipping abound across the internet." *Business Insider* similarly reported in May 2018 that "[s]ome Amazon Prime customers are fuming, claiming the company has repeatedly delayed their shipments and backtracked on the two-day-shipping guarantee that comes with membership . . . . This cuts through the greatest promise of Prime. It's not just the free, two-day shipping. It's that it's so reliable, you never have to think for more than a second about buying something."

149.    As *Business Insider* report, Amazon recognized that its customers expected "fast and reliable delivery." At the same time *Vox* reported that, as customers became less impressed by Amazon's rapid delivery promise, "more and more businesses" were adopting two-day shipping, further threatening Amazon's competitive advantage in delivery times.

### 4.    2019-2020: As Competitive Pressures Mount, Amazon Invests Massively in Expanding Fast Delivery

150.    By 2019, many of Amazon's largest competitors—including Walmart and Target— had announced their own two-day shipping promises. Combined with the alternative options that those retailers (which had both online and brick-and-mortar presences) provided customers to buy online and pickup from numerous retail locations, even infrequent or slight shipping delays for Amazon posed a substantial threat to the Company's market dominance. With a significant portion of online shoppers hooked on quick, free shipping, Amazon was highly motivated to maintain its competitive advantage, and sought to provide even faster delivery speeds.

151.    In April of 2019, Amazon announced plans to transition free Prime delivery times from two-day shipping to one-day shipping over the next year. During Amazon's Q1 2019 earnings call on April 25, 2019, CFO Brian Olsavsky represented that it was the natural evolution of the Prime program to progress to a "free one-day offer": "We've already started down this path" and "in the past months, significantly expanded our one-day eligible selection and also expanded the number of zip codes eligible for one-day shipping." Olsavsky told investors on the call that "We're able to do this because we spent 20 plus years expanding our fulfillment and logistics network, but this is still a big investment and a lot of work to do ahead of us."

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 52 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

152.   To enable this shift to expansive one-day shipping, Amazon committed to an aggressive growth strategy, through which it would ultimately double the footprint of its warehouses and other aspects of its fulfillment networks.   After announcing plans to cut the standard Prime delivery time from two days down to a single day in April 2019, Amazon expected to spend $800 million on the transition to one-day shipping, in the second quarter of 2019 alone. And Amazon additionally spent almost $1.5 billion in the fourth quarter of 2019 and $1 billion in the first quarter of 2020 on that expansion.

153.   Amazon and its senior management assured investors that these significant costs were worth it, and that the Company's expansion was calibrated to meet market demand for fast delivery.   For example, during Amazon's Q1 2019 Earnings Call, Defendant Olsavsky said that "morphing to a one-day free shipping offer will make [Prime] even more the best deal in retail," adding that "we really think it's going to be groundbreaking for Prime customers and we're very excited to add this capability."   Analysts believed those statements.   For example, following Amazon's Q1 2019 Earnings Call, *BMO Capital* was quoted as stating, "While this is a drag on profitability near term, we believe enhancements like this should encourage incremental spending by customers and attract new Prime members."   And *Mizuho Securities* likewise wrote that the "long-term benefit is that turnover will be faster in the warehouse so efficiency can be gained for fulfillment as a percentage of revenues."

154.   As intended, the move to one-day shipping put Amazon a full day ahead of the competition.   Among other things, the day after Amazon's one-day shipping announcement, Walmart tweeted, "One-day free shipping . . . without a membership fee.   Now THAT would be groundbreaking.   Stay tuned."   Walmart soon announced its own one-day delivery service, complementing its offer to purchase items online and pick them up in a brick-and-mortar location the same day.   These moves added to the pressure on Amazon.   As Alice Fournier, VP at Kantar Consulting, explained, "Amazon has been doing one-day shipping in many areas for a while now. Now they've made an announcement out of it and a commitment to it—what they're going to do is make the investments that they already were making," adding that, in contrast "Walmart has very successfully been building its store pickup, which is an online transaction that you get in one

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 53 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

day."  Similarly, *Moody*'s analyst Charlie O'Shea described Walmart's one-day shipping option as "the latest salvo in the ongoing delivery arms race initiated and recently escalated by Amazon." *Wells Fargo* analysts led by Edward Kelly said in a note that Walmart's one-day shipping "helps to alleviate some concern around the impact of Amazon's recent move and is a step forward in defending share."  And Matthew McClintock, *Barclays* retail analyst, likewise "called Amazon's announcement 'a red herring' that creates an opportunity to invest in Target.' . . .'[Target] is already ahead of [Amazon] in same day delivery (Shipt, Drive Up, etc...) and has built a supply chain that fulfills ecommerce primarily from stores (where next-day delivery is much easier), which stands in a stark contrast to most retailers."

155.    On June 3, 2019, less than two months later, Amazon announced that it had pushed the plan forward with "free one-day shipping on over 10 million products" for Prime members—with no minimum purchase.

156.    The burdens of transitioning to one-day shipping, which Amazon had justified to investors as necessary to meet demand for fast delivery, continued to mount.  For example, as *Supply Chain Dive*, a business journalism outlet focused on global supply-chain issues, reported on October 25, 2019, in the third quarter of 2019, Amazon's shipping costs increased 46% year-over-year, and profits fell 26% year-over-year.

157.    On October 24, 2019, during Amazon's Q3 2019 earnings call, Defendant Olsavsky attributed the higher costs to Amazon's continued efforts to expand one-day delivery, stating, "It's going to be the route density and other things will improve over time and get our cost structure down, but for now, there is certainly some start-up pain in adding new capacity."  Olsavsky further noted that Amazon expected those costs to further increase in Q4:  "So as we head into Q4, we've added what's just nearly $1.5 billion penalty in Q4 year-over-year."  As quoted in Amazon's Q3 2019 Earnings Statement, Defendant Bezos maintained that "Customers love the transition of Prime from two days to one day," adding that "It's a big investment, and it's the right long-term decision for customers."  As *Supply Chain Dive* reported, in total, Amazon's 2019 shipping costs reached $37.9 billion, increasing 43% year-over-year compared to the fourth quarter of 2018.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 54 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

158.   In early 2020, before the COVID-19 pandemic caused widespread changes in consumer needs and behavior, and as communicated on the Company's January 30, 2020 earnings call for the fourth quarter of 2019, Amazon projected another "approximately $1 billion of additional cost" for one-day delivery in the first quarter of 2020.  In response to multiple questions about the continued costs of transitioning to one-day shipping, Defendants continued to assure investors that those costs were justified by market demand for fast delivery.  After referencing Defendant Olsavsky's prior statements about Amazon "becoming more efficient with . . . next-day" delivery, an analyst asked for details on both the "$1 billion of [quarterly] cost" and the impact of one-day shipping on customer demand.  Defendant Olsavsky responded:  Amazon "will have to scale our fulfillment center network further.  We grew the square footage for fulfillment and transportation by 15% each of the last two years, and we look ahead and see a step-up in that this year as we . . . start to build more capacity for the one day."  Olsavsky added that Amazon would "get efficiencies" as they "learn and grow and handle more one day volume."  Investors and analysts rightly understood the Company's expansion of the fulfillment infrastructure as reflecting the Individual Defendants' judgment and commitment to fast delivery as necessary to Amazon's longstanding business strategy of taking market share to ensure growth.

159.   By February 2020, at the same time that the Company was reassuring its investors, the transition to one-day shipping raised questions inside Amazon about how it would manage such a network.  As Salal Humair—a senior principal scientist with the supply chain optimization technologies team in Amazon's inventory planning and control group—explained to *Supply Chain Dive*, for logistics, the difference between one and two-day shipping is a lot more than just 24 hours.  Humair explained that location is less relevant to two-day shipping because "You can just fly to a customer in two days" almost anywhere in the continental United States.  However, the location of inventory is critical when an order is expected in a single day or less, according to Humair.  "This is a reality that made two-day shipping a much easier feat than one-day shipping. . . . And how Amazon deals with inventory questions changed significantly when it decided to offer one-day shipping to its Prime members."

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 55 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

160.     To facilitate expanded same-day and next-day delivery, in early 2020, Amazon starting building "mini-fulfillment centers" closer to consumers, which the Company explained was to make its same-day delivery program "even faster."  Notably, Amazon's announcement came just days after news that Walmart's Walmart+ membership program could include unlimited same-day delivery on groceries.

161.     Amazon stated on March 3, 2020 that:

> Since launching Prime in 2005, we've continued to make advancements to our delivery options in order to bring members new levels of convenience.  This effort has resulted in the current evolution of Prime Two-Day Delivery to a One-Day promise, and the introduction of new programs like Amazon Day, where Prime members can choose a day of the week to receive all their orders . . . all with the goal of giving Prime members the most convenient shopping experience in retail . . . .  These are first-of-their-kind buildings and serve as mini-fulfillment centers optimized for faster click-to-delivery speeds.

**D.     Amazon Aggressively Increases Its Fulfillment Capacity and Headcount During the Pandemic**

**1.     Early 2020:  COVID-19 Causes a Massive Demand Surge**

162.     When the pandemic struck in early 2020, bringing with it lockdowns and other restrictions that limited shoppers' ability and willingness to shop in physical stores, consumer demand for goods purchased through Amazon's e-commerce business, with its promise of fast delivery times, skyrocketed.

163.     However, in the early days of the COVID-19 pandemic, Amazon's fulfillment network was unprepared for the sudden surge in demand.  On March 16, 2020, in a Company blog post, Amazon described demand-driven labor requirements as "unprecedented for this time of year," announcing:  "We are opening 100,000 new full and part-time positions across the U.S. in our fulfillment centers and delivery network to meet the surge in demand from people relying on Amazon's service during this stressful time."

**2.     2020-2021:  Amazon Continues Its Aggressive Expansion, Which Defendants Justify as Necessary to Keep Competitors at Bay and Meet Existing Demand for Fast Delivery**

164.     As discussed above, after announcing increased investments in one-day delivery, Amazon had already faced questions about the increasing cost of shipping in 2019.  As reported

in Amazon's 2019 annual report filed on Form 10-K, Amazon's cash capital expenditures increased from $11.3 billion in 2018 to $12.7 billion in 2019.  In both years, these costs primarily reflected "additional capacity to support [Amazon's] fulfillment operations and additional investments . . . in technology infrastructure."  In 2020 Amazon's spending spiked to another level as cash capital expenditures effectively tripled to $35.0 billion for the year.

165.    Analysts remained focused on Amazon's ability to protect its competitive position by resuming as much one-day delivery as possible.  For example, on April 30, 2020, during the Company's Q1 2020 Earnings Call, Defendants received a question on Amazon's "fulfillment efficiencies," with an analyst asking: "how long will it take for Amazon to get back to a point where you'd have the same sort of service efficiency levels on the retail side that you had pre-COVID, how far are you away from that?"  Defendant Olsavsky responded that despite some uncertainty, "we're glad we've made that investment":

> On the fulfillment efficiency, I think you're talking about one-day probably is the heart of your question, when will we get back to what we had seen in levels of one day . . . . I will explain a bit on the one-day shipping cost because it's aligned with this. So we had originally thought we would spend $1 billion roughly on one-day shipping in Q1 and what we're seeing is we pretty much spent about that same amount . . . . So those are actually coming in – all those things are coming in very handy to us to help get more capacity out of what we currently have and we're glad we've made that investment, but we don't actually see a savings . . . we'll see a resumption of more one-day service, but, right now things are still so up in the air that I can't really project when that day will be . . . .

166.    However, as e-commerce research firm Marketplace Pulse reported on August 11, 2020, by May of 2020 Amazon had experienced "all-time high negative seller reviews" and "[f]ailed delivery promises were the most common cause."  With the unprecedented demand for e-commerce and fast delivery that COVID-19 caused, Amazon faced significant fulfillment struggles when [third-party] sellers "ran out of inventory stored in Fulfillment by Amazon (FBA) and thus reduced Prime-enabled assortment."  As Marketplace Pulse reported on July 14, 2020, "fulfillment operations" were a significant vulnerability for Amazon, because when "Amazon's fulfillment operations . . . breaks, as it did during the pandemic, the whole Amazon breaks."  Securities analysts from Sanford C. Bernstein & Co. expressed concern that, in the wake of the

---

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 57 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1   pandemic, Amazon would have a "a very hard time" executing on one-day shipping and that the

2   program would be delayed.

3       167.    As the pandemic progressed, the strain put on Amazon's fulfillment infrastructure

4   caused Defendants to increasingly emphasize that they would expand their infrastructure to meet

5   demand for fast delivery.  These assurances that the expansion was consistent with Amazon's

6   business goals and competitive pressures were expected by and well received by investors.

7       168.    As stated in Amazon's second-quarter 2020 financial reporting in the second

8   quarter of 2020, Amazon's net sales increased 40% year-over-year to reach $89 billion.  As *Supply*

9   *Chain Dive* reported, however, analysts and market observers noted that the Company's capital

10  expenditures continued to outpace sales growth, increasing by 68% from the year prior.



CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 58 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

169.     On July 30, 2020, during Amazon's Q2 2020 Earnings Call, Defendant Olsavsky addressed the Company's reported strong performance, which he represented was "driven [by] increased consumer demand, led by Prime members," stating:

> We were able to meet this heightened demand because we were also able to open up more fulfillment network capacity as the quarter progressed with faster delivery across more selection.  I'd point to a few capacity improvements that have allowed us to enhance throughput.  First, our regular headcount grew 34% year-over-year as of the end of Q2 and continues to grow.  We welcomed more than 175,000 new employees in March and April, many of whom were displaced from other jobs in the economy.  As we've seen demand remain high, we are in the process of bringing 125,000 of these employees into regular full-time positions . . . .  As we move toward peak in the second half of the year, we will ramp-up our space needs even further, and we'll be adding significant fulfillment center and transportation capacity in the second half of the year.

170.     During the call, as Defendants credited Amazon's Q2 2020 success to the Company's fulfillment expansion, multiple analysts inquired about Amazon's one-day delivery.  Despite the sustained spending and increased capacity, Defendant Olsavsky did not commit to a timeline for returning to Amazon's pre-pandemic shipping speed.  However, in response a question on the status of the Company's "one-day investment," Olsavsky said, "the costs of one-day shipping are already built into our structure.  We've already reconfigured our network.  We've already created the capacity to be able to ship."  Earlier on the call, Olsavsky had already announced plans to increase the square footage of Amazon's distribution operation by 50% by the end of 2020, with most of the expansion still to come:  "This includes strong growth in new fulfillment center space as well as sort centers and delivery stations.  We expect the majority of this capacity to come online in late Q3 and into Q4."

171.     As *Supply Chain Dive* reported on September 21, 2019, analysts noted this meant that Amazon would be "adding three times the amount of capacity it added in 2019 . . . more than what the company added over the last three years combined," and that "Experts have long known that increasing the number of facilities will decrease transportation costs while increasing inventory and facility cost."  Despite increasing scale of Amazon's continued expansion, those analysts saw numerous advantages in "Amazon's investment in its logistics network," consistent with Defendants' positive public statements.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 59 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

172.    Following increased demand for fast home delivery as shoppers stayed at home due to COVID-19 restrictions and concerns, Amazon continued to focus on increasing its infrastructure and fulfillment network capacity.  On October 29, 2020, during Amazon's Q3 2020 Earnings Call, Defendant Olsavsky told analysts that Amazon's fulfillment and logistics square footage would increase by 50% that year and that the Company had already spent heavily on expanding its transport capability, as part of some $30 billion in capital expenditures and leases through the third quarter.  Further, Olsavsky told analysts that the heightened transportation investment would likely continue for years to come.  As companies competed for space, Amazon was understood to be a driving force behind surging industrial space rates, which financial news outlet *GlobeSt.com* reported included Amazon often paying 50% to 60% above market to get the space it wanted.[184]

173.    Defendant Olsavsky credited Amazon's ability to "meet the heightened demand" in Q3, in part, to the Company's "big year for capital investments," explaining:  "We've invested nearly $30 billion in CapEx and finance leases through the first nine months of 2020, including over $12 billion in Q3.  As I mentioned last quarter, we expect to grow our fulfillment and logistics network square footage by approximately 50% this year, which includes significant additions to our fulfillment centers, as well as our transportation facilities.  The majority of these buildings opened in late Q3 and into Q4.  About half of this square footage growth will be on the transportation side through the opening of more sort centers and delivery stations."

174.    By the end of 2020, Amazon projected quarterly revenue of over $100 billion for the first time in the Company's history.[185]  Indeed, as the *Associated Press* reported on April 29, 2021, the Company's reported fourth-quarter 2020 revenue "blew past analyst expectations" at

---

[184]  GlobeSt.com, Amazon Reportedly Ready to Dump Excess Warehouse Space (Mar. 5, 2022) ("Amazon has been a driving force for good rates in the hot industrial arena, often paying 50% to 60% above market to get the space they wanted. Investors were paying a 35% premium last fall when the retail giant was a tenant.  Those heady days may have come to a sudden halt as a slowing of e-commerce back to pre-pandemic trends has left Amazon with a surfeit of warehouse space according to a Bloomberg report.").

[185]  Amazon sees pandemic boosting holiday sales and investment in delivery (Oct. 29, 2020), https://www.reuters.com/article/uk-amazon-com-results/amazon-sees-pandemic-boosting-holiday-sales-and-investment-in-delivery-idUSKBN27E3D6.

---

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 60 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

$125.6 billion.  As online shopping continued to surge a year into the pandemic, Amazon's 2021 first-quarter profit more than tripled year-over-year.  *Id.*  As brick-and-mortar stores around the country were forced to close, some for good, Amazon's revenue was still 44% above the prior year and well over $100 billion for the second quarter in a row—a feat that only three other U.S. companies achieved.  When it reported first-quarter 2021 earnings, Amazon reported that it expected revenue to increase again, in the second quarter of 2021, with a year-over-year growth rate for the quarter of 24% to 30%.

175.   Technology news site *GeekWire* reported on February 2, 2021 that, by the end of end of 2020, Amazon had hired nearly half a million new workers.  With well over a million employees by 2021, Amazon had increased in size by 63%.

176.   The Company's bullish expansion continued into 2021.  On February 2, 2021, during Amazon's Q4 2020 Earnings Call, an analyst asked how much investment was "needed" for Amazon's fulfillment going into 2021.  After noting the "50% year-over-year" investment in fulfillment capacity or "$44 billion on [Capital Expenditures]" in 2020, Olsavsky turned to Amazon's plans for 2021:

> So we are going to have to build probably for multiple scenarios.  And in an FC world, it's hard to turn that capacity on quickly.  So it generally means you may have to overbuild to protect the customer experience.  On transportation, we made large investments in our transportation network in 2020.  That work is not done yet. We have a lot of continued expansion.  So we see that over – definitely through 2021.

Defendant Fildes added that fulfillment spending was both for "one-day delivery capabilities for Prime members" and to achieve "much more certainty on being able to get items from point A to point B."

177.   In January 2021, when customers were "relying on fast, free shipping more than ever," Amazon reported that it had purchased 11 aircrafts for their delivery network to "keep pace with meeting [their] customer promises."   Consistent with its aggressive expansion efforts, Amazon reported in its 2020 Annual Report, filed on February 3, 2021 on its Form 10-K:

> The increase in fulfillment costs in absolute dollars in 2020, compared to the prior year, is primarily due to variable costs corresponding with increased product and service sales volume and inventory levels, costs from expanding our fulfillment

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 61 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

network, and the COVID-19 related impact of lower productivity, increased employee hiring and benefits, and costs to maintain safe workplaces. We expect fulfillment costs as a percentage of net sales to continue to be negatively impacted through at least Q1 2021 by COVID-19 related costs . . . . We seek to expand our fulfillment network to accommodate a greater selection and in-stock inventory levels and to meet anticipated shipment volumes from sales of our own products as well as sales by third parties for which we provide the fulfillment services. We regularly evaluate our facility requirements.

178.    As Amazon continued to make significant investments throughout 2021 and into 2022, the connection between more expansion, faster delivery, and community investment was a message that Amazon repeated.[186]  For example, on February 18, 2021, Amazon announced a new one million-square-foot "non-sort" fulfillment center in Washington, representing that "the new fulfillment center will help enable faster shipping times on customer orders of larger items," as reported by local news outlet KHQ.

179.    Similarly, on March 30, 2021, Amazon announced four more delivery stations in Florida to "power the last mile."  An Amazon spokesperson explained:  "We are excited to continue our investment in Florida" which "will create hundreds of new job opportunities and provide faster and more efficient delivery for customers."

180.    On April 28, 2021, during Amazon's Q1 2021 Earnings Call, after noting that Amazon was "investing pretty aggressively to build out . . . last-mile fulfillment," an analyst asked at what point that expansion would be "in the right place" such that Amazon would see "the unit cost of shipping start to improve from these initiatives?"  After noting that Amazon was already "investing heavily" in the last-mile fulfillment by increasing "capacity by 50%" with an 80% increase in capital expenditures from the prior 12 months, Olsavsky responded that Amazon's cost was already "very competitive," and that fulfillment investment offered "lots of advantages" in shipping logistics, including that Defendants "pretty much have perfect information."  Olsavsky added that Amazon was "continuing to invest" and that investors would "see a large investment in

_____

[186] Faster Same-Day Delivery marks milestone by adding six new cities (Aug. 4, 2021), https://www.aboutamazon.com/news/operations/faster-same-day-delivery-marks-milestone-by-adding-six-new-cities. ("In the areas where we offer faster Same-Day Delivery service, we've built brand new mini-fulfillment centers that are optimized for faster click-to-delivery speeds.").

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 62 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  this area through 2021" which could continue into 2022—all of which would put Amazon in
2  "really good" position with capacity.

3      181.    An analyst also asked "particularly in markets where COVID is no longer a major
4  issue, have you seen any particular declines or maybe just slowdown in e-commerce demand or a
5  decline in growth?"  Olsavsky noted international "across the board" strength, before stating, "I
6  don't have a downside case yet. . . . Costs were very much under control.  We started to see strong
7  leverage of our fixed assets, especially our fulfillment center and transportation assets."  Later, in
8  response to another question on demand levels, Olsavsky responded in part, "On Q2 guidance,
9  yes, I would say, we are projecting, again, continued strength across all of our segments."

10      182.    Amazon continued to represent publicly that it was aggressively expanding its
11  fulfillment capacity in order to meet demand for faster delivery.  For example, on May 7, 2021,
12  Amazon announced five new buildings in British Columbia:  "Our new facilities will help us meet
13  our customers' growing demand for great products and faster delivery times" said Sumegha
14  Kumar, Director of Canadian Customer Fulfillment Operations, Amazon Canada.

15                    **3.    Analysts Covered the Expansion Favorably at the Time**

16      183.    When Defendants said that massive spending would pay off, the market believed
17  them.  For example, previously, when Amazon reported that the extra cost of transitioning from
18  two-day to one-day Prime delivery would increase to $1.5 billion in the fourth quarter of 2019,
19  Patrick Moorhead, Principal Analyst at Moor Insights and Strategy, said:  "Amazon is waging a
20  war of attrition to wear out the competition . . . . It's setting the bar so high knowing competitors
21  will follow and Amazon knows it can do it at lower costs sometime in the future.  One day shipping
22  also puts it more into competition with traditional brick and mortar stores.  I think time will show
23  it's worth it."  Similarly, when Amazon announced plans to spend "the entirety" of its $4 billion
24  profit "and perhaps a bit more" in the second quarter of 2020 on responding to the COVID-19
25  pandemic, JP Morgan Analyst Doug Anmuth saw it as a positive, writing, "We believe that AMZN
26  is perhaps the only company that can service customers this well with scale & effectiveness during
27  the crisis."

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 63 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

184.    Considering the magnitude of Amazon's capital expenditures continuing into 2021,

as

*The*



**Amazon's investment outpaces other retailers**

2020 capital expenditure in millions of dollars

| | |
|---|---|
| Amazon | $35,046 |
| Walmart | $10,264 |
| Target | $2,649 |
| Home Depot | $2,463 |
| O'Reilly Auto Parts | $466 |
| Wayfair | $186 |

Chart: Matt Leonard / Supply Chain Dive • Source: UBS • Created with Datawrapper

*Motley Fool* noted on May 1, 2021, the Company's long-term planning appeared to be uniquely

credited by the market:

> Over the last four quarters, Amazon has spent a whopping $45.4 billion on capital expenditures, more than twice what it spent in the 12 months prior. . . . It's hard to understate how substantial the past year's $45.4 billion in capex investment was. That's more than all but roughly 70 U.S. companies generated in revenue last year. . . . It's also important to note that investors trust Amazon to spend like this. Walmart's stock price fell in February after it said its capex would increase to $14 billion, while investors bid Target shares downward after the retailer forecast its annual capital expenditures would rise to $4 billion.

185.    As *The Motley Fool* reported, the market understood, consistent with Defendants'

public representations, that increasing demand for e-commerce and fast delivery justified

Amazon's commitment to expand its fulfillment network footprint by 50% and its workforce by

more than 60% in 2020, and that more large investments were coming in 2021:

> As a result, Amazon will need a lot more workers to staff its warehouses and fulfillment centers.  While the capacity issues that led to last year's bottlenecks have mostly been resolved, the company's plans imply that it expects continued strong sales growth.  Further, it still has work to do to reach its goals on one-day delivery. . . . ***The good news for shareholders is that Amazon's hiring is an indication that it'll have plenty of demand to meet***.

186.    In addition, on July 31, 2021, *Credit Suisse* analysts wrote that Amazon's ramp-up

in capital expenditures was more important than its revenue guidance while referencing the

Company's faster delivery promises:  "The consumer responds positively to higher/faster service

levels," they said in a note.  "Unit volume accelerated following one day Prime delivery launch in

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 64 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

2Q19 – we believe it is only a matter of time before we see a similar impact as Amazon deploys fulfillment assets into the Holidays."

187.     It is not surprising that the market viewed Amazon's claims regarding demand for e-commerce and fast delivery, and increased capacity requirements, as a concrete cost benefit analysis.  It has been well publicized that Amazon was a data-driven business that put extreme value on decision making based on real-time information on logistics and efficiency.  For example, as *Fox Business* reported on January 7, 2016, Amazon's advanced use of analytic technology, for both delivery logistics and forecasting, has long been considered key to its "competitive advantage."  Indeed, Amazon has long sought to optimize its efficiency in its delivery business through advanced software that ostensibly helps it set inventory levels, and even begin packing orders based on predictive algorithms.  As *Wall Street Journal* reported on April 22, 2018, by that point Amazon had already "spent years honing its machine learning and artificial-intelligence technology to the point where it can"—among other things—"forecast demand."  In fact, a 2020 report by longtime supply chain reporter Rick LeBlanc explained that the Company's "combination of sophisticated information technology, an extensive network of warehouses, multi-tier inventory management, and excellent transportation makes Amazon's supply chain the most efficient among all the major companies in the world."  On February 6, 2021, *Wall Street Journal* reported that Amazon was using software to manage, monitor, and evaluate data on a highly sophisticated level, "unlike almost any other company," especially for delivery and inventory logistics.

E.     **By Early 2021, Amazon Prepares to Overhaul Its Senior Management as Its Public Commitment to Expansion Continues**

188.     In February 2021, Amazon announced a significant change in its senior management.  Specifically, Bezos announced that on July 5, 2021, he would be stepping down as CEO of Amazon, the company he founded in 1994, and that he would be transitioning to the position of executive chairman.  Defendant Jassy, who had been with the Company for over 24 years, would be taking his place.  NPR reported that Jassy was one of Bezos' "most trusted lieutenants" and served as the CEO's "shadow," where he accompanied Bezos to all his meetings

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 65 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1    to learn the business.  Since Jassy was a long-time Amazon insider, he had the institutional

2    knowledge and experience to continue to execute Amazon's strategies without significant

3    interruption.  As executive chairman and Amazon's largest shareholder, Bezos would continue to

4    be engaged in the Company's initiatives.

5           189.    By all accounts, Jassy is extremely immersed in the details of Amazon's business.

6    As reported by *Wall Street Journal*, former Amazon employees described Jassy as having an

7    "ultra-detail-oriented management style," often "digging into the minutiae of his division . . .

8    sometimes to a degree that baffled his underlings."  An Amazon vice president who worked for

9    Jassy for more than a dozen years told *Wall Street Journal* that Jassy has "just a phenomenal focus

10   on details . . . [his] relentless focus on detail is truly unique."  Former Amazon employees agreed

11   that "Jassy would spend enormous amounts of time on the narrowest of details if he thought it was

12   important."  For example, when an Amazon Web Services ("AWS") data center in Virginia

13   suffered a major outage, Defendant Jassy "personally got involved in figuring out the problem,"

14   prompting other employees to start "digging at that level."

15          190.    Even Jassy has commented on his own attention to detail.  During a September

16   2021 speech, Jassy said "[w]here the rubber meets the road is in the details.  From the junior roles

17   to the senior-most, you have to be good at executing details."  He therefore demanded the same

18   degree of focus from his employees.  One employee told *Wall Street Journal* that Jassy "ha[d] a

19   sense of urgency that [he had] never seen in [his] life."

20          191.    The *Wall Street Journal* reported that at weekly "wheel" meetings, Jassy and his

21   deputies would ask in-depth questions of managers and team members, sometimes called "the

22   firing squad" by employees.[187]  Amazon Former Employee 1 ("FE-1"),[188] a senior product

23   manager who worked at Amazon from December 2019 to September 2021, said that there were

24

25

26   _____

27   [187] *Id.*

28   [188] Former Employees are referred to as "FE" and are referenced using female pronouns to
     maintain their confidentiality.

**CONSOLIDATED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**  - 66 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

weekly business reviews with Jassy when he became CEO.[189]  In her role, FE-1 was aware of weekly business review meetings with CEO Jassy, and was provided with capacity and planning information by Amazon's Financial Planning & Analysis ("FP&A") team.  The business reviews were conducted by videoconference and provided an overall broad view of the business as well as a "rolling deep dive" of a functional area each week.  According to FE-1, Jassy would "go pretty dense" in the business area that was of focus that week.  FE-1 had awareness of these meetings because, when the weekly focus area was relevant to her business, she would be in a standby room in the event that questions were asked for her to address.

### F.  Amazon Executives Have Access to Real Time Data on Critical Details of the Company's Business and Rely on Such Data in Decision Making

192.  A key component of Amazon's data-driven decision making is its Forecasting System, SCOT ("Supply Chain Optimization Technologies"), which has similarly been the subject of much public reporting.  As technology news site *Technoblender* reported on June 17, 2022:

- "Part of Amazon's e-commerce challenges today stem from a piece of technology long prized during Mr. Bezos' tenure as a secret weapon, an internal forecasting system called Supply Chain Optimization Technologies, or SCOT.  It was designed to incorporate a multitude of factors and spit out projections for product demand and the growth in logistics needed to fulfill it."

- "Amazon's SCOT forecasts produced low, medium and high estimates.  Because of unprecedented volume in the early days of the pandemic, **Amazon executives including Mr. [Dave] Clark repeatedly chose the higher end of SCOT's estimates**, said people who used the tool and worked on the SCOT team at the time.  Those estimates meant that the company needed many more fulfillment centers and other infrastructure to keep up."

- "**We made a decision to build to the high side** to avoid constraining consumers and sellers in any way,' said Mr. Jassy at the company's shareholder meeting in May."

- "Senior Amazon executives familiar with the forecasting technology said it wasn't equipped to process an unforeseeable event like the pandemic and

---

[189] From December 2019 through September 2021, when she left Amazon, FE-1 served as a Senior Product Manager in the Company's New York office, with responsibility for Amazon advertising product.

> caused the company to commit to building out warehouses and infrastructure early in the pandemic that take 18 months to two years to come online.  When the virus receded, Amazon was left with more planned capacity than orders."

193.    Investors understood that Amazon's public statements were consistent with the projections and data available to Defendants from SCOT, and similar systems, and that the information provided by those systems was accurate and reliable.  And regardless of what Amazon's SCOT system projected, by July 2021 Defendants were already aware of Amazon's excess capacity and had already begun to change course and pull back on the broad expansion plan—while still telling investors it was justified and continued apace.

### G.    By July 2021 Defendants Knew that Amazon Had Overexpanded and Decided to Reverse Course

#### 1.    Defendants Assured Investors that Amazon's Continued Expansion was Justified by Demand for Fast Delivery

194.    As *Wall Street Journal* reported on June 16, 2022, following the rise in demand for e-commerce and fast delivery caused by the COVID-19 pandemic, Amazon's "revenue grew by a total of two-thirds . . . and its profit nearly tripled" across 2020 and into the first quarter of 2021.  However, as investors belatedly learned in late-April 2022 and *Wall Street Journal* reported in June, demand for increased fulfillment capacity and delivery speeds did not keep pace with Amazon's capacity investments, and "its setback has been among the most pronounced . . . erasing more than $600 billion in market value."

195.    In the 18 months preceding July 2021, Amazon had almost doubled its warehouse and transportation network, resulting in capital expenditures and equipment leases that *Reuters* reported increased by 74% between July 2020 and July 2021 to $54.5 billion—almost double the growth rate from the year prior.  Still, as of July 2021, the public understood, consistent with Amazon's public representations, that the Company planned to continue its expansion, including by adding "517 facilities to its global distribution infrastructure in the coming years . . . 176 million square feet on top of the 402 million" it already has.

196.    Amazon announced its Q2 2021 results on July 29, 2021.  During Amazon's Q2 2021 Earnings Call, Defendant Olsavsky reassured investors that—even as the market changed

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 68 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

and growth slowed—the Company's aggressive expansion strategy remained sound: "**As we think about the pull-forward in demand we've seen these past 18 months, it has required and will continue to require a significant amount of investment in our fulfillment network**." In other words, Amazon was still investing to expand capacity, and it was justified to meet demand for e-commerce and fast delivery. Defendant Fildes reiterated the message: "**I'd just say our focus is really squarely on adding capacity to meet the current high customer demand**."

197.    On the same call, when an analyst specifically asked about Amazon's "fulfillment costs," what was driving the higher "a per-unit" cost, and if there were "inefficiencies that went on in the quarter in fulfillment?" Olsavsky did not mention overexpanding capacity or the need to pull back. In fact, quite the opposite, Olsavsky doubled down: "**So you can see there's been very strong multiyear demand here that we are still catching up with from last year. . . . So we're continuing to add, and most of that development is really ahead of us, in the second half of the year** . . . . [W]e've literally nearly doubled our network here in the last 18 months from a size standpoint."

198.    In response to another analyst's question regarding "growth assumptions for e-commerce," Olsavsky stressed that "[w]e've been playing catch-up pretty much since the pandemic started, but what suffered is space and space constraints. And it's gotten better, but it was a factor last year. . . . [I]n the United States, while it's improving, it still hasn't reached the pre-pandemic levels. So we have a lot of growth to do there." Olsavsky later added that Amazon's "space planning" was "why we're building out our network so quickly in our minds. It's hard to do quickly, but we're moving as quickly as possible. And again, we have a lot of new capacity being added in the second half of the year."

199.    On October 28, 2021, Amazon issued a press release announcing its financial results for third-quarter 2021. The release quoted Defendant Jassy as stating that Amazon had "driven extraordinary investments across our businesses to satisfy customer needs . . . we've nearly doubled the size of our fulfillment network since the pandemic began.

200.    During the earnings conference call that same day, Defendant Olsavsky stated that "**[w]e have nearly doubled our operations capacity in the past two years to keep up with**

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 69 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**customer demand**," and assured investors that the costs of that increased capacity were still warranted.  Again, Olsavsky assured investors that Amazon's expansion plans were proceeding apace and remained necessary to satisfy demand.  Olsavsky also reiterated Defendants' claim that demand for first delivery was driving the Company's aggressive expansion:  "**the incremental demand that came our way during the pandemic has remained and that we are continuing to grow on top of that**."

201.   An analyst also specifically asked Defendants if on "fulfillment capacity," Amazon could "be ahead of plan for next year and kind of cut down the investment there?"  Olsavsky knew that Amazon was *already* cutting back on expansion but still responded by saying:  "We are just now getting caught up on space for inventory. . . . **But we expect the long-term trends to be strong in this business.  We're investing as such**."

202.   Another analyst asked whether Amazon's efforts to expand same-day deliveries to customers "leverage[d] kind of your existing fulfillment center footprint."  Olsavsky responded:  "**we're well on our way to providing ultrafast delivery for things that require ultrafast or things like groceries and others, and we see that expanding**."  Olsavsky added that, "you have to have a cost structure and a logistics network that will pay for the delivery over time.  So we see it as part of an offering that we offer to customers that ranges from two days to one day to two hours or one hour in some cases.  So we like to meet customers where they are, when they need things, and we're working on speed consistently."

203.   As explained above, Amazon had repeatedly told investors that faster delivery for more customers was the primary basis for the Company's aggressive expansion.  While continuing to represent that this investment spending was justified, Defendants pointed to "cost structure and . . . logistics network" considerations while knowing that these were the very same reasons that they had already to scale back.

204.   On February 3, 2022, Amazon issued another press release in which Defendants addressed the positive future of their expanding fulfillment network without mentioning that Amazon had already changed course.  Jassy was quoted as stating: "we continue to feel optimistic and excited about the business as we emerge from the pandemic.  When you combine how **we're**

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 70 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1    **staffing and scaling our fulfillment network to bring even faster delivery to more customers,**

2    **. . . there's a lot to look forward to in the months and years ahead**."

3        205.    The same day, during Amazon's Q4 2021 earnings conference call, Defendants

4    again (for the [third] quarterly earnings call in a row) boasted about "doubling [Amazon's]

5    operations capacity" for the Pandemic era market, with Olsavsky explaining that Amazon

6    "**invested significantly to keep pace with this demand** . . . expanding our fulfillment center

7    footprint while adding significant transportation assets to ensure fast on-time delivery."  Going

8    even further, Olsavsky stated that Amazon "**continued to see an increase in customer demand**

9    **and sales during the remainder of 2021, even as the economy opened back up**"—all with the

10   no mention that capacity investments had already outpaced demand for fast delivery or that (at

11   least as early as July 2021) some of those investments were *already* being scaled back.

12       206.    Additionally, in response to an analyst's question about Amazon's investments to

13   expand the Company's same-day delivery capacity, Olsavsky assured investors that "[w]e feel

14   good about where we are.  **We're continuing to build capacity that enables us to hit those**

15   **[same-day delivery] cutoffs**."  After repeating that Amazon had "doubled the capacity in the

16   network . . . to handle today's volume" and "ship faster," Olsavsky further represented that "there's

17   a lot of expansion that's been going on in the network, and **we feel good about the basic**

18   **contributors of profitability."**

19       207.    Another analyst, after noting Amazon's "doubled . . . fulfillment network" and

20   hiring spree, directly asked Olsavsky, "Where is Amazon in terms of emerging from this [2.5 year]

21   investment cycle?  **Can you see a slowdown in that big investment spending this year?**"  In

22   response, Olsavsky discussed the Company's capital expenditure percentages, and claimed:  "If I

23   look to the future, we're still working through some of our plans for 2022, but it's coming into

24   focus a bit.  **We see CapEx for infrastructure going up**.  We still have a very fast-growing

25   business that's growing globally, and **we're adding regions and capacity to handle usage that**

26   **still exceeds revenue growth in that business.  So we feel good about making those**

27   **investments**."

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 71 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

208.    Olsavsky failed to mention that Amazon's "big investment spending" had not only slowed on the fulfillment side, but actually *required cutbacks*—which had already begun in July 2021 (and likely earlier).  Instead, Olsavsky added that, "**On the fulfillment center side . . . [w]e see that moderating, and that will probably now match growth of our underlying businesses**."

209.    On April 14, 2022, Jassy wrote a Letter to Shareholders with the Company's 2021 Annual Report, repeating Defendants' story about increased demand and expansion.  Jassy wrote that the fulfillment network "**had** to double it in the last 24 months **to meet customer demand**." After mentioning "short-term logistics and cost challenges" in the past tense, Jassy confirmed that one-day shipping, and the necessary investments in capacity, were still Amazon's focus:

> [J]ust before COVID started, we'd made the decision to invest billions of incremental dollars over several years to deliver an increasing number of Prime shipments in one day.  This initiative was slowed by the challenges of the pandemic, but we've since resumed our focus here. . . . [W]e believe our over 200 million Prime customers, who will tell you very clearly that faster is almost always better, will love this. . . .This type of iterative innovation is never finished and has periodic peaks in investment years, but leads to better long-term customer experiences, customer loyalty, and returns for our shareholders.

### 2.    Even Before July 2021, Amazon Knew That Demand For Fast Delivery Began to Decline

210.    Defendants' statements from July 2021 through April 2022 were in conflict with the reality that, by no later than July 2021, it was clear to Defendants that Amazon's fulfillment network had excess capacity—and that Amazon had already begun to reverse course on its expansion efforts.

211.    As Defendants eventually admitted on April 28, 2022—when Amazon announced a $3.8 billion net loss for first quarter of 2022—that Amazon needed to turn to "improving productivity and cost efficiencies" in Amazon's "fulfillment network."  On the Company's Q1 2022 earnings conference call that day, Olsavsky disclosed $4 billion in costs resulting from "the state of the labor force and fulfillment network" in connection with Amazon "being overstaffed, resulting in lower productivity" and "overcapacity."

212.    However, as *Wall Street Journal* reported on June 16, 2022, Amazon had been aware of the problem since at least July 2021, when Jassy began "working to cut back the excesses"

from the "Bezos-Led Overexpansion" which resulted one of the "worst stretches for financial performance in Amazon's history."

213.    As *Wall Street Journal* reported, in early 2020, following the "unprecedented" increase in purchase volume, Amazon was "short-staffed and often out of stock on key items," in some cases, pushing their delivery window from "two days to weeks."  As a result, Amazon wanted "more capacity fast" with executives repeatedly relying on the higher forecasting estimates for planning, including for new buildings and "other infrastructure."  These were investments that would take "18 months to two years to come online" and "[w]hen the virus receded, Amazon was left with more planned capacity than orders."

214.    When the news broke in June 2022, Jassy had already closed 68 stores, "much of the company's bricks-and-mortar retail operation," and was still looking for ways to "sublease at least 10 million square feet of excess warehouse space, defer construction of new facilities" and "end or renegotiate leases."  However, problems in "Amazon's retail and logistics operation had actually begun to show before" Jassy took over, and by July 2021, Jassy and Amazon were aware that their "capacity was outpacing demand" and "made a series of intensifying cutbacks to the plans for capacity growth."  Amazon "again cut back capacity growth plans in September and December of 2021."

215.    Former Amazon Employees, as well as reports on Amazon's abandonment of various new facilities, confirm that Jassy and Amazon, despite their public statements, were already well aware of the problem, and further confirms that Amazon was already making these "intensifying cutbacks" by July 2021.

216.    Despite Defendants' knowledge that Amazon's warehouse and fulfillment center network had excess capacity and far exceeded demand for fast delivery, necessitating significant cutbacks, for nearly nine months, Defendants concealed those cutbacks from the public investment community while at the same time assuring investors that the expansion strategy was necessary and continued apace.

217.    *CNBC* has reported that, by September 2022, Amazon had closed or canceled at least 44 facilities and delayed opening an additional 25 facilities—in the United States alone—for

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 73 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND ᴾᴸᴸᶜ
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

a combined total of well over 50 million square feet of excess capacity.  This is already far beyond the 10 to 30 million square feet of space that Amazon was seeking to sublet, as reported in May 2022 by *Bloomberg*, and not including the 68 "bricks-and-mortar retail" stores that, as *Wall Street Journal* reported in June, Amazon had already closed.

### 3. Former Amazon Employees Confirm that Amazon Was Pulling Back on its Expansion Plans By April 2021

218. The pullback was known internally much earlier than Amazon disclosed.  FE-1, a Senior Project Manager with Amazon from December 2019 to September 2021, explained that Amazon realized that they had overbuilt by the end of 2020.  As a Senior Vice President informed FE-1, by late 2020, there was a stall in forward-looking investments that was implemented in order to "rationalize" plans for increased fulfillment capacity.  By that point, Amazon's lease commitments overextended the desire for increased capacity, and the Company's internal projections of continued demand showed that demand was not maintaining at the level to which they had sourced increased incremental fulfillment capacity.  As FE-1 described, Amazon started making cutbacks to fulfillment capacity in the spring of 2021 and put a halt on capital expenditures. FE-1 received information on cutbacks from Amazon leadership and sources within Amazon's finance division, specifically Amazon's Financial Planning and Analysis Team.

219. FE-1 recalled discussions concerning the inevitable decline from the COVID-level purchase volumes as early as 2020, and then again on slowing down expansions when consumer volume had not materialized as expected.  FE-1 explained that very early in 2021, Amazon saw declining order volumes, and by the summer of 2021, Amazon knew that 2022 was going to be different.  Accordingly, Amazon made efforts to reduce middle mile and last mile delivery centers, as FE-1 explained, and was halting construction and even pulling out of prior deals.

220. FE-1 further explained that by the summer of 2021, the Company started slowing down hiring in Amazon's consumer business.  As FE-1 recalled, there was a major push for cost control in the Company from 2021 into 2022, to a degree that FE-1 had never previously seen, having been at Amazon since 2017.

221.   Similarly, Amazon Former Employee 2 ("FE-2")[190] worked on a team responsible for launching new Amazon last-mile delivery buildings.  FE-2 explained that the process for opening a new Amazon last-mile delivery building generally followed three stages: First, the construction team finishes the shell and structure of the building.  Second, start-up teams (like FE-2's) prepare the "shell site" for Amazon operations, including setting up all the necessary machinery and equipment.  Third, the operations team confirms that the building is fully functional and ready for management to start operating.

222.   FE-2 recalled that when demand was high for new buildings, Amazon leadership was pushing aggressively to "launch, launch, launch."  At one point in 2020, FE-2's team was expanded to launch more than 200 planned buildings.  However, in early 2021, FE-2 started to deal with what Amazon employees referred to as "mothball buildings."  A mothball building was a new Amazon site that was built and ready to be launched but did not become operational.  In the case of "mothball" buildings FE-2's team would have to "let it sit."  FE-2 explained that the start-up team would come into a shell site, ready the wiring and resources, install the vending machines and conveyors, and set up other basic equipment such as tables and chairs, but the operations team would not come to complete the launch. Instead, they would "lock the door and walk away." Eventually, as FE-2 explained, Amazon began to cancel the startup stage completely, and buildings were left as unfinished shell sites.

223.   FE-2 also explained that the Amazon Logistics (or "AMZL") team generated weekly "heatmap" reports that were distributed to all AMZL employees, including its senior-most management.  According to FE-2, these heatmap reports were excel files that documented the projected launch dates of all the buildings, as well as what progress had been made on each building and (on a weekly basis) any changes to each building's projected launch date.

---

[190] FE-2 worked at Amazon from May 17 through June 2022, and from October 2019 through June 2022 as a Launch Execution Program Manager where she managed a team responsible for launching new delivery stations, which are the "last mile" buildings in Amazon delivery infrastructure.  When she joined her final team in October 2019, it had 20 employees, but as Amazon sought to expand more quickly in 2020, it grew to as many as 70 employees.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 75 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

224.    By the summer of 2021, FE-2 had already witnessed Amazon's excess capacity firsthand.  As FE-2 recalled, she was specifically aware of at least one mothball building that was "in the vicinity of another building with similar capacity," and that building was already operating below capacity.  FE-2 recalled a demand projection that was insufficient to exceed the capacity of just one of the two buildings.

225.    Based on personal information she reviewed, FE-2 recalled the first mothball building she worked on was on March 4, 2021.  The majority of the building was ready, but the launch was paused.  Initially, the launch was delayed just a few weeks, but months passed as the date was pushed back again and again—for approximately six months.

226.    Throughout 2021, FE-2 became aware of numerous other mothball buildings as well as "decommissioned buildings" (where Amazon will effectively give up the property, strip everything out of the building, and either end or try to end the lease).  The first "decommission" that FE-2 was involved with was became decommissioned on June 8, 2021.  One of FE-2's colleagues had been involved in decommissioning buildings four or five months earlier.

227.    In September 2021, FE-2 also became aware of two additional mothball buildings.  The next month, in October 2021, FE-2 worked on another mothball building that had originally been scheduled to open in November 2021.  Instead, just over a month before launch, FE-3 was informed that the launch had been canceled and that the building would become a "shell site."  As FE-2's immediate supervisor said, "they had excess capacity."

228.    FE-2 described various complications in connection with all of Amazon's extra buildings.  At one point, Amazon had such a large amount of excess basic building equipment (tables, chairs, etc.) that it became a nuisance to deal with, and most of the inventory had to be thrown away.  Eventually, FE-2's team was reduced and then Amazon disbanded the team completely.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS   - 76 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**4.  Defendants Continued to Mislead Investors and Represent that Amazon was Expanding Capacity Despite the Substantial Pullback that Was Already Underway**

229.  Even though, as *Wall Street Journal* has reported, the Company had already decided to pull back significantly on its expansion plans by July 2021, Defendants nevertheless continued to publicly represent that its expansion plans continued.  For example:

- On September 20, 2021, Amazon announced their first fulfillment center in North Dakota:  "We are excited to have this fulfillment center up and running, which will allow us to deliver more packages, in a faster time frame, to our customers in North Dakota, Minnesota and South Dakota.  We are committed to employing hundreds here in the Fargo-Moorhead region." Said John Sabo, Amazon General Manager, Fargo.).[191]

- On September 23, 2021 Amazon announced, "faster Same-Day Delivery" expansion in select cities, which required new employees for the "new fulfillment centers" that Amazon built "in each community."[192]

- On December 9, 2021, Amazon announced its first "sub-same day" delivery fulfillment warehouse in Utah, for even faster shipping.[193]  As Amazon explained, the new fulfillment center allowed Amazon to "fulfill and deliver out of one building and directly to customers" who would "go from click to delivery in five hours or less."  *Id.*

- On March 18, 2022, Amazon announced that the first "same-day" fulfillment delivery center in Massachusetts would allow customers to "click purchase" and have an order on their "doorstep within hours."[194] ("We want you to be able to get what you want and need, when you want and need it.").

---

[191] Amazon Opens First Fulfillment Center in North Dakota (Sept. 20, 2021), https://press.aboutamazon.com/news-releases/news-release-details/amazon-opens-first-fulfillment-center-north-dakota

[192] Faster Same-Day Delivery expansion creates new, flexible roles across the U.S. (Sept. 23, 2021), https://www.aboutamazon.com/news/operations/faster-same-day-delivery-expansion-creates-new-flexible-roles-across-the-u-s

[193] Amazon unveils first sub-same day delivery station in SLC (Dec. 9, 2021), https://ksltv.com/478572/amazon-unveils-first-sub-same-day-delivery-station-in-slc/  ("The evolution of our Same-Day Delivery program is driven by our partnership with local communities like Salt Lake and is made possible by the people who live there.")

[194] Amazon Opens First Same-Day Fulfillment Center in Massachusetts (Mar. 18, 2022), https://www.businesswire.com/news/home/20220317005938/en/Amazon-Opens-First-Same-Day-Fulfillment-Center-in-Massachusetts

### 5.    Amazon Has Delayed or Canceled the Opening of Numerous Buildings

230.    During 2021, Amazon announced or confirmed plans to launch numerous large facilities across the country.  By 2022, however, many of these facilities (representing substantial square footage) were delayed or canceled entirely due to Amazon's excess capacity.  But it was not until April 28, 2022 that Defendants finally admitted that Amazon was over capacity.

231.    The scope and scale of the excess capacity is staggering.  As discussed above, by September 2022 Amazon had closed or canceled at least 44 facilities and delayed opening an additional 25.

232.    During the Class Period alone, Amazon misleadingly announced the opening of multiple sites that would either never open, be delayed indefinitely or which sat idle.  For example, in August 2021, Amazon announced plans for 1 million-square-foot fulfillment center to open in Clarksville, Tennessee in 2022:  "Amazon is proud to be part of the Clarksville community and make this investment toward workforce and economic advancement in the area."  A year later, the fulfillment center was delayed with no official opening date and the same misleading explanation discussed above:  "While we are delaying the launch of our new facility in Clarksville, it is still a part of our future plans.  Will keep you posted as those firm up down the road," said an Amazon spokesperson.

233.    On September 8, 2021, Amazon announced plans to open a 1 million-square-foot facility in Delta Township, Michigan by 2022.  However, the launch was delayed by over a year.  As the *Lansing State Journal* reported on March 14, 2022, in a February email an Amazon spokesperson confirmed that the facility would not launch until 2024, but misleadingly indicated the reasons for the change were not related to a pullback on fulfillment expansion:  "The only thing that's changed with our plans is the timing . . . .  We are a dynamic business and have dozens of fulfillment centers, sortation centers and delivery stations that are evolving and under construction across the country."[195]

---

[195]  Amazon fulfillment center in Delta Twp. won't open this fall (Mar. 14, 2022) (available on Lexis).

234.     On September 16, 2021, Amazon announced plans to launch two 1 million-square-foot distribution centers in Pasco, Washington:  "We're excited to open two new, state-of-the-art facilities in the city of Pasco . . . and we look forward to growing employment in the Tri-City region."  Amazon said it would begin hiring in 2022, but in May of 2022 an Amazon spokesperson confirmed that both of the facilities would be delayed—without a specific reason or a timeframe:  "We're still excited to launch in Pasco, though we've had to adjust our timing."

235.     In October 2021, Amazon announced a new 1 million-square-foot fulfillment center in Canton, Ohio to open in 2022:  "We're excited to be expanding our network to better serve our customers in Northeast Ohio."  However, in March of 2022, Amazon confirmed that the facility would be delayed to 2023.[196]

236.     In November 2021, citing supply chain disruptions, Amazon delayed opening its massive 3.8 million-square-foot fulfillment facility in Clay, New York.  The $350 million facility was scheduled to open in the fall 2021.  In April 2022, Amazon, still misleadingly blaming supply chain issues, delayed the Clay facility for a fourth time.

237.     The scope of Amazon's efforts to reduce its fulfillment capacity has been significant, even if Amazon itself has provided little detail concerning particular facilities.  By July 2022, Amazon's workforce had declined by 99,000 employees from the first to the second quarter of 2022—what *GeekWire* reported was "the largest sequential drop" in the Company's history.  And, by September 2022, Amazon canceled, delayed, or subleased at least 69 previously planned facilities, including those specifically referenced in the below chart:

| LOCATION | BUILDING ESTIMATE | REPORTED |
|---|---|---|
| Alcoa, TN | 634,000 SF fulfillment center | February 2022 – Delayed to 2023 |
| Arvada, CO | Delivery station | June 2021 – Canceled |
| Bakersfield, CA | 128,000 SF delivery station | July 2022 – Delayed opening indefinitely since 2021 |

---

[196] Hexamer: Supply Issues, Aggressive Construction Schedule Cause Amazon Opening Delay (Mar. 22, 2022), https://www.whbc.com/hexamer-supply-issues-aggressive-construction-schedule-cause-amazon-opening-delay/.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 79 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

| LOCATION | BUILDING ESTIMATE | REPORTED |
|---|---|---|
| Bellmawr, NJ | Delivery station | June 2022 – Closed and put up for sublease |
| Bessemer, AL | Airhub/sortation center | September 2022 – Canceled |
| Bethpage, NY | Delivery station | September 2022 – Closed and put up for sublease |
| Branford, CT | Delivery station | May 2022 – Closed |
| Canton, MS | 700,000 SF fulfillment center | February 2022 – Delayed indefinitely |
| Canton, OH | 1 million SF fulfillment center | March 2022 – Delayed to 2023 |
| Chamblee, GA | 103,000 SF Delivery Station | June 2022 – Canceled |
| Churchill, PA | 3 million SF distribution center | March 2022 – Canceled |
| Clarksville, TN | 1 million SF fulfillment center | August 2022 – Delayed to 2023 |
| Clay, NY | 3.8 million SF fulfillment center | November 2021 – Delayed to 2022 |
| Cocoa, FL | 200,000 SF delivery station | July 2022 – Opening delayed to 2023 |
| Coral Springs, FL | 250,000 SF distribution center | June 2022 – Canceled and subleased |
| Crystal Lake, IL | Delivery station | September 2022 – Canceled |
| Davenport, IA | 640,000 SF fulfillment center | May 2022 – Delayed to 2024 |
| Dayton, OH | Delivery station | September 2022 – Opening delayed to 2024 |
| Dedham, MA | Delivery station | August 2022 – Closed |
| Delta Township, MI | 1 million SF facility | March 2022 – Delayed to 2024 |
| Egg Harbor City, NJ | Delivery station | August 2022 - Canceled |
| Englewood, CO | Delivery station | September 2022 – Closed and subleased |
| Enka Village, NC | Delivery station | September 2022 – Opening delayed indefinitely |
| Essex, MD | 270,000 SF delivery station | August 2022 – Closing in October 2022 |
| Everett, MA | Delivery station | August 2022 – Closing in Q3 2022 |
| Fort Meyers, FL | 1.5 million SF fulfillment center | September 2022 – Canceled |
| Gates, NY | 2.6 million SF fulfillment center | July 2022 – Delayed to 2023 |
| Greensboro, NC | Fulfillment center | September 2022 – Canceled |

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 80 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

| LOCATION | BUILDING ESTIMATE | REPORTED |
|---|---|---|
| Hamburg, NY | 181,000 SF Delivery center | August 2022 – Opening delayed to 2023 |
| Hanover, MD | 154,000 SF delivery station | August 2022 – Closing in 2022 |
| Hayward, CA | 507,000 SF delivery station | August 2022 – Canceled and subleased |
| Hoffman Estates, IL | Fulfillment center | September 2022 – Canceled and put up for sublease |
| Hudson, NH | Two 1 million SF warehouses | April 2022 – Canceled |
| Huntley, IL | 630,000 SF Cross Dock | July 2022 – delayed to 2023 |
| Kansas City, MO | 700,000 SF Fulfillment center | September 2022 – Canceled |
| Lawrence, WI | $200 million fulfillment center | May 2022 – Canceled |
| League City, TX | 180,000 SF delivery station | June 2022 – Opening delayed indefinitely |
| Louisville, KY | Fulfillment center | September 2022 – Canceled |
| Mansfield, MA | Delivery station | August 2022 – Closing in Q3 2022 |
| Marriott-Slaterville, UT | 183,000 SF distribution center | June 2022 – Opening delayed to 2024 |
| Meridian, ID | Delivery center | August 2022 – Opening delayed indefinitely |
| Milford, MA | Delivery station | August 2022 – Closing in Q3 2022 |
| Miramar, FL | Delivery center | September 2022 – Opening delayed indefinitely |
| Montgomery, OH | Fulfillment center | September 2022 – Delayed to 2023 |
| Nashville, TN | Delivery station | July 14, 2022 – Closed |
| New York, NY | Delivery station | September 2022 – Closing and up for sublease |
| Newark, NJ | Airhub/sortation center | July 2022 – Canceled |
| Oceanside, CA | 143,000 SF delivery station | August 2022 – Canceled |
| Papillion, NE | 700,000 SF fulfillment center | July 2022 – Delayed to 2024 |
| Pasco, WA | 1 million SF distribution center | May 2022 – Delayed to 2023 |
| Peñitas, TX | 650,000 SF Fulfillment center | May 2022 – Canceled |
| Pittsfield, MI | 143,000 SF delivery station | August 2022 – Delayed indefinitely |
| Porter, TX | Delivery station | June 2022 – Delayed Indefinitely |
| Randolph, MA | Delivery station | August 2022 – Closing in Q3 2022 |

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 81 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

| LOCATION | BUILDING ESTIMATE | REPORTED |
|---|---|---|
| Riviera Beach, FL | Delivery station | September – Opening delayed indefinitely |
| Round Rock, TX | $250 million fulfillment center | May 2022 – On hold indefinitely |
| Salinas, CA | 2.8 million SF fulfillment center | April 2022 – Canceled |
| San Antonio, TX | $200 million fulfillment center | June 2022 – Delayed to Q4 2023 |
| San Leandro, CA | 294,000 SF delivery station | August 2022 – Canceled and subleased |
| Shreveport, LA | 3.4 million SF fulfillment center | June 2022 – Delayed to 2023 |
| Sioux Falls, SD | 600,000 SF fulfillment center | June 2022 – Delayed to 2024 |
| Slidell, LA | Delivery center | July 2, 2022 – Opening delayed indefinitely |
| Sonoma, CA | 250,000 SF delivery station | August 2022 – Canceled |
| Sturtevant, WI | Distribution center | February, 2022 – Closed |
| Valparaiso, IN | Delivery station | April 28, 2022 – Opening delayed indefinitely |
| Waco, TX | 700,000 SF fulfillment center | June 2022 – Delayed Indefinitely |
| West Covina, CA | 177,000 SF delivery station | March 2022 – Canceled |
| Wilmington, NC | Delivery station | September, 2022 Delayed Indefinitely |
| Woodward, IA | 1 million SF fulfillment center | November 2021 – Canceled |
| Ypsilanti, MI | 183,000 SF delivery station | August 2022 – Canceled |

## H.   The Truth Begins to Emerge About Amazon's Exploitation of Third-Party Sellers and Slowing Demand for Amazon's Fast Delivery

### 1.   During the Class Period, the Truth Gradually Emerges that Amazon Exploited Its Third-Party Sellers

238.   On April 28, 2020, *CNBC* published an article entitled "GOP Sen. Hawley asks DOJ to open a criminal investigation into Amazon."  According to the article, Senator Hawley requested that the DOJ open a criminal investigation into Amazon, citing claims that the Company engaged in "predatory and exclusionary data practices to build and maintain a monopoly" following reports that Amazon used data from third-party sellers to compete with them using its private-label business.  Senator Hawley further stated that "Amazon abuses its position as an online

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 82 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

platform and collects detailed data about merchandise so Amazon can create copycat products under an Amazon brand." That same day, *States News Service* likewise published an article detailing Senator Hawley's call for action, including the senator's letter to the DOJ, which alleged, *inter alia*, that "Amazon appears to recognize that using this data to develop its own merchandise is problematic. Indeed, Amazon insists it has adopted policies prohibiting this conduct. Yet Amazon's own employees and documents suggest that what Amazon says in its policies and what Amazon does in practice are two different things. Even if Amazon's statements are true, they are hardly reassuring. Amazon does not deny that it uses precise, intrusive data to create its own merchandise."[197] On this news, Amazon's stock price fell $61.92 per share, or 2.61%, to close at $2,314.08 per share on April 28, 2020.

239. On May 1, 2020, the first headline for a *Bloomberg* article titled, "Amazon's Bezos Faces Call to Testify Before House Panel," went live at 10:34 a.m. The article noted that the members of an antitrust panel for the House Judiciary Committee had requested that Bezos testify regarding concerns that the Company used data from third-party sellers on its site to develop competing products, in contradiction to representations the Company previously made under oath to Congress in July 2019 [198]

240. Later that day, at 4:33 p.m., *Fox News* published an article titled "Jeff Bezos could testify for Amazon's 'possibly criminally false' statements to Congress, letter reveals."[199] The article reported that "[t]he lawmakers also referenced Amazon's lack of cooperation with Congress' antitrust probe of the company."

---

[197] "Senator Hawley Requests Criminal Antitrust Investigation of Amazon," *States News Service* (Apr. 28, 2020) (available on Lexis Nexis).

[198] Ben Brody, "Amazon's Bezos Faces Call to Testify Before House Panel," *Bloomberg* (May 1, 2020), available at https://www.bloomberg.com/news/articles/2020-05-01/amazon-s-bezos-called-to-testify-before-house-antitrust-panel#xj4y7vzkg.

[199] Christopher Carbone, "Jeff Bezos could testify for Amazon's 'possibly criminally false' statements to Congress, letter reveals," *Fox News* (May 1, 2020 4:33pm), available at https://www.foxnews.com/tech/jeff-bezos-testify-amazon-congress .

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 83 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

241.    On this news, Amazon's stock price fell the same day from $2,323.00 per share at 10:34 a.m. to close at $2,286.04, a decline of $36.96 per share or 1.59%.

242.    On July 23, 2020, *Wall Street Journal* published an article entitled "Amazon Met With Startups About Investing, Then Launched Competing Products."  The article reported, in relevant part, that Amazon engaged in the practice of making initial investments or meetings with start-ups for the purpose of securing their proprietary information before launching Amazon's own competing products.

243.    On this news, Amazon's stock price fell $113.36 per share, or 3.66%, to close at $2,986.55 per share on July 23, 2020.

244.    On August 3, 2020, *Bloomberg* published an article entitled "Amazon's Market Power to Be Investigated by New York AG."  The article reported that the New York and California Attorneys Generals were joining the FTC's antitrust probe into Amazon.  *Business Insider* reported, the same day, in an article entitled "Amazon is reportedly facing a new antitrust investigation into its online marketplace led by the FTC and attorneys general in New York and California" that the joint probe relates to Amazon's treatment of third-party sellers and competition with its own products.

245.    On this news, Amazon's stock price fell $52.79 per share, or 1.67%, to close at $3,111.89 per share on August 3, 2020.

246.    On October 6, 2020, the Subcommittee released a report on Amazon's anticompetitive practices.  News agencies noted that the report hinted at a breakup of big tech companies and detailed concerns about the anticompetitive practices of Amazon.

247.    On this news, Amazon's stock price fell $99.24 per share, or 3.1%, to close at $3,099.96 per share on October 6, 2020.

248.    On April 6, 2022, *Wall Street Journal* published an article entitled "SEC Is Investigating How Amazon Disclosed Business Practices."  The article reported, in relevant part:

> Federal securities regulators are investigating how Amazon.com Inc. has disclosed some details of its business practices, including how it uses third-party-seller data for its private-label business, according to people familiar with the matter.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS   - 84 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

The Securities and Exchange Commission is probing how the technology giant—the largest U.S. e-commerce retailer and cloud-computing company—handled disclosures of its employees' use of data from sellers on its e-commerce platform, the people said. The SEC's enforcement division has asked for emails and communications from several senior Amazon executives, according to one of the people.

\* \* \*

As a result of its 16-month investigation into technology companies including Amazon beginning in 2019, the [House Judiciary Committee] proposed a series of bills aimed at reining in tech giants. One of the measures targets Amazon's private-label business, seeking to make it unlawful for the company to give its own products preference over those of competitors, or to use sellers' nonpublic data to compete with them.

\* \* \*

The SEC's probe has been under way for more than a year, one of the people familiar with the matter said.

249.   On this news, Amazon's stock price fell $105.98 per share, or 3.2%, to close at $3,175.12 per share on April 6, 2022.

### 2.   On April 28, 2022, the Truth Begins to Emerge About Reduced Demand for Amazon's Fast Delivery

250.   On April 28, 2022, Amazon announced its financial results for the first quarter of 2022. The Company reported a $3.8 billion net loss—its first quarterly loss since 2015. In Amazon's earnings release, filed with the SEC that same day on Form 8-K, Defendant Jassy admitted that Defendants were "no longer chasing physical or staffing capacity." Instead, Jassy explained, the Company would turn to "improving productivity and cost efficiencies" in Amazon's "fulfillment network." After two years of vast expansion, Jassy admitted that these improvements "may take some time." Additionally, Jassy said that Amazon was seeing "encouraging progress on . . . delivery speed performance." Jassy admitted, however that shipping speeds were only then "approaching levels not seen since the months immediately preceding the pandemic in early 2020"—despite the fact that faster delivery had repeatedly been the publicly stated basis for Amazon's aggressive fulfillment spending during those two years.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 85 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

251.     On the Company's first-quarter 2022 earnings conference call with analysts that day, Defendant Olsavsky disclosed $6 billion of "incremental costs," including $4 billion of costs that corresponded "to the state of the labor force and fulfillment network."  Regarding labor, Olsavsky stated that "we've quickly transitioned from being understaffed to being overstaffed, resulting in lower productivity.  This lower productivity added approximately $2 billion in cost compared to last year."

252.     Regarding the fulfillment network, Olsavsky admitted:

> [W]e currently have excess capacity in our fulfillment and transportation network. . . . [W]e made conscious decisions in 2020 and early 2021 to not let space be a constraint on our business.  During the pandemic, we were facing not only unprecedented demand but also extended lead times on new capacity, and we've built towards the high end of a very volatile demand outlook. . . . We estimate that this overcapacity, coupled with the extraordinary leverage we saw in Q1 of last year resulted in $2 billion of additional costs year over year in Q1.  We do expect the impacts of this fixed cost leverage to persist for the next several quarters as we grow into this capacity.

253.     Olsavsky further admitted on the first-quarter 2022 earnings call that "[i]n the consumer business . . . we currently have some excess capacity in the network that we need to grow into, so we have brought down our build expectations," adding that "many of the build decisions were made 18 to 24 months ago, so there are limitations on what we can adjust midyear." However, as discussed above, what Defendants did not say was that the Company had spent that last nine months reassuring the market that Amazon's continued, increasing investments in capacity were both necessary to meet short-term demand for e-commerce and fast delivery, and would add value in the longer term.  On the same call, in response to analyst questions concerning the costs of Amazon's "capacity issues," Olsavsky stated that "we have a chance to more right-size our capacity to a more normalized demand pattern."  Beyond the reported net loss, the first quarter of 2022 also marked Amazon's slowest quarterly growth since 2001.  As *CNBC* reported, "Amazon's revenue increased 7% . . . compared with 44% expansion" in the first quarter of 2021.

254.     The Company's April 28, 2022 disclosure concerning the significant negative impact of Amazon's fulfillment network and infrastructure spending caused a precipitous decline in the market price of Amazon common stock.  Specifically, in response to the April 28, 2022

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 86 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

disclosure, Amazon common stock declined from a closing price of $2,891.93 per share on April 28, 2022 to a closing price of $2,485.63 per share on April 29, 2022, a decline of $406.30 per share, or 14.05%.

255.    Media coverage on Amazon's "first loss in 7 years" noted the Company's disclosure that "its major investments in warehouses and staff during the coronavirus pandemic were catching up with it," including Jassy's admission that Amazon was "no longer chasing physical or staffing capacity," but instead focusing on "improving productivity and cost efficiencies throughout our fulfillment network."[200]   For example, on April 29, 2022, *CNN Business* quoted Jassy's disclosure that Amazon was "no longer chasing physical or staffing capacity" but was instead "focused on improving productivity and cost efficiencies," noting his statements on "Amazon's breakneck growth in its consumer business during the pandemic, and the 'doubling' of the company's fulfillment network in the last two years."

256.    Similarly, *Business Insider* reported on April 29, 2022 that "Amazon [was] over capacity after doubling its warehouse space during the pandemic," and that "[s]hares of Amazon fell more than 13%" following Amazon's Q1 2022 Earnings Call, where Olsavsky: (i) "said the company has 'too much space right now' compared to demand" and (ii) "told analysts on Thursday that Amazon went from being understaffed to overstaffed."

257.    Securities analysts reacted with surprise and concern to Amazon's April 28, 2022 earnings report and Defendants' disclosure that the Company was pulling back on the aggressive expansion it had previously touted, while stressing the resulting significant negative financial consequences.  One firm, Wedbush, titled its April 29, 2022 report "**We Aren't Buying What Amazon (Management) is Selling**," which aptly illustrates the mistrust and sense of betrayal among securities professionals, and Amazon investors more generally, upon learning the truth about Amazon's expansion plans.[201]

---

[200]  Business Insider US, Amazon tumbles 8.5% in premarket after posting first loss in 7 years (April 29, 2022).

[201]  Wedbush, "Amazon.com, We Aren't Buying What Amazon (Management) is Selling; PT to $3,500."

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 87 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

258.   Wedbush lowered its 12-month price target from $3,950 to $3,500 based on the news of Amazon's losses.  Wedbush cited "a previously unforeseen lack of productivity arising from the company's decision to rapidly expand its fulfillment capacity over the last 24 months ($2 billion in incremental costs)."  It reported that "lower fulfillment productivity" was "an extraordinarily weak excuse" for the quarterly losses, asking:  "The company nearly doubled its fulfillment capacity over a 24-month period and suffered a lack of productivity at the end of that period but not before?  Why the rush to expand?  Why not double capacity over 30 months, or 36, or 48?  How is it that there was no corresponding lack of productivity in Q3 or Q4 last year?"  Wedbush concluded that "Fulfillment ate up all of the growth."

259.   *JPMorgan* April 29, 2022 report showed further surprise by elite investment firms at Amazon's unanticipated losses.  *JPMorgan* wrote on April 29, 2022 that "With AMZN having doubled its fulfillment network & nearly doubled its workforce to 1.6M employees over the past 2 years, the company now has excess physical capacity & is overstaffed, & is pulling back on spending as anticipated.  However, that near-term overbuild led to $4B in lower productivity & inefficiencies in 1Q Y/Y, which we did not anticipate."

260.   BNP Paribas analysts also reported on April 29, 2022 that "Amazon delivered a weak set of earnings, missing consensus margin expectations by 150bps with heavy [free cash flow] outflows of over USD16bn, even missing our conservative estimates."  As the report explained, the "internal headwinds" included costs of overexpanding the Company's fulfillment network, as "Amazon finds itself with excess capacity," the analysts "take down our growth expectations as cuts take hold," and "[t]he biggest change is that management is no longer 'chasing' fulfillment & transportation CAPEX."

261.   Other analysts were in accord.  Susquehanna Financial Group reported on April 29, 2022 that "excess capacity" was "pressuring profitability . . . as AMZN invested heavily in 2H21 and is now working to reverse the fixed-cost deleverage and increase productivity.  These headwinds will all persist in 2Q as well."  William Blair Equity Research reported on April 28, 2022 that, along with "weaker-than-expected results for its first quarter ending March 2022" the "bigger headline was the company's first quarter loss since 2015, at a loss per share of $7.56, or

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 88 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

nearly $16.00 shy of the Street's earnings per share expectations."  RBC Capital Markets wrote on April 29, 2022 that Amazon "missed operating income by $1.7B vs. Street which included $2B of headwinds owing to having excess capacity built out."  And Telsey Advisory Group reported on April 29, 2022 that "the company missed 1Q22 profit projections, primarily due to elevated operating costs and excess capacity," including "internal (controllable) factors," including $2 billion of "excess capacity/deleverage of fixed assets."  Moreover, Telsey reported that "Amazon is focused on resizing its cost structure and eliminating inefficiencies, although it may prove challenging to effectively manage costs, given multiple areas of continued investment."

262.    Considering Amazon's inflated fulfillment costs, analysts highlighted the direct connection between Amazon's two years of capacity expansion and the Company's 2022 losses. PhillipCapital analysts likewise reported on May 4, 2022 about the "internal factors: productivity and overcapacity hurt margins" that were disclosed, and more specifically that the "[e]xcess capacity in fulfilment added [$2 billion] costs."

263.    In the months following the April 28, 2022 corrective disclosure, certain additional details of Amazon's decisions to pull back on its expansion plans have come to light.  On May 24, 2022, technology industry news site *The Information* reported Amazon had "reversed course on an aggressive build-out," and beginning in March 2022, Amazon "canceled plans for nearly 10 million square feet of warehouse space, shelving plans for more than a dozen fulfillment centers and delivery facilities around the U.S. as the company wrestles with a costly space glut on the heels of the pandemic."  *See supra* ¶¶ 230-37.

264.    By June 2022, Amazon's actions to reduce capacity began to reveal the true scale of the situation.  Noting "clear signs" of Amazon's "excess capacity problem," research analysts such as Evercore ISI Research continued to remark on the "pace and magnitude of" the Company's "capacity reduction."  In a report specifically addressing Amazon's excess capacity problems, Evercore analysts focused on the underlying issues and the severity of the problem:

> The two biggest drivers that led to Amazon's current capacity issue – the overbuilding and overstaffing of the company's retail capacity, as disclosed on the Q1 EPS call – include:  a) Amazon over extrapolated strong demand trends to persist post Covid. We are currently seeing consumer demand trends normalizing

back to pre-Covid levels – roughly 100bps of Online Retail penetration annually vs. 250bps in 2020; and b) Amazon launched a major accelerated shipping build-out program (Next Day, Same Day, and 'Super Same Day') right before Covid.

265.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Amazon stock, Plaintiff and other Class members suffered significant losses and damages.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

266.    Given the history described above, during the Class Period the market was keenly focused on Amazon's efforts to exploit its third-party sellers and to aggressively expand the Company's fulfillment capacity and network.  With respect to fulfillment, for nearly a year Defendants repeatedly stated that Amazon's costly expansion efforts were supported by increasing demand for fast delivery, a service that the Company believed set it apart from competitors.  In reality, however, demand for fast delivery had slowed by July 2021 and likely months earlier. Rather than acknowledge this declining trend in the months that followed, Defendants instead continued to reaffirm that the Company's expansion strategy was meeting rising demand for faster delivery and doing so even after the U.S. economy began to reopen after COVID-19 lockdowns.

267.    Significantly, recent news reports have confirmed that when Defendants made their misrepresentations concerning expansion, Defendants had already instituted substantial cutbacks. As reported by the June 16, 2022 article in *Wall Street Journal*, under Defendant Jassy's leadership and direction, those cutbacks began to occur in July, September, and December 2021.  Technology industry news site *The Information* similarly reported on May 24, 2022 that Amazon had "reversed course on an aggressive build-out," and beginning in March 2022, Amazon "cancelled plans for nearly 10 million square feet of warehouse space, shelving plans for more than a dozen fulfillment centers and delivery facilities around the U.S. as the company wrestles with a costly space glut on the heels of the pandemic."  Paris Martineau, *Amazon Quietly Axed Millions of Square Feet of Warehouse Space*," *The Information* (May 24, 2022), *available at* https://www.theinformation.com/articles/amazon-quietly-axed-millions-of-square-feet-of-warehouse-space.

268.    With regard to third-party sellers, beginning on February 1, 2019, when Amazon filed its Annual Report with the SEC, Amazon failed to disclose that the Company exploited its third-party sellers through a myriad of anticompetitive, discriminatory, and abusive tactics, including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

269.    Amazon also failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

270.    Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

271.    Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

272.    Instead, during the Class Period, or at least until April 6, 2022, in Amazon's SEC filings, investor conference calls, testimony before Congress, and other platforms, Defendants repeatedly claimed the opposite:  that Amazon did nothing but support its third-party sellers.

**A.      February 1, 2019 – Amazon Form 10-K and 2019 Forms 10-Q**

273.      The Class Period begins on February 1, 2019, when Amazon filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2018 (the "2018 10-K").  Appended to the 2018 10-K as exhibits were signed Certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Bezos and Olsavsky, attesting that "I have reviewed this Form 10-K of Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

274.      <u>False and Misleading Statements</u>:  According to the 2018 10-K, North America net sales in 2018 were $141.366 billion, and International net sales in 2018 were $65.866 billion.  In the 2018 10-K, the Company stated:

> North America sales increased 33% in 2017 and 2018, compared to the comparable prior years.  **The sales growth in each year primarily reflects increased unit sales, including sales by third-party sellers . . . . Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection**.

> International sales increased 23% and 21% in 2017, and 2018, compared to the comparable prior years.  **The sales growth in each year primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection**.

275.      <u>Reasons Why Defendants' Statements in ¶ 274 Were Materially False and Misleading When Made</u>:  The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements specifically attributed Amazon's increased sales to sales by third-party sellers but failed to disclose that Amazon was, as explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and

1  (iv) favoring its own private-label products to the detriment of third-party sellers.  These practices

2  created a heightened risk of governmental and other criminal and civil investigations, as well as

3  the risk of significant penalties and reputational harm.

4        276.  <u>False and Misleading Statements</u>:  The 2018 10-K contained only generic and

5  misleadingly incomplete risk statements that Amazon was "subject to general business regulations

6  and laws, as well as regulations and laws specifically governing the Internet[] [and] e-commerce"

7  and that existing and future laws and regulations covered "competition," among other things.

8  Amazon merely advised its investors that "[e]xisting and future laws and regulations may impede

9  our growth" and failed to disclose the specific and known risks arising from the Company's

10  improper business practices.

11        277.  <u>Reasons Why Defendants' Statements in ¶ 276 Were Materially False and</u>

12  <u>Misleading When Made</u>:  The statements in the paragraph above were materially false and

13  misleading when made, or omitted to state material facts necessary to make the statements not

14  misleading, because the statements above discussed Amazon's legal and regulatory risk with

15  respect to the Internet, e-commerce, and competition, but failed to disclose that Amazon was, as

16  explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its

17  products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own

18  economic gain; and (iv) favoring its own private-label products to the detriment of third-party

19  sellers.  These practices created a heightened risk of governmental and other criminal and civil

20  investigations, as well as the risk of significant penalties and reputational harm.

21        278.  <u>False and Misleading Statements</u>:  The generic and misleadingly incomplete risk

22  statements in the paragraph above were also repeated in Amazon's Forms 10-Q, filed with the SEC

23  on April 26, 2019 (1Q 2019 10-Q), July 26, 2019 (2Q 2019 10-Q), and October 25, 2019 (3Q 2019

24  10-Q).  Appended to the April 26, 2019, July 26, 2019, and October 25, 2019 10-Q Forms were

25  signed Certifications pursuant to SOX by Defendants Bezos and Olsavsky, attesting that "I have

26  reviewed this Form 10-Q of Amazon.com, Inc." and that "Based on my knowledge, this report

27  does not contain any untrue statement of a material fact or omit to state a material fact necessary

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 93 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1    to make the statements made, in light of the circumstances under which such statements were

2    made, not misleading with respect to the period covered by this report."

3        279.    <u>False and Misleading Statements</u>:  According to the 1Q 2019 10-Q, North America

4    net sales in 1Q 2019 were $35.812 billion, and International net sales in 1Q 2019 were

5    $16.192 billion.  The 1Q 2019 10-Q also contained the following statements:

> North America sales increased 17% in Q1 2019 compared to the comparable prior
> year period.  **The sales growth primarily reflects increased unit sales, including
> sales by third-party sellers.  Increased unit sales were driven largely by our
> continued efforts to reduce prices for our customers, including from our
> shipping offers, increased in-stock inventory availability, and increased
> selection**.

> International sales increased 9% in Q1 2019 compared to the comparable prior year
> period.  **The sales growth primarily reflects increased unit sales, including sales
> by third-party sellers.  Increased unit sales were driven largely by our
> continued efforts to reduce prices for our customers, including from our
> shipping offers, increased in-stock inventory availability, and increased
> selection**.

14       280.    <u>False and Misleading Statements</u>:  According to the 2Q 2019 10-Q, North America

15   net sales in 2Q 2019 were $38.653 billion, and International net sales in 2Q 2019 were

16   $16.37 billion.  The 2Q 2019 10-Q also contained the following statements:

> North America sales increased 20% in Q2 2019 and 18% for the six months ended
> June 30, 2019, compared to the comparable prior year periods.  **The sales growth
> primarily reflects increased unit sales, including sales by third-party sellers.
> Increased unit sales were driven largely by our continued efforts to reduce
> prices for our customers, including from our shipping offers, increased in-
> stock inventory availability, and increased selection**.

> International sales increased 12% in Q2 2019 and 10% for the six months ended
> June 30, 2019, compared to the comparable prior year periods.  **The sales growth
> primarily reflects increased unit sales, including sales by third-party sellers.
> Increased unit sales were driven largely by our continued efforts to reduce
> prices for our customers, including from our shipping offers, increased in-
> stock inventory availability, and increased selection**.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 94 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

281.   <u>False and Misleading Statements</u>:  According to the 3Q 2019 10-Q, North America net sales in 3Q 2019 were $42.638 billion, and International net sales in 3Q 2019 were $18.348 billion.  The 3Q 2019 10-Q also contained the following statements:

> North America sales increased 24% in Q3 2019 and 20% for the nine months ended September 30, 2019, compared to the comparable prior year periods.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection**.

> International sales increased 18% in Q3 2019 and 13% for the nine months ended September 30, 2019, compared to the comparable prior year periods.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection**.

282.   <u>Reasons Why Defendants' Statements in ¶¶ 279-81 Were Materially False and Misleading When Made</u>:  The statements in the paragraphs above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements specifically attributed Amazon's increased sales to sales by third-party sellers but failed to disclose that Amazon was, as explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and (iv) favoring its own private-label products to the detriment of third-party sellers.  These practices created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

**B.   April 11, 2019 – Amazon Form 8-K**

283.   <u>False and Misleading Statements</u>:  On April 11, 2019, Amazon filed its Form 8-K with the SEC, signed by Defendant Zapolsky ("2019 Form 10-K").  Attached to the Form 8-K was Defendant Bezos' 2018 letter to shareholders, signed by Defendant Bezos.  The 2019 Form 8-K contained the following statements concerning Amazon's third-party sellers:

> Third-party sellers are kicking our first party butt.  Badly.

> * * *

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 95 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Why did independent sellers do so much better selling on Amazon than they did on eBay?  And why were independent sellers able to grow so much faster than Amazon's own highly organized first-party sales organization?  There isn't one answer, but we do know one extremely important part of the answer:

**We helped independent sellers compete against our first-party business** by investing in and offering them the very best selling tools we could imagine and build.  There are many such tools, including tools that help sellers manage inventory, process payments, track shipments, create reports, and sell across borders – and we're inventing more every year.  But of great importance are Fulfillment by Amazon and the Prime membership program.  In combination, these two programs meaningfully improved the customer experience of buying from independent sellers.

284.    <u>Reasons Why Defendants' Statement in ¶ 283 Was Materially False and Misleading When Made</u>:  The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that Amazon "helped independent sellers compete against our first-party business," Amazon failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

285.    The above statements were also materially false because Amazon failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 96 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

286.     The above statements were also false because Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

287.     Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

**C.     April 23, 2019 – the Company's Tweet**

288.     <u>False and Misleading Statement</u>:   On April 23, 2019, in response to Senator Elizabeth Warren's April 22, 2019 tweet that her plan to break up big tech will prevent "corporations like Amazon from knocking out the rest of the competition," Amazon tweeted:

> **We don't use individual sellers' data to launch private label products** (which account for only about 1% of sales).  And sellers aren't being "knocked out" – they're seeing record sales every year . . . .[202]

289.     <u>Reasons Why Defendants' Statement in ¶ 288 Was Materially False and Misleading When Made</u>:   The statement in the paragraph above was materially false and misleading when made, or omitted to state material facts necessary to make the statement not misleading, because it failed to disclose, among other things, that Amazon was in fact leveraging its access to third-party sellers' data to identify and replicate popular and profitable products from among the hundreds of millions of listings on its Marketplace.

**D.     April 25, 2019 – Q1 2019 Earnings Call with Investors**

290.     <u>False and Misleading Statement</u>:   On April 25, 2019, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q1 2019 results (the "Q1 2019 Earnings

---

[202] https://twitter.com/amazonnews/status/1120780868614627328.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 97 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Call").  When asked to comment on Amazon's efforts to sustain its growth rate in the third-party marketplace business, Defendant Olsavsky responded, in relevant part:

> So again, let me reiterate our approach.  **So main goal here is that it will allow customers to have the broadest selection, the best available price and also the most convenient options on how they receive the item.  If we're delivering on those three elements, we're indifferent as to whether it's sold by us or a third-party.**  We actively recruit sellers to sell on our platform, it's because it adds selection . It adds – If it's in the FBA program, it adds Prime eligible selection.
>
> **We spend billions of dollars a year, as Jeff said, on infrastructure, tools and services, not only to allow sellers to sell, but to help themselves more successfully**. So we have a vested interest in the success of our sellers.  Any growth acceleration or deceleration that you see can be very much tied to the total sales of the customer – that we have the customers in any country.

291.   <u>Reasons Why Defendants' Statements in ¶ 290 Were Materially False and Misleading When Made</u>:  The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that Amazon was "indifferent as to whether it's sold by us or a third party" and that Amazon invests "to allow sellers to sell" and "to help themselves more successfully," Amazon failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

292.   The above statements were also materially false because Amazon failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 98 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

293.    Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

294.    Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

### E.    July 16, 2019 – House Judiciary Committee Testimony and the Aftermath

295.    <u>False and Misleading Statement</u>:   On July 16, 2019, Defendant Sutton testified before the House Judiciary Committee (the "July 16, 2019 Hearing").[203]   When asked by Representative Pramila Jayapal whether Amazon "track[s] [the data] and create[s] products that directly compete with those most popular brands that are out there," Defendant Sutton responded, in relevant part, that "**[Amazon] do[es] not use any of that specific seller data in creating our own private brand products**."

296.    <u>Reasons Why Defendants' Statement in ¶ 295 Was Materially False and Misleading When Made</u>:   The statement in the paragraph above was materially false and misleading when made, or omitted to state material facts necessary to make the statement not misleading, because the statement failed to disclose, among other things, that Amazon was in fact

---

[203]  Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship: Hearing Before the Subcomm. on Antitrust, Com., & Admin. L. of the H. Comm. on the Judiciary, 116th Cong. 5-6, 23-24, 38-44, 46-47, 49-51, 64, 66-67, 70-71 (2019) (testimony of Nate Sutton, Assoc. Gen. Couns., Competition, Amazon.com, Inc.), https://www.govinfo.gov/content/pkg/CHRG-116hhrg39901/pdf/CHRG-116hhrg39901.pdf.

leveraging its access to third-party sellers' data to identify and replicate popular and profitable products from among the hundreds of millions of listings on its Marketplace.

297.   <u>False and Misleading Statement</u>:  At the same hearing, in response to Subcommittee Chairman David N. Cicilline's questioning concerning third-party sellers, Defendant Sutton responded, in relevant part:

> **Our incentive is to help the seller succeed because we rely on them**.  If we did that, we know they'd go elsewhere.  They have many options.  So we apply the same criteria to both, and we do not use their individual data when we're making decisions to launch private brands.

298.   <u>Reasons Why Defendants' Statement in ¶ 297 Was Materially False and Misleading When Made</u>:  The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that Amazon's "incentive is to help the seller succeed" and that Amazon "appl[ied] the same criteria to both, and we do not use their individual data when we're making decisions to launch private brands," Amazon failed to disclose, among other things, that Amazon used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

299.   The above statements were also materially false because Amazon failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."  Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 100 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

300.   Amazon also failed to disclose that it routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

301.   Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

302.   <u>False and Misleading Statement</u>:   At the same hearing, when asked by Representative Lucy McBath whether Amazon "privilege[s] vendors who use Amazon's Fulfillment services over those who chose not to?," Defendant Sutton responded, in relevant part: "**We do not favor . . . products that use FBA over others**."

303.   <u>Reasons Why Defendants' Statement in ¶ 302 Was Materially False and Misleading When Made</u>:   The statement in the paragraph above was materially false and misleading when made, or omitted to state material facts necessary to make the statement not misleading, because the statement failed to disclose, among other things, that Amazon was in fact favoring sellers who used FBA over those who did not, for example, for search rankings and the Buy Box.

304.   <u>False and Misleading Statement</u>:   At the same hearing, when asked by Subcommittee Chairman David N. Cicilline whether Amazon's algorithm for collecting data was used to support the sale of Amazon-branded products, Defendant Sutton responded, in relevant part:

> "[o]ur algorithms, such as the buy box, is [sic] aimed to predict what customers want to buy [. . .] [a]nd **we apply the same criteria whether you're a third-party**

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 101 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

**seller or Amazon to that because we want customers to make the right purchase regardless of whether it's a seller or Amazon**."

\* \* \*

The algorithms are optimized to predict what customers want to buy regardless of the seller.  **We provide the same criteria**.

305.    <u>Reasons Why Defendants' Statements in ¶ 304 Were Materially False and Misleading When Made</u>:  The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that Amazon has used profitability—also referred to internally as "contribution profit" or "CP"—as a factor in awarding the Buy Box.  Amazon was also misappropriating third-party sellers' data to benefit its own private brands.

306.    As the Subcommittee Investigation proceeded, various reputable media outlets published reports that contradicted the testimony offered by Amazon's witnesses at the Subcommittee hearings.  For example, on July 18, 2019, the investigative news organization *Capitol Forum* published an article entitled, "Amazon:  Former Employee Challenges Executive's Denial About Company's Use of Independent Sellers' Data."[204]  The former Amazon employee stated that Amazon "routinely tracked the popularity of independent sellers' products sold through its website," and that "[the former employee] used to pull sellers' data to look at what the best products were [. . .] to create its own labels.  Accordingly, *Capitol Forum*'s reporting directly contradicted Defendant Sutton's testimony.

307.    On July 23, 2019, in response to the publication of the *Capitol Forum* article and similar reporting by other media outlets, Chairman Cicilline sent Amazon a letter requesting that the Company supplement Defendant Sutton's responses to questions at the July 16, 2019 Hearing because "[i]n several instances, Mr. Sutton responded to questions from [the Subcommittee] by

---

[204] Amazon: Former Employee Challenges Executive's Denial About Company's Use of Independent Sellers' Data, THE CAPITOL FORUM (July 18, 2019).

offering other ancillary information or partial and selective responses." [205]   Moreover, Chairman Cicilline's letter stated that "[i]n one instance, [Defendant Sutton's] answer has been contested by a former Amazon employee, raising questions about the veracity of his responses under oath."

308.   <u>False and Misleading Statement</u>:   On July 26, 2019, Defendant Zapolsky sent a letter[206] in response to Chairman Cicilline's July 23, 2019 letter, which stated, in relevant part:

> **[W]hile we prohibit in our private label strategy the use of data related specifically to individual sellers**, like other retailers we use aggregated store data (e.g., total sales) and customer shopping behavior (e.g., search volume) to identify categories and products with high customer demand over a given time period. . . .
>
> * * *
>
> **We prohibit in our private label strategy the use of data related specifically to individual sellers.**
>
> * * *
>
> **[W]e use aggregated store data on total sales and search volume for categories and products (unless the product is only offered by a single seller, in which case we do not use that data).**
>
> * * *
>
> **[T]he featured offer algorithm does not favor any particular type of offer, but rather seeks to determine which offer to highlight based on a prediction of which offer customers would choose if they were to compare all offers in detail. . . .**
>
> **Moreover, we make all offers easily available for all customers to shop. Customers may compare the closest competing offers and add them directly to their shopping cart via the "Other Sellers on Amazon" option [. . .], which is displayed on the product detail page directly below the featured offer. . . .**

309.   <u>Reasons Why Defendants' Statements in ¶ 308 Were Materially False and Misleading When Made</u>:   The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that (1) Amazon

---

[205]   https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/7.22.19%20letter%20to%20amazon%20(dnc).pdf.

[206]   https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/07.26.19%20-%20amazon%20response.pdf.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 103 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1    engaged in improper conduct with respect to its private-label business by using third-party sellers'

2    non-public data to compete with them and by giving Amazon products preference over its

3    competitors; and (2) even for purportedly aggregated data, Amazon used single sellers' data when

4    selling returned or damaged versions of an item through Amazon's Warehouse Deals program,

5    used aggregate data when there were only two or three sellers of a product, and used aggregate

6    data when there were multiple sellers but one individual seller accounted for almost 100% of all

7    sales.

8    **F.    July 25, 2019 – Amazon's Q2 2019 Earnings Call**

9         310.    <u>False and Misleading Statement</u>:   On July 25, 2019, Amazon hosted an earnings

10   call with investors and analysts to discuss the Company's Q2 2019 results (the "Q2 2019 Earnings

11   Call").  When questioned whether there would be any change in Amazon's business to focus "more

12   towards third-party from first-party," Defendant Olsavsky stated, in relevant part:

13        On your comment, I assume you meant vendors not merchants, but on the move
          from 1P to 3P, but no there shouldn't be – I can't highlight anything related shifting
14        in channel there, but I would say that we remain indifferent on whether – **we're
          focused on price convenience and selection for our customers.  And whether
15        product is a retail offering or third-party offering is not that important to us.
          As long as it's in stock, as long as it's priced competitively . . . .**
16

17        We continue to invest very heavily in our systems both for retail vendors and also
          for third-party merchants invest billions of dollars a year on behalf of them making
18        Amazon a better place for customers to buy and increasingly not only vendor sales,
          but also third-party merchant sales.
19

20        311.    <u>Reasons Why Defendants' Statements in ¶ 310 Were Materially False and

21   Misleading When Made</u>:   The statements in the paragraph above were materially false and

22   misleading when made, or omitted to state material facts necessary to make the statements not

23   misleading, because in telling investors that "whether product is a retail offering or third-party

24   offering is not that important to [Amazon,] [a]s long as it's in stock, as long as it's priced

25   competitively," and that Amazon "invest[ed] very heavily in our systems both for retail vendors

26   and also for third-party merchants . . . making Amazon a better place for . . . increasingly not only

27   vendor sales, but also third-party merchant sales," Amazon failed to disclose, among other things,

28   that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS   - 104 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

312. The above statements were also materially false because Amazon failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform. Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation. In fact, the wrongful use of such third-party seller data was a common practice within the Company. Amazon currently faces significant regulatory inquiries into such practices.

313. Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

314. Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

### G.    October 24, 2019 – Amazon's Q3 2019 Earnings Call

315. <u>False and Misleading Statement</u>: On October 24, 2019, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q3 2019 results (the "Q3 2019 Earnings Call"). When asked to comment on the opportunities and competitiveness for third-party sellers, Defendant Olsavsky responded, in relevant part, "**[o]n third party I would say we only succeed if the third party sellers succeeds. So we're heavily invested in them as they are in us. So we**

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 105 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**are constantly investing on their behalf, adding new products and features and you know we are cognizant of their economics as well and we want a business that works for both of us and we set our fees accordingly**."

316.    <u>Reasons Why Defendants' Statements in ¶ 315 Were Materially False and Misleading When Made</u>:  The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that "we only succeed if the third party seller succeeds"; "we're heavily invested in them as they are in us"; "we are constantly investing on their behalf"; "we are cognizant of their economics"; and "we want a business that works for both of us and we set our fees accordingly," Amazon failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

317.    The above statements were also materially false because Amazon failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

318.    Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 106 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

319.   Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

### H.   January 31, 2020 – Amazon's Form 10-K

320.   On January 31, 2020, Amazon filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2019 (the "2019 10-K"). Appended to the 2019 10-K as exhibits were signed Certifications pursuant to SOX by Defendants Bezos and Olsavsky, attesting that "I have reviewed this Form 10-K of Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

321.   <u>False and Misleading Statements</u>:  According to the 2019 10-K, North America net sales in 2019 were $170.773 billion, and International net sales in 2019 were $74.723 billion.  In the 2019 10-K, the Company stated:

> North America sales increased 21% in 2019, compared to the prior year. **The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection**.

> International sales increased 13% in 2019, compared to the prior year. **The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection**.

322.   <u>Reasons Why Defendants' Statements in ¶ 321 Were Materially False and Misleading When Made</u>:  The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS   - 107 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

misleading, because the statements specifically attributed Amazon's increased sales to sales by third-party sellers but failed to disclose that Amazon was, as explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and (iv) favoring its own private-label products to the detriment of third-party sellers.  These practices created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

323.  <u>False and Misleading Statements</u>:  The 2019 10-K contained only generic and misleadingly incomplete risk statements that Amazon was "subject to general business regulations and laws, as well as regulations and laws specifically governing the Internet[] [and] e-commerce" and that existing and future laws and regulations covered "competition," among other things.  Amazon merely advised its investors that "[u]nfavorable regulations, laws, decisions, or interpretations by government or regulatory authorities applying those laws and regulations" could "impede our growth" and failed to disclose the specific and known risks arising from the Company's improper business practices.

324.  <u>Reasons Why Defendants' Statements in ¶ 323 Were Materially False and Misleading When Made</u>:  The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements above discussed Amazon's legal and regulatory risk with respect to the Internet, e-commerce, and competition, but failed to disclose that Amazon was, as explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and (iv) favoring its own private-label products to the detriment of third-party sellers.  These practices created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

325.  <u>False and Misleading Statements</u>:  The generic and misleadingly incomplete risk statements in the paragraph above were also repeated in Amazon's Forms 10-Q, filed with the SEC on May 1, 2020 (1Q 2020 10-Q), July 31, 2020 (2Q 2020 10-Q), and October 30, 2020 (3Q 2020

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 108 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

10-Q).  Appended to the May 1, 2020, July 31, 2020, and October 30, 2020 Forms 10-Q were signed Certifications pursuant to SOX by Defendants Bezos and Olsavsky, attesting that "I have reviewed this Form 10-Q of Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

326.   <u>False and Misleading Statements</u>:  According to the 1Q 2020 10-Q, North America net sales in 1Q 2020 were $46.127 billion, and International net sales in 1Q 2020 were $19.106 billion.  The 1Q 2020 10-Q also contained the following statements:

North America sales increased 29% in Q1 2020 compared to the comparable prior year period.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand for household staples and other essential products . . . .**

International sales increased 18% in Q1 2020 compared to the comparable prior year period.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand for household staples and other essential products . . . .**

327.   <u>False and Misleading Statements</u>:  According to the 2Q 2020 10-Q, North America net sales in 2Q 2020 were $55.436 billion, and International net sales in 2Q 2020 were $22.668 billion  The 2Q 2020 10-Q also contained the following statements:

North America sales increased 43% in Q2 2020, and 36% for the six months ended June 30, 2020 compared to the comparable prior year periods.  The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .

International sales increased 38% in Q2 2020 and 28% for the six months ended June 30, 2020 compared to the comparable prior year periods.  The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 109 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

328.   <u>False and Misleading Statements</u>:  According to the 3Q 2020 10-Q, North America net sales in 3Q 2020 were $59.373 billion, and International net sales in 3Q 2020 were $25.171 billion.  The 3Q 2020 10-Q also contained the following statements:

North America sales increased 39% in Q3 2020, and 37% for the nine months ended September 30, 2020 compared to the comparable prior year periods.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .**

International sales increased 37% in Q3 2020 and 31% for the nine months ended September 30, 2020 compared to the comparable prior year periods.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .**

329.   <u>Reasons Why Defendants' Statements in ¶ 328 Were Materially False and Misleading When Made</u>:  The statements in the three 10-Qs above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements specifically attributed Amazon's increased sales to sales by third-party sellers but failed to disclose that Amazon was, as explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and (iv) favoring its own private-label products to the detriment of third-party sellers.  These practices created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

**I.      April 24, 2020 – Amazon Tweet**

330.   <u>False and Misleading Statement</u>:  On April 24, 2020, in response to Congressman Jerry Nadler's tweet about an April 23, 2020 *Wall Street Journal* article that alleged that Amazon employees used non-public business information from third-party sellers on its platform to develop competing products:  "[i]f true, this report raises deep concerns about Amazon's apparent lack of

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 110 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

candor before the Committee regarding an issue that is central to our investigation," Amazon tweeted:

> @RepJerryNadler. Respectfully, suggestions we misled Congress are unfounded. **We've been clear w/ the Committee that Amazon prohibits use of individual sellers' data as WSJ alleged**.   As w/ any serious allegation of employee misconduct, we are investigating.

331.   <u>Reasons Why Defendants' Statement in ¶ 330 Was Materially False and Misleading When Made</u>:   The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that (1) Amazon engaged in improper conduct with respect to its private-label business by using third-party sellers' non-public data to compete with them and by giving Amazon products preference over its competitors; and (2) even for purportedly aggregated data, Amazon used single sellers' data when selling returned or damaged versions of an item through Amazon's Warehouse Deals program, used aggregate data when there were only two or three sellers of a product, and used aggregate data when there were multiple sellers but one individual seller accounted for almost 100% of all sales.

**J.   May 15, 2020 – Amazon's Response to Subcommittee's May 1, 2020 Letter**

332.   On May 1, 2020, members of the Subcommittee sent Defendant Bezos a letter in response to an April 23, 2020 *Wall Street Journal* article which alleged that Amazon employees used sensitive business information from third-party sellers on its platform to develop competing products.  The letter stated that "[i]f these allegations are true, then Amazon exploited its role as the largest online Marketplace in the U.S. to appropriate the sensitive commercial data of individual Marketplace sellers and then used that data to compete directly with those sellers," and encouraged Defendant Bezos to testify before the Subcommittee.

333.   <u>False and Misleading Statement</u>:   On May 15, 2020, Amazon sent a letter[207] in response to the Subcommittee's May 1, 2020 letter to Defendant Bezos, stating, in relevant part:

> Because Amazon is privileged to have third-party sellers who now account for the great majority of sales of physical goods in Amazon's store, we determined years ago to take additional steps to give sellers comfort regarding their individual data. **It was purely for that reason that we went beyond any legal requirement—and beyond the protections in place at any other store we are aware of—to begin to implement internal policies to restrict the use of non-public data specific to one particular selling partner to compete directly with sellers**.  We did this because we thought it was the right thing to do for our selling partners, who are also critical customers of Amazon—we wanted to go the extra mile to protect the trust of third parties selling in our stores.

334.   <u>Reasons Why Defendants' Statements in ¶ 333 Were Materially False and Misleading When Made</u>:   The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that (1) Amazon engaged in improper conduct with respect to its private-label business by using third-party sellers' non-public data to compete with them and by giving Amazon products preference over its competitors; and (2) even for purportedly aggregated data, Amazon used single sellers' data when selling returned or damaged versions of an item through Amazon's Warehouse Deals program, used aggregate data when there were only two or three sellers of a product, and used aggregate data when there were multiple sellers but one individual seller accounted for almost 100% of all sales.

**K.     July 30, 2020 – Amazon's Q2 2020 Earnings Call**

335.   <u>False and Misleading Statement</u>:   On July 30, 2020, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q2 2020 results.   During the call, Defendant Olsavksy stated:

> Third-party units continue to represent more than half of overall unit volume, helped by improved quarter-over-quarter growth in active sellers.  **We are more**

---

[207] https://judiciary.house.gov/uploadedfiles/letter_from_brian_huseman_to_committee__may_15_2020.pdf.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**committed than ever to supporting the success of the hundreds of thousands of small and medium-sized businesses to sell their products in Amazon stores**.

336.    Reasons Why Defendants' Statements in ¶ 335 Were Materially False and Misleading When Made:  The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that "[w]e are more committed than ever to supporting the success of the hundreds of thousands of small and medium-sized business to sell their products in Amazon stores," Amazon failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

337.    The above statements were also materially false because Amazon failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

338.    Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 113 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

339.    Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

**L.      September 4, 2020 – Amazon's Response to Chairman Cicilline**

340.    <u>False and Misleading Statement</u>:  On September 4, 2020, in response to Chairman Cicilline's question "whether Amazon ever designed the Buy Box algorithm to consider profitability to Amazon as a determining factor in whether to award the Buy Box" to a third-party seller, Amazon stated "**Amazon does not consider profitability as part of the Featured Merchant Algorithm**."

341.    <u>Reasons Why Defendants' Statement in ¶ 340 Was Materially False and Misleading When Made</u>:  The statement in the paragraph above was materially false and misleading when made, or omitted to state material facts necessary to make the statement not misleading, because the statement failed to disclose, among other things, that Amazon has used profitability—also referred to internally as "contribution profit" or "CP"—as a factor in awarding the Buy Box.

**M.     September 25, 2020 – Amazon's Official Website**

342.    <u>False and Misleading Statement</u>:  On September 25, 2020, Amazon posted on its official website, that:

> **We have strict policies that forbid our own private brand teams from using individual seller data.  We train the teams on these policies and audit the teams' compliance with them.  Our approach allows us to improve our store while protecting the things sellers care about most: ensuring that their individual pricing plans, inventory levels, and sales histories are not shared with other parties or used to compete with them.**
>
> **Our continued success depends on providing a great experience – not only for our customers who benefit from wider selection and increased competition that helps keep prices low—but also for independent sellers, which means protecting their proprietary information while providing the data and tools they need to grow their businesses.**

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 114 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

343.   Reasons Why Defendants' Statements in ¶ 342 Were Materially False and Misleading When Made:   The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that Amazon leveraged its access to third-party sellers' data to identify and replicate popular and profitable products from among the hundreds of millions of listings on its Marketplace.

N.      October 6, 2020 – Amazon's Official Website

344.   False and Misleading Statement:   On October 6, 2020, Amazon stated on its official website:

> **Amazon and third-party sellers benefit each other**.  [F]lawed regulatory ideas rely on the false narrative that Amazon's interests are not aligned with those of the thousands of small and medium-sized businesses thriving as sellers in our store. **The opposite is true**: Amazon and sellers complement each other, and together we create a better customer experience than either could create alone.  **[I]n addition to great value and low prices for customers—we also have strong financial incentives to support third-party sellers because we typically make the same or more revenue on third-party sales.  Clearly, when it comes to Amazon and third-party sellers in our store, it's not zero-sum.  Amazon and third-party sellers have a mutually beneficial relationship, and our interests are well aligned.   What these misguided notions from some subcommittee staff misunderstand is the fact that third parties having the opportunity to sell right alongside a retailer's products is the very competition that most benefits consumers and has made the marketplace model so successful for third-party sellers**.[208]

345.   Reasons Why Defendants' Statements in ¶ 344 Were Materially False and Misleading When Made:   The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that "Amazon and third-party sellers benefit each other"; "Amazon's interests are aligned with those of the thousands of small and medium-sized businesses thriving as sellers in our store"; "we have strong financial incentives to support third-party sellers";

---

[208]  https://www.aboutamazon.com/news/policy-news-views/fringe-notions-on-antitrust-would-destroy-small-businesses-and-hurt-consumers?utm_source=social&utm_medium=tw&utm_term=amznnews&utm_content=HJCReport_Statement&linkId=101370594.

"Amazon and third-party sellers have a mutually beneficial relationship, and our interests are aligned"; and by touting the "fact that third parties hav[e] the opportunity to sell right alongside a retailer's products . . . made the marketplace model so successful for third-party sellers," Amazon failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

346.    The above statements were also materially false because Amazon failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

347.    Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

348.    Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 116 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**O.      November 10, 2020 – Response to the European Commission's**
**Preliminary Findings**

349.    On November 10, 2020, the European Commission informed Amazon of its preliminary view that Amazon is systematically relying on non-public business data of independent sellers who sell on its Marketplace, to the benefit of Amazon's own retail business, which directly competes with those third-party sellers.

350.    <u>False and Misleading Statement</u>:  In response, Amazon stated the following:

> "[w]e disagree with the preliminary assertions of the European Commission and will continue to make every effort to ensure it has an accurate understanding of the facts.  **No company cares more about small businesses or has done more to support them over the past two decades than Amazon**."[209]

351.    <u>Reasons Why Defendants' Statements in ¶ 350 Were Materially False and Misleading When Made</u>:  The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that "[n]o company cares more about small business or has done more to support them over the past two decades than Amazon," Amazon failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

352.    The above statements were also materially false because Amazon failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common

---

[209]  https://www.nytimes.com/2020/11/10/business/amazon-eu-antitrust.html.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 117 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1    practice within the Company.  Amazon currently faces significant regulatory inquiries into such

2    practices.

3        353.    Amazon also failed to disclose that it routinely favored its own private-label

4    products to the detriment of third-party sellers, including by granting itself access to data and tools

5    that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating

6    third-parties' products as "nonessential" while designating Amazon's own similar products as

7    "essential."

8        354.    Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment

9    and logistics services to the detriment of third-party sellers by requiring sellers to use those services

10   in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's

11   fulfillment services.

12       **P.    February 3, 2021 – Amazon's Form 10-K and Forms 10-Q**

13       355.    On February 3, 2021, Amazon filed an Annual Report on Form 10-K with the SEC,

14   reporting the Company's financial and operating results for the year ended December 31, 2020

15   (the "2020 10-K").  Appended to the 2020 10-K as exhibits were signed Certifications pursuant to

16   SOX by Defendants Bezos and Olsavsky, attesting that "I have reviewed this Form 10-K of

17   Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue

18   statement of a material fact or omit to state a material fact necessary to make the statements made,

19   in light of the circumstances under which such statements were made, not misleading with respect

20   to the period covered by this report."

21       356.    <u>False and Misleading Statement</u>:  According to the 2020 10-K, North America net

22   sales in 2020 were $236.282 billion, and International net sales in 2020 were $104.412 billion.  In

23   the 2020 10-K, the Company stated:

> North America sales increased 38% in 2020, compared to the prior year.  **The sales
> growth primarily reflects increased unit sales, including sales by third-party
> sellers.  Increased unit sales were driven largely by our continued efforts to
> reduce prices for our customers, including from our shipping offers, and
> increased demand, including for household staples and other essential and
> home products . . . .**

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 118 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

International sales increased 40% in 2020, compared to the prior year. **The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .**

357. <u>Reasons Why Defendants' Statements in ¶ 356 Were Materially False and Misleading When Made</u>: The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements specifically attributed Amazon's increased sales to sales by third-party sellers but failed to disclose that Amazon was, as explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and (iv) favoring its own private-label products to the detriment of third-party sellers. These practices created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

358. <u>False and Misleading Statements</u>: The 2020 10-K contained only generic and misleadingly incomplete risk statements that Amazon was "subject to general business regulations and laws, as well as regulations and laws specifically governing the Internet[] [and] e-commerce" and that existing and future laws and regulations covered "competition," among other things. Amazon merely advised its investors that "[u]nfavorable regulations, laws, decisions, or interpretations by government or regulatory authorities applying those laws and regulations" could "impede our growth" and failed to disclose the specific and known risks arising from the Company's improper business practices. Amazon failed to disclose that it (i) routinely strong-armed third-party sellers on its platform for its own economic benefit; (ii) routinely misappropriated third-party seller data in order to manufacture and market its own products; (iii) engaged in self-preferencing; and (iv) tied and bundled its products, misconduct that created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

359.   <u>Reasons Why Defendants' Statements in ¶ 358 Were Materially False and</u> <u>Misleading When Made</u>:   The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements above discussed Amazon's legal and regulatory risk with respect to the Internet, e-commerce, and competition, but failed to disclose that Amazon was, as explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and (iv) favoring its own private-label products to the detriment of third-party sellers.  These practices created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

360.   <u>False and Misleading Statements</u>:   The generic and misleadingly incomplete risk statements in the paragraph above were also repeated in Amazon's Forms 10-Q, filed with the SEC on April 30, 2021 (1Q 2021 10-Q), July 30, 2021 (2Q 2021 10-Q), and October 29, 2021 (3Q 2021 10-Q).  Appended to the April 30, 2021, July 30, 2021, and October 29, 2021 10-Q Forms were signed Certifications pursuant to SOX by Defendants Bezos and Olsavsky for the 1Q 2021 10-Q and by Defendants Jassy and Olsavsky for the 2Q 2021 10-Q and 3Q 2021 10-Q, attesting that "I have reviewed this Form 10-Q of Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

361.   <u>False and Misleading Statements</u>:  According to the 1Q 2021 10-Q, North America net sales in 1Q 2021 were $64.366 billion, and International net sales in 1Q 2021 were $30.649 billion.  The 1Q 2021 10-Q also contained the following statements:

> North America sales increased 40% in Q1 2021, compared to the comparable prior year period.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .**

International sales increased 60% in Q1 2021, compared to the comparable prior year period.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .**

362.    <u>False and Misleading Statements</u>:  According to the 2Q 2021 10-Q, North America net sales in 2Q 2021 were $67.550 billion, and International net sales in 2Q 2021 were $30.721 billion.  The 2Q 2021 10-Q also contained the following statements:

North America sales increased 22% in Q2 2021 and 30% for the six months ended June 30, 2021 compared to the comparable prior year periods.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . . .**

International sales increased 36% in Q2 2021 and 47% for the six months ended June 30, 2021 compared to the comparable prior year periods.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . . .**

363.    <u>False and Misleading Statements</u>:  According to the 3Q 2021 10-Q, North America net sales in 3Q 2021 were $65.557 billion, and International net sales in 3Q 2021 were $29.145 billion.  The 3Q 2021 10-Q also contained the following statements:

North America sales increased 10% in Q3 2021 and 23% for the nine months ended September 30, 2021 compared to the comparable prior year periods. **The sales growth primarily reflects increased unit sales, including sales by third-party sellers . . . . Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . . .**

International sales increased 16% in Q3 2021 and 35% for the nine months ended September 30, 2021 compared to the comparable prior year periods.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers . . . . Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . . .**

364.    <u>Reasons Why Defendants' Statements in ¶¶ 361-63 Were Materially False and Misleading When Made</u>:  The statements in the three 10-Qs above were materially false and

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 121 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements specifically attributed Amazon's increased sales to sales by third-party sellers but failed to disclose that Amazon was, as explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and (iv) favoring its own private-label products to the detriment of third-party sellers.  These practices created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

### Q.     July 29, 2021 – Q2 2021 Earnings Call

365.     <u>False and Misleading Statements</u>:   On July 29, 2021, Amazon held its second-quarter 2021 earnings conference call.  During the call, Defendants Olsavsky and Fildes explained that demand for fast delivery "has required" and "will continue to require" a significant investment in the Company's fulfillment network.[210]  As Defendant Olsavsky stated:

> I'll finish up with some comments on our ongoing investments in operations.  As we think about the **pull-forward in demand** we've seen these past 18-months, **it has required and will continue to require a significant amount of investment in our fulfillment network** . . . [s]o there's more work to do including additional build outs for our [fulfillment centers] as well as our middle-mile and last-mile capabilities to support our fast improving delivery offers for customers.

366.     During the same conference call Defendant Fildes also tied "current high customer demand" to the Company's aggressive buildout in fulfillment capabilities:

> Doug, on your second question, it's Dave here.  I'd just say our focus is really squarely on **adding capacity to meet the current high customer demand** that Brian talked about in his opening remarks.

---

[210] Statements made by Fildes during the July 2021 conference call that Olshansky joined are implicitly attributable to Olshansky.  Similarly, statements made by Olshansky during that call are implicitly attributable to Fildes.  Simply stated, a high-ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and escape liability for those misstatements.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 122 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

367.    Later on the call, Defendants reiterated that Amazon was continuing to "add[] capacity" and "invest[]" in its fulfillment capabilities in order to meet rising demand:

[Olsavsky]: I would say on the fulfillment side, there are a number of things. **First, we're adding a lot of capacity**. If you step back, the Amazon fulfilled unit volume, so that's the units coming out of our fulfillment centers, both retail and FBA, have doubled in the past two years. And the AMZL, the delivery arm of our business, has more than doubled in that time period. **So you can see there's been very strong multiyear demand here that we are still catching up with from last year** . . . . So if you've been with us a long time, you know the cadence is that as we add demand – excuse me, as we add capacity, there's a lot of additional costs from hiring to starting up, to training, to getting that building or sort center or delivery station up and running. It usually takes a multi-year period to tame those assets. And we've literally nearly doubled our network here in the last 18 months from a size standpoint. So there's a lot of that going on, a lot of strong effort by our fulfillment and ops teams to help mitigate the costs.

* * *

[Fildes]: **We're investing in the transportation network to support the demand**. A significant part of the capital investments we've been talking about for the past few years and certainly since the pandemic's start has been to support those efforts in middle and last-mile capacity **to keep pace and support with that demand**. So as we've been saying here, that work is not done yet. **We're continuing to expand. You'll see that investment throughout 2021**.

368.    <u>Reasons Why Defendants' Statements in ¶¶ 365-67 Were Materially False and Misleading When Made</u>: Defendants' statements on the July 29, 2021 Q2 Earnings Call that the Company "will continue to require a significant amount of investment" due to demand; that "it was adding capacity to meet current high customer demand"; that Amazon was "investing in the transportation network to support the demand"; and that a "significant part" of its investment "has been to support those efforts in middle to last-mile capacity to keep pace with [] demand" were false and misleading when made because, by July of 2021, Amazon's fulfillment and high-speed delivery capacity had already grown beyond market demand. Specifically, by the end of 2020, Amazon realized that they had overbuilt, according to FE-1. *See supra* ¶¶ 218-20. And by late 2020, Amazon had implemented a stall in forward-looking investments in order to "rationalize" plans for increased fulfillment capacity. By that point, as FE-1 confirmed, Amazon's internal projections of continued demand showed that demand was not maintaining at the level to which they had sourced increased incremental fulfillment capacity. FE-1 further confirmed that by very

early in 2021, Amazon saw declining order volumes.  Thus, by the spring of 2021, Amazon had started making cutbacks to fulfillment capacity and put a halt on capital expenditures.  And by the summer of 2021, Amazon was halting construction, pulling out of prior deals, and pushing for cost control to a degree that FE-1 had never previously seen since joining Amazon in 2017.

369.    In addition, the declining demand and resulting cutbacks for fast delivery was also reported by the *Wall Street Journal*:

> **By July 2021, it became clear to Mr. Jassy and Amazon's logistics team that Amazon's capacity was outpacing demand**.  They made a series of intensifying cutbacks to the plans for capacity growth, said people involved in the decisions. They again cut back capacity growth plans in September and December of 2021.

*See supra* ¶ 267.

370.    Item 303 of Regulation S-K requires publicly traded companies to disclose "known trends or uncertainties" that are "reasonably likely" to have a material impact on the company's operations.  17 C.F.R. § 229.303 (Item 303).  Rather than disclose, consistent with Item 303 of Regulation S-K, this declining trend in demand, Defendants instead doubled down by repeatedly (and falsely) stating that rising demand for fast delivery was driving the Company's push to increase capacity:  "our focus [] is on adding capacity to meet high customer demand;" "we're investing . . . to support demand"; and "[pull-forward demand] continues to require a significant amount of investment in fulfillment."

371.    The false statements and omissions above from Amazon's Q2 2021 Earnings Call were material under the federal securities laws because they created the false impression with investors that the exceedingly high cost of Amazon's aggressive buildout of its fulfillment network was a prudent use of capital because demand for fast delivery continued to rise.  While this might have been true prior to March and April 2021, thereafter, and at least as early as July 2021, Defendants' had a duty under the federal securities law be truthful about this declining trend.

372.    <u>False and Misleading Statement</u>:  In addition to the above statements, during that same earnings call, Defendant Olsavsky stated:

> As far as the higher-margin areas and whether that's a purposeful strategy, I'd like to say it is, but **if you look at what they are third-party is kind of a continuation of strength in our FBA program**, in particular, I think the sellers are doing a great

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 124 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

job of adding additional selection that's very valuable and reinforces our flywheel, and we'd like to see that and you see that third-party percent of units went up from 53% last year to 56%, and that's a steady mark.  **We've seen that, as we said, the third-party sellers are doing a great job and we like to see that**.

373.   <u>Reasons Why Defendants' Statements in ¶ 372 Were Materially False and Misleading When Made</u>:  The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that (i) third-party sellers continued to raise concerns that increased fees for compulsory FBA fulfillment were squeezing their business; (ii) Amazon engaged in anticompetitive and improper conduct with respect to its private-label business by favoring sellers who used FBA over those who did not, for example for its search rankings and the Buy Box; and (iii) Amazon was using its FBA service as an avenue to identify popular third-party seller items and gather competitively sensitive information about them.

**R.      September 13, 2021 – Amazon's Official Website**

374.   <u>False and Misleading Statement</u>: On September 13, 2021, Amazon stated on its official website:

> **Amazon remains absolutely committed to helping our third-party selling partners grow and thrive**.  Last year, Amazon invested more than $18 billion in logistics, tools, services, programs, and people to help small and medium-sized businesses succeed.  We offer resources, such as the Amazon Small Business Academy and the recently launched Amazon Black Business Accelerator, to help aspiring sellers from all backgrounds learn how to build their businesses online.

375.   <u>Reasons Why Defendants' Statement in ¶ 374 Was Materially False and Misleading When Made</u>:  The statement in the paragraph above was materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that "Amazon remains absolutely committed to helping our third-party selling partners grow and thrive," Amazon failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 125 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

376.    The above statements was also materially false because Amazon failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

377.    Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

378.    Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

**S.    October 28, 2021 – Amazon Press Release and Form 8-K**

379.    <u>False and Misleading Statement</u>:  On October 28, 2021, Amazon issued a press release (that was later filed with the SEC on Form 8-K and signed by Defendant Olsavsky) where Defendant Jassy stated that Amazon's "extraordinary investments" in its fulfillment network were needed to "satisfy customer needs":

> We've always said that when confronted with the choice between optimizing for short-term profits versus what's best for customers over the long term, we will choose the latter—and you can see that during every phase of this pandemic . . . . In the first several months of COVID-19, Amazonians played an essential role to help people secure the requisite PPE, food, and other in-demand items needed, and

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 126 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

we worked closely with businesses and governments to leverage AWS to maintain business continuity as they responded to the pandemic.   Customers have appreciated this commitment, which is part of what's driving this past quarter's AWS growth acceleration to 39% year over year; but it's also driven extraordinary investments across our businesses to satisfy customer needs—just one example is that we've nearly doubled the size of our fulfillment network since the pandemic began.

380.   <u>Reasons Why Defendants' Statements in ¶ 379 Were Knowingly False and Misleading</u>:   Defendant Jassy's statement on October 28, 2021 that Amazon's "extraordinary investments" in its fulfillment network were required to "satisfy customers needs" was materially false and misleading when made because Jassy's statement continued to perpetuate the false impression created by Defendants on July 29, 2021 that the Company's aggressive investment in fulfillment capacity was necessary and prudent because it was financially supported by increasing demand for fast delivery when in fact Jassy and other Individual Defendants knew by this point—based on internal sources at the Company and reporting by *Wall Street Journal*—that months earlier fulfillment capacity for fast delivery had already exceeded demand.   Indeed, by July of 2021, Amazon's fulfillment and high-speed delivery capacity had already grown beyond market demand.   Specifically, by the end of 2020, Amazon realized that they had overbuilt, according to FE-1.   *See supra* ¶¶ 218-20.   And by late 2020, Amazon had implemented a stall in forward-looking investments in order to "rationalize" plans for increased fulfillment capacity.   By that point, as FE-1 confirmed, Amazon's internal projections of continued demand showed that demand was not maintaining at the level to which they had sourced increased incremental fulfillment capacity.   FE-1 further confirmed that by very early in 2021, Amazon saw declining order volumes.   Thus, by the spring of 2021, Amazon had started making cutbacks to fulfillment capacity and put a halt on capital expenditures.   And by the summer of 2021, Amazon was halting construction, pulling out of prior deals, and pushing for cost control to a degree that FE-1 had never previously seen since joining Amazon in 2017.   Moreover, throughout 2021, numerous "mothball buildings" as well as "decommissioned buildings" began to appear at Amazon, including at least two more mothball buildings in September 2021, and another mothball building

in October 2021 that became a "shell site" over a month before its previously scheduled launch in November 2021.  *See supra* ¶¶ 221-28.

**T.     October 28, 2021 – Q3 2021 Earnings Call**

381.     <u>False and Misleading Statements</u>.   During Amazon's Q3 2021 Earnings Call, Defendant Olsavsky reiterated in his opening remarks that rising customer demand supported the Company's aggressive expansion, "we've nearly doubled our operations capacity in the past two years to keep up with customer demand" and that the Company's continued investment in capacity was sound:

> [T]here certainly have been challenges to overcome since February of last year. We've nearly doubled our operations capacity in the past 2 years to keep up with the customer demand.
>
> * * *
>
> Last quarter we discussed the physical capacity we were adding to meet customer demand.  We made strong progress in Q3 to build and open new facilities and as a result for the first time since the pandemic began, we are no longer capacity constrained for physical space in the network.  September alone we brought online more than 100 new buildings in the United States including fulfillment centers, sort centers, and last mile delivery stations.  **For the year, we expect our 2021 footprint additions to exceed last year's build-out, which was also significant. To put this in perspective, we are on track to double our fulfillment network over the two-year period since the pandemic's early days.**
>
> **Our revenue guidance for the fourth quarter reflects the current trends we are seeing** . . . . Consumers have started to return to pre-pandemic spending patterns, increasing their mobility and spending more on travel and services in Q2 and Q3, **but we are appreciative that the incremental demand that came our way during the pandemic has remained, and that we are continuing to grow on top of that**.

382.     During the analyst Q&A portion of the call, Defendant Olsavsky again referenced "chasing [] demand" and a "pick up" in demand:

> On your first question about whether we've – comparison of doubling the fulfillment capacity to the unit growth, keep in mind also that our fulfillment capacity also includes our transportation delivery capacity.  And in the last two years, we've also greatly ratcheted up our ability to deliver ourselves through AMZL and our percent of units that we've delivered through AMZL is over 50% of our units globally.  So that's a big – that's a driver as well.  **I'd also say that while we've been chasing really demand for last two years, we've been doing it – as I said, we're running about 100% pretty much all of last year**.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 128 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

* * *

But yes, we have unfinished business on the one-day promise side . . . . But we don't want to be as good as – just as good as we were before the pandemic.  We expect that to increase in 2022 and we're going to plan accordingly.  **And I think you start to see the difference in the growth rate before and after that one day. I won't forecast it too much, but we do – we did see pick-up and we saw really that we got into the consideration set for more purchases.  When something is available in one day or less, now you really don't have to go to a store even if you need it very quickly.  So it just opens up more ways for us to serve our customers, especially our Prime customers**.

383.    <u>Reasons Why Defendants' Statements in ¶¶ 381-82 Were Materially False and Misleading When Made</u>:  Defendants' statements on the October 28, 2021 Q3 Earnings Call that Amazon "nearly doubled [its] operations capacity in the past 2 years to keep up with the customer demand"; that "the incremental demand that came our way during the pandemic has remained, and that we are continuing to grow on top of that"; and that "we did see pick up" in demand, were materially false and misleading when made because, by July of 2021, Amazon's fulfillment and high-speed delivery capacity had already grown beyond market demand.  Specifically, by April of 2021, Amazon had already "missed its demand forecast for its North American fulfillment network" for the first time in over five years.  Moreover, throughout 2021, numerous "mothball buildings" as well as "decommissioned buildings" began to appear at Amazon, including at least two more mothball buildings in September 2021, and another mothball building in October 2021 that became a "shell site" over a month before its previously scheduled launch in November 2021. *See supra* ¶¶ 221-28.  Indeed, by the end of 2020, Amazon realized that they had overbuilt, according to FE-1.  *See supra* ¶¶ 218-20.  And by late 2020, Amazon had implemented a stall in forward-looking investments in order to "rationalize" plans for increased fulfillment capacity.  By that point, as FE-1 confirmed, Amazon's internal projections of continued demand showed that demand was not maintaining at the level to which they had sourced increased incremental fulfillment capacity.  FE-1 further confirmed that by very early in 2021, Amazon saw declining order volumes.  Thus, by the spring of 2021, Amazon had started making cutbacks to fulfillment capacity and put a halt on capital expenditures.  And by the summer of 2021, Amazon was halting

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 129 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

construction, pulling out of prior deals, and pushing for cost control to a degree that FE-1 had never previously seen since joining Amazon in 2017.

384.    In addition, this declining demand and resulting cutbacks was also reported by *Wall Street Journal*:

> **By July 2021, it became clear to Mr. Jassy and Amazon's logistics team that Amazon's capacity was outpacing demand**.  They made a series of intensifying cutbacks to the plans for capacity growth, said people involved in the decisions. They again cut back capacity growth plans in September and December of 2021.

385.    Item 303 of Regulation S-K requires publicly traded companies to disclose "known trends or uncertainties" that are "reasonably likely" to have a material impact on the company's operations.  17 C.F.R. § 229.303 (Item 303).  Rather than disclose, consistent with Item 303 of Regulation S-K, this declining trend in demand, Defendants instead doubled down by repeatedly (and falsely) stating that rising demand for fast delivery was driving the Company's push to increase capacity:  "our focus [] is on adding capacity to meet high customer demand;" "we're investing . . . to support demand"; and "[pull-forward demand] continues to require a significant amount of investment in fulfillment."

386.    The materially false statements and omissions above from Amazon's Q2 2021 Earnings Call were material under the federal securities laws because they created the false impression with investors that the exceedingly high cost of Amazon's aggressive buildout of its fulfillment network was a prudent use of capital because demand for fast delivery continued to rise.  While this might have been true prior to March and April 2021, thereafter, and at least as early as July 2021, Defendants' had a duty under the federal securities law be truthful about this declining trend.

**U.    November 1, 2021 – Amazon's Response to Subcommittee's October 18, 2021 Letter**

387.    On October 18, 2021, members of the Subcommittee sent Amazon a letter in response to "recent, credible reporting that directly contradicts the sworn testimony and representations of Amazon's top executives—including former CEO Bezos—to the Committee

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 130 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

about their company's business practices during our investigation last Congress." [211]  The letter stated that the Subcommittee was "providing [the Company] with a final opportunity to provide exculpatory evidence to corroborate the prior testimony and statements on behalf of Amazon to the Committee," and encouraged Amazon to "provide the Committee with sworn, truthful, and accurate responses to this request as we consider whether a referral of this matter to the Department of Justice for criminal investigation is appropriate."

388.   <u>False and Misleading Statement</u>: On November 1, 2021, Amazon sent a letter[212] in response to the Subcommittee's October 18, 2021 letter, stating that Amazon "ha[d] cooperated fully with the Committee's inquiries and engaged in good faith throughout this process, and the resulting record fully supports the transparency, candor, accuracy, and truthfulness of all of our statements, including on the topics raised in your letter," and that the Company "ha[d] in no way lied to or misled the Committee, and any allegation to the contrary is false and unsupported." Further, Amazon's response letter stated, in relevant part:

> [Amazon's] statements to the Committee regarding this policy have been truthful and consistent throughout.  At the July 16, 2019, hearing our witness stated that **Amazon does not use individual seller data to compete with third party sellers, clarifying specifically that Amazon does not "use any of that specific seller data in creating our own private brand products" and that Amazon does "not use their individual data when we're making decisions to launch private brands**."

389.   <u>Reasons Why Defendants' Statements in ¶ 388 Were Materially False and Misleading When Made</u>:  The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that (i) Amazon engaged in anticompetitive and otherwise improper conduct with respect to its private-label business by using third-party sellers' non-public data to compete with them and by giving Amazon products preference over its competitors; and (ii) even for purportedly aggregated data, Amazon used single

---

[211]  https://judiciary.house.gov/uploadedfiles/letter_-_amazon_misrepresentations_-_10.18.21.pdf.

[212]  *See* https://judiciary.house.gov/uploadedfiles/letter_from_brian_huseman_to_committee__nov_01_2021.pdf.

sellers' data when selling returned or damaged versions of an item through Amazon's Warehouse Deals program, used aggregate data when there were only two or three sellers of a product, and used aggregate data when there were multiple sellers but one individual seller accounted for almost 100% of all sales.

## V.     February 3, 2022 – Amazon's Q4 2021 Earnings Call

390.    <u>False and Misleading Statement</u>:  On February 3, 2022, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q4 2021 results (the "Q4 2021 Earnings Call").  When asked to discuss why third-party seller services experienced less growth, Defendant Olsavsky responded, in relevant part:

> I think the bigger point is that sellers are definitely big winners in Q4.  The percentage of units up to 56% was a record for 3P.  We continue to invest a lot to make sellers – help sellers be successful on our site.  They're a big consumer of advertising as well because they use it to build their brands and add – enable customers to see their selection and make purchases.  So we're very happy with the third-party seller services businesses, and again, looking for ways to help sellers be successful.

391.    <u>Reasons Why Defendants' Statement in ¶ 390 Was Materially False and Misleading When Made</u>:  The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that "sellers are definitely big winners in Q4" and attributing that to the fact that Amazon "continue[d] to invest a lot to make sellers – help sellers be successful on our site" and further telling investors that "we're very happy with the third-party seller services business, and again, looking for ways to help sellers be successful," Amazon failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers— and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 132 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

392.   The above statements were also materially false because Amazon failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform.   Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.   In fact, the wrongful use of such third-party seller data was a common practice within the Company.   Amazon currently faces significant regulatory inquiries into such practices.

393.   Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

394.   Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

395.   <u>False and Misleading Statements</u>:   During that same earnings call, Defendant Olsavsky reaffirmed to investors that Amazon's aggressive expansion efforts were supported by increased demand in fast delivery:

> [Brian T. Olsavsky:]   **[W]e continue to see an increase in customer demand and sales during the remainder of 2021, even as the economy opened back up . . . [w]e've invested significantly to keep pace with this demand, including nearly doubling our operations capacity in the past two years, expanding our fulfillment center footprint while adding significant transportation assets to ensure fast, on-time delivery**.   There are now 1.6 million Amazon employees worldwide, also doubling in the two-year period.
>
> * * *
>
> On the fulfillment center side, that's about 30% of the spend in the last two years. We see that moderating and that will probably now match growth of our underlying businesses.   I think there's always things that can kick up that growth rate, things like expansion of our FBA business, expansion of cube that maybe not be different

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS   - 133 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

than the square footage.  **So there's – we want to have capacity to have a healthy retail and FBA business, because that fuels Prime and one-day delivery and two-day delivery and same-day delivery. So that's very important. But we see the FCPs likely moderating this year.   And then the third piece is transportation**. We still see additional levels of investment in that in 2022.  So if you wrap that up, we expect CapEx, including equipment finance leases to increase year-over-year.  I can't give you the exact percentage, but hopefully, it gives you a little more dynamic on what – how we approach it.

396.   Reasons Why Defendants' Statements in ¶ 395 Were Materially False and Misleading When Made:  Defendants' statements on the February 3, 2022 Q4 Earnings Call that Amazon "continued to see an increase in customer demand . . . during the remainder of 2021; that "[w]e've invested significantly to keep pace with this demand"; and that "we still see additional levels of investment in [transportation] in 2022" were false and misleading when made because by July of 2021, Amazon's fulfillment and high-speed delivery capacity had already grown beyond market demand.  Specifically, by the end of 2020, Amazon realized that they had overbuilt, according to FE-1.  *See supra* ¶¶ 218-20.  And by late 2020, Amazon had implemented a stall in forward-looking investments in order to "rationalize" plans for increased fulfillment capacity.  By that point, as FE-1 confirmed, Amazon's internal projections of continued demand showed that demand was not maintaining at the level to which they had sourced increased incremental fulfillment capacity.  FE-1 further confirmed that by very early in 2021, Amazon saw declining order volumes.  Thus, by the spring of 2021, Amazon had started making cutbacks to fulfillment capacity and put a halt on capital expenditures.  And by the summer of 2021, Amazon was halting construction, pulling out of prior deals, and pushing for cost control to a degree that FE-1 had never previously seen since joining Amazon in 2017.  Moreover, throughout 2021, numerous "mothball buildings" as well as "decommissioned buildings" began to appear at Amazon, including at least two more mothball buildings in September 2021, and another mothball building in October 2021 that became a "shell site" over a month before its previously scheduled launch in November 2021.  *See supra* ¶ 221-28.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS   - 134 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

397.    In addition, this declining demand and resulting cutbacks was also reported by *Wall Street Journal*:

> **By July 2021, it became clear to Mr. Jassy and Amazon's logistics team that Amazon's capacity was outpacing demand**. They made a series of intensifying cutbacks to the plans for capacity growth, said people involved in the decisions. They again cut back capacity growth plans in September and December of 2021.

398.    Item 303 of Regulation S-K requires publicly traded companies to disclose "known trends or uncertainties" that are "reasonably likely" to have a material impact on the company's operations.  17 C.F.R. § 229.303 (Item 303).  Rather than disclose, consistent with Item 303 of Regulation S-K, this declining trend in demand, Defendants instead doubled down by repeatedly (and falsely) stating that rising demand for fast delivery was driving the Company's push to increase capacity:  "our focus [] is on adding capacity to meet high customer demand;" "we're investing . . . to support demand"; and "[pull-forward demand] continues to require a significant amount of investment in fulfillment."

399.    The false statements and omissions above from Amazon's Q2 2021 Earnings Call were material under the federal securities laws because they reiterated the false impression with investors that the exceedingly high cost of Amazon's aggressive buildout of its fulfillment network was a prudent use of capital because demand for fast delivery continued to rise.  While this might have been true prior to March and April 2021, thereafter, and at least as early as July 2021, Defendants had a duty under the federal securities law be truthful about this declining trend.

**W.    February 3, 2022 Amazon Press Release and Form 8-K**

400.    <u>False and Misleading Statement</u>:  On February 3, 2022, Amazon issued a press release (that was later filed with the SEC on Form 8-K and signed by Defendant Olsavsky) where Defendant Jassy stated that "[w]hen you combine how we're staffing and scaling our fulfillment network to bring even faster delivery to more customers . . . there's a lot to look forward to in the months and years ahead."

401.    <u>Reasons Why Defendants' Statement in ¶ 400 Was Materially False and Misleading When Made</u>:  Defendant Jassy's statement in the Press Release on February 3, 2022 was materially false and misleading because in the context of referencing "scaling [Amazon's]

fulfillment network" and how recent expansion efforts were something "to look forward to in the months and years ahead," he failed to disclose that for nearly a year, he and other Amazon executives were aware that Amazon's internal data showed decline in demand for fast delivery.  In other words, since Jassy chose to speak on the issue of what "scaling our fulfillment network" would mean for the Company "in the months and years ahead," he had duty to disclose the full context (and without omitting material facts) including that expansion was "outpacing" demand for fast delivery.

## X.    February 4, 2022 – Amazon's Form 10-K

402.    On February 4, 2022, Amazon filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2021 (the "2021 10-K").  Appended to the 2021 10-K as exhibits were signed Certifications pursuant to SOX by Defendants Jassy and Olsavsky, attesting that "I have reviewed this Form 10-K of Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

403.    <u>False and Misleading Statements</u>:  According to the 2021 10-K, North America net sales in 2021 were $279.833 billion, and International net sales in 2021 were $127.787 billion.  In the 2021 10-K, the Company stated:

> North America sales increased 18% in 2021, compared to the prior year.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers . . . . Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . . .**

> International sales increased 22% in 2021, compared to the prior year.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers . . . . Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . . .**

404.    <u>Reasons Why Defendants' Statements in ¶ 403 Were Materially False and Misleading When Made</u>:  The statements in the paragraph above were materially false and

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 136 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1   misleading when made, or omitted to state material facts necessary to make the statements not

2   misleading, because the statements specifically attributed Amazon's increased sales to sales by

3   third-party sellers but failed to disclose that Amazon was, as explained above, routinely

4   (i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment

5   of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and

6   (iv) favoring its own private-label products to the detriment of third-party sellers.  These practices

7   created a heightened risk of governmental and other criminal and civil investigations, as well as

8   the risk of significant penalties and reputational harm.

9        405.    The 2021 10-K contained only generic and misleadingly incomplete risk statements

10  that Amazon was "subject to general business regulations and laws, as well as regulations and laws

11  specifically governing the Internet[] [and] e-commerce" and that existing and future laws and

12  regulations covered "competition," among other things.  Amazon merely advised its investors that

13  "[u]nfavorable regulations, laws, decisions, or interpretations by government or regulatory

14  authorities applying those laws and regulation" could "impede our growth" and failed to disclose

15  the specific and known risks arising from the Company's improper business practices.

16       406.    Reasons Why Defendants' Statements in ¶ 405 Were Materially False and

17  Misleading When Made:  The statements in the paragraph above were materially false and

18  misleading when made, or omitted to state material facts necessary to make the statements not

19  misleading, because the statements above discussed Amazon's legal and regulatory risk with

20  respect to the Internet, e-commerce, and competition, but failed to disclose that Amazon was, as

21  explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its

22  products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own

23  economic gain; and (iv) favoring its own private-label products to the detriment of third-party

24  sellers.  These practices created a heightened risk of governmental and other criminal and civil

25  investigations, as well as the risk of significant penalties and reputational harm.

26       407.    False and Misleading Statements:  In the 2021 10-K, Amazon also stated:

27  In November 2020, the European Commission issued a Statement of Objections
    alleging that Amazon uses data relating to our marketplace sellers in a manner that
28  infringes EU competition rules.  The Statement of Objections seeks to impose

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 137 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

unspecified fines and remedial actions. **We disagree with the preliminary assertions of the European Commission** and intend to defend ourselves vigorously in this matter.

In December 2021, the Italian Competition Authority (the "ICA") issued a decision against Amazon Services Europe S.à r.l., Amazon Europe Core S.à r.l., Amazon EU S.à r.l., Amazon Italia Services S.r.l., and Amazon Italia Logistica S.r.l. claiming that certain of our marketplace and logistics practices in Italy infringed EU competition rules. The decision imposes a fine of €1.13 billion and remedial actions. **We believe the ICA's decision to be without merit and intend to defend ourselves rigorously in this matter**.

408. <u>Reasons Why Defendants' Statements in ¶ 407 Were Materially False and Misleading When Made</u>: The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that Amazon "disagree[d] with the preliminary assertions of the European Commission" and "believe the ICA's decision [was] without merit," Amazon failed to disclose, among other things, that that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and selling their products for lower prices and demanding that they pay Amazon for the lost margin.

409. The above statements were also false because Amazon also failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform. Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, sourcing those products from third-party sellers' own manufacturers, and cutting them out of the equation. In fact, the wrongful use of such third-party seller data was a common practice within the Company. Amazon currently faces significant regulatory inquiries into such practices.

410. Amazon also failed to disclose that Amazon routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 138 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

411.   Amazon also failed to disclose that Amazon routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring such sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

**Y.   March 4, 2022 – Amazon's Official Website**

412.   <u>False and Misleading Statement</u>: On March 4, 2022, Amazon stated on its official website:

> **Amazon cares about the success of our small business partners**, and we have invested billions of dollars in tools, services, programs, and people to support small and medium-sized sellers' growth. **Supporting small businesses is a fundamental part of Amazon's work and an extension of our customer-centric culture** . . . .

413.   <u>Reasons Why Defendants' Statements in ¶ 412 Were Materially False and Misleading When Made</u>:  The statements in the paragraphs above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that "Amazon cares about the success of our small business partners" and that "[s]upporting small business is a fundamental part of Amazon's work and an extension of our customer-centric culture," Amazon failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

414.   The above statements were also materially false because Amazon failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 139 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND ᴾᴸᴸᶜ
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

415.    Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

416.    Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

**Z.    April 14, 2022 – Letter to Shareholders**

417.    <u>False and Misleading Statement</u>:  On April 14, 2022, Amazon published a Letter to Shareholders authored by Defendant Jassy that was later filed with the SEC on Form 8-K.  The shareholder letter repeated the claim that Amazon's aggressive expansion efforts were justified by increasing demand for fast delivery:

> This growth also created short-term logistics and cost challenges.  **We spent Amazon's first 25 years building a very large fulfillment network, and then had to double it in the last 24 months to meet customer demand . . . .**
>
> Ironically, just before COVID started, we'd made the decision to invest billions of incremental dollars over several years to deliver an increasing number of Prime customers in one day.  This initiative was slowed by the challenges of the pandemic, but we've since resumed our focus here . . . . [W]e believe our over 200 million Price customers, who will tell you very clearly that faster is almost always better, will love this . . . . **This type of iterative innovation is never finished and has periodic peaks in investment years, but leads to better long-term customer experiences, customer loyalty, and returns for our shareholders.**

418.    <u>Reasons Why Defendants' Statements in ¶ 417 Were Materially False and Misleading When Made</u>:  Defendant Jassy's statement above that Amazon "***had*** to double

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 140 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

[capacity] in the last 24 months to meet customer demand" and that "this type of iterative innovation . . . has periodic peaks in investment years" because by July of 2021, or nearly nine months earlier, the Company's fulfillment and high-speed delivery capacity had already grown beyond "peak" market demand.  Specifically, by April of 2021, Amazon had already "missed its demand forecast for its North American fulfillment network" for the first time in over five years.   Moreover, throughout 2021, numerous "mothball buildings" as well as "decommissioned buildings" began to appear at Amazon, including at least two more mothball buildings in September 2021, and another mothball building in October 2021 that became a "shell site" over a month before its previously scheduled launch in November 2021. *See supra* ¶ 221-28.  By the end of 2020, Amazon realized that they had overbuilt, according to FE-1.  ¶¶ 218-20. And by late 2020, Amazon had implemented a stall in forward-looking investments in order to "rationalize" plans for increased fulfillment capacity.  By that point, as FE-1 confirmed, Amazon's internal projections of continued demand showed that demand was not maintaining at the level to which they had sourced increased incremental fulfillment capacity.  FE-1 further confirmed that by very early in 2021, Amazon saw declining order volumes.  Thus, by the spring of 2021, Amazon had started making cutbacks to fulfillment capacity and put a halt on capital expenditures.  And by the summer of 2021, Amazon was halting construction, pulling out of prior deals, and pushing for cost control to a degree that FE-1 had never previously seen since joining Amazon in 2017. *Id.*  In addition, this declining demand and resulting cutbacks was also reported by *Wall Street Journal*:

> **"By July 2021, it became clear to Mr. Jassy and Amazon's logistics team that Amazon's capacity was outpacing demand**.  They made a series of intensifying cutbacks to the plans for capacity growth, said people involved in the decisions. They again cut back capacity growth plans in September and December of 2021."

419.    Item 303 of Regulation S-K requires publicly traded companies to disclose "known trends or uncertainties" that are "reasonably likely" to have a material impact on the company's operations.  17 C.F.R. § 229.303 (Item 303).  Rather than disclose, consistent with Item 303 of Regulation S-K, this declining trend in demand, Defendants instead doubled down by repeatedly (and falsely) stating that rising demand for fast delivery was driving the Company's push to increase capacity: "our focus [] is on adding capacity to meet high customer demand;" "we're

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 141 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

investing . . . to support demand"; and "[pull-forward demand] continues to require a significant amount of investment in fulfillment."

420.    The false statements and omissions above from the shareholder letter were material under the federal securities laws because they created the false impression with investors that the exceedingly high cost of Amazon's aggressive buildout of its fulfillment network with billions of dollars in new capacity was a prudent use of capital because demand for fast delivery continued to rise.  While this might have been true prior to March and April 2021, thereafter, and at least as early as July 2021, Defendants had a duty under the federal securities law be truthful about this declining trend.

## VI.    ADDITIONAL FACTS PROBATIVE OF SCIENTER

421.    The Individual Defendants acted with scienter because at the time they issued public documents and other statements in Amazon's name, they knew, or with extreme recklessness disregarded, the fact that such statements were materially false and misleading or omitted material facts.  The Individual Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

422.    The Individual Defendants received information reflecting the true facts regarding Amazon, its operations and business practices, had control over and/or received the Company's materially misleading misstatements, and/or their associations with the Company made them privy to confidential proprietary information concerning Amazon.   Accordingly, the Individual Defendants were active and culpable participants in the fraudulent schemes alleged herein.  The Individual Defendants knew of and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 142 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

423.    These facts, in conjunction with the additional indica of scienter alleged in ¶ 424 through ¶ 462, collectively support a strong inference that throughout the Class Period, Defendants knew or, at a minimum, recklessly disregarded that their statements were materially false and misleading.[213]

**A.    Amazon's Fulfillment Centers Are a Core Operation of the Company**

424.    The Individual Defendants' knowledge of the practices discussed herein can be readily inferred because the Company's expansion plans were critical to Amazon's future growth and ability to provide its e-commerce customers with shortened delivery times, including one day delivery.

425.    In furtherance of the Company's expansion efforts, during the Class Period, Amazon invested significant capital in its infrastructure, fulfillment networks, and staffing. Indeed, the Company more than doubled its warehouse holdings between 2019 and early 2022, expanding from approximately 192 million square feet at the end of 2019 to more than 410 million square feet in early 2022,[214] and nearly doubled its workforce during that time.  *See* ¶ 195.  In pursuit of this endeavor, the Company spent ***billions*** of dollars on new warehouses and fulfillment centers in recent years.  *See* ¶ 209.

426.    That the Company's e-commerce expansion and fulfillment network constitute a "core operation" at Amazon is readily apparent from the Individual Defendants' own statements. As detailed herein, the Individual Defendants spoke regularly about the Company's growth and increased capacity during conference calls with investors during the Class Period.  For example, in an October 28, 2021 call with investors, Defendant Jassy told investors that "[w]e've nearly doubled our operations capacity in the past two years to keep up with customer demand" and assured the market that Amazon's investments in infrastructure were not just driven by the pandemic, but rather were "long-term trends" that "we expect . . . to be strong in this business." ¶ 201.

---

[213] The cumulative knowledge of all members of the Company's management team, including, but not limited to, the Individual Defendants, is properly imputed to Amazon.

[214] https://qz.com/2128541/thanks-to-amazon-warehouse-rents-have-never-been-higher/.

427.    The Individual Defendants' detailed and repeated pronouncements on these topics provide strong evidence that they were receiving specific information about the Company's growth and expansion-related efforts.  Alternatively, if the Individual Defendants were not knowledgeable about these matters (on which they spoke in detail), such recklessness readily satisfies the scienter requirement.

### B.    Patent Inconsistencies Between Public Statements and Internal Happenings

428.    The patent inconsistences between Defendants' public pronouncements and what was known internally within Amazon provide further circumstantial evidence of scienter.  For example, during the Company's July 29, 2021 Q2 2021 Earnings Call with investors, Defendant Olsavsky stated:  "As we think about the pull-forward in demand we've seen these past 18-months, it has required and will continue to require significant investment in our fulfillment networks." ¶ 196.  Later, Olsavsky again reiterated that "**there's been very strong multiyear demand here that we are still catching up with from last year**." *See* ¶ 197.  During that same call, Defendant Fildes, in response to a question from an analyst, stated that Amazon's "**focus is really squarely on adding capacity to meet the current high customer demand that Brian [Olsavsky] talked about in his opening remarks**." *See* ¶ 196.

429.    Likewise, during the Company's October 28, 2021 Q3 Earnings Call, Defendant Olsavsky told investors that the Company was not able to build new distribution centers fast enough to match the growing demand for e-commerce.  Specifically, he said:  "**Last quarter, we discussed the physical capacity we were adding to meet customer demand.  We made strong progress in Q3 to build and open new facilities.  And, as a result, for the first time since the pandemic began, we're no longer capacity constrained for physical space in network**." ¶ 381. Further—and in response to a question from an analyst—Olsavsky said the Company "**[had] been chasing really demand for the last two years, . . . we're running about 100% pretty much all of last year**." ¶ 382.

430.    The above statements regarding the Company's continued growth to meet demand are in direct contrast to what Defendants knew internally:  that no later than July 2021, Amazon's

capacity exceeded demand for e-commerce and fast delivery and that the Company would begin to make a series of cutbacks to its fulfillment capacity.  *See* ¶¶ 17, 19, 144, 193, 205, 208, 210-29, 266.  Stated otherwise, evidence of the incongruity between Defendants' words and the actual state of affairs within Amazon further supports a strong inference of scienter.

### C.      Jassy Is a "Hands On" CEO Intimately Involved in the Company's Day-to-Day Issues

431.      As detailed above at ¶¶ 188-91, Defendant Jassy is by all accounts a hands-on CEO who was intimately involved in every aspect of the Company following his promotion to CEO in July 2021.   Numerous articles written during the relevant time period described Jassy as "exceptionally detail-oriented," often getting "into the weeds on issues far beneath his pay grade." Even *Wall Street Journal* noted Jassy's "ultra-detail-oriented management style," remarking that one Amazon vice president who worked with Jassy for over a decade had described him as having a "phenomenal focus on details."  Jassy himself acknowledged the importance of being detailed oriented, saying in a September 2021 interview, "[w]here the rubber meets the road is in the details. From the junior roles to the senior-most, you have to be good at executing details."  It has also been said that "[y]ears devoted to technical services . . . made [Jassy] an obsessive person with the most minute details."[215]

432.      It is no surprise then, with that level of attention to detail, that Defendant Jassy, immediately following his promotion to CEO, began to conduct regular meetings with Amazon's business heads to gain a better understanding of the Company, including its capacity-related issues. According to *Wall Street Journal*, in July 2021, it became clear to Defendants, including Defendant Jassy, that Amazon's capacity was outpacing demand for e-commerce and fast delivery.  As a result, "[t]hey made a series of intensifying cutbacks to the plans for capacity growth" that month and then made additional cuts to capacity growth in September and December 2021.[216]

---

[215] Andy Jassy, the New Boss of Amazon, CE Noticias Financieras English, July 14, 2021 (available on Lexis ).

[216] Dana Mattioli, Amazon CEO Andy Jassy's First Year on the Job:  Undoing Bezos-Led Overexpansion, THE WALL STREET J. (June 16, 2022).

433.    In fact, a longtime Amazon board member said that "[f]ollowing all [of Amazon's] growth that we had in the short term, we have some things [Jassy] felt we need to do to get right in the business. . . . And so he's working on the supply, the labor and delivery speeds. ***He's right in the middle of it***."[217]

434.    Given the internal meetings conducted by Jassy starting in July 2021 regarding physical growth and capacity-related issues within Amazon, and that the Company already had decided to make drastic cuts in its fulfillment network by the end of that month, Jassy knew by that time that the Company's growth in the fulfillment area was outpacing consumer demand for e-commerce and fast delivery.

**D.      Defendants Carefully Monitored and Tracked Data Related to Growth and Capacity**

435.    Amazon has been described as "perhaps the most data-driven company in the history of the world—a business so adept at gathering customer information and crunching numbers."[218]  Defendant Jassy was closely involved with overseeing the Company's growth and capacity.  Indeed, he and the other Individual Defendants closely monitored and tracked data related to consumer demand and customer order volume.  *See* ¶¶ 192-93.

436.    It has been widely reported that "Amazon uses software to manage in a way that's unlike almost any other company. . . . Whether they're driving a delivery van, picking items from shelves or trying to maintain their product inventory to avoid being delisted, Amazon's employees, subcontractors and seller-partners are monitored, evaluated, rewarded and even flagged for reprimand or coaching by software."[219]  The Company has "spent years honing its machine learning and artificial-intelligence technology to the point where it can forecast demand, identify

---

[217]  https://nypost.com/2022/06/17/amazon-ceo-jassy-spent-first-year-cleaning-up-bezos-messes-report/.

[218]  David Lazarus, "Column:  Do you really want Amazon's new drugstore knowing your medical condition?," *Los Angeles Times Online* (Nov. 19, 2020), available on Lexis Nexis.

[219]  https://www.wsj.com/articles/amazons-new-ceo-can-either-help-workers-and-sellersor-automate-them-away-11612587602

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** - 146 - 2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

fraud and recommend products to customers."[220]   In fact, this highly advanced software helps Amazon set inventory levels and even begin packing orders based on predictive algorithms.[221] Even further, Amazon has developed a reputation for being "obsessed with data"—with some going as far to say, as reported in the *Puget Sound Business Journal*, that "Data is [Amazon's] religion."[222]

> ### E.   The Abrupt Resignation of Clark Adds to the Strong Inference of Scienter

437.   During the Class Period, Dave Clark ("Clark") was the Company's CEO Worldwide Consumer and was responsible for overseeing Amazon's warehouse and fulfillment center expansion, among other things.

438.   Clark began working for Amazon in May 1999 and held a variety of positions, including SVP of Worldwide Operations, VP of Global Consumer Fulfillment, and VP of North America Operations.   In January 2021, Clark was promoted to Amazon's CEO of Worldwide Consumer.   He is credited with spearheading the Company's sprawling fulfillment and logistics infrastructure and he also led Amazon's warehouse expansion and hiring during the relevant time period.   As *Fortune* reported on August 22, 2020, Clark had the nickname "The Sniper" because he would "hide in the shadows at warehouses seeking to catch lazy workers slacking off who he could fire."

439.   On May 25, 2022, just weeks after the Company announced publicly on April 28, 2022 that it had slowed its operations expansion plans for 2022 and 2023 "to better align with expected customer demand" (and reported its first quarterly loss since 2015), Clark presented to

---

[220]   https://www.wsj.com/articles/amazons-typical-worker-is-in-a-warehouse-making-28-446-a-year-1524402003

[221]   https://www.linkedin.com/pulse/amazon-1-internet-based-retailer-world-yovanny-hernandez/

[222]   Tony Lystra, "It's all about the data at Amazon – even when it comes to hiring," *Puget Sound Business Journal*, (Dec. 14, 2020), available at https://www.bizjournals.com/seattle/news/2020/12/14/amazon-focus-on-data-influences-its-hiring.html.

---

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** - 147 - 2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

the Company's Board of Directors a three-year plan to fix the retail business, including reducing Amazon's massive warehousing network.

440.   Less than two weeks later, on June 3, 2022, the Company announced that Clark was resigning effective July 1, 2022.  At the time of the announcement, Amazon had not identified a successor and provided no reason for his sudden departure.  Clark's sudden departure was particularly shocking and noteworthy given reports that he left $77 million in compensation on the table when he left the Company.

441.   Media reports have noted that Clark's resignation was prompted by a series of missteps in his division, including the warehouse expansion, overstaffing, and related spiraling costs.[223]

442.   Clark's resignation—which occurred approximately five weeks after the truth fully emerged—is highly suspicious and constitutes further evidence of Defendants' scienter.

**F.     The Existence of Numerous Governmental Investigations into Amazon Is Indicative of Scienter**

443.   As detailed above, ¶¶ 76-99, numerous governmental investigations both in the U.S. and abroad should have alerted Defendants to carefully evaluate and monitor whether Company employees routinely used non-public third-party data to benefit Amazon's private-label products.

444.   As noted elsewhere herein, the Subcommittee conducted hearings as part of an antitrust investigation that scrutinized the practices of Amazon and other technology companies. That investigation resulted in the Majority Staff Report and Recommendations.  The report, which was based on testimonials from third-party sellers, brand manufacturers, publishers, former employees, market participants, and internal Amazon documents, concluded that "Amazon has engaged in extensive anticompetitive conduct in its treatment of third-party sellers. . . . This

---

[223] *See, e.g.*, Katherine Long, et al., "Insiders Say Amazon's Consumer CEO Dave Clark was Felled by a Series of Missteps, Including Warehouse Overexpansion, Spiraling Costs, Overstaffing and a Union Loss," *Business Insider* (June 4, 2022), https://www.businessinsider.com/amazon-consumer-ceo-dave-clark-resigns-missteps-2022-6.

conflict [of interest] incentivizes Amazon to exploit its access to competing sellers' data and information, among other anticompetitive conduct."[224]

445.    During the hearings, lawmakers questioned Amazon executives about whether third-party seller data was used to develop private-label products or to privilege the Company's own products in search results.  Specifically, on July 16, 2019, Defendant Sutton was asked directly whether the Company "track[s] [the data] and create[s] products that directly compete with those most popular brands that are out there."  In response, Sutton said: "[w]e do not use any seller data to compete with [third parties]. . . . We do not use any of that specific seller data in creating our own private brand."

446.    On May 1, 2020, members of the Subcommittee sent Defendant Bezos a letter in response to an April 23, 2020 *Wall Street Journal* article, ¶ 332, which reported on allegations that Amazon employees had used sensitive business information from third-party sellers on its platform to develop competing products.  The letter said, in part, "[i]f these allegations are true, then Amazon exploited its role as the largest online marketplace in the U.S. to appropriate the sensitive commercial data of individual marketplace sellers and then used that data to compete directly with those sellers," and asked Bezos to testify directly before the Subcommittee.  Media reports suggest that the issue of employee access to third-party data was discussed openly during Company meetings and that "Amazon employees regularly violated the policy [not to use third party data to compete with third parties] – ***and senior officials knew it***."[225]

447.    *Wall Street Journal* reported on June 11, 2020 that the EU was planning formal antitrust charges against Amazon regarding its treatment of third-party sellers on its platform following a two-year investigation.

---

[224]  Investigation of Competition in Digital Markets, Majority Staff Report and Recommendations, Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, pg. 16 (2020).

[225]  https://arstechnica.com/tech-policy/2022/03/us-lawmakers-seek-criminal-probe-of-amazon-for-lying-about-use-of-seller-data/.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 149 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

448.     The following year, *Reuters* reported that Amazon was under investigation in India for alleged anti-competitive practices that hurt other businesses, including unfairly favoring its own branded merchandise.[226] The investigation stated that "thousands of pages of internal Amazon documents examined by Reuters—including emails, strategy papers and business plans—show the company ran a systematic campaign of creating knockoffs and manipulating search results to boost its own product lines in India, one of the company's largest growth markets."[227]

449.     On April 6, 2022, *Wall Street Journal* published an article, entitled "SEC Is Investigating How Amazon Disclosed Business Practices," which reported that "[f]ederal securities regulators are investigating how Amazon.com Inc. has disclosed some details of its business practices, including how it uses third-party-seller data for its private-label business." ¶ 248.

450.     In July 2022, it was reported that the U.K.'s antitrust unit was investigating Amazon regarding whether the Company had damaged competition by providing an unfair advantage to its own retail business and sellers at the expense of third-party merchants.[228]

### G.     Amazon's Steps to Cover Up Its Misdeeds Is Strong Evidence of Scienter

451.     The Company worked intensely to cover up its misconduct.  Amazon went as far as to lie to Congress and other regulators for years that it was not acting improperly.  When, as here, a company engages in a cover up of wrongdoing during government investigations, scienter is readily inferred.

452.     One day after *Reuters* issued its article detailing the investigation in India, on October 14, 2021, *The Markup* published its piece "Amazon Puts Its Own 'Brands' First Above Better-Rated Products," where it reported that Amazon had placed products from its house brands

---

[226] https://www.reuters.com/investigates/special-report/amazon-india-rigging/.

[227] *Id.*

[228] https://www.reuters.com/technology/amazon-faces-uk-probe-over-marketplace-practices-2022-07-06/.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 150 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1   (and products exclusive to the site) ahead of those from competitors—even competitors with

2   higher customer ratings.[229]

3       453.    On October 18, 2021, members of the Subcommittee sent Amazon another letter

4   addressing the "recent, credible reporting that directly contradicts the sworn testimony and

5   representations of Amazon's top executives—including former CEO Jeffrey Bezos—to the

6   Committee about their company's business practices during our investigation last Congress."[230]

7   Amazon responded by letter dated November 1, 2021, asserting that it "ha[d] cooperated fully with

8   the Committee's inquiries and engaged in good faith throughout this process" and further that "the

9   resulting record fully supports the transparency, candor, accuracy, and truthfulness of all of our

10  statements, including on the topics raised in your letter." The Company added that it "ha[d] in no

11  way lied to or misled the Committee, and any allegation to the contrary is false and

12  unsupported."[231]

13      454.    Members of Congress rejected outright the Company's response. In that regard, a

14  bipartisan group of lawmakers sent a letter to the DOJ on March 9, 2022, urging it to open an

15  investigation into Amazon and its executives for potentially criminal obstruction of Congress. The

16  letter stated that "Amazon lied through a senior executive's sworn testimony that Amazon did not

17  use any of the troves of data it had collected on its third-party sellers to compete with them." The

18  letter further stated that "Amazon has declined multiple opportunities to demonstrate with credible

19  evidence that it made accurate and complete representations. Amazon's failure to correct or

20  corroborate those representations suggests that Amazon and its executives have acted intentionally

21  to improperly influence, obstruct, or impede the Committee's investigation and inquiries."

22  Moreover, the letter accused the Company of being "caught in a lie and repeated

23  misrepresentations," and also averred that Amazon subsequently "attempted to cover up its lie by

24  

25  [229] https://themarkup.org/amazons-advantage/2021/10/14/amazon-puts-its-own-brands-first-above-better-rated-products.

26  [230] https://judiciary.house.gov/uploadedfiles/letter_-_amazon_misrepresentations_-_10.18.21.pdf.

27  [231] https://judiciary.house.gov/uploadedfiles/letter_from_brian_huseman_to_committee__nov_01_2021.pdf.

28  

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 151 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

offering ever-shifting explanations" of its practices and policies.  The letter referenced the investigations by *Wall Street Journal*, *Reuters*, and *The Markup* that directly contradicted Amazon's sworn testimony.

### H.    A Pattern of Fraudulent Conduct Over a Significant Period of Time Is Indicative of Scienter

455.    Apart from the regulatory investigations referenced herein, Amazon also has been accused—in private litigation—of copying others' products for its own brand.  Such "pattern evidence" (i.e.; that a defendant participated in a pattern of fraudulent conduct over a significant period of time) is probative of scienter.

456.    For example, in 2018, home-goods retailer Williams-Sonoma Inc. filed a federal lawsuit against Amazon, alleging that the Company copied its proprietary designs for chairs, lamps, and other products for an Amazon private brand called Rivet.[232]  Williams-Sonoma contended that "Amazon ha[d] engaged in a systematic campaign of copying."  The parties reached a confidential settlement in 2020.

457.    Apart from the foregoing, the Company's practices *vis-à-vis* its collection and use of private customer information have also been highly criticized and subject Amazon to significant potential legal liability.[233]  For example, in November 2019, Senator Edward Markey of Massachusetts released "**alarming findings** from his investigation of Amazon doorbell company Ring that **reveal little to no privacy policies or civil rights protections for video collected by the technology**."  Senator Markey's press release stated, in relevant part, that:

> "Amazon Ring's policies are an open door for privacy and civil liberty violations," Markey said in a statement announcing the findings.  "If you're an adult walking your dog or a child playing on the sidewalk, you shouldn't have to worry that Ring's products are amassing footage of you and that law enforcement may hold that footage indefinitely or share that footage with any third parties.  Amazon's Ring is marketed to help keep families safe, **but privacy rights are in real danger as a**

---

[232] https://www.reuters.com/investigates/special-report/amazon-india-rigging/.

[233] *See, e.g.*, Jeffrey Dastin, Chris Kirkham & Aditya Kalra, *Amazon Wages Secret War on Americans' Privacy, Documents Show*, REUTERS (Nov. 19, 2021) ("In recent years, Amazon.com Inc has killed or undermined privacy protections in more than three dozen bills across 25 states, as the e-commerce giant amassed a lucrative trove of personal data on millions of American consumers.").

*result of company policies.  Amazon is not doing enough to ensure that its products and practices do not run afoul of our civil liberties.*"

458.    Amazon's disregard for customer privacy goes beyond issues with Ring.  In a consumer class action case pending in this court captioned *Garner et al. v. Amazon.com Inc. et al.*, Case No. 21-cv-00750 (W.D. Wash.), U.S. District Judge Robert S. Lasnik declined to dismiss claims brought against the Company pertaining to its Alexa devices pursuant to the Washington Consumer Protection Act, finding that the plaintiffs had advanced "specific factual allegations of misrepresentations and omissions" that "had the capacity to deceive a substantial portion of the public."  As reported by Law360 in May 2022:

> These assertions include that Amazon had misrepresented the rarity of "false wakes" and the "care it takes to avoid unjustified recordings" and that it had failed to accurately describe what it does with voice interactions it gathers, Judge Lasnik noted.

> The plaintiffs had also satisfied the "injury to business or property" element of their CPA claim by alleging that "they paid more for their Alexa devices than they would have been willing to pay had they known that Amazon designed the devices to record even in the absence of a wake word, *permanently stores even accidental recordings, and shares recordings (intentional or not) with employees and third-parties*" and that Amazon "*took and monetized plaintiffs' personal data for its own commercial benefit without payment, thereby depriving plaintiffs of the monetary value inherent in the data that was intercepted*," according to Judge Lasnik.[234]

**I.      Bezos' Autocratic Leadership Style Is Indicative of Scienter**

459.    In the book, *The Everything Store:  Jeff Bezos and the Age of Amazon*, author Brad Stone reported that Defendant Bezos exhibits some tell-tale signs of autocratic leadership.[235]  In an autocratic approach to management, one person (here, Bezos) is responsible for making all decisions, ignores most input from others, and refrains from thinking about the considerations of subordinate employees.  Several outlets have reported that Bezos regularly hired industry experts, only to disregard all of their recommendations.

---

[234] https://www.law360.com/articles/1491560/amazon-skirts-some-wiretap-claims-in-alexa-privacy-suit.

[235] https://www.fingerprintforsuccess.com/blog/jeff-bezos-leadership-style#toc-section-1..

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 153 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

460.    As someone who engaged in autocratic leadership, it can be readily inferred that Defendant Bezos would have had knowledge of (and access to reports discussing) the pervasive corporate misconduct discussed herein.

### J.    Amazon Is a Highly-Scrutinized Company

461.    Amazon is the largest e-commerce site in the world.   Because of this, the Company's business practices have drawn intense public interest on numerous fronts—something that was well-known, or should have been known, to members of senior management, including the Individual Defendants.   Throughout the Class Period, reporters and financial analysts frequently published articles and reports regarding the Company's business practices and growth, including its warehouse expansion plans, as well as Company's alleged violations of applicable laws *vis-à-vis* its dealings with its third-party sellers.   The Company was, or should have been, acutely aware that these matters were important to the public at large.   And, as a company hyper-focused on maintaining a certain image,[236] it is reasonable to infer that Amazon and its executive management team were closely tracking the same issues that had piqued the interest of so many outside of Amazon, including the media.

462.    Ultimately, when viewed collectively, as required by applicable law, Plaintiffs' allegations support a strong inference of fraudulent intent on the part of the Defendants or, at the very least, the strong inference that Defendants' conduct was highly unreasonable and an extreme departure from standards of ordinary care.   In either case, Plaintiffs have adequately plead scienter.

## VII.    LOSS CAUSATION

463.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and engaged in a course of conduct that artificially inflated the price of Amazon common stock.   In furtherance of this scheme, Defendants operated as a fraud or deceit on Class

---

[236] *See, e.g.*, https://www.ign.com/articles/amazon-twitter-army-defend-company-ceo-jeff-bezos-leaked-document-reveals ("A leaked document reveals how Amazon recruited a number of ambassadors to defend the online reputation of the company and its CEO, Jeff Bezos."); *see also* https://celebrityreputation.com/2021-04-04-amazon-online-army-paid-propagandists-reputation-bezos.html ("Codenamed 'Veritas,' the program involved dispatching paid propagandists on Twitter and elsewhere to say awesome-sounding things about Bezos and Amazon.").

Period purchasers of Amazon common stock by failing to disclose and misrepresenting the adverse facts detailed herein, including that (1) the Company engaged in anticompetitive and improper conduct in its private-label business practices, including giving Amazon's products preference over those of its competitors and using third-party sellers' non-public data to compete with them; and (2) the Company's infrastructure and fulfillment network investments substantially outpaced customer demand for fast delivery and that its expansion placed an undue strain on Amazon's financial condition.  As a result of Defendants' misrepresentations, the price of Amazon common stock declined significantly as the prior artificial inflation came out of the Company's stock price on April 28, 2020; May 1, 2020; July 23, 2020; August 3, 2020; October 6, 2020; April 6, 2022; and April 28, 2022.  Defendants' misstatements and omissions were the proximate cause of those stock declines and the losses suffered by Class members.

464.   As a result of their purchases of Amazon common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.  When Defendants' prior misrepresentations, omissions, and fraudulent conduct were disclosed and became apparent to the market, the price of Amazon common stock fell as the prior artificial inflation dissipated.  Defendants' materially false and misleading statements and omissions had the intended effect and caused Amazon common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $3,762.15 per share on November 19, 2021.

465.   By issuing materially false and misleading statements and failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Amazon's prospects, business, and compliance with relevant laws and regulations.  As the true facts about the Company were revealed to the market, the price of Amazon common stock fell significantly.  These declines removed the inflation from Amazon common stock, causing real economic loss to investors who had purchased Amazon common stock during the Class Period.

466.   The declines in the price of Amazon common stock after each of the corrective disclosures came to light were a direct result of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Amazon common stock negate any inference that the loss suffered by Plaintiffs and the other Class members

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 155 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

467.    For example, on April 28, 2020, *CNBC* published an article entitled "GOP Sen. Hawley asks DOJ to open a criminal investigation into Amazon." The article reported that Senator Hawley requested that the DOJ open a criminal antitrust investigation into Amazon regarding "predatory and exclusionary data practices to build and maintain a monopoly" in connection with reports that the Company used data from third-party sellers to compete with them using its private label business. Senator Hawley further stated that "Amazon abuses its position as an online platform and collects detailed data about merchandise so Amazon can create copycat products under an Amazon brand." *See supra* ¶ 238.

468.    On this news, Amazon's stock price fell $61.92 per share, or 2.61%, to close at $2,314.08 per share on April 28, 2020. Following the news of Senator Hawley's request to the DOJ, *The New York Post* took note of the development mid-day, stating that "[s]hares of Amazon were down 1.9 percent Tuesday afternoon, at $2,331.04."[237]

469.    A few days later, on May 1, 2020, the first headline for a *Bloomberg* article titled, "Amazon's Bezos Faces Call to Testify Before House Panel," went live at 10:34 a.m. *Bloomberg* noted that the members of an antitrust panel for the House Judiciary Committee had requested that Bezos testify regarding concerns that the Company had used data from third-party sellers on its site to develop competing products, in contradiction to representations Amazon had previously made under oath to Congress in July 2019.[238] In the article, *Bloomberg* reported that "Amazon has faced accusations of anticompetitive conduct from many corners," and noted that "some outside sellers, who are crucial to Amazon's business, have complained that the company makes

---

[237] Nicolas Vega, "Senator asks DOJ to investigate Amazon's 'predatory' practices," *The New York Post* (Apr. 28, 2020 3:09PM), available at https://nypost.com/2020/04/28/senator-asks-doj-to-investigate-amazons-predatory-practices/?utm_campaign=iphone_nyp&utm_source=mail_app.

[238] Ben Brody, "Amazon's Bezos Faces Call to Testify Before House Panel," *Bloomberg* (May 1, 2020), available at https://www.bloomberg.com/news/articles/2020-05-01/amazon-s-bezos-called-to-testify-before-house-antitrust-panel#xj4y7vzkg.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 156 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

their goods less visible if they post lower prices on other sites, essentially forcing the merchants to raise prices elsewhere because of the importance of Amazon to their business."[239]  *See supra* ¶ 239. Later that day, at 4:33 p.m., *Fox News* published an article titled "Jeff Bezos could testify for Amazon's 'possibly criminally false' statements to Congress, letter reveals."[240]  The article reported that "[t]he lawmakers also referenced Amazon's lack of cooperation with Congress' antitrust probe of the company," including a quote from the letter that read "[l]ast September we requested documents and communications related to Amazon's relationship with sellers, including Amazon's use of third-party sellers' data . . . . Amazon has not made an adequate production in response to this request, and—seven months after the original request—significant gaps remain."

470.    On this news, Amazon's stock price fell from $2,323.00 per share at 10:34 a.m. that day to close at $2,286.04, a decline of $36.96 per share or 1.59%.  Following the close of the market, *The Motley Fool* reported that "Amazon stock fell more steeply than many of its peer consumer goods titles, as well as the wider equities market."[241]

471.    On July 23, 2020, *Wall Street Journal* published an article entitled "Amazon Met With Startups About Investing, Then Launched Competing Products."  *See supra* ¶ 241.  The article reported that Amazon engaged in the practice of making an initial investment or meeting with start-ups for the purpose of securing their proprietary information before launching Amazon's own competing products.  *Id.*

472.    On this news, Amazon's stock price fell $113.36 per share, or 3.66%, to close at $2,986.55 per share on July 23, 2020.

---

[239] *Id.*

[240] Christopher Carbone, "Jeff Bezos could testify for Amazon's 'possibly criminally false' statements to Congress, letter reveals," *Fox News* (May 1, 2020 4:33pm), available at https://www.foxnews.com/tech/jeff-bezos-testify-amazon-congress.

[241] Eric Volkman, "Lawmakers Call on Amazon's Bezos to Testify Before Congress," *The Motley Fool* (May 1, 2020 10:47 PM), available at https://www.fool.com/investing/2020/05/01/lawmakers-call-on-amazons-bezos-to-testify-before.aspx.

473.    Less than two weeks later, on August 3, 2020, in an article titled "Amazon's Market Power to Be Investigated by New York AG," *Bloomberg* reported for the first time that New York's Attorney General's Office was collaborating with an on-going federal investigation by the FTC and California's Attorney General ("California AG") regarding potential antitrust violations by the Company.  *See supra* ¶ 244.  This was the first time it was publicly disclosed that two state agencies were collaborating with the FTC on the investigation, a development that the article explained "often precede[s] a big anti-trust enforcement action."  *Id.*[242]

474.    On this news, Amazon's stock price fell $52.79 per share, or 1.67%, to close at $3,111.89 per share on August 3, 2020.

475.    Then, on October 6, 2020, the Subcommittee released its findings from a more than 16-month long investigation into competition in the digital economy and the challenges presented by the dominance of several large internet and technology companies, including Amazon.  *See supra* ¶ 246.  The report describes how Amazon and other Big Tech firms wield significant control over the markets in which they operate, including the power to cut off competitive threats.  *Id.*  The Subcommittee report concluded, *inter alia*, that Amazon's dual role as an operator of its marketplace that hosts third-party sellers, and a seller in that same marketplace, creates an inherent conflict of interest.  Moreover, this conflict incentivizes Amazon to exploit its access to competing sellers' data and information, among other improper conduct.

476.    When news of the October 6, 2020 Subcommittee report was made public, Amazon's stock price fell $99.24 per share, or 3.1%, to close at $3,099.96 per share on October 6, 2020.  Recognizing the stock decline, *The Boston Globe* reported that "[t]he stocks of four large technology companies targeted in the [Subcommittee] report all fell slightly more than the overall market, which dropped on news that President Trump was suspending economic stimulus

---

[242] The California AG subsequently sued Amazon on September 14, 2022, alleging that the Company's actions have harmed the State's consumers and economy.  That complaint further alleges that Amazon had previously "misled other regulators who have scrutinized" the Company's effect on pricing.  Rachel Lerman & Cat Zakrzewski, "California Sues Amazon for Anticompetitive Behavior," *The Washington Post* (Sept. 14, 2022).

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 158 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

negotiations."[243]   An analyst covering Amazon commented on the Subcommittee report and the impact of a potential enforcement action by stating, "the subcommittee recommends changes to antitrust laws and enforcement, which could result in major changes for Big Tech companies."[244]

477.    On April 6, 2022, *Wall Street Journal* published an article entitled "SEC Is Investigating How Amazon Disclosed Business Practices," which reported, *inter alia*, that the SEC's probe had been underway for more than a year and had focused on Amazon's disclosures regarding its use of third-party seller data for its own private-label business.  *See supra* ¶ 99.

478.    On this news, Amazon's stock price fell $105.98 per share, or 3.2%, to close at $3,175.12 per share on April 6, 2022.

479.    As a subsequent media report noted, "the recent SEC investigation shows that Amazon has continued . . . to use both customer and third-party data for its own unfair competitive advantage."[245]   Significantly, the announcement of the SEC's investigation was followed in July 2022 by media reports indicating that the Company was motivated to offer concessions to settle an EU investigation which was focused on how Amazon unfairly uses third-party seller data to benefit the Company's retail business.  To address the problem, Amazon promised to, among other things, refrain from using "non-public data" from the vendors' activities to compete with them in the Company's private label business (suggesting that, consistent with the April 6, 2022 disclosure, Amazon misused such information previously).[246]

480.    Other media reports from July 2022 indicated that the Company has discussed internally "making a more drastic move to ward off regulators: abandoning its private-label

---

[243]  Ben Brody and David McLaughlin, "Lawmakers say Amazon, Apple, Facebook, Google are abusing their power and must be reined in," *The Boston Globe* (Oct. 6, 2020), available at https://www.bostonglobe.com/2020/10/06/business/house-lawmakers-say-amazon-apple-facebook-google-are-abusing-their-dominance/.

[244]  *Truist Securities*, Sector Update at 2 (Oct. 9, 2020).

[245]  "SEC investigates Amazon over business practices," The Ticker: Baruch College (Apr. 15, 2022) (available on Lexis).

[246]  *See, e.g.*, Brian Fung, "Amazon offers concessions to resolve EU antitrust probes," CNN.com (July 14, 2022).

---

**CONSOLIDATED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**  - 159 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

business altogether.  At least as recently as last year, several top Amazon executives, including the Company's current worldwide retail CEO Doug Herrington and General Counsel David Zapolsky, expressed a willingness to make this different but significant change if it meant avoiding potentially harsh remedies resulting from government investigations in the US or abroad, according to a source with knowledge of the discussions."[247]

481.    Finally, on April 28, 2022, Amazon announced its financial results for the first-quarter 2022, wherein it reported a $3.8 billion net loss—its first quarterly loss since 2015.  In its April 28, 2022 Form 8-K, Defendant Jassy admitted that Amazon was "no longer chasing physical or staffing capacity," and that improving productivity and cost efficiencies "may take some time."  *See supra* ¶ 250.  During its first-quarter 2022 earnings call with analysts that day, Defendant Olsavsky disclosed $6 billion of "incremental costs," including $4 billion of costs that "we consider to be more within our control and are working to reduce."  *See supra* ¶ 20.

482.    When the marketplace was made aware of Amazon's disclosure regarding the large present and future negative impact of its rapid expansion, the Company's stock declined from a closing price of $2,891.93 per share on April 28, 2022, to a closing price of $2,485.63 per share on April 29, 2022, a decline of $406.30 per share, or 14.05%.  Analysts covering the Company took note of this disclosure.  For example, on April 28, 2022, analysts at RBC Capital Markets described a "triple whammy punch on the disappointing op income guidance" due to "excess capacity" and "operational deficiencies."[248]

483.    On April 29, 2022, analysts at Wedbush published a report titled "We Aren't Buying What Amazon (Management) Is Selling" in which they reported that a "previously

---

[247] *See* Jason Del Rey, "Amazon executives have discussed ditching Amazon Basics [i.e., its private label business] to appease antitrust regulators," vox.com (July 15, 2022) (noting "[t]here was a strong consensus that this could be a viable option if the company was ever pressed into a position where it had to negotiate a settlement"); "Amazon May End Basics, Other Private Labels to Appease Regulators, Report Says," https://technewsvision.co.uk (July 15, 2022) ("*Amazon* may *consider ending* its Basics line and 44 other *private labels* to *appease regulators*. . . . Executives have discussed pairing back private-label items sold in the US by half.").

[248] *RBC Capital Markets*, "Amazon Ready for the Holidays in April; Lowering Estimates and Price Target" (Apr. 28, 2022).

---

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 160 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

unforeseen lack of productivity arising from the company's decision to rapidly expand its fulfillment capacity" and a "lower labor productivity" had caused Amazon's shares to drop in the aftermarket.[249]

484.    Likewise, on April 29, 2022, analysts at J.P. Morgan issued a report that "near-term overbuild led to $4B in lower productivity & inefficiencies in 1Q Y/Y, which we did not anticipate."  The analysts added that "Amazon hardly feels clean at the moment."[250]

485.    The economic loss, i.e., damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Amazon's common stock when Defendants' misrepresentations and other fraudulent conduct were revealed to the investing public at large.

## VIII.    AMAZON'S DISCLOSURE OBLIGATION UNDER THE SECURITIES LAWS

486.    As a public company, Amazon must comply with specific regulations set forth by the SEC.  Item 303 of SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain a section called "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), which is to be drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. § 229.303.

487.    Pursuant to Item 303(a), Amazon had a duty to:

(i)    Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, would be material to an understanding of the registrant's results of operations.

(ii)    Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of

[249] *Wedbush*, "We Aren't Buying What Amazon (Management) Is Selling; PT to $3,500" (Apr. 29, 2022).

[250] *J.P.Morgan*, "Buy The Pullback As AMZN Can Work Through Incremental Cost Pressures In Coming Quarters; Reiterate OW & $4,000 PT" (Apr. 29, 2022).

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 161 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

17 C.F.R. § 229.303(b)(2).

488.    Regulation S-K further states that "[t]he discussion and analysis [section] must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

489.    In 2003, the SEC issued interpretative guidance relating to the requirement of Item 303.  Such guidance states, in pertinent part:

> We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner.  MD&A is a critical component of that communication.  The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent.
>
> * * *
>
> Financial measures generally are the starting point in ascertaining these key variables and other factors.  However, financial measures often tell only part of how a company manages its business.  Therefore, when preparing MD&A, companies should consider whether disclosure of all key variables and other factors that management uses to manage the business would be material to investors, and therefore required.
>
> * * *
>
> Companies should also consider disclosing information that may be peripheral to the accounting function, but is integral to the business or operating activity.  Examples of such measures, depending on the circumstances of a particular company, can include those based on units or volume, customer satisfaction, time-to-market, interest rates, product development, service offerings, throughput capacity, affiliations/joint undertakings, market demand, customer/vendor relations, employee retention, business strategy, changes in the managerial approach or structure, regulatory actions or regulatory environment, and any other pertinent macroeconomic measures.

490.    The MD&A disclosures in Amazon's Forms 10-K and 10-Q filed with the SEC during the Class Period were materially false and misleading because Defendants failed to disclose material downward trends associated with the Company's e-commerce and fast delivery programs

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 162 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

then known to management and that would have a material effect on the Company's future operating results.

**IX.  PRESUMPTION OF RELIANCE**

491.    Plaintiffs and the Class are entitled to a presumption of reliance established by the fraud-on-the-market doctrine as enunciated in *Basic v. Levinson*, 485 U.S. 224 (1998) ("*Basic*") and the presumption of reliance for omissions as enunciated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

492.    With respect to the *Basic* presumption, a presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period.

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiffs and other members of the class purchased common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

493.    At all relevant times, the market for Amazon's common stock was efficient for the following reasons, among others:

(a)    The Company's common stock was actively traded on the NASDAQ, an internationally efficient market, throughout the Class Period.  Shares were highly liquid during the Class Period, with an average daily volume of 3,975,233 shares traded;

(b)    The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similarly reporting services;

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 163 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

(c)     The Market reacted promptly to public information disseminated by the Company;

(d)     Amazon's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace; and

(e)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Amazon's common stock.

494.    As a result of the foregoing, the market for Amazon common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Amazon's share price.  Under these circumstances, all purchasers of Amazon common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

495.    In addition to the *Basic* presumption, a class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute* because the claims alleged are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Amazon's business operations and financial performance—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery.

496.    Rather, all that is necessary to invoke the *Affiliated Ute* presumption of reliance is that the facts withheld would be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions as set forth above, that requirement is satisfied here.

## X.     CONTROL PERSON ALLEGATIONS

497.    By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about Amazon, its business, operations, operational trends, finances, and present and future business prospects.  The Individual Defendants would ascertain such information through the Company's internal corporate documents, conversations,

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 164 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

and connections with other corporate officers, bankers, traders, risk officers, marketing experts, employees, attendance at management and Board meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as the Company officers and/or directors.

498.   It is appropriate to presume that the materially false, misleading, and incomplete information conveyed in Amazon's public filings and press releases and Defendants' public statements, as alleged herein, was the result of the collective actions of the Individual Defendants identified above.  The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

499.   The Individual Defendants were involved in drafting, producing, reviewing, approving, and/or disseminating the materially false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the fact that materially false and misleading statements were being issued regarding the Company and themselves, and approved or ratified these statements, in violation of the federal securities laws.

500.   As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ, and governed by the provisions of the federal securities laws, each of the Individual Defendants had a duty to disseminate prompt, accurate, and truthful information with respect to Amazon's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.  The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 165 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

501.     The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of Amazon, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein.

502.     The Individual Defendants are liable as participants in a scheme, plan, and course of conduct that operated as a fraud and deceit on Class Period purchases of Amazon's common stock.

## XI.   NO SAFE HARBOR—INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

503.     The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the alleged false statements pleaded here.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent that there were any forward-looking statements, there were no meaningful cautionary statements accompanying them.  To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such cautions were glaringly absent from Amazon's Class Period filings.

504.     Moreover, there can be no safe harbor protection where the cautionary language remained fixed even as the risks changed.  Here, the Company's purported cautionary language remained the same throughout the Class Period, despite changing and/or worsening conditions. The consistency of Defendants' language over time despite new information belies any contention that the cautionary language was tailored to a specific future projection, especially when, as here, that risk had already materialized at the time(s) the disclosures were made.

505.     For example, Amazon's Form 10-K filed with the SEC on February 4, 2022, contained the following boilerplate "caution":  "As we continue to add fulfillment and data center

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 166 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  capability or add new businesses with different requirements, our fulfillment and data center

2  networks become increasingly complex and operating them becomes more challenging.  There can

3  be no assurance that we will be able to operate our networks effectively."

4      506.    The supposed risk warning failed to warn the market of the known problems that

5  Amazon was then experiencing with the overexpansion of its infrastructure and fulfillment

6  networks for its e-commerce business.  Simply put, this "caution" was untethered to the known

7  problems at hand, rendering it meaningless.

8      507.    The generic nature of this disclosure is further illustrated by the fact that it was

9  repeated in each of Amazon's SEC filings from July 2021 through the end of the Class Period—

10  the time period in which the problems plaguing the Company's expansion of its fulfillment centers

11  were well known internally.

12      508.    Cautions cannot be "meaningful" if they merely repeat themselves, reporting period

13  after reporting period, without taking into account material changes to the business.

14      509.    Accordingly, the risk warnings provided by Defendants in their Class Period

15  statements were not meaningful, were themselves false and misleading, and did not shield

16  Defendants from liability on the basis that such statements were "forward-looking."

17      510.    The Private Securities Litigation Reform Act's statutory safe harbor provided for

18  forward-looking statements under certain circumstances does not apply to any of the false

19  statements pleaded in this Complaint.  None of the statements pleaded herein are forward-looking

20  statements and no such statement was identified as a forward-looking statement when made.

21  Rather, the statements alleged herein to be materially false and misleading by affirmative

22  misstatement and/or omissions of material fact all relate to facts and conditions existing at the time

23  the statements were made.  Moreover, cautionary statements, if any, did not identify important

24  factors that could cause actual results to differ materially from those in any putative forward-

25  looking statements.

26      511.    Alternatively, to the extent that the statutory safe harbor applies to any forward-

27  looking statements pleaded herein, Defendants are liable for those false forward-looking

28  statements because, at the time each of those forward-looking statements were made, the particular

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 167 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.  Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and materially misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.  In other words, the supposed "risks" that Defendants attempted to warn about had already materialized.

## XII.   CLASS ACTION ALLEGATIONS

512.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired the publicly traded common stock of Amazon during the period between February 1, 2019 and April 28, 2022, inclusive, and were damaged thereby (the "Class").  Excluded from the Class are: Defendants; members of the immediate families of the Individual Defendants; the Company's subsidiaries and affiliates; any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

513.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of April 20, 2022 (just over a week from the end of the Class Period), the Company had approximately 508.72 million shares of common stock outstanding and actively trading on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 168 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

514.    Plaintiffs' claims are typical of the claims of members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

515.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

516.    Common questions of law and fact exist as to all members of the Class predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include:

(a)    Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)    Whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c)    Whether and to what extent the market price of Amazon's common stock was artificially inflated during the Class Period because of the material misstatements and omissions alleged herein;

(d)    Whether Defendants acted with the requisite level of scienter;

(e)    Whether the Individual Defendants were controlling persons of the Company;

(f)    Whether reliance may be presumed; and

(g)    Whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

517.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress the wrongs done to them individually.  There will be no difficulty in the management of this action as a class action.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 169 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

# XIII.   CAUSES OF ACTION

## COUNT I

### Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

518.   Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

519.   This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

520.   As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made materially untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants intended to and did, as alleged here: (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices of Amazon's common stock; and (iii) cause Plaintiffs and members of the Class to purchase the Company's common stock at artificially inflated prices.

521.   Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

522.   As set forth above, Defendants made their materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner, as to constitute willful deceit and fraud upon Plaintiffs and other members of the Class who purchased Amazon's common stock during the Class Period.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 170 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

523.    In ignorance of the materially false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for the Company's common stock, Plaintiffs and other members of the Class purchased the Company's common stock at artificially inflated prices during the Class Period.  But for the fraud, Plaintiffs and members of the Class would not have purchased the Company's stock at such artificially inflated prices.  As set forth herein when the true facts were subsequently disclosed, the price of Amazon's common stock declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of the Company's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed to the investing public at large.

524.    By virtue of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants**

525.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set herein.

526.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against each of the Individual Defendants.

527.    As alleged above, Amazon violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omitting material information in connection with the purchase and sale of the Company's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.  This fraudulent conduct was undertaken with scienter, and Amazon is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 171 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

528.   As set forth above, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content of its public statements with respect to its operations, corporate governance, and compliance with regulators.

529.   By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content of its public statements with respect to its operations, corporate governance, and compliance with regulators.

530.   The Individual Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiffs and the other members of the Class who purchased Amazon's common stock during the Class Period.

531.   In ignorance of the materially false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for the Company's common stock, Plaintiffs and other members of the Class purchased the Company's common stock at an artificially inflated price during the Class Period.   But for the fraud, Plaintiffs and members of the Class would not have purchased the Company's common stock at artificially inflated prices.   As set forth herein, when the true facts were subsequently disclosed, the price of the Company's common stock declined precipitously and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Amazon's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed to the investing public.

532.   By reason of the foregoing, the Individual Defendants are liable to Plaintiffs and the members of the Class as controlling persons of the Company in violation of Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

(a)   Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as class

representatives, and appointing Motley Rice LLC and Pomerantz LLC as class counsel pursuant to Rule 23(g);

(b)     Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

(c)     Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

(d)     Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

(e)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred; and

(f)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED: September 20, 2022                          Respectfully submitted,


**BRESKIN, JOHNSON & TOWNSEND, PLLC**
*/s/ Roger M. Townsend*
Roger M. Townsend (WSBA #25525)
rtownsend@bjtlegal.com
1000 Second Avenue, Suite 3670
Seattle, WA  98104
Telephone:  (206) 652-8660
Facsimile:  (206) 652-290

*Local Counsel for Lead Plaintiffs*

| **MOTLEY RICE LLC** | **POMERANTZ LLP** |
| *\/s\/ Gregg S. Levin* | *\/s\/ Jeremy A. Lieberman* |
| Gregg S. Levin | Jeremy A. Lieberman |
| glevin@motleyrice.com | jalieberman@pomlaw.com |

William S. Norton
bnorton@motleyrice.com
Joshua C. Littlejohn
jlittlejohn@motleyrice.com
Christopher F. Moriarty
cmoriarty@motleyrice.com
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9450

*Co-Lead Counsel for Lead Plaintiffs
and the Class*

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

James A. Harrod
Jim.Harrod@blbglaw.com
Adam Hollander
adam.hollander@blbglaw.com
Brendan Walden
brendan.walden@blbglaw.com
1251 Avenue of the Americas
New York, NY  10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

*Additional Counsel*

**BARRACK, RODOS & BACINE**

Stephen R. Basser
sbasser@barrack.com
Samuel M. Ward
sward@barrack.com
600 West Broadway, Suite 900
San Diego, CA  92101
Telephone:  (619) 230-0800
Facsimile:  (619) 230-1874

Jeffrey A. Barrack
jbarrack@barrack.com
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
Telephone:  (215) 963-0600
Facsimile:  (215) 963-0838

Emma Gilmore
egilmore@pomlaw.com
Dolgora Dorzhieva
ddorzhieva@pomlaw.com
Villi Shteyn
vshteyn@pomlaw.com
600 Third Avenue
New York, NY  10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665

Orly Guy
oguy@pomlaw.com
Eitan Lavie
eitan@pomlaw.com
Ariel Shannon 4, 34th Floor
Givatayim, Israel 5320047
Telephone: +972 (0) 3 624 0240
Facsimile: +972 (0) 3 624 0111

*Co-Lead Counsel for Lead Plaintiffs
and the Class*

**CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS** - 174 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1   *Counsel for the Detectives Endowment*
    *Association Annuity Fund*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS  - 175 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660