1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SONNY JOYCE, Individually and on Behalf of All Others Similarly Situated,

                Plaintiffs,

       v.

AMAZON.COM, INC., ANDREW R. JASSY, JEFFREY P. BEZOS, BRIAN T. OLSAVSKY, DAVID A. ZAPOLSKY, and NATE SUTTON,

                Defendants.

CASE NO. 2:22-cv-00617

ORDER RE: DEFENDANTS' MOTION TO DISMISS

ASBESTOS WORKERS PHILADELPHIA WELFARE AND PENSION FUND, on behalf of itself and all others similar situated,

                Plaintiff,

       v.

AMAZON.COM, INC., ANDREW R. JASSY, BRIAN T. OLSAVSKY, and DAVID FILDES,

                Defendants.

1
2
DETECTIVES ENDOWMENT
ASSOCIATION ANNUITY FUND,
Individually and on Behalf of All Others
Similarly Situated,

3
Plaintiff,

4
v.

5
6
AMAZON.COM, INC., ANDREW R.
JASSY, BRIAN T. OLSAVSKY, and
DAVID FILDES,

7
8
Defendants.

9
## I

10
### INTRODUCTION

11
This matter comes before the Court on Defendants' Motion to Dismiss the Consolidated

12
Class Action Complaint.  Dkt. # 75.  The motion requests dismissal with prejudice.  *Id.* at 55.

13
The Court has considered the submissions in support of and in opposition to the motion, the case

14
file, and the applicable law.  Being fully advised, the Court GRANTS the motion to the extent it

15
seeks dismissal.  But it DISMISSES the complaint without prejudice and GRANTS Plaintiffs

16
leave to amend.

17
## II

18
### BACKGROUND

19
Lead Plaintiffs Universal-Investment-Gesellschaft mbH, Universal-Investment-

20
Luxembourg S.A., Menora Mivtachim Insurance Ltd., Menora Mivtachim Pensions and Gemel

21
Ltd., The Phoenix Insurance Company, Ltd., and The Phoenix Provident Pension Fund Ltd.,

22
along with Named Plaintiffs Asbestos Workers Philadelphia Welfare and Pension Fund and

23
Detectives Endowment Association Annuity Fund (collectively, "Plaintiffs") bring this

24
consolidated class action under Sections 10(b) and 20(a) of the Securities and Exchange Act of

1934 ("Exchange Act") on behalf of persons and entities who acquired publicly traded common stock of Amazon.com, Inc. ("Amazon") between February 1, 2019 and April 28, 2022 ( "Class Period"). *See generally* Dkt. ## 58, 70.

According to Plaintiffs: Amazon is a multinational technology company with multiple business lines, including e-commerce services and distribution, website development and hosting, inventory and supply chain management, and fulfillment and logistics. Dkt. # 70 at 14–15. "Through its Amazon.com e-commerce and fulfillment platforms, [Amazon] offers products to retail consumers from 1.7 million businesses." *Id.* at 18. On Amazon's online marketplace, the company sells both third-party merchandise and its own private-label products. *Id.* at 8. When using the marketplace, third-party sellers sell their products and, in return, pay fees; third-party sellers also provide certain non-public data regarding their products to Amazon. *Id.* at 8, 18. In addition, third-party sellers may sell their goods through Amazon's fulfillment service, called "Fulfilled by Amazon" ("FBA"). *Id.* at 18.

Plaintiffs bring suit against Amazon and six of its corporate executives (collectively, "Defendants"), including: (1) Jeffrey Bezos, founder and Executive Chair; (2) Andrew Jassy, Amazon President, CEO, and Director; (3) Brian Olsavsky, Senior Vice President and Chief Financial Officer; (4) David Zapolsky, Senior Vice President, General Counsel, and Secretary; (5) Nate Sutton, Associate General Counsel; and (6) David Fildes, Head of Investor Relations ("Individual Defendants"). Dkt. # 70 at 15–16.

Plaintiffs filed this action on May 6, 2022. Dkt. # 1. On August 17, 2022, the Court consolidated the case with a parallel putative class action.[1] Dkt. # 58. In the Consolidated Amended Complaint ("CAC"), filed on September 20, 2022, Plaintiffs contend that Defendants

---

[1] *See Detectives Endowment Ass'n Annuity Fund v. Amazon.com, Inc., et al.*, 2:22-cv-0095-JHC.

committed two categories of securities violations: (1) that Defendants misrepresented and/or failed to disclose the fact that they exploited third-party sellers in an anticompetitive manner ("third-party allegations"); and (2) that Defendants similarly misrepresented and/or failed to disclose Amazon's infrastructure and fulfillment capacity ("capacity allegations").  Dkt. # 70 at 12–85.  Plaintiffs bring two causes of action: (1) a claim under 15 U.S.C. § 78j (Section 10(b) of the Exchange Act) and Rule 10b-5, promulgated by the Securities and Exchange Commission ("SEC"); and (2) a claim under 15 U.S.C. § 78t(a) (Section 20(a) of the Exchange Act).  *Id.* at 176–78.

Defendants move to dismiss the CAC, contending: (1) Defendants' statements related to the third-party allegations and capacity claims were neither false nor misleading; (2) Plaintiffs fail to plead a strong inference of scienter; (3) Plaintiffs do not allege loss causation as it relates to the third-party allegations; (4) Plaintiffs' third-party allegations are time-barred; and (5) Plaintiffs fail to allege control person liability.  *See* Dkt. # 75 at 12–44.  Defendants also seek judicial notice or, in the alternative, incorporation by reference, of Exhibits 2–50.  *See* Dkt. ## 77, 76–2 through 76–50.

### III

### DISCUSSION

When considering a motion to dismiss under Rule 12(b)(6), a court construes the complaint in the light most favorable to the nonmoving party.  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).  The court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff.  *Wyler Summit P'ship v. Turner Broad. Sys. Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Securities fraud actions must meet the "exacting" pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 313 (2007). Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The PSLRA also imposes the heightened requirement that a plaintiff state with particularity "both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud." *Tellabs,* 551 U.S. at 313 (citing 15 U.S.C. § 78u–4(b)(1), (2)) (internal quotations and citations omitted); *see also Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014).

A.     Judicial Notice and Incorporation by Reference

As an initial matter, Defendants ask the Court to judicially notice or incorporate by reference these documents:

| Exhibit | Description | Complaint Reference(s) |
|---|---|---|
| 1 | Chart of Plaintiffs' statements, organized by category | None |
| 2 | Excerpts from report of the Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary *Investigation of Competition in Digital Markets: Majority Staff Report and Recommendations* | ¶¶ 7, 13, 57, 100, 118–19, 125–26, 134, 246, 475–76 |
| 3 | Letter to investors from Jeffrey Bezos (April 11, 2019) | ¶ 61 n.12 |
| 4 | Tweet from Amazon News account (April 23, 2019) | ¶ 288 |
| 5 | Excerpts from Jeffrey Bezos's testimony before the Subcommittee on Antitrust, Commercial and Administrative Law (July 29, 2020) | ¶¶ 56, 67–68, 74, 105, 108, 126, 142 |
| 6 | Excerpts from Amazon's Responses to Questions for the Record following the July 16, 2019 Subcommittee Hearing (October 11, 2019) | ¶¶ 65, 307 |

| 7 | Excerpts from Nate Sutton's testimony before the Subcommittee on Antitrust, Commercial, and Administrative Law (July 16, 2019) | ¶¶ 63, 104, 295, 297, 302, 304, 445 |
| 8 | Letter from David Zapolsky to Subcommittee Chair David N. Cicilline (July 26, 2019) | ¶¶ 308–309 |
| 9 | Letter from Amazon to Subcommittee Members (May 15, 2020) | ¶¶ 332–334 |
| 10 | *Wall Street Journal* article "Amazon Scooped Up Data From Its Own Sellers to Launch Competing Products" (April 23, 2020) | ¶¶ 53, 64–69, 330–334, 446 |
| 11 | *Washington Post* article "Amazon Could Face Heightened Antitrust Security Under a New Agreement Between U.S. Regulators" (June 1, 2019) | ¶ 96 |
| 12 | *Vox* article "Amazon May Soon Face an Antitrust Probe.  Here are 3 Questions the FTC Is Asking About." (June 4, 2019) | ¶ 97 |
| 13 | *Wall Street Journal* article "SEC is Investigating How Amazon Disclosed Business Practices" (April 6, 2022) | ¶ 248 |
| 14 | Transcript of Amazon's Q3 2020 earnings call (October 29, 2020) | ¶ 172 |
| 15 | Transcript of Amazon's Q2 2021 earnings call (July 29, 2021) | ¶¶ 196–198 |
| 16 | Excerpts from Amazon's Q1 2022 earnings release (April 28, 2022) | ¶ 250 |
| 17 | *Wall Street Journal* article "Amazon CEO Andy Jassy's First Year on the Job: Undoing Bezos-Led Overexpansion" (June 16, 2022) | ¶¶ 191–94, 212, 267 |
| 18 | *Competition Policy International* article "The Italian Competition Authority's Decision in the Amazon Logistics Case: Self-preferencing and Beyond" (April 11, 2022) | ¶ 111 n.123 |
| 19 | *Tech Crunch* article "Europe Lays Out Antitrust Case Against Amazon's Use of Big Data" (November 10, 2020) | ¶ 76 n.47 |
| 20 | Excerpts from Amazon's Form 10-K for 2019 (January 31, 2020) | ¶¶ 320–24 |
| 21 | A document posted to the House Judiciary Committee's website with Bates number AMAZON-HJC-00207035 | ¶ 75& nn. 45–46 |
| 22 | A document posted to the House Judiciary Committee's website with Bates number AMAZON-HJC-00065094 | ¶¶ 134–36, 138 |
| 23 | *Wall Street Journal* article "Amazon Restricts How Rival Device Makers Buy Ads on its Site" (September 22, 2020) | ¶¶ 133, 139–40 |
| 24 | A document posted to the House Judiciary Committee's website with Bates number AMAZON-HJC-00141750 | ¶ 106 |
| 25 | Excerpts from Amazon's Q2 2021 earnings release (July 29, 2021) | ¶¶ 196, 365–67, 428 |
| 26 | Excerpts from Amazon's Q3 2021 earnings release (October 28, 2021) | ¶¶ 381–82, 429 |
| 27 | Excerpts from Amazon's Q4 2021 earnings release (February 3, 2022) | ¶¶ 390, 395 |
| 28 | Excerpts from Amazon's Form 10-K for 2020 | ¶¶ 355–56, 358 |
| 29 | Excerpts from Amazon's Form 10-K for 2021 | ¶¶ 402–03, 405, 407 |

| 30 | Transcript of Amazon's Q3 2021 earnings call (October 28, 2021) | ¶¶ 381–86 |
| 31 | Transcript of Amazon's Q4 2021 earnings call (February 3, 2022) | ¶¶ 390–94 |
| 32 | Excerpts from Amazon's Form 10-Q for 3Q 2021 (October 29, 2021) | ¶¶ 360, 363 |
| 33 | Excerpts from Amazon's 2021 Annual Report (January 26, 2022) | ¶¶ 209, 355 |
| 34 | Transcript of Amazon's Q4 2020 earnings call (February 2, 2021) | ¶ 176 |
| 35 | Excerpts from Amazon's Form 10-Q for 2Q 2021 (July 30, 2021) | ¶¶ 360, 362 |
| 36 | *Politico* article "Amazon Knew Seller Data Was Used to Boost Company Sales" (April 30, 2021) | ¶¶ 90–95 |
| 37 | *Reuters* article "Amazon Copied Products and Rigged Search Results to Promote its Own Brands, Documents Show" (October 13, 2021) | ¶¶ 85–90 |
| 38 | *Capitol Forum* article "Amazon: Former Employee Challenged Executive's Denial About Company's Use of Independent Sellers' Data" (July 18, 2019) | ¶¶ 52, 306–07 |
| 39 | *CNBC* article "GOP Sen. Hawley asks DOJ to open a criminal investigation into Amazon" (April 28, 2020) | ¶¶ 9, 238, 467 |
| 40 | *States News Service* article "Senator Hawley Requests Criminal Antitrust Investigation of Amazon" (April 28, 2020) | ¶ 238 |
| 41 | *Bloomberg* article "Amazon's Bezos Faces Call to Testify Before House Panel" (May 1, 2020) | ¶¶ 239–241 |
| 42 | Letter from Senator Josh Hawley to Attorney General William P. Barr (April 28, 2020) | ¶ 238 |
| 43 | Tweet from House Judiciary Dems' account (April 23, 2020) | ¶ 330 |
| 44 | *Fox News* article "Jeff Bezos Could Testify for Amazon's 'Possibly Criminally False' Statements to Congress, Letter Reveals" (May 1, 2020) | ¶ 240 |
| 45 | *Wall Street Journal* article "Amazon Met with Startups About Investing, Then Launched Competing Products" (July 23, 2020) | ¶¶ 11, 242–43, 471 |
| 46 | *Bloomberg* article "Amazon's Market Power to Be Investigated by New York AG" (August 3, 2020) | ¶ 244 |
| 47 | *Business Insider* article "Amazon is reportedly facing a new antitrust investigation into its online marketplace led by the FTC and attorneys general in New York and California" (August 3, 2020) | ¶ 244 |
| 48 | *Capitol Forum* article "Amazon: EC Investigation to Focus on Whether Amazon Uses Data to Develop and Favor Private Label Products; Former Employees Say Data Key to Private Label Strategy" (November 5, 2018) | ¶ 58 |
| 49 | Letter from Brian Huseman to Subcommittee Chairmen Nadler and Cicilline and Ranking Members Sensenbrenner and Jordan (October 4, 2020) | ¶ 69 |
| 50 | Document posted to House Judiciary Committee's website with Bates number AMAZON-HJC-00129156 | ¶ 134 |
| 51 | Excerpts from Amazon's Q1 2021 earnings release (April 29, 2021) | None |

*See generally* Dkt. # 77.

ORDER RE: DEFENDANTS' MOTION TO DISMISS - 7

Generally, when considering a motion to dismiss under Rule 12(b)(6), a court may not "consider material outside the pleadings when assessing the sufficiency of a complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). The PSLRA provides two exceptions to this rule, allowing for courts to consider certain documents through: (1) judicial notice under Federal Rule of Evidence 201; and (2) the incorporation-by-reference doctrine. *Tellabs*, 551 U.S. at 322.

The Ninth Circuit, however, has noted a "concerning pattern in securities cases" in which litigants improperly exploit these two exceptions to "defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja*, 899 F.3d at 998. "The overuse and improper application of judicial notice and the incorporation-by-reference doctrine . . . can lead to unintended and harmful results[,]" in which defendants "face an alluring temptation to pile on numerous documents to their motions to dismiss to undermine the complaint." *Id.* "This risk is especially significant in fraud matters, where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access." *Id.*

1.      Judicial Notice

A court may "judicially notice a fact that is not subject to reasonable dispute" when it is (1) "generally known within the trial court's territorial jurisdiction" or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)–(2). While a court may take judicial notice of matters of public record, it may not take judicial notice of *disputed matters* contained within the public record. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). Therefore, a "high degree of indisputability" is generally required for such judicial notice. *Jespersen v. Harrah's Operating Co., Inc.*, 444 F.3d 1104, 1110 (9th Cir. 2006) (citing Fed. R. Evid. 201 advisory committee notes).

Defendants contend that Exhibits 2–50 are "properly subject to judicial notice" because these documents are publicly available, not subject to reasonable dispute, and help contextualize the allegations in the CAC.  Dkt. # 77 at 12–15 (citing cases); *see also* Dkt. ## 76–2 through 76–50.  Plaintiffs disagree, contending that "[w]hile the Court may take judicial notice of the existence and publication of these documents, the Court should ***not*** take judicial notice of these documents for the underlying truth of the statements[.]" Dkt. # 83 at 11 (citing cases).

After consideration of the parties' briefing and the applicable law, the Court takes judicial notice of the existence of Exhibits 2–50 for the limited purpose of recognizing that these documents were within the public realm at the times alleged by Plaintiffs.  The Court recognizes that (1) SEC filings, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1064 n.7 (9th Cir. 2008), (2) publicly available news articles, *Heliotrope Gen., Inc.* v. *Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999), and (3) documents posted on government websites, *City & County of San Francisco* v. *Garland*, 42 F.4th 1078, 1083 n.3 (9th Cir. 2022), are generally matters of public record.  But the parties in many instances dispute the veracity of the contents of these documents (and indeed, many of these factual disputes relate to the the basis of Plaintiffs' claims).  Judicial notice is thus appropriate only to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true."  *Von Saher* v. *Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010); *see also In re Zillow Grp., Inc. Sec. Litig.*, No. C17-1387-JCC, 2018 WL 4735711, at *3 (W.D. Wash. Oct. 2, 2018); *In re Zynga Inc. Sec. Litig.*, No. C 12-04007 JSW, 2015 WL 1382217, at *4 n.1 (N.D. Cal. Mar. 25, 2015); *Jespersen,* 444 F.3d at 1110 (discussing indisputability).

2.    Incorporation by Reference

The doctrine of incorporation by reference "treats certain documents as though they are part of the complaint itself," preventing "plaintiffs from selecting only portions of documents

that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja*, 899 F.3d at 1002.  "[C]ourts may take into account 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'" *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012).  A document may be incorporated by reference into a complaint if the plaintiff (1) "refers extensively to the document" or (2) the document "forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

        i.      Extensively Referenced

        Defendants assert that Exhibits 2–50 are appropriate for incorporation by reference because each exhibit is extensively referenced throughout the CAC. Dkt. # 77 at 10–11.  In response, Plaintiffs clarify that two documents (Exhibits 1 and 51) are not referenced at all in the CAC, and 20 documents (Exhibits 3, 4, 11–14, 16, 18, 19, 24, 34, 40, 42–44, 46–50) are referenced only once. Dkt. # 83 at 9–10.  They further argue that, although the remaining documents are referenced more than once, given the length of the CAC, these references are not sufficiently lengthy or numerous to qualify as "extensive." *Id.*

        The Court agrees with Plaintiffs that none of the exhibits in question are referenced "extensively" in the CAC.  First, "[f]or 'extensively' to mean anything under *Ritchie*, it should, ordinarily at least, mean [the document is referenced] more than once . . ." *Khoja*, 899 F.3d at 1003.  Therefore, the two exhibits that are not referenced at all, as well as the 20 documents referenced in only one paragraph of the complaint, are not extensively referenced.[2]  Further, while *Khoja* implies that the term "extensive" includes documents mentioned more than once, it

---

[2] *Koja* contemplates the possibility that a single reference may be sufficiently extensive if the reference is "relatively lengthy." *Khoja*, 899 F.3d at 1003.  But none of the CAC's references to these documents is particularly lengthy.

1    does not necessarily require incorporation by reference when an exhibit has exceeded the one-

2    reference threshold.  In this case, the CAC is particularly long, consisting of 173 pages and 532

3    paragraphs.  Although the remaining exhibits are referenced more than once, the most referenced

4    exhibit is mentioned in only thirteen out of the CAC's total 532 paragraphs (2.4%).  Further,

5    Plaintiffs make many of these references in their factual background section.  *See, e.g.*, Dkt. # 70

6    at 19, 24–25.  The Court concludes that these references fall short of the "extensive" requirement

7    articulated in *Khoja*.  *See also Synopsys, Inc. v. InnoGrit, Corp.*, No. 19-CV-02082-LHK, 2019

8    WL 4848387, at *5 (N.D. Cal. Oct. 1, 2019).

9                    ii.       Basis of the Complaint

10           Next, Defendants contend that Exhibits 2–50 should be incorporated by reference

11   because they form the basis of Plaintiffs' CAC.  First, Defendants contend that the "SEC filings,

12   earnings call transcripts, and other documents" (Exhibits 4, 6–10, 14–16, 20, 25–35, 38–39, and

13   43) form the basis of the CAC because they contain "allegedly misleading statements at the heart

14   of this lawsuit."  Dkt. # 85 at 5 (citing *Khoja*, 899 F.3d at 1002; *In re Apple Inc. Sec. Litig.*, No.

15   19-cv-02033-YGR, 2020 WL 2857397, at *5 (N.D. Cal. June 2, 2020)).  Defendants also

16   maintain that the remaining exhibits form the basis of the CAC because (1) they "contain alleged

17   corrective disclosures that purportedly revealed the fraud and caused Plaintiffs' losses" (Exhibits

18   2, 13, 15, 39–42, and 44–47); and (2) "Plaintiffs rely on [certain statements in the exhibits] . . .

19   to attempt to plead falsity and scienter for their fraud claim" (Exhibits 2, 8, 11–12, 17–19, 21–24,

20   36–38, 48, 50).  Dkt. # 85 at 6.  In response, Plaintiffs contend that there is no single document

21   on which the CAC necessarily relies to form a basis for the complaint.  Dkt. # 83 at 10 (citing

22   *Reed v. Gen. Mills, Inc.*, No. C19-0005-JCC, 2019 WL 2475706, at *2 (W.D. Wash. June 13,

23   2019)).  Plaintiffs do concede that the Court *could* find that the CAC necessarily relies on the

24   SEC filings (Exhibits 16, 20, 25–29, 32, 33, 35, 51) and earnings calls (Exhibits 14–15, 30, 31,

34), but they argue that the incorporation of these documents would still be inappropriate because they contain disputed statements, the truth of which is at issue in the fraud claims.  Dkt. # 83 at 11.

The Court agrees with Plaintiffs.  There is no indication that any of the exhibits, on their own, form the basis of Plaintiffs' CAC so as to imply that a "claim necessarily depended" on that document.  *Khoja,* 899 F.3d at 1002; *see generally Palmer v. Milnor*, No. 2:19-CV-00961-RAJ, 2021 WL 462656 (W.D. Wash. Feb. 9, 2021) (when there is no one document central to the claim, and reference to the document is brief, incorporation by reference is not appropriate). Further, "[a]lthough incorporation by reference generally permits courts to accept the truth of matters asserted in incorporated documents . . . it is improper to do so only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint."  *Khoja,* 899 F.3d at 1014. Because the truth of the statements in the SEC Filings and earnings calls—despite plausibly serving as the basis for the claims alleged in the CAC—are disputed by the parties, the Court declines to incorporate these documents at this pleading stage.

B.    Section 10(b) of the Exchange Act and Rule 10b-5

The CAC's first cause of action alleges that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5.  Section 10(b) of the Exchange Act makes it

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  The SEC, pursuant to this statute, promulgated Rule 10b–5, which makes it unlawful:

> (a) [t]o employ any device, scheme, or artifice to defraud,

ORDER RE: DEFENDANTS' MOTION TO DISMISS - 12

(b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.  17 CFR § 240.10b-5.

In a Section 10(b) private action a plaintiff must prove six elements: (1) a material misrepresentation or omission by the defendant (falsity); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008) (citing *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 341–342 (2005)).  Defendants seek dismissal of this cause of action, contending that: (1) Defendants' statements regarding the third-party allegations and capacity claims were neither false nor misleading; (2) the CAC does not allege a strong inference of scienter; (3) the CAC does not allege loss causation as it relates to the third-party allegations; and (4) the third-party allegations are time-barred.  *See* Dkt. # 75 at 12–44.

      1.      Material Misrepresentations or Omissions

Defendants first argue that none of their statements regarding third party sellers or capacity constituted material misrepresentations or omissions.

Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).  "For a statement to be false or misleading, it must 'directly contradict what the defendant knew at that time' or 'omit[ ] material information.'" *Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th

611, 619 (9th Cir. 2022) (quoting *Khoja*, 899 F.3d at 1008–09).  To comply with the PSLRA's particularity requirements and Rule 9(b), "fraud must be accompanied by the who, what, when, where, and how of the misconduct charged."  *Weston Family*, 29 F.4th at 619 (quoting *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009)).  An allegedly misleading statement must be "capable of objective verification as opposed to 'inherently subjective puffing.'"  *Oregon Pub. Employees*, 774 F.3d at 606.

   When a statement is not false, it may still be misleading if it omits material information.  *Khoja*, 899 F.3d at 1008–09 (citing *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014)).  "A statement of omission is misleading in the securities fraud context 'if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.'"  *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011) (quoting *Berson v. App. Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)).  An omission is material "when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (internal citation omitted).  Without a duty to disclose, an omission does not necessarily give rise to a cause of action under Section 10(b).  An "actionable omission claim arises only when disclosure is necessary . . . to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

a.   Statements Related to Third-Party Sellers

(1)   Whether Amazon was charged with Anticompetitive Conduct or Disclosed the Possibility of Governmental Inquiry is Irrelevant to Plaintiffs' Claims.

Defendant's first argument for dismissal is that Plaintiffs' allegations are "drawn entirely from investigations . . . of anticompetitive conduct by Congress, regulators, and state AGs[,]" which did not result in charges or adjudications during the Class Period. Dkt. # 75 at 23. Defendants assert that there is no duty to "disclose uncharged, unadjudicated wrongdoing." Dkt. # 75 at 23 (*In re PayPal Holdings, Inc. S'holder Deriv. Litig.*, No. 17-cv-00162-RS, 2018 WL 466527, at *3 (N.D. Cal. Jan. 18, 2018)). Further Defendants contend that the Subcommittee Report determined that Amazon was not breaking any laws because the Report recommended Congress enact legislation to prospectively address Defendants' challenged conduct. Dkt. # 75 at 24.

Defendants' argument is flawed. Despite references to anticompetitive behavior in the CAC, this is not an antitrust case. Instead, the Court must address whether Plaintiffs successfully plead the elements of a securities fraud claim. Whether the Subcommittee found Defendants to have violated existing antitrust laws or began to adjudicate related claims is a red herring. Instead, the Court must focus on whether Plaintiffs have pleaded—with particularity—that Defendants were deceptive with shareholders when discussing treatment of third-party sellers.

Defendants also contend that they did not mislead shareholders regarding governmental investigations into their business, because Amazon provided a disclaimer to investors that it is "regularly subject to formal and informal reviews and investigations by governments and regulatory authorities[.]" Dkt. ## 75 at 24, 76–20 at 13–14. However, here Defendants also miss the mark. Plaintiffs allege that Amazon did not disclose that it was engaging in exploitative

activities regarding its third-party sellers, not that Amazon did not disclose that it was under

investigation by a governmental entity.  Indeed, even if Defendants' argument were coherent,

"inclusion of some cautionary language in a company's disclosures is 'not enough to support a

determination as a matter of law that defendant's statements were not misleading.'"  *Warshaw v.

Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996).  The Court thus declines to entertain arguments

that the lack of governmental adjudication of a claim of anticompetitive conduct and the

company's broad cautionary language in its shareholder disclosures should warrant dismissal.

(2)     Data Statements are Adequately Alleged to be False or
Misleading.

Next, Defendants argue that Plaintiffs' third-party seller claims fail because: (1) they do

not "plead particular facts demonstrating that Amazon used nonpublic seller-specific

information in contravention of [Amazon's internal] Policy"; (2) they repeatedly misdescribe

Amazon's policy regarding third party sellers; and (3) even if they had identified isolated,

discrete instances of Amazon violating its Policy, they do not plead that such violations are

sufficiently widespread to render the Data Statements misleading.  Dkt. # 75 at 25–28.

With respect to their first argument, Defendants contend that Plaintiffs' use of the *WSJ*

article is not enough to allege a securities claim with particularity because the CAC must

contain the "job titles and responsibilities of the anonymous former employees."  Dkt. # 75 at

26 (quoting *Applestein v. Medivation, Inc.*, 561 F. App'x 598, 600 (9th Cir. 2014).  Further,

according to Defendants, Plaintiffs may use news articles to plead particular facts only if the

"newspaper article corroborates plaintiff's own investigation and provides detailed factual

allegations."  Dkt. # 75 at 26 (internal quotations omitted) (quoting *In re McKesson HBOC,

Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000)).  According to Defendants, the

CAC "cites only vague accounts from other sources" regarding third-party seller claims and

"allegations from [Plaintiffs'] own investigation" are notably absent.  Dkt. # 75 at 27.   In response, Plaintiffs contend that, when considering the use of anonymous sources in the *WSJ* article, the Court should consider that the article interviewed 20 former employees and that the Subcommittee uncovered significant evidence regarding Amazon's treatment of third-party sellers corroborating those anonymous sources.  Dkt. # 82 at 21.

 The Court agrees with Plaintiffs and recognizes that, when considering anonymous sources at the pleading stage, if "other types of information corroborate the witness statements, such detailed descriptions are not necessary."  *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *11 (plaintiffs satisfied the particularity standard because, although the news sources cited relied on anonymous sources, the allegations were also based on detailed reports and other public sources).  Here, Plaintiffs provide adequate corroborating information to support the anonymous sources in the article.  For example, the CAC describes how the Subcommittee uncovered significant corroborating evidence that Amazon leveraged third-party sellers' data to compete with them.  *See* Dkt. # 70 at 20–22, 46.

Defendants' second argument is that their internal policy prohibits use of data from *individual* third-party sellers unless publicly available, while allowing the use of third-party *aggregated* data.  Dkt. # 75 at 27.  They therefore maintain that the use of aggregate third-party seller data did not contradict statements challenged in the CAC.  Dkt. # 75 at 27.  Plaintiffs clarify in their response that they are indeed alleging that Amazon employees used individual third-party sellers' data.  Dkt. # 82 at 22.

An examination of the CAC reveals that Plaintiffs do, in fact, allege that Amazon used individual sellers' data.  Dkt. # 70 at 24 ("The [Amazon] employees relayed that Amazon's use of individual third-party seller's data was a 'common practice that was discussed openly in meetings they attended . . . pulling data on competitors, including individual sellers, for example,

was 'standard operating procedure' when making products . . .").  Dkt. # 70 at 24.  The use of

individual third-party data contradicts the statements alleged in the Complaint.  *See, e.g.,* Dkt. #

70 at 103.  Therefore, the Court concludes that Plaintiffs' allegations regarding the falsity of

these statements are sufficiently pleaded.  *See Wyler Summit P'ship*, 135 F.3d at 661.

 Defendants' third argument is that Plaintiffs only highlight "isolated, discrete instances of

Amazon violating its [third-party] Policy" and these violations are not "sufficiently widespread

to render" Defendants' statements misleading.  Dkt. # 75 at 28.  Further, Defendants assert that

no reasonable investor could believe that no violations of policy could ever occur and that Bezos

informed the Subcommittee that he could not guarantee full compliance with Amazon's internal

policies, considering the number of third-party sellers with which it engages.  Dkt. # 75 at 28.

Plaintiffs respond that they plead a regular business practice of misappropriating individual

sellers' data.  Dkt. # 82 at 22–23.

 The Court agrees with Plaintiffs that they sufficiently plead widespread violations of

Amazon's internal policy, and thus misleading Data Statements.  The CAC alleges that

Amazon's violations of its internal policy were "systemic" and that thousands of Amazon

employees had unauthorized access to non-public third-party seller data.  Dkt. # 70 at 31, 34.

These allegations suggest more than the mere "isolated" or "discrete" violations that Amazon

describes, and therefore satisfy the standard for misleading statements.  *See Kang v. PayPal

Holdings, Inc.,* 620 F. Supp. 3d 884, 899 (N.D. Cal. 2022) ("Even if Plaintiffs had identified

specific legal violations, those violations would need to be frequent or widespread enough to

render the statements misleading.").  *See also Retail Wholesale & Dep't Store Union Loc. 338

Ret. Fund v. Hewlett-Packard Co.,* 845 F.3d 1268, 1278 (9th Cir. 2017).

1

2

3                                (3)     Statements about Amazon's Search Criteria and FBA are
                                        Adequately Alleged to be False or Misleading.

4              Defendants' next argument is that Amazon never favored its own private-label products,

5     or products sold by sellers who used Amazon's fulfillment service (FBA) to the detriment of

6     third-party sellers, and that Plaintiffs' allegations of misrepresentations to that effect are

7     unsupported.  Dkt. # 75 at 28–30.  Defendants emphasize the fact that Plaintiffs' cited sources

8     for these allegations—the 2020 *WSJ* article and internal emails from 2009 and 2010—do not

9     support the proposition that Amazon was untruthful regarding its treatment of third-party sellers.

10    *Id.* at 28.  Defendants also emphasize that sellers who used FBA may have been "indirectly"

11    favored by its featured offer algorithm because the service generally provides a better and more

12    reliable experience for customers, but that these sellers were never directly favored.  *Id.*

13    Plaintiffs respond that the CAC cogently alleges false or misleading statements regarding

14    whether Amazon considered FBA participation in determining the winner of the Buy Box.  Dkt.

15    # 82 at 23.  They also emphasize that the ICA investigation found that third-party sellers who did

16    not use FBA were excluded from "a set of advantages essential for obtaining visibility and better

17    sales prospects."  *Id.* at 24 (citing Dkt. # 70 at 43–44).

18            The Court concludes that Plaintiffs sufficiently allege false or misleading statements

19    regarding Amazon's treatment of its own products, as well as products sold by third-party sellers

20    who used FBA, compared to third-party sellers who did not use FBA.  Plaintiffs do not need to

21    show, at this stage of the litigation, that Amazon's algorithm "directly" favored their own

22    products or third-party products that used FBA.  They are simply required to plead, with

23    particularity, the elements of fraud including that Defendants' statements were false or

24    misleading.  *See* Fed. R. Civ. P. 9(b).  Defendants have essentially admitted that they may have

      "indirectly" favored their own products and FBA products, which contradicts statements such as

1   "we do not favor . . . products that use FBA over others."  *See, e.g.*, Dkt. # 70 at 107.  Further

2   dissecting the minutiae of how the Buy Box algorithm worked (for example, parsing out whether

3   "FBA" vs. "shipping speed" were categories considered by the algorithm) would be

4   inappropriate at the motion to dismiss phase where discovery has not yet been completed.

5                    (4)    Statements About Amazon's Search Relationships with,
                            Investments in, and Sales by Third-Party Sellers are Adequately
6                            Alleged to be False or Misleading.

7           Lastly, Defendants argue that their remaining statements regarding third-party sellers

8   were not misleading, and that Plaintiffs' allegations are insufficient because they simply point to

9   statements that "mention third-party sellers."  Dkt. # 75 at 30–32.  Defendants emphasize that the

10  allegedly misleading statements are not factually particular, too general and subjective, and

11  opinion statements that are not alleged to be subjectively disbelieved.  *Id.*  Plaintiffs respond that

12  the CAC alleges false or misleading statements with specificity.  Dkt. # 82 at 25–26.

13          The Court concludes that the remaining challenged statements do more than simply

14  "mention" third-party sellers.  Plaintiffs point to specific statements by Defendants indicating

15  that Amazon was "committed" "to supporting" third-party sellers.  Dkt. # 70 at 118–19.

16  Plaintiffs allege that these statements were false or misleading because Defendants in fact

17  employed anticompetitive tactics against third-party sellers, including suspending their accounts,

18  destocking products, blocking purchases, and falsely listing products as out of stock.  *Id.* at 111.

19  The Court concludes that these allegations meet the particularity requirement of Rule 9(b) and do

20  more than "merely mention" third-party sellers.  *See* Dkt. # 75 at 30.

21          b.      Statements Related to Capacity

22          Defendants' motion separates its challenged statements regarding capacity into two

23  categories: statements regarding "historical and then-current demand and capacity growth," and

24  statements regarding "future plans for capacity and anticipated future demand."  Dkt. # 75 at 32–

ORDER RE: DEFENDANTS' MOTION TO DISMISS - 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

39.  With respect to the first category of statements, Defendants maintain that their statements accurately reflected then-current high demand and year-over-year growth.  Defendants also emphasize that, even if the challenged statements implied that demand were greater than it was in actuality, no reasonable investor would have relied on vague and general remarks or "non-actionable puffery."  Dkt. # 75 at 34.  With respect to the second category of statements, Defendants contend that they are not actionable because they are "quintessential statements of opinion," protected under the PSLRA safe harbor, and not misleading opinions under the *Omnicare* standard.  Dkt. # 75 at 34–37.  Lastly, Defendants urge the Court not to credit the accounts of two former Amazon employees, because the CAC does not provide an adequate basis for their personal knowledge of events.  *Id.* at 37–38.  Plaintiffs respond by clarifying that their claims relate only to then-present information that was allegedly misrepresented, and that the challenged statements cannot be classified as "puffery," forward-looking, or opinions.  Dkt. # 82 at 29–37.  They also argue that the former employee allegations are reliable and corroborate post-Class Period reporting and disclosures.  *Id.* at 32–34.

        The Court agrees that Plaintiffs sufficiently allege false or misleading statements relating to Amazon's capacity during the Class Period.  The CAC points to various statements by Defendants in and after July 2021 that Amazon was continuing to expand capacity to "keep pace" with high levels of customer demand.  *See*, *e.g.*, Dkt. # 70 at 128–29; *see also id.* at 135 (October 2021 statement that "the incremental demand that came our way during the pandemic has remained and that we are continuing to grow on top of that.").  Plaintiffs allege that, in fact, by the time those statements were made, capacity had exceeded demand and a decision had already been made to scale back expansion.  *Id.* at 85.  Plaintiffs also allege that by the time many of these statements were made, Amazon was accumulating unused warehouse space and wasted inventory because it had overbuilt, yet Defendants continued to represent that Amazon

was increasing expansion efforts to meet fast-growing demand.  *See* Dkt. # 82 at 33.  The extent to which these allegations are supported, as well as more granular questions of fact—such as whether actual net sales met projected net sales during the Class Period and whether abandoned, delayed, or cancelled projects were counted in Amazon's square footage totals—are not appropriate for resolution at this stage.  Plaintiffs allege with particularity that there was a discrepancy between the information shared with investors and the true state of affairs, which suffices to survive a motion to dismiss.  *See Fecht v. Prive Co.,* 70 F.3d 1078, 1083 (9th Cir. 1995); *In re Quality Sys., Inc. Sec. Litig.,* 865 F.3d 1130, 1143–44 (9th Cir. 2017).

Further, the challenged statements regarding capacity are not forward-looking, "puffery," or opinions, and are therefore actionable.  First, the Court agrees with Plaintiffs that the allegedly false and misleading statements related to then-present information.  Plaintiffs allege that Defendants misrepresented Amazon's decision to substantially roll back its expansion plan, a decision that had allegedly been made but not disclosed at the time of the statements in question. *See, e.g.*, Dkt. # 70 at 134 ("the incremental demand that came our way during the pandemic has remained, and that we are continuing to grow on top of that").  The statements are thus not protected by the PSLRA safe harbor.  *See* 15 U.S.C. § 78u-5(i)(1)(A) & (B).  Second, the statements in question are not puffery; they describe the relationship between demand and investment growth in more specific terms than the vaguely optimistic descriptors in the cases cited by Defendants.  *See In re SunPower Corp. Sec. Litig.*, No. 16-cv-04710-RS, 2018 WL 4904904, at *4 (N.D. Cal. Oct. 9, 2018) ("we have this strong demand" and "there is very, very strong demand" are non-actionable puffery); *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570 (6th Cir. 2004) (statement that "Ford has dedicated itself to finding even better ways of delivering safer vehicles to the consumer" was puffery).  Lastly, the challenged statements cannot be classified as opinions and are thus not subject to the *Omnicare* standard.

*See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) ("A fact is a thing done or existing or an actual happening . . . An opinion is a belief, a view, or a sentiment which the mind forms of persons or things." (internal quotations and citations omitted)).  Plaintiffs allege that Defendants concealed or misrepresented information relating to then-current customer demand, capacity, and growth plans, and many of the statements they challenge do not include qualifying language such as "I believe," or "I think" (the language referenced in *Omnicare* as typically indicative of opinion statements).

Lastly, the Court concludes that Plaintiffs describe their confidential witnesses with sufficient particularity to support the probability that they knew about Defendants' alleged fraud. In the Ninth Circuit, when a plaintiff's allegations come from accounts of confidential witnesses, their use in satisfying the PSLRA standard of particularity must be addressed.  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005).  "It is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate her claim."  *In re Silicon Graphics Inc. Securities Litigation,* 183 F.3d 970, 985 (9th Cir. 1999).  Instead, to meet this particularity requirement for personal sources of information, "personal sources of information relied upon in a complaint should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'"  *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004) (quoting *Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir.2000)).  Here, the Complaint identifies two confidential witnesses who worked for Amazon and whose accounts corroborate Plaintiffs' capacity statement allegations. Dkt. # 70 at 80–82.  The Court agrees that the witnesses' accounts, which are included in the CAC along with their job titles, experience, responsibilities, and periods of employment, comply with the applicable law because it is "plausible" that the witnesses "would know, or could

reasonably deduce," the information attributed to them.  *Berson.*, 527 F.3d 982 at 985; *see* Dkt. # 70 at 80–82.

In sum, the Court concludes that Plaintiffs sufficiently plead the first element, material misrepresentations or omissions, of their Section 10(b) claim.

2.      Strong Inference of Scienter

To plead with particularity a "strong inference" of scienter, a complaint must allege that the defendant made false or misleading statements with an intent to deceive, manipulate, or defraud, or with deliberate recklessness.  *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021)*; City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017).  Deliberate recklessness is not "*mere* recklessness." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016).  Instead, it is "an *extreme* departure from the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* (citation omitted).  To qualify as "strong," an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.  *Tellabs,* 551 U.S. at 314.

Ninth Circuit case law explains that plausibility is highly relevant to the scienter inquiry, especially in the context of the heightened pleading standards of Rule 9(b) and the PSLRA.  *See In re NVIDIA Corp.*, 768 F.3d at 1058 (rejecting a theory of scienter because of the "implausibility of the timing in CW1's account of events"); *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) ("[C]laims of fraud or mistake ... must, in addition to pleading with particularity, also plead plausible allegations."); *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020) ("[T]he PSLRA neither allows nor requires us to check our disbelief at the door.").

Further, when a plaintiff seeks to hold a company and individual defendants liable for false or misleading statements, they must "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct" on the part of the specific speaker(s) in question. *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008); *see also Curry v. Yelp Inc.*, 875 F.3d 1219, 1227 (9th Cir. 2017) (requiring "detailed and specific allegations about management's exposure to factual information within the company."). In other words, it does not suffice to simply allege that Individual Defendants had a "general awareness of the day-to-day workings of the company's business." *Id.*

a.    Lack of Motive

Defendants point out that the CAC does not allege a plausible motive for why they would knowingly lie to investors, regulators, and Congress about their relationships with third-party sellers or their expansion efforts. Dkt. # 75 at 39–40, 45–46. The Court cannot locate anywhere in the CAC where Plaintiffs specifically discuss motive. *See generally* Dkt. # 70. In their response, Plaintiffs suggest that—with respect to their treatment of third-party sellers— Defendants may have been motivated by a "desire to avoid enormous fines that government watchdogs would have imposed on Amazon for its anticompetitive conduct." Dkt. # 82 at 30. But they do not explain how lying to investors would have changed the outcome of such investigations or decreased the likelihood of fines. *See generally* Dkt. # 82. Plaintiffs do not offer any plausible motive for why Defendants would lie about their capacity expansion plan, only stating, "courts routinely find that postponing the revelation of the truth, even in the short term, is consistent with an inference of scienter." Dkt. # 82 at 49.

Plaintiffs' failure to allege a cogent motive for Defendants' alleged fraud significantly undercuts their theory of scienter. *See Prodanova*, 993 F.3d at 1103 ("if the complaint fails to plead a plausible motive for the allegedly fraudulent action, the plaintiff will face a substantial

hurdle in establishing scienter.").  First, Plaintiffs' theory for why Defendants would have concealed their allegedly anti-competitive practices with respect to third-party sellers does not make sense.  It depends on the assumption that Defendants would be motivated to inflate the price of their stock for a time, and then face the fallout when their anti-competitive practices were revealed.  If Defendants had sought to profit in the meantime, such as by selling their stock or selling the company at a premium, this theory would be more plausible.  *See, e.g.*, *In re Rigel Pharm. Inc. Sec. Litig.,* 697 F.3d 869, 884–85 (9th Cir. 2012); *Nguyen,* 962 F.3d at 415; *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 1004 (9th Cir. 2009); *Prodanova,* 993 F.3d at 1107.  But there are no such factual allegations here.  Similarly, Plaintiffs fail to allege a motive for why Defendants would spend billions of dollars expanding Amazon's fulfillment capacity to satisfy unanticipated customer demand, and then hide the fact that capacity had outpaced demand from investors.  Plaintiffs admit that Amazon's decision to over-build eventually resulted in a $3.8 billion loss and triggered employee layoffs and the shutdown of facilities.  Dkt. # 70 at 91, 95–96.  Plaintiffs do not allege that Defendants profited from this loss, or that the decision to over-build somehow benefited them at the expense of investors.  Plaintiffs' failure to plead a plausible narrative about why the Individual Defendants would make false statements cuts strongly against the inference of scienter.

> **b.**     No Direct Allegations as to the State of Mind of the Individual Defendants

Defendants correctly point out that where, as here, Plaintiffs "seek to hold individuals and a company liable on a securities fraud theory," they must "allege scienter with respect to each of the individual defendants."  Dkt. # 75 at 40–41 (citing *Oregon Pub. Emps.*, 774 F.3d at 607).  They argue that the CAC fails to meet this standard because, although it alleges that various statements are false or misleading, it does not explain whether the corresponding speaker was contemporaneously aware that the statement was false.  Dkt. # 75 at 40–41.  Plaintiffs do not

directly respond to this argument and do not parse their response into separate sections for each Individual Defendant.

Regarding Plaintiffs' third-party seller allegations, Defendants are correct that the CAC does not plead facts explaining when any Individual Defendant was purportedly informed of Amazon's allegedly anticompetitive conduct, how that information was communicated, or by whom. Plaintiffs do not point to any specific meetings or calls involving any Individual Defendants during which the purported anticompetitive conduct was discussed, nor any documents provided to any Individual Defendants about the challenged conduct. *See generally* Dkt. # 70. Regarding the capacity allegations, Plaintiffs similarly do not plead any facts about particular meetings, calls, reports, or other ways through which any Individual Defendant purportedly learned about contrary facts to their challenged statements. *See generally* Dkt. # 70. The CAC relies heavily on the *WSJ* article, which suggests, based on unknown sources, that Jassy was aware that demand had begun to slow in July 2021. But even assuming the truth of these accounts, none of Jassy's challenged statements conflict with this article. Rather, his claims that Amazon was building its fulfillment network, "to satisfy customer needs," and that the company "was scaling its fulfillment network to "bring even faster delivery to more customers" can be true even assuming a decrease in demand as of July 2021. *See* Dkt. # 70 at 133, 141. The rest of Plaintiffs' allegations, which include accounts by former employee FE-1, also do not show first-hand knowledge on the part of any Individual Defendants because they do not establish that she conveyed any information to them or personally observed any specific information being communicated at meetings, calls, or via any documents or emails.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

c.      Allegations of Circumstantial Evidence are Insufficient

Without any direct evidence as to the Individual Defendants' state of mind, Plaintiffs rely on allegations of circumstantial evidence to support the inference of scienter. But their allegations fail to clear the high bar set by *Tellabs,* 551 U.S. at 324.

(1)      Third-party Seller Allegations

In their response, Plaintiffs cite reports by three independent government watchdogs (the Subcommittee, the Commission and the ICA), finding that Amazon's treatment of third-party sellers constituted misconduct, as evidence of scienter. Dkt. # 82 at 39. But these reports do not specify whether certain members of Amazon's leadership knew about the misconduct when they made the challenged statements, which is required to show scienter. *See, e.g.*, *Prodanova,* 993 F.3d at 1110.[3]  Plaintiffs also argue that the existence of government investigations during the Class Period put Defendants "on notice of a risk." *See* Dkt. # 82 at 40. But they do not explain how the Individual Defendants' general awareness of investigations would have informed them of specific information that rendered their statements false. For example, Plaintiffs allege that Defendants should have disclosed the nature of Amazon's allegedly anti-competitive practices toward third-party sellers. *See, e.g.*, Dkt. # 70 at 126. But they do not explain how the existence of government investigations would have clued the Individual Defendants into the specific nature of these practices.

Second, Plaintiffs argue in their response that Amazon's response to the Commission's inculpatory findings "further strengthens the inference of scienter." Dkt. # 82 at 41. But the fact

---

[3] Plaintiffs cite an unpublished opinion from the Southern District of New York, in which the court stated, "[T]he most important of the[] pieces of evidence [supporting scienter] is the allegation that [the government agency] 'repeatedly informed Mylan'" of its finding of misconduct. But there, the speaker was informed of the falsity of the substance of his statements years before making them to investors. *See In Re Mylan N.V. Sec. Litig.,* No. 16-CV-7926, 2018 WL 1595985, at *13 (S.D.N.Y. 2018). But here Plaintiffs have not alleged that the Individual Defendants were contemporaneously aware of the falsity of their statements when they made them.

ORDER RE: DEFENDANTS' MOTION TO DISMISS - 28

that the company took remedial measures after the Class Period does not show what any Individual Defendant knew when making the challenged statements.  For example, stating that Amazon would refrain from using non-public data to compete with third-party sellers in the company's private-label business does not show that Individual Defendants knew of any specific anti-competitive practices during the Class Period.  In Plaintiffs' cited cases, the defendants were alleged to have had contemporaneous knowledge of the falsity of their statements.  *See, e.g.*, *Matrixx Initiatives*, 563 U.S. at 31 ("Respondents claim that Matrixx's statements were misleading in light of reports that Matrixx had received, but did not disclose . . .").  By contrast, here there is no allegation of what Individual Defendants knew during the Class Period when the challenged statements were made.

Third, Plaintiffs argue that Defendants' "decisions to speak publicly about Amazon's treatment of third-party sellers" supports the inference of scienter because it "evidences their knowledge or severe recklessness."  Dkt. # 82 at 41.  But if the mere decision to speak on a topic were indicative of scienter, there would be no distinction between the element of scienter and the requirement to plead a false statement.  Further, the challenged statements themselves do not evince any particular defendant's first-hand knowledge or state of mind.  *Cf. Institutional Invs. Grp. v. Avaya, Inc.,* 564 F.3d 242, 269–70 (3d Cir. 2009).

Fourth, Plaintiffs argue that Bezos's and Jassy's "hands-on, autocratic leadership style, further bolsters the inference of scienter."  Dkt. # 82 at 42.  But the Ninth Circuit recently rejected a similar argument concerning almost identical allegations.  *See Webb v. Solarcity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018) ("Webb has alleged that Defendants–Appellees had a hands-on style and general accounting acumen, but not that they were involved in [minute] accounting decisions . . . Webb has not alleged that Defendants–Appellees had actual access to the accounting formula, but only generalized access to reports that may have documented its

application.").  In Plaintiffs' cited cases, the allegations did not simply establish that the defendants were "hands-on" or "autocratic" leaders, but also that they had accessed specific information that would have alerted them to the falsity of their statements.  *See Nursing Home,* 380 F.3d at 1231 ("Plaintiffs allege that, since all sales information was in this database, and since the top executives admit to having monitored the database, Oracle must have been aware that it was not going to meet its sales projections earlier in the third quarter . . ."); *In re VeriFone Holdings, Inc. Sec. Litig.,* 704 F.3d 694, 710 (9th Cir. 2012) ("[T]he complaint alleges in detail that [the individual defendants] . . . would have been aware of the complications associated with the Lipman merger.").  Moreover, these cases predate *Webb,* which clearly establishes that allegations of "hands-on" leadership style are not sufficiently particularized to give rise to an inference of scienter.  884 F.3d at 857.

(2)     Capacity Allegations

Plaintiffs argue that Amazon's reputation of being "obsessed with data" supports a strong inference of scienter because it suggests that Individual Defendants closely monitored and tracked real time data.  Dkt. # 82 at 43–44.  They argue that, because Amazon used an internal forecasting system ("SCOT") to analyze growth logistics for the Company and plan capacity growth, the Individual Defendants would have been aware of the company's slowing demand and capacity expansion plan.  *Id.*  But the Ninth Circuit has rejected the argument that the existence of a management information system supports a strong inference of scienter.  *See Metzler,* 540 F.3d at 1068 ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud.").  Without any pleaded facts regarding what information was accessed, when, or by which Individual

Defendant, the existence of an internal forecasting system does not support a strong inference of scienter.

Second, Plaintiffs argue that the Individual Defendants must have known facts contradicting their challenged statements because Amazon's "e-commerce expansion and fulfillment network" is a "core operation" of the company. *See Police Ret. Sys. Of St. Louis v. Intuitive Surgical, Inc.,* 759 F.3d 1051, 1062 (9th Cir. 2014).  Knowledge of a company's core operations shows scienter when the allegations "suggest that defendants had actual access to the disputed information" or if "the relevant fact is of such prominence that it would be 'absurd' to suggest otherwise." *S. Ferry LP, No. 2 v. Killinger,* 542 F.3d 776, 785 (9th Cir. 2008).  The parties dispute whether Amazon's fulfillment related operations, which accounted for 16% of net sales, constitute a "core operation" of the company. *Compare Okla. Firefighters Pension & Ret. Sys. v. Ixia,* No. CV 13-08440 MMM, 2015 WL 1775221, at *30 (C.D. Cal. Apr. 14, 2015) (service contracts that accounted for less than 20% of revenue not a "core operation," which generally requires "that the operation in question constitute nearly all of a company's business") *with Brown v. China Integrated Energy, Inc.,* 875 F. Supp. 2d 1096, 1123 (C.D. Cal. 2012).  But even assuming they do, Plaintiffs have failed to allege "specific admissions by one or more corporate executives of detailed involvement in the minutia . . . or witness accounts demonstrating that executives had actual involvement in creating false reports," an additional requirement for satisfying the "core operations" exception. *Intuitive,* 759 F.3d at 1062; *see also Zucco,* 552 F.3d at 1000 ("The [core operations exception] permits general allegations about 'management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements' to create a strong inference of scienter when these allegations are buttressed with 'detailed and specific allegations about

management's exposure to factual information within the company.'" (internal citations omitted)).

Third, Plaintiffs argue that Jassy's "hands-on" approach, "relentless focus on detail," and "ultra-detail-oriented management style" supports his scienter. Dkt. # 82. This argument fails for the reasons stated above. *See supra,* pp. 34–35 (citing *Webb*, 884 F.3d at 857).

Fourth, Plaintiffs point to the resignation of former Amazon executive David Clark as probative of scienter. Dkt. # 82 at 46. But Plaintiffs do not "allege sufficient information to differentiate between a suspicious change in personnel and a benign one." *Zucco,* 552 F.3d at 1002. Plaintiffs do not allege that Clark was involved in any alleged fraud or that he had any knowledge of the Individual Defendants' statements or contemporaneous state of mind, pointing instead mainly to the timing of his departure. *See id.* ("a "[m]ere conclusory allegation[ ] that a financial manager resigns or retires ... shortly before the corporation issues its restatement," . . . "without more, cannot support a strong inference of scienter."). These allegations do not support a strong inference of scienter.

Plaintiffs' remaining arguments also do not support a strong inference of scienter. As this order explains *supra*, the mere fact that the Individual Defendants spoke about a topic does not provide support for a strong inference of scienter, nor does the fact that there may be inconsistencies between the Individual Defendants' public pronouncements and what was "known internally within Amazon." Dkt. # 82 at 48. Instead, Plaintiffs must specifically allege where, when, and how the Individual Defendants became aware of information contradicting their challenged statements. *See Prodanova,* 993 F.3d at 1107. Similarly, the accounts by former employees do not support a strong inference of scienter because they do not explain how the Individual Defendants gained first-hand knowledge of information contradicting their challenged statements. *Id.*

ORDER RE: DEFENDANTS' MOTION TO DISMISS - 32

1    Plaintiffs fail to establish a plausible motive for why the Individual Defendants would lie

2  to their investors.  They also fail to show that the Individual Defendants had first-hand

3  knowledge of the falsity of their statements when they were made.  Lastly, Plaintiffs' allegations

4  of circumstantial evidence regarding the Individual Defendants' state of mind do not support a

5  strong inference of scienter.  They therefore fail to adequately plead the second element of their

6  Section 10(b) claim.

7    3.    Loss Causation with Respect to the Third-Party Seller Allegations

8    Loss causation refers to the causal connection between the defendant's fraudulent

9  conduct and the plaintiff's economic loss.  One way to prove loss causation is to show that the

10  defendant's fraud was revealed to the market through one or more "corrective disclosures" and

11  that the company's stock price declined as a result.  *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d

12  781, 786 (9th Cir. 2020).

13    Defendants argue that Plaintiffs fail to plead loss causation because they do not allege a

14  corrective disclosure.  Dkt. # 75 (citing *In re BofI Holding,* 977 F.3d at 791.  Defendants argue

15  that the various news reports and the Subcommittee reports cited by Plaintiffs do not constitute

16  corrective disclosures.  Dkt. # 75 at 49–52.  Regarding the news reports, they argue that they

17  simply announce the existence of investigations, which does not suffice to establish loss

18  causation because the market "cannot possibly know what the investigation will ultimately

19  reveal."  Dkt. # 75 at 49 (citing *Loos v. Immersion Corp.,* 762 F.3d 880, 890 (9th Cir. 2014)).

20  They also argue that the alleged anticompetitive conduct discussed in the news reports is "not

21  new" but instead "cumulative of substantially identical information that was the subject of

22  repeated public reporting prior to the first alleged corrective disclosure on April 28, 2020."  Dkt.

23  # 75 at 50.  Regarding the Subcommittee reports, Defendants argue that they are not corrective

24  disclosures because they "did not determine that Amazon engaged in wrongdoing," and "did not

reveal new information to the market." *Id.* at 51–52.  Plaintiffs counter that they sufficiently plead loss causation because the various news and investigative reports referenced in the CAC constitute interrelated partial disclosures, and they clarify the causal connection between these disclosures and the harm they suffered.  Dkt. # 70 at 49–53.

First, the Court notes that establishing a corrective disclosure is only "one way to prove loss causation," as the court in *Bofl Holdings* clarifies.  977 F.3d at 791; *see also Mineworkers' Pension Scheme v. First Solar Inc.,* 881 F.3d 750, 753 (9th Cir. 2018) ("Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.").  The Supreme Court has emphasized that pleading loss causation is "not meant to impose a great burden upon a plaintiff," *Dura Pharms.,* 544 U.S. at 347, and the Ninth Circuit has held that loss causation involves "no more than the familiar test for proximate cause," and "there are an 'infinite variety' of ways for a tort to cause a loss." *Mineworkers' Pension Scheme*, 881 F.3d at 753 (internal citations omitted).  Plaintiffs allege that Amazon's stock price was artificially inflated throughout the Class Period as a result of Defendants' challenged statements and omissions.  Dkt. # 70 at 160–62.  They also allege that, following various news articles and investigative reports, Amazon's stock price dropped thereby damaging the class.  *Id.* at 162–75.

The Court concludes that Plaintiffs' allegations suffice to establish loss causation.  *Dura Pharms.,* 544 U.S. at 347.  Defendants make several references to *Loos,* in which the Ninth Circuit held that "the announcement of an investigation, standing alone and without any subsequent disclosure of actual wrongdoing, does not reveal to the market the pertinent truth of anything, and therefore does not qualify as a corrective disclosure." 762 F.3d at 890 (internal quotations and citation omitted).  But *Loos* left open the question whether the announcement of an investigation can form the basis for a viable loss causation theory if the complaint also alleges

a later corrective disclosure by the defendant. *Id.* The Ninth Circuit answered that question in the affirmative in *Lloyd v. CVB Financial Corp.,* 811 F.3d 1200, 1210 (9th Cir. 2016) ("any other rule would allow a defendant to escape liability by first announcing a government investigation and then waiting until the market reacted before revealing that prior representations under investigation were false.").

Here, Plaintiffs allege several disclosures that satisfy the *Lloyd* standard. For example, a news article published in May 2020 reported that Bezos was called to testify before an antitrust panel of the House Judiciary Committee regarding Amazon's allegedly anticompetitive use of third-party sellers' data, and a news article published in August 2020 reported that New York's Attorney General's Office was collaborating with an ongoing federal investigation regarding potential antitrust violations. Dkt. # 70 at 162–64. Amazon's stock price dropped following each of these reports. *Id.* Later, in October 2020, the Subcommittee released a report that described how Amazon's dual role as an operator of its marketplace that hosts third-party sellers and a seller in that same marketplace creates an inherent conflict of interest. *Id.* at 164. Amazon's stock price fell again following this report. *Id.*

Defendants' argument that the Subcommittee reports are not corrective disclosures because the reports did not determine that Amazon engaged in wrongdoing is not convincing. To qualify as a corrective disclosure in the securities fraud context a report need only bring to light the falsity of past challenged statements. The Subcommittee reports did so, pointing to a conflict of interest where Amazon had previously represented that its interests were aligned with those of third-party sellers. *See, e.g.*, Dkt. # 70 at 121. Defendants' argument that the alleged disclosures did not contain "new" information is similarly unconvincing. The news reports did bring to light additional information regarding the nature of investigations, and the Subcommittee reports represented authoritative findings by a government body as to Amazon's

conduct.  The causal connection between these reports and the decrease in Amazon's stock price is not difficult to follow.  *See, e.g.*, *In re New Century,* 588 F. Supp. 2d 1206, 1238 (C.D. Cal. 2008) ("The Complaint sufficiently provides KPMG with an 'indication of the loss and the causal connection that [Plaintiffs] [have] in mind.'" (alterations in original) (quoting *Dura,* 544 U.S. at 347)).

In sum, Plaintiffs adequately plead loss causation, the third element of their Section 10(b) claim, as to their third-party allegations.

4.     Timeliness of Third-Party Allegations

Defendants assert that Plaintiffs' third-party allegations are time barred because "they are predicated upon purported facts that Plaintiffs should have discovered before May 6, 2020—two years before the initial complaint in this action was filed."  Dkt. # 75 at 52 (citing Dkt. # 1).

A securities fraud claim must be brought no later than two years after "a reasonably diligent plaintiff would have discovered 'the facts constituting the violation[.]'"  *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 637 (2010) (internal citations omitted).  "[T]he limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation."  *Id.* at 653.  "[T]he statute of limitations is an affirmative defense, the defendant bears the burden of proving that the plaintiff filed beyond the limitations period."  *Payan v. Aramark Mgmt. Servs. Ltd. P'ship*, 495 F.3d 1119, 1122 (9th Cir. 2007).

Defendants argue that several news reports and other public sources revealed information regarding Amazon's business practices vis-a-vis third-party sellers before May 6, 2020, thus precluding Plaintiffs' claims.  Dkt. ## 75 at 52–54; 84 at 26.  According to Defendants, "Plaintiffs cannot sustain a fraud claim where 'most of the facts Plaintiff contends were later

discovered were indeed disclosed' before the limitations period." Dkt. # 75 at 53 (citing cases) (quoting *Welgus v. TriNet Grp., Inc.*, No. 15-cv-03625-BLF, 2017 WL 167708, at *21 (N.D. Cal. Jan. 17, 2017)).  Defendants also maintain that a "reasonably diligent plaintiff would also have discovered the facts supposedly supporting scienter before May 6, 2020."  Dkt. # 75 at 54.  In response, Plaintiffs assert that the "handful of news articles cited by Defendants" would not have alerted a "reasonably diligent plaintiff" to "the facts constituting violation."  Dkt. # 82 at 53 (citing *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011)).  Plaintiffs also argue that neither the pre-May 2020 news articles, nor the existence of various ongoing investigations at that time, could not have formed the basis for a viable securities fraud action under the "PSLRA's stringent pleading standard." Dkt. # 82 at 54–55.

The Court rejects Defendants' argument.  Whether a plaintiff should have discovered facts to support its claim is inherently a fact-intensive inquiry.  *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1080 (N.D. Cal. 2010) (citing cases).  Indeed, the Ninth Circuit instructs that

> [t]he question of what a reasonably prudent investor should have known is particularly suited to a jury determination and . . . the defendant bears a considerable burden in demonstrating, at the *summary judgment stage,* that the plaintiff's claim is time barred.   The burden must be at least as high on the pleadings.

*In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 557 (N.D. Cal. 2009) (internal quotations and citation omitted) (emphasis in original).  Defendants highlight several news articles to argue that Plaintiffs' third-party allegations are time barred.  *See, e.g.*, Dkt. ## 76-10, 76-38; 76-48; 70 at 51.  Yet the Court is not convinced that the mere fact that four articles published before May 2020—out of at least 50 different sources cited in the CAC—could imply that "most" of the facts Plaintiffs used for its third-party allegations were from before the limitations period.  *See* Dkt. # 75 at 53.  Next, Defendants appear to contend that, because two

key governmental investigations began—and certain investigative testimony was given—before May 2020, Plaintiffs third-party allegations are untimely.  The Court disagrees.  The Subcommittee reports and EU Commission final publications were well after May 2020 limitations date.  One wonders how Plaintiffs could have mounted a claim sufficient to meet the heightened pleading standards under Rule 9 and the PLSRA based on the mere commencement of these two investigations and before any final findings were issued.

Ultimately, the Court notes that the inquiry of what a reasonable investor should have known or discovered is a fact-intensive inquiry.  For these reasons, at this juncture, the Court declines to dismiss Plaintiffs' claims as untimely.

D.      Section 20(a) of the Exchange Act and Control Person Liability

To state a Section 20(a) claim, Plaintiffs must allege (1) a primary violation of the securities laws; and (2) that defendants "exercised actual power or control over" Amazon. *Zucco,* 552 F.3d at 990.

Defendants argue that, because there has been no primary violation of securities laws, this claim should be dismissed.  Dkt. # 75 at 55.  In the alternative, they urge the Court to dismiss the claim as to Sutton and Fildes because Plaintiffs fail to allege that either "exercised power or control" over Amazon.  Dkt. # 75 (citing *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp,* 320 F.3d 920, 945 (9th Cir. 2003)).  Plaintiffs respond that Sutton and Fildes both held important roles within the company and spoke on Amazon's behalf before Congress and during earnings calls, which is sufficient to allege control person liability at the pleadings stage.  Dkt. # 82 at 44–45.  As explained above, the Court agrees with Defendants that the CAC does not adequately plead a primary violation because it fails to allege scienter.

Nevertheless, the Court concludes that, assuming a primary violation is established, Plaintiffs adequately plead control person liability as to Sutton and Fields.  Whether the

defendant is a controlling person is an intensely factual question involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions. *See Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1065 (9th Cir. 2000). Plaintiffs allege that Sutton has been Amazon's Associate General Counsel, Litigation & Regulatory, since 2016, and that Fildes has served as Head of Investor Relations since June 2017. Dkt. # 70 at 16. They also allege that Sutton testified at a Subcommittee hearing in July 2019, *id.* at 105, and that Fildes spoke to investors on earnings calls, *id.* at 67, 75. At the pleadings stage, these allegations suffice to plead control. *See Howard,* 228 F.3d at 1065 (9th Cir. 2000); *Hefler v. Wells Fargo & Co.,* No. 16-CV-05479-JST, 2018 WL 1070116, at *13 (N.D. Cal. Feb. 27, 2018) ("Since Howard, '[c]ourts have found general allegations concerning an individual's title and responsibilities to be sufficient to establish control at the motion to dismiss stage.'" (quoting *In re Energy Recovery Inc. Sec. Litig.*, No. 15-CV-00265-EMC, 2016 WL 324150, at *25 (N.D. Cal. Jan. 27, 2016))); *In re Adaptive Broadband Sec. Litig.,* No. C 01-1092 SC, 2002 WL 989478, at *19 (N.D. Cal. Apr. 2, 2002) ("[T]he fact that the named individual defendants held important positions in the company is sufficient at the pleadings stage."); *In re Volkswagen, "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.,* 258 F. Supp. 3d 1037, 1049 (N.D. Cal. 2017) ("Horn's appearance [before Congress] on behalf of Volkswagen reflects his position of authority . . . "); *In re Apple Inc.,* 2020 WL 6482014, at *14 ("[P]laintiff adequately alleges that [defendant] acted as a control person because he spoke on the Company's behalf."). Plaintiffs therefore adequately plead control person liability.

## IV

### CONCLUSION

For the foregoing reasons, the Court concludes: (1) Plaintiffs adequately plead material misrepresentation or omission; (2) Plaintiffs fail to adequately plead scienter; (3) Plaintiffs

adequately plead loss causation as to their third-party claims; (4) Plaintiffs' third-party claims are timely; and (5) Plaintiffs adequately plead control person liability.  Accordingly, the Court DISMISSES Plaintiffs' Consolidated Amended Complaint without prejudice.  The Court GRANTS Plaintiffs leave until January 16, 2024, to file a second Consolidated Amended Complaint.

Dated this 4th day of December, 2023.

John H. Chun
United States District Judge