THE HONORABLE JOHN H. CHUN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | |
|---|---|
| SONNY JOYCE, Individually and On Behalf of All Others Similarly Situated,<br><br>                   Plaintiff,<br><br>        v.<br><br>AMAZON.COM, INC., ANDREW R. JASSY, JEFFREY P. BEZOS, BRIAN T. OLSAVSKY, DAVID A. ZAPOLSKY, NATE SUTTON, DAVE CLARK, JEFF WILKIE, and DOUG HERRINGTON,<br><br>                   Defendants. | Case No.: 2:22-cv-00617-JHC<br><br>**SECOND CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY DEMAND |
| ASBESTOS WORKERS PHILADELPHIA WELFARE AND PENSION FUND, on behalf of itself and all others similarly situated,<br><br>                   Plaintiff,<br><br>        v.<br><br>AMAZON.COM, INC., ANDREW R. JASSY, BRIAN T. OLSAVSKY, DAVID FILDES, DAVE CLARK, JEFF WILKIE, and DOUG HERRINGTON,<br><br>                   Defendants. | Case No.: 2:22-cv-00934-JHC<br><br>**SECOND CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY DEMAND |

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

| DETECTIVES ENDOWMENT ASSOCIATION ANNUITY FUND, Individually and On Behalf of All Others Similarly Situated, | Case No.: 2:22-cv-00950-JHC |
|---|---|
| Plaintiff, | **SECOND CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| AMAZON.COM, INC., ANDREW R. JASSY, BRIAN T. OLSAVSKY, DAVID FILDES, DAVE CLARK, JEFF WILKIE, and DOUG HERRINGTON, | <u>CLASS ACTION</u> |
| Defendants. | JURY DEMAND |

# TABLE OF CONTENTS

I.  INTRODUCTION ....................................................................................................2

II.  JURISDICTION AND VENUE ...............................................................................9

III.  PARTIES ..................................................................................................................10

    A.  Plaintiffs ........................................................................................................10

    B.  Defendants .....................................................................................................11

IV.  SUBSTANTIVE ALLEGATIONS ..........................................................................14

    A.  The Company and Its Business......................................................................14

        1.  The History of Amazon ......................................................................14

        2.  Amazon's Business Lines ...................................................................15

    B.  Amazon Exploited Its Third-Party Sellers in an Anticompetitive
        Manner ...........................................................................................................16

        1.  Amazon Misappropriated Third-Party Sellers' Data ....................19

        2.  Amazon Tied and Bundled Its Products to the Detriment of
            Third-Party Sellers ...........................................................................34

        3.  Amazon Undermined Competition and Exploited Its Power
            Over Third-Party Sellers ...................................................................45

        4.  Amazon Routinely Favored Its Own Private-Label Products
            to the Detriment of Third-Party Sellers .........................................68

        5.  During the Relevant Time, Amazon Increased the Cost
            That Third-Party Sellers Bore To Reach Shoppers and
            Drove Up Consumers' Prices...........................................................74

    C.  Amazon's Retail Model Has Long Relied on the Promise of Rapid
        Delivery...........................................................................................................77

        1.  Amazon Has Long Focused on "Delivering as Many Items
            as Fast as Possible" ..........................................................................77

        2.  2015-2017:  Amazon Announces and Expands Same-Day
            Delivery..............................................................................................78

        3.  2018-2019:  Amazon Increases Its Already-Aggressive
            Focus on Rapid Delivery ..................................................................79

        4.  2019-2020:  As Competitive Pressures Mount, Amazon
            Invests Massively in Expanding Fast Delivery..............................80

    D.  Amazon Aggressively Increases Its Fulfillment Capacity and
        Headcount During the Pandemic ...................................................................84

        1.  Early 2020:  COVID-19 Causes a Massive Demand Surge ..........84

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS    - i -
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

2.   2020-2021:  Amazon Continues Its Aggressive Expansion, Which Defendants Justify as Necessary to Keep Competitors at Bay and Meet Existing Demand for Fast Delivery..................................................................84

3.   Analysts Covered the Expansion Favorably at the Time..............91

E.   By Early 2021, Amazon Prepares to Overhaul Its Senior Management as Its Public Commitment to Expansion Continues............93

F.   Amazon Executives Have Access to Real Time Data on Critical Details of the Company's Business and Rely on Such Data in Decision Making..................................................................95

G.   By July 2021 Defendants Knew that Amazon Had Overexpanded and Decided To Reverse Course..................................................................96

1.   Defendants Assured Investors that Amazon's Continued Expansion was Justified by Demand for Fast Delivery................96

2.   Even Before July 2021, Amazon Knew That Demand For Fast Delivery Began to Decline ..................................................100

3.   Former Amazon Employees Confirm that Amazon Was Pulling Back on its Expansion Plans By Early 2021 ..................102

4.   Defendants Continued To Mislead Investors and Represent that Amazon was Expanding Capacity Despite the Substantial Pullback that Was Already Underway ......................106

5.   Amazon Has Delayed or Canceled the Opening of Numerous Buildings ..................................................................107

H.   The Truth Begins To Emerge About Amazon's Exploitation of Third-Party Sellers and Slowing Demand for Amazon's Fast Delivery..................................................................111

1.   During the Class Period, the Truth Gradually Emerges that Amazon Exploited Its Third-Party Sellers..................................111

2.   On April 28, 2022, the Truth Begins To Emerge About Reduced Demand for Amazon's Fast Delivery ..........................114

V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD.............119

A.   February 1, 2019—Amazon Form 10-K and 2019 Forms 10-Q ...........121

B.   April 11, 2019—Amazon Form 8-K.......................................................125

C.   April 23, 2019—The Company's Tweet .................................................127

D.   April 25, 2019—Q1 2019 Earnings Call with Investors.........................128

E.   May 7, 2019—Amazon Press Release....................................................129

F.   June 5, 2019—Amazon Re:MARS Conference ......................................130

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
2:22-CV-00617-JHC

- ii -

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

G.     July 16, 2019—House Judiciary Committee Testimony and the
       Aftermath ................................................................132

H.     July 25, 2019—Amazon's Q2 2019 Earnings Call.................................137

I.     August 30, 2019—CNN Interview .........................................139

J.     October 22, 2019—WSJ Tech Live Conference ....................................140

K.     October 24, 2019—Amazon's Q3 2019 Earnings Call .........................141

L.     December 19, 2019—*New York Times* Article........................................143

M.     January 31, 2020—Amazon's Form 10-K.........................................143

N.     April 24, 2020—Amazon Tweet.........................................148

O.     May 15, 2020—Amazon's Response to Subcommittee's May 1,
       2020 Letter ................................................................149

P.     May 27, 2020—Annual General Meeting ...........................................150

Q.     July 21, 2020—Amazon Press Release .........................................152

R.     July 29, 2020—Subcommittee Hearing.........................................153

S.     July 29, 2020— Subcommittee Hearing.........................................156

T.     July 30, 2020—Amazon's Q2 2020 Earnings Call.................................159

U.     September 1, 2020—Amazon Accelerate Conference ...........................161

V.     September 4, 2020—Amazon's Response to Chairman Cicilline...........161

W.     September 25, 2020—Amazon's Official Website ...............................162

X.     October 6, 2020—Amazon's Official Website........................................162

Y.     November 10, 2020—Response to the European Commission's
       Preliminary Findings..........................................................164

Z.     December 22, 2020—Amazon.com Post.................................................166

AA.    February 3, 2021—Amazon's Form 10-K and Forms 10-Q...................167

BB.    May 26, 2021—Annual General Meeting ...........................................172

CC.    July 29, 2021—Q2 2021 Earnings Call ...........................................172

DD.    September 13, 2021—Amazon's Official Website ...............................176

EE.    October 19, 2021—Amazon Press Release ...........................................177

FF.    October 19, 2021—Amazon Report ...........................................178

GG.    October 21, 2021—Amazon Accelerate Conference...........................179

HH.    October 28, 2021—Amazon Press Release and Form 8-K ...................181

II.    October 28, 2021—Q3 2021 Earnings Call...........................................182

JJ.    November 1, 2021—Amazon's Response to Subcommittee's
       October 18, 2021 Letter ....................................................185

KK.    November 29, 2021—TODAY Interview ...........................................186

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS     - iii -
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

LL.   February 3, 2022—Amazon's Q4 2021 Earnings Call ............................187

MM.   February 3, 2022 Amazon Press Release and Form 8-K ........................191

NN.   February 4, 2022—Amazon's Form 10-K................................................191

OO.   March 4, 2022—Amazon's Official Website ..........................................195

PP.   March 7, 2022—Herrington Comments For Small Business Digital
        Alliance ....................................................................................................197

QQ.   April 14, 2022—Letter to Shareholders..................................................197

VI.   ADDITIONAL ALLEGATIONS OF SCIENTER.................................................199

A.   The Ongoing FTC Investigation and Litigation Provide Substantial
      Evidence of Scienter. ..............................................................................201

B.   Amazon's Senior Executives Knew of and Helped to Orchestrate
      the Misconduct Addressed Herein ..........................................................203

C.   Amazon's Fulfillment Centers Are a Core Operation of the
      Company ..................................................................................................204

D.   Patent Inconsistencies Between Public Statements and Internal
      Events.......................................................................................................205

E.   Defendants Regularly Spoke in Detail About Amazon's
      Fulfillment Capacity and Its Centrality to the Company's
      Operations ...............................................................................................206

F.   Amazon's Compensation Structure Provided for Several Hundred
      Million Dollars in Incentives for the Individual Defendants To
      Commit Fraud ..........................................................................................210

G.   Defendants' Class Period Stock Sales Enhance the Inference of
      Scienter ...................................................................................................217

H.   Jassy Is a "Hands On" CEO Intimately Involved in the Company's
      Day-to-Day Issues ...................................................................................221

I.   Defendants Carefully Monitored and Tracked Data Related to
     Growth and Capacity ...............................................................................222

J.   The Abrupt Resignation of Clark Adds to the Strong Inference of
     Scienter ...................................................................................................223

K.   The Existence of Numerous Governmental Investigations into
     Amazon Is Indicative of Scienter............................................................224

L.   Amazon's Steps to Cover Up Its Misdeeds Is Strong Evidence of
     Scienter ...................................................................................................227

M.   A Pattern of Fraudulent Conduct Over a Significant Period of Time
      Is Indicative of Scienter ..........................................................................228

N.   The Close Proximity Between the Latest False Statements and the
     April 28, 2022 Corrective Disclosure Bolsters an Inference of
     Scienter ...................................................................................................230

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS          - iv -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

O.     Bezos's Autocratic Leadership Style Is Indicative of Scienter ...............231

P.     Amazon Is a Highly Scrutinized Company ............................................231

Q.     Amazon's Corporate Scienter Is Alleged .................................................232

VII.    LOSS CAUSATION ................................................................................233

VIII.   AMAZON'S DISCLOSURE OBLIGATION UNDER THE SECURITIES LAWS .......................................................................................................240

IX.    PRESUMPTION OF RELIANCE ........................................................241

X.     CONTROL PERSON ALLEGATIONS ................................................243

XI.    NO SAFE HARBOR—INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ....................................................................................245

XII.   CLASS ACTION ALLEGATIONS ......................................................247

XIII.  CAUSES OF ACTION .........................................................................248

1.         Lead Plaintiffs Universal-Investment-Gesellschaft mbH, Universal-Investment-Luxembourg S.A., Menora Mivtachim Insurance Ltd., Menora Mivtachim Pensions and Gemel Ltd., The Phoenix Insurance Company, Ltd., and The Phoenix Provident Pension Fund Ltd. (collectively, "Lead Plaintiffs"), with named plaintiffs Asbestos Workers Philadelphia Welfare and Pension Fund and Detectives Endowment Association Annuity Fund (collectively with Lead Plaintiffs, "Plaintiffs") bring this action pursuant to Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, individually and on behalf of all other persons and entities, who purchased or otherwise acquired the publicly traded common stock of Amazon.com, Inc. ("Amazon" or the "Company") during the period between February 1, 2019 and April 28, 2022, inclusive (the "Class Period"), and were damaged thereby (subject to certain exclusions enumerated in ¶ 749, below) (the "Class").

2.         Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.  Plaintiffs' information and belief is based upon, *inter alia*, the independent investigation of Court-appointed Co-Lead Counsel Motley Rice LLC and Pomerantz LLP, and Additional Counsel Bernstein Litowitz Berger and Grossmann LLP and Barrack, Rodos & Bacine.  That investigation included review and analysis of, among other things: (i) Amazon's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) research reports and advisories by securities and financial analysts; (iii) transcripts of Amazon's conference calls with analysts and investors; (iv) press releases, presentations, and media reports issued by and disseminated by the Company; (v) news reports and media concerning Amazon and other facts related to this action; (vi) data reflecting the price of Amazon common stock; (vii) communications with knowledgeable individuals, including former employees of Amazon; (viii) a Congressional report addressing Amazon's business practices relevant to this action; (ix) an investigation conducted by the Federal Trade Commission ("FTC") and the Attorneys General of seventeen states based, in part, on Amazon's own documents, and the ensuing complaint brought by these parties against Amazon (the "FTC

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS        - 1 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Complaint" or "FTC Compl.");[1] (x) an investigation conducted by the Attorney General of the State of California, and the ensuing complaint; and (xi) information readily available on the Internet.

3.        Counsel's investigation regarding the factual allegations concerned herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants (as defined herein) or are exclusively within their custody or control.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.      INTRODUCTION

4.        Headquartered in Seattle, Washington, Amazon is a global technology company with multiple business lines, including its prominent e-commerce business.

5.        This securities fraud class action arises from two categories of misrepresentations: (i) those concerning the way Amazon sells third-party merchandise and Amazon's own private-label products on its e-commerce platform, and (ii) those pertaining to Amazon's over-expansion of the infrastructure and fulfillment network for its e-commerce business.

6.        *First*, throughout the Class Period, Defendants made false and/or misleading statements regarding, and/or failed to disclose, Amazon's business policies and practices that, among other things:  (a) had the effect of raising costs to customers (and driving customers to more expensive products); and (b) operated to the detriment of (and/or exploited) third-party sellers. These various business practices are detailed herein and all created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

7.        On the Company's Amazon.com e-commerce platform, Amazon sells both third-party merchandise and Amazon's own private-label products.  As the owner and operator of the Amazon.com e-commerce platform, Amazon has access to certain non-public data of the third-

---

[1] *Fed. Trade Comm'n et al. v. Amazon.com Inc.*, No. 2:23-cv-01495 (W.D. Wash. Nov. 2, 2023), ECF No. 114.

party sellers that use the Amazon.com platform.  On or around June 3, 2019, the U.S. House Committee on the Judiciary (the "House Judiciary Committee") initiated a bipartisan investigation into the state of competition online.  The investigation, led by the Subcommittee on Antitrust, Commercial and Administrative Law (the "Subcommittee"), examined the business practices and market dominance of Facebook, Google, Apple, and, of particular relevance, Amazon (the "Subcommittee Investigation").

8.        During the course of the Subcommittee Investigation, the Subcommittee held several oversight hearings in which various officers of the above referenced companies, including their respective Chief Executive Officers ("CEOs"), offered witness testimony on topics such as the effect of market power on the press, innovation, and privacy, and the market dominance of the firms under investigation.  *See Online Platforms and Market Power* hearings before the Subcommittee ("Subcommittee Hearings").

9.        After each of the hearings, members of the Subcommittee submitted questions for the record to the witnesses.  The Subcommittee concluded in a written report, *inter alia*, that Amazon had grown to be such a dominant force in the online retail market that it had monopoly power over third-party sellers on its Marketplace.  Lawmakers also concluded that Amazon's dual role selling products on its own website and running a Marketplace for third-party sellers "creates an inherent conflict of interest" that encourages Amazon to exploit its access to competing sellers' data and information.  It noted that Amazon publicly describes these sellers as "partners," but "behind closed doors, the company refers to them as 'internal competitors.'"

10.        On September 26, 2023, after investigating Amazon for four years, the FTC, joined by 17 state attorneys general, sued Amazon alleging violations of federal and state antitrust law. The FTC Complaint revealed that Amazon had implemented strategies that (a) precluded other sellers from lowering their prices and (b) degraded quality for consumers.  Among other things, the FTC Complaint details how the Company punished sellers who sought to offer prices lower than Amazon (keeping prices higher for products across the Internet) and biased Amazon's search results to preference the Company's own products over ones that Amazon knows are of better quality.  According to the agency, Amazon also replaced relevant, organic search results with paid

advertisements—while at the same time deliberately increasing junk ads that worsened search quality for customers.

11.        The FTC Complaint expressly references misconduct occurring during the Class Period in this case.  For example, according to the FTC, Amazon repeatedly has hiked average fulfillment fees to sellers, which jumped approximately 30% between 2020 and 2022.  And during 2022, Amazon explained to thousands of sellers that a "pre-requisite" to "win[ning] the 'Buy Box'" is to ensure that lower prices are never available off Amazon.

12.        The wrongdoing addressed in the FTC Complaint is extensive and includes the fact that Amazon designed and implemented a first-party anti-discounting algorithm to deter other online stores from offering lower prices than those of Amazon's Retail products.  Amazon's former CEO of its Worldwide Consumer business, Jeff Wilke ("Wilke"), conceived of an algorithm to solve Amazon's dilemma when it came to the prices of the Company's first-party Retail unit's products.  As Wilke explained, this anti-discounting algorithm enabled Amazon to avoid a "perfectly competitive market" where rivals continually lower their prices, benefiting consumers.

13.        The FTC Complaint also revealed that Amazon's strategy to degrade relevant, organic search results was directed by its former CEO and founder, Bezos, who instructed the Company's executives to increase the number of junk ads in searches because Amazon could extract billions of dollars through increased advertising despite worsening its services for customers.

14.        In addition, the FTC Complaint revealed that Amazon's management used the "Signal messaging app" to hide information to impede the FTC's investigation.  More specifically, the agency avers that the Company deleted internal communications using the "disappearing message" feature of Signal and destroyed more than two years' worth of such communications, from June 2019 to at least early 2022—despite the agency instructing Amazon not to do so. Amazon thus destroyed highly relevant documents that cover almost the entirety of the Class Period.  Amazon executives' attempt to hinder the FTC's investigation of the Company—and cover up wrongdoing—constitutes strong evidence of their scienter.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

15.     Apart from the foregoing, on September 14, 2022, California's Attorney General filed an antitrust lawsuit against Amazon alleging that the Company stifles competition and increases the prices that consumers pay across the Internet.  That action largely focuses on the manner in which Amazon penalizes third-party sellers for listing products at lower prices on other websites.  If Amazon spots a product listed cheaper on a competitor's website, the Company often will remove important buttons like "Buy Now" and "Add to Cart" from a product listing page.  Those buttons are a major driver of sales for companies selling through Amazon, and losing them can quickly hurt their businesses.

16.     In March 2023, Judge Ethan Schulman of the San Francisco Superior Court denied Amazon's motion to dismiss that lawsuit, stating that the operative complaint had sufficiently alleged that the Company's policies "have had the anticompetitive effect of raising prices on competing retail marketplaces as well as on third-party sellers' own websites."  In a statement issued following the Court's decision, California Attorney General Rob Bonta stated:  "There is no shortage of evidence showing that the 'Everything store' is costing consumers more for just about everything.  We won't stand by while Amazon uses coercive contracting practices to dominate the market at the expense of California consumers, small business owners, and the economy."

17.     As the truth regarding Amazon's business practices with third parties came to light, the Company's share price declined precipitously.  On April 28, 2020, *CNBC* published an article reporting that Senator Josh Hawley had asked the U.S. Department of Justice ("DOJ") to open a criminal antitrust investigation into the Company regarding "predatory and exclusionary data practices to build a monopoly" in connection with reports that Amazon used third-party seller data to develop products for its private label business.  On this news, Amazon's stock price fell $61.92 per share, or 2.61%, to close at $2,314.08 per share on April 28, 2020.

18.     A few days later, on May 1, 2020, the first headline for a *Bloomberg* article titled "Amazon's Bezos Faces Call to Testify Before House Panel," went live at 10:34 a.m.  That article reported that the members of an antitrust panel for the House Judiciary Committee had requested that Defendant Bezos testify regarding concerns that Amazon used data from third-party sellers on

1  its website to develop competing products, in contradiction to representations the Company

2  previously made under oath to Congress in July 2019.  On this news, Amazon's stock price fell

3  from $2,323.00 per share to close at $2,286.04, a decline of $36.96 per share or 1.59%.

4  19.        On July 23, 2020, *The Wall Street Journal* (hereinafter "*Wall Street Journal*")

5  published an article titled "Amazon Met With Startups About Investing, Then Launched

6  Competing Products," which reported, in relevant part, that Amazon had engaged in the practice

7  of making initial investments or meetings with start-ups for the purpose of securing their

8  proprietary information before launching Amazon's own competing products.  On this news,

9  Amazon's stock price fell $113.36 per share, or 3.66%, to close at $2,986.55 per share on July 23,

10  2020.

11  20.        Then, on August 3, 2020, *Bloomberg* published an article titled "Amazon's Market

12  Power to Be Investigated by New York AG."  That article reported that the New York and

13  California Attorneys General were joining an antitrust probe into Amazon being conducted by the

14  Federal Trade Commission ("FTC").  That same day, *Business Insider* similarly reported that

15  "Amazon is reportedly facing a new antitrust investigation into its online Marketplace led by the

16  FTC and attorneys general in New York and California."  *Business Insider* further stated that the

17  joint probe related to Amazon's treatment of third-party sellers and competition with its own

18  products.  On this news, Amazon's stock price fell $52.79 per share, or 1.67%, to close at

19  $3,111.89 per share on August 3, 2020.

20  21.        On October 6, 2020, following the publication of news reports discussing the

21  above-referenced Subcommittee report, Amazon's stock price fell $99.24 per share, or 3.1%, to

22  close at $3,099.96 per share on October 6, 2020.

23  22.        Then, *Wall Street Journal* published an article on April 6, 2022, entitled "SEC Is

24  Investigating How Amazon Disclosed Business Practices."  The article reported, *inter alia*, that

25  the SEC's probe has been underway for more than a year and focuses on Amazon's disclosures

26  regarding its use of third-party seller data for its own private-label business.

27  23.        On this news, Amazon's stock price fell $105.98 per share, or 3.2%, to close at

28  $3,175.12 per share on April 6, 2022.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 6 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

24.     **Second**, prior to the onset of the pandemic in early 2020, a key priority for Amazon was providing customers with faster delivery times, including same-day delivery.  To meet that goal, Amazon invested significant capital to aggressively expand its infrastructure and fulfillment networks.  Fast delivery is, and has long been, fundamental to Amazon's retail model.  As Amazon explains, it is a company focused on "delivering as many items as fast as possible."  Amazon's value proposition to both its customers—and to investors—is significantly premised on its ability to offer a cost-effective alternative to both brick-and-mortar stores and alternative online retailers.  That value is inherently linked to fast delivery.

25.     In addition, although Amazon reported substantial profits leading up to and throughout much of the Class Period, the Company since its founding has invested in building market share and capacity—even when doing so caused losses.  By 2019, after years of massive profitability, investors expected continued success and growth.  Those expectations were reinforced by the Company's public statements, including assurances that the short-term costs of growing fulfillment capacity were justified by Amazon's overall business strategy, and that investment in fulfillment infrastructure would fuel fast shipping, crowding out competitors, taking market share and delivering future profit.  Yet by July 2021, Defendants and others at Amazon knew the opposite: Amazon's fulfillment and high-speed delivery capacity had already grown far beyond what could be justified based on that strategy, and had become a drag on profitability.  The infrastructure expansion needed to be scaled back, imposing a massive financial hit to the Company and reflecting a reversal of Defendants' Class Period statements regarding fulfillment expansion.

26.     Throughout the Class Period, Defendants repeatedly and consistently told investors that the Company's investments in expanding infrastructure and fulfillment network capacity were sound and appropriate decisions for the long term.  For example, after the market closed on July 29, 2021, Defendant Olsavsky, Amazon's Chief Financial Officer ("CFO"), represented to investors that "a significant amount of investment in our fulfillment network," "at a rapid rate," was needed to meet "strong multiyear demand."  Olsavsky assured investors that "we have a lot of growth to do here," which is why the Company was "moving as quickly as possible" to grow.  On February 3,

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 7 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

2022, Defendant Olsavsky represented that "we continue to see an increase in customer demand and sales during the remainder of 2021" and "[w]e've invested significantly to keep pace with this demand, including nearly doubling our operations capacity in the past two years, expanding our fulfillment center footprint . . . ."

27.        These and similar statements made throughout the Class Period were false.   In reality, Defendants knew or recklessly disregarded that the Company's infrastructure and fulfillment network investments had already substantially outpaced Amazon's business needs, and that those investments were a massive, self-imposed, undue strain on Amazon's financial condition.   Indeed, contrary to Defendants' public statements during the Class Period and as later confirmed by *Wall Street Journal*, by July 2021, Defendants implemented cutbacks to Amazon's fulfillment capacity without disclosing that critical information to investors.

28.        Defendants acted with scienter in making the false and misleading statements concerning the fulfilment network.   The allegations below, including from both public reports and Plaintiffs' investigation, reflect that senior executives had direct knowledge of the pull back in the fulfillment network well prior to July 2021.   Among other things, Olsavsky's repeated statements in response to analyst and investor questions, which were observed and informed by the other Executive Defendants, reflected that these Defendants had detailed knowledge of the underlying true facts concerning the pull back on expansion of the fulfilment network.

29.        The Executive Defendants had a motive too.   Amazon's executive compensation plans provided virtually no cash compensation.   Instead, the Executive Defendants had the potential to earn tens of millions of dollars in stock grants, but those grants vested over long period and did not accelerate upon separation from Amazon.   As a result, the Executive Defendants had extreme motivation—an aggregate value of over $290 million—to sustain the public and investor perception that they were successfully fulfilling their objectives.   Once public tide turned against them, as it did with Defendant Clark, they would lose all of the unvested stock granted to them. *See infra* ¶¶ 622-38.

30.        The truth emerged on April 28, 2022, when Amazon reported a $3.8 billion net quarterly loss—its first reported net quarterly loss since 2015.   After months of falsely representing

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 8 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

that Amazon's expansion of its e-commerce fulfillment network and infrastructure was necessary and appropriate, Defendants disclosed that Amazon was "no longer chasing physical or staffing capacity." Defendants disclosed $6 billion of "incremental costs" to Amazon, including $2 billion due to "overcapacity" in the Company's "fulfillment and transportation network." Defendants further disclosed that they "expect[ed] the expected effects of these . . . to persist for the next several quarters as we grow into this capacity."

31.         On this news, the price of Amazon stock fell $406.30 per share, or more than 14%, from a close of $2,891.93 per share on April 28, 2022, to close at $2,485.63 per share on April 29, 2022.

32.         As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Amazon's stock, when the truth began to come to light, Plaintiffs and other Class members have suffered significant losses and damages.

## II.      JURISDICTION AND VENUE

33.         The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

34.         This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

35.         Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as Amazon maintains its headquarters in this District and many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material fact, occurred and/or were directed in substantial part in this District.

36.         In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 9 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

III.    **PARTIES**

A.    **Plaintiffs**

37.         Lead Plaintiff Universal-Investment-Gesellschaft mbH is an investment company based in Frankfurt am Main, Germany, which manages assets in the hundreds of billions of Euros. As reflected in the Certification previously filed with the Court (ECF No. 29-1), Universal's funds purchased Amazon common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

38.         Lead Plaintiff Universal-Investment-Luxembourg S.A. is an investment company based in Grevenmacher, Luxembourg, which manages assets in the hundreds of billions of Euros. As reflected in the Certification previously filed with the Court (ECF No. 29-1), Universal Luxembourg's funds purchased Amazon common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

39.         Lead Plaintiff Menora Mivtachim Insurance Ltd. ("Menora Insurance") and Menora Mivtachim Pensions and Gemel Ltd. ("Menora Pensions & Gemel" and, collectively with Menora Insurance, "Menora") is an affiliate of Menora Mivtachim Holdings Ltd., a holdings company based in Ramat Gan, Israel.  It is among Israel's largest insurance and finance groups, with more than $70 billion in assets under management.   As reflected in the Certifications previously filed with the Court (ECF No. 35-3), Menora purchased Amazon common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

40.         Lead Plaintiff The Phoenix Insurance Company, Ltd. ("Phoenix Insurance"), the principal branch of Phoenix Holdings Ltd. ("Phoenix Holdings"), is a leading Israeli insurance company, and provides insurance products and services including life insurance, long-term savings, pension, and provident funds, general insurance, and healthcare insurance.  Phoenix Insurance has over $10 billion in assets under management.  The Phoenix Provident Pension Fund Ltd. ("Phoenix Pension" and, collectively with Phoenix Insurance, "Phoenix") is wholly owned by Phoenix Holdings and has extensive experience in pension and provident fund management,

and manages NIS 55 billion in assets for more than 800,000 customers.  As reflected in the Certifications previously filed with the Court (ECF No. 35-3), Phoenix purchased Amazon common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

41.        Named Plaintiff Asbestos Workers Philadelphia Welfare and Pension Fund ("Asbestos Workers") is a multi-employer defined benefit union pension fund based in Philadelphia, Pennsylvania.  As set forth in a previously filed Certification, *see* ECF No. 70-1, Asbestos Workers purchased shares of Amazon common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

42.        Plaintiff Detectives Endowment Association Annuity Fund ("Detectives") is a multi-employer defined benefit union pension fund based in New York, New York.  As set forth in a previously filed Certification, ECF No. 70-2, Detectives purchased shares of Amazon common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

### B.        Defendants

43.        Defendant Amazon is a multinational technology company with multiple business lines, including e-commerce services and distribution, website development and hosting, inventory and supply chain management, and fulfillment and logistics.  Amazon is a Delaware corporation with its principal corporate offices in Seattle, Washington.  The Company's common stock trades on the Nasdaq Global Select Markets ("NASDAQ") under the ticker symbol "AMZN."  As of April 20, 2022, Amazon had approximately 508.72 million shares of common stock outstanding, owned by at least hundreds or thousands of investors.[2]

---

[2]  On June 6, 2022, a previously announced split of Amazon common stock took effect.  Pursuant to the stock split, each outstanding share of Amazon common stock was divided into 20 shares. Throughout this Complaint, references to the market price of Amazon common stock and to the number of shares outstanding reflect the (pre-split) numbers and values at the time.  Currently, Amazon has more than 10.1 billion shares of common stock outstanding.  The share prices referenced herein accurately state the stock's market prices at the relevant time, but many sources

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 11 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

44.        Defendant Jeffrey P. Bezos ("Bezos") founded Amazon in 1994 and has served as Executive Chair since July 2021.  He has served as Chair of the Board since 1994 and previously served as CEO from May 1996 until July 2021, and as President from 1994 until June 1999 and again from October 2000 to July 2021.

45.        Defendant Andrew R. Jassy ("Jassy") is the current President, CEO, and Director of Amazon.  He has held these positions since July 5, 2021.  Since joining Amazon in 1997, Jassy has held numerous leadership roles across the Company.  He previously served as Senior Vice President of Amazon Web Services ("AWS") from its inception in April 2006 until April 2016, when he became the CEO of AWS.  He was the CEO of AWS until July 2021 when he succeeded Bezos as the President and CEO of Amazon.

46.        Defendant Brian T. Olsavsky ("Olsavsky") has served as Senior Vice President and CFO of Amazon since June 2015.  He served as Vice President, Finance for the Global Consumer Business from December 2011 to June 2015, and has held numerous financial leadership roles across Amazon with global responsibility since April 2002.

47.        Defendant David A. Zapolsky ("Zapolsky") has served as Senior Vice President, General Counsel, and Secretary since May 2014.  From September 2012 to May 2014, he held the title of Vice President, General Counsel, and Secretary and, between April 2002 and September 2012, he was the Vice President and Associate General Counsel for Litigation and Regulatory matters.

48.        Defendant Nate Sutton ("Sutton") is Amazon's Associate General Counsel, Litigation & Regulatory, and has held this position since December 2016.

49.        Defendant David Fildes ("Fildes") has served as Head of Investor Relations of Amazon since June 2017.  He joined Amazon in October 2011, serving as Senior Manager of Investor Relations until April 2015.  He became the Director of Investor Relations in May 2015 and held that title until June 2017.

---

for stock prices are "split adjusted" and accordingly show those prices as if the split had already happened—*i.e.*, one-twentieth of the actual then-current price.

50.        Defendant Jeff Wilke ("Wilke") was the CEO of Amazon Worldwide Consumer between April 2016 and March 2021.  Wilke reported directly to Defendant Bezos.  Wilke was Amazon's number-two executive during the relevant time period.  Bezos considered Wilke to be his "tutor", stating "I have been lucky enough to have him as my tutor.  I've learned so much from him, and I'm not the only one.  He's been an incredible teacher to all of us."

51.        Defendant Dave Clark ("Clark") was the CEO of Amazon Worldwide Consumer between March 2021 and July 2022, succeeding Wilke.  In that role, Clark was Amazon's number-two executive at Amazon.  Before assuming that role at the Company, he was Amazon's Senior Vice President of Worldwide Operations.  Clark reported directly to Defendant Bezos and then to Defendant Jassy upon his succession to the position of Amazon's CEO.

52.        Defendant Doug Herrington ("Herrington") is currently the CEO of Amazon Worldwide, the head of Amazon's online and physical retail business.  He was appointed to that position in July 2022.  Before July 2022, Herrington led Amazon's North American consumer business. Herrington reported directly to Defendant Jassy.  Herrington was the highest-paid Amazon executive in 2022, receiving $43.2 million in total compensation.

53.        Defendants Bezos, Jassy, Olsavsky, Zapolsky, Sutton, Fildes, Wilke, Clark, and Herrington are collectively referred to hereinafter as the "Individual Defendants" and, together with Amazon, as the "Defendants."   The Individual Defendants directly participated in the management of Amazon's operations, including its accounting and reporting functions, had the ability to and did control Amazon's financial reporting, and were privy to confidential information concerning Amazon and its business, operations, and financial statements, as alleged herein.  They were also involved in drafting, reviewing, publishing, and/or disseminating the false and misleading financial statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued, and approved or ratified these misstatements in violation of the federal securities laws.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 13 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

IV.     **SUBSTANTIVE ALLEGATIONS**

A.     **The Company and Its Business**

1.     **The History of Amazon**

54.     Founded by Jeff Bezos in 1994, Amazon is now one of the largest companies in the world.  Its history is a story of relentless growth, acquisition, expansion into new business lines, and driving competitors out of markets through aggressive price-cutting.  As described in author Brad Stone's book, *The Everything Store:  Jeff Bezos and the Age of Amazon*, detailing Amazon's growth and developments, Bezos used the Internet's infinite space to create "the merchandiser's dream of the everything store—a store with infinite selection."  A drive for efficiency and scale has allowed the Company to drive down prices and offer discounts and free shipping to customers, further driving growth.  Over time, the Company has grown to rival Internet giants like Alphabet and Apple.

55.     The Company began as an online bookstore in Seattle, with Bezos and his employees working out of his garage.  Amazon went public in 1997 at $18 a share, with a valuation of $300 million.  During the dot-com boom of the late 1990s, Amazon expanded into selling CDs, DVDs, electronics, and toys.  After mastering what Stone's book called "the physics of its own complex distribution network," the Company further expanded into clothing, jewelry, sporting goods, automotive parts, and endless other categories of goods, becoming the country's largest online retailer.

56.     In 1999, Amazon patented the ability to purchase an item online with a single click of the mouse, encouraging customers to buy more with even greater convenience.  Also in 1999, Amazon launched its third-party-seller marketplace, now known as the Marketplace, where third parties can sell new or used goods through Amazon.  The Marketplace is at issue in this action.

57.     In 2003, Amazon launched Amazon Web Services, licensing its platform to other e-commerce sites and positioning the Company as a business-to-business technology company.  This cloud hosting business is currently one of the Company's biggest revenue drivers.

58.     In 2005, the Company launched Amazon Prime, a subscription-based loyalty program that (at launch) included free two-day shipping on any order.  Amazon has since offered

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 14 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

deliveries through Prime that includes delivery speeds as fast as same-day.  With more than 100 million members worldwide, Prime is considered one of Amazon's most valuable assets.

59.        Amazon has both introduced many of its own products, including the Kindle e-reader and smart-speaker Echo devices using the Company's Alexa virtual personal assistant, and has also made multiple acquisitions over the last 15 years to expand the breadth and depth of its business offerings, including buying the grocery chain Whole Foods Market.

60.        Amazon reached a $1 trillion market cap in September 2018, driven in large part by investor enthusiasm for growing profits tied to its ever-expanding retail and delivery footprint.  In 2019, the Company had nearly 700,000 employees, 288 million square feet of real estate, and accounted for nearly half of online retail in the United States.  Currently, Amazon has a market cap of $1.3 trillion, reported 2021 revenue of $386 billion and profits of $21 billion, and 1.6 million employees.

### 2.        Amazon's Business Lines

61.        Amazon operates an enormous range of businesses, including cloud services, e-commerce and distribution, fulfillment and logistics, entertainment, television and film production, and groceries.  Through its Amazon.com e-commerce and fulfillment platforms, the Company offers products to retail consumers from 1.7 million businesses.  Its membership program, Amazon Prime, offers free delivery and access to Prime Video, Amazon Music, Amazon Photos, Prime Wardrobe, Prime Reading, and grocery delivery.  Amazon sells groceries and prepared foods through its ownership of Whole Foods Market and its Amazon Go stores and Amazon Fresh online grocery platform.

62.        Amazon's vast array of consumer offerings is founded on its delivery and logistics systems, which includes its network of warehouses; Amazon Air, a fleet of aircraft; a fleet of vans for "last mile" delivery; Prime Air, a network of drones; and Amazon Scout, a fully-electronic unmanned delivery vehicle system.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 15 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.      Amazon Exploited Its Third-Party Sellers in an Anticompetitive Manner**

63.      As set forth below, Defendants misrepresented and failed to disclose the Company's exploitation of third-party sellers on Amazon's website, such as Amazon's misappropriation of third-party seller's data for its own benefit.  By way of background, Amazon introduced its Marketplace platform in 2000, offering a centralized website through which third-party sellers could sell their goods, which it called "Fulfilled by Amazon" ("FBA").  Third-party sellers increasingly availed themselves of Amazon's centralized FBA Marketplace as Amazon became a ubiquitous online seller of goods, replacing individual websites across the Internet.

64.      Amazon's third-party sellers sell their products on the Amazon Marketplace and pay fees to Amazon.  On the Amazon Marketplace, consumers can buy items directly from the Company or they can purchase from independent third-party sellers offering their own products for sale.  However, in exchange for giving the parties access to its platform to sell their products, Amazon gathered sales data from those third parties and used it to introduce its own competing products.

65.      Former Amazon employees have confirmed that Amazon used sales data gleaned from the Company's Marketplace as a sales platform to obtain an anticompetitive and unfair advantage in competing with other sellers on the platform.  As reported in *The Capitol Forum* on November 5, 2018, an Amazon employee speaking on the condition of anonymity revealed, "[e]verybody [at Amazon] has access to all the seller data," including "who purchased what, what products were selling."  This Amazon employee further explained that Amazon employees can "data mine all the best-selling products and go make a private label."

66.      As noted elsewhere herein, an April 23, 2020 *Wall Street Journal* report confirmed that Amazon, through its executives, intentionally violated corporate policies that were meant to create a wall between the Company's private-label business and its Marketplace business.  Based on interviews with former Company employees, *Wall Street Journal* reported that the use of data obtained through Amazon's Marketplace was common practice and discussed openly in meetings

the employees attended.   Moreover, executives had access to data containing proprietary information that they used to research best-selling items Amazon was interested in competing with.

67.        The reporting by *Wall Street Journal*—and other media outlets—laid bare Amazon's systemic improper and anticompetitive practices, including its treatment of third-party sellers.   It was thus hardly surprising when Congress opted to investigate, among other issues, how Amazon was utilizing competitively sensitive information about competitors' products to boost its own retail activities, at the expense of the third-party sellers on its Marketplace.

68.        In June 2019, the House Judiciary Committee initiated a bipartisan investigation into the state of competition online, spearheaded by the Subcommittee.   As part of a top-to-bottom review of the market, the Subcommittee examined the market dominance of Amazon, Apple, Facebook, and Google (and their business practices) to determine how their power affects the U.S. economy and democracy in general.   Over the course of its investigation, the Subcommittee held seven congressional hearings; reviewed nearly 1.3 million internal documents and communications from the investigated companies; analyzed submissions from 38 antitrust experts; and conducted interviews with more than 240 market participants, former employees of the investigated firms, and other individuals.   Only a small amount of the internal Amazon documents reviewed by the Subcommittee are publicly available.[3]

69.        A year after initiating the investigation, the Subcommittee received testimony from Defendant Bezos.   The Subcommittee pressed for answers about Amazon's business practices and the extent to which Amazon has exploited, entrenched, and expanded its power over digital markets in anticompetitive and abusive ways.   According to the Subcommittee, Bezos's answers were often evasive and non-responsive.

70.        On October 2, 2020, the Subcommittee released an initial report finding that Amazon exploited third-party sellers on its platform.[4]   The Subcommittee published its final report

---

[3]   https://judiciary.house.gov/online-platforms-and-market-power/amazon-documents.htm.

[4]   The House Committee on the Judiciary, Investigation of Competition in Digital Markets https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf?utm_campaign=4493-519 (Oct. 2, 2020).

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 17 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

in July 2022.[5]   The Subcommittee Investigation uncovered substantial evidence that Amazon (i) routinely exploited third-party sellers on its platform; (ii) routinely misappropriated third-party seller data in order to manufacture and market its own private-label products; (iii) engaged in self-preferencing whereby it directed customers to its own products as opposed to third party sellers; and (iv) tied and bundled its products by forcing third-party sellers to pay for fulfillment and logistics services in order to have a chance to compete on the platform and get preferential treatment in search rankings and the "Buy Box."   The Buy Box is displayed prominently on Amazon and allows customers to add items from a specific retailer directly into their shopping carts.  Winning the Buy Box is key for Marketplace sellers as the vast majority of transactions are conducted through the Buy Box.[6]

71.        Amazon downplayed the Subcommittee's findings, stating that:

> All large organizations attract the attention of regulators, and we welcome that scrutiny.  But large companies are not dominant by definition, and the presumption that success can only be the result of anti-competitive behavior is simply wrong.  And yet, despite overwhelming evidence to the contrary, those fallacies are at the core of this regulatory spit-balling on antitrust.  This flawed thinking would have the primary effect of forcing millions of independent retailers out of online stores, thereby depriving these small businesses of one of the fastest and most profitable ways available to reach customers.  For consumers, the result would be less choice and higher prices.  Far from enhancing competition, these uninformed notions would instead reduce it.[7]

72.        Throughout the Class Period, Amazon denied any wrongdoing, telling investors, for example, that:  "*We helped independent sellers compete against our first-party business* by investing in and offering them the very best selling tools we could imagine and build"; "*[Amazon] do[es] not use any of that specific seller data in creating our own private brand products*"; "*We do not favor . . . products that use FBA over others*"; and "*[o]ur algorithms, such as the buy box,*

---

[5]  https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf.

[6]  European Commission, Antitrust: Commission opens investigation into possible anti-competitive                    conduct                    of                    Amazon, https://ec.europa.eu/commission/presscorner/detail/en/IP_19_4291 (July 17, 2019).

[7]  Annie Palmer, Jordan Novet, Amazon bullies partners and vendors, says antitrust subcommittee, CNBC (Oct. 6, 2020) https://www.cnbc.com/2020/10/06/amazon-bullies-partners-and-vendors-says-antitrust-subcommittee.html.

*is [sic] aimed to predict what customers want to buy . . . [a]nd we apply the same criteria whether you're a third-party seller or Amazon to that* because we want customers to make the right purchase regardless of whether it's a seller or Amazon."

### 1.    Amazon Misappropriated Third-Party Sellers' Data

73.        The Subcommittee found that one of the ways in which Amazon treats third-party sellers unfairly centers on Amazon's asymmetric access to and use of third-party seller data.[8] During its investigation, the Subcommittee uncovered significant evidence that Amazon leverages its access to third-party sellers' data to identify and replicate popular and profitable products from among the hundreds of millions of listings on its Marketplace.[9]   Armed with the third-party competitors' data, Amazon:  (1) copies the product to create a competing private-label product;[10] or (2) identifies and sources the product directly from the manufacturer to free ride off the seller's efforts, and then cuts that seller out of the equation.[11]   As the Institute for Local Self-Reliance's Stacy Mitchell told the Subcommittee, "Amazon's power as a gatekeeper allows it to maintain a God-like view of the transactions of rival businesses and customers, and use this data to move into new markets with a built-in advantage."

74.        The Company claims that third-party listings far outnumber Amazon's first-party listings.[12]   In a 2018 shareholder letter, Defendant Bezos wrote, "Third-party sellers are kicking our first-party butt. Badly."[13]   In response to a question from the Subcommittee, however, Amazon admitted that by percentage of sales—a more telling measure than listings—Amazon's first-party sales are significant and growing in a number of categories.  For example, in books, Amazon owns

---

[8]  Innovation and Entrepreneurship Hearing at 5 (statement of Stacy Mitchell, Co-Dir., Inst. for Local Self-Reliance).

[9]  *See, e.g.*, Interview with Source 158 (July 2, 2020); Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary (July 22, 2020) (on file with Comm.).

[10]  *See, e.g.*, Interview with Jason Boyce, Founder & CEO, Avenue7Media (Sept. 15, 2020).

[11]  *See, e.g.*, Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary (July 22, 2020) (on file with Comm.).

[12]  *Id*. at 303.

[13]  Jeff Bezos, 2018 Letter to Shareholders, THE AMAZON BLOG: DAY ONE (Apr. 11, 2019), https://blog.aboutamazon.com/company-news/2018-letter-to-shareholders.

---

74% of sales, whereas third-party sellers account for only 26% of sales.[14]  At the category level, it does not appear that third-party sellers are "kicking" Amazon's first-party "butt."  Amazon is poised to overtake its third-party sellers in several categories as its first-party business continues to grow:



**Third-Party vs. First-Party Listings and Sales on Amazon**[15]

75.        Amazon claimed in response to questions from the Subcommittee to Bezos that it has taken and continues to take steps "to protect seller data by instituting its voluntarily-adopted Seller Data Protection Policy, which prohibits Amazon Retail teams from using non-public seller-specific data to compete against third-party sellers."[16]  However, an internal Amazon document from 2014, titled "Frequently Asked Questions," indicates that Amazon was aware that the Seller Data Protection Policy had significant loopholes.  For example, the document indicates that even seller-specific data can be used for "strategic business decision at the category level or above."[17]

---

[14]  CEO Hearing at 304 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[15]  *Id*. at 303–04.

[16]  Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00142724 (on file with Comm.); CEO Hearing at 281 (response to Questions for the Record of Jeff Bezos, CEO, Amazon. com, Inc.).

[17]  Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00221869 (June 30, 2014) (on file with Comm.).

76.     Following up on public reporting and information collected during the investigation evidencing that Amazon was abusing its access to third-party sellers' data, Representative Pramila Jayapal (D–WA) asked Defendant Sutton about this precise issue at a Subcommittee hearing in July 2019.  Defendant Sutton testified unequivocally that "We do not use [third-party sellers'] individual data when we're making decisions to launch private brands."[18]

77.     *Wall Street Journal* reported on April 23, 2020, that executives in Amazon's private-label division "had access to data containing proprietary information that they used to research bestselling items they might want to compete against, including on individual sellers on Amazon's website."[19]  According to the sources, "[i]f access was restricted, managers sometimes would ask an Amazon business analyst to create reports featuring the information . . . including one who called the practice 'going over the fence.'"[20]  In other cases, "supposedly aggregated data was derived exclusively or almost entirely from one seller."[21]  Thus, while Amazon claimed that it did not use individual third-party seller data, it could still gain critical information from a third-party seller by combining its data with another much smaller seller and gleaning all the information it needed from this supposedly "aggregated" data.  *Wall Street Journal* staff conducted interviews with more than 20 former employees and at least one current employee of Amazon's private-label business and also reviewed Amazon documents for the report.[22]  The employees relayed that Amazon's use of individual third-party seller's data was a "common practice that was discussed openly in meetings they attended."[23]  According to the sources, pulling data on competitors, including individual sellers, for example, was "standard operating procedure" when making

---

[18]  Innovation and Entrepreneurship Hearing at 42 (statement of Nate Sutton, Assoc. Gen. Couns., Competition, Amazon.com, Inc.).

[19]  Dana Mattioli, Amazon Scooped Up Data from Its Own Sellers to Launch Competing Products, WALL ST. J. (Apr. 23, 2020), https://www.wsj.com/articles/amazon-scooped-up-datafrom-its-own-sellers-to-launch-competing-products-11587650015.

[20]  *Id.*

[21]  *Id.*

[22]  *Id.*

[23]  *Id.*

products such as electronics, suitcases, sporting goods, or other lines.[24]  "We knew we shouldn't," said one former employee who accessed the data and described a pattern of using it to launch and benefit Amazon products.  "But at the same time, we are making Amazon branded products, and we want them to sell."[25]

78.      Amazon claimed that it was using only "aggregated" data—data compiled from a multitude of third-party sellers, but even this later representation was misleading.  In many instances, the "aggregated" data actually derived exclusively or almost entirely from one seller.[26] In one case, for example, Amazon employees reportedly used non-public sales data about a third-party seller of car-trunk organizers named Fortem to develop an Amazon private-label version of the very same product.[27]  Fortem accounted for 99.95% of total sales in the car-trunk organizer product category.  But because Fortem did not account for 100% of total sales, Amazon employees were allowed to misappropriate Fortem's confidential information.  In other instances, if there was only one seller of an item, and Amazon was selling returned or damaged versions of that item through its Amazon Warehouse Deals clearance account, Amazon considered that "aggregate" data—and hence permissible for its employees to use.[28]

79.      In a written statement issued in response to the *Wall Street Journal* article, Amazon said only that "we strictly prohibit our employees from using nonpublic, seller-specific data to determine which private label products to launch."[29]

80.      In light of the April 2020 *Wall Street Journal* report, the Subcommittee requested that Bezos testify to address the possibility that Defendant Sutton had misled Congress.[30]  Despite

---

[24]  *Id.*

[25]  *Id.*

[26]  *Id.*

[27]  *Id.*

[28]  *Id.*

[29]  *Id.*

[30]  Letter from Hon. Jerrold Nadler, Chair, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chair, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin.

numerous references to them in Amazon's internal documents, Bezos claimed to be unaware of these practices.  According to Bezos, "Amazon first learned about the alleged violations of Amazon's voluntarily adopted Seller Data Protection Policy recently reported in *The Wall Street Journal* from *The Wall Street Journal*."[31]

81.          Representative Ken Buck (R–CO) similarly raised this issue with Defendant Bezos, stating, "I'm concerned that you've used Amazon's dominant market position to unfairly harm competition.  We've heard from a number of companies that Amazon uses proprietary data from third-party companies to launch its own private-label products."[32]   Later in the hearing, Representative Kelly Armstrong (R–ND) described this as an "important issue," and asked whether "Amazon is conducting an internal investigation into the use of third-party data," to which Defendant Bezos answered in the affirmative.

82.          In October 2020, approximately six months after Amazon said that it had initiated the investigation,[33] the Company informed the Committee of its completion.[34]   According to Amazon's Vice President of Public Policy, Brian Huseman, "Amazon's records of past data queries related to the two products cited in *The Wall Street Journal* report show that a single former

Law of the H. Comm. on the Judiciary, Hon. Joe Neguse, Vice Chair, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. Pramila Jayapal, Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. On the Judiciary, Hon. Ken Buck, Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. On the Judiciary & Hon. Matt Gaetz, Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, to Jeff Bezos, CEO, Amazon.com, Inc. (May 1, 2020) (on file with Comm.).

[31]  CEO Hearing at 280 (response to Questions for the Record of Jeff Bezos, CEO, Amazon. com, Inc.).

[32]  *Id*. at 121 (question of Rep. Ken Buck (R–CO), Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[33]  Amazon Public Policy (@amazon_policy), TWITTER (Apr. 24, 2020, 3:36 p.m.), https://twitter.com/amazonlpolicy/status/1253769684425625601.

[34]  Letter from Brian Huseman, Vice President, Pub. Pol'y, Amazon.com, Inc., to Hon. Jerrold Nadler, Chair, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chair, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. Jim Jordan, Ranking Member, H. Comm. on the Judiciary (Oct. 4, 2020) (on file with Comm.).

employee pulled and analyzed only aggregate data for both products in compliance with the Seller Data Protection Policy."[35]   But that claim is at odds with the evidence uncovered by the Subcommittee.[36]   For example, in a submission to the Subcommittee, a former employee said:

> In 2010, I started working on the Amazon marketplace team . . . . It was widely known that many (10+) of my peers were running very successful [third-party] accounts, where they were pulling private data on Amazon seller activity, so they could figure out market opportunity, etc.   Totally not legitimate, but no one monitored or seemed to care.[37]

83.        Referring to accessibility of third-party seller data, the same individual told the Subcommittee, "It's a candy shop, everyone can have access to anything they want," and added, "There's a rule, but there's nobody enforcing or spot-checking.   They just say, don't help yourself to the data . . . it was 'wink, wink don't access."[38]

84.        As reported in its final July 2022 report, the Subcommittee also interviewed another third-party seller who described how Amazon uses a request for proof of authenticity to collect proprietary information about a seller's business.   According to the seller, Amazon will submit a product authenticity claim to sellers, forcing the retailer to submit their original sales receipts as proof that the items are authentic.[39]   Although a seller is supposed to be able to black out price information, sometimes the platform will reject a submission on the basis that it is an "altered document."[40]   With insight into the seller's costs and supplier, combined with its knowledge of the seller's retail price among a virtually unfathomable amount of other data, Amazon Retail can easily replicate the seller's listing to offer a competing product.

---

[35]  *Id*.

[36]  *See* Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary (July 22, 2020) (on file with Comm.) (describing a member's experience in which Amazon allowed a distributor to sell a product for about a year, "then went out and replicated the product and began selling their own branded product, terminating the distributor . . . . Amazon became the winner and the distributor was left empty handed.").

[37]  Submission from Source 91, to H. Comm. on the Judiciary (Sept. 16, 2020) (on file with Comm.).

[38]  *Id*.

[39]  Interview with Source 154 (July 2, 2019).

[40]  *Id*.

85.          One former third-party seller and retired U.S. Marine told the Subcommittee about several instances—over seventeen years—when Amazon had leveraged his work, undercut him on price, and eventually drove him out of business.  In each instance, he had to change his business model after Amazon took over the Buy Box[41] for his listings, "killing" his sales.[42]  On at least two different occasions, his company did all the legwork to create a new, top-selling product or product line, as well as creating the product listings, only to have Amazon copy the idea and offer a competing product.  Amazon used different tactics each time, but the result was always the same: Amazon profited from his work and made it impossible for him to fairly compete.[43]

86.          As part of his last attempt to sell on Amazon, his business created its own line of table game products with a unique design and color palette.  Once these products became top sellers, Amazon again swooped in to reap the rewards of his work.  Amazon copied his designs, down to the color palette, and started selling their competing products at unsustainable prices. Ultimately, he exited his seller business, gave up on trying to bring new products to consumers, and founded a consulting agency for Amazon sellers.[44]

87.          In addition to its private-label business, Amazon also uses third-party seller data to benefit its Amazon Retail business, where the Company functions more like a retailer.  At the Subcommittee's July 29, 2020 hearing, Chair David N. Cicilline (D–RI) asked Defendant Bezos about this conduct, recounting the story that a former third-party seller shared with the Subcommittee:

> During this investigation, we have heard so many heartbreaking stories of small businesses who sunk significant time and resources into building a business and selling on Amazon, only to have Amazon poach their best-selling items and drive them out of business.

---

[41] The Subcommittee explains how the Buy Box works:  "When a shopper lands on a product detail page, Amazon chooses one seller whose details appear in the Buy Box—the white box on the right-hand side of the page.  When a customer clicks on the 'Add to Cart' button, the sale goes to the seller in this box."  https://www.govinfo.gov/content/pkg/CPRT-17HPRT47832.pdf at 209.

[42] Interview with Jason Boyce, Founder & CEO, Avenue7Media (Sept. 15, 2020).

[43] *Id.*

[44] *Id.*

So I want to talk to you about one company that really stood out from the rest. I want you to pay close attention to how they described your partnership, Mr. Bezos. We heard from a small apparel company that makes and sells what they call "useful apparel" for people who work on their feet and with their hands, like construction workers and firefighters.

This particular business discovered and started selling a unique item that had never been a top seller for the brand. They were making about $60,000 a year on just this one item. One day, they woke up and found that Amazon had started listing the exact same product, causing their sales to go to zero overnight. Amazon had undercut their price, setting it below what the manufacturer would generally allow it to be sold so that, even if they wanted to, they couldn't match the price.[45]

88.        In addition to collecting data relating to sales, Amazon can also reverse engineer third-party sellers' cost structures through the tools that it offers sellers to track profits, costs, ad spend, and other expenses, as well as fulfillment services through FBA. An internal Amazon document made public by the Subcommittee shows that Amazon can use its FBA service as an avenue to identify popular third-party seller items and gather competitively sensitive information about them.[46] Defendant Olsavsky was copied on this correspondence.[47] Thus, FBA provides another avenue for Amazon to access competing sellers' third-party data.

89.        The Subcommittee is not the only governmental body that investigated Amazon and found evidence of theft and other misconduct by the Company *vis-à-vis* its third-party sellers. The European Commission ("EU" or the "Commission") also began scrutinizing Amazon about its treatment of third-party sellers as far back as September 2018.[48]

90.        On July 17, 2019, the EU issued a press release announcing that it had opened a formal antitrust investigation to assess whether Amazon had breached the Commission's

---

[45] CEO Hearing at 116 (question of Rep. David N. Cicilline (D–RI), Chair, Subcomm. On Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary), https://www.govinfo.gov/content/pkg/CHRG-116hhrg41317/html/CHRG-116hhrg41317.htm (July 29, 2020).

[46] *See, e.g.*, *id.* at AMAZON–HJC–00207035 to –00207036 (Sept. 19, 2013) (on file with Comm.) ("On the top selling Owl necklace . . . we should go deep and see what we can learn including how much it would costs [sic] to manufacture this?").

[47] *Id.*

[48] https://techcrunch.com/2020/11/10/europe-lays-out-antitrust-case-against-amazons-use-of-big-data/.

competition rules by using non-public data from independent retailers who sell on its Marketplace.[49]

91.      The Commission announced that, "[a]s part of its in-depth investigation," it would look into:

- the standard agreements between Amazon and marketplace sellers, which allow Amazon's retail business to analyse and use third party seller data.  In particular, the Commission will focus on whether and how the use of accumulated marketplace seller data by Amazon as a retailer affects competition; and

- the role of data in the selection of the winners of the 'Buy Box' and the impact of Amazon's potential use of competitively sensitive marketplace seller information on that selection.   The 'Buy Box' is displayed prominently on Amazon and allows customers to add items from a specific retailer directly into their shopping carts.  Winning the 'Buy Box' seems key for marketplace sellers as a vast majority of transactions are done through it.[50]

92.      As part of their investigation, EU regulators obtained a massive data set from Amazon—covering over 80 million transactions and more than 100 million product listings on its European marketplaces—to analyze how its business uses merchant data.[51]

93.      On November 10, 2020, news agencies reported that, as a result of its investigation, the Commission laid out a first set of antitrust charges against Amazon focused on its dual role as a platform for other sellers but also a retailer itself on its own platform—and its cumulative use of third party merchant data to underpin Amazon's own retail decisions.[52]   Competition chief Margrethe Vestager said the Commission's preliminary conclusion was that Amazon abused its

---

[49] European Commission, *Antitrust: Commission opens investigation into possible anti-competitive conduct of Amazon*, https://ec.europa.eu/commission/presscorner/detail/en/IP_19_4291 (July 17, 2019).

[50] *Id*.

[51] *Id*.

[52] https://techcrunch.com/2020/11/10/europe-lays-out-antitrust-case-against-amazons-use-of-big-data/.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 27 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

market position in France and Germany, its biggest markets in the European Union, via the Company's use of big data to "illegally distort" competition into online retail markets.[53]

94.       Vestager explained that Amazon has, "for example, access to data on the number of ordered and shipped units of sellers' products, revenues on the marketplace, the number of visits to sellers' offers, information relating to shipping—including the past performance of the seller, the consumers' claims on the sellers' products including the activated guarantees," and said that "Amazon gets this data from every seller, every listed product, every purchase on its platform."[54] Vestager said that "Amazon is data driven.  It's a highly automated company—where business decisions are based on algorithmic tools.  Our investigation shows that very granular, real-time business data relating to third party sellers' listings and transactions on the Amazon platform systematically feed into the algorithm of Amazon's retail business.  It is based on these algorithms that Amazon decides what new products to launch, the price of each individual offer, the management of inventories, and the choice of the best supplier for a product."[55]

95.       The EU also concluded that Amazon had accumulated the business data of more than 800,000 active sellers in the European Union, covering more than one billion products, thus putting individual sellers on its platform who did not have access to that information trove at a huge disadvantage.[56]

96.       Reached for comment, Amazon's spokesperson vociferously disagreed with the Commission's assessment that Amazon uses data from third-party sellers on its platforms to benefit Amazon's own business, stating:  "We disagree with the preliminary assertions of the European Commission and will continue to make every effort to ensure it has an accurate understanding of the facts."[57]

---

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 28 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

97.     In response to the Commission's investigations, Amazon eventually agreed to take several remedial actions.  Specifically, as CNN reported on July 14, 2022, Amazon offered to change its business practices in Europe in order to address concerns over its use of non-public third-party seller data.[58]  Under the proposed changes, Amazon has offered not to use data gathered from third-party sellers for its own retail decisions, such as determining what products to sell under Amazon's private label.[59]

98.     A separate investigation conducted by *Reuters* corroborates the wrongdoing uncovered by the Subcommittee and the EU.  On October 13, 2021, *Reuters* reported that a review it conducted of internal Amazon documents shows that the Company ran a systematic campaign of creating knockoffs and manipulating search results to boost its own product lines in India, one of the Company's largest growth markets.[60]  *Reuters* reviewed thousands of pages of internal Amazon documents, including emails, strategy papers and business plans in preparation for its report.[61]

99.     The documents *Reuters* reviewed reveal how Amazon's private-brands team in India secretly exploited internal data from Amazon.in, Amazon's India website, to copy products sold by other companies, and then offered them on its platform.[62]  The employees also drummed up sales of Amazon private-brand products by rigging Amazon's search results so that the Company's products would appear, as one Amazon 2016 strategy report for India put it, "in the first 2 or three . . . search results" when customers were shopping on Amazon.in.[63]

100.     The internal documents also show that Amazon employees studied proprietary data about other brands on Amazon.in, including detailed information about customer returns, in order

---

[58] Amazon offers concessions to resolve EU antitrust probes, https://www.cnn.com/2022/07/14/tech/amazon-concessions-eu-antitrust (July 14, 2022).

[59] *See* https://ec.europa.eu/competition/antitrust/cases1/202229/AT_40462_8414012_7971_3.pdf.

[60] *See* https://www.reuters.com/investigates/special-report/amazon-india-rigging.

[61] *Id.*

[62] *Id.*

[63] *Id.*

to identify and target goods—described as "reference" or "benchmark" products—and "replicate" them.[64]  As part of that effort, the 2016 internal report laid out Amazon's strategy for a brand the Company originally created for the Indian market called "Solimo."[65]  The Solimo strategy, according to Amazon, was simple: "use information from Amazon.in to develop products and then leverage the Amazon.in platform to market these products to our customers."[66]  The Solimo project in India has had international impact, with numerous of Solimo-branded health and household products being offered for sale on Amazon's U.S. website, Amazon.com.[67]

101.     The 2016 report also shows that Amazon employees working on the Company's own products, known as private brands or private labels, planned to partner with the manufacturers of the products targeted for copying, because they learned that those manufacturers employ "unique processes which impact the end quality of the product."[68]  The report, entitled "India Private Brands Program," stated that:  "It is difficult to develop this expertise across products and hence, to ensure that we are able to fully match quality with our reference product, we decided to only partner with the manufacturers of our reference product."  It termed such manufacturer expertise "Tribal Knowledge."[69]

102.     *Reuters* reported that the internal Amazon documents it reviewed showed for the first time that manipulating search results to favor Amazon's own products, as well as copying other sellers' goods, were part of a formal, clandestine strategy at Amazon—and that high-level executives were told about it.  The documents showed that at least two Amazon executives reviewed the India strategy—Senior Vice Presidents Diego Piacentini, who has since left the Company, and Russell Grandinetti, who currently runs Amazon's international consumer

---

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.*

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 30 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

business.[70]  Grandinetti also served as Senior Vice President of Kindle Content at Amazon.com, Inc., reporting directly to Defendant Bezos.[71]  During the Class Period, Grandinetti also reported at least directly to Jeff Wilke, CEO of Amazon's Worldwide Consumer business, who in turn reported directly to Bezos.[72]  Grandinetti and Defendant Olsavsky were also part of the elite Amazon S Team, a very small, close-knit senior leadership team of Amazon executives who worked closely with Amazon's CEO, Bezos, on all important matters affecting the Company.[73]

103.       As with other allegations of wrongdoing, Amazon flatly denied *Reuters*' accounts, stating in a written response to the article that "We believe these claims are factually incorrect and unsubstantiated."[74]  Amazon insisted that it "strictly prohibits the use or sharing of non-public, seller-specific data for the benefit of any seller, including sellers of private brands."  The Company further claimed that the way it displays search results does not favor private-brand products.  "We display search results based on relevance to the customer's search query, irrespective of whether such products have private brands offered by sellers or not."[75]

104.       An internal audit report reviewed by *Politico* shows that Amazon's senior leadership knew at least as early as 2015 that numerous employees had access to sensitive third-party seller data.  In an article published on April 30, 2021, *Politico* reported that an internal Amazon audit report seen by *Politico* squarely warned Amazon's senior leadership in 2015 that 4,700 members of its workforce working on its own sales had unauthorized access to sensitive third-party seller data on the platform.[76]

---

[70] *Id.*

[71] https://www.justice.gov/sites/default/files/atr/legacy/2013/07/18/px-0835.pdf.

[72] https://www.cnbc.com/2017/11/28/who-are-amazons-top-executives.html.

[73] *See*     https://www.seattletimes.com/business/amazon/whos-in-charge-at-amazon-moves-on-secretive-s-team-signal-tech-giants-priorities/.

[74] https://www.reuters.com/investigates/special-report/amazon-india-rigging/.

[75] *Id.*

[76] https://www.politico.eu/article/amazon-seller-data-company-sales/.

105.　　　　According to the audit report, top management at Amazon, including Defendant Wilke, the Company's number-two executive until he left the Company in March of 2021, and Defendant Zapolsky knew that insufficiently robust access restrictions meant scores of insiders could inappropriately access seller-specific data.[77]  "Permissions are not adequately restricted, making it possible for unauthorized users to view Seller-specific information such as performance history and authentication keys, edit inventory levels and pricing, and manage returns," the report stated.[78]  The audit noted that Amazon left its "spoofer access" tool, a digital tool that makes improper use of third-party data possible, wide open to unauthorized access by employees across the world—including in China—to access and modify sensitive information.[79]

106.　　　　The report also underscored that an earlier internal audit had identified similar failings in 2010.[80]  In other words, Amazon had done little to nothing to address the issue.

107.　　　　An Amazon spokesperson responded to *Politico*'s revelations in generic terms, saying that like all companies, it audits its policies for compliance and makes improvements based on its findings.[81]  "This includes Amazon's internal seller data protection policy, which limits the use of seller data."[82]

108.　　　　*Politico* noted that "Amazon has long denied reports that employees access data on individual sellers to develop competing products."[83]

109.　　　　Amazon is also the subject of investigations by the FTC and the SEC.  On June 1, 2019, *The Washington Post* reported that the FTC planned to investigate Amazon as part of a

---

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] *Id.*

1    broader investigation into large technology companies.[84]  This followed an earlier announcement

2    that the FTC had established a special task force to monitor the big tech companies and to

3    investigate "any potential anticompetitive conduct in those markets, and tak[e] enforcement

4    actions when warranted."[85]  According to Gene Kimmelman, the president of Public Knowledge,

5    a Washington-based consumer advocacy group:  "This should be a wake-up call to both Google

6    and Amazon to behave themselves because it at least shows that the Justice Department and FTC

7    are thinking about them."[86]

8    110.        In June 2019, Vox also reported that the FTC had started questioning some of

9    Amazon's competitors about its business practices, including how Amazon is competing against

10   its own sellers, according to someone briefed on the discussions.[87]

11   111.        *Bloomberg* reported that FTC investigators began interviewing Amazon's third-

12   party sellers in September 2019 as part of a "sweeping probe" to determine whether Amazon is

13   using its market power to hurt competition.[88]  Reportedly, several attorneys and an economist have

14   been conducting interviews that typically last about 90 minutes.[89]  According to Michael Kades,

15   who spent 20 years at the FTC, the length of the interviews and the manpower devoted to

16   examining Amazon point to a serious inquiry rather than investigators merely responding to

17   complaints and going through the motions:  "Early in an investigation, that's a sign of staff doing

18   a serious job," Kades said.  "They're spending lots of time with witnesses and trying to really

19

20   [84] Tony Romm, *Amazon could face heightened antitrust scrutiny under a new agreement between*
     *U.S.          regulators*,          Wash.          Post          (June 1,          2019)
21   https://www.washingtonpost.com/technology/2019/06/02/amazon-could-face-heightened-
     antitrust-scrutiny-under-new-agreementbetween-us-regulators/.
22
     [85] *Id.*
23
     [86] *Id.*
24   [87] Jason Del Rey, Amazon may soon face an antitrust probe. Here are 3 questions the FTC is
     asking about it., Vox (June 4, 2019), https://www.vox.com/recode/2019/6/4/18651694/amazon-
25   ftc-antitrust-investigation-prime.
26   [88] Spencer Soper & Ben Brody, *Amazon Probed by U.S. Antitrust Officials Over Marketplace*,
     Bloomberg (Sept. 11, 2019), https://www.bloomberg.com/news/articles/2019-09-11/amazon-
27   antitrust-probe-ftc-investigators-interview-merchants.

28   [89] *Id.*

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 33 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

understand what they're saying."[90]   According to reports, regulators are skeptical that shoppers and suppliers have real alternatives to Amazon.[91]

112.        The FTC investigation recently uncovered that, internally, Amazon recognized that it gave Company employees access to a "very powerful tool that provide[d] users with the ability to indiscriminately search for any seller account, view and edit data without the seller's consent, and create risk for customers, sellers, and Amazon."[92]   Amazon also knew that it "lack[s] sufficient logging, monitoring, and alerting of unauthorized access" to seller data, and further that "the lack of technical control and coverage for all uses of seller data causes risk to Amazon."[93]   Still, Amazon took no steps to implement adequate controls against the misappropriation of third-party seller data.

113.        On April 6, 2022, *Wall Street Journal* disclosed that the "SEC Is Investigating How Amazon Disclosed Business Practices."   The article reported, in relevant part, that the SEC "is probing how the technology giant . . . handled disclosures of its employees' use of data from sellers on its e-commerce platform."   The SEC requested emails and communications from several senior Amazon executives.

### 2.        Amazon Tied and Bundled Its Products to the Detriment of Third-Party Sellers

114.        There is a strong link between Amazon Marketplace and Amazon's Fulfillment by Amazon (FBA) program, Amazon's paid logistics service.   A draft Q&A for Defendant Olsavsky before a 2018 earnings call explained the connection between Prime and FBA:   "Prime and FBA reinforce each other—they are inextricably linked.   FBA adds Prime eligible selection. Prime member growth and purchasing habits attract sellers to FBA."   As the Subcommittee found, Amazon used its dominance in each of these markets to strengthen and reinforce its position in the other.

---

[90] *Id.*

[91] *Id.*

[92] FTC Compl. ¶ 255.

[93] *Id.*

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 34 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

115.        As Amazon's e-commerce business has grown, the Company has also developed a significant logistics business providing fulfillment and delivery services to third-party sellers through its FBA program.  Nearly 85% of the top 10,000 Amazon Marketplace sellers reportedly rely on this program to fulfill and deliver their orders.  Third-party sellers that use FBA keep their inventory in Amazon's fulfillment centers.[94]

116.        As the Company describes it, Amazon's FBA program combines warehousing, packing, and shipping services, and most importantly, access to Prime customers.[95]  A recent consumer survey indicated that 75% of Amazon Prime customers specifically search for products flagged as Prime-eligible.  As a result, as the Online Merchant's Guild told the Subcommittee, many sellers will "say that without Prime you are dead."  For a seller's products to obtain the Prime badge, which is essential to making sales on the platform because it boosts search rankings and the ability to get the Buy Box, a seller must either qualify for Amazon's Seller Fulfilled Prime ("SFP") program or use Amazon's FBA service.  On August 18, 2020, Amazon informed sellers of changes to SFP, which rendered it an entirely impractical option for most sellers (by forcing them to meet intense targets for one- and two-day delivery and have nationwide delivery coverage).[96]  Even before this change, only a very small percentage of sellers could meet the

---

[94] The House Committee on the Judiciary, Investigation of Competition in Digital Markets, https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf (July 19, 2022).

[95] Fulfillment by Amazon, AMAZON, https://sell.amazon.com/fulfillment-by-amazon.html (last visited Oct. 4, 2020).

[96] Pascal, The Seller Fulfilled Prime Team, Important Updates to Seller Fulfilled Prime, AMAZON SERVS. SELLER FORUMS (Aug. 18, 2020), https://sellercentral.amazon.com/forums/t/important-updates-to-seller-fulfilled-prime/682240.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 35 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

onerous eligibility requirements for SFP (there were just 200 total).[97]  This means that paying for

FBA is functionally the only way for sellers to get the Prime badge for their product listings.[98]

117.        Due to a lack of alternatives, third-party sellers have no choice but to purchase

fulfillment services from Amazon.   More than 73% of all Marketplace sellers worldwide

reportedly rely on FBA services.[99]   Numerous third-party sellers told the Subcommittee that they

felt they have no choice but to pay for FBA to maintain a favorable search result position, to reach

Amazon's more than 112 million Prime members, and to win the Buy Box—through which the

vast majority of Amazon sales are made.[100]  Given that FBA is effectively the only way for sellers

to get a Prime badge, this indicates that Amazon does favor sellers who use FBA over those who

do not for both its search rankings and the Buy Box.[101]

118.        In response to concerns about Amazon tying a seller's ability to make sales on its

platform to participation in FBA, Amazon offered contradictory statements.    In the

Subcommittee's July 16, 2019 hearing, Representative Lucy McBath (D–GA) asked Defendant

Sutton, whether Amazon "privilege[d] vendors who use Amazon Fulfillment Services over those

who chose not to."[102]  Defendant Sutton asserted that Amazon "do[es] not favor . . . products that

---

[97]  *See, e.g.*, Interview with Jason Boyce, Founder & CEO, Avenue7Media, LLC (Sept. 15, 2020)
("It used to be possible, but hard, to be a Seller Fulfilled Prime seller.  There were only 200 sellers
that were able to meet the requirements.  What's changing recently is that they used to allow you
to have the Prime badge in certain regions, but now they say you need the Prime badge nationally,
i.e., you need to have multiple warehouses across the country plus ship on Saturdays, etc.").

[98]  Regan McPhee, How to Sell on Amazon Prime in 2020, JUNGLESCOUT (May 27, 2020),
https://www.junglescout.com/blog/how-to-sell-on-amazon-prime/.

[99]  *See* J. Clament, Fulfillment by Amazon (FBA) Usage Among Top Marketplace Sellers
Worldwide       2017–2018,        STATISTA        (Jan. 7,        2020),
https://www.statista.com/statistics/1020046/global-fba-usage-top-amazon-sellers/.

[100]  *See, e.g.*, Submission from Source 43, to H. Comm. on the Judiciary, 30 (Oct. 26, 2019) (on
file with Comm.).

[101]  The House Committee on the Judiciary, Investigation of Competition in Digital Markets,
https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf
(July 19, 2022).

[102]  Innovation and Entrepreneurship Hearing at 50 (question of Rep. Lucy McBath (D–GA),
Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the

---

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 36 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

use FBA over others."[103]   He also falsely stated that Fulfillment by Amazon is not a factor in Amazon's ranking algorithm.[104]

119.        At the Subcommittee's July 29, 2020 hearing, Representative Mary Gay Scanlon (D–PA) asked Defendant Bezos about whether there is a connection between a seller's use of FBA and its ability to win the Buy Box.[105]   In response, Defendant Bezos claimed that the Buy Box may "indirectly" favor products that can be shipped with Prime.[106]   Bezos claimed that it is in the best interest of consumers for sellers to use the FBA and that Amazon "does not consider profitability as part of the Featured Merchant Algorithm."[107]   Documents reviewed by the Subcommittee, however, indicate that Amazon has, in fact, used profitability to Amazon—also referred to internally as "contribution profit" or "CP"—as a factor in awarding the Buy Box.[108]

120.        Furthermore, Amazon's own documents, revealed by the House Judiciary Committee, show that it has considered FBA participation for purposes of determining the Buy

---

Judiciary),                https://www.govinfo.gov/content/pkg/CHRG-116hhrg39901/html/CHRG-116hhrg39901.htm.

[103]   *Id.*

[104]   *Id.* at 499 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Couns., Competition, Amazon.com, Inc.).

[105]   CEO Hearing at 161 (question of Rep. Mary Gay Scanlon (D–PA), Vice Chair, H. Comm. on the Judiciary).

[106]   *Id.* (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[107]   *Id.* at 282 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[108]   Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00141750 (Mar. 25, 2010) (on file with Comm.).

Box winner.[109]  An Amazon document that sets forth pricing rules for a pilot program favors third-party sellers that use FBA over those who do not for awarding the Buy Box:

## INTERNAL PRICING STRATEGY DOCUMENT[110]

From: Wales, Chance
To: VanDuine, Jason
Sent: 3/25/2010 11:26:35 AM
Subject: RE: SIGN OFF REQUESTED: Pre-WBR Follow-up: Healthcare Pricing Strategy

ok

From: VanDuine, Jason
Sent: Thursday, March 25, 2010 9:46 AM
To: Wales, Chance
Cc: VanDuine, Jason
Subject: SIGN OFF REQUESTED: Pre-WBR Follow-up: Healthcare Pricing Strategy

Chance – please sign off (or provide fdbk) before I send to Doug.
Jason

Doug,
You had asked me to help you understand the 'size of the issue' with regards to diverted product as well as clarification on pricing rules/matching for the image competitor simulation in the Healthcare category. Some current data (from February):

1. The top 25 negative CP ASINs in Health & Beauty (all image ASINs) accounted for $265k in negative CP, 46k units and $1.6M in product revenue.
2. The diverted product ASINs (8 of the top 25) accounted for $109k in negative CP (41% of ttl), 14k units (31% of ttl) and $366k (21% of ttl) in product revenue.
3. Babycare products accounted for 14 of the top 25 ASINs (13 diaper and 1 wipe ASIN) and the remaining 3 ASINs are vendor or operational cost issues that are being addressed.
4. The image competitor pilot in Healthcare will address 6 of the 8 ASINs referenced in #2 (it will not address Align and All – both in Nutrition & Wellness)

We do not plan any manipulation to pricing rules in the Healthcare category other than the setting of number of image ASINs to zero.
Use cases (for Pricing Rules): using Prilosec as the example (CP neutral = $27)

| Ref # | Use Case | Amazon Landed Cost | Comp Box Price | Comp Shipping Cost | Comp Landed Price | Amazon Match Price | Non-Prime (1% pad to FBA, 2% pad to 3P) | Prime (5% pad) |
|---|---|---|---|---|---|---|---|---|
| 1 | Walmart (Image Competitor) | $27.00 | $28.00 | $0.97 | $28.97 | $28.00 | Amzn wins buy box | Amzn wins buy box |
| 2 | DAB Nutrition (3P) + FBA | $27.00 | $26.50 | $0.00 | $26.50 | $27.00 | 3P wins buy box | Amzn wins buy box |
| 3 | DAB Nutrition (3P) + no FBA | $27.00 | $26.50 | $0.00 | $26.50 | $27.00 | Amzn wins buy box | Amzn wins buy box |
| 4 | AllTheTimeWholesale + no FBA | $27.00 | $22.00 | $4.50 | $26.50 | $27.00 | Amzn wins buy box | Amzn wins buy box |

The primary change coming is that we will now lose the buy box if 3P merchants continue to price below CP neutral (we will stop at CP neutral unless matching to an image competitor). As long as Prilosec is priced below $27 landed price (excluding buffers), we will lose the buy box. Currently, the lowest landed is under $20.
Estimated impact (based on simulation completed by the Pricing team) is a 6% negative impact on Healthcare category growth and a $.74/unit positive impact on CP. Using OP2 as the base, this would translate to ($750k) in revenue loss and ($775k) gain in CP. We will begin the pilot in April and will measure results on a weekly basis (with highlights in the pre-WBR as appropriate).
If you have any further questions, please let me know.
Jason

121.      One third-party seller provided the Subcommittee with evidence that Amazon favors sellers who participate in Amazon's fulfillment program over sellers who do not.  The seller set up an experiment where he sold the same product, one self-fulfilled and the other fulfilled through FBA, and ran different test cases.[111]  The seller found that, "Even when the consumer price of the self-fulfilled order was reduced and sold for a lower price (7% lower) than the FBA

---

[109] *Id*. at AMAZON–HJC–00142724.

[110] Prepared by the Subcommittee based on Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00141750 (Mar. 5, 2010) (on file with Comm.).

[111] Submission from Source 43, to H. Comm. on the Judiciary, 29 (Oct. 26, 2019) (on file with Comm.).

offer, the FBA still 'won' the 'Buy Box.'"[112]  The seller indicated that, without this favorable treatment for FBA, it would not choose to use FBA, as it found Amazon's fulfillment service was often slower and less reliable than self-fulfillment.[113]

122.       Although Defendant Bezos told the Subcommittee that Fulfillment by Amazon "is probably the greatest invention that we ever created for sellers," and that "it's working for sellers," information that the Subcommittee reviewed indicated that the opposite is true.[114]  One third-party seller told the Subcommittee, "We use both FBA and self-fulfillment, [and] all of our negative comments are on items shipped through FBA."[115]  According to another seller that uses FBA, at one point, Amazon decided to change the packaging on her products from cardboard boxes to padded envelopes, causing damage to her products in transit.  When the items started arriving at her customers' homes in a damaged state, this caused a surge of negative reviews and requests for returns.  When she asked Amazon to remove these bad reviews, which were caused by FBA's shipping methods, Amazon refused.[116]

123.       A competing online marketplace described to the Subcommittee how Amazon's FBA program makes it more difficult to compete with Amazon, stating, "[T]hrough anticompetitive strategies and practices by Amazon, many . . . sellers are being pulled into Amazon's tied marketplace-and-ecommerce-fulfilment ecosystem in a manner that makes them not only less independent but directly dependent on Amazon."[117]  It further explained that, because of Amazon's dominance in online commerce, "Even sellers who sell on other marketplaces are pushed into FBA, because it is the only practicable way to obtain sales on the Amazon

---

[112] *Id.*

[113] *Id.*; *see also* Interview with Source 920 (July 14, 2020); Interview with Source 100 (July 24, 2020).

[114] CEO Hearing at 161 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[115] Interview with Source 89 (July 22, 2020).

[116] Interview with Source 149 (Feb. 26, 2020).

[117] Submission from Source 11, to H. Comm. on the Judiciary, 1 (Oct. 14, 2019) (on file with Comm.).

marketplace."[118]  In addition to the Subcommittee's investigation, described more fully below, antitrust enforcement agencies are currently investigating Amazon for tying these two services together.[119]

124.        The Subcommittee is not the only independent body that found Amazon has engaged in such misconduct.  On April 16, 2019, the Italian Competition Authority announced it was launching a probe of Amazon over concerns that the Company was giving sellers using its logistics service a better chance to appear on the Buy Box.[120]  Competition Authority officers carried out inspections, with the support of the Special Antitrust Unit of the Guardia di Finanza, at some of Amazon's premises.[121]

125.        Eventually, news outlets announced on December 9, 2021 that the Italian regulators hit Amazon with a €1.1 billion fine for promoting its own logistics, or fulfillment, service that ships and delivers packages, on its Italian platform to the detriment of third-party sellers who did not use it.[122]  The misconduct dated from at least 2016.[123]  Based on its investigation, the Italian regulator found that third-party sellers who do not use Amazon's fulfillment service are excluded from "a set of advantages essential for obtaining visibility and better sales prospects."[124]  Those included had better access to Amazon's "most loyal and high-end customers" who use Amazon

---

[118] *Id.* at 2.

[119] *See, e.g.*, Press Release, It. Competition Auth., Amazon: Investigation Launched on Possible Abuse of a Dominant Position in Online Marketplaces and Logistic Services (Apr. 15, 2019), https://en.agcm.it/en/media/press-releases/2019/4/A528  (announcing    the    launch    of    an investigation into whether "Amazon would unduly exploit its dominant position in the market for e-commerce platforms intermediary services in order to significantly restrict competition in the e-commerce logistics market, as well as—potentially—in the e-commerce platform market, to the detriment of final consumers.").

[120] *Id.*

[121] *Id.*

[122] https://www.france24.com/en/europe/20211209-italy-slaps-amazon-with-%E2%82%AC1-1-billion-fine-for-abusing-dominant-market-position.

[123] *Id.*

[124] *Id.*

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 40 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Prime, the Company's loyalty program.[125]  The regulator concluded that "Amazon has artificially combined two distinct services:  the presence on the platform at remunerative conditions (possibility of not being subject to the evaluation of one's own performance, of offering products with the Prime label, of selling during special events and of having a high chance of winning the BuyBox) and the FBA service for the fulfillment of orders—in order to create an illicit incentive to purchase FBA, in the absence of alternative ways of accessing the same advantages, apart from the use of FBA."[126]

126.        Additionally, the regulator found that a tough performance measurement system is reserved for sellers who do not use Amazon's logistics system, which can lead, if failed, to suspension of the seller's account.[127]

127.        In light of this misconduct, the regulator directed Amazon to grant sales privileges and visibility to all third-party sellers who meet fair and non-discriminatory standards for fulfillment, and to decide and publish such standards.[128]

128.        Once again, Amazon denied any misconduct, stating that "We strongly disagree with the decision of the Italian Competition Authority."  "The proposed fine and remedies are unjustified and disproportionate," the Company said in a statement.[129]  Amazon said it would appeal the ruling, asserting that signing up for the fulfillment service was not obligatory and that vendors already access Amazon Prime customers in Italy through other platforms.[130]

129.        On November 10, 2020, the European Commission also announced that it opened a second formal investigation into the possible preferential treatment of Amazon's own retail offers

---

[125] *Id.*

[126] https://www.competitionpolicyinternational.com/the-italian-competition-authoritys-decision-in-the-amazon-logistics-case-self-preferencing-and-beyond/.

[127] https://www.france24.com/en/europe/20211209-italy-slaps-amazon-with-%E2%82%AC1-1-billion-fine-for-abusing-dominant-market-position.

[128] *Id.*

[129] https://www.law.com/international-edition/2021/12/15/italian-competition-judgment-against-amazon-shows-the-future-of-big-tech-regulation-in-europe/.

[130] *Id.*

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 41 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

and those of marketplace sellers that use Amazon's FBA.[131]   In particular, the Commission announced it was investigating whether the criteria that Amazon sets to select the winner of the "Buy Box" and to enable sellers to offer products to Prime users, under Amazon's Prime loyalty program, lead to preferential treatment of Amazon's retail business or of the sellers that use Amazon's logistics and delivery services.[132]   According to Vestager, "The Buy Box is essential. It prominently shows you offers for one single seller of a chosen product with the possibility for the consumer to purchase it directly.  So winning the Buy Box is crucial for the marketplace sellers as it seems that more than 80% of all transactions on Amazon are channeled through it."[133]

130.         In response to the European Commission's investigation, Amazon eventually agreed to take several remedial actions.  Specifically, on July 14, 2022, Amazon offered to change its business practices in Europe to address its alleged bias in granting sellers access to its Buy Box and its Prime program.[134]  Amazon has offered to treat all sellers equally when determining which product to feature in the Buy Box.[135]  As part of the Buy Box concession, Amazon proposed to offer a second seller placement in the Buy Box, which could potentially boost visibility for more sellers.[136]  Amazon also made several commitments related to sellers' relationships with Amazon Prime, and said sellers under its Prime label would be able to use any shipping carrier they desire rather than Amazon's own fulfillment services.[137]

---

[131] European Commission, *Antitrust: Commission sends Statement of Objections to Amazon for the use of non-public independent seller data and opens second investigation into its e-commerce business practices*, https://ec.europa.eu/commission/presscorner/detail/en/ip_20_2077 (Nov. 10, 2020).

[132] *Id.*

[133] https://techcrunch.com/2020/11/10/europe-lays-out-antitrust-case-against-amazons-use-of-big-data/.

[134] *Amazon offers concessions to resolve EU antitrust probes*, https://www.cnn.com/2022/07/14/tech/amazon-concessions-eu-antitrust (July 14, 2022).

[135] *Id.*

[136] *Id.*

[137] *Id.*

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 42 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

131.       The results of the independent investigations conducted by the FTC and the Attorneys General of seventeen states over the course of four years also confirm that Amazon coerced third-party sellers to use the Company's fulfillment service, FBA.  Those investigations found that Amazon exploits sellers' demand for access to Prime eligibility by conditioning that access on use of the FBA, even though other fulfillment options could provide comparable or better service.[138]  Amazon's former head of FBA internally acknowledged that "[s]ellers may not have wanted to buy fulfillment [from Amazon]" but they did so in order to "buy increased sales" that come with Prime eligibility.[139]  Indeed, an internal Amazon study found that sellers with Prime access through their use of FBA increased their chances of winning the Buy Box compared to sellers that used non-Amazon fulfillment services.[140]  Another internal study conducted by Amazon showed that third-party sellers who do not employ FBA incur a sales "penalty" and suffer drops in sales.[141]

132.       The investigations further found that by forcing third-party sellers to use FBA in order to obtain Prime eligibility, Amazon raised the costs of third-party sellers who desired selling through other non-Amazon channels (by forcing them to split their inventory to sell across multiple channels).[142]  Internally, Amazon recognized that this maneuver hurt third-party sellers, with Amazon's Vice President of Worldwide Selling Partner Services recently acknowledging that "[a] seller doesn't want to have two sets of supply-chain services, one that's for Amazon and one that's for someone else."[143]

133.       Based on review of internal Amazon documents, the investigations uncovered that before 2019, Amazon tested a strategy that allowed a few third-party sellers to use non-Amazon

---

[138] FTC Compl. ¶ 353.  The Complaint alleges twenty counts of violations of state and federal law.

[139] FTC Compl. ¶ 361.

[140] FTC Compl. ¶ 363.

[141] *Id.*

[142] FTC Compl. ¶¶ 364-74.

[143] FTC Compl. ¶ 364.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 43 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

fulfillment centers, but found that it was "strategically risky" to continue or expand the program because it could "seriously imperil FBA."[144]  More specifically, according to the investigations, in 2015, Amazon briefly experimented with allowing a small subset of sellers to fulfill Prime-eligible orders without using FBA, through a program called Seller Fulfilled Prime ("SFP").  Even then, Amazon required the sellers to meet stringent criteria, with sellers having to "meet a high bar for shipping speed and consistency" akin to the shipping speeds Amazon promised Prime subscribers.[145]  As just one example, the investigations uncovered that sellers enrolled in SFP met their promised "delivery estimate" requirement set by Amazon more than 95% of the time in 2018.[146]  At times, these sellers outperformed FBA-fulfilled orders on this metric.[147]

134.        While SFP was popular with sellers, the investigations found that Amazon foreclosed enrollment in 2019 when it learned that independent fulfillment providers were advertising their ability to help sellers obtain Prime eligibility for products sold on Amazon and fulfilled through SFP.  Defendant Clark wrote that he was "losing [his] mind" after learning that UPS was advertising that its fulfillment service could fulfill Prime-eligible orders. In that same email chain, two high-level Amazon executives agreed that Amazon should consider shutting down SFP in the United States.[148]  Just a few months later, in a meeting titled "3PL impact mitigation," Amazon formally stopped new enrollment in SFP.[149]

135.        The plan to close SFP was met with resistance by some inside Amazon, who advocated "not to Sunset the SFP Program as both Customers and Sellers will lose the Prime benefits on 115 [million] unique items that are offered today with faster speeds to our Prime

---

[144]  FTC Compl. ¶¶ 398-402.

[145]  FTC Compl. ¶ 399.

[146]  FTC Compl. ¶ 401.

[147]  *Id.*

[148]  FTC Compl. ¶ 403.

[149]  FTC Compl. ¶ 404.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 44 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

customers."[150]  But Defendant Wilke ruled that out.[151]  As for the sellers already in SFP, Amazon demanded that they fulfill orders themselves, rather than using independent fulfillment providers.[152]  "Most remaining SFP sellers have since left or been disqualified from the program."[153]

### 3.    Amazon Undermined Competition and Exploited Its Power Over Third-Party Sellers

136.         Amazon's dual role as an operator of its Marketplace that hosts third-party sellers, and a seller in that same Marketplace, creates an inherent conflict of interest.  This conflict incentivizes Amazon to exploit its access to competing sellers' data and information, among other misconduct.  Knowing that investors were acutely focused on these issues, Defendants made numerous materially false and misleading statements throughout the Class Period to alleviate any concerns about its business practices.

137.         In its July 2022 final report on competition in the digital marketplace summarizing the investigation, the Subcommittee concluded that Amazon routinely "employ[ed] strong-arm tactics" against third-party sellers on its platforms.[154]  To investors, Amazon described third-party sellers as "partners."  But Amazon's internal documents that the Subcommittee reviewed show that, behind closed doors, the Company refers to them as "internal competitors."

138.         Indeed, while Amazon has referred to third-party sellers on its Marketplace as "partners" and "customers," numerous small- and medium-sized third-party sellers told the Subcommittee that Amazon bullied and mistreated them for its own benefit.  The Online Merchants Guild, a trade association representing the interests of sellers engaged in online

---

[150]  FTC Compl. ¶ 405.

[151]  *Id.*

[152]  *Id.*

[153]  *Id.*

[154]  The House Committee on the Judiciary, Investigation of Competition in Digital Markets, https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf (July 19, 2022).

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 45 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

commerce, stated that it had "seen Amazon use their position of strength to take advantage of sellers."[155]

139.        As Stacy Mitchell, Co-Director of the Institute for Local Self-Reliance, noted during the Subcommittee's hearing on Innovation and Entrepreneurship, "Among the most egregious examples of Amazon's arbitrary treatment of sellers are its abrupt suspensions of their accounts, frequently made without explanation."  Once Amazon suspends a seller's account or delists its products, the business is left with largely ineffective remedies as they watch their sales disappear.  Sellers shared with the Subcommittee their experience that communications to Amazon's Seller Support Central generally prompt automated, unhelpful responses, which may be entirely unrelated to the specific case, question, or concern raised by the seller.

140.        Over the course of the investigation, the Subcommittee heard from numerous sellers who described abusive tactics or mistreatment by Amazon in a variety of circumstances.  For example, at the Subcommittee's January 17, 2020 hearing, CEO and Founder of PopSockets David Barnett testified about Amazon's bullying tactics, which he said were enabled by "the asymmetry in power between Amazon and its partners."[156]  He stated that after the two companies decided on a minimum price at which Amazon would sell PopSockets, Amazon sold the products for a lower price and then demanded that PopSockets pay for the lost margin.[157]  As a result, PopSockets decided to end its relationship with Amazon Retail.[158]  When PopSockets communicated this to Amazon, its response was, "No, you are not leaving the relationship."[159]  PopSockets did sever its relationship with Amazon Retail for a period of time, but reestablished it about a year later.[160]  Mr. Barnett estimates that, in 2019, his company incurred losses of

---

[155]  Submission from Online Merchants Guild, to H. Comm. on the Judiciary 3 (Oct. 29, 2019) (on file with Comm.).

[156]  Competitors Hearing at 22 (statement of David Barnett, CEO & Founder, PopSockets LLC), https://www.congress.gov/116/chrg/CHRG-116hhrg40788/CHRG-116hhrg40788.pdf.

[157]  *Id*. at 20.

[158]  *Id*.

[159]  *Id*. at 17.

[160]  *Id*. at 20-21.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 46 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

1  $10 million in revenue when he stopped selling to Amazon Retail and Amazon blocked one of his

2  authorized distributors from selling on the Marketplace.[161]

3  141.         The Subcommittee learned about numerous other instances of Amazon strong-

4  arming its third-party sellers.  One such company that conducts business with multiple divisions

5  of Amazon described how the platform leveraged its dominance in e-commerce to force

6  acceptance of certain terms and conditions during negotiations over a different part of its

7  business.[162]  According to this company, Amazon knows the power they have as a retailer.  In the

8  midst of negotiations, Amazon repeatedly referenced its power to destock the company's products

9  on Amazon.com as a "bargaining chip to force terms" unrelated to retail distribution on the

10 company.[163]

11 142.         Book publishers likewise described Amazon's exploitation of its asymmetric power

12 dynamic with its third-party sellers.  According to one publisher, "Amazon has used retaliation . . .

13 to coerce publishers to accept contractual terms that impose substantial penalties for promoting

14 competition" with Amazon's rivals.[164]  The publisher added that the platform's retaliatory conduct

15 shows "Amazon's ability and willingness to leverage its market power to prevent publishers from

16 working effectively with rival e-book retailers and, thereby, maintain and enhance its dominance

17 in e-book distribution."[165]

18 143.         Amazon's retaliatory tactics against publishers include removing the "buy" button,

19 which blocks a customer's ability to purchase a publisher's current titles;[166] and removing the "pre-

20 order" button, which eliminates the ability for a consumer to pre-order a publisher's forthcoming

21

22 _____

   [161] *Id.* at 4.

23 [162] Interview with Source 148 (Aug. 26, 2020).

24 [163] *Id.*

25 [164] Submission from Source 17, to H. Comm. on the Judiciary, 13 (Nov. 14, 2019) (on file with
   Comm.).

26 [165] *Id.* at 3 (Sept. 22, 2020) (on file with Comm.).

27 [166] *See, e.g.*, David Streitfeld, Amazon Pulls Thousands of E-Books in Dispute, N.Y. TIMES:
   BITS (Feb. 22, 2012), https://bits.blogs.nytimes.com/2012/02/22/amazon-pulls-thousands-of-
28 ebooks-in-dispute/?hpw.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 47 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

titles.[167]   Another form of retaliation that Amazon reportedly engaged in was falsely showing publishers' titles as out of stock or with delayed shipping times.[168]

144.       The Subcommittee described a third-party's complaint against Amazon as follows: "From the third-party retailers' perspective, Amazon Marketplace is like Hotel California, a lovely place to start or expand an online retail business, but check out from Amazon Marketplace and you can quickly find your business in bankruptcy."[169]   Additional comments from sellers that the Subcommittee interviewed include, "We're stuck.  We don't have a choice but to sell through Amazon,"[170] and, referring to Amazon, "They've never been a great partner, but you have to work with them."[171]

145.       In another example, a third-party bookseller told the Subcommittee that Amazon delisted 99% of his business's inventory in September 2019.[172]   The bookseller requested that Amazon return its products, which were stored in Amazon's warehouses.[173]   As of July 2020, Amazon had returned only a small fraction of the bookseller's inventory and continued to charge him storage fees.[174]   Amazon blocked the bookseller both from selling its products on its Marketplace and from retrieving its inventory, precluding the seller from trying to recover some of his losses by making sales through another, albeit smaller, channel.  At the Subcommittee's July 29, 2020 hearing, Representative Lucy McBath (D–GA) presented the bookseller's story to

---

[167] *See, e.g.*, Polly Mosendz, Amazon Blocks Pre-orders of Hachette Books, THE ATLANTIC (May 23, 2014), https://www.theatlantic.com/business/archive/2014/05/amazon-blacklists-hachettebooks/371545/.

[168] *See, e.g.*, David Streitfeld, Writers Feel an Amazon-Hachette Spat, N.Y. TIMES (May 9, 2014), https://www.nytimes.com/2014/05/10/technology/writers-feel-an-amazon-hachette-spat.html.

[169] Class Action Complaint at 20, *Frame-Wilson v. Amazon.com*, Inc., No. 20–cv–00424 (W.D. Wash. Mar. 9, 2020).

[170] Interview with Source 150 (July 11, 2020).

[171] Interview with Source 151 (July 2, 2020).

[172] Interview with Source 125 (July 7, 2020).

[173] *Id*.

[174] *Id*.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 48 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Defendant Bezos, who responded that this treatment is "not the systematic approach that [Amazon] take[s]."[175]   However, evidence the Subcommittee collected through extensive seller interviews shows that Amazon's poor treatment of sellers is not isolated to a handful of incidents—a fact supported both by public posts on Amazon's Seller Central forum,[176] as well as pleas for help routinely sent directly to Defendant Bezos.[177]

146.        Amazon third-party sellers are also precluded from pursuing their claims against Amazon in court and are instead forced into arbitration through forced and binding arbitration clauses.[178]   This puts them at a tremendous disadvantage.   Between 2014 and 2019, even as the number of Amazon sellers continued to grow by hundreds of thousands per year, only 163 initiated arbitration proceedings.[179]   Because sellers are generally aware that the process is unfair and unlikely to result in a meaningful remedy, they have little incentive to bring an action.[180]

147.        The Subcommittee's findings about Amazon's exploitation of—and competition with—its third-party sellers have recently been independently corroborated by the investigations

---

[175] CEO Hearing at 113 (statement of Jeff Bezos, CEO, Amazon.com, Inc.), July 29, 2020 https://www.govinfo.gov/content/pkg/CHRG-116hhrg41317/html/CHRG-116hhrg41317.htm.

[176] *See, e.g.*, iNOVATECHIMEDICAL, Inventory Being Held Hostage by Amazon for 3 Months, AMAZON SERVS. SELLER FORUMS (Apr. 8, 2020, 10:30 p.m.), *https://sellercentral*.amazon.com/forums/t/inventory-being-held-hostage-by-amazon-for-3-months/607892.

[177] *See* Josh Dzieza, Prime and Punishment: Dirty Dealing in the $175 Billion Amazon Marketplace, VERGE (Dec. 19, 2018), https://www.theverge.com/2018/12/19/18140799/amazonmarketplace-scams-seller-court-appeal-reinstatement ("Emailing the richest man in the world is actually the standard method of escalating an Amazon seller appeal.  It's called a Jeff Bomb, or . . . a Jeff Letter."); Interview with Chris McCabe, Founder, ecommerceChris LLC (Dec. 30, 2019) ("Out of desperation, some sellers try to email Jeff Bezos directly."); Submission from Source 125, to H. Comm. on the Judiciary (Jan. 27, 2020) (on file with Comm.); Submission from Source 150, to H. Comm. on the Judiciary (Aug. 16, 2017) (on file with Comm.).

[178] Amazon Services Business Solutions Agreement, https://sellercentral.amazon.com/help/hub/reference/external/G1791?locale=en-US.

[179] The House Committee on the Judiciary, Investigation of Competition in Digital Markets, https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf (July 19, 2022).

[180] *Id.*

conducted by the FTC and the Attorneys General of seventeen states.  According to the FTC and AG investigations, many third-party sellers complain of a wide-range of punitive measures implemented against them by Amazon, ranging from abrupt and arbitrary account suspensions to sellers having their inventory unexpectedly seized with no recourse.[181]  Indeed, the FTC Complaint cites an internal Amazon study detailing how the Company's sellers live "in constant fear" of Amazon arbitrarily interfering with their ability to sell on Amazon, which "put[s] their businesses and livelihoods at risk."[182]  The investigations uncovered that, for years, Amazon has employed (and continues employing) a price-surveillance group called the Competitive Monitoring Team, uniquely designed to uncover if Amazon's third-party sellers offer their products on other platforms at lower prices.[183]

148.        More specifically, Amazon has been employing its price surveillance team throughout the years to detect when its competitors, which according to individuals within the Company included third-party sellers, offer lower rates for products sold outside the Company's marketplace.  Rather than help third-party sellers, as it publicly claims, Amazon schemes to undercut them.  Amazon's top executives, including Defendants Bezos, Wilke, and Herrington have long known of these practices, and they themselves plotted to undermine third-party sellers who dared to offer discounts outside Amazon.  One example involved efforts to undercut the business of diapers.com, "a merchant on [Amazon's] site," as early as 2009.[184]  In February 2009, Herrington learned that diapers.com is Amazon's "biggest competitor in the diaper space. They keep the pressure on pricing on us. . . . They are a merchant on our site . . ."[185]  Herrington immediately ordered that Amazon "match pricing on these guys no matter what the cost."[186]

---

[181]  FTC Compl. ¶ 256.

[182]  *Id.*

[183]  *Id.* ¶ 263.

[184]  AMAZON-HJC-OO 151722-23 (2009 internal email chain).  Amazon's conduct *vis-à-vis* diapers.com was a focus of the Subcommittee's investigation that was commenced during the Class Period here.  *See infra* ¶ 199.

[185]  AMAZON-HJC-OO 151722-23.

[186]  *Id.*

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 50 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Following this order, several internal emails discussed how Amazon was "benchmarking" diapers.com.[187]  By May 12, 2009, Amazon's "benchmarking team" completed the study on diapers.com.  An email authored the same day noted that the benchmarking team "are presenting their findings to JeffB [Jeff Bezos] this afternoon."[188]

149.        Roughly one year later, on June 8, 2010, Bezos emailed a group of high-level Company executives, including Herrington and Wilke, that "there's a techcrunch post yesterday about diapers.com's parent co launching soap.com.  Tens of thousands of skus.  What do we make of this?"[189]  Roughly two hours later, Herrington responded to Bezos's request for an action plan, stating in relevant part:

> Given diapers.com's strength and competencies, soap.com is our most significant short term competitor in the hpc space.  What are we doing?
>
> 1.    We have already initiated a more aggressive "plan to win" against diapers.com in the diaper/baby space, which includes market leading pricing on diapers ("double your SNS discount to 30% off diapers and wipes"), a free PRIME offering for new Moms, and a structured and marketed "Amazon Mom" program".  Per Greg's suggestion on Friday, we are scheduling some time to review this with you.  To the extent this plan undercuts the core diapers business for diapers.com, it will slow the adoption of soap.com.
>
> 2.    Ensure price and selection parity with the soap.com assortment at launch.  This is table-stakes, but we are gearing up CMT and our vendor managers to ensure we have pricing and selection parity day 1 of their launch.

150.        Later that same day, Herrington sent an email noting that he is "scheduling a deeper discussion with bezos [Jeff Bezos] on the topic: Plan to Win (esp w/in context of soap.com)."[190]  Subsequently, Amazon proceeded to undercut diapers.com's business by temporarily slashing the price of those products.[191]  An internal profit-and-loss statement from

---

[187]  AMAZON-HJC-OO 142833-42 (2009 internal email chain).

[188]  *Id.*

[189]  AMAZON-HJC-00132026 (2010 internal email chain).

[190]  *Id.*

[191]  That Amazon affirmatively took steps to undercut diapers.com's business was not known until the House Judiciary Committee published certain internal Company emails in July 2020—during the Class Period.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Amazon showed that in one month alone, Amazon was willing to bleed over $200 million in diaper profit losses to undercut the third-party seller.[192]

151.      The "aggressive 'plan to win'" at all costs worked.   In an email sent on September 21, 2010, Peter Krawiec, the Company's then Vice President of Worldwide Corporate Development, informed Wilke and Herrington that "[i]f you have not looked at management's forecast you should when you get a few mins.  [*T*]*hey expect to lose lots of money over the next few y*[*ea*]*rs- this will make it worse*.  They also expect a lot of their growth to come from soap.com which is unproven and less growth from diapers.  In the end soap.com is projected to be bigger than diapers.com." (emphasis added).[193]

152.      Eventually, Amazon acquired the struggling diapers.com, cut its promotions and discounts on diapers, and ultimately increased the prices on diapers.[194]

153.      According to the FTC and the Attorneys' General's investigations, Amazon uses its price-surveillance team to punish third-party marketplace sellers who offer lower prices on competing online stores.[195]   Amazon imposes other contractual obligations suppressing price competition on its most important sellers, backed up by the threat of even stronger penalties, including banishing those sellers from using Amazon's marketplace.[196]  The Company also deters third-party sellers from even attempting to compete with Amazon's first-party retail business on

---

[192]  CEO Hearing (question of Rep. Mary Gay Scanlon (D–PA), Vice Chair, H. Comm. on the Judiciary), https://www.govinfo.gov/content/pkg/CHRG-116hhrg41317/html/CHRG-116hhrg41317.htm. (July 29, 2020).

[193]  AMAZON-HJC-00009716 (2010 internal email chain).

[194]  CEO Hearing (question of Rep. Mary Gay Scanlon (D–PA), Vice Chair, H. Comm. on the Judiciary), https://www.govinfo.gov/content/pkg/CHRG-116hhrg41317/html/CHRG-116hhrg41317.htm. (July 29, 2020).  As discussed elsewhere herein, Amazon's mistreatment of diapers.com is emblematic of how poorly Amazon has treated third-party sellers for years, including during the Class Period.  *See generally* Part IV.B (¶¶ 63-215).

[195]  FTC Compl. ¶ 263.

[196]  *Id.*

1   price by ensuring that the third-party seller's lower prices do not result in greater scale, only lower

2   margins.[197]

3   154.          More specifically, the investigations uncovered that using its vast surveillance

4   network, Amazon **systematically** punishes sellers when Amazon detects a lower price on other

5   online stores.[198]  "One way Amazon punishes sellers is by disqualifying a seller's offer from

6   appearing in the Buy Box when Amazon finds a lower price on another online store for an item

7   being sold by a seller on Amazon."[199]  For many sellers, losing the ability to qualify for the Buy

8   Box is an existential threat to their business.  Another way Amazon punishes sellers is by imposing

9   contractual obligations on certain important sellers,[200] backed up with the threat of even stronger

10  penalties, including total banishment from Amazon's marketplace.[201]

11  155.          As explained in more detail below, the investigations leave no room for doubt that

12  Amazon's top executives, including many of the Individual Defendants, were acutely aware of the

13  Company's various practices.  Indeed, Defendant Herrington internally explained that policing

14  sellers to prevent them from discounting elsewhere, so Amazon can maintain a reputation for

15  having low prices, is "a dirty job, but we need to do it."[202]

16  156.          The investigations also detail how Amazon penalized third-party sellers over the

17  years when it found lower prices being offered outside the Amazon platform.  The Company

18  initially included a clause in its Business Solutions Agreement, a contract it imposed on all third-

19  party sellers, which explicitly prohibited sellers from offering lower prices elsewhere.[203]  From at

20  least as early as 2011 until March 2019, this contract required each seller to "maintain [price]

21

22  [197] *Id.*

23  [198] *Id.* ¶ 269.

24  [199] *Id.*

25  [200] As described in the FTC Complaint, Amazon, through its ASB program (discussed below),
     contractually prevents brands from offering lower prices elsewhere online even when it would be
26  profitable for them to do so, including on their own websites, *id.* ¶ 310.

27  [201] *Id.*

     [202] *Id.* ¶ 268.

28  [203] *Id.*

---

**SECOND CONSOLIDATED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** - 53 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  parity" between Amazon and other online sales channels.  This provision ensured that a seller
2  could not offer lower prices on other online stores without breaching their Amazon contract, even
3  when their selling costs were lower on those stores.[204]

4  157.       In December 2018, U.S. Senator Richard Blumenthal sent public letters to the FTC
5  and the U.S. Department of Justice expressing "deep[] concern[] that the price parity provisions in
6  Amazon's contracts with third-party sellers could stifle market competition and artificially inflate
7  prices on consumer goods."[205]  Three months later, Amazon supposedly dropped this contractual
8  provision, but behind the scenes the Company found other ways to prevent and/or punish third-
9  party sellers who offered lower prices elsewhere.[206]

10  158.       An internal Company document dated just weeks after Amazon supposedly
11  dropped its contractual price parity requirement specifically acknowledged that Amazon would
12  employ an expanded mechanism called "Select Competitor-Featured Offer Disqualification," or
13  "SC-FOD," to accomplish the same goal as the contractual parity provision did.[207]  SC-FOD is an
14  Amazon algorithm that disqualifies a seller's offer from winning the Buy Box if Amazon detects
15  a price that is lower, even by a penny, for that product on any online store that Amazon designates
16  as a "Select Competitor."  If Amazon disqualifies every offer for a given product from winning
17  the Buy Box, Amazon removes the Buy Box itself from the product's Detail Page.[208]

18  159.       Amazon initially designated only the very largest online stores as "Select
19  Competitors."  After dropping the price parity clause from its Business Solutions Agreement,
20  Amazon exponentially expanded its classification of "Select Competitors."  According to a senior
21  Amazon executive, Amazon expanded this designation to make "the punitive aspect" of SC-FOD
22  "more effective."[209]

---

[204]  *Id.*

[205]  *Id.* ¶ 274.

[206]  *Id.* ¶¶ 274-75.

[207]  *Id.* ¶ 276.

[208]  *Id.* ¶ 277.

[209]  *Id.* ¶ 280.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 54 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

160.      Internally, Amazon acknowledged that its expansion of SC-FOD appears to be "not only trivial but a trick and an attempt to garner goodwill with policymakers amid increasing competition concerns."[210]

161.      Amazon threatens third-party sellers with punishment if it detects a lower price offered by these sellers on other online platforms.  In 2022 alone, for example, Amazon told thousands of sellers that a "pre-requisite" to "win[ning] the 'Buy Box'" is to ensure that lower prices are never available outside Amazon.[211]  Internally, Amazon knew all too well that blocking a seller from using the Buy Box "tank[s]" that seller's sales.[212]

162.      The investigations revealed that Amazon penalizes third-party sellers using a variety of punitive measures, including demoting third-party sellers in search results; hiding their prices on the Search Results page; excluding them from Sponsored Products advertisements; and prohibiting them from appearing in certain recommendation widgets.[213]

163.      In addition to using the SC-FOD mechanism to punish third-party sellers offering lower price products on other platforms, the investigations revealed that Amazon continues to contractually prohibit its most important third-party sellers from discounting elsewhere.  These prohibitions appear in "Amazon's Standards for Brands" ("ASB") program.[214]  Amazon applies ASB to brands, brand licensees, and brand representatives that use Amazon's Marketplace ("ASB sellers").[215]  Amazon can, at its own discretion, designate a seller as an ASB seller even if the seller objects.[216]

164.      Amazon considers ASB sellers particularly important for several reasons.  *First*, ASB sellers make up a large volume of third-party sellers.  For example, in 2021, 55% of Amazon

---

[210] *Id. ¶* 276.

[211] *Id.* ¶ 281.

[212] *Id.* ¶ 284.

[213] *Id.* ¶ 283.

[214] *Id.* ¶ 286.

[215] *Id.* ¶ 287.

[216] *Id.* ¶ 287.

Marketplace sales were by ASB sellers, and the Company projected they would sell more than $151 billion of products on Amazon in 2022.[217]  *Second*, ASB sellers have a close relationship with the brands they sell so they have more control over brand prices and selection across channels than "resellers," who do not enjoy such a close relationship, a fact internally highlighted by a founding member of the Amazon team responsible for ASB.[218]

165.      The investigations uncovered that Amazon implemented ASB in September 2018 through an amendment to the Business Solutions Agreement.[219]  Through ASB, Amazon contractually requires ASB sellers to ensure that the prices for products they offer online on other platforms are as high or higher than their prices on Amazon at least 95% of the time.[220]  Amazon also imposes strict contractual requirements on ASB sellers related to product selection, in-stock rates, and Prime eligibility.  Specifically, the selection requirement compels ASB sellers to sell most of their selection on Amazon; the in-stock requirement compels ASB sellers to have nearly all of their inventory in-stock and ready for sale to Amazon customers; and the Prime eligibility requirement compels ASB sellers to use Amazon's fulfillment service for the vast majority of their products.[221]

166.      The investigations revealed that if an ASB seller violates any part of ASB, Amazon threatens not just to kick ASB sellers' offers out of the Buy Box, but to foreclose them from selling on Amazon's Marketplace altogether.[222]  Thus, Amazon punishes ASB sellers if they offer lower prices or a different selection of products on other platforms; if they fail to meet certain inventory in-stock levels; or if they do not ensure that most of their products are Prime eligible.[223]  In addition to closing their accounts, Amazon also places limits on which products or brands ASB sellers are

---

[217] *Id.* ¶ 288.

[218] *Id.* ¶ 289.

[219] *Id.* ¶ 290.

[220] *Id.* ¶ 291.

[221] *Id.* ¶ 292.

[222] *Id.* ¶ 294.

[223] *Id.*

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 56 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

allowed to sell.[224]   Amazon imposed these restrictions throughout the Class Period.  The FTC complaint provides several examples of such improper restrictions imposed by Amazon on ASB sellers during the Class Period.  By way of example, Amazon will threaten an ASB seller's "privileges"—including the "privilege" to "operate as a seller in the Amazon store altogether"—if the ASB seller violates any part of ASB.  In other words, Amazon threatens not just to move ASB sellers' offers out of the Buy Box but to remove them from Amazon's Marketplace altogether if they offer lower prices or a different selection of products on other online stores.  Additionally, Amazon also places limits on which products or brands sellers are allowed to sell.[225]

167.        The results of the investigations show that the development of ASB is traced directly to Defendant Herrington having reached a "boiling point" because "well-known brands" were using "other marketplaces" and "competitor sites" to sell products "at significantly lower prices than on Amazon."[226]

168.        Amazon left no room for doubt about the reasons for penalizing third-party sellers in its messages to ASB sellers: they were sanctioned because "customers considering your products could have easily found your products cheaper at another major retailer, and may have chosen to shop elsewhere."[227]  Amazon offered to restore the ASB sellers' privileges, however, if the ASB sellers met the ASB requirement that their off-Amazon prices were as high as their on-Amazon prices at least 95% of the time.[228]

169.        ASB sellers capitulated when Amazon confronted them.  For instance, in 2019, Amazon punished an ASB seller because it offered its products at a discount on another online platform.  After hearing from Amazon, the seller committed to act within days to "fix the prices at the other Retailers" by directing their "wholesale team" to make sure that all their online prices

---

[224] *Id.* ¶ 295.

[225] *Id.* ¶¶ 294-95.

[226] *Id.* ¶ 296.

[227] *Id.* ¶ 297.

[228] *Id.*

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 57 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

were at least as high as their Amazon prices.[229]  In late 2021, another ASB seller told a top-level Amazon executive that ASB is a "Brand Killer."  The ASB seller said that "[t]he ASB Team is trying to dictate the prices at which we sell inventory . . . . This may, in turn, cause us to raise prices in other sales channels in order to keep Amazon offers. . . . This is a lose-lose situation for all parties involved."[230]  A late 2021 internal program assessment conducted by Amazon underscored that the Company's punishments had their desired effect,  as they created a "strong incentive" for ASB sellers to ensure that their products are not priced lower elsewhere.[231]

170.	The investigations further uncovered that, in addition to the ASB program, Amazon employs another mechanism modeled on ASB called "Customer Experience Ambassadors" ("CXA").[232]  Amazon adopted CXA out of concern that some of its largest sellers could "[g]et [t]oo [b]ig" and use their size to "divert traffic away from Amazon, either by providing competing fulfillment capabilities and [P]rime like benefits through their own store, or by selling to a competitor with these capabilities."[233]  CXA demands a 98% price parity from some of the largest Amazon third-party sellers.[234]  Amazon targets these "top Sellers" because it knows that they "have an outsized impact on [c]ustomers' shopping experience."[235]  These sellers collectively sold billions worth of products from June 2020 through June 2021 alone.[236]  Like ASB, CXA is neither "optional nor negotiable" for third-party sellers.[237]

171.	The punishments imposed by Amazon, including its price-parity demands, have hurt third-party sellers because they have no option but to pay the high fees charged by the

---

[229] *Id.* ¶ 299.

[230] *Id.* ¶ 300.

[231] *Id.* ¶ 301.

[232] *Id.* ¶ 302

[233] *Id.* ¶ 303.

[234] *Id.* ¶ 302.

[235] *Id.*

[236] *Id.*

[237] *Id.*

1    Company when selling on Amazon's marketplace.  Indeed, an internal 2018 analysis conducted

2    by the Company concluded that "it has become more difficult over time [for third-party sellers] to

3    be profitable on Amazon."[238]

4    172.        The investigations also unearthed that Amazon uses a first-party anti-discounting

5    algorithm developed to discipline third-party sellers from lowering their prices.[239]  Through this

6    mechanism, Amazon detects and deters price discounts, artificially inflates prices on and off

7    Amazon, and deprives third-party sellers of their ability to gain scale from lower-price offerings.[240]

8    When using its first-party anti-discounting algorithm, Amazon disciplines sellers by immediately

9    copying—but never undercutting—prices.[241]  If the lowest price by a monitored online store or

10   marketplace seller increases (or the product goes out of stock), Amazon automatically increases

11   its Retail price to copy the new lowest price.[242]  If Amazon detects a "lowest price" drop, Amazon

12   automatically copies that move.[243]  And if the "lowest price" increases, Amazon automatically

13   copies again without even considering whether it could earn more business by continuing to offer

14   the lower price to customers.[244]

15   173.        The architect of this first-party algorithm was Defendant Wilke.[245]  Inside Amazon,

16   Wilke observed that the algorithm allows Amazon to avoid a "perfectly competitive market."[246]

17   Wilke noted that Amazon uses a "game theory approach" where Amazon will "never move first"

18   to lower prices.[247]  Wilke admitted that if Amazon detects a price change,  it replicates it to the

19

20   _____

21   [238]  *Id.* ¶ 315.

     [239]  *Id.* ¶¶ 325-26.

22   [240]  *Id.*

23   [241]  *Id.* ¶ 329.

24   [242]  *Id.*

25   [243]  *Id.*

     [244]  *Id.*

26   [245]  *Id.* ¶ 327.

27   [246]  *Id.*

28   [247]  *Id.* ¶ 328.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1   penny, with the net effect that "prices will go up."[248]  Wilke is also quoted as saying that the first-

2   party discounting algorithm has "work[ed]" just as he planned.[249]

3   174.        The investigations referred to several examples showing how the first-party anti-

4   discounting scheme worked.  One example involved a company called Zulily, an online superstore

5   market specializing in homeware, children's products, and women's clothing.[250]  In late 2019,

6   Zulily implemented a "Best Price Promise" strategy that depicted the products it offered, which

7   were priced at a discount, along the same products offered by Amazon's marketplace, which were

8   higher priced.[251]  Amazon then sprang into action, with Zulily's suppliers losing Amazon's Buy

9   Box.[252]  For instance, a supplier of infant care products informed Zulily that Amazon retaliated by

10  removing the Buy Box on approximately 2,000 of the supplier's products.[253]

11  175.        A recent complaint filed by Zulily against Amazon provides several additional

12  examples where Amazon punished its third-party sellers who also were Zulily suppliers because

13  they offered products on Zulily at a discount.  In November 2020, a supplier of beauty products

14  asked Zulily if "there is a way you can increase the sale prices?  I am receiving complaints from

15  several of my online retail partners (especially the exclusive partner for the Amazon

16  marketplace). . . . When Amazon detects a substantially lower price for the same item, Amazon

17  will automatically reduce traffic and un-feature the item on Amazon.  Thus, the sales on Amazon

18  dropped significantly and my Amazon partner was not happy about this."[254]  When Zulily pushed

19  back, the seller responded that "I don't think I can allow deep discounts for selling [my] items [on]

20  online channels anymore . . . . Can you please raise the prices to  at least $29.98? . . . I am running

21

22

---

[248]  *Id.*

[249]  *Id.* ¶ 332.

[250]  *Id.* ¶ 343.

[251]  *Id.* ¶ 344.

[252]  *Id.* ¶ 346.

[253]  *Id.*

[254]  Compl. ¶ 130, *Zulily, LLC v. Amazon.com, Inc.*, No. 2:23-cv-01900 (W.D. Wash. Dec. 11, 2023).

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 60 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  into a much bigger issue if I can't solve this matter by next week."[255]  Ultimately, this Amazon

2  third-party seller left Zulily.[256]

3  176.        In August 2021, a personal care electronics brand asked Zulily if it "[w]ould it be

4  possible to update the retail on the below [item] to $19.99 ASAP. . . . This is currently below MAP

5  [minimum agreed pricing] . . . . Unfortunately we will need to have this sku removed if it cannot

6  be increased . . . . This caused the amazon listing to be pulled down.  We also need the [other item]

7  updated to $36.95 in all colors."[257]  The Amazon third-party seller told Zulily that "[u]nfortunately

8  Amazon has implemented strict pricing requirements and they will remove any deals with lower

9  pricing elsewhere.  We are going to take an extremely big hit to revenue because of this and cannot

10 afford for this to happen again.  Previously we were ok to run lower than MAP pricing . . . , but

11 moving forward we need all MAP pricing to be implemented for all skus."[258]  While Zulily tried

12 to work with this supplier to "hide" its prices until the customer added the product to the cart, the

13 seller later notified Zulily that "[i]t looks like there is an issue here again with items being below

14 MAP/price not hidden . . . . At this point [we] want[] to remove all deals and inventory until Q1

15 since this has happened several times and is causing a big disruption to the Amazon business . . . .

16 [W]e . . . have no choice but to remove [our product] from Zulily unless they began to sell at or

17 above MAP permanently going forward . . . .  We simply cannot afford buy-box shutdowns on

18 Amazon anymore."[259]  Eventually, the Amazon third-party seller ended its relationship with

19 Zulily.[260]

20 177.        In yet another example, an Amazon third-party seller of apparel informed Zulily in

21 January 2020 that "we have had almost 2000 skus suppressed on Amazon because of [lower prices

22 on this competing retailer's site] . . . . Amazon has told us indirectly that [you are] the issue with

---

[255]  *Id.*

[256]  *Id.*

[257]  *Id.* ¶ 131.

[258]  *Id.*

[259]  *Id.* ¶ 132.

[260]  *Id.* ¶ 133.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 61 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

all of their inactive skus . . . . As much as I dislike Amazon, and like [you], [t]he fact is we sell more on Amazon . . . . I'm left with [limited] options," including: "[w]e will have to move up our price on [your site]" [or] "[w]e have to stop selling our best selling styles to [you]."[261]

178.     In January 2020, a housewares supplier asked Zulily to stop showing Amazon price comparisons with its products because "Amazon is connecting that the same item is being sold for much less, and we are losing the buy box on Amazon.  That results in barely any to no sales, on items we sold 100s before."[262]  The supplier added that "[w]e are trying to figure out how to strategize going forward we keep having to remove items."[263]

179.     Amazon not only punished these and other third-party sellers, but also employed its anti-discounting algorithm against Zulily to stymie competition.  This maneuver caused "continuous price spirals" that led Zulily to drop products from its online store.[264]  Internal Amazon documents show that the tactic worked, resulting in a "consistent drop" in Zulily traffic.[265]  Amazon's Vice President of Pricing demanded that his team "keep going" to completely wipe out price competition.[266]  In the end, Zulily had no choice but to abandon its  "Best Price Promise" program and to remove all Amazon price-comparisons from its website.[267]

180.     In addition to the internal communications identified in the FTC Complaint, internal Amazon emails dating back to June 2016, uncovered by Plaintiffs' counsel, show how Herrington, Wilke, and Sebastian Gunningham, the Senior Vice President of Amazon Marketplace, were forcing third-party sellers to take certain actions detrimental to themselves in order to benefit Amazon.  In those emails, Herrington, Wilke, and Gunningham discussed various "supplier" tenets.  The word "supplier" in those emails refers to third-party "vendors" and "sellers"

---

[261] *Id*. ¶ 134.

[262] *Id*. ¶ 135.

[263] *Id*.

[264] *Id*. ¶ 136.

[265] *Id*. ¶ 137.

[266] *Id*. ¶ 138.

[267] *Id*. ¶ 139.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 62 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  on Amazon's marketplace, meaning "anyone who has product for sale on [Amazon's] website,

2  regardless if they are a traditional vendor or seller." One of the "tenets" discussed (tenet number 5)

3  was that Amazon will "***force***" suppliers (*i.e.*, third-party vendors or sellers) to "either lower the

4  price, provide the selection or enter the Amazon Reseller program" "[i]f it is determined that an

5  Amazon Customer has access to a lower price or selection off of Amazon." The emails also

6  described Amazon's Reseller program, "where Amazon negotiates a price with the Supplier (*i.e.*,

7  third-party vendors or sellers)" as "really tough on business terms" with the Suppliers.

8  181.        Moreover, a separate investigation conducted by the State of California's Attorney

9  General's Office, which led to a complaint being filed for violations of competition law, found

10  that Amazon engaged in a number of improper practices designed to suppress competition and to

11  benefit Amazon at the expense of third-party sellers.[268] The California Attorney General's Office

12  refers to its investigation as "widespread and sourced from multiple levels of the market, including

13  the internal files of Amazon and the Office's independent investigation of data, documents, and

14  witnesses."[269]

15  182.        According to the California Attorney General's investigation, Amazon's internal

16  documents show that it was aware that its price parity provisions are "perceived as an alleged

17  disincentive to price competition" and that they "encourage[] Sellers to raise their prices on

18  competitor websites."[270]  "Individual third-party sellers and wholesale suppliers have told the

19  [AG's] Office that they would offer lower prices or allow discounting on competing sites if

20  Amazon did not demand price parity."[271]  Moreover, "Ecommerce consultants—experienced

21  market participants who advise third-party sellers and wholesale suppliers on how to sell and be

22  successful on Amazon—tell their clients not to offer or allow lower prices off Amazon. They have

---

[268] *The People of the State of California v. Amazon.com, Inc.*, CGC-22-601826 (Cal. Super. Ct. Apr. 5, 2023)  ("California Compl."). Amazon's demurrer to the complaint was overruled. *The People of the State of California v. Amazon.com, Inc.*, CGC-22-601826 (Cal. Super. Ct. Mar. 30, 2023).

[269] California Compl. ¶ 12.

[270] California Compl. ¶ 8.

[271] *Id.* ¶ 12.

1    confirmed to the Office that their clients would offer lower prices and greater selection and allow

2    more discounting off Amazon were it not for Amazon's price parity policies."[272] Likewise, "major

3    online retail stores—*i.e.*, Amazon's primary competitors—confirmed to the [AG's] Office that

4    sellers told them that they cannot offer lower prices or participate in discount events, or in some

5    cases offer their products at all, on those competing retail sites because of Amazon price parity."[273]

6    And, "Amazon's own internal documents and the [AG's] Office's data analyses confirm that

7    merchants generally do not lower their prices on or to Amazon to comply with the prohibition on

8    relative discounting off Amazon."[274]   The California Attorney General's investigation found that

9    "Amazon has misled consumers into believing they are getting the low prices that would prevail

10   in a competitive market when, in fact, it has deliberately caused prices to be generally higher

11   everywhere else than they would be absent price parity."[275]

12   183.         Internal Amazon documents reviewed by the California Attorney General's office

13   show that just a few months after Amazon supposedly eliminated its contractual price parity

14   provisions, the Company planned to expand penalties for sellers offering lower prices outside

15   Amazon's marketplace.[276]   An Amazon director internally acknowledged that the expanded

16   penalties "may generate pushback given recent positive press about our change to remove the

17   previous price parity clause which required 3P [third-party] Sellers to price their products on

18   Amazon lower than they price them anywhere else."[277]

19   184.         Internal Amazon communications show that the price parity requirements did not

20   change after the Company removed the provision form its Business Solutions Agreement

21

22

23

24   [272] *Id.*

25   [273] *Id.*

26   [274] *Id.*

27   [275] *Id.*

28   [276] *Id.* ¶ 14.

     [277] *Id.*

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 64 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

("BSA").[278, 279]   One document prepared around March 2019 made clear that with "the recent removal of the price parity clause in our BSA . . . our expectations and policies have not changed."[280]   As a Director at Amazon internally explained, sellers asked "Didn't you just remove your price parity clause which means I can set whatever prices . . . ?  And the answer is no."[281]

185.       The California Attorney General's investigation uncovered that "[a]t the time Amazon retired the explicit price parity provision from its BSA in March 2019, Amazon deliberately did not inform sellers that they were no longer required to maintain the same or higher prices via their other sales channels as they offered on Amazon."[282]   According to that investigation, "[w]hile Amazon claims to regulators that it welcomes sellers offering different pricing off Amazon, a corporate representative for Amazon with direct responsibility for seller pricing confirmed under oath she is unaware that Amazon has actually communicated this to sellers and that Amazon does not encourage sellers to price their products lower off Amazon than on Amazon and does not tell sellers that they can offer a lower price on other sales channels.  The only direct communications are to the contrary; Amazon directly communicates to sellers, 'we welcome sellers advertising the same pricing and discounts off-Amazon as they offer in our store.'"[283]

186.       Indeed, the California Attorney General's investigation found that, throughout the period covered by this action (i.e., the Class Period), Amazon punished sellers violating its coerced price parity requirements with removal (or the threat of removal) of the sellers' products from the Buy Box.[284]   In fact, Amazon expanded the punishment of sellers during this time period.[285]   The

---

[278]  *Id.* ¶ 125.

[279]  Amazon coerced its third-party sellers to sign a Business Solutions Agreement requiring them to comply with certain selling terms and policies.  *Id.* ¶ 113.

[280]  *Id.* ¶ 125.

[281]  *Id.*

[282]  *Id.* ¶ 128.

[283]  *Id.* ¶ 130.

[284]  *Id.* ¶¶ 132-37.

[285]  *Id.* ¶¶ 135-38.

---

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 65 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Company did so to penalize sellers who were "promoting" "lower prices" outside Amazon and thereby "succeeding in driving traffic away from Amazon."[286]

187.     While Amazon pressures third-party sellers to increase their prices, Amazon's Director of Worldwide Pricing admitted under oath during the California Attorney General's investigation that "it's outside of the scope of what—where we would have authority" to "tell sellers anything, really, about how they should operate in channels outside of Amazon" regarding price.[287]

188.     According to the California AG investigation, Amazon has a Competitor Monitoring Team tasked with prying on competitors.[288]  Since at least 2007 and throughout the Class Period, at the request of Defendant Wilke, Amazon has used what it labels a "tit-for-tat" pricing strategy that encouraged third-party sellers to *raise* their prices on Amazon if the prices were raised elsewhere.[289] Amazon pitched this strategy as an inducement for sellers purportedly "to increase your chances of becoming the Featured Offer."[290]

189.     In the meantime, Amazon charges third-party sellers on its platform exorbitant fees, higher than any other competing platform.[291]  In an internal August 2017 study, Amazon found that the "Total Effective Fee Rates (sum of all fees paid by Sellers, including referral, storage, fulfillment, and advertising, as a percentage of selling price)" paid by sellers that used FBA were 25% of their sales revenues, versus 7% paid by sellers to Shopify, 10% to eBay, 16% to Walmart,

---

[286]  *Id.* ¶ 137.

[287]  *Id.* ¶ 163.

[288]  *Id.* ¶ 32.

[289]  *Id.* ¶¶ 33-34.

[290]  *Id.* ¶ 34.

[291]  *Id.* ¶¶ 55-56.  These include fees for sponsored ads that have become a "must" for third-party sellers.  During the Class Period, Amazon received numerous complaints from consumers complaining that the sponsored ads steered them to irrelevant and expensive products.  *Id.* ¶¶ 76-77.  Amazon's chief economist internally noted the "secondary impacts on customer experience at Amazon stores" of ads as they "are not relevant to the customer's search, and/or lead to increases in prices."  *Id.* ¶ 78.

1  and 16% to Jet.com.[292]   Amazon continued to extract such mammoth fees throughout the Class
2  Period.[293]

3  190.      Amazon internally acknowledges that "[i]n the past, Sellers faced a flat 15%
4  referral fee and the choice between FBA and MFN," but now they face significant "complexity,"
5  and Amazon repeatedly "hear[s] from Sellers that they . . . find it increasingly difficult to evaluate
6  their fees to make decisions as we introduce new fulfillment and advertising fees."[294]   Amazon
7  found "[i]n a recent study, 83% of 1,668 Sellers indicated that they had difficulty making business
8  decisions based on our published fee schedule and had trouble accurately estimating their fees
9  across tools."[295]   But third-party sellers have no other real alternatives.[296]   The California Attorney
10 General's complaint quotes an aggrieved third-party seller noting that "Amazon's power over
11 online merchants is not just in sales, but also in the way that sellers are treated," with the typical
12 seller "ha[ving] zero bargaining power whatsoever . . . in their negotiations with Amazon.
13 Everything is take it or leave it . . . . All of the bargaining power rests with Amazon."[297]   Another
14 third-party seller noted the sellers' lack of any power whatsoever to negotiate terms with the
15 Company, with "Amazon "chang[ing] its policies for sellers regularly and with little notice."[298]
16 This seller remarked that "[a]s a company whose whole business is dependent on sales on Amazon,
17 when Amazon makes a policy change with little to no notice, it dramatically impacts [this seller's]
18 business in a negative way."[299]

19
20
21
22 _____
   [292]  *Id.* ¶ 56.
23 [293]  *Id.*
24 [294]  *Id.* ¶ 65.
25 [295]  *Id.*
26 [296]  *Id.*
27 [297]  *Id.* ¶ 66.
   [298]  *Id.* ¶ 67.
28 [299]  *Id.*

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 67 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

191.        Given their fear of retaliation, third-party sellers are afraid to speak publicly about their grievances with Amazon.[300]  Internally, Amazon acknowledges this fact.[301]

### 4.    Amazon Routinely Favored Its Own Private-Label Products to the Detriment of Third-Party Sellers

192.        By virtue of its role as an intermediary in the Marketplace, Amazon can give itself favorable treatment relative to competing sellers.  It has done so through its control over the Buy Box, as well as by granting itself access to data and tools that are off-limits to third-party sellers. Most recently, there have been reports that Amazon has given preferential treatment to its own non-essential products over competitors' non-essential products during the global pandemic.

193.        One tool that Amazon Retail uses to benefit its own business is Amazon Vine, a review-generating program.[302]  In interviews the Subcommittee conducted with market participants, many sellers said that good reviews are critical for a product to be successful online.[303] Accordingly, sellers aim to obtain as many positive reviews as possible early in a product's life cycle.  At one time, it was permissible for Amazon sellers to provide incentives such as free samples to reviewers.  However, in 2016, it was reported that some sellers were generating fake reviews.[304]  In response to these reports, Amazon announced that it would ban incentivized reviews except for those obtained through its own incentivized review program, Amazon Vine.[305]  As a result, sellers lost access to this program, regardless of whether they were engaged in bad conduct or not.

---

[300]  *Id.* ¶ 68.

[301]  *Id.*

[302]  Innovation and Entrepreneurship Hearing at 509 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Couns., Competition, Amazon.com, Inc.).

[303]  *See, e.g.*, Interview with Source 125 (July 7, 2020) (explaining that the inability to move customer reviews from Amazon to other marketplaces is a barrier to use of other marketplaces, due to the importance of customer feedback for seller reputation).

[304]  Elizabeth Weise, Amazon Bans "Incentivized" Reviews, USA TODAY (Oct. 3, 2016), https://www.usatoday.com/story/tech/news/2016/10/03/amazon-bans-incentivized-reviews/91488702/.

[305]  *Id.*

194.         For many years, including after the incentivized-reviews ban, the Amazon Vine program was not available to third-party sellers, while Amazon continued to enjoy the program's ability to "minimize marketing costs associated with generating awareness early in a product's lifecycle," among other benefits.[306]  An Amazon internal document described other advantages of the program as "[d]riv[ing] conversion and sales with more insightful reviews on detail pages," and "contribute[ing] to higher order counts and sales."[307]

195.         By both banning incentivized reviews and excluding third-party sellers from the Amazon Vine program, Amazon allocated to itself a significant marketing advantage over the other businesses with which it competes on its platform.

196.         Amazon's dual position as both operator and seller on its Marketplace also provides it with the ability to disadvantage competitors that seek to sell or advertise on its platform.  One way that Amazon does this is by limiting certain rivals' ability to buy Amazon.com search advertising—ads that present products at the top of the search results when consumers enter specific search terms or a product name.  As *Wall Street Journal* reported on September 20, 2020, although "search advertising is a lucrative part of the company's business," Amazon "won't let some of its own large competitors buy sponsored-product ads tied to searches for Amazon's own devices."[308]

197.         *Wall Street Journal* also reported that Roku, Inc. "can't even buy [ ] Amazon ads tied to its own products."[309]  Consistent with this report, a competitor of Amazon that manufactures

---

[306] Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00146732 (Dec. 14, 2017) (on file with Comm.); Spencer Soper, Amazon Doles Out Freebies to Juice Sales of Its Own Brands, BLOOMBERG NEWS (Oct. 16, 2018), https://www.bloomberg.com/news/articles/2018-10-16/amazon-doles-out-freebies-to-juice-sales-of-its-own-brands.

[307] Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00146732 (Dec. 14, 2017) (on file with Comm.); *see also id*. at AMAZON–HJC–0059576 (Nov. 22, 2010) (describing the program as "[g]reat for new product launches—good for seeding").

[308] Dana Mattioli et al., Amazon Restricts How Rival Device Makers Buy Ads on Its Site, WALL ST. J. (Sept. 22, 2020), https://www.wsj.com/articles/amazon-restricts-advertisingcompetitor-device-makers-roku-arlo-11600786638.

[309] *Id*.

---

voice-enabled devices told the Subcommittee that Amazon prohibited it from buying ads on Amazon.com.[310]  The competitor expressed concerns about the harm this could cause consumers, who may be confused or deceived when they receive ads promoting Amazon products even when they specifically search for a competitor's product on Amazon.com.[311]

198.     The Subcommittee's investigation also uncovered internal Amazon documents showing that Amazon's executives have long understood the competitive advantage Amazon wields due to the Company's control over search advertising on Amazon.com.  In an internal email that became public when the Subcommittee released its final report in July 2022, describing an ad block against Groupon and other "deal site ecommerce competitors,"[312] an Amazon executive wrote that "Groupon is blocked+let's keep a clear line on this.  No deal site ecommerce competitors allowed to advertise on amazon.x sites."[313]

199.     Similarly, an email also made public recently by the Subcommittee shows high-level Amazon executives discussing the possibility of implementing an ad block against Diapers.com, saying:

> Do we really think it is ok that Diapers.com flipped from selling on the platform to being a large scale user of Product Ads totally unscrrutinized [sic]?  I don't . . . . We're under no obligation to allow them to advertise on our site.  I'd argue we should block them from buying Product Ads immediately or at minimum price those ads so they truly reflect the opportunity cost of a lost diaper buyer (or to reflect the true value of a new customer to such a competitor[]).[314]

200.     The executive suggested that Amazon should maintain a "watch list" of strategic competitors and set up "[a]n automatic trigger when a merchant on [the] watch list . . . attempts to

---

[310] Interview with Source 148 (Aug. 26, 2020).

[311] *Id*.

[312] Submission from Amazon, to H. Comm. on the Judiciary, AMAZON–HJC–00129156 (Dec. 14, 2017) (on file with Comm.).

[313] *Id*.

[314] *Id*. at AMAZON–HJC–00065094 (May 28, 2009) (on file with Comm.).

launch a significant quantity of product ads—with escalated approval required to allow their ads to launch."[315]

201.          Based on discussions with Company employees, *Wall Street Journal* reported that Amazon ultimately implemented a plan of this type.  Amazon employees involved in advertising decisions said the policies for dealing with competing device makers are a deliberate part of Amazon's strategy for promoting its own products.  *Wall Street Journal* reporters also spoke with executives at rival companies and advertising firms, and those sources confirmed Amazon's practice of limiting the ability of its competitors to promote their own products.

202.          For example, Amazon competitor Roku, an entity that was competing directly with the Amazon Fire TV, was blocked from buying ads on Amazon.[316]  Netgear, a large manufacturer of Wi-Fi routers, was blocked from buying search ads keyed to Amazon's own brand of router. The same is true of Facebook and its inability to buy sponsored ads using Amazon Echo-related keywords due to a competing product, and Arlo, a competitor to Ring, which is unable to buy keywords related to Ring.[317]

203.          According to the *Wall Street Journal* article, "Tier 1 Competitors" are blocked from buying certain ads and employees are allegedly instructed to "mark any discussion of this practice . . . with 'privileged and confidential' to evade regulators."[318]

204.          Once again, Amazon denied these allegations, claiming that employees are instructed to mark emails as privileged only when seeking legal counsel.  In response to a request for comment, Amazon also refused to directly address the question of whether or not it impedes its rivals' marketing.

---

[315] *Id.*

[316] *Id.*

[317] *Id.*

[318] Dana Mattioli et al., *Amazon Restricts How Rival Device Makers Buy Ads on Its Site*, WALL ST. J. (Sept. 22, 2020), https://www.wsj.com/articles/amazon-restricts-advertisingcompetitor-device-makers-roku-arlo-11600786638.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 71 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

205.         Amazon also unfairly discriminated against third-party sellers during the global pandemic by using the pandemic as a pretext to delay shipments of its competitors' products.  In March 2020, Amazon announced that it would begin temporarily delaying shipments of all non-essential products from its warehouses, regardless of whether they were sold by Amazon or by competing third-party sellers.[319]  The Company claimed it was doing so to better serve customers in need while also helping to ensure the safety of warehouse workers.  The effect of this change was to block third-party sellers of items that Amazon designated "nonessential" from shipping new inventory using Fulfillment by Amazon.

206.         However, Amazon exempted itself from this policy and continued to ship non-essential items sold by Amazon Retail from its warehouses.  According to a survey of Amazon workers conducted by Change to Win between April 29 and May 9, 2020, located by the Subcommittee, workers reported that Amazon had "continued to ship non-essential items such as hammocks, fish tanks, sex toys, and pool floaties."[320]  More than two-thirds of fulfillment center workers reported that 50% or more of the items they handled during this period were non-essential.  Based on the survey results, Change to Win concluded that "Amazon has continued to place workers in danger of contracting COVID–19 in order to ship non-essential goods."[321]  A number of market participants that the Subcommittee interviewed also indicated that Amazon prioritized shipping its own items over those sold by third-party sellers.[322]  As revealed in the Subcommittee's

---

[319] CEO Hearing at 286–87 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[320] CHANGE TO WIN, AMAZON COVID–19 WORKER SURVEY DATA BRIEF 3 (2020), https://static1.squarespace.com/static/5d374de8aae9940001c8ed59/t/5ec67b15a155792a0f9ef435/1590065963743/Amazon-Worker-COVID-19-Data-Brief.pdf.

[321] *Id.*

[322] *See, e.g.*, Submission from Source 91, to H. Comm. on the Judiciary (Sept. 16, 2020) ("When we looked at Amazon private-label products during April/early May, they were almost all available for immediate Prime delivery, while comparable national brands were not able to get the same shipment times.  Definitely preference was given to many Amazon private-label products during times of 'essential'/'non-essential' classification."); Interview with Source 152 (Sept. 18, 2020).

July 2022 report, Bezos eventually admitted that Amazon did give preferential treatment to its own products for a period of time, but claimed it was "unintentional."[323]

207.        The investigations of the FTC and the Attorneys General likewise found that, during the relevant time, Amazon favored its private label products at the expense of third-party sellers.  For example, at least starting in April 2018, after Amazon acquired Ring, a video doorbell company, the Company buried organic search results under recommendation widgets, such as the "expert recommendation" widgets, which displays Amazon's private label products over products offered by third-party sellers.[324]  A recommendation widget is defined as "a discrete portion of Amazon's website or mobile app that lets customers scroll through a set of recommended products."[325]

208.        Over the objections of the then-head of Amazon Search, the Company started to blacklist specific "competitive products" from its expert recommendation widget, concealing them from consumers.[326]  Moreover, when Amazon sold one of its own "product[s] within a given search query category," Amazon displayed the "expert recommendation" widget only if the recommendation included the Company's private label products.[327]  As the investigations uncovered, "under this policy," for instance, Amazon "would not show an expert recommendation for 'tablets' that does not include Kindle," Amazon's private label product.[328]  Instead, "[r]ather than competing to secure recommendations based on quality, Amazon intentionally warped its own algorithms to hide helpful, objective, expert reviews from its shoppers."[329]  As one Amazon

---

[323]  CEO Hearing at 287 (response to Questions for the Record of Jeff Bezos, CEO, Amazon. com, Inc.) ("After instituting these changes, Amazon became aware that shipments of certain Amazon devices that did not fall into the priority categories had been inadvertently included in the list of products with faster delivery promises.  This was unintentional.").

[324]  FTC Compl. ¶ 241.

[325]  Id. ¶ 242.

[326]  Id. ¶¶ 245-46.

[327]  Id. ¶ 246.

[328]  Id.

[329]  Id.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 73 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

executive internally remarked, "[f]or a lot of people on the team, it was not an Amazonian thing to do," noting that "[j]ust putting our badges on those products when we didn't necessarily earn them seemed a little bit against the customer, as well as anti-competitive."[330]

### 5.    During the Relevant Time, Amazon Increased the Cost That Third-Party Sellers Bore To Reach Shoppers and Drove Up Consumers' Prices

209.    The FTC and the Attorneys General's investigations additionally uncovered that, through another mechanism, Amazon raised the cost that third-party sellers absorbed to reach shoppers and also increased the price consumers paid for products offered on Amazon's marketplace.[331]  According to the investigations, in 2016 Defendant Bezos "directly ordered his advertising team to continue to increase the number of advertisements on Amazon by allowing more irrelevant advertisements, because the revenue generated by advertisements eclipsed the revenue lost by degrading consumers' shopping experience."[332]  The investigations found that, "following those commands, Amazon dramatically ramped up the number of advertisements it shows shoppers."[333]  By 2017, the top of the search result page on Amazon's marketplace became a stomping ground for advertisers.[334]  In just one year, Amazon more than doubled the percentage of times where a query would show an advertisement at the top of the search results page and more than quintupled the percentage of advertisements shown.[335]

210.    In so doing, Amazon not only increased the total number of advertisements, but also the number of "defect" advertisements shown to consumers, *i.e.*, advertisements that are not relevant at all to consumers or only marginally relevant.[336]  The FTC Complaint reveals that, "[a]t a key meeting, Mr. Bezos directed his executives to '[a]ccept more defects' as a way to increase

---

[330] *Id.*

[331] *Id.* ¶¶ 229-40.

[332] *Id.* ¶ 229.

[333] *Id.* ¶ 230.

[334] *Id.*

[335] *Id.*

[336] *Id.* ¶ 231.

1   the total number of advertisements shown and drive up Amazon's advertising profits."[337]  After

2   Amazon's employees dutifully implemented Bezos's instructions, internal Amazon studies

3   showed that the tactic worked, resulting in Amazon's overall profits increasing by millions of

4   dollars.[338]  Amazon revised its ad auction to incorporate the "cost of defect" to exponentially

5   increase its profits, with senior executives agreeing that "we'd be crazy not to" increase the number

6   of advertisements shown to consumers.[339]

7   211.        The investigations found that "although Amazon considered placing 'guardrails'

8   on advertisements to protect the customer experience, it consistently rejected such ideas," with

9   "[s]enior Amazon executives g[iving] 'clear guidance' that 'advertising should not be constrained

10  by additional guardrails . . . like . . . search relevance.'"[340]  As one senior Amazon executive

11  remarked internally, advertising at all cost to extract profits "has effectively become 'law' even if

12  it has many flaws."[341]  Amazon also put its own advertising team in charge of deciding how many

13  search page slots were allocated to ads, prompting the same executive to note that it created "a risk

14  of the fox . . . guarding the henhouse" but concluding that it was acceptable because Amazon was

15  already "in a situation where the hens are out of the house anyways," given the Company's control

16  over ad placement.[342]  Another senior Amazon executive observed that it was in the advertising

17  division's "nature" as the proverbial "scorpion" to poison search results.[343]

18  212.        Amazon implemented Bezos's directive, notwithstanding the fact "defect" ads were

19  not in the interest of consumers.  One Amazon executive collected and internally circulated

20  examples laying bare this fact.[344]

21

22  _____

    [337] *Id.* ¶ 232.

23  [338] *Id.*

24  [339] *Id.*

25  [340] *Id.* ¶ 233.

    [341] *Id.*

26  [342] *Id.*

27  [343] *Id.*

28  [344] *Id.* ¶ 234.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 75 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

213.        Through this deployment of paid ads, Amazon drove shoppers towards more expensive products.[345]  An Amazon 2018 internal study prepared by the Company's economists found that the "median price for [Sponsored Products] search results is [redacted]% higher than the median price of the neighboring organic content," and "[redacted]% of [Sponsored Products] Search results have higher prices than the adjacent organic result, and for [redacted]% of impressions, the [Sponsored Products] price is at least twice that of the organic result."[346]  The study noted that Amazon's method of advertising resulted in higher prices for customers because "as the share of site real estate devoted to sponsored content grows, it becomes harder for customers to undo price effects" by viewing lower-product listings.[347]  The study also observed that, as advertising grew, "the price difference translates into a material impact on overall site ASP [average sales price]."[348]

214.        The paid advertising method employed by Amazon naturally raised the price the third-party sellers had to pay to reach consumers.[349]  As one Amazon executive explained internally, sellers purchasing advertising "have to pay per click for preferred Search and Detail Page placement in addition to the fixed commission Amazon charges per sale."[350]  Meanwhile, as the executive also noted, "[t]his extra cost is likely to be passed down to the customer and result in higher prices for customers."[351]

215.        As the investigations uncovered, "Amazon's quality degradation has been wildly profitable."[352]  "In 2015, Amazon earned $1 billion in revenue from advertising in the United

[345] *Id.* ¶ 235.

[346] *Id.*

[347] *Id.*

[348] *Id.*

[349] *Id.* ¶ 236.

[350] *Id.*

[351] *Id.*

[352] *Id.* ¶ 239.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 76 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

States."[353]   "By 2021, that number had increased to [several] billion[s], leading to [several] billion[s] in profits in the United States alone."[354]   The prospect of such a marked-increase in profits through this element of the fraud incentivized Defendants to act in the way that they did.

## C. Amazon's Retail Model Has Long Relied on the Promise of Rapid Delivery

216.     Fast delivery is, and has long been, fundamental to Amazon's retail model.  As Amazon explains, it is a company focused on "delivering as many items as fast as possible." Amazon's value proposition to both its customers—and to investors—is significantly premised on its ability to offer a cost-effective alternative to both brick-and-mortar stores and alternative online retailers.  That value is inherently linked to fast delivery.

217.     In addition, although leading up to and throughout much of the Class Period Amazon reported substantial profits, the Company since its founding has invested in building market share and capacity—even when doing so caused losses.  By 2019 after years of massive profitability, investors expected continued success and growth.   Those expectations were reinforced by the Company's public statements, including assurances that short-term costs of growing fulfillment capacity were justified by market demand for fast delivery, and that investment in fulfillment infrastructure would fuel fast shipping, crowd out competitors, take market share, and deliver future profits.  Yet by July 2021, Defendants and others at Amazon knew the opposite:  Amazon's fulfillment and high-speed delivery capacity had grown too much and too fast and needed to be scaled back, imposing a massive financial hit to Amazon.

### 1. Amazon Has Long Focused on "Delivering as Many Items as Fast as Possible"

218.     In 2005, Amazon launched its Amazon Prime membership service, through which the Company offered free two-day shipping to its retail customers at a time when such quick delivery times were "virtually unheard of."  Amazon's promise of free two-day delivery fueled substantial growth and in large part enabled Amazon to become the retail giant it is today.  When

---

[353] *Id.*

[354] *Id.*

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 77 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Amazon Prime launched, it set Amazon apart from its major retail competitors, such as Walmart, Target, and Costco.  As Amazon stated in response to an inquiry from *Vox*, reported on April 24, 2019, "Prime offers the fastest way to receive items for free."  Although the Prime membership comes with many benefits, "Prime customers pay for—and expect—quick, free shipping."

219.	Amazon's aggressive focus on growth through faster shipping and increased fulfillment capacity continued.  In 2004, 10 years after Amazon was founded, its annual revenue was just under $7 billion.  By 2011, Amazon Prime subscriptions were increasing significantly, with membership doubling less than two years later to an estimated 10 million subscribers.  At that point, Amazon was committed to making rapid delivery a critical part of its brand, from two-day, to one-day, and eventually same-day delivery in many markets.  To facilitate that rapid delivery, an extensive fulfillment network became the lynchpin of Amazon's business model.  An April 2020 report, "Mapping Amazon: Where the Online Giants Locates Its Warehouses and Why," reported that, "[t]o execute rapid delivery, Amazon couldn't get away with only a handful of warehouses.  It had to locate warehouses in many markets where the greatest number of Prime households are located."  The strategy was effective for several years.  In 2014, "Amazon became the fastest company ever to reach $100 billion in annual sales."  By 2018, Amazon's revenue reached almost $233 billion.

### 2.	2015-2017:  Amazon Announces and Expands Same-Day Delivery

220.	Amazon and its senior management have been focused on increasing delivery speeds for years.  For example, on May 28, 2015, Amazon forever changed online delivery by announcing free same-day delivery in 14 major cities across the United States.  Describing affordable same-day delivery as the "Holy Grail" of online shopping, the *LA Times* noted that, "[a]lthough every retailer would like to offer same-day delivery, few have the infrastructure in place to handle such a complex undertaking or the sales volume to make it worth it."  A year later, Amazon expanded same-day delivery to 27 metro areas and announced a new air cargo network. In a March 9, 2016 press release, Dave Clark, Amazon's then-Senior VP of Worldwide Operations, explained that the Company "add[ed] 20 planes to ensure air cargo capacity to support

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 78 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

one and two-day delivery for customers" for its "ultra-fast delivery promises."  And in 2017, Bezos announced that Amazon was preparing a drone delivery service to get orders to customers within 30 minutes.  Since then, Amazon has continued to prioritize increasing the speed and reach of its retail delivery services, including through Amazon Prime.  Indeed, as Amazon explained in a June 2, 2017 press release, as the Company has opened new fulfillment centers in order to facilitate faster delivery to retail customers, the "[m]ost important[]" factor has been whether the locations of new sites would "improve Prime benefits with faster shipping speeds for customers."

### 3.   2018-2019:  Amazon Increases Its Already-Aggressive Focus on Rapid Delivery

221.     By 2018, 100 million people were using Amazon's Prime service, in large part due to its promise of reliable and free two-day shipping.  According to a survey by market-research firm The Diffusion Group, 79% of Prime members said that free two-day shipping was the "primary reason" they subscribed to Amazon Prime.  Yet at the time, Amazon was not always able to meet customer expectations with its two-day delivery and, as *Vox* reported on April 24, 2019, the Company faced the problem of "weaning Prime users off the near-instantaneous shipping they've come to expect."  For example, by the winter of 2018, it was "undeniable that Amazon delivery [was not] as seamless as it used to be."  As *Fast Company* reported on December 19, 2018, "Complaints about slow Prime shipping abound across the internet."  *Business Insider* similarly reported in May 2018 that "[s]ome Amazon Prime customers are fuming, claiming the company has repeatedly delayed their shipments and backtracked on the two-day-shipping guarantee that comes with membership . . . . This cuts through the greatest promise of Prime.  It's not just the free, two-day shipping.  It's that it's so reliable, you never have to think for more than a second about buying something."

222.     As *Business Insider* reported, Amazon recognized that its customers expected "fast and reliable delivery."  At the same time *Vox* reported that, as customers became less impressed by Amazon's rapid delivery promise, "more and more businesses" were adopting two-day shipping, further threatening Amazon's competitive advantage in delivery times.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 4. 2019-2020: As Competitive Pressures Mount, Amazon Invests Massively in Expanding Fast Delivery

223.     By 2019, many of Amazon's largest competitors—including Walmart and Target— had announced their own two-day shipping promises.  Combined with the alternative options that those retailers (which had both online and brick-and-mortar presences) provided customers to buy online and pickup from numerous retail locations, even infrequent or slight shipping delays for Amazon posed a substantial threat to the Company's market dominance.  With a significant portion of online shoppers hooked on quick, free shipping, Amazon was highly motivated to maintain its competitive advantage, and sought to provide even faster delivery speeds.

224.     In April of 2019, Amazon announced plans to transition free Prime delivery times from two-day shipping to one-day shipping over the next year.  During Amazon's Q1 2019 earnings call on April 25, 2019, CFO Brian Olsavsky represented that it was the natural evolution of the Prime program to progress to a "free one-day offer":  "We've already started down this path" and "in the past months, significantly expanded our one-day eligible selection and also expanded the number of zip codes eligible for one-day shipping."  Olsavsky told investors on the call that "We're able to do this because we spent 20 plus years expanding our fulfillment and logistics network, but this is still a big investment and a lot of work to do ahead of us."

225.     To enable this shift to expansive one-day shipping, Amazon committed to an aggressive growth strategy, through which it would ultimately double the footprint of its warehouses and other aspects of its fulfillment networks.  After announcing plans to cut the standard Prime delivery time from two days down to a single day in April 2019, Amazon expected to spend $800 million on the transition to one-day shipping, in the second quarter of 2019 alone.  And Amazon additionally spent almost $1.5 billion in the fourth quarter of 2019 and $1 billion in the first quarter of 2020 on that expansion.

226.     Amazon and its senior management assured investors that these significant costs were worth it, and that the Company's expansion was calibrated to meet market demand for fast delivery.  For example, during Amazon's Q1 2019 Earnings Call, Defendant Olsavsky said that "morphing to a one-day free shipping offer will make [Prime] even more the best deal in retail,"

adding that "we really think it's going to be groundbreaking for Prime customers and we're very excited to add this capability."  Analysts believed those statements.  For example, following Amazon's Q1 2019 Earnings Call, *BMO Capital* was quoted as stating, "While this is a drag on profitability near term, we believe enhancements like this should encourage incremental spending by customers and attract new Prime members."  And *Mizuho Securities* likewise wrote that the "long-term benefit is that turnover will be faster in the warehouse so efficiency can be gained for fulfillment as a percentage of revenues."

227.       As intended, the move to one-day shipping put Amazon a full day ahead of the competition.  Among other things, the day after Amazon's one-day shipping announcement, Walmart tweeted, "One-day free shipping . . . without a membership fee.  Now THAT would be groundbreaking.  Stay tuned."  Walmart soon announced its own one-day delivery service, complementing its offer to purchase items online and pick them up in a brick-and-mortar location the same day.  These moves added to the pressure on Amazon.  As Alice Fournier, VP at Kantar Consulting, explained, "Amazon has been doing one-day shipping in many areas for a while now.  Now they've made an announcement out of it and a commitment to it—what they're going to do is make the investments that they already were making," adding that, in contrast "Walmart has very successfully been building its store pickup, which is an online transaction that you get in one day."  Similarly, *Moody*'s analyst Charlie O'Shea described Walmart's one-day shipping option as "the latest salvo in the ongoing delivery arms race initiated and recently escalated by Amazon." *Wells Fargo* analysts led by Edward Kelly said in a note that Walmart's one-day shipping "helps to alleviate some concern around the impact of Amazon's recent move and is a step forward in defending share."  And Matthew McClintock, *Barclays* retail analyst, likewise "called Amazon's announcement 'a red herring' that creates an opportunity to invest in Target.' . . . '[Target] is already ahead of [Amazon] in same day delivery (Shipt, Drive Up, etc...) and has built a supply chain that fulfills ecommerce primarily from stores (where next-day delivery is much easier), which stands in a stark contrast to most retailers."

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 81 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

228.         On June 3, 2019, less than two months later, Amazon announced that it had pushed the plan forward with "free one-day shipping on over 10 million products" for Prime members—with no minimum purchase.

229.         The burdens of transitioning to one-day shipping, which Amazon had justified to investors as necessary to meet demand for fast delivery, continued to mount.  For example, as *Supply Chain Dive*, a business journalism outlet focused on global supply-chain issues, reported on October 25, 2019, in the third quarter of 2019, Amazon's shipping costs increased 46% year-over-year, and profits fell 26% year-over-year.

230.         On October 24, 2019, during Amazon's Q3 2019 earnings call, Defendant Olsavsky attributed the higher costs to Amazon's continued efforts to expand one-day delivery, stating, "It's going to be the route density and other things will improve over time and get our cost structure down, but for now, there is certainly some start-up pain in adding new capacity."  Olsavsky further noted that Amazon expected those costs to further increase in Q4:  "So as we head into Q4, we've added what's just nearly $1.5 billion penalty in Q4 year-over-year."  As quoted in Amazon's Q3 2019 Earnings Statement, Defendant Bezos maintained that "Customers love the transition of Prime from two days to one day," adding that "It's a big investment, and it's the right long-term decision for customers."  As *Supply Chain Dive* reported, in total, Amazon's 2019 shipping costs reached $37.9 billion, increasing 43% year-over-year compared to the fourth quarter of 2018.

231.         In early 2020, before the COVID-19 pandemic caused widespread changes in consumer needs and behavior, and as communicated on the Company's January 30, 2020 earnings call for the fourth quarter of 2019, Amazon projected another "approximately $1 billion of additional cost" for one-day delivery in the first quarter of 2020.  In response to multiple questions about the continued costs of transitioning to one-day shipping, Defendants continued to assure investors that those costs were justified by market demand for fast delivery.  After referencing Defendant Olsavsky's prior statements about Amazon "becoming more efficient with . . . next-day" delivery, an analyst asked for details on both the "$1 billion of [quarterly] cost" and the impact of one-day shipping on customer demand.  Defendant Olsavsky responded:  Amazon "will have to scale our fulfillment center network further.  We grew the square footage for fulfillment

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 82 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  and transportation by 15% each of the last two years, and we look ahead and see a step-up in that

2  this year as we . . . start to build more capacity for the one day."  Olsavsky added that Amazon

3  would "get efficiencies" as they "learn and grow and handle more one day volume."  Investors and

4  analysts rightly understood the Company's expansion of the fulfillment infrastructure as reflecting

5  the Individual Defendants' judgment and commitment to fast delivery as necessary to Amazon's

6  longstanding business strategy of taking market share to ensure growth.

7  232.    By February 2020, at the same time that the Company was reassuring its investors,

8  the transition to one-day shipping raised questions inside Amazon about how it would manage

9  such a network.  As Salal Humair—a senior principal scientist with the supply chain optimization

10  technologies team in Amazon's inventory planning and control group—explained to *Supply Chain*

11  *Dive*, for logistics, the difference between one and two-day shipping is a lot more than just 24

12  hours.  Humair explained that location is less relevant to two-day shipping because "You can just

13  fly to a customer in two days" almost anywhere in the continental United States.  However, the

14  location of inventory is critical when an order is expected in a single day or less, according to

15  Humair.  "This is a reality that made two-day shipping a much easier feat than one-day

16  shipping. . . . And how Amazon deals with inventory questions changed significantly when it

17  decided to offer one-day shipping to its Prime members."

18  233.    To facilitate expanded same-day and next-day delivery, in early 2020, Amazon

19  starting building "mini-fulfillment centers" closer to consumers, which the Company explained

20  was to make its same-day delivery program "even faster."  Notably, Amazon's announcement

21  came just days after news that Walmart's Walmart+ membership program could include unlimited

22  same-day delivery on groceries.

23  234.    Amazon stated on March 3, 2020 that:

24      Since launching Prime in 2005, we've continued to make advancements to our
        delivery options in order to bring members new levels of convenience.  This effort
25      has resulted in the current evolution of Prime Two-Day Delivery to a One-Day
        promise, and the introduction of new programs like Amazon Day, where Prime
26      members can choose a day of the week to receive all their orders . . . all with the
        goal of giving Prime members the most convenient shopping experience in
27      retail . . . . These are first-of-their-kind buildings and serve as mini-fulfillment
        centers optimized for faster click-to-delivery speeds.
28

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 83 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**D.    Amazon Aggressively Increases Its Fulfillment Capacity and Headcount During the Pandemic**

**1.    Early 2020:  COVID-19 Causes a Massive Demand Surge**

235.        When the pandemic struck in early 2020, bringing with it lockdowns and other restrictions that limited shoppers' ability and willingness to shop in physical stores, consumer demand for goods purchased through Amazon's e-commerce business, with its promise of fast delivery times, skyrocketed.

236.        However, in the early days of the COVID-19 pandemic, Amazon's fulfillment network was unprepared for the sudden surge in demand.  On March 16, 2020, in a Company blog post, Amazon described demand-driven labor requirements as "unprecedented for this time of year," announcing:  "We are opening 100,000 new full and part-time positions across the U.S. in our fulfillment centers and delivery network to meet the surge in demand from people relying on Amazon's service during this stressful time."

**2.    2020-2021:  Amazon Continues Its Aggressive Expansion, Which Defendants Justify as Necessary to Keep Competitors at Bay and Meet Existing Demand for Fast Delivery**

237.        As discussed above, after announcing increased investments in one-day delivery, Amazon had already faced questions about the increasing cost of shipping in 2019.  As reported in Amazon's 2019 annual report filed on Form 10-K, Amazon's cash capital expenditures increased from $11.3 billion in 2018 to $12.7 billion in 2019.  In both years, these costs primarily reflected "additional capacity to support [Amazon's] fulfillment operations and additional investments . . . in technology infrastructure."  In 2020 Amazon's spending spiked to another level as cash capital expenditures effectively tripled to $35.0 billion for the year.

238.        Analysts remained acutely focused on Amazon's ability to protect its competitive position by resuming as much one-day delivery as possible.  To assure investors that the fulfillment expansion would continue to meet the demand for fast delivery, Defendants made repeated, detailed statements concerning these issues.  For example, on April 30, 2020, during the Company's Q1 2020 Earnings Call, Defendants received a question on Amazon's "fulfillment efficiencies," with an analyst asking: "how long will it take for Amazon to get back to a point

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 84 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

where you'd have the same sort of service efficiency levels on the retail side that you had pre-COVID, how far are you away from that?"  Defendant Olsavsky responded that despite some uncertainty, "we're glad we've made that investment":

> On the fulfillment efficiency, I think you're talking about one-day probably is the heart of your question, when will we get back to what we had seen in levels of one day . . . . I will explain a bit on the one-day shipping cost because it's aligned with this.  So we had originally thought we would spend $1 billion roughly on one-day shipping in Q1 and what we're seeing is we pretty much spent about that same amount . . . . So those are actually coming in—all those things are coming in very handy to us to help get more capacity out of what we currently have and we're glad we've made that investment, but we don't actually see a savings . . . we'll see a resumption of more one-day service, but, right now things are still so up in the air that I can't really project when that day will be . . . .

239.        However, as e-commerce research firm Marketplace Pulse reported on August 11, 2020, by May of 2020 Amazon had experienced "all-time high negative seller reviews" and "[f]ailed delivery promises were the most common cause."  With the unprecedented demand for e-commerce and fast delivery that COVID-19 caused, Amazon faced significant fulfillment struggles when [third-party] sellers "ran out of inventory stored in Fulfillment by Amazon (FBA) and thus reduced Prime-enabled assortment."  As Marketplace Pulse reported on July 14, 2020, "fulfillment operations" were a significant vulnerability for Amazon, because when "Amazon's fulfillment operations . . . breaks, as it did during the pandemic, the whole Amazon breaks."  Securities analysts from Sanford C. Bernstein & Co. expressed concern that, in the wake of the pandemic, Amazon would have a "a very hard time" executing on one-day shipping and that the program would be delayed.

240.        As the pandemic progressed, the strain put on Amazon's fulfillment infrastructure caused Defendants to increasingly emphasize that they would expand their infrastructure to meet demand for fast delivery.  These assurances that the expansion was consistent with Amazon's business goals and competitive pressures were expected by and well received by investors.

241.        As stated in Amazon's second-quarter 2020 financial reporting in the second quarter of 2020, Amazon's net sales increased 40% year-over-year to reach $89 billion.  As *Supply*

*Chain Dive* reported, however, analysts and market observers noted that the Company's capital expenditures continued to outpace sales growth, increasing by 68% from the year prior.



242.     As noted above, analysts and investors continued to press Defendants for information concerning the relationship between demand and the scale of Amazon's fulfilment network.   On July 30, 2020, during Amazon's Q2 2020 Earnings Call, Defendant Olsavsky addressed the Company's reported strong performance, which he represented was "driven [by] increased consumer demand, led by Prime members," stating:

> We were able to meet this heightened demand because we were also able to open up more fulfillment network capacity as the quarter progressed with faster delivery across more selection.  I'd point to a few capacity improvements that have allowed us to enhance throughput.  First, our regular headcount grew 34% year-over-year as of the end of Q2 and continues to grow.  We welcomed more than 175,000 new employees in March and April, many of whom were displaced from other jobs in the economy.  As we've seen demand remain high, we are in the process of bringing 125,000 of these employees into regular full-time positions . . . .  As we move toward peak in the second half of the year, we will ramp-up our space needs even further, and we'll be adding significant fulfillment center and transportation capacity in the second half of the year.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 86 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

243.        During the call, as Defendants credited Amazon's Q2 2020 success to the Company's fulfillment expansion, multiple analysts inquired about Amazon's one-day delivery. Despite the sustained spending and increased capacity, Defendant Olsavsky did not commit to a timeline for returning to Amazon's pre-pandemic shipping speed.  However, in direct response to an analyst's question on the status of the Company's "one-day investment," Olsavsky said, "the costs of one-day shipping are already built into our structure.  We've already reconfigured our network.  We've already created the capacity to be able to ship."  Earlier on the call, Olsavsky had already announced plans to increase the square footage of Amazon's distribution operation by 50% by the end of 2020, with most of the expansion still to come:  "This includes strong growth in new fulfillment center space as well as sort centers and delivery stations.  We expect the majority of this capacity to come online in late Q3 and into Q4."

244.        As *Supply Chain Dive* reported on September 21, 2019, analysts noted this meant that Amazon would be "adding three times the amount of capacity it added in 2019 . . . more than what the company added over the last three years combined," and that "Experts have long known that increasing the number of facilities will decrease transportation costs while increasing inventory and facility cost."  Despite increasing scale of Amazon's continued expansion, those analysts saw numerous advantages in "Amazon's investment in its logistics network," consistent with Defendants' positive public statements.

245.        Following increased demand for fast home delivery as shoppers stayed at home due to COVID-19 restrictions and concerns, Amazon continued to focus on increasing its infrastructure and fulfillment network capacity.  On October 29, 2020, during Amazon's Q3 2020 Earnings Call, Defendant Olsavsky told analysts that Amazon's fulfillment and logistics square footage would increase by 50% that year and that the Company had already spent heavily on expanding its transport capability, as part of some $30 billion in capital expenditures and leases through the third quarter.  Further, Olsavsky told analysts that the heightened transportation investment would likely continue for years to come.  As companies competed for space, Amazon was understood to be a

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 87 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

driving force behind surging industrial space rates, which financial news outlet *GlobeSt.com* reported included Amazon often paying 50% to 60% above market to get the space it wanted.[355]

246.       Defendant Olsavsky credited Amazon's ability to "meet the heightened demand" in Q3, in part, to the Company's "big year for capital investments," explaining:  "We've invested nearly $30 billion in CapEx and finance leases through the first nine months of 2020, including over $12 billion in Q3.  As I mentioned last quarter, we expect to grow our fulfillment and logistics network square footage by approximately 50% this year, which includes significant additions to our fulfillment centers, as well as our transportation facilities.  The majority of these buildings opened in late Q3 and into Q4.  About half of this square footage growth will be on the transportation side through the opening of more sort centers and delivery stations."

247.       By the end of 2020, Amazon projected quarterly revenue of over $100 billion for the first time in the Company's history.[356]  Indeed, as the *Associated Press* reported on April 29, 2021, the Company's reported fourth-quarter 2020 revenue "blew past analyst expectations" at $125.6 billion.  As online shopping continued to surge a year into the pandemic, Amazon's 2021 first-quarter profit more than tripled year-over-year.  *Id.*  As brick-and-mortar stores around the country were forced to close, some for good, Amazon's revenue was still 44% above the prior year and well over $100 billion for the second quarter in a row—a feat that only three other U.S. companies achieved.  When it reported first-quarter 2021 earnings, Amazon reported that it expected revenue to increase again, in the second quarter of 2021, with a year-over-year growth rate for the quarter of 24% to 30%.

---

[355] GlobeSt.com, Amazon Reportedly Ready to Dump Excess Warehouse Space (Mar. 5, 2022) ("Amazon has been a driving force for good rates in the hot industrial arena, often paying 50% to 60% above market to get the space they wanted. Investors were paying a 35% premium last fall when the retail giant was a tenant.  Those heady days may have come to a sudden halt as a slowing of e-commerce back to pre-pandemic trends has left Amazon with a surfeit of warehouse space according to a Bloomberg report.").

[356] Amazon sees pandemic boosting holiday sales and investment in delivery (Oct. 29, 2020), https://www.reuters.com/article/uk-amazon-com-results/amazon-sees-pandemic-boosting-holiday-sales-and-investment-in-delivery-idUSKBN27E3D6.

248.        Technology news site *GeekWire* reported on February 2, 2021 that, by the end of end of 2020, Amazon had hired nearly half a million new workers.  With well over a million employees by 2021, Amazon had increased in size by 63%.

249.        The Company's bullish expansion continued into 2021.  On February 2, 2021, during Amazon's Q4 2020 Earnings Call, an analyst asked how much investment was "needed" for Amazon's fulfillment going into 2021.  After noting the "50% year-over-year" investment in fulfillment capacity or "$44 billion on [Capital Expenditures]" in 2020, Olsavsky turned to Amazon's plans for 2021:

> So we are going to have to build probably for multiple scenarios.  And in an FC world, it's hard to turn that capacity on quickly.  So it generally means you may have to overbuild to protect the customer experience.  On transportation, we made large investments in our transportation network in 2020.  That work is not done yet.  We have a lot of continued expansion.  So we see that over—definitely through 2021.

Defendant Fildes added that fulfillment spending was both for "one-day delivery capabilities for Prime members" and to achieve "much more certainty on being able to get items from point A to point B."

250.        In January 2021, when customers were "relying on fast, free shipping more than ever," Amazon reported that it had purchased 11 aircrafts for their delivery network to "keep pace with meeting [their] customer promises."  Consistent with its aggressive expansion efforts, Amazon reported in its 2020 Annual Report, filed on February 3, 2021 on its Form 10-K:

> The increase in fulfillment costs in absolute dollars in 2020, compared to the prior year, is primarily due to variable costs corresponding with increased product and service sales volume and inventory levels, costs from expanding our fulfillment network, and the COVID-19 related impact of lower productivity, increased employee hiring and benefits, and costs to maintain safe workplaces.  We expect fulfillment costs as a percentage of net sales to continue to be negatively impacted through at least Q1 2021 by COVID-19 related costs . . . .  We seek to expand our fulfillment network to accommodate a greater selection and in-stock inventory levels and to meet anticipated shipment volumes from sales of our own products as well as sales by third parties for which we provide the fulfillment services.  We regularly evaluate our facility requirements.

251.        As Amazon continued to make significant investments throughout 2021 and into 2022, the connection between more expansion, faster delivery, and community investment was a

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 89 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

message that Amazon repeated.[357]  For example, on February 18, 2021, Amazon announced a new one million-square-foot "non-sort" fulfillment center in Washington, representing that "the new fulfillment center will help enable faster shipping times on customer orders of larger items," as reported by local news outlet KHQ.

252.        Similarly, on March 30, 2021, Amazon announced four more delivery stations in Florida to "power the last mile."  An Amazon spokesperson explained:  "We are excited to continue our investment in Florida" which "will create hundreds of new job opportunities and provide faster and more efficient delivery for customers."

253.        On April 28, 2021, during Amazon's Q1 2021 Earnings Call, after noting that Amazon was "investing pretty aggressively to build out . . . last-mile fulfillment," an analyst asked at what point that expansion would be "in the right place" such that Amazon would see "the unit cost of shipping start to improve from these initiatives?"  After noting that Amazon was already "investing heavily" in the last-mile fulfillment by increasing "capacity by 50%" with an 80% increase in capital expenditures from the prior 12 months, Olsavsky responded that Amazon's cost was already "very competitive," and that fulfillment investment offered "lots of advantages" in shipping logistics, including that Defendants "pretty much have perfect information."  Olsavsky added that Amazon was "continuing to invest" and that investors would "see a large investment in this area through 2021" which could continue into 2022—all of which would put Amazon in "really good" position with capacity.

254.        An analyst also asked "particularly in markets where COVID is no longer a major issue, have you seen any particular declines or maybe just slowdown in e-commerce demand or a decline in growth?"  In response to that inquiry, Olsavsky noted international "across the board" strength, before stating, "I don't have a downside case yet. . . . Costs were very much under control.  We started to see strong leverage of our fixed assets, especially our fulfillment center and

---

[357] Faster Same-Day Delivery marks milestone by adding six new cities (Aug. 4, 2021), https://www.aboutamazon.com/news/operations/faster-same-day-delivery-marks-milestone-by-adding-six-new-cities. ("In the areas where we offer faster Same-Day Delivery service, we've built brand new mini-fulfillment centers that are optimized for faster click-to-delivery speeds.").

transportation assets."   Later, in response to another question on demand levels, Olsavsky responded in part, "On Q2 guidance, yes, I would say, we are projecting, again, continued strength across all of our segments."

255.       Amazon continued to represent publicly that it was aggressively expanding its fulfillment capacity in order to meet demand for faster delivery.  For example, on May 7, 2021, Amazon announced five new buildings in British Columbia:  "Our new facilities will help us meet our customers' growing demand for great products and faster delivery times" said Sumegha Kumar, Director of Canadian Customer Fulfillment Operations, Amazon Canada.

### 3.       Analysts Covered the Expansion Favorably at the Time

256.       When Defendants said that massive spending would pay off, the market believed them.  For example, previously, when Amazon reported that the extra cost of transitioning from two-day to one-day Prime delivery would increase to $1.5 billion in the fourth quarter of 2019, Patrick Moorhead, Principal Analyst at Moor Insights and Strategy, said:  "Amazon is waging a war of attrition to wear out the competition . . . . It's setting the bar so high knowing competitors will follow and Amazon knows it can do it at lower costs sometime in the future.  One day shipping also puts it more into competition with traditional brick and mortar stores.  I think time will show it's worth it."  Similarly, when Amazon announced plans to spend "the entirety" of its $4 billion profit "and perhaps a bit more" in the second quarter of 2020 on responding to the COVID-19 pandemic, JP Morgan Analyst Doug Anmuth saw it as a positive, writing, "We believe that AMZN is perhaps the only company that can service customers this well with scale & effectiveness during the crisis."

1
2
3
4
5
6
7
8



257.        Considering the magnitude of Amazon's capital expenditures continuing into 2021, as *The Motley Fool* noted on May 1, 2021, the Company's long-term planning appeared to be uniquely credited by the market:

> Over the last four quarters, Amazon has spent a whopping $45.4 billion on capital expenditures, more than twice what it spent in the 12 months prior. . . . It's hard to understate how substantial the past year's $45.4 billion in capex investment was. That's more than all but roughly 70 U.S. companies generated in revenue last year. . . . It's also important to note that investors trust Amazon to spend like this. Walmart's stock price fell in February after it said its capex would increase to $14 billion, while investors bid Target shares downward after the retailer forecast its annual capital expenditures would rise to $4 billion.

258.        As *The Motley Fool* reported, the market understood, consistent with Defendants' public representations, that increasing demand for e-commerce and fast delivery justified Amazon's commitment to expand its fulfillment network footprint by 50% and its workforce by more than 60% in 2020, and that more large investments were coming in 2021:

> As a result, Amazon will need a lot more workers to staff its warehouses and fulfillment centers. While the capacity issues that led to last year's bottlenecks have mostly been resolved, the company's plans imply that it expects continued strong sales growth. Further, it still has work to do to reach its goals on one-day delivery. . . . **The good news for shareholders is that Amazon's hiring is an indication that it'll have plenty of demand to meet**.

259.        In addition, on July 31, 2021, *Credit Suisse* analysts wrote that Amazon's ramp-up in capital expenditures was more important than its revenue guidance while referencing the Company's faster delivery promises: "The consumer responds positively to higher/faster service levels," they said in a note. "Unit volume accelerated following one day Prime delivery launch in

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 92 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

2Q19—we believe it is only a matter of time before we see a similar impact as Amazon deploys fulfillment assets into the Holidays."

260.         It is not surprising that the market viewed Amazon's claims regarding demand for e-commerce and fast delivery, and increased capacity requirements, as a concrete cost benefit analysis. It has been well publicized that Amazon was a data-driven business that put extreme value on decision making based on real-time information on logistics and efficiency. For example, as *Fox Business* reported on January 7, 2016, Amazon's advanced use of analytic technology, for both delivery logistics and forecasting, has long been considered key to its "competitive advantage." Indeed, Amazon has long sought to optimize its efficiency in its delivery business through advanced software that ostensibly helps it set inventory levels, and even begin packing orders based on predictive algorithms. As *Wall Street Journal* reported on April 22, 2018, by that point Amazon had already "spent years honing its machine learning and artificial-intelligence technology to the point where it can"—among other things—"forecast demand." In fact, a 2020 report by longtime supply chain reporter Rick LeBlanc explained that the Company's "combination of sophisticated information technology, an extensive network of warehouses, multi-tier inventory management, and excellent transportation makes Amazon's supply chain the most efficient among all the major companies in the world." On February 6, 2021, *Wall Street Journal* reported that Amazon was using software to manage, monitor, and evaluate data on a highly sophisticated level, "unlike almost any other company," especially for delivery and inventory logistics.

### E.    By Early 2021, Amazon Prepares to Overhaul Its Senior Management as Its Public Commitment to Expansion Continues

261.         In February 2021, Amazon announced a significant change in its senior management. Specifically, Bezos announced that on July 5, 2021, he would be stepping down as CEO of Amazon, the company he founded in 1994, and that he would be transitioning to the position of executive chairman. Defendant Jassy, who had been with the Company for over 24 years, would be taking his place. NPR reported that Jassy was one of Bezos's "most trusted lieutenants" and served as the CEO's "shadow," where he accompanied Bezos to all his meetings

to learn the business.  Since Jassy was a long-time Amazon insider, he had the institutional knowledge and experience to continue to execute Amazon's strategies without significant interruption.  As executive chairman and Amazon's largest shareholder, Bezos would continue to be engaged in the Company's initiatives.

262.     By all accounts, Jassy is extremely immersed in the details of Amazon's business.  As reported by *Wall Street Journal*, former Amazon employees described Jassy as having an "ultra-detail-oriented management style," often "digging into the minutiae of his division . . . sometimes to a degree that baffled his underlings."  An Amazon vice president who worked for Jassy for more than a dozen years told *Wall Street Journal* that Jassy has "just a phenomenal focus on details . . . [his] relentless focus on detail is truly unique."  Former Amazon employees agreed that "Jassy would spend enormous amounts of time on the narrowest of details if he thought it was important."  For example, when an Amazon Web Services ("AWS") data center in Virginia suffered a major outage, Defendant Jassy "personally got involved in figuring out the problem," prompting other employees to start "digging at that level."

263.     Even Jassy has commented on his own attention to detail.  During a September 2021 speech, Jassy said "[w]here the rubber meets the road is in the details.  From the junior roles to the senior-most, you have to be good at executing details."  He therefore demanded the same degree of focus from his employees.  One employee told *Wall Street Journal* that Jassy "ha[d] a sense of urgency that [he had] never seen in [his] life."

264.     The *Wall Street Journal* reported that at weekly "wheel" meetings, Jassy and his deputies would ask in-depth questions of managers and team members, sometimes called "the firing squad" by employees.[358]  Amazon Former Employee 1 ("FE-1"),[359] a senior product manager who worked at Amazon from December 2019 to September 2021, said that there were

---

[358] *Id.*

[359] Former Employees are referred to as "FE" and are referenced using female pronouns to maintain their confidentiality.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 94 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

weekly business reviews with Jassy when he became CEO.[360]  In her role, FE-1 was aware of weekly business review meetings with CEO Jassy, and was provided with capacity and planning information by Amazon's Financial Planning & Analysis ("FP&A") team.  The business reviews were conducted by videoconference and provided an overall broad view of the business as well as a "rolling deep dive" of a functional area each week.  According to FE-1, Jassy would "go pretty dense" in the business area that was of focus that week.  FE-1 had awareness of these meetings because, when the weekly focus area was relevant to her business, she would be in a standby room in the event that questions were asked for her to address.

## F. Amazon Executives Have Access to Real Time Data on Critical Details of the Company's Business and Rely on Such Data in Decision Making

265.     A key component of Amazon's data-driven decision making is its Forecasting System, SCOT ("Supply Chain Optimization Technologies"), which has similarly been the subject of much public reporting.  As technology news site *Technoblender* reported on June 17, 2022:

- "Part of Amazon's e-commerce challenges today stem from a piece of technology long prized during Mr. Bezos' tenure as a secret weapon, an internal forecasting system called Supply Chain Optimization Technologies, or SCOT.  It was designed to incorporate a multitude of factors and spit out projections for product demand and the growth in logistics needed to fulfill it."

- "Amazon's SCOT forecasts produced low, medium and high estimates.  Because of unprecedented volume in the early days of the pandemic, **Amazon executives including Mr. [Dave] Clark repeatedly chose the higher end of SCOT's estimates**, said people who used the tool and worked on the SCOT team at the time.  Those estimates meant that the company needed many more fulfillment centers and other infrastructure to keep up."

- "**We made a decision to build to the high side** to avoid constraining consumers and sellers in any way,' said Mr. Jassy at the company's shareholder meeting in May."

- "Senior Amazon executives familiar with the forecasting technology said it wasn't equipped to process an unforeseeable event like the pandemic and

---

[360] From December 2019 through September 2021, when she left Amazon, FE-1 served as a Senior Product Manager in the Company's New York office, with responsibility for Amazon advertising product.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 95 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

caused the company to commit to building out warehouses and infrastructure early in the pandemic that take 18 months to two years to come online.  When the virus receded, Amazon was left with more planned capacity than orders."

266.     Investors understood that Amazon's public statements were consistent with the projections and data available to Defendants from SCOT, and similar systems, and that the information provided by those systems was accurate and reliable.  And regardless of what Amazon's SCOT system projected, by July 2021 Defendants were already aware of Amazon's excess capacity and had already begun to change course and pull back on the broad expansion plan—while still telling investors it was justified and continued apace.

     **G.     By July 2021 Defendants Knew that Amazon Had Overexpanded and Decided To Reverse Course**

       **1.     Defendants Assured Investors that Amazon's Continued Expansion was Justified by Demand for Fast Delivery**

267.     As *Wall Street Journal* reported on June 16, 2022, following the rise in demand for e-commerce and fast delivery caused by the COVID-19 pandemic, Amazon's "revenue grew by a total of two-thirds . . . and its profit nearly tripled" across 2020 and into the first quarter of 2021.  However, as investors belatedly learned in late-April 2022 and *Wall Street Journal* reported in June, demand for increased fulfillment capacity and delivery speeds did not keep pace with Amazon's capacity investments, and "its setback has been among the most pronounced . . . erasing more than $600 billion in market value."

268.     In the 18 months preceding July 2021, Amazon had almost doubled its warehouse and transportation network, resulting in capital expenditures and equipment leases that *Reuters* reported increased by 74% between July 2020 and July 2021 to $54.5 billion—almost double the growth rate from the year prior.  Still, as of July 2021, the public understood, consistent with Amazon's public representations, that the Company planned to continue its expansion, including by adding "517 facilities to its global distribution infrastructure in the coming years . . . 176 million square feet on top of the 402 million" it already has.

269.     Amazon announced its Q2 2021 results on July 29, 2021.  During Amazon's Q2 2021 Earnings Call, Defendant Olsavsky reassured investors that—even as the market changed

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 96 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

and growth slowed—the Company's aggressive expansion strategy remained sound:  "**As we think about the pull-forward in demand we've seen these past 18 months, it has required and will continue to require a significant amount of investment in our fulfillment network**."  In other words, Amazon was still investing to expand capacity, and it was justified to meet demand for e-commerce and fast delivery.  Defendant Fildes reiterated the message:  "**I'd just say our focus is really squarely on adding capacity to meet the current high customer demand**."

270.        On the same call, when an analyst specifically asked about Amazon's "fulfillment costs," what was driving the higher "a per-unit" cost, and if there were "inefficiencies that went on in the quarter in fulfillment?"  Olsavsky did not mention overexpanding capacity or the need to pull back.  In fact, quite the opposite, Olsavsky doubled down:  "**So you can see there's been very strong multiyear demand here that we are still catching up with from last year. . . . So we're continuing to add, and most of that development is really ahead of us, in the second half of the year** . . . . [W]e've literally nearly doubled our network here in the last 18 months from a size standpoint."

271.        In response to another analyst's question regarding "growth assumptions for e-commerce," Olsavsky stressed that "[w]e've been playing catch-up pretty much since the pandemic started, but what suffered is space and space constraints.  And it's gotten better, but it was a factor last year. . . . [I]n the United States, while it's improving, it still hasn't reached the pre-pandemic levels.  So we have a lot of growth to do there."  Olsavsky later added that Amazon's "space planning" was "why we're building out our network so quickly in our minds.  It's hard to do quickly, but we're moving as quickly as possible.  And again, we have a lot of new capacity being added in the second half of the year."

272.        On October 28, 2021, Amazon issued a press release announcing its financial results for third-quarter 2021.  The release quoted Defendant Jassy as stating that Amazon had "driven extraordinary investments across our businesses to satisfy customer needs . . . we've nearly doubled the size of our fulfillment network since the pandemic began."

273.        During the earnings conference call that same day, Defendant Olsavsky stated that "**[w]e have nearly doubled our operations capacity in the past two years to keep up with**

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 97 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

customer demand," and assured investors that the costs of that increased capacity were still warranted.  Again, Olsavsky assured investors that Amazon's expansion plans were proceeding apace and remained necessary to satisfy demand.  Olsavsky also reiterated Defendants' claim that demand for first delivery was driving the Company's aggressive expansion:  "**the incremental demand that came our way during the pandemic has remained and that we are continuing to grow on top of that**."

274.        An analyst also specifically asked Defendants if on "fulfillment capacity," Amazon could "be ahead of plan for next year and kind of cut down the investment there?"  Olsavsky knew that Amazon was *already* cutting back on expansion but still responded by saying:  "We are just now getting caught up on space for inventory. . . . **But we expect the long-term trends to be strong in this business.  We're investing as such**."

275.        Another analyst asked whether Amazon's efforts to expand same-day deliveries to customers "leverage[d] kind of your existing fulfillment center footprint."  Olsavsky responded:  "**we're well on our way to providing ultrafast delivery for things that require ultrafast or things like groceries and others, and we see that expanding**."  Olsavsky added that, "you have to have a cost structure and a logistics network that will pay for the delivery over time.  So we see it as part of an offering that we offer to customers that ranges from two days to one day to two hours or one hour in some cases.  So we like to meet customers where they are, when they need things, and we're working on speed consistently."

276.        As explained above, Amazon had repeatedly told investors that faster delivery for more customers was the primary basis for the Company's aggressive expansion.  While continuing to represent that this investment spending was justified, Defendants pointed to "cost structure and . . . logistics network" considerations while knowing that these were the very same reasons that they had already begun to scale back.

277.        On February 3, 2022, Amazon issued another press release in which Defendants addressed the positive future of their expanding fulfillment network without mentioning that Amazon had already changed course.  Jassy was quoted as stating: "we continue to feel optimistic and excited about the business as we emerge from the pandemic.  When you combine how **we're**

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 98 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  **staffing and scaling our fulfillment network to bring even faster delivery to more customers,**

2  **. . . there's a lot to look forward to in the months and years ahead**."

3  278.        The same day, during Amazon's Q4 2021 earnings conference call, Defendants

4  again (for the [third] quarterly earnings call in a row) boasted about "doubling [Amazon's]

5  operations capacity" for the Pandemic era market, with Olsavsky explaining that Amazon

6  "**invested significantly to keep pace with this demand** . . . expanding our fulfillment center

7  footprint while adding significant transportation assets to ensure fast on-time delivery."  Going

8  even further, Olsavsky stated that Amazon "**continued to see an increase in customer demand**

9  **and sales during the remainder of 2021, even as the economy opened back up**"—all with the

10  no mention that capacity investments had already outpaced demand for fast delivery or that (at

11  least as early as July 2021) some of those investments were *already* being scaled back.

12  279.        Additionally, in response to an analyst's question about Amazon's investments to

13  expand the Company's same-day delivery capacity, Olsavsky assured investors that "[w]e feel

14  good about where we are.  **We're continuing to build capacity that enables us to hit those**

15  **[same-day delivery] cutoffs**."  After repeating that Amazon had "doubled the capacity in the

16  network . . . to handle today's volume" and "ship faster," Olsavsky further represented that "there's

17  a lot of expansion that's been going on in the network, and **we feel good about the basic**

18  **contributors of profitability.**"

19  280.        Another analyst, after noting Amazon's "doubled . . . fulfillment network" and

20  hiring spree, directly asked Olsavsky, "Where is Amazon in terms of emerging from this [2.5 year]

21  investment cycle?  **Can you see a slowdown in that big investment spending this year?**"  In

22  response, Olsavsky discussed the Company's capital expenditure percentages, and claimed:  "If I

23  look to the future, we're still working through some of our plans for 2022, but it's coming into

24  focus a bit.  **We see CapEx for infrastructure going up**.  We still have a very fast-growing

25  business that's growing globally, and **we're adding regions and capacity to handle usage that**

26  **still exceeds revenue growth in that business.   So we feel good about making those**

27  **investments**."

28

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 99 -
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

281.        Olsavsky failed to mention that Amazon's "big investment spending" had not only slowed on the fulfillment side, but actually *required cutbacks*—which had already begun in July 2021 (and likely earlier).  Instead, Olsavsky added that, "**On the fulfillment center side . . . [w]e see that moderating, and that will probably now match growth of our underlying businesses**."

282.        On April 14, 2022, Jassy wrote a Letter to Shareholders with the Company's 2021 Annual Report, repeating Defendants' story about increased demand and expansion.  Jassy wrote that the fulfillment network "**had to double** it in the last 24 months **to meet customer demand**."  After mentioning "short-term logistics and cost challenges" in the past tense, Jassy confirmed that one-day shipping, and the necessary investments in capacity, were still Amazon's focus:

> [J]ust before COVID started, we'd made the decision to invest billions of incremental dollars over several years to deliver an increasing number of Prime shipments in one day.  This initiative was slowed by the challenges of the pandemic, but we've since resumed our focus here. . . . [W]e believe our over 200 million Prime customers, who will tell you very clearly that faster is almost always better, will love this. . . .This type of iterative innovation is never finished and has periodic peaks in investment years, but leads to better long-term customer experiences, customer loyalty, and returns for our shareholders.

### 2.        Even Before July 2021, Amazon Knew That Demand For Fast Delivery Began to Decline

283.        Defendants' statements from July 2021 through April 2022 were in conflict with the reality that, by no later than July 2021, it was clear to Defendants that Amazon's fulfillment network had excess capacity—and that Amazon had already begun to reverse course on its expansion efforts.

284.        As Defendants eventually admitted on April 28, 2022—when Amazon announced a $3.8 billion net loss for first quarter of 2022—that Amazon needed to turn to "improving productivity and cost efficiencies" in Amazon's "fulfillment network."  On the Company's Q1 2022 earnings conference call that day, Olsavsky disclosed $4 billion in costs resulting from "the state of the labor force and fulfillment network" in connection with Amazon "being overstaffed, resulting in lower productivity" and "overcapacity."

285.        However, as *Wall Street Journal* reported on June 16, 2022, Amazon had been aware of the problem since at least July 2021, when Jassy began "working to cut back the excesses"

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 100
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

from the "Bezos-Led Overexpansion" which resulted one of the "worst stretches for financial performance in Amazon's history."

286.     As *Wall Street Journal* reported, in early 2020, following the "unprecedented" increase in purchase volume, Amazon was "short-staffed and often out of stock on key items," in some cases, pushing their delivery window from "two days to weeks." As a result, Amazon wanted "more capacity fast" with executives repeatedly relying on the higher forecasting estimates for planning, including for new buildings and "other infrastructure." These were investments that would take "18 months to two years to come online" and "[w]hen the virus receded, Amazon was left with more planned capacity than orders."

287.     When the news broke in June 2022, Jassy had already closed 68 stores, "much of the company's bricks-and-mortar retail operation," and was still looking for ways to "sublease at least 10 million square feet of excess warehouse space, defer construction of new facilities" and "end or renegotiate leases." However, problems in "Amazon's retail and logistics operation had actually begun to show before" Jassy took over, and by July 2021, Jassy and Amazon were aware that their "capacity was outpacing demand" and "made a series of intensifying cutbacks to the plans for capacity growth." Amazon "again cut back capacity growth plans in September and December of 2021."

288.     Former Amazon Employees, as well as reports on Amazon's abandonment of various new facilities, confirm that Jassy, Olsavsky, Clark, and Amazon, despite their public statements, were already well aware of the problem, and further confirms that Amazon was already making these "intensifying cutbacks" by July 2021.

289.     Despite Defendants' knowledge that Amazon's warehouse and fulfillment center network had excess capacity and far exceeded demand for fast delivery, necessitating significant cutbacks, for nearly nine months, Defendants concealed those cutbacks from the public investment community while at the same time assuring investors that the expansion strategy was necessary and continued apace.

290.     *CNBC* has reported that, by September 2022, Amazon had closed or canceled at least 44 facilities and delayed opening an additional 25 facilities—in the United States alone—for

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 101
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

a combined total of well over 50 million square feet of excess capacity. This is already far beyond the 10 to 30 million square feet of space that Amazon was seeking to sublet, as reported in May 2022 by *Bloomberg*, and not including the 68 "bricks-and-mortar retail" stores that, as *Wall Street Journal* reported in June, Amazon had already closed.

### 3. Former Amazon Employees Confirm that Amazon Was Pulling Back on its Expansion Plans By Early 2021

291.     The pullback was known internally much earlier than Amazon disclosed. FE-1, a Senior Project Manager with Amazon from December 2019 to September 2021, explained that Amazon realized that they had overbuilt by the end of 2020. As a Senior Vice President informed FE-1, by late 2020, there was a stall in forward-looking investments that was implemented in order to "rationalize" plans for increased fulfillment capacity. By that point, Amazon's lease commitments overextended the demand for increased capacity, and the Company's internal projections of continued demand showed that demand was not maintaining at the level to which they had sourced increased incremental fulfillment capacity. As FE-1 described, Amazon started making cutbacks to fulfillment capacity in the spring of 2021 and put a halt on capital expenditures. FE-1 received information on cutbacks from Amazon leadership and sources within Amazon's finance division, specifically Amazon's Financial Planning and Analysis Team.

292.     FE-1 recalled discussions concerning the inevitable decline from the COVID-level purchase volumes as early as 2020, and then again on slowing down expansions when consumer volume had not materialized as expected. FE-1 explained that very early in 2021, Amazon saw declining order volumes, and by the summer of 2021, Amazon knew that 2022 was going to be different. Accordingly, Amazon made efforts to reduce middle mile and last mile delivery centers, as FE-1 explained, and was halting construction and even pulling out of prior deals.

293.     FE-1 further explained that by the summer of 2021, the Company started slowing down hiring in Amazon's consumer business. As FE-1 recalled, there was a major push for cost control in the Company from 2021 into 2022, to a degree that FE-1 had never previously seen, having been at Amazon since 2017.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 102
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

294.     Similarly, Amazon Former Employee 2 ("FE-2")[361] worked on a team responsible for launching new Amazon last-mile delivery buildings.  FE-2 explained that the process for opening a new Amazon last-mile delivery building generally followed three stages: First, the construction team finishes the shell and structure of the building.  Second, start-up teams (like FE-2's) prepare the "shell site" for Amazon operations, including setting up all the necessary machinery and equipment.  Third, the operations team confirms that the building is fully functional and ready for management to start operating.

295.     FE-2 recalled that when demand was high for new buildings, Amazon leadership was pushing aggressively to "launch, launch, launch."  At one point in 2020, FE-2's team was expanded to launch more than 200 planned buildings.  However, in early 2021, FE-2 started to deal with what Amazon employees referred to as "mothball buildings."  A mothball building was a new Amazon site that was built and ready to be launched but did not become operational.  In the case of "mothball" buildings FE-2's team would have to "let it sit."  FE-2 explained that the start-up team would come into a shell site, ready the wiring and resources, install the vending machines and conveyors, and set up other basic equipment such as tables and chairs, but the operations team would not come to complete the launch. Instead, they would "lock the door and walk away." Eventually, as FE-2 explained, Amazon began to cancel the startup stage completely, and buildings were left as unfinished shell sites.

296.     FE-2 also explained that the Amazon Logistics (or "AMZL") team generated weekly "heatmap" reports that were distributed to all AMZL employees, including its senior-most management.  According to FE-2, these heatmap reports were excel files that documented the projected launch dates of all the buildings, as well as what progress had been made on each building and (on a weekly basis) any changes to each building's projected launch date.

---

[361] FE-2 worked at Amazon from May 17 through June 2022, and from October 2019 through June 2022 as a Launch Execution Program Manager where she managed a team responsible for launching new delivery stations, which are the "last mile" buildings in Amazon delivery infrastructure.  When she joined her final team in October 2019, it had 20 employees, but as Amazon sought to expand more quickly in 2020, it grew to as many as 70 employees.

297.        By the summer of 2021, FE-2 had already witnessed Amazon's excess capacity firsthand.  As FE-2 recalled, she was specifically aware of at least one mothball building that was "in the vicinity of another building with similar capacity," and that building was already operating below capacity.  FE-2 recalled a demand projection that was insufficient to exceed the capacity of just one of the two buildings.

298.        Based on personal information she reviewed, FE-2 recalled the first mothball building she worked on was on March 4, 2021.  The majority of the building was ready, but the launch was paused.  Initially, the launch was delayed just a few weeks, but months passed as the date was pushed back again and again—for approximately six months.

299.        Throughout 2021, FE-2 became aware of numerous other mothball buildings as well as "decommissioned buildings" (where Amazon will effectively give up the property, strip everything out of the building, and either end or try to end the lease).  The first "decommission" that FE-2 was involved with was became decommissioned on June 8, 2021.  One of FE-2's colleagues had been involved in decommissioning buildings four or five months earlier.

300.        In September 2021, FE-2 also became aware of two additional mothball buildings. The next month, in October 2021, FE-2 worked on another mothball building that had originally been scheduled to open in November 2021.  Instead, just over a month before launch, FE-2 was informed that the launch had been canceled and that the building would become a "shell site."  As FE-2's immediate supervisor said, "they had excess capacity."

301.        FE-2 described various complications in connection with all of Amazon's extra buildings.  At one point, Amazon had such a large amount of excess basic building equipment (tables, chairs, etc.) that it became a nuisance to deal with, and most of the inventory had to be thrown away.  Eventually, FE-2's team was reduced and then Amazon disbanded the team completely.

302.        FE-3 served in various capacities associated with the development and planning of Amazon's fulfillment network from August 2020 through June 2022.  Critically, from 2020 through June 2022 FE-3 was responsible for the development of Amazon's fulfillment network in

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 104
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

North America, with particular responsibility for Canada.[362]  In FE-3's role during 2021 through 2022, FE-3 was involved in many meetings, and drafted, reviewed and exchanged documents that reflected plans to be presented to senior Amazon executives, including Bezos and Olsavsky, concerning the development of facilities to be added to Amazon's fulfillment network.

303.     FE-3 prepared reports on fulfilment center expansion plans and discussed those with his supervisors, a North America Supply Chain Director and a Senior Vice President of Global Customer Fulfillment.  FE-3 confirmed that these plans were discussed at meetings with C-level employees at Amazon.

304.     FE-3 indicated that the plans for the addition of fulfillment centers were presented to Olsavsky, and required the ultimate approval of Defendant Bezos.  FE-3 also indicated that final approval for the development of any fulfillment centers was distributed by email from Bezos with one word: "approved"; Defendant Olsavsky was copied on those emails.

305.     FE-3 participated in many meetings where executives discussed the scope of fulfillment sites to be added in the United States and Canada.  For example, FE-3 indicated that there was a meeting in in early 2021, during which FE-3 and others were tasked with presenting recommendations for the number of locations to be added to the fulfillment network.  FE-3's plan called for four additional fulfillment centers in all of Canada over the next three years.  The related draft for the United States included the addition of approximately 80 sites in the United States.  FE-3 reported that the U.S. expansion plan would require expenditures of up to $50 billion, based on an average fulfilment center cost of approximately $400-$600 million each.

306.     FE-3 believed that the plans for expansion in the U.S. were too aggressive and would need to be scaled back.

307.     FE-3 further reported that by February of 2021 Amazon's managers and executives in the fulfilment capacity organization began "questioning" the approximately 80 facility U.S. expansion plan.  FE-3 stated that prior to summer 2021, Amazon managers and executives in the

---

[362]  FE-3 progressed from Pathways Operations Manager (March 2018 – February 2019), to Senior Operations Manager (February 2019 – August 2020), to Senior Manager, Supply Chain Execution (Capacity) (August 2020 – June 2022).

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 105
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

fulfilment capacity organization were discussing that the plan for 80 facilities was an error because the pandemic was not going to last forever and vaccines were getting rolled out.

### 4. Defendants Continued To Mislead Investors and Represent that Amazon was Expanding Capacity Despite the Substantial Pullback that Was Already Underway

308.    Even though, as *Wall Street Journal* has reported, the Company had already decided to pull back significantly on its expansion plans by July 2021, Defendants nevertheless continued to publicly represent that its expansion plans continued.  For example:

- On September 20, 2021, Amazon announced their first fulfillment center in North Dakota:  "We are excited to have this fulfillment center up and running, which will allow us to deliver more packages, in a faster time frame, to our customers in North Dakota, Minnesota and South Dakota.  We are committed to employing hundreds here in the Fargo-Moorhead region." Said John Sabo, Amazon General Manager, Fargo.).[363]

- On September 23, 2021 Amazon announced, "faster Same-Day Delivery" expansion in select cities, which required new employees for the "new fulfillment centers" that Amazon built "in each community."[364]

- On December 9, 2021, Amazon announced its first "sub-same day" delivery fulfillment warehouse in Utah, for even faster shipping.[365]  As Amazon explained, the new fulfillment center allowed Amazon to "fulfill and deliver out of one building and directly to customers" who would "go from click to delivery in five hours or less."  *Id.*

- On March 18, 2022, Amazon announced that the first "same-day" fulfillment delivery center in Massachusetts would allow customers to "click purchase" and have an order on their "doorstep within hours."[366]

---

[363] Amazon Opens First Fulfillment Center in North Dakota (Sept. 20, 2021), https://press.aboutamazon.com/news-releases/news-release-details/amazon-opens-first-fulfillment-center-north-dakota.

[364] Faster Same-Day Delivery expansion creates new, flexible roles across the U.S. (Sept. 23, 2021), https://www.aboutamazon.com/news/operations/faster-same-day-delivery-expansion-creates-new-flexible-roles-across-the-u-s.

[365] Amazon unveils first sub-same day delivery station in SLC (Dec. 9, 2021), https://ksltv.com/478572/amazon-unveils-first-sub-same-day-delivery-station-in-slc/  ("The evolution of our Same-Day Delivery program is driven by our partnership with local communities like Salt Lake and is made possible by the people who live there.").

[366] Amazon Opens First Same-Day Fulfillment Center in Massachusetts (Mar. 18, 2022), https://www.businesswire.com/news/home/20220317005938/en/Amazon-Opens-First-Same-Day-Fulfillment-Center-in-Massachusetts.

("We want you to be able to get what you want and need, when you want and need it.").

### 5.      Amazon Has Delayed or Canceled the Opening of Numerous Buildings

309.      During 2021, Amazon announced or confirmed plans to launch numerous large facilities across the country.  By 2022, however, many of these facilities (representing substantial square footage) were delayed or canceled entirely due to Amazon's excess capacity.  But it was not until April 28, 2022 that Defendants finally admitted that Amazon was over capacity.

310.      The scope and scale of the excess capacity is staggering.  As discussed above, by September 2022 Amazon had closed or canceled at least 44 facilities and delayed opening an additional 25.

311.      During the Class Period alone, Amazon misleadingly announced the opening of multiple sites that would either never open, be delayed indefinitely or which sat idle.  For example, in August 2021, Amazon announced plans for 1 million-square-foot fulfillment center to open in Clarksville, Tennessee in 2022:  "Amazon is proud to be part of the Clarksville community and make this investment toward workforce and economic advancement in the area."  A year later, the fulfillment center was delayed with no official opening date and the same misleading explanation discussed above:  "While we are delaying the launch of our new facility in Clarksville, it is still a part of our future plans.  Will keep you posted as those firm up down the road," said an Amazon spokesperson.

312.      On September 8, 2021, Amazon announced plans to open a 1 million-square-foot facility in Delta Township, Michigan by 2022.  However, the launch was delayed by over a year. As the *Lansing State Journal* reported on March 14, 2022, in a February email an Amazon spokesperson confirmed that the facility would not launch until 2024, but misleadingly indicated the reasons for the change were not related to a pullback on fulfillment expansion:  "The only thing that's changed with our plans is the timing . . . . We are a dynamic business and have dozens of

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 107
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  fulfillment centers, sortation centers and delivery stations that are evolving and under construction
2  across the country."[367]

3  313.       On September 16, 2021, Amazon announced plans to launch two 1 million-square-
4  foot distribution centers in Pasco, Washington:  "We're excited to open two new, state-of-the-art
5  facilities in the city of Pasco . . . and we look forward to growing employment in the Tri-City
6  region."  Amazon said it would begin hiring in 2022, but in May of 2022 an Amazon spokesperson
7  confirmed that both of the facilities would be delayed—without a specific reason or a timeframe:
8  "We're still excited to launch in Pasco, though we've had to adjust our timing."

9  314.       In October 2021, Amazon announced a new 1 million-square-foot fulfillment
10  center in Canton, Ohio to open in 2022:  "We're excited to be expanding our network to better
11  serve our customers in Northeast Ohio."  However, in March of 2022, Amazon confirmed that the
12  facility would be delayed to 2023.[368]

13  315.       In November 2021, citing supply chain disruptions, Amazon delayed opening its
14  massive 3.8 million-square-foot fulfillment facility in Clay, New York.  The $350 million facility
15  was scheduled to open in the fall 2021.  In April 2022, Amazon, still misleadingly blaming supply
16  chain issues, delayed the Clay facility for a fourth time.

17  316.       The scope of Amazon's efforts to reduce its fulfillment capacity has been
18  significant, even if Amazon itself has provided little detail concerning particular facilities.  By July
19  2022, Amazon's workforce had declined by 99,000 employees from the first to the second quarter
20  of 2022—what *GeekWire* reported was "the largest sequential drop" in the Company's history.

21
22
23
24
25
26  [367] Amazon fulfillment center in Delta Twp. won't open this fall (Mar. 14, 2022) (available on Lexis).

27  [368] Hexamer: Supply Issues, Aggressive Construction Schedule Cause Amazon Opening Delay
28  (Mar. 22, 2022), https://www.whbc.com/hexamer-supply-issues-aggressive-construction-schedule-cause-amazon-opening-delay/.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 108
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

And, by September 2022, Amazon canceled, delayed, or subleased at least 69 previously planned facilities, including those specifically referenced in the below chart:

| LOCATION | BUILDING ESTIMATE | REPORTED |
|---|---|---|
| Alcoa, TN | 634,000 SF fulfillment center | February 2022 – Delayed to 2023 |
| Arvada, CO | Delivery station | June 2021 – Canceled |
| Bakersfield, CA | 128,000 SF delivery station | July 2022 – Delayed opening indefinitely since 2021 |
| Bellmawr, NJ | Delivery station | June 2022 – Closed and put up for sublease |
| Bessemer, AL | Airhub/sortation center | September 2022 – Canceled |
| Bethpage, NY | Delivery station | September 2022 – Closed and put up for sublease |
| Branford, CT | Delivery station | May 2022 – Closed |
| Canton, MS | 700,000 SF fulfillment center | February 2022 – Delayed indefinitely |
| Canton, OH | 1 million SF fulfillment center | March 2022 – Delayed to 2023 |
| Chamblee, GA | 103,000 SF Delivery Station | June 2022 – Canceled |
| Churchill, PA | 3 million SF distribution center | March 2022 – Canceled |
| Clarksville, TN | 1 million SF fulfillment center | August 2022 – Delayed to 2023 |
| Clay, NY | 3.8 million SF fulfillment center | November 2021 – Delayed to 2022 |
| Cocoa, FL | 200,000 SF delivery station | July 2022 – Opening delayed to 2023 |
| Coral Springs, FL | 250,000 SF distribution center | June 2022 – Canceled and subleased |
| Crystal Lake, IL | Delivery station | September 2022 – Canceled |
| Davenport, IA | 640,000 SF fulfillment center | May 2022 – Delayed to 2024 |
| Dayton, OH | Delivery station | September 2022 – Opening delayed to 2024 |
| Dedham, MA | Delivery station | August 2022 – Closed |
| Delta Township, MI | 1 million SF facility | March 2022 – Delayed to 2024 |
| Egg Harbor City, NJ | Delivery station | August 2022 – Canceled |
| Englewood, CO | Delivery station | September 2022 – Closed and subleased |
| Enka Village, NC | Delivery station | September 2022 – Opening delayed indefinitely |
| Essex, MD | 270,000 SF delivery station | August 2022 – Closing in October 2022 |

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 109
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

| Location | Building Estimate | Reported |
|---|---|---|
| Everett, MA | Delivery station | August 2022 – Closing in Q3 2022 |
| Fort Meyers, FL | 1.5 million SF fulfillment center | September 2022 – Canceled |
| Gates, NY | 2.6 million SF fulfillment center | July 2022 – Delayed to 2023 |
| Greensboro, NC | Fulfillment center | September 2022 – Canceled |
| Hamburg, NY | 181,000 SF Delivery center | August 2022 – Opening delayed to 2023 |
| Hanover, MD | 154,000 SF delivery station | August 2022 – Closing in 2022 |
| Hayward, CA | 507,000 SF delivery station | August 2022 – Canceled and subleased |
| Hoffman Estates, IL | Fulfillment center | September 2022 – Canceled and put up for sublease |
| Hudson, NH | Two 1 million SF warehouses | April 2022 – Canceled |
| Huntley, IL | 630,000 SF Cross Dock | July 2022 – Delayed to 2023 |
| Kansas City, MO | 700,000 SF Fulfillment center | September 2022 – Canceled |
| Lawrence, WI | $200 million fulfillment center | May 2022 – Canceled |
| League City, TX | 180,000 SF delivery station | June 2022 – Opening delayed indefinitely |
| Louisville, KY | Fulfillment center | September 2022 – Canceled |
| Mansfield, MA | Delivery station | August 2022 – Closing in Q3 2022 |
| Marriott-Slaterville, UT | 183,000 SF distribution center | June 2022 – Opening delayed to 2024 |
| Meridian, ID | Delivery center | August 2022 – Opening delayed indefinitely |
| Milford, MA | Delivery station | August 2022 – Closing in Q3 2022 |
| Miramar, FL | Delivery center | September 2022 – Opening delayed indefinitely |
| Montgomery, OH | Fulfillment center | September 2022 – Delayed to 2023 |
| Nashville, TN | Delivery station | July 14, 2022 – Closed |
| New York, NY | Delivery station | September 2022 – Closing and up for sublease |
| Newark, NJ | Airhub/sortation center | July 2022 – Canceled |
| Oceanside, CA | 143,000 SF delivery station | August 2022 – Canceled |
| Papillion, NE | 700,000 SF fulfillment center | July 2022 – Delayed to 2024 |
| Pasco, WA | 1 million SF distribution center | May 2022 – Delayed to 2023 |

| LOCATION | BUILDING ESTIMATE | REPORTED |
|---|---|---|
| Peñitas, TX | 650,000 SF Fulfillment center | May 2022 – Canceled |
| Pittsfield, MI | 143,000 SF delivery station | August 2022 – Delayed indefinitely |
| Porter, TX | Delivery station | June 2022 – Delayed indefinitely |
| Randolph, MA | Delivery station | August 2022 – Closing in Q3 2022 |
| Riviera Beach, FL | Delivery station | September – Opening delayed indefinitely |
| Round Rock, TX | $250 million fulfillment center | May 2022 – On hold indefinitely |
| Salinas, CA | 2.8 million SF fulfillment center | April 2022 – Canceled |
| San Antonio, TX | $200 million fulfillment center | June 2022 – Delayed to Q4 2023 |
| San Leandro, CA | 294,000 SF delivery station | August 2022 – Canceled and subleased |
| Shreveport, LA | 3.4 million SF fulfillment center | June 2022 – Delayed to 2023 |
| Sioux Falls, SD | 600,000 SF fulfillment center | June 2022 – Delayed to 2024 |
| Slidell, LA | Delivery center | July 2, 2022 – Opening delayed indefinitely |
| Sonoma, CA | 250,000 SF delivery station | August 2022 – Canceled |
| Sturtevant, WI | Distribution center | February 2022 – Closed |
| Valparaiso, IN | Delivery station | April 28, 2022 – Opening delayed indefinitely |
| Waco, TX | 700,000 SF fulfillment center | June 2022 – Delayed indefinitely |
| West Covina, CA | 177,000 SF delivery station | March 2022 – Canceled |
| Wilmington, NC | Delivery station | September 2022 – Delayed indefinitely |
| Woodward, IA | 1 million SF fulfillment center | November 2021 – Canceled |
| Ypsilanti, MI | 183,000 SF delivery station | August 2022 – Canceled |

H.   **The Truth Begins To Emerge About Amazon's Exploitation of Third-Party Sellers and Slowing Demand for Amazon's Fast Delivery**

1.   **During the Class Period, the Truth Gradually Emerges that Amazon Exploited Its Third-Party Sellers**

317.     On April 28, 2020, *CNBC* published an article entitled "GOP Sen. Hawley asks DOJ to open a criminal investigation into Amazon."  According to the article, Senator Hawley requested that the DOJ open a criminal investigation into Amazon, citing claims that the Company

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 111
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

engaged in "predatory and exclusionary data practices to build and maintain a monopoly" following reports that Amazon used data from third-party sellers to compete with them using its private-label business. Senator Hawley further stated that "Amazon abuses its position as an online platform and collects detailed data about merchandise so Amazon can create copycat products under an Amazon brand." That same day, *States News Service* likewise published an article detailing Senator Hawley's call for action, including the senator's letter to the DOJ, which alleged, *inter alia*, that "Amazon appears to recognize that using this data to develop its own merchandise is problematic. Indeed, Amazon insists it has adopted policies prohibiting this conduct. Yet Amazon's own employees and documents suggest that what Amazon says in its policies and what Amazon does in practice are two different things. Even if Amazon's statements are true, they are hardly reassuring. Amazon does not deny that it uses precise, intrusive data to create its own merchandise."[369] On this news, Amazon's stock price fell $61.92 per share, or 2.61%, to close at $2,314.08 per share on April 28, 2020.

318.      On May 1, 2020, the first headline for a *Bloomberg* article titled, "Amazon's Bezos Faces Call to Testify Before House Panel," went live at 10:34 a.m. The article noted that the members of an antitrust panel for the House Judiciary Committee had requested that Bezos testify regarding concerns that the Company used data from third-party sellers on its site to develop competing products, in contradiction to representations the Company previously made under oath to Congress in July 2019.[370]

319.      Later that day, at 4:33 p.m., *Fox News* published an article titled "Jeff Bezos could testify for Amazon's 'possibly criminally false' statements to Congress, letter reveals."[371] The

---

[369] "Senator Hawley Requests Criminal Antitrust Investigation of Amazon," *States News Service* (Apr. 28, 2020) (available on Lexis Nexis).

[370] Ben Brody, "Amazon's Bezos Faces Call to Testify Before House Panel," *Bloomberg* (May 1, 2020), available at https://www.bloomberg.com/news/articles/2020-05-01/amazon-s-bezos-called-to-testify-before-house-antitrust-panel#xj4y7vzkg.

[371] Christopher Carbone, "Jeff Bezos could testify for Amazon's 'possibly criminally false' statements to Congress, letter reveals," *Fox News* (May 1, 2020 4:33pm), available at https://www.foxnews.com/tech/jeff-bezos-testify-amazon-congress.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 112
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

article reported that "[t]he lawmakers also referenced Amazon's lack of cooperation with Congress' antitrust probe of the company."

320.     On this news, Amazon's stock price fell the same day from $2,323.00 per share at 10:34 a.m. to close at $2,286.04, a decline of $36.96 per share or 1.59%.

321.     On July 23, 2020, *Wall Street Journal* published an article entitled "Amazon Met With Startups About Investing, Then Launched Competing Products." The article reported, in relevant part, that Amazon engaged in the practice of making initial investments or meetings with start-ups for the purpose of securing their proprietary information before launching Amazon's own competing products.

322.     On this news, Amazon's stock price fell $113.36 per share, or 3.66%, to close at $2,986.55 per share on July 23, 2020.

323.     On August 3, 2020, *Bloomberg* published an article entitled "Amazon's Market Power to Be Investigated by New York AG." The article reported that the New York and California Attorneys Generals were joining the FTC's antitrust probe into Amazon. *Business Insider* reported, the same day, in an article entitled "Amazon is reportedly facing a new antitrust investigation into its online marketplace led by the FTC and attorneys general in New York and California" that the joint probe relates to Amazon's treatment of third-party sellers and competition with its own products.

324.     On this news, Amazon's stock price fell $52.79 per share, or 1.67%, to close at $3,111.89 per share on August 3, 2020.

325.     On October 6, 2020, the Subcommittee released a report on Amazon's anticompetitive practices. News agencies noted that the report hinted at a breakup of big tech companies and detailed concerns about the anticompetitive practices of Amazon.

326.     On this news, Amazon's stock price fell $99.24 per share, or 3.1%, to close at $3,099.96 per share on October 6, 2020.

327.        On April 6, 2022, *Wall Street Journal* published an article entitled "SEC Is Investigating How Amazon Disclosed Business Practices."  The article reported, in relevant part:

> Federal securities regulators are investigating how Amazon.com Inc. has disclosed some details of its business practices, including how it uses third-party-seller data for its private-label business, according to people familiar with the matter.
>
> The Securities and Exchange Commission is probing how the technology giant— the largest U.S. e-commerce retailer and cloud-computing company—handled disclosures of its employees' use of data from sellers on its e-commerce platform, the people said.  The SEC's enforcement division has asked for emails and communications from several senior Amazon executives, according to one of the people.
>
> . . . .
>
> As a result of its 16-month investigation into technology companies including Amazon beginning in 2019, the [House Judiciary Committee] proposed a series of bills aimed at reining in tech giants.  One of the measures targets Amazon's private-label business, seeking to make it unlawful for the company to give its own products preference over those of competitors, or to use sellers' nonpublic data to compete with them.
>
> . . . .
>
> The SEC's probe has been under way for more than a year, one of the people familiar with the matter said.

328.        On this news, Amazon's stock price fell $105.98 per share, or 3.2%, to close at $3,175.12 per share on April 6, 2022.

### 2.        On April 28, 2022, the Truth Begins To Emerge About Reduced Demand for Amazon's Fast Delivery

329.        On April 28, 2022, Amazon announced its financial results for the first quarter of 2022.  The Company reported a $3.8 billion net loss—its first quarterly loss since 2015.  In Amazon's earnings release, filed with the SEC that same day on Form 8-K, Defendant Jassy admitted that Defendants were "no longer chasing physical or staffing capacity."  Instead, Jassy explained, the Company would turn to "improving productivity and cost efficiencies" in Amazon's "fulfillment network."  After two years of vast expansion, Jassy admitted that these improvements "may take some time."  Additionally, Jassy said that Amazon was seeing "encouraging progress on . . . delivery speed performance."  Jassy admitted, however that shipping speeds were only then

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 114
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

"approaching levels not seen since the months immediately preceding the pandemic in early 2020"—despite the fact that faster delivery had repeatedly been the publicly stated basis for Amazon's aggressive fulfillment spending during those two years.

330.    On the Company's first-quarter 2022 earnings conference call with analysts that day, Defendant Olsavsky disclosed $6 billion of "incremental costs," including $4 billion of costs that corresponded "to the state of the labor force and fulfillment network."  Regarding labor, Olsavsky stated that "we've quickly transitioned from being understaffed to being overstaffed, resulting in lower productivity.  This lower productivity added approximately $2 billion in cost compared to last year."

331.    Regarding the fulfillment network, Olsavsky admitted:

> [W]e currently have excess capacity in our fulfillment and transportation network. . . . [W]e made conscious decisions in 2020 and early 2021 to not let space be a constraint on our business.  During the pandemic, we were facing not only unprecedented demand but also extended lead times on new capacity, and we've built towards the high end of a very volatile demand outlook. . . . We estimate that this overcapacity, coupled with the extraordinary leverage we saw in Q1 of last year resulted in $2 billion of additional costs year over year in Q1.  We do expect the impacts of this fixed cost leverage to persist for the next several quarters as we grow into this capacity.

332.    Olsavsky further admitted on the first-quarter 2022 earnings call that "[i]n the consumer business . . . we currently have some excess capacity in the network that we need to grow into, so we have brought down our build expectations," adding that "many of the build decisions were made 18 to 24 months ago, so there are limitations on what we can adjust midyear." However, as discussed above, what Defendants did **not** say was that the Company had spent that last nine months reassuring the market that Amazon's continued, increasing investments in capacity were both necessary to meet short-term demand for e-commerce and fast delivery, and would add value in the longer term.  On the same call, in response to analyst questions concerning the costs of Amazon's "capacity issues," Olsavsky stated that "we have a chance to more right-size our capacity to a more normalized demand pattern."  Beyond the reported net loss, the first quarter of 2022 also marked Amazon's slowest quarterly growth since 2001.  As *CNBC* reported, "Amazon's revenue increased 7% . . . compared with 44% expansion" in the first quarter of 2021.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 115
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

333.        The Company's April 28, 2022 disclosure concerning the significant negative impact of Amazon's fulfillment network and infrastructure spending caused a precipitous decline in the market price of Amazon common stock.  Specifically, in response to the April 28, 2022 disclosure, Amazon common stock declined from a closing price of $2,891.93 per share on April 28, 2022 to a closing price of $2,485.63 per share on April 29, 2022, a decline of $406.30 per share, or 14.05%.

334.        Media coverage on Amazon's "first loss in 7 years" noted the Company's disclosure that "its major investments in warehouses and staff during the coronavirus pandemic were catching up with it," including Jassy's admission that Amazon was "no longer chasing physical or staffing capacity," but instead focusing on "improving productivity and cost efficiencies throughout our fulfillment network."[372]   For example, on April 29, 2022, *CNN Business* quoted Jassy's disclosure that Amazon was "no longer chasing physical or staffing capacity" but was instead "focused on improving productivity and cost efficiencies," noting his statements on "Amazon's breakneck growth in its consumer business during the pandemic, and the 'doubling' of the company's fulfillment network in the last two years."

335.        Similarly, *Business Insider* reported on April 29, 2022 that "Amazon [was] over capacity after doubling its warehouse space during the pandemic," and that "[s]hares of Amazon fell more than 13%" following Amazon's Q1 2022 Earnings Call, where Olsavsky:  (i) "said the company has 'too much space right now' compared to demand," and (ii) "told analysts on Thursday that Amazon went from being understaffed to overstaffed."

336.        Securities analysts reacted with surprise and concern to Amazon's April 28, 2022 earnings report and Defendants' disclosure that the Company was pulling back on the aggressive expansion it had previously touted, while stressing the resulting significant negative financial consequences.  One firm, Wedbush, titled its April 29, 2022 report "**We Aren't Buying What Amazon (Management) is Selling**," which aptly illustrates the mistrust and sense of betrayal

---

[372] Business Insider US, Amazon tumbles 8.5% in premarket after posting first loss in 7 years (April 29, 2022).

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 116
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

among securities professionals, and Amazon investors more generally, upon learning the truth about Amazon's expansion plans.[373]

337.         Wedbush lowered its 12-month price target from $3,950 to $3,500 based on the news of Amazon's losses.  Wedbush cited "a previously unforeseen lack of productivity arising from the company's decision to rapidly expand its fulfillment capacity over the last 24 months ($2 billion in incremental costs)."  It reported that "lower fulfillment productivity" was "an extraordinarily weak excuse" for the quarterly losses, asking:  "The company nearly doubled its fulfillment capacity over a 24-month period and suffered a lack of productivity at the end of that period but not before?  Why the rush to expand?  Why not double capacity over 30 months, or 36, or 48?  How is it that there was no corresponding lack of productivity in Q3 or Q4 last year?"  Wedbush concluded that "Fulfillment ate up all of the growth."

338.         *JPMorgan* April 29, 2022 report showed further surprise by elite investment firms at Amazon's unanticipated losses.  *JPMorgan* wrote on April 29, 2022 that "With AMZN having doubled its fulfillment network & nearly doubled its workforce to 1.6M employees over the past 2 years, the company now has excess physical capacity & is overstaffed, & is pulling back on spending as anticipated.  However, that near-term overbuild led to $4B in lower productivity & inefficiencies in 1Q Y/Y, which we did not anticipate."

339.         BNP Paribas analysts also reported on April 29, 2022 that "Amazon delivered a weak set of earnings, missing consensus margin expectations by 150bps with heavy [free cash flow] outflows of over USD16bn, even missing our conservative estimates."  As the report explained, the "internal headwinds" included costs of overexpanding the Company's fulfillment network, as "Amazon finds itself with excess capacity," the analysts "take down our growth expectations as cuts take hold," and "[t]he biggest change is that management is no longer 'chasing' fulfillment & transportation CAPEX."

---

[373]  Wedbush, "Amazon.com, We Aren't Buying What Amazon (Management) is Selling; PT to $3,500."

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 117
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

340.          Other analysts were in accord.  Susquehanna Financial Group reported on April 29, 2022 that "excess capacity" was "pressuring profitability . . . as AMZN invested heavily in 2H21 and is now working to reverse the fixed-cost deleverage and increase productivity.  These headwinds will all persist in 2Q as well."  William Blair Equity Research reported on April 28, 2022 that, along with "weaker-than-expected results for its first quarter ending March 2022" the "bigger headline was the company's first quarter loss since 2015, at a loss per share of $7.56, or nearly $16.00 shy of the Street's earnings per share expectations."  RBC Capital Markets wrote on April 29, 2022 that Amazon "missed operating income by $1.7B vs. Street which included $2B of headwinds owing to having excess capacity built out."  And Telsey Advisory Group reported on April 29, 2022 that "the company missed 1Q22 profit projections, primarily due to elevated operating costs and excess capacity," including "internal (controllable) factors," including $2 billion of "excess capacity/deleverage of fixed assets."  Moreover, Telsey reported that "Amazon is focused on resizing its cost structure and eliminating inefficiencies, although it may prove challenging to effectively manage costs, given multiple areas of continued investment."

341.          Considering Amazon's inflated fulfillment costs, analysts highlighted the direct connection between Amazon's two years of capacity expansion and the Company's 2022 losses. PhillipCapital analysts likewise reported on May 4, 2022 about the "internal factors: productivity and overcapacity hurt margins" that were disclosed, and more specifically that the "[e]xcess capacity in fulfilment added [$2 billion] costs."

342.          In the months following the April 28, 2022 corrective disclosure, certain additional details of Amazon's decisions to pull back on its expansion plans have come to light.  On May 24, 2022, technology industry news site *The Information* reported Amazon had "reversed course on an aggressive build-out," and beginning in March 2022, Amazon "canceled plans for nearly 10 million square feet of warehouse space, shelving plans for more than a dozen fulfillment centers and delivery facilities around the U.S. as the company wrestles with a costly space glut on the heels of the pandemic."  *See supra* ¶¶ 309-16.

343.          By June 2022, Amazon's actions to reduce capacity began to reveal the true scale of the situation.  Noting "clear signs" of Amazon's "excess capacity problem," research analysts

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 118
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

such as Evercore ISI Research continued to remark on the "pace and magnitude of" the Company's

"capacity reduction."  In a report specifically addressing Amazon's excess capacity problems,

Evercore analysts focused on the underlying issues and the severity of the problem:

> The two biggest drivers that led to Amazon's current capacity issue—the overbuilding and overstaffing of the company's retail capacity, as disclosed on the Q1 EPS call—include:  a) Amazon over extrapolated strong demand trends to persist post Covid. We are currently seeing consumer demand trends normalizing back to pre-Covid levels—roughly 100bps of Online Retail penetration annually vs. 250bps in 2020; and b) Amazon launched a major accelerated shipping build-out program (Next Day, Same Day, and 'Super Same Day') right before Covid.

344.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline

in the market value of Amazon stock, Plaintiff and other Class members suffered significant losses

and damages.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

345.     Given the history described above, during the Class Period the market was keenly

focused on Amazon's efforts to exploit its third-party sellers and to aggressively expand the

Company's fulfillment capacity and network.  With respect to fulfillment, for nearly a year

Defendants repeatedly stated that Amazon's costly expansion efforts were supported by increasing

demand for fast delivery, a service that the Company believed set it apart from competitors.  In

reality, however, demand for fast delivery had slowed by July 2021 and likely months earlier.

Rather than acknowledge this declining trend in the months that followed, Defendants instead

continued to reaffirm that the Company's expansion strategy was meeting rising demand for faster

delivery and doing so even after the U.S. economy began to reopen after COVID-19 lockdowns.

346.     Significantly, recent news reports have confirmed that when Defendants made their

misrepresentations concerning expansion, Defendants had already instituted substantial cutbacks.

As reported by the June 16, 2022 article in *Wall Street Journal*, under Defendant Jassy's leadership

and direction, those cutbacks began to occur in July, September, and December 2021.  Technology

industry news site *The Information* similarly reported on May 24, 2022 that Amazon had "reversed

course on an aggressive build-out," and beginning in March 2022, Amazon "cancelled plans for

nearly 10 million square feet of warehouse space, shelving plans for more than a dozen fulfillment

centers and delivery facilities around the U.S. as the company wrestles with a costly space glut on the heels of the pandemic."  Paris Martineau, *Amazon Quietly Axed Millions of Square Feet of Warehouse Space*," *The Information* (May 24, 2022), *available at* https://www.theinformation.com/articles/amazon-quietly-axed-millions-of-square-feet-of-warehouse-space.

347.    With regard to third-party sellers, beginning on February 1, 2019, when Amazon filed its Annual Report with the SEC, Amazon failed to disclose that the Company exploited its third-party sellers through a myriad of anticompetitive, discriminatory, and abusive tactics, including by abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

348.    Amazon also failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

349.    Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

350.    Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 120
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

351.        Instead, during the Class Period, or at least until April 6, 2022, in Amazon's SEC filings, investor conference calls, testimony before Congress, and other platforms, Defendants repeatedly claimed the opposite:  that Amazon did nothing but support its third-party sellers.

A.        **February 1, 2019—Amazon Form 10-K and 2019 Forms 10-Q**

352.        The Class Period begins on February 1, 2019, when Amazon filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2018 (the "2018 10-K").  Appended to the 2018 10-K as exhibits were signed Certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Bezos and Olsavsky, attesting that "I have reviewed this Form 10-K of Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

353.        <u>False and Misleading Statements</u>:  According to the 2018 10-K, North America net sales in 2018 were $141.366 billion, and International net sales in 2018 were $65.866 billion.  In the 2018 10-K, the Company stated:

> North America sales increased 33% in 2017 and 2018, compared to the comparable prior years.  The sales growth in each year primarily reflects increased unit sales, including sales by third-party sellers . . . . Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection.
>
> International sales increased 23% and 21% in 2017, and 2018, compared to the comparable prior years.  The sales growth in each year primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection.

354.        <u>Reasons Why Defendants' Statements in ¶ 353 Were Materially False and Misleading When Made</u>:  The statements in paragraph 353 above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements specifically attributed Amazon's increased sales to sales by third-party sellers but failed to disclose that Amazon was, as explained above, routinely

(i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and (iv) favoring its own private-label products to the detriment of third-party sellers. These practices created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

355. <u>False and Misleading Statements</u>: The 2018 10-K also contained the following statements:

Competition

The worldwide marketplace in which we compete is evolving rapidly and intensely competitive, and we face a broad array of competitors from many different industry sectors around the world. Our current and potential competitors include: (1) physical, e-commerce, and omnichannel retailers, publishers, vendors, distributors, manufacturers, and producers of the products we offer and sell to consumers and businesses . . . (4) companies that provide e-commerce services, including . . . advertising, fulfillment . . . ; (5) companies that provide fulfillment and logistics services for themselves or for third parties, whether online or offline . . . . We believe that the principal competitive factors in our retail businesses include selection, price, and convenience, including fast and reliable fulfillment. . . . Some of our current and potential competitors have greater resources . . . and greater control over inputs critical to our various businesses. They may secure better terms from suppliers, adopt more aggressive pricing . . . direct consumers to their own offerings instead of ours . . . .

356. <u>Reasons Why Defendants' Statements in ¶ 355 Were Materially False and Misleading When Made</u>: The statements in paragraph 355 above, conveying the misleading impression that competition in Amazon's core retail business was fierce, were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that Amazon took actions to undermine competition. For example, Amazon was employing an ad auction using "defect" advertisements, which raised the costs to both sellers and customers. Amazon was also employing a price and selection parity strategy to undercut competition, and it was punishing third-party sellers offering lower prices outside Amazon. Internal documents show that these punishments occurred because "customers considering your products could have easily found your products cheaper at another major retailer, and may have chosen to shop elsewhere." The statements also failed to disclose that Amazon was

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 122
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1   undermining third-party sellers using Amazon's marketplace by taking actions that undermined

2   their bottom line and viability.  Moreover, Amazon was forcing third-party sellers to use FBA in

3   order to obtain Prime eligibility, raising the costs of third-party sellers who desired selling through

4   other non-Amazon channels.

5   357.   <u>False and Misleading Statements</u>:  The 2018 10-K contained only generic and

6   misleadingly incomplete risk statements that Amazon was "subject to general business regulations

7   and laws, as well as regulations and laws specifically governing the Internet[] [and] e-commerce"

8   and that existing and future laws and regulations covered "competition," among other things.

9   Amazon merely advised its investors that "[e]xisting and future laws and regulations may impede

10   our growth" and failed to disclose the specific and known risks arising from the Company's

11   improper business practices.

12   358.   <u>Reasons Why Defendants' Statements in ¶ 357 Were Materially False and</u>

13   <u>Misleading When Made</u>:  The statements in the preceding paragraph were materially false and

14   misleading when made, or omitted to state material facts necessary to make the statements not

15   misleading, because the statements above discussed Amazon's legal and regulatory risk with

16   respect to the Internet, e-commerce, and competition, but failed to disclose that Amazon was, as

17   explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its

18   products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own

19   economic gain; and (iv) favoring its own private-label products to the detriment of third-party

20   sellers.  These practices created a heightened risk of governmental and other criminal and civil

21   investigations, as well as the risk of significant penalties and reputational harm.

22   359.   <u>False and Misleading Statements</u>:  The generic and misleadingly incomplete risk

23   statements in the paragraph above were also repeated in Amazon's Forms 10-Q, filed with the SEC

24   on April 26, 2019 (1Q 2019 10-Q), July 26, 2019 (2Q 2019 10-Q), and October 25, 2019 (3Q 2019

25   10-Q).  Appended to the April 26, 2019, July 26, 2019, and October 25, 2019 10-Q Forms were

26   signed Certifications pursuant to SOX by Defendants Bezos and Olsavsky, attesting that "I have

27   reviewed this Form 10-Q of Amazon.com, Inc." and that "Based on my knowledge, this report

28   does not contain any untrue statement of a material fact or omit to state a material fact necessary

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 123
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  to make the statements made, in light of the circumstances under which such statements were

2  made, not misleading with respect to the period covered by this report."

3  360.        <u>False and Misleading Statements</u>:  According to the 1Q 2019 10-Q, North America

4  net sales in 1Q 2019 were $35.812 billion, and International net sales in 1Q 2019 were

5  $16.192 billion.  The 1Q 2019 10-Q also contained the following statements:

> North America sales increased 17% in Q1 2019 compared to the comparable prior
> year period.  The sales growth primarily reflects increased unit sales, including
> sales by third-party sellers.  Increased unit sales were driven largely by our
> continued efforts to reduce prices for our customers, including from our shipping
> offers, increased in-stock inventory availability, and increased selection.

> International sales increased 9% in Q1 2019 compared to the comparable prior year
> period.  The sales growth primarily reflects increased unit sales, including sales by
> third-party sellers.  Increased unit sales were driven largely by our continued efforts
> to reduce prices for our customers, including from our shipping offers, increased
> in-stock inventory availability, and increased selection.

13  361.        <u>False and Misleading Statements</u>:  According to the 2Q 2019 10-Q, North America

14  net sales in 2Q 2019 were $38.653 billion, and International net sales in 2Q 2019 were

15  $16.37 billion.  The 2Q 2019 10-Q also contained the following statements:

> North America sales increased 20% in Q2 2019 and 18% for the six months ended
> June 30, 2019, compared to the comparable prior year periods.  **The sales growth
> primarily reflects increased unit sales, including sales by third-party sellers.
> Increased unit sales were driven largely by our continued efforts to reduce
> prices for our customers, including from our shipping offers, increased in-
> stock inventory availability, and increased selection**.

> International sales increased 12% in Q2 2019 and 10% for the six months ended
> June 30, 2019, compared to the comparable prior year periods.  **The sales growth
> primarily reflects increased unit sales, including sales by third-party sellers.
> Increased unit sales were driven largely by our continued efforts to reduce
> prices for our customers, including from our shipping offers, increased in-
> stock inventory availability, and increased selection**.

24  362.        <u>False and Misleading Statements</u>:  According to the 3Q 2019 10-Q, North America

25  net sales in 3Q 2019 were $42.638 billion, and International net sales in 3Q 2019 were

26  $18.348 billion.  The 3Q 2019 10-Q also contained the following statements:

> North America sales increased 24% in Q3 2019 and 20% for the nine months ended
> September 30, 2019, compared to the comparable prior year periods.  **The sales
> growth primarily reflects increased unit sales, including sales by third-party**

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 124
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection**.

International sales increased 18% in Q3 2019 and 13% for the nine months ended September 30, 2019, compared to the comparable prior year periods.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection**.

363.        <u>Reasons Why Defendants' Statements in ¶¶ 359-62 Were Materially False and Misleading When Made</u>:  The statements in paragraphs 359-62 above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements specifically attributed Amazon's increased sales to sales by third-party sellers but failed to disclose that Amazon was, as explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and (iv) favoring its own private-label products to the detriment of third-party sellers.  These practices created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

    **B.        April 11, 2019—Amazon Form 8-K**

364.        <u>False and Misleading Statements</u>:  On April 11, 2019, Amazon filed its Form 8-K with the SEC, signed by Defendant Zapolsky ("2019 Form 10-K").  Attached to the Form 8-K was Defendant Bezos's 2018 letter to shareholders, signed by Defendant Bezos.  The 2019 Form 8-K contained the following statements concerning Amazon's third-party sellers:

Third-party sellers are kicking our first party butt.  Badly.

. . . .

Why did independent sellers do so much better selling on Amazon than they did on eBay?  And why were independent sellers able to grow so much faster than Amazon's own highly organized first-party sales organization?  There isn't one answer, but we do know one extremely important part of the answer:

**We helped independent sellers compete against our first-party business** by investing in and offering them the very best selling tools we could imagine and build.  There are many such tools, including tools that help sellers manage

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 125
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

inventory, process payments, track shipments, create reports, and sell across borders—and we're inventing more every year.  But of great importance are Fulfillment by Amazon and the Prime membership program.  In combination, these two programs meaningfully improved the customer experience of buying from independent sellers.

365.     <u>Reasons Why Defendants' Statement in ¶ 364 Was Materially False and Misleading When Made</u>:  The statements in paragraph 364 above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that Amazon "helped independent sellers compete against our first-party business," Amazon failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

366.     The above statements were also materially false because Amazon failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

367.     The above statements were also false because Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 126
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

368.        Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

369.        Moreover, the foregoing statements failed to disclose that Amazon was employing an ad auction using "defect" advertisements, which raised the costs that third-party sellers bore to reach customers.  Amazon also self-servingly put its own advertising team in charge of deciding how many search page slots were allocated to ads, with Amazon having complete control over ad placements.  Finally, at a minimum, the statements failed to disclose that Amazon did not have sufficiently robust access restrictions to guard third-party sellers' data, which increased the risk that insiders could inappropriately access and use seller-specific data to benefit Amazon's private-label business.

C.        **April 23, 2019—The Company's Tweet**

370.        <u>False and Misleading Statement</u>:   On April 23, 2019, in response to Senator Elizabeth Warren's April 22, 2019 tweet that her plan to break up big tech will prevent "corporations like Amazon from knocking out the rest of the competition," Amazon tweeted:

> **We don't use individual sellers' data to launch private label products** (which account for only about 1% of sales).  And sellers aren't being "knocked out"—they're seeing record sales every year . . . .[374]

371.        <u>Reasons Why Defendants' Statement in ¶ 370 Was Materially False and Misleading When Made</u>:   The statement in the preceding paragraph was materially false and misleading when made, or omitted to state material facts necessary to make the statement not misleading, because it failed to disclose, among other things, that Amazon was in fact leveraging its access to third-party sellers' data to identify and replicate popular and profitable products from among the hundreds of millions of listings on its Marketplace.

---

[374] https://twitter.com/amazonnews/status/1120780868614627328.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 127
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**D.**     **April 25, 2019—Q1 2019 Earnings Call with Investors**

372.     <u>False and Misleading Statement</u>:  On April 25, 2019, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q1 2019 results (the "Q1 2019 Earnings Call").  When asked to comment on Amazon's efforts to sustain its growth rate in the third-party marketplace business, Defendant Olsavsky responded, in relevant part:

> So again, let me reiterate our approach.  So main goal here is that it will allow customers to have the broadest selection, the best available price and also the most convenient options on how they receive the item.  If we're delivering on those three elements, we're indifferent as to whether it's sold by us or a third-party.  We actively recruit sellers to sell on our platform, it's because it adds selection.  It adds—If it's in the FBA program, it adds Prime eligible selection.

> We spend billions of dollars a year, as Jeff said, on infrastructure, tools and services, not only to allow sellers to sell, but to help themselves more successfully.  So we have a vested interest in the success of our sellers.  Any growth acceleration or deceleration that you see can be very much tied to the total sales of the customer—that we have the customers in any country.

373.     <u>Reasons Why Defendants' Statements in ¶ 372 Were Materially False and Misleading When Made</u>:  The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that Amazon was "indifferent as to whether it's sold by us or a third party" and that Amazon invests "to allow sellers to sell" and "to help themselves more successfully," Amazon failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

374.     The above statements were also materially false because Amazon failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 128
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

(Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

375.        Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

376.        In addition, Amazon failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

### E.        May 7, 2019—Amazon Press Release

377.        <u>False and Misleading Statement</u>: On May 7, 2019, Amazon published a press release titled "Amazon Publishes 2019 SMB Impact Report; Launches 'Build Your Business with Amazon' Website to Help Businesses, Authors, and Developers Succeed with Support from Amazon."  In the press release, Defendant Wilke stated with respect to the manner in which Amazon deals with third-party sellers (referred to as customers below):

> Amazon's mission is to be Earth's most customer-centric company.  Among the customers we're focused on are small businesses and entrepreneurs.  As we work to help them grow their businesses, we are making big investments: in our delivery network, data centers, AI research, robotics.  Since 2011, we've invested tens of billions to help SMBs [small and medium-sized businesses] succeed working with Amazon[.]

378.        <u>Reasons Why Defendants' Statements in ¶ 377 Were Materially False and Misleading When Made</u>:  The statements in paragraph 377 above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that "[a]mong the customers we're focused on are small businesses and entrepreneurs.  As we work to help them grow their businesses, we are making big

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 129
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1    investments . . . we've invested tens of billions to help SMBs [small and medium-sized businesses]

2    succeed working with Amazon," Wilke failed to disclose negative information that cut directly

3    against the disclosed information, *i.e.*, that Amazon was taking steps to undermine small

4    businesses and entrepreneurs.  Wilke failed to disclose, for example, that that the Company was

5    undermining sellers who offered discounts outside Amazon's marketplace; employing a first-party

6    anti-discounting algorithm to discipline third-party sellers who offered lower prices on other

7    platforms; and using a "tit-for-tat" strategy whereby third-party sellers had to raise their prices in

8    order to win the Featured Offer.

9    379.        Wilke also failed to disclose that Amazon routinely tied and bundled the

10   Company's paid fulfillment and logistics services to the detriment of third-party sellers by

11   requiring sellers to use those services in order to list their products and by awarding the "Buy Box"

12   to sellers who used Amazon's fulfillment services.  Amazon tied Prime eligibility with use of FBA.

13   380.        Wilke also failed to disclose that Amazon used third-party sellers' data to directly

14   compete with those businesses on Amazon's platform.   Specifically, Amazon routinely

15   misappropriated third-party sellers' data and used that data, among other things, to copy their

16   products by creating competing private-label (Amazon) products, source those products from

17   third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use

18   of such third-party seller data was a common practice within the Company.  Amazon currently

19   faces significant regulatory inquiries into such practices.  At a minimum, Wilke failed to disclose

20   that Amazon did not have sufficiently robust access restrictions to guard third-party sellers' data,

21   which increased the risk that insiders could inappropriately access and use seller-specific data to

22   benefit Amazon's private-label business.

23          **F.        June 5, 2019—Amazon Re:MARS Conference**

24   381.        <u>False and Misleading Statement</u>:  On June 5, 2019, during the Amazon Re:MARS

25   conference, according to a Bloomberg article titled "Amazon Retail Chief Defends Private-Label

26   Business Amid Scrutiny," Wilke defended the Company from charges that it unfairly competes

27

28

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 130
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

with independent merchants who sell on its e-commerce site, saying Amazon's private-label business is much smaller than those of major rivals:

> Most of our competitors have a much larger percentage of their sales in private label" than Amazon does, Jeff Wilke said during the company's re:MARS conference in Las Vegas.  He added that house brand products accounted for about 1% of the company's sales.

382.     Reasons Why Defendants' Statements in ¶ 381 Were Materially False and Misleading When Made:  The statements in paragraph 381 above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because Amazon was in fact unfairly competing with and unfairly treating third-party sellers.  Wilke failed to disclose, for example, that Amazon was undermining sellers who offered discounts outside Amazon's marketplace; was employing a first-party anti-discounting algorithm to discipline third-party sellers who offered lower prices on other platforms; and using a "tit-for-tat" strategy whereby third-party sellers had to raise their prices in order to win the Featured Offer.

383.     Wilke also failed to disclose that Amazon routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.  Amazon tied Prime eligibility with use of FBA.

384.     In addition, Wilke failed to disclose that Amazon used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.  At a minimum, Wilke failed to disclose that Amazon did not have sufficiently robust access restrictions to guard third-party sellers' data, which increased the risk that insiders could inappropriately access and use seller-specific data to benefit Amazon's private-label business.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 131
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

385.        <u>False and Misleading Statement</u>:  Moreover, according to a June 5, 2019 article from *Business Insider* titled "Amazon consumer CEO Jeff Wilke says that he's okay with government scrutiny but that the company shouldn't be broken up," Defendant Wilke also made the following additional statements:

> As for the fear that Amazon house brands could be the subject of investigation, Wilke had a response to that as well.  He said that private-label products have always been part of retail and that Amazon's competitors do up to 20% of their sales via their own house brands.
>
> . . . .
>
> And he said Amazon does not give its corporate employees access to any seller data in order to choose which products to create on its own.  It uses 'data that is available to anyone. It's the bestseller list,' he said.
>
> . . . .
>
> "We don't allow anyone inside Amazon to have access to any individual seller's data to build a private label," he said.

386.        <u>Reasons Why Defendants' Statements in ¶ 385 Were Materially False and Misleading When Made</u>:  The statements in paragraph 385 above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that Amazon was in fact leveraging its exclusive access to third-party sellers' data to identify and replicate popular and profitable products from among the hundreds of millions of listings on its marketplace.  At a minimum, Wilke failed to disclose that Amazon did not have sufficiently robust access restrictions to guard third-party sellers' data, which increased the risk that insiders could inappropriately access and use seller-specific data to benefit Amazon's private-label business.

**G.        July 16, 2019—House Judiciary Committee Testimony and the Aftermath**

387.        <u>False and Misleading Statement</u>:  On July 16, 2019, Defendant Sutton testified before the House Judiciary Committee (the "July 16, 2019 Hearing").[375]   When asked by

---

[375] Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship: Hearing Before the Subcomm. on Antitrust, Com., & Admin. L. of the H. Comm. on the Judiciary, 116th Cong. 5-

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 132
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Representative Pramila Jayapal whether Amazon "track[s] [the data] and create[s] products that directly compete with those most popular brands that are out there," Defendant Sutton responded, in relevant part, that "**[Amazon] do[es] not use any of that specific seller data in creating our own private brand products**."

388.    <u>Reasons Why Defendants' Statement in ¶ 387 Was Materially False and Misleading When Made</u>:  The statement in the preceding paragraph was materially false and misleading when made, or omitted to state material facts necessary to make the statement not misleading, because the statement failed to disclose, among other things, that Amazon was in fact leveraging its access to third-party sellers' data to identify and replicate popular and profitable products from among the hundreds of millions of listings on its Marketplace.

389.    <u>False and Misleading Statement</u>:  At the same hearing, in response to Subcommittee Chairman David N. Cicilline's questioning concerning third-party sellers, Defendant Sutton responded, in relevant part:

> **Our incentive is to help the seller succeed because we rely on them**.  If we did that, we know they'd go elsewhere.  They have many options.  So we apply the same criteria to both, and we do not use their individual data when we're making decisions to launch private brands.

390.    <u>Reasons Why Defendants' Statement in ¶ 389 Was Materially False and Misleading When Made</u>:  The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that Amazon's "incentive is to help the seller succeed" and that Amazon "appl[ied] the same criteria to both, and we do not use their individual data when we're making decisions to launch private brands," Amazon failed to disclose, among other things, that Amazon used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon)

---

6, 23-24, 38-44, 46-47, 49-51, 64, 66-67, 70-71 (2019) (testimony of Nate Sutton, Assoc. Gen. Couns., Competition, Amazon.com, Inc.),  https://www.govinfo.gov/content/pkg/CHRG-116hhrg39901/pdf/CHRG-116hhrg39901.pdf.

products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

391.     The above statements were also materially false because Amazon failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

392.     Amazon also failed to disclose that it routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

393.     Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

394.     <u>False and Misleading Statement</u>:   At the same hearing, when asked by Representative Lucy McBath whether Amazon "privilege[s] vendors who use Amazon's Fulfillment services over those who chose not to?," Defendant Sutton responded, in relevant part: "**We do not favor . . . products that use FBA over others**."

395.     <u>Reasons Why Defendants' Statement in ¶ 394 Was Materially False and Misleading When Made</u>:  The statement in the preceding paragraph was materially false and misleading when made, or omitted to state material facts necessary to make the statement not misleading, because the statement failed to disclose, among other things, that Amazon was in fact favoring sellers who used FBA over those who did not, for example, for search rankings and the Buy Box.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 134
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

396.     <u>False and Misleading Statement</u>:   At the same hearing, when asked by Subcommittee Chairman David N. Cicilline whether Amazon's algorithm for collecting data was used to support the sale of Amazon-branded products, Defendant Sutton responded, in relevant part:

> "[o]ur algorithms, such as the buy box, is [sic] aimed to predict what customers want to buy [. . .] [a]nd we apply the same criteria whether you're a third-party seller or Amazon to that because we want customers to make the right purchase regardless of whether it's a seller or Amazon."
>
> . . . .
>
> The algorithms are optimized to predict what customers want to buy regardless of the seller.  **We provide the same criteria**.

397.     <u>Reasons Why Defendants' Statements in ¶ 396 Were Materially False and Misleading When Made</u>:   The statements in paragraph 396 above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that Amazon has used profitability—also referred to internally as "contribution profit" or "CP"—as a factor in awarding the Buy Box.  Amazon was also misappropriating third-party sellers' data to benefit its own private brands.

398.     As the Subcommittee Investigation proceeded, various reputable media outlets published reports that contradicted the testimony offered by Amazon's witnesses at the Subcommittee hearings.  For example, on July 18, 2019, the investigative news organization *Capitol Forum* published an article entitled, "Amazon:  Former Employee Challenges Executive's Denial About Company's Use of Independent Sellers' Data."[376]  The former Amazon employee stated that Amazon "routinely tracked the popularity of independent sellers' products sold through its website," and that "[the former employee] used to pull sellers' data to look at what the best products were [. . .] to create its own labels.  Accordingly, *Capitol Forum*'s reporting directly contradicted Defendant Sutton's testimony.

---

[376] Amazon: Former Employee Challenges Executive's Denial About Company's Use of Independent Sellers' Data, THE CAPITOL FORUM (July 18, 2019).

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 135
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

399.          On July 23, 2019, in response to the publication of the *Capitol Forum* article and similar reporting by other media outlets, Chairman Cicilline sent Amazon a letter requesting that the Company supplement Defendant Sutton's responses to questions at the July 16, 2019 Hearing because "[i]n several instances, Mr. Sutton responded to questions from [the Subcommittee] by offering other ancillary information or partial and selective responses." [377]   Moreover, Chairman Cicilline's letter stated that "[i]n one instance, [Defendant Sutton's] answer has been contested by a former Amazon employee, raising questions about the veracity of his responses under oath."

400.          <u>False and Misleading Statement</u>:   On July 26, 2019, Defendant Zapolsky sent a letter[378] in response to Chairman Cicilline's July 23, 2019 letter, which stated, in relevant part:

> **[W]hile we prohibit in our private label strategy the use of data related specifically to individual sellers**, like other retailers we use aggregated store data (e.g., total sales) and customer shopping behavior (e.g., search volume) to identify categories and products with high customer demand over a given time period. . . .
>
> . . . .
>
> We prohibit in our private label strategy the use of data related specifically to individual sellers.
>
> . . . .
>
> [W]e use aggregated store data on total sales and search volume for categories and products (unless the product is only offered by a single seller, in which case we do not use that data).
>
> . . . .
>
> [T]he featured offer algorithm does not favor any particular type of offer, but rather seeks to determine which offer to highlight based on a prediction of which offer customers would choose if they were to compare all offers in detail. . . .
>
> Moreover, we make all offers easily available for all customers to shop. Customers may compare the closest competing offers and add them directly to their shopping cart via the "Other Sellers on Amazon" option [. . .], which is displayed on the product detail page directly below the featured offer. . . .

---

[377] https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/7.22.19%20letter%20to%20amazon%20(dnc).pdf.

[378] https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/07.26.19%20-%20amazon%20response.pdf.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 136
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

401.      <u>Reasons Why Defendants' Statements in ¶ 400 Were Materially False and Misleading When Made</u>:  The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that (1) Amazon engaged in improper conduct with respect to its private-label business by using third-party sellers' non-public data to compete with them and by giving Amazon products preference over its competitors; and (2) even for purportedly aggregated data, Amazon used single sellers' data when selling returned or damaged versions of an item through Amazon's Warehouse Deals program, used aggregate data when there were only two or three sellers of a product, and used aggregate data when there were multiple sellers but one individual seller accounted for almost 100% of all sales.

402.      And, at a minimum, the statements failed to disclose that Amazon did not have sufficiently robust access restrictions to guard third-party sellers' data, which increased the risk that insiders could inappropriately access and use seller-specific data to benefit Amazon's private-label business.

### H.      July 25, 2019—Amazon's Q2 2019 Earnings Call

403.      <u>False and Misleading Statement</u>:  On July 25, 2019, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q2 2019 results (the "Q2 2019 Earnings Call").  When questioned whether there would be any change in Amazon's business to focus "more towards third-party from first-party," Defendant Olsavsky stated, in relevant part:

> On your comment, I assume you meant vendors not merchants, but on the move from 1P to 3P, but no there shouldn't be—I can't highlight anything related shifting in channel there, but I would say that we remain indifferent on whether—**we're focused on price convenience and selection for our customers.  And whether product is a retail offering or third-party offering is not that important to us.  As long as it's in stock, as long as it's priced competitively . . . .**
>
> We continue to invest very heavily in our systems both for retail vendors and also for third-party merchants invest billions of dollars a year on behalf of them making Amazon a better place for customers to buy and increasingly not only vendor sales, but also third-party merchant sales.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 137
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1    404.    <u>Reasons Why Defendants' Statements in ¶ 403 Were Materially False and</u>

2  <u>Misleading When Made</u>:  The statements in the preceding paragraph were materially false and

3  misleading when made, or omitted to state material facts necessary to make the statements not

4  misleading, because in telling investors that "whether product is a retail offering or third-party

5  offering is not that important to [Amazon,] [a]s long as it's in stock, as long as it's priced

6  competitively," and that Amazon "invest[ed] very heavily in our systems both for retail vendors

7  and also for third-party merchants . . . making Amazon a better place for . . . increasingly not only

8  vendor sales, but also third-party merchant sales," Amazon failed to disclose, among other things,

9  that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—

10  through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly

11  suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-

12  order" buttons to block purchases of their products, and falsely listing their products as "out of

13  stock" or with delayed shipping times, and sold their products for lower prices and demanded that

14  they pay Amazon for the lost margin.

15    405.    The above statements were also materially false because Amazon failed to disclose

16  that it routinely used third-party sellers' data to directly compete with those businesses on

17  Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and

18  used that data, among other things, to copy their products by creating competing private-label

19  (Amazon) products, source those products from third-party sellers' own manufacturers, and cut

20  them out of the equation.  In fact, the wrongful use of such third-party seller data was a common

21  practice within the Company.  Amazon currently faces significant regulatory inquiries into such

22  practices.

23    406.    Amazon also failed to disclose that it routinely favored its own private-label

24  products to the detriment of third-party sellers, including by granting itself access to data and tools

25  that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating

26  third-parties' products as "nonessential" while designating Amazon's own similar products as

27  "essential."

28

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 138
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

407.        Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

**I.        August 30, 2019—CNN Interview**

408.        <u>False and Misleading Statement</u>:  On August 30, 2019, during a report on Amazon by CNN titled "Special Report: The Age of Amazon," Defendant Wilke was asked about Amazon's use of data from third-party sellers, and whether Amazon prioritizes its private label products.  He made the following statements:

> HARLOW:  Questions have also been raised about the data Amazon collects from all of its marketplace sellers.
>
> MITCHELL:  We see Amazon mines their data, watches what they're selling well, and then become a seller in that category itself.  It's a very difficult environment in order to succeed in.
>
> HARLOW:  But Jeff Wilke, the man in charge of the Amazon Marketplace sees it much differently.
>
> WILKE:  **We don't use any data about specific items that's not available to the world by just looking at—at our website.**
>
> . . . .
>
> HARLOW:  Does Amazon give priority to and prioritize its private label in search?
>
> WILKE:  **We prioritize the things that customers want.**

409.        <u>Reasons Why Defendants' Statements in ¶ 408 Were Materially False and Misleading When Made</u>:  The statements in paragraph 408 above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that Amazon was in fact leveraging its exclusive access to third-party sellers' data to identify and replicate popular and profitable products from among the hundreds of millions of listings on its marketplace.  At a minimum, Wilke failed to disclose that Amazon did not have sufficiently robust access restrictions to guard third-party sellers' data, which increased the risk that insiders could inappropriately

access and use seller-specific data to benefit Amazon's private-label business.  Amazon was also prioritizing its own private label products over non-private label products.

410.    Moreover, far from prioritizing what customers wanted, Wilke failed to disclose that Amazon took actions to increase the prices that customers paid for products.  For example, Amazon was undermining sellers who offered discounts outside Amazon's marketplace; employing a first-party anti-discounting algorithm to discipline third-party sellers who offered lower prices on other platforms; and used a "tit-for-tat" strategy whereby third-party sellers had to raise their prices in order to win the Featured Offer.  These actions increased the prices for customers.

**J.      October 22, 2019—WSJ Tech Live Conference**

411.    <u>False and Misleading Statement</u>:  On October 22, 2019, Defendant Wilke said the following at the *Wall Street Journal*'s Tech Live Conference in response to questioning about why Amazon's private label brands pop up at the top of search results on the website:

> Let's make sure that we're really clear on what you're seeing.  A search result is a ranked list of the stuff in response to the key words that you typed.  **The private brand does not get an advantage there.  If a private brand shows up in a search result it's because lots of customers are clicking on that particular private brand, so we have some very popular private brands; Amazon basics for example is super popular**.  But we also have merchandising widgets—we call them widgets—but, you know, slots throughout the experience on mobile and on desktop where we can show customers things that they might be interested in that are related to their key words but it's not the search results.  So if you're seeing things at the top that aren't very popular it's probably because it's a new thing and there's a merchandising widget that is featuring it but it's not going to show up at the top of the search result just because it's an amazon private brand, unless its popular.
>
> The other thing I would say about **private brands is that we have a very strict policy on how we use data from sellers, so we do not allow individual seller's data to be used by the retail teams when they're thinking about what private label products to launch**.  But the fact is that private label products that you want to launch are the ones that show up at the top of the search results whether its amazon, or google, or ebay.  Yeah, so you can go out and see what's popular and then you go see if you can find a manufacturer who can manufacture a substitute that is high quality and a great value for customers.  And if you can we think it's a great customer service just like retailers have done for a century.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 140
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

412.     <u>Reasons Why Defendants' Statements in ¶ 411 Were Materially False and</u> <u>Misleading When Made</u>:  The statements in paragraph 411 above concerning the use of individual seller data were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that Amazon engaged in improper conduct with respect to its private-label business by using third-party sellers' non-public data to compete with them and by giving Amazon products preference over its competitors.  At a minimum, Wilke failed to disclose that Amazon did not have sufficiently robust access restrictions to guard third-party sellers' data, which increased the risk that insiders could inappropriately access and use seller-specific data to benefit Amazon's private-label business.

413.     The statements in the paragraph above concerning what shows up in the search results were materially false and misleading when made, or omitted to state facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that Amazon was systematically disqualifying third-party sellers offering discounted products outside Amazon from appearing in the Buy Box.  The statements also failed to disclose that Amazon used a "tit-for-tat" strategy whereby third-party sellers had to raise their prices in order to win the Featured Offer.

**K.     October 24, 2019—Amazon's Q3 2019 Earnings Call**

414.     <u>False and Misleading Statement</u>:  On October 24, 2019, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q3 2019 results (the "Q3 2019 Earnings Call").  When asked to comment on the opportunities and competitiveness for third-party sellers, Defendant Olsavsky responded, in relevant part, "**[o]n third party I would say we only succeed if the third party sellers succeeds.  So we're heavily invested in them as they are in us.  So we are constantly investing on their behalf, adding new products and features and you know we are cognizant of their economics as well and we want a business that works for both of us and we set our fees accordingly**."

415.     <u>Reasons Why Defendants' Statements in ¶ 414 Were Materially False and</u> <u>Misleading When Made</u>:  The statements in the preceding paragraph were materially false and

1   misleading when made, or omitted to state material facts necessary to make the statements not

2   misleading, because in telling investors that "we only succeed if the third party seller succeeds";

3   "we're heavily invested in them as they are in us"; "we are constantly investing on their behalf";

4   "we are cognizant of their economics"; and "we want a business that works for both of us and we

5   set our fees accordingly," Amazon failed to disclose, among other things, that Amazon routinely

6   retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of

7   anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party

8   sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block

9   purchases of their products, and falsely listing their products as "out of stock" or with delayed

10  shipping times, and sold their products for lower prices and demanded that they pay Amazon for

11  the lost margin.

12  416.      The above statements were also materially false because Amazon failed to disclose

13  that it routinely used third-party sellers' data to directly compete with those businesses on

14  Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and

15  used that data, among other things, to copy their products by creating competing private-label

16  (Amazon) products, source those products from third-party sellers' own manufacturers, and cut

17  them out of the equation.  In fact, the wrongful use of such third-party seller data was a common

18  practice within the Company.  Amazon currently faces significant regulatory inquiries into such

19  practices.

20  417.      Amazon also failed to disclose that it routinely favored its own private-label

21  products to the detriment of third-party sellers, including by granting itself access to data and tools

22  that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating

23  third-parties' products as "nonessential" while designating Amazon's own similar products as

24  "essential."

25  418.      In addition, Amazon failed to disclose that it routinely tied and bundled its paid

26  fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use

27  those services in order to list their products and by awarding the "Buy Box" to sellers who used

28  Amazon's fulfillment services.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 142
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**L.**    **December 19, 2019—*New York Times* Article**

419.    <u>False and Misleading Statement</u>:  On December 19, 2019, in an article published by the *New York Times* titled, "Prime Power: How Amazon Squeezes the Businesses Behind Its Store," on the topic of Amazon's treatment of third-party sellers using Amazon's marketplace, Defendant Wilke stated that the Company's future depended on policing the Amazon website without harming well-meaning merchants and stated, "We have a strong incentive to be as accurate as possible in identifying bad actors, make very few mistakes when we're wrong, on giving second chances to people who make an honest mistake[.]"  He also insisted that third-party sellers were succeeded on Amazon: "If sellers weren't succeeding, they wouldn't be here."

420.    <u>Reasons Why Defendants' Statements in ¶ 419 Were Materially False and Misleading When Made</u>:  The statements in paragraph 419 above, which conveyed the message that Amazon was helping third-party sellers succeed, were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, for example, that Amazon was undermining sellers who offered discounts outside Amazon's marketplace; was employing a first-party anti-discounting algorithm to discipline third-party sellers who offered lower prices on other platforms; and using a "tit-for-tat" strategy whereby third-party sellers had to raise their prices in order to win the Featured Offer.

421.    Wilke also failed to disclose that Amazon routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services. Amazon tied Prime eligibility with use of FBA.

422.    Wilke likewise failed to disclose that Amazon did not have sufficiently robust access restrictions to guard third-party sellers' data, which increased the risk that insiders could inappropriately access and use seller-specific data to benefit Amazon's private-label business.

**M.**    **January 31, 2020—Amazon's Form 10-K**

423.    On January 31, 2020, Amazon filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2019 (the "2019 10-K").  Appended to the 2019 10-K as exhibits were signed Certifications pursuant to

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 143
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

SOX by Defendants Bezos and Olsavsky, attesting that "I have reviewed this Form 10-K of Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

424.     <u>False and Misleading Statements</u>:  According to the 2019 10-K, North America net sales in 2019 were $170.773 billion, and International net sales in 2019 were $74.723 billion.  In the 2019 10-K, the Company stated:

> North America sales increased 21% in 2019, compared to the prior year.  The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection.

> International sales increased 13% in 2019, compared to the prior year.  The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, increased in-stock inventory availability, and increased selection.

425.     <u>Reasons Why Defendants' Statements in ¶ 424 Were Materially False and Misleading When Made</u>:  The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements specifically attributed Amazon's increased sales to sales by third-party sellers but failed to disclose that Amazon was, as explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and (iv) favoring its own private-label products to the detriment of third-party sellers.  These practices created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

426.　　　　Underline{False and Misleading Statements}:  The 2019 10-K also contained the following statements:

Competition

The worldwide marketplace in which we compete is evolving rapidly and intensely competitive, and we face a broad array of competitors from many different industry sectors around the world.   Our current and potential competitors include: (1) physical, e-commerce, and omnichannel retailers, publishers, vendors, distributors, manufacturers, and producers of the products we offer and sell to consumers and businesses . . . (4) companies that provide e-commerce services, including . . . advertising, fulfillment . . . ; (5) companies that provide fulfillment and logistics services for themselves or for third parties, whether online or offline . . . .  We believe that the principal competitive factors in our retail businesses include selection, price, and convenience, including fast and reliable fulfillment. . . .  Some of our current and potential competitors have greater resources . . . and greater control over inputs critical to our various businesses.  They may secure better terms from suppliers, adopt more aggressive pricing . . . direct consumers to their own offerings instead of ours . . . .

427.　　　　Underline{Reasons Why Defendants' Statements in ¶ 426 Were Materially False and Misleading When Made}:  The statements in paragraph 426 above, conveying the misleading impression that competition in Amazon's core retail business was fierce, were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that Amazon took actions to undermine competition.  For example, Amazon was employing an ad auction using "defect" advertisements, which raised the costs to both sellers and customers.  Amazon was also employing a price and selection parity strategy to undercut competition, and it was punishing third-party sellers offering lower prices outside Amazon.  Internal documents show that these punishments occurred because "customers considering your products could have easily found your products cheaper at another major retailer, and may have chosen to shop elsewhere."  The statements also failed to disclose that Amazon was undermining third-party sellers using Amazon's marketplace by taking actions that undermined their bottom line and viability.  Moreover, Amazon was forcing third-party sellers to use FBA in order to obtain Prime eligibility, raising the costs of third-party sellers who desired selling through other non-Amazon channels.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 145
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

428.     <u>False and Misleading Statements</u>:   The 2019 10-K contained only generic and misleadingly incomplete risk statements that Amazon was "subject to general business regulations and laws, as well as regulations and laws specifically governing the Internet[] [and] e-commerce" and that existing and future laws and regulations covered "competition," among other things. Amazon merely advised its investors that "[u]nfavorable regulations, laws, decisions, or interpretations by government or regulatory authorities applying those laws and regulations" could "impede our growth" and failed to disclose the specific and known risks arising from the Company's improper business practices.

429.     <u>Reasons Why Defendants' Statements in ¶ 428 Were Materially False and Misleading When Made</u>:   The statements in paragraph 428 above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements above discussed Amazon's legal and regulatory risk with respect to the Internet, e-commerce, and competition, but failed to disclose that Amazon was, as explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and (iv) favoring its own private-label products to the detriment of third-party sellers.   These practices created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

430.     <u>False and Misleading Statements</u>:   The generic and misleadingly incomplete risk statements in the paragraph above were also repeated in Amazon's Forms 10-Q, filed with the SEC on May 1, 2020 (1Q 2020 10-Q), July 31, 2020 (2Q 2020 10-Q), and October 30, 2020 (3Q 2020 10-Q).   Appended to the May 1, 2020, July 31, 2020, and October 30, 2020 Forms 10-Q were signed Certifications pursuant to SOX by Defendants Bezos and Olsavsky, attesting that "I have reviewed this Form 10-Q of Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 146
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

431.     <u>False and Misleading Statements</u>:  According to the 1Q 2020 10-Q, North America net sales in 1Q 2020 were $46.127 billion, and International net sales in 1Q 2020 were $19.106 billion.  The 1Q 2020 10-Q also contained the following statements:

> North America sales increased 29% in Q1 2020 compared to the comparable prior year period.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand for household staples and other essential products . . . .**

> International sales increased 18% in Q1 2020 compared to the comparable prior year period.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand for household staples and other essential products . . . .**

432.     <u>False and Misleading Statements</u>:  According to the 2Q 2020 10-Q, North America net sales in 2Q 2020 were $55.436 billion, and International net sales in 2Q 2020 were $22.668 billion  The 2Q 2020 10-Q also contained the following statements:

> North America sales increased 43% in Q2 2020, and 36% for the six months ended June 30, 2020 compared to the comparable prior year periods.  The sales growth primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .

> International sales increased 38% in Q2 2020 and 28% for the six months ended June 30, 2020 compared to the comparable prior year periods.  The sales growth primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .

433.     <u>False and Misleading Statements</u>:  According to the 3Q 2020 10-Q, North America net sales in 3Q 2020 were $59.373 billion, and International net sales in 3Q 2020 were $25.171 billion.  The 3Q 2020 10-Q also contained the following statements:

> North America sales increased 39% in Q3 2020, and 37% for the nine months ended September 30, 2020 compared to the comparable prior year periods.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and**

**increased demand, including for household staples and other essential and home products . . . .**

International sales increased 37% in Q3 2020 and 31% for the nine months ended September 30, 2020 compared to the comparable prior year periods.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers.  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .**

434.     Reasons Why Defendants' Statements in ¶¶ 430-33 Were Materially False and Misleading When Made:  The statements in the three 10-Qs above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements specifically attributed Amazon's increased sales to sales by third-party sellers but failed to disclose that Amazon was, as explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and (iv) favoring its own private-label products to the detriment of third-party sellers.  These practices created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

**N.     April 24, 2020—Amazon Tweet**

435.     False and Misleading Statement:  On April 24, 2020, in response to Congressman Jerry Nadler's tweet about an April 23, 2020 *Wall Street Journal* article that alleged that Amazon employees used non-public business information from third-party sellers on its platform to develop competing products:  "[i]f true, this report raises deep concerns about Amazon's apparent lack of candor before the Committee regarding an issue that is central to our investigation," Amazon tweeted:

> @RepJerryNadler. Respectfully, suggestions we misled Congress are unfounded.
> **We've been clear w/ the Committee that Amazon prohibits use of individual sellers' data as WSJ alleged.**  As w/ any serious allegation of employee misconduct, we are investigating.

436.     Reasons Why Defendants' Statement in ¶ 435 Was Materially False and Misleading When Made:  The statements in paragraph 435 above were materially false and

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 148
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that (1) Amazon engaged in improper conduct with respect to its private-label business by using third-party sellers' non-public data to compete with them and by giving Amazon products preference over its competitors; and (2) even for purportedly aggregated data, Amazon used single sellers' data when selling returned or damaged versions of an item through Amazon's Warehouse Deals program, used aggregate data when there were only two or three sellers of a product, and used aggregate data when there were multiple sellers but one individual seller accounted for almost 100% of all sales.

### O.   May 15, 2020—Amazon's Response to Subcommittee's May 1, 2020 Letter

437.   On May 1, 2020, members of the Subcommittee sent Defendant Bezos a letter in response to an April 23, 2020 *Wall Street Journal* article which alleged that Amazon employees used sensitive business information from third-party sellers on its platform to develop competing products.  The letter stated that "[i]f these allegations are true, then Amazon exploited its role as the largest online Marketplace in the U.S. to appropriate the sensitive commercial data of individual Marketplace sellers and then used that data to compete directly with those sellers," and encouraged Defendant Bezos to testify before the Subcommittee.

438.   <u>False and Misleading Statement</u>:  On May 15, 2020, Amazon sent a letter[379] in response to the Subcommittee's May 1, 2020 letter to Defendant Bezos, stating, in relevant part:

> Because Amazon is privileged to have third-party sellers who now account for the great majority of sales of physical goods in Amazon's store, we determined years ago to take additional steps to give sellers comfort regarding their individual data. **It was purely for that reason that we went beyond any legal requirement—and beyond the protections in place at any other store we are aware of—to begin to implement internal policies to restrict the use of non-public data specific to one particular selling partner to compete directly with sellers.**  We did this because we thought it was the right thing to do for our selling partners, who are also critical customers of Amazon—we wanted to go the extra mile to protect the trust of third parties selling in our stores.

---

[379] https://judiciary.house.gov/uploadedfiles/letter_from_brian_huseman_to_committee__may_15_2020.pdf.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 149
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

439.     <u>Reasons Why Defendants' Statements in ¶ 438 Were Materially False and Misleading When Made</u>:   The statements in paragraph 438 above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that (1) Amazon engaged in improper conduct with respect to its private-label business by using third-party sellers' non-public data to compete with them and by giving Amazon products preference over its competitors; and (2) even for purportedly aggregated data, Amazon used single sellers' data when selling returned or damaged versions of an item through Amazon's Warehouse Deals program, used aggregate data when there were only two or three sellers of a product, and used aggregate data when there were multiple sellers but one individual seller accounted for almost 100% of all sales.

**P.     May 27, 2020—Annual General Meeting**

440.     <u>False and Misleading Statement</u>:  On May 27, 2020, at the Amazon Annual General Meeting, Defendant Bezos stated: "We support millions of small businesses who sell through Amazon[.]"

441.     <u>Reasons Why Defendants' Statement in ¶ 440 Was Materially False and Misleading When Made</u>:  The statement in paragraph 440 was materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that Amazon supported millions of small businesses (many of which were third-party sellers) sell through Amazon, the statement failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

442.     The above statement also was materially false and misleading because it failed to disclose that Amazon routinely used third-party sellers' data to directly compete with those

1    businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party

2    sellers' data and used that data, among other things, to copy their products by creating competing

3    private-label (Amazon) products, source those products from third-party sellers' own

4    manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller

5    data was a common practice within the Company.  Amazon currently faces significant regulatory

6    inquiries into such practices.

7    443.      The above statement was also materially false and misleading because it failed to

8    disclose that Amazon routinely favored its own private-label products to the detriment of third-

9    party sellers, including by granting itself access to data and tools that are off-limits for third-party

10   sellers and, during the pandemic, discriminatorily designating third-parties' products as

11   "nonessential" while designating Amazon's own similar products as "essential."

12   444.      The statement also failed to disclose that Amazon routinely tied and bundled its

13   paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to

14   use those services in order to list their products and by awarding the "Buy Box" to sellers who

15   used Amazon's fulfillment services.

16   445.      Moreover, the statement failed to disclose that Amazon was employing an ad

17   auction using "defect" advertisements, which raised the costs that third-party sellers bore to reach

18   customers.  Amazon also self-servingly put its own advertising team in charge of deciding how

19   many search page slots were allocated to ads, with Amazon having complete control over ad

20   placements.  The statement also failed to disclose that Amazon was undermining small businesses

21   selling through Amazon's marketplace by taking actions that undermined their bottom line and

22   viability.

23   446.      <u>False and Misleading Statement</u>:  Also at the May 27, 2020 Amazon Annual

24   General Meeting, Defendant Bezos said the following:

25       We continue to dramatically under charge for Prime relative to the value we create
         for customers and that is the strategy.

26

27       . . . .

28       [W]e will stay customer obsessed instead of competitor obsessed.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 151
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

447.        Reasons Why Defendants' Statements in ¶ 446 Were Materially False and Misleading When Made:  The statements in paragraph 446 above that Amazon advanced the interests of customers were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that Amazon was employing an ad auction using "defect" advertisements, which raised the costs to customers and drove customers to more expensive products.  Amazon also buried organic search results under recommendation widgets that displayed Amazon's private label products.

448.        The statements were also materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that Amazon punished third-party sellers offering lower prices outside Amazon.   Internal documents show that these punishments occurred because "customers considering your products could have easily found your products cheaper at another major retailer, and may have chosen to shop elsewhere."

449.        The statements also failed to disclose that Amazon closed SFP, even though customers (and sellers) were going to lose the Prime benefits of millions of unique items.

Q.    July 21, 2020—Amazon Press Release

450.        False and Misleading Statement:  On July 21, 2020, Amazon published a press release titled "Amazon 2020 SMB Impact Report Highlights Success for Small and Medium-Sized Businesses Despite COVID-19; American Sellers Average $160,000 in Annual Sales."   In the press release, Defendant Wilke boasted that third-party sellers are succeeding on Amazon, backed by Amazon's alleged support:

> "At Amazon, supporting small and medium-sized businesses is a fundamental part of our work and an extension of our customer-centric culture.  Our success depends on their success[.]"  "COVID-19 has changed the way we live and work and has created daunting challenges for small businesses around the world.  Yet smaller companies have continued to grow with Amazon, despite the crisis.  Third-party sellers have seen record sales in our stores and continue to outpace our first-party sales."

451.        Reasons Why Defendants' Statements in ¶ 450 Were Materially False and Misleading When Made:  The statements in paragraph 450 above, conveying the misleading

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 152
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

message that Amazon was supporting third-party sellers, helping them grow to see record sales that outpace Amazon's private-label sales, were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose negative information that cut against the positive information.  Wilke failed to disclose, for example, that Amazon was undermining sellers who offered discounts outside Amazon's marketplace; was employing a first-party anti-discounting algorithm to discipline third-party sellers who offered lower prices on other platforms; and used a "tit-for-tat" strategy whereby third-party sellers had to raise their prices in order to win the Featured Offer.

452.     Wilke also failed to disclose that Amazon routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.  Amazon tied Prime eligibility with use of FBA.

453.     Wilke likewise failed to disclose that Amazon did not have sufficiently robust access restrictions to guard third-party sellers' data, which increased the risk that insiders could inappropriately access and use seller-specific data to benefit Amazon's private-label business.

**R.     July 29, 2020—Subcommittee Hearing**

454.     <u>False and Misleading Statement</u>:  At the Subcommittee's July 29, 2020 hearing, Defendant Bezos testified and stated the following:

> 20 years ago, we made the decision to invite other sellers to sell in our store, to share the same valuable real estate we've spent billions to build, market and maintain.  We believe that combining the strengths of Amazon Store with the vast selection of products offered by third parties would be a better experience for customers, and that the growing pie of revenue and profits would be big enough for all.  We were betting that it was not a zero sum game.

455.     Later, Bezos added that:  "Third-party sellers, in aggregate, are doing extremely well on Amazon."  He also stated that:

> [W]e have a policy against using individual seller data to compete with our private labeled products.

456.     <u>Reasons Why Defendants' Statements in ¶¶ 454-55 Were Materially False and Misleading When Made</u>:  The statements in the preceding two paragraphs were materially false

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 153
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in representing that third-party sellers were doing extremely well on Amazon, the statements failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

457.     The above statements were also materially false and misleading because they failed to disclose that Amazon routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

458.     The foregoing statements were also materially false and misleading because they failed to disclose that Amazon routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

459.     These statements also failed to disclose that Amazon routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

460.     Moreover, the statements failed to disclose that Amazon was employing an ad auction using "defect" advertisements, which raised the costs that third-party sellers bore to reach customers.  Amazon also self-servingly put its own advertising team in charge of deciding how

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 154
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

many search page slots were allocated to ads, with Amazon having complete control over ad placements. The statements also failed to disclose that Amazon was undermining third-party sellers using Amazon's marketplace by taking actions that undermined their bottom line and viability.

461. <u>False and Misleading Statement</u>: Also at the Subcommittee's July 29, 2020 hearing, Defendant Bezos testified and stated the following:

> The retail market we participate in is extraordinarily large and competitive. Amazon accounts for less than 1% of the $25 trillion global retail market, and less than 4% of US retail. There's room in retail for multiple winners. We compete against large, established players, like Target, Costco, Kroger, and of course, Walmart, a company more than twice Amazon's size.

462. <u>Reasons Why Defendants' Statements in ¶ 461 Were Materially False and Misleading When Made</u>: The statements in the preceding paragraph, conveying the impression that competition in Amazon's core retail business was fierce, were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that Amazon took actions to undermine competition. For example, Amazon was employing an ad auction using "defect" advertisements, which raised the costs to both sellers and customers. Amazon was also employing a price and selection parity strategy to undercut competition, and it was punishing third-party sellers offering lower prices outside Amazon. Internal documents show that these punishments occurred because "customers considering your products could have easily found your products cheaper at another major retailer, and may have chosen to shop elsewhere." The statements also failed to disclose that Amazon was undermining third-party sellers using Amazon's marketplace by taking actions that undermined their bottom line and viability. Moreover, Amazon was forcing third-party sellers to use FBA in order to obtain Prime eligibility, raising the costs of third-party sellers who desired selling through other non-Amazon channels.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 155
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

        **S.**      **July 29, 2020— Subcommittee Hearing**

2

463.       <u>False and Misleading Statement</u>:  In a prepared statement to the Subcommittee on

3

July 29, 2020, Defendant Bezos stated the following:

4

> [B]y focusing obsessively on customers, we are internally driven to improve our
> services, add benefits and features, invent new products, lower prices, and speed up
> shipping times. . . [n]ot every business takes this customer-first approach, but we
> do, and it's our greatest strength.

5

6

7

464.       <u>Reasons Why Defendants' Statements in ¶ 463 Were Materially False and</u>

8

<u>Misleading When Made</u>:  The statements in the preceding paragraph, conveying the message that

9

Amazon advanced the interests of customers, were materially false and misleading when made, or

10

omitted to state material facts necessary to make the statements not misleading, because they failed

11

to disclose that Amazon was employing an ad auction using "defect" advertisements, which raised

12

the costs to customers and drove customers to more expensive products.  Amazon also buried

13

organic search results under recommendation widgets that displayed Amazon's private label

14

products.

15

465.       The foregoing statements also failed to disclose that Amazon was employing a price

16

and selection parity strategy to undercut competition, and it was punishing third-party sellers

17

offering lower prices outside Amazon.  Internal documents show that these punishments occurred

18

because "customers considering your products could have easily found your products cheaper at

19

another major retailer, and may have chosen to shop elsewhere."  The statements likewise failed

20

to disclose that Amazon was undermining third-party sellers using Amazon's marketplace by

21

taking actions that undermined their bottom line and viability.  For example, Amazon would match

22

the third-party sellers' lower-priced products through promotions and discounts, weaken the

23

seller's business, and thereafter let the promotions and discounts expire.  These actions resulted in

24

higher prices for customers.

25

466.       The foregoing statements further failed to disclose that Amazon closed SFP even

26

though customers (and sellers) were going to lose the Prime benefits of millions of unique items.

27

28

**SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** - 156
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

467.     <u>False and Misleading Statement</u>: Also in his prepared statement to the Subcommittee on July 29, 2020, Defendant Bezos stated the following regarding third-party sellers:

> It's also important to understand that Amazon's success depends overwhelmingly on the success of the thousands of small and medium-sized businesses that also sell their products in Amazon's stores.  Back in 1999, we took what at the time was the unprecedented step of welcoming third-party sellers into our stores and enabling them to offer their products right alongside our own.  Internally, this was extremely controversial, with many disagreeing and some predicting this would be the beginning of a long, losing battle.  We didn't have to invite third-party sellers into the store.  We could have kept this valuable real estate for ourselves.  But we committed to the idea that over the long term it would increase selection for customers, and that more satisfied customers would be great for both third-party sellers and for Amazon.  And that's what happened.  Within a year of adding those sellers, third-party sales accounted for 5% of unit sales, and it quickly became clear that customers loved the convenience of being able to shop for the best products and to see prices from different sellers all in the same store.  These small and medium-sized third-party businesses now add significantly more product selection to Amazon's stores than Amazon's own retail operation.  **Third-party sales now account for approximately 60% of physical product sales on Amazon, and those sales are growing faster than Amazon's own retail sales.  We guessed that it wasn't a zero sum game.  And we were right—the whole pie did grow, third-party sellers did very well and are growing fast, and that has been great for customers and for Amazon**.

468.     <u>Reasons Why Defendants' Statements in ¶ 467 Were Materially False and Misleading When Made</u>:  The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

469.     The above statements were also materially false and misleading because they failed to disclose that Amazon routinely used third-party sellers' data to directly compete with those

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 157
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1   businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party

2   sellers' data and used that data, among other things, to copy their products by creating competing

3   private-label (Amazon) products, source those products from third-party sellers' own

4   manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller

5   data was a common practice within the Company.  Amazon currently faces significant regulatory

6   inquiries into such practices.

7   470.        The foregoing statements were also materially false and misleading because they

8   failed to disclose that Amazon routinely favored its own private-label products to the detriment of

9   third-party sellers, including by granting itself access to data and tools that are off-limits for third-

10  party sellers and, during the pandemic, discriminatorily designating third-parties' products as

11  "nonessential" while designating Amazon's own similar products as "essential."

12  471.        The statements also failed to disclose that Amazon routinely tied and bundled its

13  paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to

14  use those services in order to list their products and by awarding the "Buy Box" to sellers who

15  used Amazon's fulfillment services.

16  472.        Moreover, the statements failed to disclose that Amazon was employing an ad

17  auction using "defect" advertisements, which raised the costs that third-party sellers bore to reach

18  customers.  Amazon also self-servingly put its own advertising team in charge of deciding how

19  many search page slots were allocated to ads, with Amazon having complete control over ad

20  placements.  The statements also failed to disclose that Amazon was undermining third-party

21  sellers using Amazon's marketplace by taking actions that undermined their bottom line and

22  viability.

23  473.        <u>False and Misleading Statement</u>:   Also in his prepared statement to the

24  Subcommittee on July 29, 2020, Defendant Bezos stated the following about competition:

25          **The global retail market we compete in is strikingly large and extraordinarily
        competitive** . . . while we have always focused on producing a great customer
26      experience for retail sales done primarily online, sales initiated online are now an
        even larger growth area for other stores. . . . Like almost every other segment of our
27      economy, technology is used everywhere in retail and has only made retail more
        competitive, whether online, in physical stores, or in the various combinations of

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 158
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

the two that make up most stores today. . . . The range of retail competitors and related services is constantly changing, and the only real constant in retail is customers' desire for lower prices, better selection, and convenience.

474.     <u>Reasons Why Defendants' Statements in ¶ 473 Were Materially False and Misleading When Made</u>:  The statements in paragraph 473 above, conveying the impression that competition in Amazon's core retail business was fierce, were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that Amazon took actions to undermine competition.  For example, Amazon was employing an ad auction using "defect" advertisements, which raised the costs to both sellers and customers.  Amazon was also employing a price and selection parity strategy to undercut competition, and it was punishing third-party sellers offering lower prices outside Amazon.  Internal documents show that these punishments occurred because "customers considering your products could have easily found your products cheaper at another major retailer, and may have chosen to shop elsewhere."  The statements also failed to disclose that Amazon was undermining third-party sellers using Amazon's marketplace by taking actions that undermined their bottom line and viability.  Moreover, Amazon was forcing third-party sellers to use FBA in order to obtain Prime eligibility, raising the costs of third-party sellers who desired selling through other non-Amazon channels.

**T.     July 30, 2020—Amazon's Q2 2020 Earnings Call**

475.     <u>False and Misleading Statement</u>:  On July 30, 2020, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q2 2020 results.  During the call, Defendant Olsavksy stated:

> Third-party units continue to represent more than half of overall unit volume, helped by improved quarter-over-quarter growth in active sellers.  **We are more committed than ever to supporting the success of the hundreds of thousands of small and medium-sized businesses to sell their products in Amazon stores**.

476.     <u>Reasons Why Defendants' Statements in ¶ 475 Were Materially False and Misleading When Made</u>:  The statements in paragraph 475 above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that "[w]e are more committed than ever to supporting the

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 159
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1    success of the hundreds of thousands of small and medium-sized business to sell their products in

2    Amazon stores," Amazon failed to disclose, among other things, that Amazon routinely retaliated

3    against its third-party sellers—and used the threat of retaliation—through a myriad of

4    anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party

5    sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block

6    purchases of their products, and falsely listing their products as "out of stock" or with delayed

7    shipping times, and sold their products for lower prices and demanded that they pay Amazon for

8    the lost margin.

9    477.      The above statements were also materially false because Amazon failed to disclose

10   that it routinely used third-party sellers' data to directly compete with those businesses on

11   Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and

12   used that data, among other things, to copy their products by creating competing private-label

13   (Amazon) products, source those products from third-party sellers' own manufacturers, and cut

14   them out of the equation.  In fact, the wrongful use of such third-party seller data was a common

15   practice within the Company.  Amazon currently faces significant regulatory inquiries into such

16   practices.

17   478.      Amazon also failed to disclose that it routinely favored its own private-label

18   products to the detriment of third-party sellers, including by granting itself access to data and tools

19   that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating

20   third-parties' products as "nonessential" while designating Amazon's own similar products as

21   "essential."

22   479.      Furthermore, Amazon failed to disclose that it routinely tied and bundled its paid

23   fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use

24   those services in order to list their products and by awarding the "Buy Box" to sellers who used

25   Amazon's fulfillment services.

26

27

28

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 160
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1   **U.      September 1, 2020—Amazon Accelerate Conference**

2   480.      <u>False and Misleading Statement</u>:  On September 1, 2020, Defendant Wilke gave a

3   speech at the Amazon Accelerate Conference, an event targeting third-party merchants on

4   Amazon.  During the speech, he stated:

5         We do not look at individual seller data when we decide what products to launch in
          private label[.]  If someone breaks the rules, we're going to take action.

6

7         . . . .

8         We understand there are reports of a few violations[.]  We don't believe that they're
          accurate, but just to be sure, we've launched an internal investigation to get to the
9         bottom of it.

10  481.      <u>Reasons Why Defendants' Statements in ¶ 480 Were Materially False and</u>

11  <u>Misleading When Made</u>:  The statements in paragraph 480 above were materially false and

12  misleading when made, or omitted to state material facts necessary to make the statements not

13  misleading, because the statements failed to disclose that Amazon used third-party sellers' data to

14  directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely

15  misappropriated third-party sellers' data and used that data, among other things, to copy their

16  products by creating competing private-label (Amazon) products, source those products from

17  third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use

18  of such third-party seller data was a common practice within the Company.  Amazon currently

19  faces significant regulatory inquiries into such practices.  At a minimum, Wilke failed to disclose

20  that Amazon did not have sufficiently robust access restrictions to guard third-party sellers' data,

21  which increased the risk that insiders could inappropriately access and use seller-specific data to

22  benefit Amazon's private-label business.

23  **V.      September 4, 2020—Amazon's Response to Chairman Cicilline**

24  482.      <u>False and Misleading Statement</u>:  On September 4, 2020, in response to Chairman

25  Cicilline's question "whether Amazon ever designed the Buy Box algorithm to consider

26  profitability to Amazon as a determining factor in whether to award the Buy Box" to a third-party

27  seller, Amazon stated "**Amazon does not consider profitability as part of the Featured**

28  **Merchant Algorithm**."

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 161
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

483.     <u>Reasons Why Defendants' Statement in ¶ 482 Was Materially False and Misleading When Made</u>:   The statement in paragraph 482 above was materially false and misleading when made, or omitted to state material facts necessary to make the statement not misleading, because the statement failed to disclose, among other things, that Amazon has used profitability—also referred to internally as "contribution profit" or "CP"—as a factor in awarding the Buy Box.

### W.     September 25, 2020—Amazon's Official Website

484.     <u>False and Misleading Statement</u>:   On September 25, 2020, Amazon posted on its official website, that:

> We have strict policies that forbid our own private brand teams from using individual seller data.  We train the teams on these policies and audit the teams' compliance with them.  Our approach allows us to improve our store while protecting the things sellers care about most: ensuring that their individual pricing plans, inventory levels, and sales histories are not shared with other parties or used to compete with them.

> Our continued success depends on providing a great experience—not only for our customers who benefit from wider selection and increased competition that helps keep prices low—but also for independent sellers, which means protecting their proprietary information while providing the data and tools they need to grow their businesses.

485.     <u>Reasons Why Defendants' Statements in ¶ 484 Were Materially False and Misleading When Made</u>:   The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that Amazon leveraged its access to third-party sellers' data to identify and replicate popular and profitable products from among the hundreds of millions of listings on its Marketplace.

### X.     October 6, 2020—Amazon's Official Website

486.     <u>False and Misleading Statement</u>:   On October 6, 2020, Amazon stated on its official website:

> **Amazon and third-party sellers benefit each other**.  [F]lawed regulatory ideas rely on the false narrative that Amazon's interests are not aligned with those of the thousands of small and medium-sized businesses thriving as sellers in our store. **The opposite is true**:  Amazon and sellers complement each other, and together

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 162
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

we create a better customer experience than either could create alone. **[I]n addition to great value and low prices for customers—we also have strong financial incentives to support third-party sellers because we typically make the same or more revenue on third-party sales. Clearly, when it comes to Amazon and third-party sellers in our store, it's not zero-sum. Amazon and third-party sellers have a mutually beneficial relationship, and our interests are well aligned. What these misguided notions from some subcommittee staff misunderstand is the fact that third parties having the opportunity to sell right alongside a retailer's products is the very competition that most benefits consumers and has made the marketplace model so successful for third-party sellers**.[380]

487.     <u>Reasons Why Defendants' Statements in ¶ 486 Were Materially False and Misleading When Made</u>:  The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that "Amazon and third-party sellers benefit each other"; "Amazon's interests are aligned with those of the thousands of small and medium-sized businesses thriving as sellers in our store"; "we have strong financial incentives to support third-party sellers"; "Amazon and third-party sellers have a mutually beneficial relationship, and our interests are aligned"; and by touting the "fact that third parties hav[e] the opportunity to sell right alongside a retailer's products . . . made the marketplace model so successful for third-party sellers," Amazon failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

488.     The above statements were also materially false because Amazon failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on

---

[380] https://www.aboutamazon.com/news/policy-news-views/fringe-notions-on-antitrust-would-destroy-small-businesses-and-hurt-consumers?utm_source=social&utm_medium=tw&utm_term=amznnews&utm_content=HJCReport_Statement&linkId=101370594.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 163
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

489.       Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

490.       Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

Y.       **November 10, 2020—Response to the European Commission's Preliminary Findings**

491.       On November 10, 2020, the European Commission informed Amazon of its preliminary view that Amazon is systematically relying on non-public business data of independent sellers who sell on its Marketplace, to the benefit of Amazon's own retail business, which directly competes with those third-party sellers.

492.       <u>False and Misleading Statement</u>:  In response, Amazon stated the following:

"[w]e disagree with the preliminary assertions of the European Commission and will continue to make every effort to ensure it has an accurate understanding of the facts.  **No company cares more about small businesses or has done more to support them over the past two decades than Amazon**."[381]

493.       <u>Reasons Why Defendants' Statements in ¶ 492 Were Materially False and Misleading When Made</u>:  The statements in the preceding paragraph were materially false and

---

[381] https://www.nytimes.com/2020/11/10/business/amazon-eu-antitrust.html.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 164
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  misleading when made, or omitted to state material facts necessary to make the statements not

2  misleading, because in telling investors that "[n]o company cares more about small business or

3  has done more to support them over the past two decades than Amazon," Amazon failed to

4  disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and

5  used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive

6  tactics including abruptly suspending third-party sellers' accounts, destocking their products,

7  removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing

8  their products as "out of stock" or with delayed shipping times, and sold their products for lower

9  prices and demanded that they pay Amazon for the lost margin.

10  494.     The above statements were also materially false because Amazon failed to disclose

11  that it routinely used third-party sellers' data to directly compete with those businesses on

12  Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and

13  used that data, among other things, to copy their products by creating competing private-label

14  (Amazon) products, source those products from third-party sellers' own manufacturers, and cut

15  them out of the equation.  In fact, the wrongful use of such third-party seller data was a common

16  practice within the Company.  Amazon currently faces significant regulatory inquiries into such

17  practices.

18  495.     Amazon also failed to disclose that it routinely favored its own private-label

19  products to the detriment of third-party sellers, including by granting itself access to data and tools

20  that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating

21  third-parties' products as "nonessential" while designating Amazon's own similar products as

22  "essential."

23  496.     Amazon also failed to disclose that it routinely tied and bundled its paid fulfillment

24  and logistics services to the detriment of third-party sellers by requiring sellers to use those services

25  in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's

26  fulfillment services.

27

28

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 165
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**Z.      December 22, 2020—Amazon.com Post**

497.      <u>False and Misleading Statement</u>:   On December 22, 2020, Defendant Wilke published a blog post to the Amazon website titled "Amazon investing over $5 billion in small business success and stability during difficult time."  In the post, Defendant Wilke stated:

> This continues to be an incredibly difficult year for entrepreneurs and small business owners around the world.  Nobody had a playbook for how to keep a business going through a global pandemic, but you continue to meet the challenge and serve customers every day.  **We're inspired by your efforts and want to help you be successful during these times**.  Our communities are depending on Amazon and all the small businesses who sell in our store to keep as much in stock as we can and to deliver products to doorsteps while keeping our employees and partners safe and healthy.
>
> We're working hard and investing heavily to support you and your business.
>
> . . . .
>
> Sellers surpassed $4.8 billion in worldwide sales from Black Friday through Cyber Monday, growing about 60% from last year.  Your businesses continue to grow faster than Amazon's own first-party retail business, and we're glad.  What's good for you is good for Amazon, our customers, and communities around the world.
>
> You, and the more than 1.7 million small- and medium-sized businesses serving Amazon customers in our store, have never been more important for our communities, and we want to thank you for your continued partnership and support.  **We remain more committed than ever to supporting your success**, and we hope you and your families stay safe this holiday season.

498.      <u>Reasons Why Defendants' Statements in ¶ 497 Were Materially False and Misleading When Made</u>:  The statements in the preceding paragraph, conveying the message that Amazon was helping entrepreneurs and small businesses (which include third-party sellers), were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because Amazon failed to reveal negative information that cut against the positive information that was disclosed.  Wilke failed to disclose, for example, that Amazon was undermining sellers who offered discounts outside Amazon's marketplace; was employing a first-party anti-discounting algorithm to discipline third-party sellers who offered lower prices on other platforms; and used a "tit-for-tat" strategy whereby third-party sellers had to raise their prices in order to win the Featured Offer.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 166
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

499.         Wilke also failed to disclose that Amazon routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.  Amazon tied Prime eligibility with use of FBA.

500.         Wilke likewise failed to disclose that Amazon did not have sufficiently robust access restrictions to guard third-party sellers' data, which increased the risk that insiders could inappropriately access and use seller-specific data to benefit Amazon's private-label business.

**AA.    February 3, 2021—Amazon's Form 10-K and Forms 10-Q**

501.         On February 3, 2021, Amazon filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2020 (the "2020 10-K").  Appended to the 2020 10-K as exhibits were signed Certifications pursuant to SOX by Defendants Bezos and Olsavsky, attesting that "I have reviewed this Form 10-K of Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

502.         <u>False and Misleading Statement</u>:  According to the 2020 10-K, North America net sales in 2020 were $236.282 billion, and International net sales in 2020 were $104.412 billion.  In the 2020 10-K, the Company stated:

> North America sales increased 38% in 2020, compared to the prior year.  The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .

> International sales increased 40% in 2020, compared to the prior year.  The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand, including for household staples and other essential and home products . . . .

503.         <u>Reasons Why Defendants' Statements in ¶ 502 Were Materially False and Misleading When Made</u>:  The statements in paragraph 502 above were materially false and

misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements specifically attributed Amazon's increased sales to sales by third-party sellers but failed to disclose that Amazon was, as explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and (iv) favoring its own private-label products to the detriment of third-party sellers.  These practices created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

504.     <u>False and Misleading Statements</u>:  The 2020 10-K also contained the following statements:

Competition

The worldwide marketplace in which we compete is evolving rapidly and intensely competitive, and we face a broad array of competitors from many different industry sectors around the world.   Our current and potential competitors include: (1) physical, e-commerce, and omnichannel retailers, publishers, vendors, distributors, manufacturers, and producers of the products we offer and sell to consumers and businesses . . . (4) companies that provide e-commerce services, including . . . advertising, fulfillment . . . ; (5) companies that provide fulfillment and logistics services for themselves or for third parties, whether online or offline . . . .  We believe that the principal competitive factors in our retail businesses include selection, price, and convenience, including fast and reliable fulfillment. . . .  Some of our current and potential competitors have greater resources . . . and greater control over inputs critical to our various businesses. They may secure better terms from suppliers, adopt more aggressive pricing . . . direct consumers to their own offerings instead of ours . . . .

505.     <u>Reasons Why Defendants' Statements in ¶ 504 Were Materially False and Misleading When Made</u>:  The statements in paragraph 504 above, conveying the message that competition in Amazon's core retail business was fierce, were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that Amazon took actions to undermine competition.  For example, Amazon was employing an ad auction using "defect" advertisements, which raised the costs to both sellers and customers.  Amazon was also employing a price and selection parity strategy to undercut competition, and it was punishing third-party sellers offering lower prices outside

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 168
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1    Amazon.   Internal documents show that these punishments occurred because "customers

2    considering your products could have easily found your products cheaper at another major retailer,

3    and may have chosen to shop elsewhere."  The statements also failed to disclose that Amazon was

4    undermining third-party sellers using Amazon's marketplace by taking actions that undermined

5    their bottom line and viability.  Moreover, Amazon was forcing third-party sellers to use FBA in

6    order to obtain Prime eligibility, raising the costs of third-party sellers who desired selling through

7    other non-Amazon channels.

8        506.        <u>False and Misleading Statements</u>:  The 2020 10-K contained only generic and

9    misleadingly incomplete risk statements that Amazon was "subject to general business regulations

10   and laws, as well as regulations and laws specifically governing the Internet[] [and] e-commerce"

11   and that existing and future laws and regulations covered "competition," among other things.

12   Amazon merely advised its investors that "[u]nfavorable regulations, laws, decisions, or

13   interpretations by government or regulatory authorities applying those laws and regulations" could

14   "impede our growth" and failed to disclose the specific and known risks arising from the

15   Company's improper business practices.  Amazon failed to disclose that it (i) routinely strong-

16   armed third-party sellers on its platform for its own economic benefit;  (ii) routinely

17   misappropriated third-party seller data in order to manufacture and market its own products;

18   (iii) engaged in self-preferencing; and (iv) tied and bundled its products, misconduct that created

19   a heightened risk of governmental and other criminal and civil investigations, as well as the risk

20   of significant penalties and reputational harm.

21       507.        <u>Reasons Why Defendants' Statements in ¶ 506 Were Materially False and</u>

22   <u>Misleading When Made</u>:  The statements in paragraph 506 above were materially false and

23   misleading when made, or omitted to state material facts necessary to make the statements not

24   misleading, because the statements above discussed Amazon's legal and regulatory risk with

25   respect to the Internet, e-commerce, and competition, but failed to disclose that Amazon was, as

26   explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its

27   products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own

28   economic gain; and (iv) favoring its own private-label products to the detriment of third-party

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 169
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1    sellers.  These practices created a heightened risk of governmental and other criminal and civil

2    investigations, as well as the risk of significant penalties and reputational harm.

3    508.        Underline: False and Misleading Statements:  The generic and misleadingly incomplete risk

4    statements in the paragraph above were also repeated in Amazon's Forms 10-Q, filed with the SEC

5    on April 30, 2021 (1Q 2021 10-Q), July 30, 2021 (2Q 2021 10-Q), and October 29, 2021 (3Q 2021

6    10-Q).  Appended to the April 30, 2021, July 30, 2021, and October 29, 2021 10-Q Forms were

7    signed Certifications pursuant to SOX by Defendants Bezos and Olsavsky for the 1Q 2021 10-Q

8    and by Defendants Jassy and Olsavsky for the 2Q 2021 10-Q and 3Q 2021 10-Q, attesting that "I

9    have reviewed this Form 10-Q of Amazon.com, Inc." and that "Based on my knowledge, this

10   report does not contain any untrue statement of a material fact or omit to state a material fact

11   necessary to make the statements made, in light of the circumstances under which such statements

12   were made, not misleading with respect to the period covered by this report."

13   509.        False and Misleading Statements:  According to the 1Q 2021 10-Q, North America

14   net sales in 1Q 2021 were $64.366 billion, and International net sales in 1Q 2021 were

15   $30.649 billion.  The 1Q 2021 10-Q also contained the following statements:

16   > North America sales increased 40% in Q1 2021, compared to the comparable prior
17   > year period.  The sales growth primarily reflects increased unit sales, including
     > sales by third-party sellers.  Increased unit sales were driven largely by our
18   > continued efforts to reduce prices for our customers, including from our shipping
     > offers, and increased demand, including for household staples and other essential
19   > and home products . . . .

20   > International sales increased 60% in Q1 2021, compared to the comparable prior
21   > year period.  The sales growth primarily reflects increased unit sales, including
     > sales by third-party sellers.  Increased unit sales were driven largely by our
22   > continued efforts to reduce prices for our customers, including from our shipping
     > offers, and increased demand, including for household staples and other essential
23   > and home products . . . .

24   510.        False and Misleading Statements:  According to the 2Q 2021 10-Q, North America

25   net sales in 2Q 2021 were $67.550 billion, and International net sales in 2Q 2021 were

26   $30.721 billion.  The 2Q 2021 10-Q also contained the following statements:

27   > North America sales increased 22% in Q2 2021 and 30% for the six months ended
     > June 30, 2021 compared to the comparable prior year periods.  **The sales growth**
28   > **primarily reflects increased unit sales, including sales by third-party sellers.**

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 170
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . . .**

International sales increased 36% in Q2 2021 and 47% for the six months ended June 30, 2021 compared to the comparable prior year periods. **The sales growth primarily reflects increased unit sales, including sales by third-party sellers. Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . . .**

511.        <u>False and Misleading Statements</u>:  According to the 3Q 2021 10-Q, North America net sales in 3Q 2021 were $65.557 billion, and International net sales in 3Q 2021 were $29.145 billion.  The 3Q 2021 10-Q also contained the following statements:

North America sales increased 10% in Q3 2021 and 23% for the nine months ended September 30, 2021 compared to the comparable prior year periods.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers . . . . Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . . .**

International sales increased 16% in Q3 2021 and 35% for the nine months ended September 30, 2021 compared to the comparable prior year periods.  **The sales growth primarily reflects increased unit sales, including sales by third-party sellers . . . . Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . . .**

512.        <u>Reasons Why Defendants' Statements in ¶¶ 508-11 Were Materially False and Misleading When Made</u>:  The statements in the three 10-Qs above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements specifically attributed Amazon's increased sales to sales by third-party sellers but failed to disclose that Amazon was, as explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and (iv) favoring its own private-label products to the detriment of third-party sellers.  These practices created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 171
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

BB.    **May 26, 2021—Annual General Meeting**

513.    Underline{False and Misleading Statement}:  On May 26, 2021, at the Amazon Annual General Meeting, Defendant Bezos, during a question-and-answer session at the end of the meeting, was asked to address the criticism that Amazon has grown too big and too powerful.  Bezos pushed back on that assertion and argued that Amazon faces intense competition in every industry it does business in, including its core retail business, where the market is "thriving."  He stated:

> Consumers can shop at dozens of large national retailers, hundreds of regional retailers, hundreds of thousands of small retailers both online and in store . . . . It's a very healthy industry and far from a winner-take-all situation and we are still a small fraction of retail.

514.    Underline{Reasons Why Defendants' Statements in ¶ 513 Were Materially False and Misleading When Made}:  The statements in paragraph 513 above, conveying the misleading impression that competition in Amazon's core retail business was fierce, were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that Amazon took actions to undermine competition.  For example, Amazon was employing an ad auction using "defect" advertisements, which raised the costs to both sellers and customers.  Amazon was also employing a price and selection parity strategy to undercut competition, and it was punishing third-party sellers offering lower prices outside Amazon.  Internal documents show that these punishments occurred because "customers considering your products could have easily found your products cheaper at another major retailer, and may have chosen to shop elsewhere."  The statements also failed to disclose that Amazon was undermining third-party sellers using Amazon's marketplace by taking actions that undermined their bottom line and viability.  Moreover, Amazon was forcing third-party sellers to use FBA in order to obtain Prime eligibility, raising the costs of third-party sellers who desired selling through other non-Amazon channels.

CC.    **July 29, 2021—Q2 2021 Earnings Call**

515.    Underline{False and Misleading Statements}:  On July 29, 2021, Amazon held its second-quarter 2021 earnings conference call.  During the call, Defendants Olsavsky and Fildes explained

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 172
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

that demand for fast delivery "has required" and "will continue to require" a significant investment in the Company's fulfillment network.[382]  As Defendant Olsavsky stated:

> I'll finish up with some comments on our ongoing investments in operations.  As we think about the **pull-forward in demand** we've seen these past 18-months, **it has required and will continue to require a significant amount of investment in our fulfillment network** . . . [s]o there's more work to do including additional build outs for our [fulfillment centers] as well as our middle-mile and last-mile capabilities to support our fast improving delivery offers for customers.

516.　　During the same conference call Defendant Fildes also tied "current high customer demand" to the Company's aggressive buildout in fulfillment capabilities:

> Doug, on your second question, it's Dave here.  I'd just say our focus is really squarely on **adding capacity to meet the current high customer demand** that Brian talked about in his opening remarks.

517.　　Later on the call, Defendants reiterated that Amazon was continuing to "add[] capacity" and "invest[]" in its fulfillment capabilities in order to meet rising demand:

> [Olsavsky]: I would say on the fulfillment side, there are a number of things. **First, we're adding a lot of capacity**. If you step back, the Amazon fulfilled unit volume, so that's the units coming out of our fulfillment centers, both retail and FBA, have doubled in the past two years.  And the AMZL, the delivery arm of our business, has more than doubled in that time period. **So you can see there's been very strong multiyear demand here that we are still catching up with from last year** . . . . So if you've been with us a long time, you know the cadence is that as we add demand—excuse me, as we add capacity, there's a lot of additional costs from hiring to starting up, to training, to getting that building or sort center or delivery station up and running.  It usually takes a multi-year period to tame those assets.  And we've literally nearly doubled our network here in the last 18 months from a size standpoint.  So there's a lot of that going on, a lot of strong effort by our fulfillment and ops teams to help mitigate the costs.
>
> . . . .
>
> [Fildes]: **We're investing in the transportation network to support the demand**. A significant part of the capital investments we've been talking about for the past few years and certainly since the pandemic's start has been to support those efforts in middle and last-mile capacity **to keep pace and support with that**

---

[382] Statements made by Fildes during the July 2021 conference call that Olshansky joined are implicitly attributable to Olshansky.  Similarly, statements made by Olshansky during that call are implicitly attributable to Fildes.  Simply stated, a high-ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and escape liability for those misstatements.

**demand**.   So as we've been saying here, that work is not done yet.   **We're continuing to expand.   You'll see that investment throughout 2021**.

518.      Reasons Why Defendants' Statements in ¶¶ 515-17 Were Materially False and Misleading When Made:  Defendants' statements on the July 29, 2021 Q2 Earnings Call that the Company "will continue to require a significant amount of investment" due to demand; that "it was adding capacity to meet current high customer demand"; that Amazon was "investing in the transportation network to support the demand"; and that a "significant part" of its investment "has been to support those efforts in middle to last-mile capacity to keep pace with . . . demand" were false and misleading when made because, by July of 2021, Amazon's fulfillment and high-speed delivery capacity had already grown beyond market demand.  Specifically, by the end of 2020, Amazon realized that they had overbuilt, according to FE-1.  *See supra* ¶¶ 291-93.  And by late 2020, Amazon had implemented a stall in forward-looking investments in order to "rationalize" plans for increased fulfillment capacity.  By that point, as FE-1 confirmed, Amazon's internal projections of continued demand showed that demand was not maintaining at the level to which they had sourced increased incremental fulfillment capacity.  FE-1 further confirmed that by very early in 2021, Amazon saw declining order volumes.  Thus, by the spring of 2021, Amazon had started making cutbacks to fulfillment capacity and put a halt on capital expenditures.  And by the summer of 2021, Amazon was halting construction, pulling out of prior deals, and pushing for cost control to a degree that FE-1 had never previously seen since joining Amazon in 2017.

519.      In addition, the declining demand and resulting cutbacks for fast delivery was also reported by the *Wall Street Journal*:

> **By July 2021, it became clear to Mr. Jassy and Amazon's logistics team that Amazon's capacity was outpacing demand**.  They made a series of intensifying cutbacks to the plans for capacity growth, said people involved in the decisions.  They again cut back capacity growth plans in September and December of 2021.

520.      Item 303 of Regulation S-K requires publicly traded companies to disclose "known trends or uncertainties" that are "reasonably likely" to have a material impact on the company's operations.  17 C.F.R. § 229.303 (Item 303).  Rather than disclose, consistent with Item 303 of Regulation S-K, this declining trend in demand, Defendants instead doubled down by repeatedly

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 174
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

(and falsely) stating that rising demand for fast delivery was driving the Company's push to increase capacity: "our focus . . . is on adding capacity to meet high customer demand;" "we're investing . . . to support demand"; and "[pull-forward demand] continues to require a significant amount of investment in fulfillment."

521.     The false statements and omissions above from Amazon's Q2 2021 Earnings Call were material under the federal securities laws because they created the false impression with investors that the exceedingly high cost of Amazon's aggressive buildout of its fulfillment network was a prudent use of capital because demand for fast delivery continued to rise.  While this might have been true prior to March and April 2021, thereafter, and at least as early as July 2021, Defendants' had a duty under the federal securities law be truthful about this declining trend.

522.     <u>False and Misleading Statement</u>:  In addition to the above statements, during that same earnings call, Defendant Olsavsky stated:

> As far as the higher-margin areas and whether that's a purposeful strategy, I'd like to say it is, but **if you look at what they are third-party is kind of a continuation of strength in our FBA program**, in particular, I think the sellers are doing a great job of adding additional selection that's very valuable and reinforces our flywheel, and we'd like to see that and you see that third-party percent of units went up from 53% last year to 56%, and that's a steady mark.  **We've seen that, as we said, the third-party sellers are doing a great job and we like to see that.**

523.     <u>Reasons Why Defendants' Statements in ¶ 522 Were Materially False and Misleading When Made</u>:  The statements in paragraph 522 above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that (i) third-party sellers continued to raise concerns that increased fees for compulsory FBA fulfillment were squeezing their business; (ii) Amazon engaged in anticompetitive and improper conduct with respect to its private-label business by favoring sellers who used FBA over those who did not, for example for its search rankings and the Buy Box; and (iii) Amazon was using its FBA service as an avenue to identify popular third-party seller items and gather competitively sensitive information about them.

**DD.    September 13, 2021—Amazon's Official Website**

524.    <u>False and Misleading Statement</u>: On September 13, 2021, Amazon stated on its official website:

> **Amazon remains absolutely committed to helping our third-party selling partners grow and thrive**.  Last year, Amazon invested more than $18 billion in logistics, tools, services, programs, and people to help small and medium-sized businesses succeed.  We offer resources, such as the Amazon Small Business Academy and the recently launched Amazon Black Business Accelerator, to help aspiring sellers from all backgrounds learn how to build their businesses online.

525.    <u>Reasons Why Defendants' Statement in ¶ 524 Was Materially False and Misleading When Made</u>:  The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that "Amazon remains absolutely committed to helping our third-party selling partners grow and thrive," Amazon failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

526.    The above statements was also materially false because Amazon failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

527.    Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools

that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

528.        Additionally, Amazon failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

### EE.    October 19, 2021—Amazon Press Release

529.        <u>False and Misleading Statement</u>:  On October 19, 2021, Amazon issued a press release titled "Amazon's 2021 Small Business Empowerment Report Reveals Third-Party Sellers Have Created More than 1.8 Million U.S. Jobs," in which Defendant Clark stated the following:

> Over 20 years ago, we made the decision to open our store's virtual shelves to third-party sellers.  At the time, big-box retailers had been pushing small businesses out of the retail market[.]  **But we made a bet that bringing selling partners into our store would not only be a win for customers who want vast product selection, low prices, and fast delivery, but it would also be a win for small businesses that want to reach more customers, increase their revenue and profits, and create good jobs.  It proved to be a great bet**.

530.        <u>Reasons Why Defendants' Statements in ¶ 529 Were Materially False and Misleading When Made</u>:  The statements in paragraph 529 above, conveying the message that third-party sellers were winning on Amazon's marketplace and that customers benefitted from lower prices and large selections of products, were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to reveal negative information that cut against the positive information that was disclosed.  The statements failed to disclose, for example, that Amazon was undermining sellers who offered discounts outside Amazon's marketplace; employing a first-party anti-discounting algorithm to discipline third-party sellers who offered lower prices on other platforms; and using a "tit-for-tat" strategy whereby third-party sellers had to raise their prices in order to win the Featured Offer.

531.         The foregoing statements also failed to disclose that Amazon routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.  Amazon tied Prime eligibility with use of FBA.

532.         The foregoing statements likewise failed to disclose that Amazon did not have sufficiently robust access restrictions to guard third-party sellers' data, which increased the risk that insiders could inappropriately access and use seller-specific data to benefit Amazon's private-label business.

**FF.   October 19, 2021—Amazon Report**

533.         <u>False and Misleading Statement</u>:  On October 19, 2021, Amazon released a report titled "2021 Amazon Small Business Empowerment Report" in which Defendant Clark stated the following:

> Over 20 years ago, we made the decision to open our store's virtual shelves to third-party sellers.  At the time, big-box retailers had been pushing small businesses out of the retail market.  **But we made a bet that bringing selling partners into our store would not only be a win for customers who want vast product selection, low prices, and fast delivery, but it would also be a win for small businesses that want to reach more customers, increase their revenue and pro its, and create good jobs.  It proved to be a great bet** . . . .

> Our decision kicked off an industry trend that has resulted in small businesses having a range of options when deciding how and where to sell their products.  Small businesses now have the opportunity to sell to customers through the sites of major retailers, their own sites, third-party-only marketplaces, and through the top social media and search services.  We know sellers have lots of options, and **we work hard to make Amazon the best partner to help drive their success**.

> Every day, we see our selling partners provide great product selection, low prices, and convenience for customers.  That's why we invested more than $18 billion in selling partner success last year.  These investments included logistics, teams, services, programs, and tools like Brand Follow and Stores that allow sellers to connect their brands directly to millions of customers.  Last year, while many other companies passed along the increased costs of doing business during the pandemic through surcharges and fee changes, we absorbed over $5 billion of those costs on behalf of sellers and **have continued investing billions more this year to help sellers as we all work toward recovery.  These investments help selling partners quickly launch their business on Amazon, scale and reach more customers, and establish and build their brands** . . . .

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 178
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

As always, it's Day 1 for us as we continue to listen to our selling partners and invent on their behalf.

534.     <u>Reasons Why Defendants' Statements in ¶ 533 Were Materially False and Misleading When Made</u>:  The statements in paragraph 533 above, conveying the  message that third-party sellers were winning on Amazon's marketplace, and that customers benefitted from lower prices and large selections of products, were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to reveal negative information that cut against the positive information that was disclosed.  The statements failed to disclose, for example, that Amazon was undermining sellers who offered discounts outside Amazon's marketplace; employing a first-party anti-discounting algorithm to discipline third-party sellers who offered lower prices on other platforms; and using a "tit-for-tat" strategy whereby third-party sellers had to raise their prices in order to win the Featured Offer.

535.     The statements also failed to disclose that Amazon routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.  Amazon tied Prime eligibility with use of FBA.

536.     The statements likewise failed to disclose that Amazon did not have sufficiently robust access restrictions to guard third-party sellers' data, which increased the risk that insiders could inappropriately access and use seller-specific data to benefit Amazon's private-label business.

**GG.     October 21, 2021—Amazon Accelerate Conference**

537.     <u>False and Misleading Statement</u>:  On October 21, 2021, Defendant Clark spoke at the Amazon Accelerate Conference, an event targeting third-party merchants on Amazon.  He stated:

> I think one of the things very special to me personally about our seller business is uh how much **we've been able to democratize shopping for sellers and give them an opportunity to serve customers not just in their communities but across their state across the country and even across the world in a way that you just**

**couldn't do you know a decade or two decades ago and opening that up for sellers I think is one of the most important things we've done as a company**.

. . . .

There's sellers are in all different forms and fashion and sizes and so **we need to help them across the life cycle that includes you know allowing them to bring new products helping them discover which products they need to bring or could bring to the store to help customers and you know you've got some interesting products to help them with that along the way and then sellers need to understand how to build their brands and how through brand development they can more directly connect customers over time can build a following inside of amazon can build up all the things they need to do to have a great store inside of Amazon**.

. . . .

Well first and foremost I think **sellers are our customers** this is the that's you know when I wake up in the morning I'm thinking about multiple sets of customers I'm thinking about how do we please and . . . I wake up in the morning and I scour the news and what people are saying to understand like where both end users and sellers where are the places we could be better.

538.     <u>Reasons Why Defendants' Statements in ¶ 537 Were Materially False and Misleading When Made</u>:  The statements in paragraph 537 above, conveying the message that Amazon was helping third-party sellers win on Amazon's marketplace, were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to reveal negative information that cut against the positive information that was disclosed.  The statements failed to disclose, for example, that Amazon was undermining sellers who offered discounts outside Amazon's marketplace; was employing a first-party anti-discounting algorithm to discipline third-party sellers who offered lower prices on other platforms; and used a "tit-for-tat" strategy whereby third-party sellers had to raise their prices in order to win the Featured Offer.

539.     The foregoing statements also failed to disclose that Amazon routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.  Amazon tied Prime eligibility with use of FBA.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 180
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

540.     The foregoing statements likewise failed to disclose that Amazon did not have sufficiently robust access restrictions to guard third-party sellers' data, which increased the risk that insiders could inappropriately access and use seller-specific data to benefit Amazon's private-label business.

**HH.    October 28, 2021—Amazon Press Release and Form 8-K**

541.     <u>False and Misleading Statement</u>:  On October 28, 2021, Amazon issued a press release (that was later filed with the SEC on Form 8-K and signed by Defendant Olsavsky) where Defendant Jassy stated that Amazon's "extraordinary investments" in its fulfillment network were needed to "satisfy customer needs":

> We've always said that when confronted with the choice between optimizing for short-term profits versus what's best for customers over the long term, we will choose the latter—and you can see that during every phase of this pandemic . . . . In the first several months of COVID-19, Amazonians played an essential role to help people secure the requisite PPE, food, and other in-demand items needed, and we worked closely with businesses and governments to leverage AWS to maintain business continuity as they responded to the pandemic.  Customers have appreciated this commitment, which is part of what's driving this past quarter's AWS growth acceleration to 39% year over year; but it's also driven extraordinary investments across our businesses to satisfy customer needs—just one example is that we've nearly doubled the size of our fulfillment network since the pandemic began.

542.     <u>Reasons Why Defendants' Statements in ¶ 541 Were Knowingly False and Misleading</u>:  Defendant Jassy's statement on October 28, 2021 that Amazon's "extraordinary investments" in its fulfillment network were required to "satisfy customers needs" was materially false and misleading when made because Jassy's statement continued to perpetuate the false impression created by Defendants on July 29, 2021 that the Company's aggressive investment in fulfillment capacity was necessary and prudent because it was financially supported by increasing demand for fast delivery when in fact Jassy and other Individual Defendants knew by this point—based on internal sources at the Company and reporting by *Wall Street Journal*—that months earlier fulfillment capacity for fast delivery had already exceeded demand.  Indeed, by July of 2021, Amazon's fulfillment and high-speed delivery capacity had already grown beyond market demand.  Specifically, by the end of 2020, Amazon realized that they had overbuilt, according to

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 181
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

FE-1.  *See supra* ¶¶ 291-93.  And by late 2020, Amazon had implemented a stall in forward-looking investments in order to "rationalize" plans for increased fulfillment capacity.  By that point, as FE-1 confirmed, Amazon's internal projections of continued demand showed that demand was not maintaining at the level to which they had sourced increased incremental fulfillment capacity.  FE-1 further confirmed that by very early in 2021, Amazon saw declining order volumes.  Thus, by the spring of 2021, Amazon had started making cutbacks to fulfillment capacity and put a halt on capital expenditures.  And by the summer of 2021, Amazon was halting construction, pulling out of prior deals, and pushing for cost control to a degree that FE-1 had never previously seen since joining Amazon in 2017.  Moreover, throughout 2021, numerous "mothball buildings" as well as "decommissioned buildings" began to appear at Amazon, including at least two more mothball buildings in September 2021, and another mothball building in October 2021 that became a "shell site" over a month before its previously scheduled launch in November 2021.  *See supra* ¶¶ 295-300.

## II.    October 28, 2021—Q3 2021 Earnings Call

543.    <u>False and Misleading Statements</u>.  During Amazon's Q3 2021 Earnings Call, Defendant Olsavsky reiterated in his opening remarks that rising customer demand supported the Company's aggressive expansion, "we've nearly doubled our operations capacity in the past two years to keep up with customer demand" and that the Company's continued investment in capacity was sound:

> [T]here certainly have been challenges to overcome since February of last year.  We've nearly doubled our operations capacity in the past 2 years to keep up with the customer demand.
>
> . . . .
>
> Last quarter we discussed the physical capacity we were adding to meet customer demand.  We made strong progress in Q3 to build and open new facilities and as a result for the first time since the pandemic began, we are no longer capacity constrained for physical space in the network.  September alone we brought online more than 100 new buildings in the United States including fulfillment centers, sort centers, and last mile delivery stations.  **For the year, we expect our 2021 footprint additions to exceed last year's build-out, which was also significant.  To put this in perspective, we are on track to double our fulfillment network over the two-year period since the pandemic's early days.**

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 182
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**Our revenue guidance for the fourth quarter reflects the current trends we are seeing** . . . . Consumers have started to return to pre-pandemic spending patterns, increasing their mobility and spending more on travel and services in Q2 and Q3, **but we are appreciative that the incremental demand that came our way during the pandemic has remained, and that we are continuing to grow on top of that**.

544.    During the analyst Q&A portion of the call, Defendant Olsavsky again referenced "chasing . . . demand" and a "pick up" in demand:

On your first question about whether we've—comparison of doubling the fulfillment capacity to the unit growth, keep in mind also that our fulfillment capacity also includes our transportation delivery capacity.  And in the last two years, we've also greatly ratcheted up our ability to deliver ourselves through AMZL and our percent of units that we've delivered through AMZL is over 50% of our units globally.  So that's a big—that's a driver as well.  **I'd also say that while we've been chasing really demand for last two years, we've been doing it—as I said, we're running about 100% pretty much all of last year**.

. . . .

But yes, we have unfinished business on the one-day promise side . . . . But we don't want to be as good as—just as good as we were before the pandemic.  We expect that to increase in 2022 and we're going to plan accordingly.  **And I think you start to see the difference in the growth rate before and after that one day. I won't forecast it too much, but we do—we did see pick-up and we saw really that we got into the consideration set for more purchases.  When something is available in one day or less, now you really don't have to go to a store even if you need it very quickly.  So it just opens up more ways for us to serve our customers, especially our Prime customers**.

545.    <u>Reasons Why Defendants' Statements in ¶¶ 543-44 Were Materially False and Misleading When Made</u>:  Defendants' statements on the October 28, 2021 Q3 Earnings Call that Amazon "nearly doubled [its] operations capacity in the past 2 years to keep up with the customer demand"; that "the incremental demand that came our way during the pandemic has remained, and that we are continuing to grow on top of that"; and that "we did see pick up" in demand, were materially false and misleading when made because, by July of 2021, Amazon's fulfillment and high-speed delivery capacity had already grown beyond market demand.  Specifically, by April of 2021, Amazon had already "missed its demand forecast for its North American fulfillment network" for the first time in over five years.  Moreover, throughout 2021, numerous "mothball buildings" as well as "decommissioned buildings" began to appear at Amazon, including at least

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 183
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

two more mothball buildings in September 2021, and another mothball building in October 2021 that became a "shell site" over a month before its previously scheduled launch in November 2021. *See supra* ¶¶ 295-300.  Indeed, by the end of 2020, Amazon realized that they had overbuilt, according to FE-1.  *See supra* ¶¶ 291-93.  And by late 2020, Amazon had implemented a stall in forward-looking investments in order to "rationalize" plans for increased fulfillment capacity.  By that point, as FE-1 confirmed, Amazon's internal projections of continued demand showed that demand was not maintaining at the level to which they had sourced increased incremental fulfillment capacity.  FE-1 further confirmed that by very early in 2021, Amazon saw declining order volumes.  Thus, by the spring of 2021, Amazon had started making cutbacks to fulfillment capacity and put a halt on capital expenditures.  And by the summer of 2021, Amazon was halting construction, pulling out of prior deals, and pushing for cost control to a degree that FE-1 had never previously seen since joining Amazon in 2017.

546.        In addition, this declining demand and resulting cutbacks was also reported by *Wall Street Journal*:

> **By July 2021, it became clear to Mr. Jassy and Amazon's logistics team that Amazon's capacity was outpacing demand**.  They made a series of intensifying cutbacks to the plans for capacity growth, said people involved in the decisions.  They again cut back capacity growth plans in September and December of 2021.

547.        Item 303 of Regulation S-K requires publicly traded companies to disclose "known trends or uncertainties" that are "reasonably likely" to have a material impact on the company's operations.  17 C.F.R. § 229.303 (Item 303).  Rather than disclose, consistent with Item 303 of Regulation S-K, this declining trend in demand, Defendants instead doubled down by repeatedly (and falsely) stating that rising demand for fast delivery was driving the Company's push to increase capacity:  "our focus . . . is on adding capacity to meet high customer demand;" "we're investing . . . to support demand"; and "[pull-forward demand] continues to require a significant amount of investment in fulfillment."

548.        The materially false statements and omissions above from Amazon's Q2 2021 Earnings Call were material under the federal securities laws because they created the false impression with investors that the exceedingly high cost of Amazon's aggressive buildout of its

fulfillment network was a prudent use of capital because demand for fast delivery continued to rise.  While this might have been true prior to March and April 2021, thereafter, and at least as early as July 2021, Defendants' had a duty under the federal securities law be truthful about this declining trend.

**JJ.     November 1, 2021—Amazon's Response to Subcommittee's October 18, 2021 Letter**

549.        On October 18, 2021, members of the Subcommittee sent Amazon a letter in response to "recent, credible reporting that directly contradicts the sworn testimony and representations of Amazon's top executives—including former CEO Bezos—to the Committee about their company's business practices during our investigation last Congress."[383]  The letter stated that the Subcommittee was "providing [the Company] with a final opportunity to provide exculpatory evidence to corroborate the prior testimony and statements on behalf of Amazon to the Committee," and encouraged Amazon to "provide the Committee with sworn, truthful, and accurate responses to this request as we consider whether a referral of this matter to the Department of Justice for criminal investigation is appropriate."

550.        <u>False and Misleading Statement</u>:  On November 1, 2021, Amazon sent a letter[384] in response to the Subcommittee's October 18, 2021 letter, stating that Amazon "ha[d] cooperated fully with the Committee's inquiries and engaged in good faith throughout this process, and the resulting record fully supports the transparency, candor, accuracy, and truthfulness of all of our statements, including on the topics raised in your letter," and that the Company "ha[d] in no way lied to or misled the Committee, and any allegation to the contrary is false and unsupported." Further, Amazon's response letter stated, in relevant part:

> [Amazon's] statements to the Committee regarding this policy have been truthful and consistent throughout.  At the July 16, 2019, hearing our witness stated that **Amazon does not use individual seller data to compete with third party sellers, clarifying specifically that Amazon does not "use any of that specific seller data**

---

[383]  https://judiciary.house.gov/uploadedfiles/letter_-_amazon_misrepresentations_-_10.18.21.pdf.

[384]  *See* https://judiciary.house.gov/uploadedfiles/letter_from_brian_huseman_to_committee__nov_01_2021.pdf.

in creating our own private brand products" and that Amazon does "not use their individual data when we're making decisions to launch private brands."

551.     Reasons Why Defendants' Statements in ¶ 550 Were Materially False and Misleading When Made:  The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that (i) Amazon engaged in anticompetitive and otherwise improper conduct with respect to its private-label business by using third-party sellers' non-public data to compete with them and by giving Amazon products preference over its competitors; and (ii) even for purportedly aggregated data, Amazon used single sellers' data when selling returned or damaged versions of an item through Amazon's Warehouse Deals program, used aggregate data when there were only two or three sellers of a product, and used aggregate data when there were multiple sellers but one individual seller accounted for almost 100% of all sales.

**KK.     November 29, 2021—TODAY Interview**

552.     False and Misleading Statement:  On November 29, 2021, Defendant Clark was interviewed for the TODAY Show on NBC and stated:

> Well what I tell you this plane back here is probably half filled with small business packages I **our job is about enabling small business** over half the items sold on amazon on a regular basis and through the holiday season are going to be those small businesses that's what we do we've spent all this money and all this time for decades **building out the infrastructure that powers small business it enables them to compete with the big box retailers by giving them the logistics and the technology infrastructure to compete both nationally and globally so no I feel great about small business in America I feel great about what we've done to help empower it** and I think what you see behind me and what you you'll see us execute to in the next week is all about delivering for those folks.

553.     Reasons Why Defendants' Statements in ¶ 552 Were Materially False and Misleading When Made:  The statements in paragraph 552 above, conveying the impression that Amazon was helping small businesses through Amazon's marketplace, were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to reveal negative information that cut against the positive information that was disclosed.  The statements failed to disclose, for example, that

Amazon was undermining sellers who offered discounts outside Amazon's marketplace; was employing a first-party anti-discounting algorithm to discipline third-party sellers who offered lower prices on other platforms; and used a "tit-for-tat" strategy whereby third-party sellers had to raise their prices in order to win the Featured Offer.

554.      The foregoing statements also failed to disclose that Amazon routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.  Amazon tied Prime eligibility with use of FBA.

555.      The foregoing statements likewise failed to disclose that Amazon did not have sufficiently robust access restrictions to guard third-party sellers' data, which increased the risk that insiders could inappropriately access and use seller-specific data to benefit Amazon's private-label business.

**LL.      February 3, 2022—Amazon's Q4 2021 Earnings Call**

556.      <u>False and Misleading Statement</u>:  On February 3, 2022, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q4 2021 results (the "Q4 2021 Earnings Call").  When asked to discuss why third-party seller services experienced less growth, Defendant Olsavsky responded, in relevant part:

> I think the bigger point is that sellers are definitely big winners in Q4.  The percentage of units up to 56% was a record for 3P.  We continue to invest a lot to make sellers—help sellers be successful on our site.  They're a big consumer of advertising as well because they use it to build their brands and add—enable customers to see their selection and make purchases.  So we're very happy with the third-party seller services businesses, and again, looking for ways to help sellers be successful.

557.      <u>Reasons Why Defendants' Statements in ¶ 556 Were Materially False and Misleading When Made</u>:  The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that "sellers are definitely big winners in Q4" and attributing that to the fact that Amazon "continue[d] to invest a lot to make sellers—help sellers be successful on our site" and further telling investors that "we're very happy with the third-party

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 187
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

seller services business, and again, looking for ways to help sellers be successful," Amazon failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

558.     The above statements were also materially false because Amazon failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform. Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation. In fact, the wrongful use of such third-party seller data was a common practice within the Company. Amazon currently faces significant regulatory inquiries into such practices.

559.     Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

560.     In addition, Amazon failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 188
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

561.     <u>False and Misleading Statements</u>:   During that same earnings call, Defendant Olsavsky reaffirmed to investors that Amazon's aggressive expansion efforts were supported by increased demand in fast delivery:

> [Brian T. Olsavsky:]   [W]e continue to see an increase in customer demand and sales during the remainder of 2021, even as the economy opened back up . . . [w]e've invested significantly to keep pace with this demand, including nearly doubling our operations capacity in the past two years, expanding our fulfillment center footprint while adding significant transportation assets to ensure fast, on-time delivery.   There are now 1.6 million Amazon employees worldwide, also doubling in the two-year period.
>
> . . . .
>
> On the fulfillment center side, that's about 30% of the spend in the last two years. We see that moderating and that will probably now match growth of our underlying businesses.   I think there's always things that can kick up that growth rate, things like expansion of our FBA business, expansion of cube that maybe not be different than the square footage. **So there's—we want to have capacity to have a healthy retail and FBA business, because that fuels Prime and one-day delivery and two-day delivery and same-day delivery. So that's very important. But we see the FCPs likely moderating this year.   And then the third piece is transportation**.   We still see additional levels of investment in that in 2022.   So if you wrap that up, we expect CapEx, including equipment finance leases to increase year-over-year.   I can't give you the exact percentage, but hopefully, it gives you a little more dynamic on what—how we approach it.

562.     <u>Reasons Why Defendants' Statements in ¶ 561 Were Materially False and Misleading When Made</u>:   Defendants' statements on the February 3, 2022 Q4 Earnings Call that Amazon "continued to see an increase in customer demand . . . during the remainder of 2021; that "[w]e've invested significantly to keep pace with this demand"; and that "we still see additional levels of investment in [transportation] in 2022" were false and misleading when made because by July of 2021, Amazon's fulfillment and high-speed delivery capacity had already grown beyond market demand.   Specifically, by the end of 2020, Amazon realized that they had overbuilt, according to FE-1.   *See supra* ¶¶ 291-93.   And by late 2020, Amazon had implemented a stall in forward-looking investments in order to "rationalize" plans for increased fulfillment capacity.   By that point, as FE-1 confirmed, Amazon's internal projections of continued demand showed that demand was not maintaining at the level to which they had sourced increased incremental fulfillment capacity.   FE-1 further confirmed that by very early in 2021, Amazon saw declining

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 189
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

order volumes.  Thus, by the spring of 2021, Amazon had started making cutbacks to fulfillment capacity and put a halt on capital expenditures.  And by the summer of 2021, Amazon was halting construction, pulling out of prior deals, and pushing for cost control to a degree that FE-1 had never previously seen since joining Amazon in 2017.  Moreover, throughout 2021, numerous "mothball buildings" as well as "decommissioned buildings" began to appear at Amazon, including at least two more mothball buildings in September 2021, and another mothball building in October 2021 that became a "shell site" over a month before its previously scheduled launch in November 2021.  *See supra* ¶¶ 295-300.

563.     In addition, this declining demand and resulting cutbacks was also reported by *Wall Street Journal*:

> **By July 2021, it became clear to Mr. Jassy and Amazon's logistics team that Amazon's capacity was outpacing demand**.  They made a series of intensifying cutbacks to the plans for capacity growth, said people involved in the decisions. They again cut back capacity growth plans in September and December of 2021.

564.     Item 303 of Regulation S-K requires publicly traded companies to disclose "known trends or uncertainties" that are "reasonably likely" to have a material impact on the company's operations.  17 C.F.R. § 229.303 (Item 303).  Rather than disclose, consistent with Item 303 of Regulation S-K, this declining trend in demand, Defendants instead doubled down by repeatedly (and falsely) stating that rising demand for fast delivery was driving the Company's push to increase capacity:  "our focus . . . is on adding capacity to meet high customer demand;" "we're investing . . . to support demand"; and "[pull-forward demand] continues to require a significant amount of investment in fulfillment."

565.     The false statements and omissions above from Amazon's Q2 2021 Earnings Call were material under the federal securities laws because they reiterated the false impression with investors that the exceedingly high cost of Amazon's aggressive buildout of its fulfillment network was a prudent use of capital because demand for fast delivery continued to rise.  While this might have been true prior to March and April 2021, thereafter, and at least as early as July 2021, Defendants had a duty under the federal securities law be truthful about this declining trend.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 190
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**MM.   February 3, 2022 Amazon Press Release and Form 8-K**

566.       Underline{False and Misleading Statement}:   On February 3, 2022, Amazon issued a press release (that was later filed with the SEC on Form 8-K and signed by Defendant Olsavsky) where Defendant Jassy stated that "[w]hen you combine how we're staffing and scaling our fulfillment network to bring even faster delivery to more customers . . . there's a lot to look forward to in the months and years ahead."

567.       Underline{Reasons Why Defendants' Statement in ¶ 566 Was Materially False and Misleading When Made}:   Defendant Jassy's statement in the Press Release on February 3, 2022 was materially false and misleading because in the context of referencing "scaling [Amazon's] fulfillment network" and how recent expansion efforts were something "to look forward to in the months and years ahead," he failed to disclose that for nearly a year, he and other Amazon executives were aware that Amazon's internal data showed decline in demand for fast delivery.  In other words, since Jassy chose to speak on the issue of what "scaling our fulfillment network" would mean for the Company "in the months and years ahead," he had duty to disclose the full context (and without omitting material facts) including that expansion was "outpacing" demand for fast delivery.

**NN.   February 4, 2022—Amazon's Form 10-K**

568.       On February 4, 2022, Amazon filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2021 (the "2021 10-K").  Appended to the 2021 10-K as exhibits were signed Certifications pursuant to SOX by Defendants Jassy and Olsavsky, attesting that "I have reviewed this Form 10-K of Amazon.com, Inc." and that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  The 2021 10-K was also signed by Defendant Bezos as the Executive Chair of the Company.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 191
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

569.     <u>False and Misleading Statements</u>:  According to the 2021 10-K, North America net sales in 2021 were $279.833 billion, and International net sales in 2021 were $127.787 billion.  In the 2021 10-K, the Company stated:

> North America sales increased 18% in 2021, compared to the prior year.  The sales growth primarily reflects increased unit sales, including sales by third-party sellers . . . .  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . . .

> International sales increased 22% in 2021, compared to the prior year.  The sales growth primarily reflects increased unit sales, including sales by third-party sellers . . . .  Increased unit sales were driven largely by our continued efforts to reduce prices for our customers, including from our shipping offers, and increased demand . . . .

570.     <u>Reasons Why Defendants' Statements in ¶ 569 Were Materially False and Misleading When Made</u>:  The statements in paragraph 569 above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements specifically attributed Amazon's increased sales to sales by third-party sellers but failed to disclose that Amazon was, as explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and (iv) favoring its own private-label products to the detriment of third-party sellers.  These practices created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

571.     <u>False and Misleading Statements</u>:  The 2021 10-K also contained the following statements:

> Competition

> The worldwide marketplace in which we compete is evolving rapidly and intensely competitive, and we face a broad array of competitors from many different industry sectors around the world.  Our current and potential competitors include: (1) physical, e-commerce, and omnichannel retailers, publishers, vendors, distributors, manufacturers, and producers of the products we offer and sell to consumers and businesses . . . (4) companies that provide e-commerce services, including . . . advertising, fulfillment . . . ; (5) companies that provide fulfillment and logistics services for themselves or for third parties, whether online or

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 192
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

offline . . . . We believe that the principal competitive factors in our retail businesses include selection, price, and convenience, including fast and reliable fulfillment. . . . Some of our current and potential competitors have greater resources . . . and greater control over inputs critical to our various businesses. They may secure better terms from suppliers, adopt more aggressive pricing . . . direct consumers to their own offerings instead of ours . . . .

572.     <u>Reasons Why Defendants' Statements in ¶ 571 Were Materially False and Misleading When Made</u>:  The statements in paragraph 571 above, conveying the impression that competition in Amazon's core retail business was fierce, were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose that Amazon took actions to undermine competition.  For example, Amazon was employing an ad auction using "defect" advertisements, which raised the costs to both sellers and customers.  Amazon was also employing a price and selection parity strategy to undercut competition, and it was punishing third-party sellers offering lower prices outside Amazon.   Internal documents show that these punishments occurred because "customers considering your products could have easily found your products cheaper at another major retailer, and may have chosen to shop elsewhere."  The statements also failed to disclose that Amazon was undermining third-party sellers using Amazon's marketplace by taking actions that undermined their bottom line and viability.  Moreover, Amazon was forcing third-party sellers to use FBA in order to obtain Prime eligibility, raising the costs of third-party sellers who desired selling through other non-Amazon channels.

573.     <u>False and Misleading Statements</u>:   The 2021 10-K contained only generic and misleadingly incomplete risk statements that Amazon was "subject to general business regulations and laws, as well as regulations and laws specifically governing the Internet[] [and] e-commerce" and that existing and future laws and regulations covered "competition," among other things. Amazon merely advised its investors that "[u]nfavorable regulations, laws, decisions, or interpretations by government or regulatory authorities applying those laws and regulation" could "impede our growth" and failed to disclose the specific and known risks arising from the Company's improper business practices.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 193
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

574.     <u>Reasons Why Defendants' Statements in ¶ 573 Were Materially False and Misleading When Made</u>:  The statements in paragraph 573 above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements above discussed Amazon's legal and regulatory risk with respect to the Internet, e-commerce, and competition, but failed to disclose that Amazon was, as explained above, routinely (i) misappropriating third-party sellers' data; (ii) tying and bundling its products to the detriment of third-party sellers; (iii) exploiting third-party sellers for its own economic gain; and (iv) favoring its own private-label products to the detriment of third-party sellers.  These practices created a heightened risk of governmental and other criminal and civil investigations, as well as the risk of significant penalties and reputational harm.

575.     <u>False and Misleading Statements</u>:  In the 2021 10-K, Amazon also stated:

> In November 2020, the European Commission issued a Statement of Objections alleging that Amazon uses data relating to our marketplace sellers in a manner that infringes EU competition rules.  The Statement of Objections seeks to impose unspecified fines and remedial actions.  **We disagree with the preliminary assertions of the European Commission** and intend to defend ourselves vigorously in this matter.

> In December 2021, the Italian Competition Authority (the "ICA") issued a decision against Amazon Services Europe S.à r.l., Amazon Europe Core S.à r.l., Amazon EU S.à r.l., Amazon Italia Services S.r.l., and Amazon Italia Logistica S.r.l. claiming that certain of our marketplace and logistics practices in Italy infringed EU competition rules.  The decision imposes a fine of €1.13 billion and remedial actions.  **We believe the ICA's decision to be without merit and intend to defend ourselves rigorously in this matter**.

576.     <u>Reasons Why Defendants' Statements in ¶ 575 Were Materially False and Misleading When Made</u>:  The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that Amazon "disagree[d] with the preliminary assertions of the European Commission" and "believe the ICA's decision [was] without merit," Amazon failed to disclose, among other things, that that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation—through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 194
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1   products, removing the "buy" or "pre-order" buttons to block purchases of their products, and

2   falsely listing their products as "out of stock" or with delayed shipping times, and selling their

3   products for lower prices and demanding that they pay Amazon for the lost margin.

4   577.        The above statements were also false because Amazon also failed to disclose that

5   it routinely used third-party sellers' data to directly compete with those businesses on Amazon's

6   platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that

7   data, among other things, to copy their products by creating competing private-label (Amazon)

8   products, sourcing those products from third-party sellers' own manufacturers, and cutting them

9   out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice

10  within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

11  578.        Amazon also failed to disclose that Amazon routinely favored its own private-label

12  products to the detriment of third-party sellers, including by granting itself access to data and tools

13  that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating

14  third-parties' products as "nonessential" while designating Amazon's own similar products as

15  "essential."

16  579.        Additionally, Amazon failed to disclose that Amazon routinely tied and bundled its

17  paid fulfillment and logistics services to the detriment of third-party sellers by requiring such

18  sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers

19  who used Amazon's fulfillment services.

20  **OO.   March 4, 2022—Amazon's Official Website**

21  580.        <u>False and Misleading Statement</u>:  On March 4, 2022, Amazon stated on its official

22  website:

23          **Amazon cares about the success of our small business partners**, and we have
        invested billions of dollars in tools, services, programs, and people to support small
24          and medium-sized sellers' growth.  **Supporting small businesses is a
        fundamental part of Amazon's work and an extension of our customer-centric
25          culture** . . . .

26  581.        <u>Reasons Why Defendants' Statements in ¶ 580 Were Materially False and</u>

27  <u>Misleading When Made</u>:  The statements in paragraph 580 above were materially false and

28

---

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 195
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in telling investors that "Amazon cares about the success of our small business partners" and that "[s]upporting small business is a fundamental part of Amazon's work and an extension of our customer-centric culture," Amazon failed to disclose, among other things, that Amazon routinely retaliated against its third-party sellers—and used the threat of retaliation— through a myriad of anticompetitive, discriminatory, and abusive tactics including abruptly suspending third-party sellers' accounts, destocking their products, removing the "buy" or "pre-order" buttons to block purchases of their products, and falsely listing their products as "out of stock" or with delayed shipping times, and sold their products for lower prices and demanded that they pay Amazon for the lost margin.

582.        The above statements were also materially false because Amazon failed to disclose that it routinely used third-party sellers' data to directly compete with those businesses on Amazon's platform.  Specifically, Amazon routinely misappropriated third-party sellers' data and used that data, among other things, to copy their products by creating competing private-label (Amazon) products, source those products from third-party sellers' own manufacturers, and cut them out of the equation.  In fact, the wrongful use of such third-party seller data was a common practice within the Company.  Amazon currently faces significant regulatory inquiries into such practices.

583.        Amazon also failed to disclose that it routinely favored its own private-label products to the detriment of third-party sellers, including by granting itself access to data and tools that are off-limits for third-party sellers and, during the pandemic, discriminatorily designating third-parties' products as "nonessential" while designating Amazon's own similar products as "essential."

584.        Additionally, Amazon failed to disclose that it routinely tied and bundled its paid fulfillment and logistics services to the detriment of third-party sellers by requiring sellers to use those services in order to list their products and by awarding the "Buy Box" to sellers who used Amazon's fulfillment services.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 196
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**PP.     March 7, 2022—Herrington Comments For Small Business Digital Alliance**

585.     <u>False and Misleading Statement</u>:  On March 7, 2022, Defendant Herrington made comments related to a press release from the Small Business Digital Alliance, titled "What They Are Saying: Corporate America, Chambers, Local Small Business Leaders Applaud New SBDA Digital Initiative For Entrepreneurs":

> Over 20 years ago, Amazon made the decision to open our store's virtual shelf space to third-party sellers. **That decision has proven not only to be a win for customers who want vast product selection, low prices, and fast delivery, but also for millions of small businesses that can now reach more customers, increase revenue, and create jobs in their local communities**.  Today, we are building on that success by collaborating with the U.S. Small Business Administration and Business Forward's Small Business Digital Alliance as a national member.  Amazon's pioneering e-commerce tools, resources, and educational materials will be available through SBDA to every small business owner who wants to start or grow their business online.

586.     <u>Reasons Why Defendants' Statements in ¶ 585 Were Materially False and Misleading When Made</u>:  The statements in paragraph 585 above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because in touting that Amazon was helping third-party sellers and customers, Herrington failed to reveal negative information that cut against the positive information that was disclosed, *i.e.*, that Amazon was taking steps that undermined third-party sellers and increased the price (and selection of products) to customers.  Herrington failed to disclose, for example, that Amazon was undermining sellers who offered discounts outside Amazon's marketplace; Amazon was forcing sellers to ensure that the prices they offered outside Amazon's marketplace were at least as high or higher than the prices on Amazon; Amazon was punishing sellers showing discounted products outside Amazon; and Amazon was forcing third-party sellers to take detrimental actions in order to benefit Amazon, such as entering the Amazon Reseller program.

**QQ.     April 14, 2022—Letter to Shareholders**

587.     <u>False and Misleading Statement</u>:  On April 14, 2022, Amazon published a Letter to Shareholders authored by Defendant Jassy that was later filed with the SEC on Form 8-K.  The

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 197
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

shareholder letter repeated the claim that Amazon's aggressive expansion efforts were justified by increasing demand for fast delivery:

> This growth also created short-term logistics and cost challenges. We spent Amazon's first 25 years building a very large fulfillment network, and then had to double it in the last 24 months to meet customer demand . . . .

> Ironically, just before COVID started, we'd made the decision to invest billions of incremental dollars over several years to deliver an increasing number of Prime customers in one day. This initiative was slowed by the challenges of the pandemic, but we've since resumed our focus here . . . . [W]e believe our over 200 million Price customers, who will tell you very clearly that faster is almost always better, will love this . . . . **This type of iterative innovation is never finished and has periodic peaks in investment years, but leads to better long-term customer experiences, customer loyalty, and returns for our shareholders.**

588.        <u>Reasons Why Defendants' Statements in ¶ 587 Were Materially False and Misleading When Made</u>:  Defendant Jassy's statement above that Amazon "***had*** to double [capacity] in the last 24 months to meet customer demand" and that "this type of iterative innovation . . . has periodic peaks in investment years" because by July of 2021, or nearly nine months earlier, the Company's fulfillment and high-speed delivery capacity had already grown beyond "peak" market demand.  Specifically, by April of 2021, Amazon had already "missed its demand forecast for its North American fulfillment network" for the first time in over five years.   Moreover, throughout 2021, numerous "mothball buildings" as well as "decommissioned buildings" began to appear at Amazon, including at least two more mothball buildings in September 2021, and another mothball building in October 2021 that became a "shell site" over a month before its previously scheduled launch in November 2021. *See supra* ¶¶ 295-300.  By the end of 2020, Amazon realized that they had overbuilt, according to FE-1.  ¶¶ 291-93.  And by late 2020, Amazon had implemented a stall in forward-looking investments in order to "rationalize" plans for increased fulfillment capacity.  By that point, as FE-1 confirmed, Amazon's internal projections of continued demand showed that demand was not maintaining at the level to which they had sourced increased incremental fulfillment capacity.  FE-1 further confirmed that by very early in 2021, Amazon saw declining order volumes.  Thus, by the spring of 2021, Amazon had started making cutbacks to fulfillment capacity and put a halt on capital expenditures.  And by the summer of 2021, Amazon was halting construction, pulling out of prior deals, and pushing for

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 198
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

cost control to a degree that FE-1 had never previously seen since joining Amazon in 2017. *Id.* In addition, this declining demand and resulting cutbacks was also reported by *Wall Street Journal*:

> **By July 2021, it became clear to Mr. Jassy and Amazon's logistics team that Amazon's capacity was outpacing demand**. They made a series of intensifying cutbacks to the plans for capacity growth, said people involved in the decisions. They again cut back capacity growth plans in September and December of 2021.

589.     Item 303 of Regulation S-K requires publicly traded companies to disclose "known trends or uncertainties" that are "reasonably likely" to have a material impact on the company's operations.  17 C.F.R. § 229.303 (Item 303).  Rather than disclose, consistent with Item 303 of Regulation S-K, this declining trend in demand, Defendants instead doubled down by repeatedly (and falsely) stating that rising demand for fast delivery was driving the Company's push to increase capacity:  "our focus . . . is on adding capacity to meet high customer demand"; "we're investing . . . to support demand"; and "[pull-forward demand] continues to require a significant amount of investment in fulfillment."

590.     The false statements and omissions above from the shareholder letter were material under the federal securities laws because they created the false impression with investors that the exceedingly high cost of Amazon's aggressive buildout of its fulfillment network with billions of dollars in new capacity was a prudent use of capital because demand for fast delivery continued to rise.  While this might have been true prior to March and April 2021, thereafter, and at least as early as July 2021, Defendants had a duty under the federal securities law be truthful about this declining trend.

## VI.     ADDITIONAL ALLEGATIONS OF SCIENTER

591.     The Individual Defendants acted with scienter because at the time they issued public documents and other statements in Amazon's name, they knew, or with extreme recklessness disregarded, the fact that such statements were materially false and misleading or omitted material facts.  The Individual Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

592.        The Individual Defendants received information reflecting the true facts regarding Amazon, its operations and business practices, had control over and/or received the Company's materially misleading misstatements, and/or their associations with the Company made them privy to confidential proprietary information concerning Amazon.   Accordingly, the Individual Defendants were active and culpable participants in the fraudulent schemes alleged herein.  The Individual Defendants knew of and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants.

593.        These facts, in conjunction with the additional indicia of scienter alleged below in paragraphs 596 through 699, collectively support a strong inference that throughout the Class Period, Defendants knew or, at a minimum, recklessly disregarded that their statements were materially false and misleading.[385]

594.        Indeed, the magnitude, scope, and duration of Amazon's misconduct described in this Complaint support a strong inference of scienter.  Both common sense and logic dictate that it is highly improbable that Amazon engaged in the pervasive misconduct identified herein *for well over a decade* without the knowledge and instruction of the Individual Defendants.  The notion that certain lower-level or rogue employees acted without the Individual Defendants' knowledge and approval for so long on such a wide-ranging scheme impacting hundreds of billions of dollars in retail sales and touching hundreds of thousands of products being sold belies credulity.

595.        The nature, range, and extent of Amazon's misconduct were discussed often and at various levels of the Company—including within the executive ranks.  *See, e.g.*, ¶¶ 148-50, 209-10, 264-66, 302-05.  The widespread nature of that conduct as relayed in those internal discussions further strengthens the inference that Defendants knew or, at minimum, were deliberately reckless

---

[385] The cumulative knowledge of all members of the Company's management team, including, but not limited to, the Individual Defendants, is properly imputed to Amazon.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 200
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

in not knowing of the misstated and omitted facts.  By way of example, during the Class Period, Defendants were personally involved in the planning of Amazon's fulfillment network.  According to FE-3, the plans for the addition of fulfillment centers were presented to Olsavsky, and required the ultimate approval of Defendant Bezos.  FE-3 also indicated that final approval for the development of any fulfillment centers was distributed by email from Bezos with one word: "approved"; Defendant Olsavsky was copied on those emails.  ¶ 304.

A.    **The Ongoing FTC Investigation and Litigation Provide Substantial Evidence of Scienter.**

596.    As discussed previously, on September 23, 2023, following a four-year investigation, the FTC, joined by 17 state attorneys general, brought a lawsuit against Amazon alleging violations of federal and state antitrust law.  After an extensive investigation, the FTC concluded that Amazon engaged in an "illegal course of exclusionary conduct" and expressly referenced misconduct that occurred during the Class Period in this case.

597.    The FTC revealed that Amazon attempted to impede the agency's investigation and conceal information about the Company's internal operations.  According to the FTC Complaint, Amazon's executives systematically and intentionally deleted internal communications using the "disappearing message" feature of the Signal messaging app.  In doing so, the Company destroyed more than two years' worth of internal communications, from June 2019 to at least early 2022— almost the entire Class Period.  *See supra* ¶ 14.  This was done despite the FTC's explicit instructions to the Company that it not destroy any communications.  *Id.*  Deliberate concealment of the truth is strong evidence of scienter.

598.    Numerous additional facts from the FTC Investigation give rise to the strong inference of scienter that, throughout the Class Period, Defendants were not only aware of the Company's improper (and unscrupulous) business practices, but in fact were directly responsible for those improper practices.  In that regard, Amazon designed and implemented a first-party anti-discounting algorithm to deter other online stores from offering lower prices than those of Amazon's Retail products.  The FTC Investigation revealed that Defendant Wilke, Amazon's former CEO of its Worldwide Consumer business, conceived of an algorithm to solve Amazon's

dilemma when it came to the prices of the Company's first-party Retail unit's products.  As Wilke explained, this anti-discounting algorithm enabled Amazon to avoid a "perfectly competitive market" where rivals continually lower their prices, benefiting consumers.  *See* ¶ 173.

599.        That investigation also uncovered that, internally, Amazon recognized that it provided its employees access to a "very powerful tool that provide[d] users with the ability to indiscriminately search for any seller account, view and edit data without the seller's consent, and create risk for customers, sellers, and Amazon."  *See* ¶ 112.  While internally the Company knew that it "lack[s] sufficient logging, monitoring, and alerting of unauthorized access" to seller data, and that the "lack of technical control and coverage for all uses of seller data causes risk to Amazon," the Company did not implement adequate controls against the misappropriation of third-party seller data and instead used that data to its own benefit.  Such a failure to implement proper controls further strengthens the inference of scienter.

600.        Moreover, an internal Amazon document made public by the Subcommittee shows that Amazon can use its FBA service as an avenue to identify popular third-party seller items and gather competitively sensitive information about them.  ¶ 88.  Defendant Olsavsky was copied on this correspondence (and thus had actual access to information about the Company's malfeasance).  *Id.*

601.        Apart from the foregoing, the FTC Complaint also revealed that Amazon purposefully shows irrelevant advertisements over more relevant results in order to steer shoppers toward the Company's own—"often inferior"—products.  *See* FTC Compl. ¶ 120.  Amazon's strategy to degrade relevant, organic search results was not driven solely by algorithms, but ***was a deliberate strategy directed by its former CEO, Defendant Bezos***.  In order to significantly increase revenue generated by advertising, Bezos directly instructed the Company's executives to "accept more defects" (i.e., allow more irrelevant or junk advertisements to populate in response to customers' queries).  *See supra* ¶ 210.  While this resulted in an increase in the number of advertisements shown on the website (and more profits to Amazon), it also resulted in a worse experience for the customer.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 202
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**B.**     **Amazon's Senior Executives Knew of and Helped to Orchestrate the Misconduct Addressed Herein**

602.      Amazon's top executives, including Defendants Bezos, Wilke, and Herrington, have long known of the misconduct identified herein; and they themselves helped to orchestrate the Company's scheme to undermine third-party sellers.  Apart from the practices discussed in subpart A above, the Company engaged in efforts to undercut the business of diapers.com, "a merchant on [Amazon's] site," as early as 2009.  ¶ 148.  In February 2009, Defendant Herrington learned that diapers.com is Amazon's "biggest competitor in the diaper space. They keep the pressure on pricing on us. . . . They are a merchant on our site . . . ."  Herrington immediately ordered that Amazon "match pricing on these guys no matter what the cost."  By May 12, 2009, Amazon's "benchmarking team" had completed the study on diapers.com.  An email authored the same day noted that the benchmarking team "are ***presenting their findings to JeffB [Jeff Bezos] this afternoon***."  Then, on June 8, 2010, Bezos emailed a group of high-level Company executives, including Herrington and Wilke, asking for their thoughts on diapers.com's parent co-launching soap.com.  Roughly two hours later, Herrington responded to Bezos's request and provided a corporate action plan.  ¶ 149.

603.      Additionally, the development of ASB, *see* discussion at ¶¶ 163-70, is traced directly to Defendant Herrington having reached a "boiling point" because "well-known brands" were using "other marketplaces" and "competitor sites" to sell products "at significantly lower prices than on Amazon," ¶ 167.  As pled elsewhere herein, Amazon punishes ASB sellers if they offer lower prices or a different selection of products on other platforms; if they fail to meet certain inventory in-stock levels; or if they do not ensure that most of their products are Prime eligible.

604.      Internal Amazon emails dating back to June 2016, uncovered by Plaintiffs' counsel, show how Defendants Herrington, Wilke, and another Company executive were forcing third-party sellers to take certain actions detrimental to them in order to benefit Amazon.  ¶ 180.  And, since at least 2007 and throughout the Class Period, at the request of Defendant Wilke, Amazon has used what it labels a "tit-for-tat" pricing strategy.

605.     Apart from the foregoing, an internal audit report reviewed by *Politico* warned Amazon's top executives in 2015—***including Defendant Wilke and Defendant Zapolsky***—that inadequate access restrictions allowed scores of insiders to inappropriately access seller-specific data.  Indeed, an earlier internal audit had identified similar failings in 2010 (but Amazon had done nothing to address the issue).  ¶¶ 104-05.

606.     Defendants' unequivocal statements about Amazon's treatment of third-party sellers support the inference that they spoke with knowledge (or were severely reckless in addressing the matter at all).  Defendants stated that, for example, "We don't use individual sellers' data to launch private label products," ¶ 370; "We do not favor . . . products that use FBA over others," ¶ 394; and "the featured offer algorithm does not favor any particular type of offer," ¶ 400.  Those statements were made without qualification or hedging—suggesting that they were made with the requisite scienter.

### C.     Amazon's Fulfillment Centers Are a Core Operation of the Company

607.     The Individual Defendants' knowledge of the practices discussed herein can be readily inferred because the Company's expansion plans were critical to Amazon's future growth and ability to provide its e-commerce customers with shortened delivery times, including one day delivery.[386]

608.     In furtherance of the Company's expansion efforts, during the Class Period, Amazon invested significant capital in its infrastructure, fulfillment networks, and staffing.  Indeed, the Company more than doubled its warehouse holdings between 2019 and early 2022, expanding from approximately 192 million square feet at the end of 2019 to more than 410 million square feet in early 2022,[387] and nearly doubled its workforce during that time.  *See* ¶ 338.  In pursuit of this endeavor, the Company spent ***billions*** of dollars on new warehouses and fulfillment centers in recent years.  *See* ¶ 282.

---

[386] With respect to Olsavsky, the law recognizes that any perceived gap in his scienter *vis-à-vis* the capacity issue is "bridged" given that he was speaking directly to an analyst.

[387] https://qz.com/2128541/thanks-to-amazon-warehouse-rents-have-never-been-higher/.

609.         That the Company's e-commerce expansion and fulfillment network constitute a "core operation" at Amazon is readily apparent from the Individual Defendants' own statements. As detailed herein, the Individual Defendants spoke regularly about the Company's growth and increased capacity during conference calls with investors during the Class Period.  For example, in an October 28, 2021 call with investors, Defendant Jassy told investors that "[w]e've nearly doubled our operations capacity in the past two years to keep up with customer demand" and assured the market that Amazon's investments in infrastructure were not just driven by the pandemic, but rather were "long-term trends" that "we expect . . . to be strong in this business." ¶ 274.

610.         The Individual Defendants' detailed and repeated pronouncements on these topics provide strong evidence that they were receiving specific information about the Company's growth and expansion-related efforts.  Alternatively, if the Individual Defendants were not knowledgeable about these matters (on which they spoke in detail), such recklessness readily satisfies the scienter requirement.

### D.    Patent Inconsistencies Between Public Statements and Internal Events

611.         The patent inconsistences between Defendants' public pronouncements and what was known internally within Amazon provide further circumstantial evidence of scienter.  For example, during the Company's July 29, 2021 Q2 2021 Earnings Call with investors, Defendant Olsavsky stated:  "As we think about the pull-forward in demand we've seen these past 18-months, it has required and will continue to require a significant amount of investment in our fulfillment networks."  ¶ 515.  Later, Olsavsky again reiterated that "**there's been very strong multiyear demand here that we are still catching up with from last year**."  ¶ 517.  During that same call, Defendant Fildes, in response to a question from an analyst, stated that Amazon's "**focus is really squarely on adding capacity to meet the current high customer demand that Brian [Olsavsky] talked about in his opening remarks**."  ¶ 516.

612.         Likewise, during the Company's October 28, 2021 Q3 Earnings Call, Defendant Olsavsky told investors that the Company was not able to build new distribution centers fast enough to match the growing demand for e-commerce.  Specifically, he said:  "**Last quarter, we**

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 205
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

discussed the physical capacity we were adding to meet customer demand.  We made strong progress in Q3 to build and open new facilities.  And, as a result, for the first time since the pandemic began, we're no longer capacity constrained for physical space in network**."  ¶ 543.  Further—and in response to a question from an analyst—Olsavsky said the Company "**[had] been chasing really demand for the last two years, . . . we're running about 100% pretty much all of last year**."  ¶ 544.

613.        The above statements regarding the Company's continued growth to meet demand are in direct contrast to what Defendants knew internally:  that no later than July 2021, Amazon's capacity exceeded demand for e-commerce and fast delivery and that the Company would begin to make a series of cutbacks to its fulfillment capacity.  *See, e.g.*, ¶ 285.  Stated otherwise, evidence of the incongruity between Defendants' words and the actual state of affairs within Amazon further supports a strong inference of scienter.

### E.        Defendants Regularly Spoke in Detail About Amazon's Fulfillment Capacity and Its Centrality to the Company's Operations

614.        As detailed in the preceding sections setting forth Defendants' materially false and misleading statements, Defendant Olsavsky, in particular, made repeated statements to the public regarding the size, capacity, expansion and operation of Amazon's fulfillment network and importance of the network to the Company's strategy.  In making these detailed statements on a repeated and routine basis, Olsavsky strongly implied  to investors that he had clear knowledge of the underlying issues concerning Amazon's fulfilment capacity.  Further, Olsavsky knew that statements related to Amazon's fulfillment capacity were of extreme interest to investors and analysts throughout the Class Period, as fulfillment capacity was raised in every quarterly earnings call by both analysts and Olsavsky himself.  In each quarterly earnings call during the Class Period, Olsavsky was asked by analysts about and provided detailed statements regarding Amazon's strategy to increase fulfillment capacity, as well as the importance of this fulfillment network to the Company's business.

615.        Investors relied heavily on Olsavsky's repeated public statements on the matter.  These public statements made by Olsavsky highlighted plans to expand the fulfillment network

due to a wave of demand resulting from the effects of the COVID-19 pandemic, all while the Company was in fact cutting expansion plans due to a problem of overcapacity, which was known to Defendants but concealed from investors.  These statements by Olsavsky were either knowingly false (having been informed by true facts known to (i) him, (ii) executives within the Company, and/or (iii) the other Individual Defendants, who furnished information to Olsavsky), or were made recklessly without any investigation of the underlying true facts.  Either way, these repeated, detailed statements are highly probative of Defendants' scienter.

616.     Additionally, Olsavsky made repeated statements about the vitality and centrality of Amazon's fulfillment capacity to the Company's profitability and outlook, implying that the Individual Defendants closely monitored the status of the fulfillment network and plans to expand it, and knew or should have known of the reality that the Company was pulling back from its expansion plans during the Class Period due to overcapacity.

617.     Given the importance fulfillment capacity had to investors and analysts, Olsavsky regularly spoke about it in a detailed manner on quarterly earnings calls.  For example:

- On January 30, 2020, Olsavsky responded to an analyst question that "we will have to scale our fulfillment center network further.  **We grew the square footage for fulfillment and transportation by 15% each of the last two years**.  And we'll look ahead and see a step-up in that this year as we start to build more capacity for the one-day."  (Q4 2019 Earnings Call).

- On July 29, 2020, Olsavsky said that "**we expect a meaningfully higher year-over-year square footage growth of approximately 50%.  This includes strong growth in new fulfillment center space as well as sort centers and delivery stations**."  (Q2 2020 Earnings Call).

- On October 29, 2020, Olsavsky repeated his statement that Amazon planned to increase its fulfillment capacity by saying "As I mentioned last quarter, **we expect to grow our fulfillment and logistics network square footage by approximately 50% this year which includes significant additions to our fulfillment centers as well as our transportation facilities**."  (Q3 2020 Earnings Call).

- On February 2, 2021, Olsavsky again stated that "We also continue to add buildings in our fulfillment and logistics network **with square footage growing about 50% year-over-year in 2020**.  And unlike in a typical year when new buildings are mostly in place by the end of Q3, **this year a significant number of them came online in Q4** as our teams pulled out all the stops to be ready for customer demand, and it turns out we needed that capacity in order to fill the strong customer demand in Q4."  (Q4 2020 Earnings Call).

- Later, on April 29, 2021, Olsavsky said in response to an analyst's question regarding fulfillment capacity that "We talked about it last year, our fulfillment, including Amazon Logistics investment, **we increased our capacity by 50%**. And you can see from our CapEx numbers, **the CapEx, including infrastructure, of course, increased to 80% in the trailing 12 months over the prior trailing 12 months. So certainly, a large area of investment, not only fulfillment centers, but also two elements of transportation, what we call the middle mile where we're putting sort centers, Amazon Air, line haul, trailers, think of all the intermediate movements between our warehouses and our final delivery stations**." (Q1 2021 Earnings Call).

- On July 30, 2021, Olsavsky stated "**As we think about the pull-forward in demand we've seen these past 18 months, it has required and will continue to require a significant amount of investment in our fulfillment network.** Our teams have done a remarkable job stepping up to serve customers and support our vendors and sellers, and we've worked hard to increase capacity at a rapid rate. . . . This is all part of a multi-year investment cycle for us. Unit volumes, while obviously growing at lower rates of last year's large comp continue to remain high, and we see strong demand for FBA and third-party sellers. So, there's more work to do, **including additional build-outs of our Fulfillment Centers, as well as our middle mile and last-mile capabilities to support our fast-improving delivery offers for customers**." (Q2 2021 Earnings Call).

- Olsavsky made additional statements in the same earnings call regarding fulfillment capacity, saying: "First, we are adding a lot of capacity . . . . So, you can see there's been **very strong multiyear demand here that we're still catching up with from last year**. So most of—I mentioned earlier our year-over-year **growth in CapEx and equipment leases is 74% in the second—at the end of June compared to 38% the year before**." (Q2 2021 Earnings Call).

- On October 28, 2021, Olsavsky stated that "**September alone, we brought online more than 100 new buildings in the United States, including fulfillment centers, source centers, and last-mile delivery stations. For the year, we expect our 2021 footprint additions to exceed last year's buildout, which was also significant. Put this in perspective, we are on track to double our fulfillment network over the two-year period since the pandemic's early days. A lot of this increased capacity supports our FBA sellers**." (Q3 2021 Earnings Call).

- On February 3, 2022, Olsavsky stated that "**We see the CapEx for infrastructure going up. . . . On the fulfillment center side, that's about 30% of the spend in the last two years**." (Q4 2021 Earnings Call).

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 208
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

618.          In addition to his repeated statements about capacity expansion, Olsavsky stated repeatedly that fulfillment capacity was a key component of Amazon's ability to meet demand and, while creating an initial "headwind," was critical to Amazon's profitability.  For example:

- On July 29, 2020, Olsavsky emphasized that "**Once these buildings open, they are a headwind to profitability as they ramp up and we prepare for Q4 peak**." (Q2 2020 Earnings Call).

- On October 29, 2020, Olsavsky reiterated the fulfillment centers' integrality as a "headwind to profitability", when he said that "**Once new buildings open, their short-term headwind to profitability as they ramp up and we prepare for Q4 peak.  More of this headwind will be felt in Q4 rather than in Q3 and this is reflected in our Q4 guidance.  We were able to meet the heightened demand in Q3 because we opened up more network capacity particularly in our transportation network**."  (Q3 2020 Earnings Call).

- Olsavsky also highlighted the criticality of fulfillment centers to Amazon's operations, saying that "**our teams pulled out all the stops to be ready for customer demand, and it turns out we needed that capacity in order to fill the strong customer demand in Q4**."  (Q4 2020 Earnings Call).

- On February 2, 2022, Olsavsky stated that capacity growth was critical to handle growth in revenue, by saying "**We still have a very fast-growing business this growing globally, and we're adding regions and capacity to handle usage that still exceeds revenue growth in that business.  So, we feel good about making those investments**."  (Q4 2021 Earnings Call).

619.          Defendants' statements about the business reasons for building out fulfilment capacity were taken seriously by analysts covering Amazon, and clearly seen as a proxy for the overall health and demand in the consumer business.  One example includes a Morningstar report from July 30, 2021, stating:

[C]onsumers' online shopping levels are returning to more normal levels . . . .  Meanwhile, the company continues to *add capacity at a breakneck pace in order to meet customer demand and one day delivery*, even as it roughly doubled its footprint during the last 18 months.  We see *no cracks in the long-term story as Amazon* . . . . We think results show the company can *sustain strength even as the lockdowns ease*, *as management sees no slowdown in demand*.  We are again impressed by Amazon's earnings power as COVID-19 costs roll away and the *company grows into its 50% fulfilment capacity expansion from 2020*.

620.          Similarly, an Evercore analyst report from September 13, 2021 indicated:

[I]nvestors *under-appreciate the magnitude and meaning of Amazon's dramatic fulfilment capacity expansion* . . . . *AMZN's logistics buildout has actually accelerated in 2021*, with the company now on track to add 171MM sq. feet of

distribution capacity this year, up from 116MM in 2020. **Which means Amazon will have added more fulfilment capacity in the last two years than it added in the prior 10 years combined**. And the upshot of this is almost certainly going to be faster and better fulfilment service for all Amazon Retail customers. The **Amazon value prop continues to get stronger, which increases our confidence in the company's growth outlook**.

621.     These repeated, specific, and consistent public statements, many of which were false and misleading, by Defendants through Defendant Olsavsky on fulfillment capacity clearly support a strong inference of scienter.

**F.     Amazon's Compensation Structure Provided for Several Hundred Million Dollars in Incentives for the Individual Defendants To Commit Fraud**

622.     During the Class Period, the Individual Defendants collectively received over $290 million in incentive compensation that (i) was tied to their ability to retain their positions for as long as possible, and (ii) perpetuated public/investor perception that they were successful in running Amazon's business. Indeed, Amazon's executive compensation plan in place during the Class Period provided for very low cash compensation, **but** extremely lucrative benefits that rewarded Company executives with many millions of dollars and incentivized them to publicly project success. Thus, Defendants' efforts to avoid public and investor scrutiny by misrepresenting or concealing the issues *vis-à-vis* both third-party sellers and the pullback in fulfillment capacity allowed them to reap massive financial benefits. The Company's compensation plan incentivized those executives, including Individual Defendants Jassy, Olsavsky, Clark and Zapolsky (collectively, the "Non-Bezos Executive Defendants"), to maintain their positions as long as they could, which would allow them to obtain additional stock grants and let earlier stock grants vest.

623.     Specifically, under Amazon's executive compensation plan, "[b]ase salaries for named executive officers are designed to provide a minimum level of cash compensation and to be significantly less than those paid to senior leadership at similarly situated companies."[388] No Executive Defendant received a higher base salary than $175,000 through 2022, the last year of

---

[388] *See, e.g.* Amazon 2022 Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 at 92 (Apr. 14, 2022) [hereinafter 2022 Definitive Proxy Statement].

the Class Period.  The plan also did not include "annual [cash] bonuses or annual incentive awards."[389]

624.       Instead of a large base salary or annual cash bonus, "the primary component of a named executive officer's total compensation is stock-based compensation."[390]  Executives receive restricted stock grants upon hiring and in connection with internal promotions, as well as periodic restricted stock grants.[391]

625.       As Amazon's Definitive Proxy Statements explain, these stock grants did not vest immediately but instead had "long vesting periods" of "generally five years or more"; each year Defendants could look forward to the vesting of stock awards granted in previous years.[392]  For example, as of December 31, 2020, Defendant Jassy held 48,756 shares of stock that were scheduled to vest between February 15, 2021 and February 21, 2026.[393]

626.       Amazon's compensation actually incentivized the non-Bezos Executive Defendants to maintain their positions as long as possible so that they could actually obtain the stock grants that were awarded annually and vested over long periods, even at the cost of committing fraud.  That is because Amazon's compensation plan did not provide for "accelerate[d] vesting upon termination"; instead, "[i]f an executive terminate[d] employment or retire[d], *all unvested equity is forfeited*."[394]  In addition, Amazon's agreements with its executives did not provide for any "cash severance programs."[395]  Therefore, if any of the non-Bezos Executive Defendants were terminated during the Class Period, they would have lost the *entire* value of the unvested stock.

---

[389] *Id.* at 88, 90.

[390] *Id.* at 92; 2021 Definitive Proxy Statement at 64.

[391] 2022 Definitive Proxy Statement at 65.

[392] 2021 Definitive Proxy Statement at 64.

[393] *Id.* at 71.

[394] *Id.*; *see also* 2021 Definitive Proxy Statement at 72 ("Upon termination of employment for any reason, all unvested restricted stock units expire").

[395] 2022 Definitive Proxy Statement at 90.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 211
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

627.        Executives' restricted stock options vested in tranches once per quarter in February, May, August, and November; each non-Bezos Executive Defendant could receive up to four tranches of previously-unvested stock in a calendar year.[396]  This incentivized these Defendants to hold on to their positions as long as possible; indeed, even a few months' continued employment meant the vesting of millions, even tens of millions, of dollars in Company stock.

628.        Throughout the Class Period, job performance was a key component in determining the issuance of periodic grants, providing the non-Bezos Executive Defendants with a financial motive to publicly portray their performance in the best light possible, including, but not limited to, through projecting success in terms of the Company's third-party seller business and the size, success and development of its fulfilment infrastructure, which, as described above was considered to be highly correlated to demand and growth of Amazon's retail business.[397]  Continuing through to the 2021 Definitive Proxy Statement, dated April 15, 2021, Amazon explained that during its "annual performance and compensation review process," Amazon's CEO, its Senior Vice President of Human Resources, and the Leadership Development and Compensation Committee determined whether to award periodic grants based on "a variety of factors, including the named executive officer's level of responsibility, past contributions to performance, and expected contributions to [Amazon's] future success."[398]

629.        Similarly, the 2022 Definitive Proxy Statement, dated April 14, 2022, described the periodic grant determination process, indicating that Amazon's Leadership Development and Compensation Committee (the "Compensation Committee") issued periodic grants "to set a total compensation target for each named executive officer by evaluating a variety of factors, such as the compensation of similarly situated senior executives at Amazon and at other companies with which we compete for talent, past contributions to performance, and expected contributions to our

---

[396]  *See id.*; *see also* 2022 Definitive Proxy at 100.

[397]  Defendant Bezos did not receive periodic grants, and Plaintiffs do not allege he possessed this specific motivation for fraud.

[398]  2021 Definitive Proxy Statement at 65.

1    future success."[399]   The non-Bezos Executive Defendants, therefore, retained the motive to

2    publicly portray their performance in the most positive ways and receive the grants.

3    630.          Amazon specifically awarded Defendants unvested stock based on their perceived

4    contributions to Amazon's continued growth.  The Definitive Proxies' discussion of "key aspects

5    of Mr. Olsavsky's performance," for example, included "managing [Amazon's] credit facilities

6    and liquidity to **finance [Amazon's] operations and continue [its] expansion**," as well as "his

7    contribution to maintaining strong internal controls over financial reporting **as the scope of our**

8    **operations grew**."[400]   And the grants to Defendant Zapolsky attributed his award in part to the

9    "quality and thoroughness of his counsel and advice to management and the Board on legal and

10   policy issues **arising in the course of the Company's growth**," as well as "the development of

11   legal and compliance programs that he has overseen to support Amazon's Worldwide Consumer

12   operations" and other groups that "**embarked on new projects, entered new jurisdictions, and**

13   **undertaken new businesses**."[401]   When Mr. Jassy received his promotion to CEO, the Definitive

14   Proxy Statement linked his periodic grant to his "past performance **and critical role in leading the**

15   **Company forward**."[402]

16   631.          If Defendants had disclosed the specific problems and issues existing within the

17   Company (which problems and issues are outlined in this Complaint), they would have risked

18   undermining an important rationale for their periodic stock grants, or at least the stated rationale

19   provided by the Compensation Committee.  Since the stock awards in question referenced

20   Defendants' past and future contributions to Amazon's "growth" and "expansion," Defendants'

21   incentives lay with portraying that growth and expansion as a continuing phenomenon.

22   Defendants could lose a portion of their expected periodic grants if they revealed, *inter alia*, that

23   Amazon's "growth" was unsustainable, or that its "expansion" exceeded expected future demand.

24

25   [399]  2022 Definitive Proxy Statement at 95-96.

26   [400]  2020 Definitive Proxy Statement at 56-57; 2021 Definitive Proxy Statement at 65-66; 2023
     Definitive Proxy Statement at 97.

27   [401]  2021 Definitive Proxy Statement at 66; 2023 Definitive Proxy Statement at 98.

28   [402]  2022 Definitive Proxy Statement at 93.

**SECOND CONSOLIDATED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** - 213
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

632.     In the case of Defendant Clark, Amazon also awarded periodic stock grants tied directly to the growth of fulfillment centers.  The 2021 Definitive Proxy Statement, in describing Defendant Clark's award of 10,660 shares, explained that the Compensation Committee considered a number of factors, including his "experience and skill in managing Worldwide Operations for our consumer business" and his "sustained performance over the years preceding the grant."  The award explanation also specifically cited Clark's "*development of innovative delivery arrangements such as Amazon Air and our last-mile delivery networks [and] the expansion and staffing of our fulfillment centers*, including development of industry-leading pay and training program."[403]

633.     The next year, the Definitive Proxy Statement linked Defendant Clark's further award to the level of compensation appropriate "given the size and complexity of the operations he oversees" and the compensation levels "for large general industry, retail industry, and transportation/logistics industry CEOs, many of whom oversee operations that do not have the geographic scope *and are not as complex, profitable, or fast-growing as the operations managed by Mr. Clark*."[404]

634.     As Amazon explained in the 2022 Definitive Proxy Statement and as detailed in paragraph 625 above, the vesting periods for Amazon's restricted stock grants were "generally five years or more."[405]  During the Class Period, the non-Bezos Executive Defendants collectively received hundreds of millions of dollars in incentive compensation from stock awards that vested based on their continuing tenure as executives at Amazon.  The number and value of the shares (as reported in each year's Definitive Proxy Statement and calculated based on the closing market

---

[403]  2021 Definitive Proxy Statement at 66.

[404]  *Id.* at 93.

[405]  *Id.*

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 214
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

price of Amazon common stock on the vesting date or preceding day if the vesting date was not a trading day) are summarized in the below table[406]:

| Defendant | Amazon Shares Vested In 2019 (Value) | Amazon Shares Vested In 2020 (Value) | Amazon Shares Vested In 2021 (Value) | Amazon Shares Vested In 2022 (Value) |
|---|---|---|---|---|
| Jassy | 28,326 ($50m) | 16,446 ($41m) | 13,001 ($43m) | 248,080 ($31m) |
| Olsavsky | 7,323 ($13m) | 5,895 ($16m) | 4,557 ($15m) | 71,380 ($9m) |
| Zapolsky | N/A | 5,895 ($16m) | 4,557 ($15m) | 71,380 ($9m) |
| Clark | N/A | 7,918 ($21m) | 6,696 ($22m) | N/A |

635.     As noted above, Amazon's compensation plan, however, did not provide for "accelerate[d] vesting upon termination"; instead, "[i]f an executive terminates employment or retires, *all unvested equity is forfeited*."[407]  In addition, Amazon's agreements with the executive defendants did not provide for any "cash severance programs."[408]  Therefore, if any of the non-Bezos Executive Defendants was terminated during the Class Period, he would have lost the *entire* value of the unvested stock.  This incentivized Defendants to hold on to their positions as long as possible, especially since, as explained in paragraph 627 above, shares vested at multiple points in a given year.  The unvested equity for each Defendant outstanding for each year of the Class Period (with the value as reported in the Definitive Proxy Statement for each year and calculated based

---

[406] Source for all figures: 2020 Definitive Proxy Statement at 63; 2021 Definitive Proxy Statement at 72; 2022 Definitive Proxy Statement at 101; 2022 Definitive Proxy Statement at 104. The value was determined by the "number of shares of stock acquired upon vesting multiplied by the closing price of [Amazon] closing stock on the vesting day." *Id.*  (All figures are rounded to the nearest million.)

[407] *Id.*; *see also* 2021 Definitive Proxy Statement at 72 ("Upon termination of employment for any reason, all unvested restricted stock units expire").

[408] 2022 Definitive Proxy Statement at 90.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 215
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

on the closing market price of Amazon common stock on December 31 of the preceding calendar year) appear in the below table[409]:

| DEFENDANT | UNVESTED EQUITY YE 2019 (VALUE) | UNVESTED EQUITY YE 2020 (VALUE) | UNVESTED EQUITY YE 2021 (VALUE) | UNVESTED EQUITY YE 2022 (VALUE) |
|---|---|---|---|---|
| Jassy | 53,874 ($100m) | 48,756 ($159m) | 96,755 ($323m) | 1,687,020 ($142m) |
| Olsavsky | 16,389($30m) | 15,901 ($52m) | 11,344 ($38m) | 263,300 ($22m) |
| Zapolsky | N/A | 15,901 ($52m) | 11,344 ($38m) | 263,300 ($22m) |
| Clark | N/A | 29,586 ($96m) | 38,890 ($130m) | N/A |

636.    Additionally, by September of 2020, Defendant Wilke, considered "the logical successor to" Defendant Bezos, retired.[410]  Industry speculation posited Defendant Jassy, in addition to David Clark and Senior Vice President of Worldwide Business Development Jeff Blackburn, as potential successors.[411]  These executives, as they were in competition for the CEO position, were incentivized to portray their corporate achievements in the best possible light. When Defendant Jassy won the position, the total value of his—then unvested—restricted stock awards totaled $211,933,520.[412]  Conversely, when Defendant Clark resigned under duress during 2022, he forfeited unvested stock that had been valued at well over $100 million prior to the end of the Class Period.

637.    Separate and apart from the foregoing, the movement in Amazon's stock price each year provides further motive for Defendants to lie about Amazon's expansion plans and business practices that harm consumers and third-party sellers.  Indeed, one of Amazon's "Compensation

---

[409] Source for all figures: 2020 Definitive Proxy Statement at 62; 2021 Definitive Proxy Statement at 71; 2022 Definitive Proxy Statement at 100; 2022 Definitive Proxy Statement at 103. The value was determined by the total number of unvested stock multiplied by the closing price on the last day of the calendar year.  *Id.*  (All figures are rounded to the nearest million.)

[410] John Cook, *Who Will (Eventually) Replace Jeff Bezos?  Amazon Succession Mystery Deepens With Key Exec's Exit*, GEEKWIRE.COM (Aug. 28, 2020), https://www.geekwire.com/2020/will-eventually-replace-jeff-bezos-amazon-succession-mystery-deepens-key-execs-exit/.

[411] *Id.*

[412] 2022 Definitive Proxy Statement at 98.

Philosoph[ies]" for named executive officers, as described in the Company's April 15, 2021 Definitive Proxy,[413] is that "when . . . set[ting] [the Company's] executives' target compensation, we assume a fixed annual increase in the stock price so that ***our executives' compensation will be negatively impacted if our stock price is flat or declines, and is favorably impacted if the stock performs beyond the initial stock price assumption***."

638.         Thus, if Amazon's stock price between January and the end of the year remains the same or decreases, Defendants will be compensated less.  If the Company's stock price increases between January and the end of the year, their compensation would be "favorably" impacted.

### G.    Defendants' Class Period Stock Sales Enhance the Inference of Scienter

639.         The Individual Defendants also profited massively from Amazon's artificially inflated stock price during the Class Period by offloading their personally held Amazon shares through a series of, often well-timed, sales.  Moreover, in many instances, the Individual Defendants' Class Period sales of Amazon shares (all of which occurred at artificially inflated prices), represent a significant departure from their sales in the time period preceding the Class Period.  All told, the Individual Defendants sold ***over $23.3 billion in Amazon shares*** during the Class Period.

640.         Defendant Bezos sold 8,500,000 Amazon shares[414] during the Class Period for proceeds of over ***$23 billion***.  Bezos's sales during the 38-month Class Period were drastically different from his trading patterns during the prior 38 months (the "Control Period").[415]  During the Control Period, Bezos sold 4.02 million Amazon shares, meaning that Bezos sold ***more than double*** the amount of Amazon stock for approximately ***six times*** the proceeds during the Class Period as compared to the Control Period.

---

[413]  Apr. 15, 2021 DEF14 at 63.

[414]  The Amazon share amounts referenced in this section ***do not*** account for the 20:1 stock split effectuated by Amazon after the end of the Class Period on June 6, 2022.

[415]  The control period runs from November 7, 2015 through February 1, 2019.

641.        Defendant Jassy sold 59,354 Amazon shares during the Class Period for proceeds of over ***$145 million***.  During the Control Period, Jassy sold 42,243 Amazon shares for proceeds of over $39.3 million, meaning that Jassy sold Amazon stock for over ***three times*** the proceeds during the Class Period as compared to the Control Period.

642.        Defendant Wilke sold 52,635 Amazon shares during the Class Period for proceeds of over ***$111.2 million***.  During the Control Period, Wilke sold Amazon shares for proceeds of over $78.5 million, meaning that Wilke sold Amazon stock of substantially greater value during the Class Period as compared to the Control Period.

643.        Defendant Zapolsky sold 16,063 Amazon shares during the Class Period for proceeds of over ***$42.3 million***.  During the Control Period, Zapolsky sold Amazon shares for proceeds of over $29.1 million, meaning that Zapolsky sold Amazon stock of substantially greater value during the Class Period as compared to the Control Period.

644.        Defendant Olsavsky sold 17,535 Amazon shares during the Class Period for proceeds of over ***$43.9 million***.  During the Control Period, Olsavsky sold Amazon shares for proceeds of over $30 million, meaning that Olsavsky sold Amazon stock of substantially greater value during the Class Period as compared to the Control Period.

645.        Defendant Clark sold 5,372 Amazon shares during the Class Period for proceeds of over ***$17.8 million***.  During the Control Period, Clark did not report any sales of Amazon shares.

646.        The timing of Bezos's Class Period sales was suspicious.  For example, Bezos sold a total of 1 million Amazon shares on November 1-4, 2021.  These sales occurred just four days after the October 28, 2021 Q3 Earnings Call, when Defendant Olsavsky falsely stated that Amazon expected to exceed the prior year's fulfillment capacity expansion, and just five months before Amazon's share price began to collapse after the truth of Amazon's fulfillment operations were revealed on in Q1 2022 Earnings Call on April 28, 2022.

647.        Additionally, the timing of Defendant Jassy's Class Period sales was similarly suspicious.  Jassy sold almost 18,000 Amazon shares in November 2021, beginning just 18 days after Defendant Olsavsky's false statements regarding the expandatory outlook for Amazon's

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 218
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

fulfillment network were made, and only 5 months before Amazon's share price fell as a result of the revelatory Q1 2022 Earnings Call on April 28, 2022.

648.      Finally, Jassy, Olsavsky, Clark and Zapolsky each sold shares on February 15, 2022, just over two months prior to the end of the Class Period, when Amazon shares experienced a massive, sudden decline.  These four Defendants' sales on February 15, 2022 generated proceeds totaling over $12 million:

| Defendant | Shares Sold Feb. 15, 2022 | Proceeds |
|---|---|---|
| Jassy | 848 | $2,671,980 |
| Olsavsky | 910 | $2,867,337 |
| Clark | 1,027 | $3,235,994 |
| Zapolsky | 1,060 | $3,339,975 |

649.      The Individual Defendants' motivation to sell stock at prices inflated by the fraud further strengthens the strong inference of scienter.

650.      While it appears that the Individual Defendants' Class Period sales were conducted pursuant to Section 10b5-1 trading plans ("10b5-1 Plans" or "Plans"), the existence of such Plans does not negate Defendants' motive or a strong inference of scienter.

651.      Subsection "c" of the Rule, 10b5-1(c) created an affirmative defense to insider trading claims for those trades made under a pre-existing binding agreement or plan.  *See* Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, at 51-727-28 (Aug. 24, 2000).  Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to insider trading liability only if it is entered into by an insider "before becoming aware" of inside information, and was established "in good faith and not as part of a plan to scheme or evade the prohibitions" against insider trading.  Notably, it does not appear that any of the Defendants disclosed these Plans to the public.  Plaintiffs have not been able to locate or identify the terms of any of the Defendants' 10b5-1 Plans and understand that the SEC did not require such Plans to be made public prior to or during the Class Period.

652.      10b5-1 Plans have been, and still are, heavily scrutinized by the SEC and the public at large.  For instance, in 2007, *Bloomberg* published an article, "The SEC Is Eyeing Insider Stock Sales," which detailed an academic study of such trading plans which demonstrated that insiders perform "substantially better" when they make trades under 10b5-1 Plans "than would be expected

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 219
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

if trading were truly automatic" (as trades *should be* under these Plans).  The study revealed that trades made based on the Plans "beat the market by 6% over six months, while those at the same firms who traded outside of the plans only topped it by 1.9%."

653.    In 2009, Alan Jagolinzer found sales executed within 10b5-1 Plans earn returns that are, on average, greater than returns earned by the market index and also returns earned by insiders who execute sales outside of 10b5-1 Plans.  The study finds "insiders' sales systematically follow positive and precede negative firm performance, generating abnormal forward-looking returns larger than those earned by non-participating colleagues."  Alan D. Jagolinzer, *SEC Rule 10b5-1 and Insiders' Strategic Trade*, Mgmt. Sci. Quarterly, *available at* http://ssrn.com/abstract=541502.

654.    Several years later, on November 27, 2012, *Wall Street Journal* published an article written by Susan Pulliam and Rob Barry, called "Executives' Good Luck in Trading Own Stock" cautioning that executives trading under 10b5-1 Plans can strategically time their trades to avoid financial losses and yield greater returns because the plans are not public and therefore can be canceled, amended, or modified at any time unbeknownst to the public.

655.    In March 2013, Wilson Sonsini cautioned clients that "[t]he floodlights now aimed at such plans are the result of recent *Wall Street Journal* articles showing that corporate insiders, even those executive trades pursuant to Rule 10b5-1 plans, have generated significant profits—or avoided significant losses—by trading company stock in the days just before their companies issued market-moving news."

656.    In their 2021 *Gaming The System: Three 'Red Flag' of Potential 10b5-1 Abuse*, academics at Stanford University and The Wharton School of the University of Pennsylvania analyzed over 20,000 10b5-1 plans and concluded that "a subset of executives use 10b5-1 plans to engage in opportunistic, large-scale selling of company shares."[416]  In December 2022, the SEC

---

[416]    David F. Larcker, Bradford Lynch, Philip Quinn, Brian Tayan & Daniel J. Taylor, *Gaming The System: Three 'Red Flags' of Potential 10b5-1 Abuse* (Stanford Closer Look Series Jan. 19, 2021), *available at* https://www.gsb.stanford.edu/faculty-research/publications/gaming-system-three-red-flags-potential-10b5-1-abuse.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 220
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

adopted amendments to Rule 10b5-1 under the Exchange Act.  These amendments aimed to strengthen investor protections concerning insider trading.

657.        As detailed above, the trading behavior of the Individual Defendants during the Class Period is sufficiently suspicious in timing and/or amount so as to preclude any affirmative defense that might otherwise have been available to their pre-planned sales made under such trading plans.

### H.    Jassy Is a "Hands On" CEO Intimately Involved in the Company's Day-to-Day Issues

658.        As detailed above at ¶¶ 261-64, Defendant Jassy is by all accounts a hands-on CEO who was intimately involved in every aspect of the Company following his promotion to CEO in July 2021.   Numerous articles written during the relevant time period described Jassy as "exceptionally detail-oriented," often getting "into the weeds on issues far beneath his pay grade." Even *Wall Street Journal* noted Jassy's "ultra-detail-oriented management style," remarking that one Amazon vice president who worked with Jassy for over a decade had described him as having a "phenomenal focus on details."  Jassy himself acknowledged the importance of being detailed oriented, saying in a September 2021 interview, "[w]here the rubber meets the road is in the details. From the junior roles to the senior-most, you have to be good at executing details."  It has also been said that "[y]ears devoted to technical services . . . made [Jassy] an obsessive person with the most minute details."[417]

659.        It is no surprise then, with that level of attention to detail, that Defendant Jassy, immediately following his promotion to CEO, began to conduct regular meetings with Amazon's business heads to gain a better understanding of the Company, including its capacity-related issues. According to *Wall Street Journal*, in July 2021, it became clear to Defendants, including Defendant Jassy, that Amazon's capacity was outpacing demand for e-commerce and fast delivery.  As a

---

[417] Andy Jassy, the New Boss of Amazon, CE Noticias Financieras English, July 14, 2021 (available on Lexis).

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 221
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

result, "[t]hey made a series of intensifying cutbacks to the plans for capacity growth" that month and then made additional cuts to capacity growth in September and December 2021.[418]

660.        In fact, a longtime Amazon board member said that "[f]ollowing all [of Amazon's] growth that we had in the short term, we have some things [Jassy] felt we need to do to get right in the business. . . . And so he's working on the supply, the labor and delivery speeds. *__He's right in the middle of it__*."[419]

661.        Given the internal meetings conducted by Jassy starting in July 2021 regarding physical growth and capacity-related issues within Amazon, and that the Company already had decided to make drastic cuts in its fulfillment network by the end of that month, Jassy knew by that time that the Company's growth in the fulfillment area was outpacing consumer demand for e-commerce and fast delivery.

## I.     Defendants Carefully Monitored and Tracked Data Related to Growth and Capacity

662.        Amazon has been described as "perhaps the most data-driven company in the history of the world—a business so adept at gathering customer information and crunching numbers."[420]  Defendant Jassy was closely involved with overseeing the Company's growth and capacity.  Indeed, he and the other Individual Defendants closely monitored and tracked data related to consumer demand and customer order volume.  *See* ¶¶ 265-66.

663.        It has been widely reported that "Amazon uses software to manage in a way that's unlike almost any other company. . . . Whether they're driving a delivery van, picking items from shelves or trying to maintain their product inventory to avoid being delisted, Amazon's employees, subcontractors and seller-partners are monitored, evaluated, rewarded and even flagged for

---

[418]  Dana Mattioli, Amazon CEO Andy Jassy's First Year on the Job:  Undoing Bezos-Led Overexpansion, THE WALL STREET J. (June 16, 2022).

[419]  https://nypost.com/2022/06/17/amazon-ceo-jassy-spent-first-year-cleaning-up-bezos-messes-report/.

[420]  David Lazarus, "Column:  Do you really want Amazon's new drugstore knowing your medical condition?," *Los Angeles Times Online* (Nov. 19, 2020), available on Lexis Nexis.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 222
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

reprimand or coaching by software."[421]   The Company has "spent years honing its machine learning and artificial-intelligence technology to the point where it can forecast demand, identify fraud and recommend products to customers."[422]   In fact, this highly advanced software helps Amazon set inventory levels and even begin packing orders based on predictive algorithms.[423] Even further, Amazon has developed a reputation for being "obsessed with data"—with some going as far to say, as reported in the *Puget Sound Business Journal*, that "Data is [Amazon's] religion."[424]

### J.   The Abrupt Resignation of Clark Adds to the Strong Inference of Scienter

664.    Defendant Clark was the Chief Executive Officer of Amazon Worldwide Consumer between March 2021 and July 2022, succeeding Defendant Wilke.   In that role, Clark was Amazon's number-two executive at Amazon.   Before assuming that role at the Company, he was Amazon's Senior Vice President of Worldwide Operations and was responsible for overseeing Amazon's warehouse and fulfillment center expansion, among other things.

665.    Among other things, Clark is credited with spearheading the Company's sprawling fulfillment and logistics infrastructure and he also led Amazon's warehouse expansion and hiring during the relevant time period.   As *Fortune* reported on August 22, 2020, Clark had the nickname "The Sniper" because he would "hide in the shadows at warehouses seeking to catch lazy workers slacking off who he could fire."

666.    Clark also spoke publicly during the Class Period about the Company's third-party seller business.   *See* ¶¶ 533, 537, 552.

---

[421]   https://www.wsj.com/articles/amazons-new-ceo-can-either-help-workers-and-sellersor-automate-them-away-11612587602

[422]   https://www.wsj.com/articles/amazons-typical-worker-is-in-a-warehouse-making-28-446-a-year-1524402003

[423]   https://www.linkedin.com/pulse/amazon-1-internet-based-retailer-world-yovanny-hernandez/

[424]   Tony Lystra, "It's all about the data at Amazon—even when it comes to hiring," *Puget Sound Business Journal*, (Dec. 14, 2020), available at https://www.bizjournals.com/seattle/news/2020/12/14/amazon-focus-on-data-influences-its-hiring.html.

667.　　　　On May 25, 2022, just weeks after the Company announced publicly on April 28, 2022 that it had slowed its operations expansion plans for 2022 and 2023 "to better align with expected customer demand" (and reported its first quarterly loss since 2015), Clark presented to the Company's Board of Directors a three-year plan to fix the retail business, including reducing Amazon's massive warehousing network.

668.　　　　Less than two weeks later, on June 3, 2022, the Company announced that Clark was resigning effective July 1, 2022.  At the time of the announcement, Amazon had not identified a successor and provided no reason for his sudden departure.  Clark's sudden departure was particularly shocking and noteworthy given reports that he left $77 million in compensation on the table when he left the Company.  (This amount reflects the severe decline in the price of Amazon shares immediately following the end of the Class Period.)

669.　　　　Media reports have noted that Clark's resignation was prompted by a series of missteps in his division, including the warehouse expansion, overstaffing, and related spiraling costs.[425]

670.　　　　Clark's resignation—which occurred approximately five weeks after the truth fully emerged—is highly suspicious and constitutes further evidence of Defendants' scienter.

### K.　The Existence of Numerous Governmental Investigations into Amazon Is Indicative of Scienter

671.　　　　Numerous governmental investigations, both in the U.S. and abroad, should have alerted Defendants to carefully evaluate and monitor whether Company employees routinely used non-public third-party data to benefit Amazon's private-label products.

672.　　　　Significantly, the Subcommittee conducted hearings as part of an antitrust investigation that scrutinized the practices of Amazon and other technology companies.  That investigation resulted in the Majority Staff Report and Recommendations.  The report, which was based on testimonials from third-party sellers, brand manufacturers, publishers, former employees,

---

[425] *See, e.g.*, Katherine Long, et al., "Insiders Say Amazon's Consumer CEO Dave Clark was Felled by a Series of Missteps, Including Warehouse Overexpansion, Spiraling Costs, Overstaffing and a Union Loss," *Business Insider* (June 4, 2022), https://www.businessinsider.com/amazon-consumer-ceo-dave-clark-resigns-missteps-2022-6.

market participants, and internal Amazon documents, concluded that "Amazon has engaged in extensive anticompetitive conduct in its treatment of third-party sellers. . . . This conflict [of interest] incentivizes Amazon to exploit its access to competing sellers' data and information, among other anticompetitive conduct."[426]

673.        During the hearings, lawmakers questioned Amazon executives about whether third-party seller data was used to develop private-label products or to privilege the Company's own products in search results.  Specifically, on July 16, 2019, Defendant Sutton was asked directly whether the Company "track[s] [the data] and create[s] products that directly compete with those most popular brands that are out there."  In response, Sutton said: "We do not use any seller data to compete with [third parties]. . . . We do not use any of that specific seller data in creating our own private brand."

674.        On May 1, 2020, members of the Subcommittee sent Defendant Bezos a letter in response to an April 23, 2020 *Wall Street Journal* article, ¶ 437, which reported on allegations that Amazon employees had used sensitive business information from third-party sellers on its platform to develop competing products.  The letter said, in part, "[i]f these allegations are true, then Amazon exploited its role as the largest online marketplace in the U.S. to appropriate the sensitive commercial data of individual marketplace sellers and then used that data to compete directly with those sellers," and asked Bezos to testify directly before the Subcommittee.  Media reports suggest that the issue of employee access to third-party data was discussed openly during Company meetings and that "Amazon employees regularly violated the policy [not to use third party data to compete with third parties]—***and senior officials knew it***."[427]

---

[426]  Investigation of Competition in Digital Markets, Majority Staff Report and Recommendations, Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, pg. 16 (2020).

[427]  https://arstechnica.com/tech-policy/2022/03/us-lawmakers-seek-criminal-probe-of-amazon-for-lying-about-use-of-seller-data/.

675.      *Wall Street Journal* reported on June 11, 2020 that the EU was planning formal antitrust charges against Amazon regarding its treatment of third-party sellers on its platform following a two-year investigation.

676.      The following year, *Reuters* reported that Amazon was under investigation in India for alleged anti-competitive practices that hurt other businesses, including unfairly favoring its own branded merchandise.[428]   The investigation stated that "thousands of pages of internal Amazon documents examined by Reuters—including emails, strategy papers and business plans—show the company ran a systematic campaign of creating knockoffs and manipulating search results to boost its own product lines in India, one of the company's largest growth markets."[429]

677.      On April 6, 2022, *Wall Street Journal* published an article, entitled "SEC Is Investigating How Amazon Disclosed Business Practices," which reported that "[f]ederal securities regulators are investigating how Amazon.com Inc. has disclosed some details of its business practices, including how it uses third-party-seller data for its private-label business." ¶ 327.

678.      In July 2022, it was reported that the U.K.'s antitrust unit was investigating Amazon regarding whether the Company had damaged competition by providing an unfair advantage to its own retail business and sellers at the expense of third-party merchants.[430]

679.      As discussed elsewhere herein, *see* ¶¶ 10, 596, the FTC and 17 state attorneys general filed suit against the Company, averring that Amazon's actions allow it to stop rivals and sellers from lowering prices, degrade quality for shoppers, overcharge sellers, stifle innovation, and prevent rivals from fairly competing against Amazon.  As also discussed elsewhere herein, *see* ¶¶ 15-16, 181-90, the California Attorney General filed a lawsuit against the Company averring, among other things, that in order to avoid competing on prices with other online e-commerce sites, Amazon requires merchants to enter into agreements that severely penalize them

---

[428]  https://www.reuters.com/investigates/special-report/amazon-india-rigging/.

[429]  *Id.*

[430]  https://www.reuters.com/technology/amazon-faces-uk-probe-over-marketplace-practices-2022-07-06/.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 226
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  if their products are offered for a lower price off-Amazon.  These agreements thwart the ability of

2  other online retailers to compete and harm merchants and consumers through inflated fees and

3  higher prices.

### L.  Amazon's Steps to Cover Up Its Misdeeds Is Strong Evidence of Scienter

680.     The Company worked intensely to cover up its misconduct.  Amazon went as far

as to lie to Congress and other regulators for years that it was not acting improperly.  When, as

here, a company engages in a cover up of wrongdoing during government investigations, scienter

is readily inferred.

681.     One day after *Reuters* issued its article detailing the investigation in India, on

October 14, 2021, *The Markup* published its piece "Amazon Puts Its Own 'Brands' First Above

Better-Rated Products," where it reported that Amazon had placed products from its house brands

(and products exclusive to the site) ahead of those from competitors—even competitors with

higher customer ratings.[431]

682.     On October 18, 2021, members of the Subcommittee sent Amazon another letter

addressing the "recent, credible reporting that directly contradicts the sworn testimony and

representations of Amazon's top executives—including former CEO Jeffrey Bezos—to the

Committee about their company's business practices during our investigation last Congress."[432]

Amazon responded by letter dated November 1, 2021, asserting that it "ha[d] cooperated fully with

the Committee's inquiries and engaged in good faith throughout this process" and further that "the

resulting record fully supports the transparency, candor, accuracy, and truthfulness of all of our

statements, including on the topics raised in your letter."  The Company added that it "ha[d] in no

---

[431] https://themarkup.org/amazons-advantage/2021/10/14/amazon-puts-its-own-brands-first-above-better-rated-products.

[432] https://judiciary.house.gov/uploadedfiles/letter_-_amazon_misrepresentations_-_10.18.21.pdf.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 227
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

way lied to or misled the Committee, and any allegation to the contrary is false and unsupported."[433]

683.          Members of Congress rejected outright the Company's response.  In that regard, a bipartisan group of lawmakers sent a letter to the DOJ on March 9, 2022, urging it to open an investigation into Amazon and its executives for potentially criminal obstruction of Congress.  The letter stated that "Amazon lied through a senior executive's sworn testimony that Amazon did not use any of the troves of data it had collected on its third-party sellers to compete with them."  The letter further stated that "Amazon has declined multiple opportunities to demonstrate with credible evidence that it made accurate and complete representations.  Amazon's failure to correct or corroborate those representations suggests that Amazon and its executives have acted intentionally to improperly influence, obstruct, or impede the Committee's investigation and inquiries."  Moreover, the letter accused the Company of being "caught in a lie and repeated misrepresentations," and also averred that Amazon subsequently "attempted to cover up its lie by offering ever-shifting explanations" of its practices and policies.  The letter referenced the investigations by *Wall Street Journal*, *Reuters*, and *The Markup* that directly contradicted Amazon's sworn testimony.

684.          Additionally, the FTC has averred that the Company also deleted internal communications using the "disappearing message" feature of Signal and destroyed more than two years' worth of such communications, from June 2019 to at least early 2022—virtually all of the Class Period.  *See* ¶ 14.

## M.    A Pattern of Fraudulent Conduct Over a Significant Period of Time Is Indicative of Scienter

685.          Apart from the regulatory investigations referenced herein, Amazon also has been accused—in private litigation—of copying others' products for its own brand.  Such "pattern evidence" (i.e., that a defendant participated in a pattern of fraudulent conduct over a significant period of time) is probative of scienter.

---

[433] https://judiciary.house.gov/uploadedfiles/letter_from_brian_huseman_to_committee__nov_01_2021.pdf.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 228
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

686.        For example, in 2018, home-goods retailer Williams-Sonoma Inc. filed a federal lawsuit against Amazon, alleging that the Company copied its proprietary designs for chairs, lamps, and other products for an Amazon private brand called Rivet.[434]   Williams-Sonoma contended that "Amazon ha[d] engaged in a systematic campaign of copying." The parties reached a confidential settlement in 2020.

687.        Apart from the foregoing, the Company's practices *vis-à-vis* its collection and use of private customer information have also been highly criticized and subject Amazon to significant potential legal liability.[435]   For example, in November 2019, Senator Edward Markey of Massachusetts released "**alarming findings** from his investigation of Amazon doorbell company Ring that **reveal little to no privacy policies or civil rights protections for video collected by the technology**."   Senator Markey's press release stated, in relevant part, that:

> "Amazon Ring's policies are an open door for privacy and civil liberty violations," Markey said in a statement announcing the findings.  "If you're an adult walking your dog or a child playing on the sidewalk, you shouldn't have to worry that Ring's products are amassing footage of you and that law enforcement may hold that footage indefinitely or share that footage with any third parties.  Amazon's Ring is marketed to help keep families safe, **but privacy rights are in real danger as a result of company policies.  Amazon is not doing enough to ensure that its products and practices do not run afoul of our civil liberties**."

688.        Amazon's disregard for customer privacy goes beyond issues with Ring.  In a consumer class action case pending in this court captioned *Garner et al. v. Amazon.com Inc. et al*., Case No. 21-cv-00750 (W.D. Wash.), U.S. District Judge Robert S. Lasnik declined to dismiss claims brought against the Company pertaining to its Alexa devices pursuant to the Washington Consumer Protection Act, finding that the plaintiffs had advanced "specific factual allegations of

---

[434] https://www.reuters.com/investigates/special-report/amazon-india-rigging/.

[435] *See, e.g.*, Jeffrey Dastin, Chris Kirkham & Aditya Kalra, *Amazon Wages Secret War on Americans' Privacy, Documents Show*, REUTERS (Nov. 19, 2021) ("In recent years, Amazon.com Inc has killed or undermined privacy protections in more than three dozen bills across 25 states, as the e-commerce giant amassed a lucrative trove of personal data on millions of American consumers.").

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 229
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

misrepresentations and omissions" that "had the capacity to deceive a substantial portion of the public."  As reported by Law360 in May 2022:

> These assertions include that Amazon had misrepresented the rarity of "false wakes" and the "care it takes to avoid unjustified recordings" and that it had failed to accurately describe what it does with voice interactions it gathers, Judge Lasnik noted.

> The plaintiffs had also satisfied the "injury to business or property" element of their CPA claim by alleging that "they paid more for their Alexa devices than they would have been willing to pay had they known that Amazon designed the devices to record even in the absence of a wake word, ***permanently stores even accidental recordings, and shares recordings (intentional or not) with employees and third-parties" and that Amazon "took and monetized plaintiffs' personal data for its own commercial benefit without payment, thereby depriving plaintiffs of the monetary value inherent in the data that was intercepted***," according to Judge Lasnik.[436]

### N.   The Close Proximity Between the Latest False Statements and the April 28, 2022 Corrective Disclosure Bolsters an Inference of Scienter

689.   On April 28, 2022, Amazon reported its first quarterly loss in nearly seven years. Among other admissions, as detailed in ¶ 329 above, Defendant Jassy admitted in that day's earnings release that Amazon was "no longer chasing physical or staffing capacity," and on Amazon's first-quarter 2022 earnings call that day, Defendant Olsavsky admitted that the Company had "excess capacity in our fulfillment and transportation network."  These admissions stand in stark contrast to what Amazon had told investors mere weeks and months before the corrective disclosure.

690.   On February 3, 2022, Defendant Olsavsky insisted in an earnings call that Amazon "continued to see an increase in customer demand . . . during the remainder of 2021; that "[w]e've invested significantly to keep pace with this demand"; and that "we still see additional levels of investment in [transportation] in 2022."  A press release that same day referenced "scaling [Amazon's] fulfillment network" and how recent expansion efforts were something "to look forward to in the months and years ahead."

---

[436] https://www.law360.com/articles/1491560/amazon-skirts-some-wiretap-claims-in-alexa-privacy-suit.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 230
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

691.        On April 14, 2022, only *two weeks* before the April 28 disclosure of the truth that Amazon's fulfillment center expansion had outstripped demand, Defendant Jassy proclaimed that Amazon "***had*** to double [capacity] in the last 24 months to meet customer demand" and that "this type of iterative innovation . . . has periodic peaks in investment years."

692.        The short time between these last alleged false statements and the revelation of the truth makes it less plausible that any intervening events, or new knowledge gained by the Defendants, explains the inconsistency between the statements.  There is no indication that any new information reached Defendants between February 3, 2022 and April 28, 2022, let alone in the 14-day period between April 14, 2022 and April 28, 2022 that would have led them to drastically change their outlook regarding Amazon's fulfillment network.  The fact that these statements were so different despite the brief passage of time between them, therefore, is strong circumstantial evidence of scienter.

### O.        Bezos's Autocratic Leadership Style Is Indicative of Scienter

693.        In the book, *The Everything Store:  Jeff Bezos and the Age of Amazon*, author Brad Stone reported that Defendant Bezos exhibits some tell-tale signs of autocratic leadership.[437]  In an autocratic approach to management, one person (here, Bezos) is responsible for making all decisions, ignores most input from others, and refrains from thinking about the considerations of subordinate employees.  Several outlets have reported that Bezos regularly hired industry experts, only to disregard all of their recommendations.

694.        As someone who engaged in autocratic leadership, it can be readily inferred that Defendant Bezos would have had knowledge of (and access to reports discussing) the pervasive corporate misconduct discussed herein.

### P.        Amazon Is a Highly Scrutinized Company

695.        Amazon is the largest e-commerce site in the world.  Because of this, the Company's business practices have drawn intense public interest on numerous fronts—something that was well-known, or should have been known, to members of senior management, including

---

[437] https://www.fingerprintforsuccess.com/blog/jeff-bezos-leadership-style#toc-section-1..

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 231
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

the Individual Defendants.   Throughout the Class Period, reporters and financial analysts frequently published articles and reports regarding the Company's business practices and growth, including its warehouse expansion plans, as well as Company's alleged violations of applicable laws *vis-à-vis* its dealings with its third-party sellers.   The Company was, or should have been, acutely aware that these matters were important to the public at large.   And, as a company hyper-focused on maintaining a certain image,[438] it is reasonable to infer that Amazon and its executive management team were closely tracking the same issues that had piqued the interest of so many outside of Amazon, including the media.

696.        Ultimately, when viewed collectively, as required by applicable law, Plaintiffs' allegations support a strong inference of fraudulent intent on the part of the Defendants or, at the very least, the strong inference that Defendants' conduct was highly unreasonable and an extreme departure from standards of ordinary care.   In either case, Plaintiffs have adequately plead scienter.

### Q.     Amazon's Corporate Scienter Is Alleged

697.        Each of the Individual Defendants was a high-ranking management-level employee of Amazon.   The scienter of each of the Individual Defendants and of all other management-level employees of Amazon, including each high-ranking officer or director, is imputable to Amazon.   The knowledge of each of these individuals should therefore be imputed to Amazon for the purposes of assessing corporate scienter.

698.        Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Amazon as an entity.   Corporate scienter may be alleged independently when, as here, a statement or course of conduct would have been approved by corporate officials sufficiently knowledgeable about the Company to know the statement could be misleading, or that a course of conduct was deceptive.   Here, Defendants'

---

[438] *See, e.g.*, https://www.ign.com/articles/amazon-twitter-army-defend-company-ceo-jeff-bezos-leaked-document-reveals ("A leaked document reveals how Amazon recruited a number of ambassadors to defend the online reputation of the company and its CEO, Jeff Bezos."); *see also* https://celebrityreputation.com/2021-04-04-amazon-online-army-paid-propagandists-reputation-bezos.html ("Codenamed 'Veritas,' the program involved dispatching paid propagandists on Twitter and elsewhere to say awesome-sounding things about Bezos and Amazon.").

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 232
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

course of conduct, and Defendants' materially misleading statements and omissions made to the investing public, regarding the Company's wide-ranging misconduct and its e-commerce expansion and fulfillment network—important topics that would necessarily require approval by appropriate corporate officers—were deceptive and constituted a fraud upon investors.

699.　　　A corporation can only act through its employees, agents or officers and Amazon is responsible for the acts of its executives, employees and other agents performed within the scope of their authority.  Here, Amazon's executives, employees and other agents acted within the scope of their authority since they were engaged in the performance of duties that were expressly or impliedly assigned to them by the Company.[439]

## VII.　LOSS CAUSATION

700.　　　During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and engaged in a course of conduct that artificially inflated the price of Amazon common stock.  In furtherance of this scheme, Defendants operated as a fraud or deceit on Class Period purchasers of Amazon common stock by failing to disclose and misrepresenting the adverse facts detailed herein, including that (1) the Company engaged in anticompetitive and improper conduct in its private-label business practices, including giving Amazon's products preference over those of its competitors and using third-party sellers' non-public data to compete with them; and (2) the Company's infrastructure and fulfillment network investments substantially outpaced customer demand for fast delivery and that its expansion placed an undue strain on Amazon's financial condition.  As a result of Defendants' misrepresentations, the price of Amazon common stock declined significantly as the prior artificial inflation came out of the Company's stock price on April 28, 2020; May 1, 2020; July 23, 2020; August 3, 2020; October 6, 2020; April 6, 2022; and April 28, 2022.  Defendants' misstatements and omissions were the proximate cause of those stock declines and the losses suffered by Class members.

---

[439] *See, e.g.*, *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 926 (N.D. Cal. 2020) ("It is beyond dispute that a corporation can be liable for the fraud committed by its officers, so long as the officer commits it within the scope of his or her employment.  ***Janus did not change that***.") (emphasis added).

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 233
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

701.        As a result of their purchases of Amazon common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.  When Defendants' prior misrepresentations, omissions, and fraudulent conduct were disclosed and became apparent to the market, the price of Amazon common stock fell as the prior artificial inflation dissipated.  Defendants' materially false and misleading statements and omissions had the intended effect and caused Amazon common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $3,762.15 per share on November 19, 2021.

702.        By issuing materially false and misleading statements and failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Amazon's prospects, business, and compliance with relevant laws and regulations.  As the true facts about the Company were revealed to the market, the price of Amazon common stock fell significantly.  These declines removed the inflation from Amazon common stock, causing real economic loss to investors who had purchased Amazon common stock during the Class Period.

703.        The declines in the price of Amazon common stock after each of the corrective disclosures came to light were a direct result of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Amazon common stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

704.        For example, on April 28, 2020, *CNBC* published an article entitled "GOP Sen. Hawley asks DOJ to open a criminal investigation into Amazon."  The article reported that Senator Hawley requested that the DOJ open a criminal antitrust investigation into Amazon regarding "predatory and exclusionary data practices to build and maintain a monopoly" in connection with reports that the Company used data from third-party sellers to compete with them using its private label business.  Senator Hawley further stated that "Amazon abuses its position as an online platform and collects detailed data about merchandise so Amazon can create copycat products under an Amazon brand."  *See supra* ¶ 317.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 234
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

705.        On this news, Amazon's stock price fell $61.92 per share, or 2.61%, to close at $2,314.08 per share on April 28, 2020.  Following the news of Senator Hawley's request to the DOJ, *The New York Post* took note of the development mid-day, stating that "[s]hares of Amazon were down 1.9 percent Tuesday afternoon, at $2,331.04."[440]

706.        A few days later, on May 1, 2020, the first headline for a *Bloomberg* article titled, "Amazon's Bezos Faces Call to Testify Before House Panel," went live at 10:34 a.m.  *Bloomberg* noted that the members of an antitrust panel for the House Judiciary Committee had requested that Bezos testify regarding concerns that the Company had used data from third-party sellers on its site to develop competing products, in contradiction to representations Amazon had previously made under oath to Congress in July 2019.[441]  In the article, *Bloomberg* reported that "Amazon has faced accusations of anticompetitive conduct from many corners," and noted that "some outside sellers, who are crucial to Amazon's business, have complained that the company makes their goods less visible if they post lower prices on other sites, essentially forcing the merchants to raise prices elsewhere because of the importance of Amazon to their business."[442]  Later that day, at 4:33 p.m., *Fox News* published an article titled "Jeff Bezos could testify for Amazon's 'possibly criminally false' statements to Congress, letter reveals."[443]  The article reported that "[t]he lawmakers also referenced Amazon's lack of cooperation with Congress' antitrust probe of the company," including a quote from the letter that read "[l]ast September we requested documents and communications related to Amazon's relationship with sellers, including Amazon's use of

---

[440] Nicolas Vega, "Senator asks DOJ to investigate Amazon's 'predatory' practices," *The New York Post* (Apr. 28, 2020 3:09PM), available at https://nypost.com/2020/04/28/senator-asks-doj-to-investigate-amazons-predatory-practices/?utm_campaign=iphone_nyp&utm_source=mail_app.

[441] Ben Brody, "Amazon's Bezos Faces Call to Testify Before House Panel," *Bloomberg* (May 1, 2020), available at https://www.bloomberg.com/news/articles/2020-05-01/amazon-s-bezos-called-to-testify-before-house-antitrust-panel#xj4y7vzkg.

[442] *Id.*

[443] Christopher Carbone, "Jeff Bezos could testify for Amazon's 'possibly criminally false' statements to Congress, letter reveals," *Fox News* (May 1, 2020 4:33pm), available at https://www.foxnews.com/tech/jeff-bezos-testify-amazon-congress.

---

**SECOND CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** - 235
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

third-party sellers' data . . . . Amazon has not made an adequate production in response to this request, and—seven months after the original request—significant gaps remain."

707.         On this news, Amazon's stock price fell from $2,323.00 per share at 10:34 a.m. that day to close at $2,286.04, a decline of $36.96 per share or 1.59%.  Following the close of the market, *The Motley Fool* reported that "Amazon stock fell more steeply than many of its peer consumer goods titles, as well as the wider equities market."[444]

708.         On July 23, 2020, *Wall Street Journal* published an article entitled "Amazon Met With Startups About Investing, Then Launched Competing Products."  *See supra* ¶ 321.  The article reported that Amazon engaged in the practice of making an initial investment or meeting with start-ups for the purpose of securing their proprietary information before launching Amazon's own competing products.

709.         On this news, Amazon's stock price fell $113.36 per share, or 3.66%, to close at $2,986.55 per share on July 23, 2020.

710.         Less than two weeks later, on August 3, 2020, in an article titled "Amazon's Market Power to Be Investigated by New York AG," *Bloomberg* reported for the first time that New York's Attorney General's Office was collaborating with an on-going federal investigation by the FTC and California's Attorney General regarding potential antitrust violations by the Company.  *See supra* ¶ 323.  This was the first time it was publicly disclosed that two state agencies were collaborating with the FTC on the investigation, a development that the article explained "often precede[s] a big anti-trust enforcement action."  *Id*.[445]

---

[444]  Eric Volkman, "Lawmakers Call on Amazon's Bezos to Testify Before Congress," *The Motley Fool* (May 1, 2020 10:47 PM), available at https://www.fool.com/investing/2020/05/01/lawmakers-call-on-amazons-bezos-to-testify-before.aspx.

[445]  The California AG subsequently sued Amazon on September 14, 2022, alleging that the Company's actions have harmed the State's consumers and economy.  That complaint further alleges that Amazon had previously "misled other regulators who have scrutinized" the Company's effect on pricing.  Rachel Lerman & Cat Zakrzewski, "California Sues Amazon for Anticompetitive Behavior," *The Washington Post* (Sept. 14, 2022).

711.      On this news, Amazon's stock price fell $52.79 per share, or 1.67%, to close at $3,111.89 per share on August 3, 2020.

712.      Then, on October 6, 2020, the Subcommittee released its findings from a more than 16-month long investigation into competition in the digital economy and the challenges presented by the dominance of several large internet and technology companies, including Amazon. *See supra* ¶ 325. The report describes how Amazon and other Big Tech firms wield significant control over the markets in which they operate, including the power to cut off competitive threats. *Id*. The Subcommittee report concluded, *inter alia*, that Amazon's dual role as an operator of its marketplace that hosts third-party sellers, and a seller in that same marketplace, creates an inherent conflict of interest. Moreover, this conflict incentivizes Amazon to exploit its access to competing sellers' data and information, among other improper conduct.

713.      When news of the October 6, 2020 Subcommittee report was made public, Amazon's stock price fell $99.24 per share, or 3.1%, to close at $3,099.96 per share on October 6, 2020. Recognizing the stock decline, *The Boston Globe* reported that "[t]he stocks of four large technology companies targeted in the [Subcommittee] report all fell slightly more than the overall market, which dropped on news that President Trump was suspending economic stimulus negotiations."[446] An analyst covering Amazon commented on the Subcommittee report and the impact of a potential enforcement action by stating, "the subcommittee recommends changes to antitrust laws and enforcement, which could result in major changes for Big Tech companies."[447]

714.      On April 6, 2022, *Wall Street Journal* published an article entitled "SEC Is Investigating How Amazon Disclosed Business Practices," which reported, *inter alia*, that the SEC's probe had been underway for more than a year and had focused on Amazon's disclosures regarding its use of third-party seller data for its own private-label business. *See supra* ¶ 327.

---

[446] Ben Brody and David McLaughlin, "Lawmakers say Amazon, Apple, Facebook, Google are abusing their power and must be reined in," *The Boston Globe* (Oct. 6, 2020), available at https://www.bostonglobe.com/2020/10/06/business/house-lawmakers-say-amazon-apple-facebook-google-are-abusing-their-dominance/.

[447] *Truist Securities*, Sector Update at 2 (Oct. 9, 2020).

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 237
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

715.        On this news, Amazon's stock price fell $105.98 per share, or 3.2%, to close at $3,175.12 per share on April 6, 2022.

716.        As a subsequent media report noted, "the recent SEC investigation shows that Amazon has continued . . . to use both customer and third-party data for its own unfair competitive advantage."[448]  Significantly, the announcement of the SEC's investigation was followed in July 2022 by media reports indicating that the Company was motivated to offer concessions to settle an EU investigation which was focused on how Amazon unfairly uses third-party seller data to benefit the Company's retail business.  To address the problem, Amazon promised to, among other things, refrain from using "non-public data" from the vendors' activities to compete with them in the Company's private label business (suggesting that, consistent with the April 6, 2022 disclosure, Amazon misused such information previously).[449]

717.        Other media reports from July 2022 indicated that the Company has discussed internally "making a more drastic move to ward off regulators: abandoning its private-label business altogether.  At least as recently as last year, several top Amazon executives, including the Company's current worldwide retail CEO Doug Herrington and General Counsel David Zapolsky, expressed a willingness to make this different but significant change if it meant avoiding potentially harsh remedies resulting from government investigations in the US or abroad, according to a source with knowledge of the discussions."[450]

---

[448] "SEC investigates Amazon over business practices," The Ticker: Baruch College (Apr. 15, 2022) (available on Lexis).

[449] *See, e.g.*, Brian Fung, "Amazon offers concessions to resolve EU antitrust probes," CNN.com (July 14, 2022).

[450] *See* Jason Del Rey, "Amazon executives have discussed ditching Amazon Basics [i.e., its private label business] to appease antitrust regulators," vox.com (July 15, 2022) (noting "[t]here was a strong consensus that this could be a viable option if the company was ever pressed into a position where it had to negotiate a settlement"); "Amazon May End Basics, Other Private Labels to Appease Regulators, Report Says," https://technewsvision.co.uk (July 15, 2022) ("***Amazon*** may ***consider ending*** its Basics line and 44 other ***private labels*** to ***appease regulators***. . . . Executives have discussed pairing back private-label items sold in the US by half.").

718.        Finally, on April 28, 2022, Amazon announced its financial results for the first-quarter 2022, wherein it reported a $3.8 billion net loss—its first quarterly loss since 2015.  In its April 28, 2022 Form 8-K, Defendant Jassy admitted that Amazon was "no longer chasing physical or staffing capacity," and that improving productivity and cost efficiencies "may take some time." *See supra* ¶ 329.  During its first-quarter 2022 earnings call with analysts that day, Defendant Olsavsky disclosed $6 billion of "incremental costs," ¶ 330, including $4 billion of costs that the Company considered to be more within its control and was working to reduce.

719.        When the marketplace was made aware of Amazon's disclosure regarding the large present and future negative impact of its rapid expansion, the Company's stock declined from a closing price of $2,891.93 per share on April 28, 2022, to a closing price of $2,485.63 per share on April 29, 2022, a decline of $406.30 per share, or 14.05%.  Analysts covering the Company took note of this disclosure.  For example, on April 28, 2022, analysts at RBC Capital Markets described a "triple whammy punch on the disappointing op income guidance" due to "excess capacity" and "operational deficiencies."[451]

720.        On April 29, 2022, analysts at Wedbush published a report titled "We Aren't Buying What Amazon (Management) Is Selling" in which they reported that a "previously unforeseen lack of productivity arising from the company's decision to rapidly expand its fulfillment capacity" and a "lower labor productivity" had caused Amazon's shares to drop in the aftermarket.[452]

721.        Likewise, on April 29, 2022, analysts at J.P. Morgan issued a report that "near-term overbuild led to $4B in lower productivity & inefficiencies in 1Q Y/Y, which we did not anticipate."  The analysts added that "Amazon hardly feels clean at the moment."[453]

---

[451] *RBC Capital Markets*, "Amazon Ready for the Holidays in April; Lowering Estimates and Price Target" (Apr. 28, 2022).

[452] *Wedbush*, "We Aren't Buying What Amazon (Management) Is Selling; PT to $3,500" (Apr. 29, 2022).

[453] *J.P.Morgan*, "Buy The Pullback As AMZN Can Work Through Incremental Cost Pressures In Coming Quarters; Reiterate OW & $4,000 PT" (Apr. 29, 2022).

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 239
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

722.       The economic loss, i.e., damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Amazon's common stock when Defendants' misrepresentations and other fraudulent conduct were revealed to the investing public at large.

## VIII.   AMAZON'S DISCLOSURE OBLIGATION UNDER THE SECURITIES LAWS

723.       As a public company, Amazon must comply with specific regulations set forth by the SEC.  Item 303 of SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain a section called "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), which is to be drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. § 229.303.

724.       Pursuant to Item 303(a), Amazon had a duty to:

> (i)       Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, would be material to an understanding of the registrant's results of operations.

> (ii)      Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

17 C.F.R. § 229.303(b)(2).

725.       Regulation S-K further states that "[t]he discussion and analysis [section] must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 240
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

726.        In 2003, the SEC issued interpretative guidance relating to the requirement of Item 303.  Such guidance states, in pertinent part:

> We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner.  MD&A is a critical component of that communication.  The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent.
>
> . . . .
>
> Financial measures generally are the starting point in ascertaining these key variables and other factors.  However, financial measures often tell only part of how a company manages its business.  Therefore, when preparing MD&A, companies should consider whether disclosure of all key variables and other factors that management uses to manage the business would be material to investors, and therefore required.
>
> . . . .
>
> Companies should also consider disclosing information that may be peripheral to the accounting function, but is integral to the business or operating activity. Examples of such measures, depending on the circumstances of a particular company, can include those based on units or volume, customer satisfaction, time-to-market, interest rates, product development, service offerings, throughput capacity, affiliations/joint undertakings, market demand, customer/vendor relations, employee retention, business strategy, changes in the managerial approach or structure, regulatory actions or regulatory environment, and any other pertinent macroeconomic measures.

727.        The MD&A disclosures in Amazon's Forms 10-K and 10-Q filed with the SEC during the Class Period were materially false and misleading because Defendants failed to disclose material downward trends associated with the Company's e-commerce and fast delivery programs then known to management and that would have a material effect on the Company's future operating results.

## IX.    PRESUMPTION OF RELIANCE

728.        Plaintiffs and the Class are entitled to a presumption of reliance established by the fraud-on-the-market doctrine as enunciated in *Basic v. Levinson*, 485 U.S. 224 (1998) ("*Basic*") and the presumption of reliance for omissions as enunciated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 241
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

729.        With respect to the *Basic* presumption, a presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a)        Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)        The omissions and misrepresentations were material;

(c)        The Company's stock traded in an efficient market;

(d)        The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)        Plaintiffs and other members of the class purchased common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

730.        At all relevant times, the market for Amazon's common stock was efficient for the following reasons, among others:

(a)        The Company's common stock was actively traded on the NASDAQ, an internationally efficient market, throughout the Class Period.  Shares were highly liquid during the Class Period, with an average daily volume of 3,975,233 shares traded;

(b)        The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similarly reporting services;

(c)        The Market reacted promptly to public information disseminated by the Company;

(d)        Amazon's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace; and

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 242
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

(e)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Amazon's common stock.

731.     As a result of the foregoing, the market for Amazon common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Amazon's share price.  Under these circumstances, all purchasers of Amazon common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

732.     In addition to the *Basic* presumption, a class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute* because the claims alleged are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Amazon's business operations and financial performance—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery.

733.     Rather, all that is necessary to invoke the *Affiliated Ute* presumption of reliance is that the facts withheld would be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions as set forth above, that requirement is satisfied here.

## X.     CONTROL PERSON ALLEGATIONS

734.     By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about Amazon, its business, operations, operational trends, finances, and present and future business prospects.  The Individual Defendants would ascertain such information through the Company's internal corporate documents, conversations, and connections with other corporate officers, bankers, traders, risk officers, marketing experts, employees, attendance at management and Board meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as the Company officers and/or directors.

735.     It is appropriate to presume that the materially false, misleading, and incomplete information conveyed in Amazon's public filings and press releases and Defendants' public

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 243
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

statements, as alleged herein, was the result of the collective actions of the Individual Defendants identified above. The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

736.      The Individual Defendants were involved in drafting, producing, reviewing, approving, and/or disseminating the materially false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the fact that materially false and misleading statements were being issued regarding the Company and themselves, and approved or ratified these statements, in violation of the federal securities laws.

737.      As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ, and governed by the provisions of the federal securities laws, each of the Individual Defendants had a duty to disseminate prompt, accurate, and truthful information with respect to Amazon's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

738.      The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of Amazon, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 244
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

739.         The Individual Defendants are liable as participants in a scheme, plan, and course of conduct that operated as a fraud and deceit on Class Period purchases of Amazon's common stock.

## XI.   NO SAFE HARBOR—INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

740.         The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the alleged false statements pleaded here.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent that there were any forward-looking statements, there were no meaningful cautionary statements accompanying them.  To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such cautions were glaringly absent from Amazon's Class Period filings.

741.         Moreover, there can be no safe harbor protection where the cautionary language remained fixed even as the risks changed.  Here, the Company's purported cautionary language remained the same throughout the Class Period, despite changing and/or worsening conditions.  The consistency of Defendants' language over time despite new information belies any contention that the cautionary language was tailored to a specific future projection, especially when, as here, that risk had already materialized at the time(s) the disclosures were made.

742.         For example, Amazon's Form 10-K filed with the SEC on February 4, 2022, contained the following boilerplate "caution":  "As we continue to add fulfillment and data center capability or add new businesses with different requirements, our fulfillment and data center networks become increasingly complex and operating them becomes more challenging.  There can be no assurance that we will be able to operate our networks effectively."

743.         The supposed risk warning failed to warn the market of the known problems that Amazon was then experiencing with the overexpansion of its infrastructure and fulfillment networks for its e-commerce business.  Simply put, this "caution" was untethered to the known problems at hand, rendering it meaningless.

744.        The generic nature of this disclosure is further illustrated by the fact that it was repeated in each of Amazon's SEC filings from July 2021 through the end of the Class Period—the time period in which the problems plaguing the Company's expansion of its fulfillment centers were well known internally.

745.        Cautions cannot be "meaningful" if they merely repeat themselves, reporting period after reporting period, without taking into account material changes to the business.

746.        Accordingly, the risk warnings provided by Defendants in their Class Period statements were not meaningful, were themselves false and misleading, and did not shield Defendants from liability on the basis that such statements were "forward-looking."

747.        The Private Securities Litigation Reform Act's statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint.  None of the statements pleaded herein are forward-looking statements and no such statement was identified as a forward-looking statement when made. Rather, the statements alleged herein to be materially false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made.  Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

748.        Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.  Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and materially misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 246
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

material adverse facts undermining such disclosures.  In other words, the supposed "risks" that Defendants attempted to warn about had already materialized.

## XII.   CLASS ACTION ALLEGATIONS

749.       Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired the publicly traded common stock of Amazon during the period between February 1, 2019 and April 28, 2022, inclusive, and were damaged thereby (the "Class").  Excluded from the Class are: Defendants; members of the immediate families of the Individual Defendants; the Company's subsidiaries and affiliates; any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

750.       The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of April 20, 2022 (just over a week from the end of the Class Period), the Company had approximately 508.72 million shares of common stock outstanding and actively trading on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

751.       Plaintiffs' claims are typical of the claims of members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

752.       Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 247
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

753.        Common questions of law and fact exist as to all members of the Class predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include:

(a)        Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)        Whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c)        Whether and to what extent the market price of Amazon's common stock was artificially inflated during the Class Period because of the material misstatements and omissions alleged herein;

(d)        Whether Defendants acted with the requisite level of scienter;

(e)        Whether the Individual Defendants were controlling persons of the Company;

(f)        Whether reliance may be presumed; and

(g)        Whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

754.        A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress the wrongs done to them individually.  There will be no difficulty in the management of this action as a class action.

## XIII.   CAUSES OF ACTION

### COUNT I

**Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder Against All Defendants**

755.        Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 248
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

756.     This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

757.     As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made materially untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants intended to and did, as alleged here: (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices of Amazon's common stock; and (iii) cause Plaintiffs and members of the Class to purchase the Company's common stock at artificially inflated prices.

758.     Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

759.     As set forth above, Defendants made their materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner, as to constitute willful deceit and fraud upon Plaintiffs and other members of the Class who purchased Amazon's common stock during the Class Period.

760.     In ignorance of the materially false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for the Company's common stock, Plaintiffs and other members of the Class purchased the Company's common stock at artificially inflated prices during the Class Period.  But for the fraud, Plaintiffs and members of the Class would not have purchased the Company's stock at such artificially inflated prices.  As set forth herein when the true facts were

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 249
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  subsequently disclosed, the price of Amazon's common stock declined precipitously and Plaintiffs

2  and members of the Class were harmed and damaged as a direct and proximate result of their

3  purchases of the Company's common stock at artificially inflated prices and the subsequent decline

4  in the price of that stock when the truth was disclosed to the investing public at large.

5  761.       By virtue of the foregoing, Defendants are liable to Plaintiffs and members of the

6  Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5.

7                          **COUNT II**

8        **Violations of Section 20(a) of the Exchange Act**
         **Against the Individual Defendants**

9  762.       Plaintiffs repeat and reallege each and every allegation contained above as if fully

10 set herein.

11 763.       This Count is asserted pursuant to Section 20(a) of the Exchange Act against each

12 of the Individual Defendants.

13 764.       As alleged above, Amazon violated Section 10(b) of the Exchange Act and

14 Rule 10b-5 promulgated thereunder by making materially false and misleading statements and

15 omitting material information in connection with the purchase and sale of the Company's common

16 stock and by participating in a fraudulent scheme and course of business or conduct throughout

17 the Class Period.  This fraudulent conduct was undertaken with scienter, and Amazon is charged

18 with the knowledge and scienter of each of the Individual Defendants who knew of or acted with

19 deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature

20 of its scheme during the Class Period.

21 765.       As set forth above, the Individual Defendants each had the power to influence and

22 control, and did influence and control, directly or indirectly, the decision making of the Company,

23 including the content of its public statements with respect to its operations, corporate governance,

24 and compliance with regulators.

25 766.       By virtue of the foregoing, the Individual Defendants each had the power to

26 influence and control, and did influence and control, directly or indirectly, the decision making of

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 250
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND ᴾᴸᴸᶜ
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  the Company, including the content of its public statements with respect to its operations, corporate

2  governance, and compliance with regulators.

3  767.        The Individual Defendants acted knowingly and intentionally, or in such a

4  deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiffs and the other

5  members of the Class who purchased Amazon's common stock during the Class Period.

6  768.        In ignorance of the materially false and misleading nature of the Company's

7  statements and omissions, and relying directly or indirectly on those statements or upon the

8  integrity of the market prices for the Company's common stock, Plaintiffs and other members of

9  the Class purchased the Company's common stock at an artificially inflated price during the Class

10  Period.  But for the fraud, Plaintiffs and members of the Class would not have purchased the

11  Company's common stock at artificially inflated prices.  As set forth herein, when the true facts

12  were subsequently disclosed, the price of the Company's common stock declined precipitously

13  and Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result

14  of their purchases of Amazon's common stock at artificially inflated prices and the subsequent

15  decline in the price of that stock when the truth was disclosed to the investing public.

16  769.        By reason of the foregoing, the Individual Defendants are liable to Plaintiffs and

17  the members of the Class as controlling persons of the Company in violation of Section 20(a) of

18  the Exchange Act.

19                          **PRAYER FOR RELIEF**

20        WHEREFORE, Plaintiffs pray for judgment as follows:

21        (a)        Determining that this action is a proper class action maintained under

22  Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as class

23  representatives, and appointing Motley Rice LLC and Pomerantz LLC as class counsel

24  pursuant to Rule 23(g);

25        (b)        Declaring and determining that Defendants violated the Exchange Act by

26  reason of the acts and omissions alleged herein;

27

28

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 251
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

(c)     Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

(d)     Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

(e)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred; and

(f)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED: February 6, 2024                          Respectfully submitted,


**BRESKIN, JOHNSON & TOWNSEND, PLLC**
*/s/ Roger M. Townsend*
Roger M. Townsend (WSBA #25525)
rtownsend@bjtlegal.com
1000 Second Avenue, Suite 3670
Seattle, WA  98104
Telephone:  (206) 652-8660
Facsimile:  (206) 652-290

*Local Counsel for Lead Plaintiffs*

**MOTLEY RICE LLC**                              **POMERANTZ LLP**
*/s/ Gregg S. Levin*                             */s/ Jeremy A. Lieberman*
Gregg S. Levin                                   Jeremy A. Lieberman
glevin@motleyrice.com                            jalieberman@pomlaw.com
William S. Norton                                Emma Gilmore
bnorton@motleyrice.com                           egilmore@pomlaw.com
Joshua C. Littlejohn                             Villi Shteyn
jlittlejohn@motleyrice.com                       vshteyn@pomlaw.com
Christopher F. Moriarty                          600 Third Avenue
cmoriarty@motleyrice.com                         New York, NY  10016
28 Bridgeside Blvd.                              Telephone:  (212) 661-1100

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 252
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Mt. Pleasant, SC  29464
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9450

*Co-Lead Counsel for Lead Plaintiffs
and the Class*

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

James A. Harrod
Jim.Harrod@blbglaw.com
1251 Avenue of the Americas
New York, NY  10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

*Additional Counsel*

**BARRACK, RODOS & BACINE**

Stephen R. Basser
sbasser@barrack.com
Samuel M. Ward
sward@barrack.com
600 West Broadway, Suite 900
San Diego, CA  92101
Telephone:  (619) 230-0800
Facsimile:  (619) 230-1874

Jeffrey A. Barrack
jbarrack@barrack.com
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
Telephone:  (215) 963-0600
Facsimile:  (215) 963-0838

*Counsel for the Detectives Endowment
Association Annuity Fund*

Facsimile:  (212) 661-8665

Orly Guy
oguy@pomlaw.com
Eitan Lavie
eitan@pomlaw.com
Ariel Shannon 4, 34th Floor
Givatayim, Israel 5320047
Telephone: +972 (0) 3 624 0240
Facsimile: +972 (0) 3 624 0111

*Co-Lead Counsel for Lead Plaintiffs
and the Class*

SECOND CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 253
2:22-CV-00617-JHC

BRESKIN | JOHNSON | TOWNSEND ᴾᴸᴸᶜ
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660