THE HONORABLE JOHN H. CHUN

1
2
3
4
5

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**SEATTLE DIVISION**

6
7
8
9
10
11
12
13

| | |
|---|---|
| SONNY JOYCE, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> AMAZON.COM, INC., ANDREW R. JASSY, JEFFREY P. BEZOS, BRIAN T. OLSAVSKY, DAVID A. ZAPOLSKY, NATE SUTTON, DAVE CLARK, JEFF WILKE, and DOUG HERRINGTON, <br><br> Defendants. | Case No.: 2:22-cv-00617-JHC <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> NOTE ON MOTION CALENDAR: JULY 29, 2024 <br><br> ORAL ARGUMENT REQUESTED |

14
15
16
17
18
19
20
21
22

| | |
|---|---|
| ASBESTOS WORKERS PHILADELPHIA WELFARE AND PENSION FUND, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> AMAZON.COM, INC., ANDREW R. JASSY, BRIAN T. OLSAVSKY,  DAVID FILDES, DAVE CLARK, JEFF WILKE, and DOUG HERRINGTON, <br><br> Defendants. | Case No.: 2:22-cv-00934-JHC <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> NOTE ON MOTION CALENDAR: JULY 29, 2024 <br><br> ORAL ARGUMENT REQUESTED |

23
24
25
26
27
28

| | |
|---|---|
| DETECTIVES ENDOWMENT ASSOCIATION ANNUITY FUND, Individually and On Behalf of All Others Similarly Situated, <br><br>                     Plaintiff, <br><br>    v. <br><br> AMAZON.COM, INC., ANDREW R. JASSY, BRIAN T. OLSAVSKY,  DAVID FILDES, DAVE CLARK, JEFF WILKE, and DOUG HERRINGTON, <br><br>                   Defendants. | Case No.: 2:22-cv-00950-JHC <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> <u>NOTE ON MOTION CALENDAR:</u> JULY 29, 2024 <br><br> ORAL ARGUMENT REQUESTED |

**OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT**
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

GLOSSARY ......................................................................................................................... vii

INTRODUCTION ...................................................................................................................1

ARGUMENT ..........................................................................................................................2

I.   The Complaint Alleges a Strong Inference of Defendants' Scienter ...................................2

    A.   Legal Standard for Scienter:  a Holistic Review of Plausible Inferences ...............2

    B.   The Complaint Presents Compelling Allegations of Motive ...................................3

        1.   Amazon's Compensation Structure Incentivized Short-Term
            Results ......................................................................................................4

        2.   Defendants' Class Period Stock Sales Support Scienter...........................8

    C.   The Complaint Alleges that Defendants Knowingly or Recklessly
        Misrepresented Amazon's Treatment of Third-Party Sellers ...............................13

        1.   Bezos Directed Amazon to Use "Defective" Ads.....................................14

        2.   Wilke Disciplined Third-Party Sellers Who Discounted Outside
            Amazon and Directed a Retaliatory Pricing Strategy ..............................15

        3.   Bezos, Wilke, and Herrington Had Direct Knowledge of
            Amazon's Other Efforts to Undermine Third-Party Sellers and
            Competition..............................................................................................16

        4.   Wilke and Clark Had Knowledge of and Participated in
            Amazon's Plan to Close SFP, Forcing Third-Party Sellers to Use
            FBA..........................................................................................................18

        5.   Plaintiffs' Other Allegations Support a Strong Inference of
            Scienter ...................................................................................................18

    D.   The Complaint Adequately Alleges Defendants Knowingly or
        Recklessly Misrepresented Amazon's Fulfillment Expansion ..............................20

        1.   FE-3's Firsthand Account Supports the Inference of Scienter .................20

        2.   Additional Allegations Support a Strong Inference of Scienter ...............22

            a.   Olsavsky's and Jassy's Detailed Statements Reflect Their
                Scienter .......................................................................................22

            b.   The Temporal Proximity of Defendants' Statements with
                 the Revelation of the Truth Further Supports Scienter .................23

II.   The Complaint Plausibly Alleges New Actionable False and Misleading
    Statements ......................................................................................................................24

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

- i -

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

III.     The Claims Against Clark and Wilke Are Timely ................................................ 26

IV.     The Complaint Adequately Pleads Control Person Liability ................................ 26

CONCLUSION ....................................................................................................................... 27

LCR 7(E) WORD-COUNT CERTIFICATION .................................................................... 29

**OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE SECOND**
**CONSOLIDATED CLASS ACTION COMPLAINT**
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

**TABLE OF AUTHORITIES**

2

<u>C</u><small>ASES</small>

3

*3226701 Canada, Inc. v. Qualcomm, Inc.*,
     2017 WL 4759021 (S.D. Cal. Oct. 20, 2017) ................................................................. 21

4

*Amazon.com Services LLC v. Paradigm Clinical Research Institute, Inc.*,
     631 F.Supp.3d 950 (W.D. Wash. 2022)........................................................................... 20

5

*Brendon v. Allegiant Travel Co.*,
     412 F.Supp.3d 1244 (D. Nev. 2019) ............................................................................... 22

6

*Brooks v. Tarsadia Hotels*,
     2019 WL 2436395 (S.D. Cal. June 11, 2019) ................................................................. 26

7

8

*City of Pontiac General Employees' Retirement System v. MBIA, Inc.*,
     637 F.3d 169 (2d Cir. 2011)............................................................................................. 26

9

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
     81 F.4th 918 (9th Cir. 2023) .............................................................................................. 3

10

11

*Evanston Police Pension Fund v. McKesson Corp.*,
     411 F.Supp.3d 580 (N.D. Cal. 2019) ..................................................................... 8, 14, 25

12

*Fouad v. Isilon Systems, Inc.*,
     2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ............................................................ 12

13

*Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*,
     63 F.4th 747 (9th Cir. 2023) ................................................................................... 3, 14, 25

14

15

*Hodges v. Akeena Solar, Inc.*,
     2010 WL 3705345 (N.D. Cal. May 20, 2010) ................................................................. 10

16

*Holmes v. Baker*,
     166 F.Supp.2d 1362 (S.D. Fla. 2001) ............................................................................. 12

17

18

*In re Adaptive Broadband Securities Litigation*,
     2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ..................................................................... 27

19

*In re Alphabet, Inc. Securities Litigation*,
     1 F.4th 687 (9th Cir. 2021) ................................................................................... 3, 17, 22

20

21

*In re American Apparel, Inc. Shareholder Litigation*,
     2013 WL 174119 (C.D. Cal. Jan 16, 2013) .................................................................... 21

22

*In re Amgen Securities Litigation*,
     2014 WL 12585809 (C.D. Cal. Aug. 4, 2014).................................................................. 3

23

*In re Apple Inc. Securities Litigation*,
     2020 WL 2857397 (N.D. Cal. June 2, 2020) .................................................................. 13

24

25

*In re Apple Inc. Securities Litigation*,
     2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) .................................................................. 27

26

*In re ArthroCare Corp. Securities Litigation*,
     726 F.Supp.2d 696 (W.D. Tex. 2010).............................................................................. 13

27

28

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

- iii -

BRESKIN | JOHNSON | TOWNSEND <small>PLLC</small>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

*In re BP Prudhoe Bay Royalty Trust Securities Litigation*,
   2007 WL 3171435 (W.D. Wash. Oct. 26, 2007) ................................................. 3

*In re Charles Schwab Corp. Securities Litigation*,
   257 F.R.D. 534 (N.D. Cal. 2009) ..................................................................... 26

*In re Citigroup Inc. Securities Litigation*,
   753 F.Supp.2d 206 (S.D.N.Y. 2010) ................................................................. 16

*In re Countrywide Financial Corp. Derivative Litigation*,
   554 F.Supp.2d 1044 (C.D. Cal. 2008) ............................................................. 21

*In re Daou Systems, Inc.*,
   411 F.3d 1006 (9th Cir. 2005) .......................................................... 8, 11, 14

*In re Fibrogen, Inc., Securities Litigation*,
   2022 WL 2793032 (N.D. Cal. July 15, 2022) ..................................................... 8

*In re Galena Biopharma, Inc. Securities Litigation*,
   117 F.Supp.3d 1145 (D. Or. 2015) ................................................................. 20

*In re Intuitive Surgical Securities Litigation*,
   65 F.Supp.3d 821 (N.D. Cal. 2014) ............................................................ 8, 12

*In re MicroStrategy, Inc. Securities Litigation*,
   115 F.Supp.2d 620 (E.D. Va. 2000) ................................................................. 17

*In re Plantronics, Inc. Securities Litigation*,
   2022 WL 17974627 (N.D. Cal. Nov. 7, 2022) ..................................................... 3

*In re Qualcomm Inc. Securities Litigation*,
   2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) ................................................... 23

*In re Quality Systems, Inc. Securities Litigation*,
   865 F.3d 1130 (9th Cir. 2017) ......................................................................... 8

*In re QuantumScape Securities Class Action Litigation*,
   580 F.Supp.3d 714 (N.D. Cal. 2022) ............................................................... 23

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
   2010 WL 8816155 (N.D. Cal. Aug. 10, 2010) ................................................... 8

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
   697 F.3d 869 (9th Cir. 2012) ........................................................................... 8

*In re Romeo Power Inc. Securities Litigation*,
   2022 WL 1806303 (S.D.N.Y. June 2, 2022) ..................................................... 11

*In re SeeBeyond Technologies Corp. Securities Litigation*,
   266 F.Supp.2d 1150 (C.D. Cal. 2003) ............................................................. 12

*In re Terayon Communications System, Inc. Securities Litigation*,
   2002 WL 989480 (N.D. Cal. Mar. 29, 2002) ................................................... 10

*In re Toyota Motor Corp. Securities Litigation*,
   2011 WL 2675395 (C.D. Cal. July 7, 2011) ............................................... 16, 19

*In re VeriFone Holdings, Inc. Securities Litigation*,
   704 F.3d 694 (9th Cir. 2012) ........................................................................... 3

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

- iv -

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

*Jackson v. Microchip Technology Inc.*,
    2020 WL 1170843 (D. Ariz. Mar. 11, 2020) ............................................ 22

*Jaeger v. Zillow Group, Inc.*,
    644 F.Supp.3d 857 (W.D. Wash. 2022) ........................................................ 3

*Kang v. PayPal Holdings, Inc.*,
    620 F.Supp.3d 884 (N.D. Cal. 2022) ......................................................... 12

*Lamartina v. VMware, Inc.*,
    2023 WL 2763541 (N.D. Cal. Mar. 31, 2023) ........................................... 11

*Maverick Fund, L.D.C. v. First Solar, Inc.*,
    2018 WL 6181241 (D. Ariz. Nov. 27, 2018) ......................................... 20, 21

*Mild v. PPG Industries, Inc.*,
    2018 WL 6787351 (C.D. Cal. Dec. 21, 2018) ............................................ 19

*Mulderrig v. Amyris, Inc.*,
    492 F.Supp.3d 999 (N.D. Cal. 2020) .................................................... 10, 11

*N.T.A.A., Inc. v. Nordstrom, Inc.*,
    2023 WL 9419145 (C.D. Cal. Nov. 3, 2023) .............................................. 20

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West
    Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ....................................................................... 5

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ................................................................... 12

*Prodanova v. H.C. Wainwright & Co.*,
    993 F.3d 1097 (9th Cir. 2021) ..................................................................... 3

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ............................................................... 19, 23

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
    2024 WL 1898512 (S.D.N.Y. May 1, 2024) ............................................. 5, 6

*Schueneman v. Arena Pharmaceuticals, Inc.*,
    840 F.3d 709 (9th Cir. 2016) ..................................................................... 14

*Schultz v. TomoTherapy Inc.*,
    676 F.Supp.2d 780 (W.D. Wis. 2009) ........................................................ 21

*Sgalambo v. McKenzie*,
    739 F.Supp.2d 453 (S.D.N.Y. 2010) .......................................................... 17

*Shenwick v. Twitter, Inc.*,
    282 F.Supp.2d 1115 (N.D. Cal. 2017) .................................................... 3, 19

*Sinnathurai v. Novavax, Inc.*,
    645 F.Supp.3d 495 (D. Md. 2022) .......................................................... 9, 21

*South Ferry LP #2 v. Killinger*,
    687 F.Supp.2d 1248 (W.D. Wash. 2009) ................................................... 23

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

- v -

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..................................................................................................... 2, 3

*Warman v. Overland Data Inc.*,
    1998 WL 110018 (S.D. Cal. Feb. 20, 1998) ..................................................................... 25

*Zamir v. Bridgepoint Education, Inc.*,
    2016 WL 3971400 (S.D. Cal. July 25, 2016) ................................................................... 11

*Zelman v. JDS Uniphase Corp.*,
    376 F.Supp.2d 956 (N.D. Cal. 2005) .............................................................................. 15

*Zola v. TD Ameritrade, Inc.*,
    172 F.Supp.3d 1055 (D. Neb. 2016) ............................................................................... 15

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ......................................................................................... 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**GLOSSARY**

| TERM OR ABBREVIATION | MEANING |
|---|---|
| ¶__ | Paragraphs of the Complaint |
| AG | Attorney General |
| CEO | Chief Executive Officer |
| Complaint | Second Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 95) |
| FBA | Fulfilled by Amazon |
| FE | Former Employee |
| FTC | Federal Trade Commission |
| Individual Defendants | Defendants Bezos, Jassy, Olsavsky, Zapolsky, Sutton, Fildes, Wilke, Clark, and Herrington |
| Motion, MTD and MTD __ | Defendants' Motion to Dismiss the Second Consolidated Class Action Complaint (ECF No. 104), and pages of the MTD |
| Order and Order __ | Order re: Defendants' Motion to Dismiss (ECF No. 92), and pages of the Order |
| Plaintiffs | Lead Plaintiffs Universal-Investment-Gesellschaft mbH, Universal-Investment-Luxembourg S.A., Menora Mivtachim Insurance Ltd. and Menora Mivtachim Pensions and Gemel Ltd., The Phoenix Insurance Company, Ltd., and Plaintiffs Asbestos Workers Philadelphia Welfare and Pension Fund, and Detectives Endowment Association Annuity Fund |
| SFP | Seller Fulfilled Prime |
| Signal | Encrypted messaging application with a "disappearing messages" feature |
| SVP | Senior Vice President |
| UPS | United Parcel Service, Inc. |
| *WSJ* | *The Wall Street Journal* |

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

- vii -

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Plaintiffs submit this Opposition to Defendants' Motion to Dismiss the Complaint.[1]

## INTRODUCTION

In the Order, the Court concluded that Plaintiffs' prior complaint adequately pleaded "material misrepresentation[s] or omission[s] ... loss causation [and] control person liability," and that Plaintiffs' claims were timely.  Order 39-40.  Scienter was the only element of Plaintiffs' Section 10(b) claim the Court found insufficiently pled.  The Court granted Plaintiffs leave to file an amended complaint.  *Id.* at 40.

The Complaint pleads additional facts leading to a compelling inference of scienter.  For example, Plaintiffs have marshaled additional, particularized facts from the FTC's four-year investigation (joined by numerous state AGs) and another investigation by the California AG describing how Amazon implemented strategies that (a) precluded other sellers from lowering their prices and (b) degraded quality for consumers.  The new, detailed allegations from these investigations create an inference of scienter by showing that the Individual Defendants orchestrated—and had personal knowledge of—these practices.  The Complaint also details how Bezos directed the other Individual Defendants to conceal their conduct from regulators and investors by using Signal, an encrypted-messaging application that sends "disappearing messages."  Amazon has admitted that "it is possible that some responsive communications" were destroyed, suggesting intentional spoliation of evidence.  If Defendants knew their conduct was proper and consistent with their disclosures to investors, they would have no reason to delete their communications.

Additionally, the Complaint is now bolstered by new particularized allegations demonstrating that the Individual Defendants were financially motivated to deceive investors about Amazon's mistreatment of third-party sellers and overcapacity issues.  Indeed, the Individual Defendants profited handsomely from Amazon's artificially inflated stock price through a program that *directly* tied their compensation—the overwhelming majority of which was performance-

---

[1]    Unless otherwise indicated, defined terms retain the definitions assigned in the Complaint.  All emphases are added and all internal citations are omitted, unless otherwise indicated.

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

based stock grants (not salary)—to the Company's stock price, as well as to Amazon's "growth" and "expansion."

During the Class Period, the Individual Defendants collectively received over $290 million in incentive compensation that (i) was tied to their ability to retain their positions for as long as possible; (ii) required public/investor perception that they were successful in running Amazon's business; and (iii) rewarded executives if Amazon's stock price was higher at year-end compared to where the stock was trading at the beginning of the year.  The Company's executive compensation plan provided for very low cash compensation, but extremely lucrative benefits that rewarded Amazon executives with hundreds of millions of dollars and incentivized them to publicly project success.  Furthermore, Defendants offloaded millions of Amazon shares through a series of well-timed sales.

The Complaint also adds allegations from FE-3, who describes Bezos's and Olsavsky's involvement in and detailed knowledge of decisions concerning fulfillment centers.  This information demonstrates that managers and senior executives knew long before April 2022 that Amazon's aggressive expansion plans would need to be curtailed.

In addition to bolstering the allegations of Defendants' scienter, the Complaint also alleges additional false and misleading statements concerning Amazon's treatment of third-party sellers that, like Defendants' other representations previously upheld by the Court, are actionable.  Moreover, Plaintiffs' new claims against Defendants Clark and Wilke are timely and their control person claim is adequately pled.

The Court should deny Defendants' Motion.

## ARGUMENT

## I.   The Complaint Alleges a Strong Inference of Defendants' Scienter

### A.   Legal Standard for Scienter:  a Holistic Review of Plausible Inferences

A plaintiff sufficiently pleads a defendant's scienter if "assess[ing] all the allegations holistically," the plaintiff has created an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324, 326 (2007).  "The inference ... need not be irrefutable, *i.e.*, of the

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324.  Rather, a "tie goes to the Plaintiff."  *In re Amgen Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014).  The law does "***not*** require a plaintiff to plead evidence."  *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 17974627, at *5 (N.D. Cal. Nov. 7, 2022).[2]

Critically, the Court must consider the Complaint's allegations *collectively*, "[e]ven if no single allegation, standing alone, is 'sufficient to give rise to a strong inference of scienter,' a holistic review of all the allegations may 'combine to give rise to a strong inference of scienter.'" *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 940 (9th Cir. 2023).  The Ninth Circuit has emphasized that ***all of Plaintiffs' allegations*** need to be considered in this manner.  *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) ("The relevant inquiry is 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.") (emphasis in original).  When Plaintiffs' extensive scienter-related averments are considered as a whole, Plaintiffs easily meet the standard.

## B.    The Complaint Presents Compelling Allegations of Motive

Although "motive is not required to plead securities fraud,"[3] the Complaint nevertheless contains detailed allegations addressing how the Individual Defendants were personally motivated

---

[2]    "Although the Court may 'compare competing explanations and inferences,' those inferences still must 'arise ***from the facts alleged in the complaint***.'"  *Shenwick v. Twitter, Inc.*, 282 F.Supp.2d 1115, 1124 (N.D. Cal. 2017) (footnote call number omitted).  Here, all Defendants have offered is their own self-serving (and unsupported) version of the relevant events that improperly contradicts well-pleaded factual allegations.  *See, e.g.*, MTD 14, 23.

[3]    *In re BP Prudhoe Bay Royalty Tr. Sec. Litig.*, 2007 WL 3171435, at *3 (W.D. Wash. Oct. 26, 2007) ("Defendants ... argu[e] that if Plaintiffs do not adequately explain why Defendants did what they did, intent to defraud cannot be proven.  Defendants are incorrect."); *see also Jaeger v. Zillow Grp., Inc.*, 644 F.Supp.3d 857, 873-75 (W.D. Wash. 2022) (finding scienter based on confidential witness allegations and core operations doctrine without any motive discussion).  While the Ninth Circuit has stated that failure to plead motive "makes it much less likely that a plaintiff can show a strong inference of scienter," *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1108 (9th Cir. 2021) (*see* MTD 7), the court confirmed that a complaint could "otherwise assert[] compelling and particularized facts showing fraudulent intent or deliberate recklessness," *id.*  Since *Prodanova*, the Ninth Circuit has found plaintiffs sufficiently alleged scienter without motive allegations on at least three occasions.  *See NVIDIA*, 81 F.4th at 940 (finding scienter, absent any discussion of motive, on basis allegations supported "a strong inference that [the executive] reviewed sales data"); *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 772-74 (9th Cir. 2023) (without discussing defendants' potential financial motivations, finding scienter based on allegations defendants participated in "company-wide pressure campaign" underlying fraud and had "access to information" showing falsity of their statements); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 707 (9th Cir. 2021) ("Allegations of suspicious stock sales ... are not needed where, as here, other allegations in the complaint raise a strong inference of scienter.").

**OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT**
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

by incentive compensation and insider stock sales to misrepresent Amazon's treatment of third-party sellers and overcapacity issues. Amazon's compensation structure, heavily weighted toward perceived job performance, resulted in the Individual Defendants receiving incentive compensation valued at over **$290 million** and motivated them to inflate Amazon's results and conceal their associated fraudulent activity. Additionally, Defendants sold stock totaling over **$23.3 billion** in proceeds, at rates substantially higher than in prior years and at suspicious times, reflecting their motive to inflate Amazon's share price over the short term. ¶¶622-57.

When considered together, the incentive compensation and insider trading allegations reflect a clear motive. In response, Defendants rely on legally insufficient and highly technical arguments that defy common sense and fail to rebut the compelling inference of scienter.

### 1. Amazon's Compensation Structure Incentivized Short-Term Results

Amazon boasts that "[b]ase salaries for named executive officers are designed to provide *a minimum level of cash compensation and to be significantly less than those paid to senior leadership at similarly situated companies*." ¶623. Instead, the "primary component" of each executive officer's compensation was in the form of "stock-based compensation." ¶624. The Individual Defendants had base salaries of no more than $175,000, ¶623, but Amazon's compensation structure provided annual incentive awards to each executive in Company stock valued from $9 million—more than *50 times* their maximum base salary—to $50 million—more than *285 times* their maximum annual salary, ¶634. Critically, these awards vested over time so, while Defendants were "granted" this compensation in prior years, they could only obtain the value if they retained their positions through one or more quarterly vesting periods—any unvested compensation was forfeited upon their separation from Amazon. ¶626. Specifically, under

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

- 4 -

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Amazon's periodic grants, which vested over periods of five years or more, ¶625, eligible Defendants received incentive compensation valued at over $290 million:

| DEFENDANT | AMAZON SHARES VESTED IN 2019 (VALUE) | AMAZON SHARES VESTED IN 2020 (VALUE) | AMAZON SHARES VESTED IN 2021 (VALUE) | AMAZON SHARES VESTED IN 2022 (VALUE) |
|---|---|---|---|---|
| Jassy | 28,326 ($50m) | 16,446 ($41m) | 13,001 ($43m) | 248,080 ($31m) |
| Olsavsky | 7,323 ($13m) | 5,895 ($16m) | 4,557 ($15m) | 71,380 ($9m) |
| Zapolsky | N/A | 5,895 ($16m) | 4,557 ($15m) | 71,380 ($9m) |
| Clark | N/A | 7,918 ($21m) | 6,696 ($22m) | N/A |

¶634. Moreover, because of the long vesting periods, these executives routinely possessed tens (and even hundreds) of millions of dollars in unvested equity. *Id.* This structure created massive short-term financial incentives for them to inflate the results within their portfolio and conceal any adverse results or issues, because retaining their positions for just a few quarters would lead to tens of millions in compensation.

Courts infer motive when, as here, a plaintiff alleges that defendants were driven "to inflate [the corporation]'s financial results and stock prices because their eligibility for stock options and executive bonuses **were based principally on the company's financial performance**." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003); *see also San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *7 (S.D.N.Y. May 1, 2024) ("[I]f a plaintiff shows a 'direct link between the compensation package and the fraudulent statements because of **the magnitude of the compensation and the defendants' motive to sweep problems under the rug,'** then bonuses can be probative").

As in these cases, Amazon's incentive compensation structure incentivized Defendants to issue the false and misleading statements alleged in the Complaint. **First**, given the grants' long vesting periods and Amazon's all-or-nothing approach to vesting, these executives stood to gain tremendous amounts for every few months they could hold onto their jobs. In addition to considering what individual defendants stood to gain by continuing a fraud, courts examining scienter also review what they stood to lose if that fraud were revealed. *See San Antonio Fire,*

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

2024 WL 1898512, at *7 (finding motive allegations supported scienter when corporation's board "reduced cash and stock bonuses" as "issues began to emerge"). As the Complaint details, Defendants' stock options were forfeited upon their termination and Amazon did not provide cash severance, so if the Defendants were terminated during the Class Period they would have lost the entire value of their unvested equity. ¶626. By contrast, for every quarter that Defendants held onto their positions, they received millions, or even tens of millions, in vested stock. ¶627. The value of this stock far outweighed their base salaries. Defendants Olsavsky, Zapolsky, Clark, and Jassy received incentive compensation averaging between *21 and 61 times their base salary during every quarter* in 2021 alone. ¶634. Given these tremendous returns, Defendants were highly "motivated" to maximize their tenure and present strong performance for "a time, and then face the fallout" with tens of millions in compensation in hand. Order 26.

Defendant Clark's abrupt resignation and subsequent loss of compensation vividly demonstrate this point. On April 28, 2022, Amazon posted its first quarterly loss since 2015, and in doing so admitted what it had concealed throughout the Class Period: that its fulfillment expansion had outpaced demand, leading to costly overstaffing and overcapacity. ¶¶329-30. Indeed, Defendant Olsavsky admitted that these twin issues had led to billions in additional costs for the Company. ¶330. Once the previously hidden issues were disclosed, repercussions swiftly followed. Within weeks, on June 3, 2022, Clark announced his resignation from Amazon, with media reports linking his resignation to the newly disclosed overcapacity issues, and indicating that Clark forfeited nearly $80 million of incentive compensation. ¶¶667-69. Based on the value of the other Defendants' vested stock during 2022, ¶634, Clark would have received at least *$10 million* in additional vested stock had he simply been able to survive through the end of 2022. Given the consequences of bad news, Amazon executives were incentivized to portray the Company's performance each quarter in the best light possible, even at the cost of hiding its anticompetitive third-party practices and looming expansion issues, while collecting as much compensation as they could before these problems (and their fraud) were revealed.

*Second*, Amazon's proxy filings make clear that an executive's perceived performance was a key component in determining stock grants. The 2021 and 2022 Definitive Proxies state that

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

grants were based in part on "past contributions to performance" and "expected contributions to ... future success."  ¶¶628-29.  Moreover, the proxies' explanation of the grants to Olsavsky, Zapolsky, and Jassy specifically referenced their contributions to Amazon's growth, and the grants to Clark specifically referenced his role supervising the operation of Amazon's fulfillment centers. And as discussed above, once the illusory nature of that growth was revealed, Clark did not last long at the Company.  ¶¶630, 632-33.  Therefore, Defendants stood to increase their compensation by making Amazon seem as successful as possible, including by "hid[ing] the fact that capacity had outpaced demand from investors," Order 26, and by concealing how the Company boosted its revenue through anticompetitive practices.

**Third,** the Complaint explains that when setting executive compensation, Amazon's compensation committee assumed "a fixed annual increase in the stock price so that our executives' compensation will be negatively impacted if our stock price is flat or declines [at year-end], and is favorably impacted if the stock performs beyond the initial stock price assumption." ¶637.  Therefore, "if Amazon's stock price between January and the end of the year remains the same or decreases, ***Defendants will be compensated less***.  If the Company's stock price increases between January and the end of the year, their compensation would be 'favorably' impacted." ¶638.  Simply stated, Defendants' incentive compensation was explicitly tied to short-term increases in the Company's stock price between January and December, further demonstrating that Defendants ***were motivated*** to "inflate the price of their stock for a time."  Order 26.

Defendants are now limited to the scope of their meager response to Plaintiffs' compensation-based allegations in which they do not contest the truth of ***any*** of these facts. Instead, they rely on the proposition that merely pleading compensation was "based partly on the executive's success in achieving key corporate goals" is insufficient to plead motive.  MTD 10, 15 n.9. But this ignores the unique design of Amazon's compensation scheme which, combined with extremely low cash salaries, no cash bonuses, and massive stock-based ***incentive*** awards that vested quarterly but were forfeited upon separation, created a "perfect storm" of short-term motive to inflate performance and conceal problems.  When, as here, "executives' compensation from stock and cash awards ***far outstripped their base salaries***," courts have found allegations of

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

performance-based compensation sufficient to show motive. *Evanston Police Pension Fund v. McKesson Corp.*, 411 F.Supp.3d 580, 603 (N.D. Cal. 2019); *see also In re Fibrogen, Inc., Sec. Litig.*, 2022 WL 2793032, at *28 (N.D. Cal. July 15, 2022) (allegations supported motive when defendants' "options and stock awards ***far outweigh[ed] their salary***").

Defendants' sole citation, to *In re Rigel Pharmaceuticals, Inc. Securities Litigation*, 697 F.3d 869 (9th Cir. 2012), is inapposite because the Ninth Circuit did not find that the defendants' incentive compensation outstripped their base salaries, as in *McKesson*, *Fibrogen*, and here. Instead, the *Rigel* court found only that their compensation was "based partly" on performance. 697 F.3d at 884. The district court opinion in that case confirmed as much since, according to the complaint, the "five Individual Defendants only received less than $2.3 million in increased compensation and bonuses in 2008, which is ***significantly less than what they lost by retaining their shares***." *In re Rigel Pharms., Inc. Sec. Litig.*, 2010 WL 8816155, at *13 (N.D. Cal. Aug. 10, 2010). Here, given Defendants' minimal base compensation, they stood to gain substantially more from holding onto their positions and gaining incentive compensation than they could lose from a stock drop.

### 2. Defendants' Class Period Stock Sales Support Scienter

The Individual Defendants also profited massively from "often well-timed" stock sales. ¶639. These sales are clearly indicative of motive. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1130, 1146 (9th Cir. 2017) ("'Unusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter."). To determine whether stock sales are suspicious, courts consider "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Id.* The test is in the disjunctive: "[u]nusual trading ***or*** trading at suspicious times ***or*** in suspicious amounts by corporate insiders has long been recognized as probative of scienter." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005).

Plaintiffs allege that multiple Defendants received significant proceeds from Class Period stock sales far greater than their sales during an equivalent period immediately prior (the "Control Period"). *See, e.g.*, *In re Intuitive Surgical Sec. Litig.*, 65 F.Supp.3d 821, 839 n.4 (N.D. Cal. 2014) (inferring scienter when plaintiffs "analyzed the trading by the individual Defendants during the

**OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT**
2:22-cv-00617-JHC

**BRESKIN** | **JOHNSON** | **TOWNSEND** PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Class Period and during the equal-length period immediately preceding the Class Period"). **Bezos received over $23 billion** from sales of Amazon stock during the Class Period, selling 8,500,000 million shares.  ¶640.  During the three years before the Class Period, Bezos sold less than half as many shares for around 1/6th of the proceeds.  *Id.*  Meanwhile, Jassy, Wilke, Zapolsky, Olsavsky, and Clark collectively sold over $360 million in stock during the Class Period.  ¶¶641-45.  In most cases, these sales were substantially more than these Defendants received from stock sales during the Control Period:

| Defendant | Sales (Class Period) | Sales (Control Period) |
| --- | --- | --- |
| Jassy | $145 million | $39.3 million |
| Wilke | $111.2 million | $78.5 million |
| Zapolsky | $42.3 million | $29.1 million |
| Olsavsky | $43.9 million | $30 million |
| Clark | $17.8 million | None Reported |

*Id.*  Jassy's Class Period sales were more than two-and-a-half times his sales during the Control Period, while Wilke's, Zapolsky's, and Clark's proceeds were between more than 33% and more than 46% higher than during the Control Period.  These substantial increases support a finding of scienter.  *See Sinnathurai v. Novavax, Inc.*, 645 F.Supp.3d 495, 511, 529 (D. Md. 2022) (stock sales supported scienter when individual defendants "collectively increased their total stock sales by over 33 percent" during the Class Period compared to the control period).

Defendants' sales were also suspiciously timed.  For example, Bezos sold 1 million shares just **four days** after the October 28, 2021 Q3 Earnings Call, when Olsavsky falsely stated that Amazon expected to exceed the prior year's fulfillment capacity expansion, and just five months before Amazon's share price began to collapse after the truth of Amazon's fulfillment operations was revealed on April 28, 2022.  ¶646.  Jassy sold 1,340 shares of stock in November 2021, beginning just 18 days after Olsavsky made false statements regarding the expandatory outlook for Amazon's fulfillment network, and only five months before Amazon's share price fell as a

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

- 9 -

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

result of the revelatory earnings call on April 28, 2022.  ¶647; MTD 9 n.4.[4]  Finally, Jassy, Olsavsky, Clark, and Zapolsky sold shares of stock worth a combined $12 million on February 15, 2022, just two months prior to the end of the Class Period (when Jassy admitted, *inter alia*, that Amazon was "no longer chasing physical or staffing capacity").  ¶¶329, 648.  These suspiciously timed sales support scienter.  *See Hodges v. Akeena Solar, Inc.*, 2010 WL 3705345, at *6 (N.D. Cal. May 20, 2010) ("[T]he allegations that [defendant] sold his stock at or near the two critical announcements would demonstrate 'unusual stock sales.'").  Notably, when the timing of the insider sales is suspicious, as it is here, prior trading history is *not* dispositive.  *See In re Terayon Commc'ns Sys., Inc. Sec. Litig.*, 2002 WL 989480, at *12 (N.D. Cal. Mar. 29, 2002).

    Defendants do not dispute the timing of the sales, or that the executives in question reaped substantially more in proceeds during the Class Period than during the Control Period.  Instead, they resort to a number of unavailing arguments.  ***First***, Defendants attempt to artificially reduce the analysis of Defendants' stock sales by bifurcating the Class Period into two categories of statements—(i) capacity and (ii) third-party seller related—and analyzing stock sales in different periods of time for each category.  But Defendants offer no case law support for this bifurcated approach and courts in similar cases have routinely examined stock sales over the ***entire*** Class Period.  *See Mulderrig v. Amyris, Inc.*, 492 F.Supp.3d 999, 1013, 1029-30 (N.D. Cal. 2020) (identifying three categories of false or misleading statements, but analyzing stock sales by an individual defendant across entire Class Period).  In the case of Jassy and Olsavsky, Defendants' suggested approach leads to the absurd argument that sales made during the so-called "Capacity Control Period" of October 29, 2020 through July 29, 2021, ***when an alleged fraud considering the third-party seller statements already was underway***, should count ***against*** a finding of motive. MTD 8.  This proposed bifurcation is nonsensical, as the key question in a motive analysis should be whether Defendants' proceeds from Class Period stock sales as a whole were substantially more

---

[4]    In a typographical error, the Complaint erroneously quotes the shares sold as 18,000.  Defendants do not contest that Jassy sold stock during this time period or that the overall number of shares he sold (as referenced elsewhere in the Complaint) is correct.

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

- 10 -

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

than those from sales during the Control Period, and Defendants do not contest the fact that they were.[5]

*Second*, Defendants claim that Plaintiffs failed to provide a "meaningful trading history" for Jassy and Olsavsky.  MTD 7.  Not so.  Plaintiffs detailed stock sales made during the Class Period and their timing, and compared the proceeds from those sales during the Control Period, which is sufficient to provide a meaningful trading history.  ¶¶639-49.  *See also Mulderrig*, 492 F.Supp.3d at 1029 (stock sales supported pleading of scienter when plaintiffs alleged defendant's sales during class period as compared to control period).  The case Defendants rely on for their argument is inapposite.  Unlike here, where Plaintiffs compared sales of stock during the Class Period to those during an equivalent and immediately preceding Control Period, the plaintiffs in *Zucco Partners, LLC v. Digimarc Corp.* "**fail[ed] to provide any information**" as to pre-class period trading.  552 F.3d 981, 1005 (9th Cir. 2009).

*Third*, Defendants assert that certain executives "acquired" more shares during the Class Period than they sold.  MTD 8, 15.  But this fails to account for the fact that Amazon, as discussed above, compensated its employees through stock grants.  Thus, those executives did not affirmatively purchase or otherwise acquire shares in Amazon during the Class Period; rather, their holdings grew from their compensation.  Indeed, the court in *Lamartina v. VMware, Inc.* found that individual defendants' increased class period holdings of 31% and 19% resulting from compensation awards (and not volitional purchases) did not negate scienter.  2023 WL 2763541, at *15 (N.D. Cal. Mar. 31, 2023); *see also In re Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303, at *5 (S.D.N.Y. June 2, 2022) (rejecting argument that "inference of scienter is undermined" because defendants "increased their positions in Romeo stock during the class period" when they "received [their] shares as part of a compensation or incentive package").[6]

---

[5]   The Court should also reject Defendants' efforts to limit the Court's consideration of motive for the capacity statements to Defendants Jassy and Olsavsky.  Courts have held that stock sales by non-defendant insiders—much less defendants who did not make the given statements being analyzed—may be considered when evaluating scienter. *See, e.g.*, *Daou*, 411 F.3d at 1024 (sales by non-defendant executives support scienter).

[6]   One case cited by Defendants, *Zamir v. Bridgepoint Education, Inc.*, 2016 WL 3971400 (S.D. Cal. July 25, 2016), did not discuss whether the acquisitions were open market purchases, newly granted compensation, or options, *see id.*

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Even if some Defendants' stock holdings increased during the Class Period, other courts have held that the increased stock holdings of any individual defendant are of no moment when the allegations otherwise support scienter. *See, e.g.*, *Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397, at *11 (W.D. Wash. Dec. 29, 2008) (finding fact defendant did not sell "any stock during the Class Period but instead continued to purchase [company] stock . . . was not sufficient to overcome the strong inference of scienter created by the allegations above"). Indeed, class period stock purchases by insiders can contribute to a finding of scienter because the purchases may have been made in an effort to "negate any possible inference of fraud." *Holmes v. Baker*, 166 F.Supp.2d 1362, 1378 (S.D. Fla. 2001).

*Fourth*, Defendants contend that the proportion of sales by Jassy, Olsavsky, Bezos, and Wilke was not large compared to their holdings. MTD 17, 19. But the Ninth Circuit has found that a defendant's stock sale of "only 2.1% of his holdings ... support[s] a strong inference of scienter" when those sales were otherwise suspicious and other indicia of scienter existed. *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004); *see also In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F.Supp.2d 1150, 1168-69 (C.D. Cal. 2003) (sale of "only 7.6%" supported scienter).

*Fifth*, Defendants seek to undermine Plaintiffs' motive allegations by citing cases claiming it is not suspicious for stock sales to occur around the time of earnings calls, when shares vested and, in the case of Wilke, around the time of retirement. MTD 9-10, 18, 19. But even when defendants propose "innocuous inferences" from stock sales, such as "chalking up the timing of the trades as correlating with quarterly earnings calls," courts have found that allegations of stock sales made at times when defendants had access to information the public did not and then made trades inconsistent with their prior trading history "remain cogent and give rise to a strong inference of scienter." *Intuitive*, 65 F.Supp.3d at 839. Moreover, as discussed in Section I.B.1 above, stock options vested quarterly, and Plaintiffs do not allege any Defendants made quarterly

at *10, so it does not apply here. In *Kang v. PayPal Holdings, Inc.*, 620 F.Supp.3d 884, 901 (N.D. Cal. 2022), defendants increased their holdings due to vested options, but the court did not discuss whether those options were part of defendants' compensation, much less a significant part compared to base salaries, as is the case here.

**OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC**

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

sales during the Class Period.  The Court therefore cannot conclude, based on the Complaint, that sales at the time of vesting was a regular practice.

**Finally**, Defendants rely on the argument that certain trades were made pursuant to Section 10b5-1 trading plans.  MTD 8-9, 15.  But such plans can be strategically timed and subject to abuse.  ¶¶651-57.  For that reason, courts routinely ***reject*** consideration of Rule 10b5-1(c) in determining the sufficiency of a complaint's scienter allegations.  *See, e.g.*, *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *22 n.13 (N.D. Cal. June 2, 2020) ("[T]he use of the 10b5-1 plan is an affirmative defense that does not rebut well-pled allegations of scienter at the pleading stage.").

Here, Defendants have not specified ***when*** the trading plans were initiated or whether they retained any discretion over trading decisions under the plans.  Courts have found that trading plans entered into during a class period, or that provided the executive with discretion over investment decisions, cannot be used to negate an inference of scienter.  *See, e.g.*, *In re ArthroCare Corp. Sec. Litig.*, 726 F.Supp.2d 696, 722 (W.D. Tex. 2010) ("[W]hether or not the stocks in this case were sold pursuant to a 10b5-1 trading plan is irrelevant at this stage in the proceedings, as the existence of such a plan is an affirmative defense, ***which requires evidence of the plan itself and of details such as the date the plan was entered into and whether it wholly removed trades from the defendant's discretion***.").

Such case law accords with reports that question whether trading plans are exculpatory, with one *WSJ* report finding that "executives trading under 10b5-1 Plans can strategically time their trades to avoid financial losses and yield greater returns because the plans are not public and therefore can be canceled, amended, or modified at any time unbeknownst to the public."  ¶¶652-56.  Given the absence of details about the trading plans (or when they were entered into), the Court cannot credit Defendants' unsupported representations at this stage of the case.

### C.  The Complaint Alleges that Defendants Knowingly or Recklessly Misrepresented Amazon's Treatment of Third-Party Sellers

The Court previously found that, while Plaintiffs pled "widespread violations of Amazon's internal policy," scienter was not adequately pled because the prior complaint contained "no direct allegations as to the state of mind of the Individual Defendants."  Order 26-27.  The Court then

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

concluded Plaintiffs' other allegations failed to support a strong inference of scienter.  *Id*. at 28-30.

The Complaint addresses those deficiencies by providing particularized allegations establishing that Bezos, Wilke, Herrington, and Clark **designed, directed, or knew about** practices intended to benefit Amazon at the expense of third-party sellers and customers.  These practices were concealed by or misrepresented in their public statements to investors.  Plaintiffs' new averments raise a strong inference of scienter.  *See Glazer Cap.*, 63 F.4th at 772-73 (strong inference of scienter when defendant participated in campaign and therefore knew of suspect practices); *Daou*, 411 F.3d at 1023 (scienter when defendants "personally directed" practices).[7]

Significantly, this Court has already rejected one of Defendants' primary contentions: that Plaintiffs must plead that the Individual Defendants knew the suspect practices were "unlawful" under the antitrust laws.  *See* MTD 20-21.  The Court found the argument "flawed," explaining that "this is not an antitrust case .... Whether the Subcommittee found Defendants to have violated existing antitrust laws ... is a red herring."  Order 15.  Defendants face liability here because they inaccurately represented Amazon's business practices to investors.  *See Schueneman v. Arena Pharmaceuticals, Inc.*, 840 F.3d 698, 709 (9th Cir. 2016) ("It is the failure to disclose 'issues' and 'concerns' ... that matters.").  As this Court found, the appropriate "focus" is on "whether Plaintiffs have pleaded—with particularity—**that Defendants were deceptive with shareholders when discussing treatment of third-party sellers**."  Order 15.  The Complaint readily satisfies this standard.[8]

## 1.    Bezos Directed Amazon to Use "Defective" Ads

During the Class Period, Amazon made it more costly for third-party sellers to reach customers and drove up the price for consumers by flooding search results with what it referred to

---

[7]    These new averments derive from **Amazon's own documents**, unearthed recently as part of the FTC and the state AGs' years-long investigations regarding the Company's anticompetitive practices.

[8]    Defendants' contention that "a mere investigation into or lawsuit concerning Amazon's business practices does not establish that an *antitrust violation occurred*," MTD 20, misses the mark.  The governmental actions plainly establish facts relevant to falsity and scienter, on which Plaintiffs and the Court may rely at the 12(b)(6) stage.  *See*, *e.g.*, *McKesson Corp.*, 411 F.Supp.3d at 593 (crediting allegations in complaint filed by attorneys general).

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

- 14 -

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

as "defect" ads (i.e., ads designed to obscure third-party results).  ¶¶209-15.  This practice was **implemented at Defendant Bezos's request** and had the effect of "poison[ing] search results." ¶211.  At a key 2016 meeting, Bezos directed Company executives to "'[a]ccept more defects' as a way to increase the total number of advertisements shown and drive up Amazon's advertising profits."  ¶210.  Following Bezos's mandate, "Amazon revised its ad auction to incorporate the 'cost of defect' to exponentially increase its profits."  *Id.*  Before Bezos's directive, "[i]n 2015, Amazon earned $1 billion in revenue from advertising in the United States."  ¶215.  After Bezos's directive, "[b]y 2021, that number had increased to [several] billion[s], leading to [several] billion[s] in profits in the United States alone."  *Id.*  The marked increase in profits incentivized Defendants to commit fraud.  *See, e.g.*, *Zola v. TD Ameritrade, Inc.*, 172 F.Supp.3d 1055, 1073-74 (D. Neb. 2016) (scienter allegations upheld based, in part, on "motive, as reflected in [the firm's] alleged generation of over one billion dollars in revenue").  As one senior Amazon executive remarked internally, advertising at all costs to extract profits after Bezos's instruction "has effectively become 'law.'"  ¶211.[9]

### 2. Wilke Disciplined Third-Party Sellers Who Discounted Outside Amazon and Directed a Retaliatory Pricing Strategy

"Amazon uses a first-party anti-discounting algorithm designed to prevent third parties from lowering their prices" outside Amazon's marketplace.  ¶¶172-79.  **Wilke was the architect of the algorithm**, which Amazon employed throughout the Class Period.  ¶173.  The algorithm detected and matched price discounts, artificially inflating prices on and off Amazon, and depriving third-party sellers of their ability to gain scale from lower-price offerings.  ¶172.  Wilke observed that the algorithm allowed the Company to avoid a "perfectly competitive market."  ¶173.

---

[9]   That Bezos's instructions regarding the use of "defect ads" predated the Class Period is of no consequence.  Defendants wholly ignore (*see* MTD 20) the tenet that "facts relevant to scienter will ordinarily date from before any alleged misrepresentations."  *Zelman v. JDS Uniphase Corp.*, 376 F.Supp.2d 956, 971 (N.D. Cal. 2005).  That allegations may be based on pre-Class Period observations does not diminish their weight "since such circumstances would be among those knowable at the time of the statements."  *Id.*  Defendants do not explain how Bezos magically unlearned his knowledge of the practice he directed. ¶211.

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Additionally, since at least 2007 and throughout the Class Period, Amazon has used, **at Wilke's request**, a "'tit-for-tat' pricing strategy that encouraged third-party sellers to *raise* their prices on Amazon if the prices were raised elsewhere." ¶188.

### 3. Bezos, Wilke, and Herrington Had Direct Knowledge of Amazon's Other Efforts to Undermine Third-Party Sellers and Competition

Amazon also employed a variety of other practices to discipline third-party sellers and eliminate its competition throughout the Class Period. **Defendants Bezos, Wilke, and Herrington either directed those practices or had direct knowledge of them**.

For example, Bezos was aware of Amazon's price and selection parity strategy to undercut competition at least as early as 2009. ¶¶147-52. As the governmental investigations found, this practice continued throughout the Class Period. ¶¶153, 166-69, 172-78. Courts routinely credit similar allegations that rely on government investigations. *See In re Toyota Motor Corp. Sec. Litig.*, 2011 WL 2675395, at *4 (C.D. Cal. July 7, 2011) (government investigations "would almost certainly have brought the matter to upper management's attention").

Additionally, for years, Amazon has employed a price-surveillance group called the Competitive Monitoring Team, which is designed to detect when a third-party seller lowers its pricing on other platforms. ¶147. The Company then schemed to undercut them. ¶148. One example involved diapers.com, a merchant on Amazon's platform. ¶148. After learning that this merchant offered discounts outside Amazon's marketplace, Herrington immediately required Amazon to "match pricing on these guys no matter what the cost" and those findings were presented "to JeffB [Jeff Bezos]" in May 2009. *Id.* (alteration in original).[10]   In 2010, diapers.com's parent launched soap.com, causing Bezos to ask for a responsive plan of action, with Herrington answering, "We have already initiated a more aggressive 'plan to win' against diapers.com …." ¶149. The plan included "[e]nsur[ing] price and selection parity." *Id.* The

---

[10]   Defendants contend that Plaintiffs' new averments regarding Bezos's knowledge are irrelevant since none of the false and misleading statements attributed to him mention, *inter alia*, diapers. MTD 20. This is a red herring. Scienter turns on the incongruity between a defendant's words and the company's conduct. *See, e.g., In re Citigroup Inc. Sec. Litig.*, 753 F.Supp.2d 206, 238 (S.D.N.Y. 2010) ("[I]ncongruity between word and deed establishes … scienter."). Here, Bezos's statements conveyed the false impression that Amazon was *helping* third-party sellers compete with Amazon, which also benefited consumers, when in reality the opposite was true. *See, e.g.*, ¶¶355, 440, 446, 463, 467.

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

"'aggressive plan to win' at all costs" worked, with Wilke and Herrington briefed on the outcome. ¶151.

An internal email from June 2016 shows how Wilke, Herrington, and Sebastian Gunningham, the SVP of Amazon Marketplace,[11] were forcing third-party sellers to benefit Amazon at their expense.  ¶180.  The email discusses "supplier" tenets imposed on third-party sellers, including "forc[ing]" suppliers to "either lower the price, provide the selection [on Amazon's marketplace] or enter the Amazon Reseller program" "[i]f it is determined that an Amazon Customer has access to a lower price or selection off of Amazon."  *Id.*

Wilke also had access to specific information that alerted him to the falsity of his public statements regarding Amazon's treatment of third-party sellers' data.  An internal audit report at Amazon warned Wilke in 2015 that 4,700 Amazon employees working on private label sales had unauthorized access to sensitive third-party seller data.  ¶¶104-05.  This meant there was a particularly heightened risk that scores of insiders could inappropriately use seller-specific data.  Accordingly, by insisting that "Amazon does not give its corporate employees access to any seller data in order to choose which products to create on its own," ¶385, Wilke knowingly or recklessly misled investors.

That Amazon's misrepresentations regarding its relationship with third-party sellers were made in written testimony provided under penalty of perjury to Congress (*see, e.g.*, ¶467 (Bezos)) further enhances the strong inference of scienter.  An analysis of scienter is premised on "logic, common sense, and human experience"[12] and it is highly improbable that Amazon's most senior official did not take all necessary steps beforehand to ensure that he knew (and understood) the material facts directly bearing upon the accuracy of his testimony.[13]

---

[11]   The "scienter of the senior controlling officers of a corporation [such as Gunningham] may be attributed to [Amazon] ... when those senior officials were acting within the scope of their apparent authority."  *Alphabet*, 1 F.4th at 705.  *See also supra* pp. 21-22.

[12]   *In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 631 (E.D. Va. 2000).

[13]   *See, e.g.*, *Sgalambo v. McKenzie*, 739 F.Supp.2d 453, 479, 483 (S.D.N.Y. 2010) (finding scienter when it was "highly plausible" officers "had knowledge of and access to" relevant data).

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

- 17 -

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Finally, Amazon systematically punishes sellers when it detects a lower price on other online stores.  ¶¶154, 181-87.  Herrington was aware of this practice because he commented on it, stating policing sellers from discounting elsewhere is "a dirty job, but we need to do it."  ¶155.

Herrington also devised a mechanism prohibiting Amazon's most important third-party sellers from discounting on other platforms.  ¶¶163-67.  Those prohibitions appeared in Amazon's Standards for Brands program and were applied throughout the Class Period to many third-party sellers at Amazon's unfettered discretion.  *Id.*

### 4. Wilke and Clark Had Knowledge of and Participated in Amazon's Plan to Close SFP, Forcing Third-Party Sellers to Use FBA

This Court already found Plaintiffs adequately pled that Amazon misrepresented that it did not favor its own products:  "Defendants have essentially admitted that they may have 'indirectly' favored their own products and FBA products."  Order 19-20. Amazon's FBA program combines shipping services with access to Prime customers.  ¶116.  Obtaining the Prime badge boosts search rankings and the ability to get the Buy Box, which allows customers to add items from other retailers to their virtual Amazon "shopping cart."  ¶¶116, 70.  The FTC and AGs' investigations found that Amazon coerced third-party sellers to use FBA and further that ***Wilke and Clark had knowledge*** of this practice.  ¶¶131-35.

Before the Class Period began, Amazon tested a strategy that permitted some third-party sellers to use non-Amazon fulfillment centers (through a program called SFP) to fulfill Prime-eligible orders.  ¶133.  But it found that it was "strategically risky" to continue this practice as it could "seriously imperil FBA."  *Id.*  In an email that spearheaded the effort to shut down SFP, Clark wrote that he was "losing [his] mind" after learning that UPS, a third-party delivery service company, was advertising that its own fulfillment service could fulfill Prime-eligible orders.  ¶134. Emails reflect that both Clark and Wilke knew about and supported the decision to shut down SFP. ¶¶134-35.

### 5. Plaintiffs' Other Allegations Support a Strong Inference of Scienter

The Complaint also plausibly alleges circumstantial evidence supportive of scienter.  For example, Plaintiffs allege that in December 2018, Senator Blumenthal ***wrote public letters*** to,

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

among others, the FTC with "'deep[] concern[]' that the 'price parity provisions in Amazon's contracts with third-party sellers could stifle market competition and artificially inflate prices on consumer goods.'"  ¶157.  "[T]he existence of [these] government investigations would have clued the Individual Defendants into the specific nature of [Amazon's] practices."  Order 28.  *See also Reese v. Malone*, 747 F.3d 557, 571 (9th Cir. 2014) (scienter inference strengthened when conduct was "the focus of both public and government inquiries"); *In re Toyota*, 2011 WL 2675395, at *4 (government investigations supported scienter).  And, Amazon's response to the Blumenthal letter (purportedly dropping its contractual price-parity provisions in an attempt to placate policymakers, ¶¶157, 160),[14] strengthens the inference of scienter.  *See Schueneman*, 840 F.3d at 708 ("Defendants' own response to the issue contributes to an inference of scienter.").[15]

Wilke's specific statements concerning Amazon's use of third-party sellers' data further demonstrate his familiarity with the topic and contribute to a strong inference of scienter.  *See*, *e.g.*, *Shenwick*, 282 F.Supp.3d at 1147 ("[A]n assertion that Defendants were unaware of an alleged issue can be 'directly contradicted by the fact that [they] specifically addressed it in [their] statement[s].'") (alterations in original).  Given that the Court previously found Plaintiffs sufficiently pled that "violations of [Amazon's] internal policy were 'systemic' and that thousands of Amazon employees had unauthorized access to non-public third-party seller data" (Order 18), the Complaint creates an inference, based on his public statements, that Wilke was aware of the violations.

Finally, Amazon's executives systematically and intentionally deleted their internal communications using the "disappearing message" feature of the Signal messaging app.  ¶597.  In all, Amazon destroyed more than two years' worth of internal communications covering the period from June 2019 to at least early 2022, notwithstanding the FTC's explicit instructions that it preserve all relevant information.  *Id*.  Amazon executives' attempt to cover up wrongdoing further

---

[14]   In reality, this was simply a ruse as Amazon continued enforcing this practice through other mechanisms concealed from investors.  ¶¶157-70.

[15]   Defendants also promised to refrain from using non-public data from the vendors' activities to compete with them in the Company's private label business.  ¶¶97, 716.  *See Mild v. PPG Indus., Inc.*, 2018 WL 6787351, at *7 (C.D. Cal. Dec. 21, 2018) (finding "remedial measures" support inference of scienter).

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

- 19 -

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

supports a strong inference of Defendants' scienter.  *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F.Supp.3d 1145, 1166 (D. Or. 2015) (collecting cases).  Defendants unpersuasively argue that the Complaint pleads only that "unidentified members" of "Amazon's management" used the Signal app and its disappearing message feature.  MTD 22.  However, new information from the FTC action makes clear that Bezos, Wilke, Clark, Herrington, Jassy and Olsavsky (among others) *all* used Signal during the relevant time, with Bezos personally directing the practice.[16]  And, contrary to Defendants' contention, the FTC's investigation reveals that, in fact, Amazon admitted that "it is possible that some responsive communications" were destroyed.[17]

### D.    The Complaint Adequately Alleges Defendants Knowingly or Recklessly Misrepresented Amazon's Fulfillment Expansion

#### 1.    FE-3's Firsthand Account Supports the Inference of Scienter

Defendants' scienter with respect to the capacity allegations is enhanced by an account from FE-3, a former Company employee during 2020-2022, who prepared reports on expansion plans that were discussed at C-level meetings and "approved" by "email[s] from Bezos" (copying Olsavsky) despite the fact that by February of 2021, Amazon's managers and executives had begun "questioning" the expansion plan.  ¶¶302-07.  *See Maverick Fund, L.D.C. v. First Solar, Inc.*, 2018 WL 6181241, at *11 (D. Ariz. Nov. 27, 2018) ("Plaintiffs also allege facts that the confidential witnesses, based on their position descriptions, were positioned to know.").  This is consistent with the Court's prior Order.  *See* Order 23-24 (when Plaintiffs coupled witnesses' accounts with "job titles, experience, responsibilities, and periods of employment," it was "plausible that the witnesses would know, or reasonably deduce, the information attributed to them").

---

[16]  *See* Pls.' Mot. to Compel Prod. of Docs. Related to Spoliation at 2, 5-6, 11, *Fed. Trade Comm'n v. Amazon.com, Inc.*, No. 23-cv-01495 (W.D. Wash.), ECF 198 ("ECF 198") (noting "Mr. Bezos was a heavy Signal user ... and instructed others to use the app" and stating "[n]otable Signal users at Amazon ... include Mr. Bezos, current CEO Andy Jassy, General Counsel David Zapolsky, former CEO of Worldwide Consumer Jeff Wilke, and former CEO of Worldwide Operations Dave Clark") (attached as Ex. 1 to Decl. of Gregg S. Levin).  "[C]ourts may take judicial notice of court filings." *Amazon.com Servs. LLC v. Paradigm Clinical Rsch. Inst., Inc.*, 631 F.Supp.3d 950, 961 (W.D. Wash. 2022).

[17]  ECF 198 at 3.  *See also N.T.A.A., Inc. v. Nordstrom, Inc.*, 2023 WL 9419145, at *5 (C.D. Cal. Nov. 3, 2023) (finding "frequent[] use[]" of "[s]ignal messaging application" whose "ephemeral nature" resulted in "no messages [being] recoverable … reflect[ed] ... deliberate attempt ... to conceal the contents of those messages").

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

In her roles, FE-3 also drafted various documents regarding the fulfillment network that were presented to senior Amazon executives, ***including Bezos and Olsavsky***. ¶302. *See Maverick Fund*, 2018 WL 6181241, at *11 (crediting allegations attributed to FE who knew executives received reports about issues in department); *Schultz v. TomoTherapy Inc.*, 676 F.Supp.2d 780, 791 (W.D. Wis. 2009) (allegations from confidential sources that company officials received weekly emailed "Backlog List" that included pertinent information "sufficiently support[ed] an inference that the defendants knew").

Defendants' protestations that the averments from FE-3 do little to show knowledge (MTD 11) are unavailing. First, FE-3's allegations demonstrate that these senior Company officials "remained abreast of the relevant issues" and, as such, are "probative on the issue of scienter." *Novavax*, 645 F.Supp.3d at 526. Second, whether FE-3 has met the Individual Defendants is beside the point[18] given that fulfilment center expansion plans and costs were discussed at meetings that FE-3 attended with C-level employees at Amazon. ¶¶303-07. It is reasonable to infer that those C-Suite employees subsequently shared the information conveyed to them with their superiors—who would have included executives such as Bezos, Jassy, and Olsavsky. *See, e.g.*, *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 174119, at *21 (C.D. Cal. Jan 16, 2013) ("[Those] who had access to information concerning these problems worked only one or two levels below Charney and Kowalewski, supporting an inference that the information was communicated to them at some point in time."); *3226701 Canada, Inc. v. Qualcomm, Inc.*, 2017 WL 4759021, at *23 (S.D. Cal. Oct. 20, 2017) (crediting notion that subordinate "would have kept [Defendant] ... apprised of the thermal problems with the 810") (first alteration in original).

Defendants also contend that FE-3's allegations directed to Bezos are irrelevant since he did not make any capacity statements. MTD 11 n.5. But, Bezos's scienter is germane because "a plaintiff may establish scienter of the corporation through the scienter of its corporate officers or

---

[18] The law does not require that a witness aver that she personally interacted with a named defendant. *See, e.g.*, *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F.Supp.2d 1044, 1059-60 (C.D. Cal. 2008) (scienter strongly inferred though witnesses who had "[n]ever spoken or had other contact with any of the seven non-management directors" and "none is alleged to have personal knowledge relating to the two management directors").

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

directors." *Jackson v. Microchip Tech. Inc.*, 2020 WL 1170843, at *11 (D. Ariz. Mar. 11, 2020).

Here, Bezos was a key officer and Amazon's autocratic leader. ¶¶693-94.

### 2. Additional Allegations Support a Strong Inference of Scienter

#### a. Olsavsky's and Jassy's Detailed Statements Reflect Their Scienter

Courts "may consider a senior executive's role ... includ[ing] ... whether, given the importance of the information, 'it would be "absurd" to suggest that management was without knowledge of the matter.'" *Alphabet*, 1 F.4th at 706; *see also Brendon v. Allegiant Travel Co.*, 412 F.Supp.3d 1244, 1261 (D. Nev. 2019) ("'absurd' to suggest" no knowledge when defendants "responded to at least one [analyst] question ... suggesting that they were familiar with the ... issues").

Here, in quarterly earnings calls throughout the Class Period, Olsavsky and Jassy spoke in detail about Amazon's capacity expansion, and how fulfillment capacity was a key component of the Company's ability to meet demand, described how Amazon's expansion of its fulfillment capacity was critical to the Company's profitability and driven by growing demand, and analysts took notice. *See, e.g.*, ¶618 (Olsavsky: "We still have a very fast-growing business this growing globally, and we're adding regions and capacity to handle usage that still exceeds revenue growth in that business. So, we feel good about making those investments."); ¶609 (Jassy: "We've nearly doubled our operations capacity in the past two years to keep up with customer demand" and assuring the market that Amazon's investments in infrastructure were not just driven by the pandemic, but rather were "long-term trends" that "we expect ... to be strong in this business"). Olsavsky also answered analysts' questions; and they in turn took his detailed pronouncements seriously. *See, e.g.*, ¶619 (analysts commenting, on July 30, 2021, that "the company continues to add capacity at a breakneck pace in order to meet customer demand …. We see no cracks in the long-term story … as management sees no slowdown in demand"). The Court previously found that, even as Defendants made those statements, "Amazon's decision to substantially roll back its expansion plan ... had allegedly been made." Order 22.

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

It would be absurd to suggest that Olsavsky and Jassy knew enough about capacity and consumer demand issues to discuss them publicly yet knew nothing about them for purposes of scienter. *See Reese*, 747 F.3d at 572 (holding officer "'bridge[d] the [scienter] gap' herself by referencing the data directly. It is unclear what further facts plaintiffs would need to plead to create a stronger inference that she had access to information she discussed publicly.") (alterations in original)); *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019) (finding "specific" statements "in response to questions from analysts and investors" may "give rise to a strong inference that Defendants acted with the required state of mind").

Common sense compels the conclusion that if Olsavsky and Jassy repeatedly spoke about the specifics of Amazon's fulfillment capacity then they were armed with knowledge. Alternatively, it would have been reckless for Olsavsky or Jassy to speak to analysts about Amazon's fulfillment capacity in such detail if they knew nothing about that subject. *See S. Ferry LP #2 v. Killinger*, 687 F.Supp.2d 1248, 1260 (W.D. Wash. 2009) (when defendant speaks without "actual knowledge" regarding subject at hand, "it would be at least actionably reckless to reassure the public about these matters at all"); *In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) ("[T]his Court can reasonably conclude[, given repeated statements on topics of investor and analyst focus,] either that Defendants [had] access to information regarding [the subject of the misstatements], or ... were recklessly indifferent to the truth or falsity of their … statements and never bothered to investigate [them].").

Moreover, by early 2021, and no later than July 2021, it was known internally that Amazon had excess capacity that needed to be curtailed. *See, e.g.*, ¶¶287-88, 291-93, 307. This information was "***completely at odds with reality***" and further supports a strong inference of scienter. *In re QuantumScape Sec. Class Action Litig.*, 580 F.Supp.3d 714, 741 (N.D. Cal. 2022). *See also* ¶¶515-17, 541, 543-44, 561, 566, 587.

### b.    The Temporal Proximity of Defendants' Statements with the Revelation of the Truth Further Supports Scienter

"Temporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter." *Reese*, 747 F.3d at 574-75 (finding "three

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

to six months" between misrepresentation and disclosure "bolster[ed] the inference of scienter").
Here, *just two weeks* after Defendants made proclamations about doubling capacity, ¶691, Jassy
disclosed that Amazon was "no longer chasing physical or staffing capacity," ¶¶329, 718, and
Olsavsky admitted that the Company had "excess capacity in our fulfillment and transportation
network," ¶¶331, 689.  Similarly, these admissions came less than three months after Olsavsky
insisted that Amazon "continued to see an increase in customer demand," ¶¶278, 561, 690, and an
Amazon press release stated that recent expansion efforts were something "to look forward to in
the months and years ahead," ¶¶277, 566, 690.

## II.    The Complaint Plausibly Alleges New Actionable False and Misleading Statements

This Court previously held that Defendants made actionably false and misleading
statements regarding Amazon's relationship with, investments in, and sales by third-party sellers;
its search algorithms (which the prior complaint pleaded favored Amazon's own private label
products and those of third-party sellers using Amazon's FBA services); and the Company's
treatment of third-party sellers' data. *See* Order 15-20.  The Complaint pleads additional false and
misleading statements concerning these same categories, including:

- Amazon's relationship with third-party sellers, *e.g.*, ¶¶377, 497 (Wilke: Amazon was "work[ing] to help [third-party sellers] grow their business" by "making big investments: in our delivery network"; "[w]e remain more committed than ever to supporting [small businesses'] success"); ¶440 (Bezos: "We support millions of small businesses who sell through Amazon"); ¶467 (Bezos: "[T]hird-party sellers did very well and are growing fast"); ¶533 (Clark: Amazon "continued investing billions" to help third-party sellers "scale and reach more customers, and establish and build their brands"); ¶585 (Herrington: describing Amazon's "decision to open our store's virtual shelf space to third-party sellers" as a "win" for "millions of small businesses that can now reach more customers, increase revenue, and create jobs");

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC
- 24 -
BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

- Amazon's search criteria, *e.g.*, ¶411 (Wilke: "The private brand does not get an advantage here. If a private brand shows up in a search result it's because lots of customers are clicking on that particular private brand."); and

- Amazon's use of third-party sellers' data, *e.g.*, ¶385 (Wilke: "We don't allow anyone inside Amazon to have access to any individual seller's data to build a private label.").

Defendants contend that these new statements are simply too "vague" and "unspecific" to be actionable and that such "optimistic," "feel good" statements are "[in]capable of objective verification" and thus "immaterial" as a matter of law. MTD 15-20. However, the Court's Order held that similar statements were actionable—including Defendants' claims that Amazon was "committed" "to supporting" third-party sellers and touting the fairness of its search algorithm and treatment of third-party sellers—in light of Plaintiffs' extensive allegations that Defendants employed "anticompetitive tactics against third-party sellers," "essentially admitted that they may have 'indirectly' favored their own products" through their "algorithm," and did in fact "use ... individual third-party seller's data." Order 17-20. These newly alleged false statements are actionable for the same reason. *See, e.g.*, *Glazer Cap.*, 63 F.4th at 759, 767-68, 770 (finding statements that rate of closing deals "'remain[s] very strong' and 'very healthy'" and company was "very comfortable in our pipeline" misleading because they "contravened the unflattering facts in [Forescout's] possession" (alterations in original)); *Warman v. Overland Data Inc.*, 1998 WL 110018, at *3 (S.D. Cal. Feb. 20, 1998) ("[P]laintiffs may allege false statements through statements that 'failed to reflect the company's true condition at the time the statements were made.'").[19]

---

[19]   Defendants' statements about competition, e.g., claiming the ecommerce market was "intensely competitive," with sellers competing with Amazon on "selection, price, and ... fast ... fulfillment," are similarly actionable. ¶¶355, 473, 513. *See, e.g.*, *McKesson Corp.*, 411 F.Supp.3d at 599 (statements describing generic drug market as "competitive" were false and misleading as "market was, in fact, rife with anticompetitive conduct"). Inextricably intertwined with such statements were Defendants' (demonstrably false) representations that Amazon was taking specific actions to benefit customers. ¶¶446, 463.

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**III.     The Claims Against Clark and Wilke Are Timely**

Defendants argue that "[a]ll claims against Clark and Wilke should be dismissed as untimely" because their alleged false statements were all made before February 6, 2022.  MTD 25. But, as this Court recognized, "whether a plaintiff should have discovered facts to support its claim is inherently a fact-intensive inquiry."  Order 37.  Moreover, "[b]ecause the statute of limitations is an affirmative defense, the 'defendant has the burden of ***proving*** the action is time-barred.'"  *Brooks v. Tarsadia Hotels*, 2019 WL 2436395, at *5 (S.D. Cal. June 11, 2019).

The appropriate focus is not on when Clark and Wilke spoke (or when their speech was revealed as false), but rather on when Plaintiffs "had enough information about [their] scienter to plead it with sufficient particularity to survive a motion to dismiss."  *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011).  Here, such information includes: (i) Clark's abrupt resignation on June 3, 2022 (and his having forfeited $77 million), in light of media reports on missteps in his division (¶668); (ii) the FTC's September 2023 lawsuit detailing how Wilke was the architect of an "anti-discounting algorithm" designed to avoid a "perfectly competitive market" (¶¶173, 598); and (iii) internal emails showing how Wilke conspired with other executives to undercut competitors' businesses (¶¶149-51, 180), including through a "tit-for-tat" strategy to cause third-party sellers to *raise* their prices as revealed by the California AG's April 2023 complaint (¶¶181 n.268, 188).

Furthermore, "the Ninth Circuit is particularly hesitant to find inquiry notice as a matter of law where 'the plaintiff alleges that the defendants' reassurances convinced the plaintiff to postpone his or her legal action.'"  *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 557 (N.D. Cal. 2009).  Here, both Clark, ¶¶529, 533, 537, 552, and Wilke, ¶¶377, 381, 385, 408, 411, 419, 450, 480, 497, often falsely denied Amazon's mistreatment of third-party sellers.

Plaintiffs' claims against Clark and Wilke are timely.

**IV.     The Complaint Adequately Pleads Control Person Liability**

Plaintiffs' control person claims are viable since the Complaint adequately pleads a primary violation of Section 10(b).  And Defendants ignore that, before July 2022, Herrington led Amazon's entire North American consumer business and, since 2010, was engaged in "deep[]

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1   discussion[s]" on business strategy with Bezos.  ¶¶52, 149-50, 602.  "[T]he fact that [Herrington]

2   held [an] important position[] is sufficient at the pleadings stage."  *In re Adaptive Broadband Sec.*

3   *Litig.*, 2002 WL 989478, at *19 (N.D. Cal. Apr. 2, 2002).  Moreover, the Complaint "adequately

4   alleges that [Herrington] acted as a control person because he spoke on the Company's behalf."

5   *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *14 (N.D. Cal. Nov. 4, 2020).  *See also* ¶585.

6                                  **CONCLUSION**

7        Defendants' Motion should be denied.

8

9   DATED: June 14, 2024                   Respectfully submitted,

10

11

12  **BRESKIN, JOHNSON & TOWNSEND,**
    **PLLC**

13  */s/ Roger M. Townsend*

14  Roger M. Townsend (WSBA #25525)
    rtownsend@bjtlegal.com

15  1000 Second Avenue, Suite 3670
    Seattle, WA  98104

16  Telephone:  (206) 652-8660
    Facsimile:  (206) 652-290

17  *Local Counsel for Lead Plaintiffs*

18  **MOTLEY RICE LLC**                     **POMERANTZ LLP**

19  */s/ Gregg S. Levin*                    */s/ Jeremy A. Lieberman*

20  Gregg S. Levin                          Jeremy A. Lieberman
    glevin@motleyrice.com                   jalieberman@pomlaw.com

21  William S. Norton                       Emma Gilmore
    bnorton@motleyrice.com                  egilmore@pomlaw.com

22  Joshua C. Littlejohn                    Villi Shteyn
    jlittlejohn@motleyrice.com              vshteyn@pomlaw.com

23  Christopher F. Moriarty                 600 Third Avenue
    cmoriarty@motleyrice.com                New York, NY  10016

24  28 Bridgeside Blvd.                     Telephone:  (212) 661-1100
    Mt. Pleasant, SC  29464                 Facsimile:  (212) 661-8665

25  Telephone:  (843) 216-9000
    Facsimile:  (843) 216-9450

26                                          Orly Guy
                                            oguy@pomlaw.com

27  *Co-Lead Counsel for Lead Plaintiffs*   Eitan Lavie
    *and the Class*                         eitan@pomlaw.com

28

OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT
2:22-cv-00617-JHC

- 27 -

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

2

*/s/ James A. Harrod*

3

James A. Harrod
Jim.Harrod@blbglaw.com

4

1251 Avenue of the Americas
New York, NY  10020

5

Telephone: (212) 554-1400
Facsimile: (212) 554-1444

6

7

*Additional Counsel and Counsel for*
*Asbestos Workers Philadelphia Welfare*
*and Pension Fund*

8

9

**BARRACK, RODOS & BACINE**

*/s/ Stephen R. Basser*

10

Stephen R. Basser
sbasser@barrack.com

11

Samuel M. Ward
sward@barrack.com

12

600 West Broadway, Suite 900
San Diego, CA  92101

13

Telephone:  (619) 230-0800
Facsimile:  (619) 230-1874

14

15

Jeffrey A. Barrack

16

jbarrack@barrack.com
3300 Two Commerce Square

17

2001 Market Street
Philadelphia, PA  19103

18

Telephone:  (215) 963-0600
Facsimile:  (215) 963-0838

19

20

*Counsel for the Detectives Endowment*
*Association Annuity Fund*

21

22

23

24

25

26

27

28

Ariel Shannon 4, 34th Floor
Givatayim, Israel 5320047
Telephone: +972 (0) 3 624 0240
Facsimile: +972 (0) 3 624 0111

*Co-Lead Counsel for Lead Plaintiffs*
*and the Class*

**OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE SECOND**
**CONSOLIDATED CLASS ACTION COMPLAINT**
2:22-cv-00617-JHC

- 28 -

**BRESKIN** | **JOHNSON** | **TOWNSEND** PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

## LCR 7(E) WORD-COUNT CERTIFICATION

2

As required by Western District of Washington Local Civil Rule 7(e), I certify that this

3

memorandum contains 9,798 words, in compliance with the Court's April 8, 2024 Order in the

4

case, ECF 103.

5

6

Dated:  June 14, 2024                                      **BRESKIN, JOHNSON & TOWNSEND, PLLC**

7

*/s/ Roger M. Townsend*

Roger M. Townsend (WSBA #25525)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND
CONSOLIDATED CLASS ACTION COMPLAINT**
2:22-cv-00617-JHC

BRESKIN │ JOHNSON │ TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660