1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9

SONNY JOYCE, Individually and on Behalf
of All Others Similarly Situated,

CASE NO. 2:22-cv-00617

10

Plaintiffs,

ORDER RE: DEFENDANTS' MOTION
TO DISMISS

11

v.

12
13
14

AMAZON.COM, INC., ANDREW R.
JASSY, JEFFREY P. BEZOS, BRIAN T.
OLSAVSKY, DAVID A. ZAPOLSKY, and
NATE SUTTON,

Defendants.

15
16
17

ASBESTOS WORKERS PHILADELPHIA
WELFARE AND PENSION FUND, on
behalf of itself and all others similar situated,

Plaintiff,

18

v.

19
20
21

AMAZON.COM, INC., ANDREW R.
JASSY, BRIAN T. OLSAVSKY, DAVID
FILDES, DAVE CLARK, JEFF WILKE, and
DOUG HERRINGTON,

22

Defendants.

23
24

ORDER RE: DEFENDANTS' MOTION TO DISMISS - 1

1
2
3
4
5
6
7
8

DETECTIVES ENDOWMENT
ASSOCIATION ANNUITY FUND,
Individually and on Behalf of All Others
Similarly Situated,

Plaintiff,

v.

AMAZON.COM, INC., ANDREW R.
JASSY, BRIAN T. OLSAVSKY, DAVID
FILDES, DAVE CLARK, JEFF WILKE, and
DOUG HERRINGTON,

Defendants.

9
10

# I

## INTRODUCTION

11
12
13
14
15
16
17
18
19
20
21
22
23
24

This putative securities fraud class action comes before the Court on Defendants' Motion to Dismiss the Second Consolidated Class Action Complaint. Dkt. # 104. Plaintiffs maintain that several Amazon executives made false or misleading statements when they spoke publicly about the company's treatment of third-party sellers and plans for capacity expansion. In ruling on Defendants' prior motion to dismiss, the Court dismissed Plaintiffs' claims because they failed to adequately plead scienter—that is, sufficiently allege facts evidencing that Defendants made false or misleading statements with *deliberate recklessness* or an *intent* to deceive, manipulate, or defraud. Indeed, plaintiffs alleging securities fraud must meet a high bar. In addition to meeting Rule 9(b)'s "particularity" requirement, the allegations must satisfy the "heightened pleading instructions" detailed in the Private Securities Litigation Reform Act (PSLRA) and "state with particularity facts giving rise to a strong inference" that Defendants acted with scienter. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007); Fed. R. Civ. P. 9(b). These exacting requirements "ha[ve] teeth" and pose a significant hurdle for

ORDER RE: DEFENDANTS' MOTION TO DISMISS - 2

securities fraud plaintiffs; the PSLRA reflects the desire of Congress to put an early stop to securities cases that lack merit. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020). In the third complaint filed in this action, which includes additional allegations, Plaintiffs still do not meet the high bar for adequately pleading scienter.

The Court has considered the submissions in support of and in opposition to the motion, the case file, and the applicable law, as well as the parties' arguments at the hearing on March 13, 2025. Being fully advised, the Court GRANTS the motion and DISMISSES this matter with prejudice.

## II

### BACKGROUND

Lead Plaintiffs Universal-Investment-Gesellschaft mbH, Universal-Investment-Luxembourg S.A., Menora Mivtachim Insurance Ltd., Menora Mivtachim Pensions and Gemel Ltd., The Phoenix Insurance Company, Ltd., and The Phoenix Provident Pension Fund Ltd., along with the Named Plaintiffs Asbestos Workers Philadelphia Welfare and Pension Fund and Detectives Endowment Association Annuity Fund (collectively, Plaintiffs) bring this consolidated class action under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (Exchange Act) individually and on behalf of persons and entities who acquired publicly traded common stock of Amazon.com, Inc. between February 1, 2019 and April 28, 2022 (Class Period). *See generally* Dkt. ## 58, 70, 95.

Amazon is a multinational technology company with multiple business lines, including e-commerce services and distribution, website development and hosting, inventory and supply chain management, and fulfillment and logistics. Dkt. # 95 at 18. "Through its Amazon.com e-commerce and fulfillment platforms, [Amazon] offers products to retail consumers from 1.7 million businesses." *Id.* at 22. On Amazon's online marketplace, the company sells both third-

party merchandise and its own private-label products.  *Id.* at 9.  When using the marketplace, third-party sellers sell their products and, in return, pay fees; third-party sellers also provide certain non-public data about their products to Amazon.  *Id.* at 9–10.  In addition, third-party sellers may sell their goods through Amazon's fulfillment service, called "Fulfilled by Amazon" (FBA).  *Id.* at 23.

Plaintiffs bring suit against Amazon and nine of its corporate executives (collectively, Defendants), including: (1) Jeffrey Bezos, founder and Executive Chair; (2) Andrew Jassy, Amazon President, CEO, and Director; (3) Brian Olsavsky, Senior Vice President and Chief Financial Officer; (4) David Zapolsky, Senior Vice President, General Counsel, and Secretary; (5) Nate Sutton, Associate General Counsel; (6) David Fildes, Head of Investor Relations; (7) Jeff Wilke, CEO of Amazon Worldwide Consumer from April 2016 to March 2021; (8) Dave Clark, CEO of Amazon Worldwide Consumer from March 2021 to July 2022; and (9) Doug Herrington, CEO of Amazon Worldwide (Individual Defendants).  Dkt. # 95 at 19–20.

Plaintiffs filed this action on May 6, 2022.  Dkt. # 1.  On August 17, 2022, the Court consolidated the case with a parallel putative class action.[1]  Dkt. # 58.  In the Consolidated Amended Complaint (CAC), filed on September 20, 2022, Plaintiffs contended that Defendants committed two categories of securities violations: (1) misrepresentation relating to, or failure to disclose, the fact that they exploited third-party sellers in an anticompetitive manner (third-party seller allegations); and (2) misrepresentation relating to, or failure to disclose, Amazon's infrastructure and fulfillment capacity (capacity allegations).  Dkt. # 70 at 16–91.  Plaintiffs brought two causes of action: (1) a claim under 15 U.S.C. § 78j (Section 10(b) of the Exchange

---

[1] *See Detectives Endowment Ass'n Annuity Fund v. Amazon.com, Inc., et al.*, 2:22-cv-0095-JHC.

Act) and Rule 10b-5, promulgated by the Securities and Exchange Commission; and (2) a claim under 15 U.S.C. § 78t(a) (Section 20(a) of the Exchange Act). *Id.* at 176–78.

Defendants moved to dismiss the CAC, contending: (1) Defendants' statements related to the third-party seller and capacity allegations were neither false nor misleading; (2) Plaintiffs failed to plead facts giving rise to a strong inference of scienter; (3) Plaintiffs did not allege loss causation as it related to the third-party seller allegations; (4) Plaintiffs' third-party seller allegations were time-barred; and (5) Plaintiffs failed to allege control person liability. *See* Dkt. # 75 at 22–55. Defendants also sought judicial notice or, in the alternative, incorporation by reference, of Exhibits 2–50. *See* Dkt. ## 77, 76–2 through 76–50.

The Court granted Defendants' Motion to Dismiss without prejudice and took judicial notice of Exhibits 2–50 only to recognize these documents were within the public realm at the times alleged by Plaintiffs. Dkt. # 92 at 12, 39–40. The Court dismissed the CAC, concluding that: (1) Plaintiffs adequately pleaded material misrepresentations or omissions, the first element of their Section 10(b) claim, as to both the capacity and third-party seller allegations; (2) Plaintiffs failed to sufficiently plead facts giving rise to a strong inference of scienter, the second element of their Section 10(b) claim, as to both the capacity and third-party seller allegations; (3) Plaintiffs adequately pleaded loss causation, the third element of their Section 10(b) claim, as to their third-party seller allegations; (4) the inquiry of what a reasonable investor should have known or discovered is a fact-intensive inquiry and the Court declined to dismiss Plaintiffs' claims as untimely; and (5) Plaintiffs adequately pleaded control person liability. Dkt. # 92 at 12–40. In other words, the Court dismissed the CAC because Plaintiffs failed to adequately plead scienter. *Id.* at 39.

Plaintiffs filed a Second Consolidated Class Action Complaint (SAC) on February 6, 2024. Dkt. # 95. The SAC makes new allegations, including allegations related to the Individual

Defendants' purported motives to commit securities fraud, pending antitrust litigation against Amazon, and Amazon's plans to add more fulfillment sites in the United States and Canada. *See id.* at 111–13, 208–09, 217–24. The SAC also adds three Individual Defendants and twenty-two allegedly fraudulent statements. *Id.* at 19–20, 126–206. And Plaintiffs maintain that Defendants committed the same categories of securities violations and bring the same causes of action. *Id.* at 255–58.

Defendants now move to dismiss the SAC, arguing: (1) Plaintiffs fail to allege a cogent motive to deceive shareholders; (2) Plaintiffs fail to allege any Individual Defendant's direct knowledge of inconsistent information that would show scienter; (3) Plaintiffs' allegations generally fail to support a strong inference of scienter; (4) the new third-party seller allegations do not point to false or misleading conduct; (5) the claims against Defendants Wilke and Clark are time-barred; and (6) Plaintiffs fail to adequately allege control person liability. Dkt. # 104 at 13–33.

### III

### DISCUSSION

When considering a motion to dismiss under Rule 12(b)(6), a court accepts all factual allegations as true and construes them in the light most favorable to the nonmoving party. *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Securities fraud actions must also meet the "exacting" pleading standards of Federal Rule of Civil Procedure 9(b) and the PSLRA. *Tellabs*, 551 U.S. 308, 313 (2007). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances

constituting fraud or mistake." Fed. R. Civ. P. 9(b).  The PSLRA imposes the heightened

requirement that a plaintiff state with particularity "both the facts constituting the alleged

violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate,

or defraud." *Tellabs,* 551 U.S. at 313 (citing 15 U.S.C. § 78u–4(b)(1), (2)) (internal quotations

and citations omitted); *see also Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d

598, 604 (9th Cir. 2014).

   In assessing scienter, courts consider the complaint in its entirety and all other sources

that are ordinarily examined when ruling on a Rule 12(b)(6) motion to dismiss.  *Tellabs*, 551

U.S. at 322.  The inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a

strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets

that standard." *Id.* at 322–23 (internal citations omitted); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th

687, 701 (9th Cir. 2021).  Courts must also consider all reasonable inferences, including those

that favor the plaintiff and those of nonfraudulent intent.  *Tellabs*, 551 U.S. at 323–24; *see*

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1066 n.10 (9th Cir. 2008).  In

short, courts ask: "When the allegations are accepted as true and taken collectively, would a

reasonable person deem the inference of scienter at least as strong as any opposing inference?"

*Tellabs*, 551 U.S. at 326.

A.  Scienter

   The SAC posits several new allegations against the Individual Defendants, but they do

not adequately plead with particularity facts supporting a strong inference of scienter.[2]

---

[2] The Court addressed several of Plaintiffs' scienter arguments in a prior order and does not re-address those arguments here.  *See* Dkt. # 92 at 24–33.  But the Court does consider those arguments as part of its holistic scienter analysis.  *See* Section A.4, *infra*.

To plead with particularity facts that support a "strong inference" of scienter, a complaint must allege the defendant made false or misleading statements with deliberate recklessness or an intent to deceive, manipulate, or defraud. *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1106; *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017). Deliberate recklessness is not "*mere* recklessness." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). Rather, it is "an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* (citation omitted). To satisfy this requirement, an inference of scienter must be more than just plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. *Tellabs,* 551 U.S. at 314. This is an "exacting" pleading obligation, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 9901002 (9th Cir. 2009), that "present[s] no small hurdle for the securities fraud plaintiff," *Schueneman*, 840 F.3d at 705 (internal quotations omitted).

Plausibility is also important to the scienter inquiry, especially under the heightened pleading standards of Rule 9(b) and the PSLRA. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1058 (9th Cir. 2014) (rejecting a theory of scienter because of the "implausibility of the timing in CW1's account of events"); *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) ("[C]laims of fraud or mistake . . . must, in addition to pleading with particularity, also plead plausible allegations."); *Nguyen*, 962 F.3d 405 at 415 ("[T]he PSLRA neither allows nor requires us to check our disbelief at the door.").

Further, when a plaintiff seeks to hold a company and individual defendants liable for false or misleading statements, they must "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct," *Glazer Cap. Mgmt.,*

*LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008), or "detailed and specific allegations about management's exposure to factual information within the company." *Curry v. Yelp Inc.,* 875 F.3d 1219, 1227 (9th Cir. 2017). In other words, it does not suffice to simply allege that Individual Defendants had a "general awareness of the day-to-day workings of the company's business." *Glazer Cap. Mgmt.*, 549 F.3d at 745.

       1.     Motive

Courts generally expect that the financial motive to commit securities fraud will be clear. *Prodanova*, 993 F.3d at 1107. If a complaint does not plead a plausible motive, it is "much less likely that a plaintiff can show a strong inference of scienter." *Id.* at 1108. This is not dispositive, however, because a complaint that lacks plausible motive allegations may still meet the burden of pleading a strong inference of scienter if it asserts compelling and particularized facts that show fraudulent intent or deliberate recklessness. *Id.* (citing *Tellabs*, 551 U.S. at 325; *Nguyen*, 962 F.3d at 415).

Plaintiffs offer two motives to explain why Defendants engaged in the alleged fraud: (1) to increase their pay under Amazon's executive compensation plan; and (2) to improve the timing and dollar value of their stock sales during the Class Period. Dkt. # 95 at 217–28. Neither proposed motive yields a strong inference of scienter.

       a.     Compensation Plan

According to Plaintiffs, Amazon's executive compensation plan provides low levels of cash compensation and no annual cash bonuses or incentive awards. *Id.* at 217. Instead, executive officers are mainly paid with stock. *Id.* These stock grants have long vesting periods, generally five or more years, and unvested equity is forfeited if an executive is discharged or retires. *Id.* Under the plan, stock vests in tranches every quarter and the amount of stock that each executive receives is largely determined by job performance. *Id.*

Plaintiffs maintain that this compensation structure uniquely motivated the Individual Defendants to engage in fraud. *Id.* at 217–28. Because the compensation of these executives mainly came from stock grants—which were based on job performance—Plaintiffs contend the Individual Defendants were highly motivated to engage in fraud and make Amazon seem as successful as possible to increase their pay. *Id.* at 16. In other words, they say that the direct correlation between Amazon's stock price and the Individual Defendants' compensation was strong motivation to commit securities fraud. *Id.* at 217–28.

These allegations reflect some motivation to engage in fraud because each executive stood to receive millions in stock awards every year if Amazon continued to be a success. *Id.* But it is hardly unusual for an officer of a publicly traded company to hope to maintain—or increase—the company's stock price. And allegations of a desire to achieve routine business objectives, "absent some truly compelling allegations," do not suffice to allege scienter on their own. *Schueneman*, 840 F.3d at 709 n.8; *see In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012). Holding otherwise "would support a finding of scienter for any company that seeks to enhance its business prospects." *Rigel*, 697 F.3d at 884 (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002)). Plaintiffs' other allegations about the executive compensation plan do not constitute "truly compelling circumstances" and thus do not support a strong inference of scienter.

*First*, Plaintiffs argue that "given the grants' long vesting periods and Amazon's all-or-nothing approach to vesting, these executives stood to gain tremendous amounts for every few months they could hold onto their jobs." Dkt. # 106 at 14. To the extent this argument suggests the Individual Defendants were at risk of losing their jobs if they did not make false or misleading statements, it should be noted that the SAC does not allege any of the executive defendants needed to issue false statements or face a risk of termination. Nor do Plaintiffs

provide any allegations about Amazon's typical hiring and firing practices for executives.  So, in effect, Plaintiffs allege the Individual Defendants made false or misleading statements to keep getting paid in vested stock grants every quarter, and to avoid a loss in the stock's value if the purported fraud was discovered.  But the executives' desire to keep their jobs and maintain the company's stock price are routine business objectives that do not show a strong motive to commit fraud.  This is particularly true because the SAC alleges the Individual Defendants risked losing all of their unvested equity if they were fired, not that the Individual Defendants were at risk of being fired by Amazon if they did not make the allegedly false or misleading statements.

Clark's resignation does not change the outcome of this analysis.  Dkt. # 95 at 230–31.  Plaintiffs claim Clark departed Amazon once the overcapacity issues surfaced.  *Id.* at 230.  They also argue his departure was "highly suspicious" because Amazon did not identify a successor before he left and because he departed only five weeks after Amazon's alleged misconduct was revealed.  *Id.* at 231.  Plaintiffs also allege Clark forfeited $77 million when he left the company.  *Id.*  These allegations evince a small degree of scienter because, taken in the light most favorable to Plaintiffs, they show that Amazon forced an executive to resign under unusual circumstances after the company needed to report poor financial performance.  *See City of Dearborn Heights*, 856 F.3d at 622.  In turn, other executives—to avoid similarly being fired—may have been motivated to commit fraud and keep other instances of poor financial performance under wraps.

But the Court must also consider plausible opposing inferences from this conduct.  *Tellabs*, 551 U.S. at 323–24.  The Court can infer that Clark may have also willingly accepted a new job and freely forfeited his unvested stock options.  Plaintiffs offer no allegations about Clark's future job prospects, and it is plausible that he forfeited compensation at Amazon to make even more money at a different company.  And while Plaintiffs contend that Clark departed under unusual circumstances, they offer no allegations about Amazon's typical hiring

and firing practices for corporate executives.  Plaintiffs provide no allegation that Amazon typically identifies a successor before an executive's departure or that Amazon generally provides a reason when its executives leave the company.  Plaintiffs similarly do not provide any information about the compensation that executives typically forfeit when they leave Amazon. Lacking the requisite particularity, these allegations do not provide "sufficient information to differentiate between a suspicious change in personnel and a benign one." *Zucco*, 552 F.3d at 1002.

Plaintiffs also allege all nine Individual Defendants made false or misleading statements during the Class Period.  Dkt. # 95 at 206–07.  But Plaintiffs argue that only Clark was forced to resign by Amazon once the truth emerged. *Id.* at 230–31.  This undermines Plaintiffs' argument that all the Individual Defendants made misleading public statements to maximize their tenure at the company.

*Second*, Plaintiffs contend that Amazon executives' "perceived performance was a key component in determining stock grants" so "Defendants stood to increase their compensation by making Amazon seem as successful as possible[.]"  Dkt. # 106 at 15–16. There is nothing inherently nefarious about executives contributing to a company's growth or overseeing its operations. *See* Dkt. # 95 at 220–21.  And there is nothing extraordinary about tying executives' compensation to a company's performance.  These routine business objectives do not support a strong inference of scienter. *See also* Rigel, 697 F.3d at 884 ("[I]t is common for executive compensation, including stock options and bonuses, to be based partly on the executive's success in achieving key corporate goals.").

Plaintiffs' allegations differ materially from other instances when courts have found scienter based on a correlation between a company's financial performance and stock awards to executives.  Granted, the executives here—as well as those in the other cases cited by

ORDER RE: DEFENDANTS' MOTION TO DISMISS - 12

1    Plaintiffs—received stock awards that far exceeded their base salary.  But those other courts

2    relied on additional factors before making a finding of scienter.  For example, in *Evanston Police*

3    *Pension Fund v. McKesson Corp.*, the complaint alleged the existence of "specific stock and

4    cash award multipliers that tied [executives'] compensation to McKesson's financial

5    performance in 2014, 2015, 2016, and 2017."  411 F. Supp. 3d 580, 603 (N.D. Cal. 2019).  The

6    court noted that "[t]he most salient allegations about McKesson's compensation arrangements

7    are the multipliers and tables showing [the executives'] earnings."  *Id.* at 603.  These allegations

8    showed a "strong correlation" between financial results and executive compensation.  *Id.*  The *In*

9    *re Fibrogen, Inc.* court likewise determined the allegations in the complaint provided "some

10   support to Plaintiffs' allegations of scienter" because "Plaintiffs have alleged that FibroGen's

11   Proxy expressly ties some individual defendants' large compensation to [a drug application to

12   the FDA] relying on manipulated data."  2022 WL 2793032, at *28 (N.D. Cal. July 15, 2022).

13   And the executives' "significantly higher" compensation was "explicitly attributed to the

14   submission of the [drug application to the FDA] in 2019[.]"  *Id.*

15         By contrast, here, Plaintiffs make the nonspecific claim that the compensation committee

16   determined stock grants based on "a variety of factors, including the named executive officer's

17   level of responsibility, past contributions to performance, and expected contributions to

18   [Amazon's] future success."  Dkt. # 95 at 219.  And they say that periodic stock grants were

19   issued "to set a total compensation target for each named executive officer by evaluating a

20   variety of factors, such as the compensation of similarly situated senior executives at Amazon

21   and at other companies with which we compete for talent, past contributions to performance, and

22   expected contributions to our future success."  *Id.* at 219–20.  These general performance metrics

23   are readily distinguishable from stock and cash award multipliers tied directly to a company's

24   financial performance and large stock grants tied directly to a drug application that relied on

manipulated data.  *See Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018) ("Surely every company that goes public wants to . . . maintain a high share price . . . to finance acquisitions and expand.").

*Third*, Plaintiffs explain that Amazon's compensation committee assumed "a fixed annual increase in the stock price so that our executives' compensation will be negatively impacted if our stock price is flat or declines [at year-end], and is favorably impacted if the stock performs beyond the initial stock price assumption." Dkt. # 95 at 16.  In other words, Amazon executives received greater compensation when the company's stock price grew faster than the compensation committee assumed it would each year.  But the motivation to outpace the company's anticipated stock growth is yet another routine business objective and does not support a finding of scienter.  Still, according to Plaintiffs, this motivated Defendants to chase "short-term increases in the Company's stock price" and to "inflate the price of their stock for a time." *Id.* (citing Dkt. # 92 at 26).  Yet Plaintiffs fail to explain why this would motivate Defendants to inflate the company's stock price for only a short period.  Accepting Plaintiffs allegations as true, this argument can support only a marginal inference of scienter.  Considering the stock grants' long vesting periods (five years or more), this likely just motivated Amazon executives to organically grow the company's stock price faster than the assumed annual increase.  Then, the vested stock would be worth more and the executives' compensation would be higher.

In sum, Amazon's executive compensation plan did provide some motive for the Individual Defendants to engage in fraud.  This theory is plausible but not compelling because it reveals that the Individual Defendants' compensation was tied to routine business objectives.  Under Plaintiffs' theory, any company that ties executive compensation to stock performance provides motivation for its executives to commit securities fraud.  But the Court will not

conclude that there is fraudulent intent just because Defendants' compensation was based in part on achieving common corporate goals. *Rigel*, 697 F.3d at 884. These motive allegations do not support a strong inference of scienter.

      b.    Stock Sales

The Court considers the stock sale arguments collectively and agrees with Plaintiffs that the Individual Defendants' use of Rule 10b5-1 trading plans is an affirmative defense that does not rebut well-pleaded scienter allegations at the pleading stage. *See In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *22 n.13 (N.D. Cal. June 2, 2020); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009). Even so, Plaintiffs' stock sale arguments do not support a strong inference of scienter.

The stock sales of corporate insiders "are suspicious only when they are 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *City of Dearborn Heights*, 856 F.3d at 621 (quoting *Zucco*, 552 F.3d at 1005) (cleaned up). Courts must consider three factors in making this determination: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Zucco*, 552 F.3d at 1005.[3] A plaintiff must also provide a "meaningful trading history" for individual defendants' stock sales to support an inference of scienter. *Id.* "Even if the defendant's trading history is simply not available, for reasons beyond a plaintiff's control, the plaintiff is not excused from pleading the relevant history." *Id.*

---

[3] Plaintiffs say that "this test is in the disjunctive" but they are mistaken. Dkt. # 106 at 17 (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005)). More recent authority from the Ninth Circuit confirms that courts must consider all three factors. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 621 (9th Cir. 2017).

(1)    Amount and Percentage of Shares Sold by Insiders

For each Individual Defendant, the SAC focuses on the proceeds from stock sales during the Class Period but does not provide the percentage of shares sold. Dkt. # 95 at 224–31. This weighs heavily against a finding of scienter because it does not establish the requisite "meaningful trading history." *Zucco*, 552 F.3d at 1005. Still, Defendants show that Bezos sold less than 11% of his shares and Wilke sold 13% of his shares during the Class Period. Dkt. # 104 at 24, 26. This too weighs against finding the sales suspicious. The Ninth Circuit typically requires a larger a percentage of shares to be sold to support a finding of scienter. *See Metzler*, 540 F.3d at 1067 (explaining that the Ninth Circuit typically requires the sale of more than 37% of shares to support a finding of scienter).

Rather than provide the amount and percentage of shares sold by insiders, the SAC focuses on the proceeds the Individual Defendants received from their stock sales. Dkt. # 106 at 17–18. But stock sales proceeds are not among the factors a court must consider when performing the stock sale analysis. *Zucco*, 552 F.3d at 1005.[4]

(2)    Timing of Sales

Plaintiffs challenge the timing of only a few stock sales made during the Class Period. They argue 11.7%[5] of Bezos's Class Period sales were suspiciously timed because they occurred four days after the 2021 Q3 Earnings Call. They likewise argue 30.3%[6] of Jassy's Class Period sales were suspicious because they occurred 18 days after the 2021 Q3 Earnings Call. Dkt. # 95

---

[4] Plaintiffs similarly ignore this binding precedent in arguing "the key question in a motive analysis should be whether Defendants' proceeds from Class Period stock sales as a whole were substantially more than those from sales during the Control Period . . . ." Dkt. # 106 at 19–20.

[5] Plaintiffs allege Bezos sold one million Amazon shares between November 1–4, 2021 and sold 8,500,000 Amazon shares during the Class Period. Dkt. # 95 at 224–25. 1,000,000/8,500,000 = 0.11765, or 11.7%.

[6] Plaintiffs allege Jassy sold almost 18,000 shares in November 2021 and 59,354 Amazon shares during the Class Period. Dkt. # 95 at 224–25. At most, 18,000/59,354 = 0.30327 or 30.3%.

at 224–25.  But these allegations provide only minimal support for Plaintiffs' arguments because "[o]fficers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures." *Lipton*, 284 F.3d at 1037.

Plaintiffs also argue that Jassy, Olsavsky, Clark, and Zapolsky made suspiciously timed sales on February 15, 2022, more than two months before Amazon shares experienced a sudden decline.  Dkt. # 95 at 226.  But these sales are not suspicious either.  The sales on February 15 were of 1.43%[7] of Jassy's Class Period sales, 5.19%[8] of Olsavsky's Class Period sales, 19.12%[9] of Clark's Class Period sales, and 6.60%[10] of Zapolsky's Class Period sales. *Id.*  The limited shares sold by these Defendants on this date weighs against finding the timing suspicious.  Nor do Plaintiffs allege these stock sales occurred at or near the stock's peak price during the Class Period—in fact, they occurred several months after the price reached its Class Period high on November 19, 2021—and this fact also weighs against finding the timing of these sales suspicious.  Dkt. # 95 at 241; *see Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001); *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1151–52 (W.D. Wash. 2006).

### (3)     Consistent with Prior Trading History

Bezos and Jassy sold more shares during the 38-month Class Period than they did during the prior 38 months (Control Period).  Dkt. # 95 at 224–25.  Bezos sold 8.5 million shares during the Class Period and 4.02 million shares during the Control Period. *Id.*  Jassy sold 59,354 shares during the Class Period and 42,243 shares during the Control Period. *Id.*  This increase in selling

---

[7] Plaintiffs allege Jassy sold 848 shares on February 15, 2022 and 59,354 Amazon shares during the Class Period.  Dkt. # 95 at 224–25.  848/59,354 = 0.01429 or 1.43%.

[8] Plaintiffs allege Olsavsky sold 910 shares on February 15, 2022 and 17,535 Amazon shares during the Class Period.  Dkt. # 95 at 224–25.  910/17,535 = 0.05190 or 5.19%.

[9] Plaintiffs allege Clark sold 1,027 shares on February 15, 2022 and 5,372 Amazon shares during the Class Period.  Dkt. # 95 at 224–25.  1,027/5,372 = 0.19118 or 19.12%.

[10] Plaintiffs allege Zapolsky sold 1,060 shares on February 15, 2022 and 16,063 Amazon shares during the Class Period.  Dkt. # 95 at 224–25.  1,060/16,063 = 0.06599 or 6.60%.

activity does not warrant inferring scienter.  Even doubling the rate of stock sales, as Bezos did, yields a much lower increase in selling activity than cases when courts have found this factor supports a finding of scienter.  For example, in *America West* the court held this factor supported a finding of scienter because "[n]one of the individual defendants sold stocks during the twenty months preceding the ten month class period."  *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. America W. Holding Corp.*, 320 F.3d 920, 939–40 (9th Cir. 2003).  In *Oracle*, the court found this factor supported scienter because the defendant had sold no stock for five years. *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004); *see also In re Alteryx, Inc. Securities Litig.*, 2021 WL 4551201, at *5 (C.D. Cal. June 17, 2021) (doubling rate of stock sales does not support strong inference of scienter).  The Court must also consider the compelling nonfraudulent inference that Bezos was selling shares because he stepped down as CEO in the middle of the Class Period, and executives often sell stock when retiring.  *See, e.g.*, *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999) ("It is not unusual for individuals leaving a company . . . to sell shares.").

      Plaintiffs do not allege facts showing the sales of Defendants Wilke, Zapolsky, Olsavsky, and Clark differed from any prior trading history.  Dkt. # 95 at 218 (failing to identify the amount and percentage of shares sold in the Control Period).

      Thus, Plaintiffs fail to show Defendants' trades were "dramatically out of line with prior trading practices" or "calculated to maximize the personal benefit from undisclosed information."  *City of Dearborn Heights*, 856 F.3d at 621.  This conclusion is also buttressed by the lack of allegations about the stock sales of Defendants Sutton, Herrington, and Fildes.  *See* Dkt. # 95 at 224–28; *McGuire v. Dendreon Corp.*, 2008 WL 1791381, at *9 (W.D. Wash. Apr. 18, 2008) ("[T]he fact that three other Individual Defendants did *not* sell their shares undermines

1  Plaintiffs' scienter argument."); *Metzler*, 540 F.3d at 1067 ("[One defendant] sold nothing at all,

2  suggesting that there was no insider information from which to benefit.").

3        2.      Allegations of Direct Evidence of Scienter

4        Plaintiffs seeking to hold individuals and a company liable for securities fraud must

5  "allege scienter with respect to each of the individual defendants." *Oregon Pub. Emps. Ret.*

6  *Fund*, 774 F.3d at 607.  The Court reiterated this requirement in its prior ruling.  *See* Dkt. # 92 at

7  26–27.  Yet the SAC does not appear to acknowledge this rule.  Plaintiffs do not provide a

8  separate section for each Individual Defendant that explains whether the speaker was

9  contemporaneously aware that their statements were false when made.  Even so, the Court

10  focuses on whether Plaintiffs have pleaded—with particularity—that Defendants intended to

11  deceive, manipulate, or defraud shareholders, or they made statements with deliberate

12  recklessness, when discussing treatment of third-party sellers and Amazon's fulfillment

13  expansion.[11]  *Prodanova*, 993 F.3d at 1106; *City of Dearborn Heights*, 856 F.3d at 619.

14              a.      Third-Party Seller Allegations

15        The SAC does not pair the third-party seller statements with compelling and

16  particularized facts that show the Individual Defendants possessed scienter when they made their

17  public statements.  These allegedly fraudulent statements include public statements from Bezos,

18  Wilke, and Herrington.  For instance, at the Amazon Annual General Meeting in 2020, Bezos

19  told attendees, "We support millions of small businesses who sell through Amazon" and "We

20  continue to dramatically under charge for Prime relative to the value we create for customers and

21  that is the strategy."  Dkt. # 95 at 157–58.  Bezos also publicly stated, "Third-party sellers, in

22

23        _____
          [11] Defendants repeatedly suggest the Individual Defendants did not possess scienter because they

24  did not know the alleged practices were unlawful.  *See, e.g.*, Dkt. # 104 at 20–21.  This is not the
      appropriate inquiry.  *See also* Dkt. # 92 at 24.

ORDER RE: DEFENDANTS' MOTION TO DISMISS - 19

aggregate, are doing extremely well on Amazon." *Id.* at 160.  Wilke told the *Wall Street Journal*, "The private brand does not get an advantage there. If a private brand shows up in a search result it's because lots of customers are clicking on that particular private brand, so we have some very popular private brands; Amazon basics for example is super popular." *Id.* at 147 (emphasis removed).  In a *New York Times* article, Wilke was similarly quoted as saying, "If [third-party] sellers weren't succeeding, they wouldn't be here." *Id.* at 150.  And Herrington told the Small Business Digital Alliance that "Amazon made the decision to open our store's virtual shelf space to third-party sellers. That decision has proven not only to be a win for customers who want vast product selection, low prices, and fast delivery, but also for millions of small businesses that can now reach more customers, increase revenue, and create jobs in their local communities." *Id.* at 204.  None of the allegations that accompany these statements give rise to a strong inference of scienter.

### (1) "Defect" Advertisements

Plaintiffs first allege that Bezos directed Amazon executives to accept more "defect" advertisements.[12] Dkt. # 95 at 81–82.  But the allegations also explain that Bezos implemented this policy "as a way to increase the total number of advertisements shown and drive up Amazon's advertising profits." *Id.*  And they do not show conduct by Bezos necessarily inconsistent with his statements at issue.  For example, there are no allegations that Bezos implemented these advertisements knowing that they would raise the price third-party sellers had to pay to reach consumers.  Bezos is also not alleged to have made any false or misleading statements related to advertisements or search results.  These allegations do not support a strong inference of scienter.

---

[12] According to Plaintiffs, these are "irrelevant or junk advertisements" that "populate in response to customers' queries."  Dkt. # 95 at 209.

1

2

(2)    Pricing Algorithm and Strategy

Plaintiffs allege that Wilke was the architect of Amazon's pricing algorithm, and that

Amazon employed a "tit-for-tat" pricing strategy at his request. *Id.* at 66, 73; *see* Dkt. 110 at 1.

These allegations are generic. They do not show conduct by Wilke necessarily inconsistent with

his statement at issue. Nor do they describe Wilke's role in creating or implementing the pricing

algorithm. *See* Dkt. # 95 at 66–67. They do not describe what information Wilke gleaned as

architect of the algorithm. *Id.* Plaintiffs similarly fail to describe Wilke's role in establishing the

"tit-for-tat" pricing strategy, other than to say Amazon implemented it at his request. *Id.* at 73.

No allegation says anything about whether Wilke knew these pricing programs would benefit

Amazon at the expense of third-party sellers. Nor do these allegations say anything about the

information Wilke learned while working on these strategies. Plaintiffs fail to allege that Wilke

learned information while involved in this work that shows his later public statements were

issued with deliberate recklessness or an intent to deceive, manipulate, or defraud.

(3)    Eliminating Competition from Third-Party Sellers

Plaintiffs assert that Bezos, Wilke, and Herrington were aware of practices intended to

eliminate competition from third-party sellers. They allege, as an example, that between 2009–

10 Amazon schemed to undercut diapers.com (a merchant on its website). *Id.* at 57–59. But

these allegations concern emails that were exchanged nearly a decade before the Class Period

begins on February 1, 2019. *Id.*; *see id.* at 247. The PSLRA requires "particular allegations

which strongly imply Defendants' *contemporaneous* knowledge that the statement was false

when made." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008) (quoting *In re Read-Rite Corp.*, 335 F.3d 843, 847 (9th Cir. 2003)). The length of time between the

Individual Defendants' statements and these allegations weighs against a finding of scienter. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) ("Falsity is alleged

1    when a plaintiff points to defendant's statements that directly contradict what the defendant

2    knew at that time.").

3        And although the SAC alleges Amazon's Competitive Monitoring Team kept

4    undercutting third-party sellers through the Class Period, there are no other particularized facts

5    that show any Individual Defendants were aware of this practice, what information was

6    communicated to them, when that information was communicated, or by whom.  *See* Dkt. # 95 at

7    59, 64–69.  This too weighs against a finding of scienter.

8        Another example Plaintiffs provide is that Wilke and Herrington, and the SVP of

9    Amazon Marketplace, discussed various "supplier tenets" in 2016.  *Id.* at 70–71.  Plaintiffs allege

10   that these tenets applied to third-party vendors or sellers and that one tenet would require third

11   parties to "either lower the price, provide the selection or enter the Amazon Reseller program"

12   "[i]f it is determined that an Amazon Customer has access to a lower price or selection off of

13   Amazon."  *Id.* at 70.  It is unclear from the SAC what this means or what impact it would have

14   on third-party sellers.  Nevertheless, these allegations do not support a finding of scienter

15   because they do not show that Wilke and Herrington knew these tenets, if implemented, would

16   harm third-party sellers, how that information was communicated, or by whom.  Plaintiffs also

17   fail to allege these tenets were ever implemented by Amazon or that any Individual Defendant

18   learned they did, in fact, harm third-party vendors.  *Id.*  To the contrary, Plaintiffs say that the

19   Amazon Reseller Program, and these tenets, were intended to be "really tough on business

20   terms" with suppliers.  *Id.*  These allegations do not provide compelling and particularized facts

21   that establish scienter.

22       Plaintiffs' allegations about employees' access to third-party seller data also do not

23   support an inference of scienter either.  *Id.* at 38–39.  Plaintiffs do not provide particularized

24   allegations that any Individual Defendant accessed third-party seller data, knew that any Amazon

ORDER RE: DEFENDANTS' MOTION TO DISMISS - 22

employee accessed this data, or knew that access to this data was abused. *Id.* These allegations are not enough to establish scienter. *City of Dearborn Heights*, 856 F.3d at 620; *see Johnson v. Costco Wholesale Corp.*, 2019 WL 6327580, at *19 (W.D. Wash. Nov. 26, 2019) ("Ability to access is not enough on its own. Plaintiffs must allege that Defendants personally accessed the information showing a material weakness in internal controls. Plaintiffs fail to do so.").

That Amazon prepared written testimony for Congress about third-party sellers similarly does not establish scienter. Dkt. # 95 at 234, 242. The Court can infer that Amazon would have collected relevant information and familiarized itself with the relevant evidence before submitting this testimony. But this fact does not accompany allegations that, while preparing this testimony, any Individual Defendants were exposed to facts that would have contradicted their later public statements. This allegation does not support a finding of scienter.

Finally, Plaintiffs allege Amazon punishes third-party sellers through its "Amazon's Standards for Brands" (ASB) program if the seller offer lower prices on a different platform, fails to meet certain inventory requirements, or if most of their products are not Prime eligible. *Id.* at 63. Plaintiffs explain this program was developed because Herrington reached a "boiling point" after third-party vendors sold products at lower prices on websites other than Amazon.com. *Id.* at 64. Plaintiffs also allege that Herrington knew Amazon was policing sellers from discounting on other platforms because he said it was "a dirty job, but we need to do it." *Id.* at 60. These allegations are too generic as well. They do not explain how the development of the ASB program can be "traced directly" to Herrington, his involvement in the ASB program, when or how he learned this program would prevent third-party sellers from discounting on other platforms, or even what information he knew about the program. Herrington's "dirty job" comment similarly does not come with specific information conveyed to him about the effect of policing third-party sellers, or any allegations about the information that led him to make this

remark.  Without more information related to the allegedly anticompetitive conduct, these

allegations do not establish scienter.  *See Metzler*, 540 F.3d at 1068 ("[C]orporate management's

general awareness of the day-to-day workings of the company's business does not establish

scienter—at least absent some additional allegation of specific information conveyed to

management and related to the fraud.").

(4)    Amazon's Plan to Close SFP

According to Plaintiffs, Amazon coerced third-party sellers into using its fulfillment

service (FBA) by conditioning Prime eligibility on the use of this service.  Dkt. # 95 at 50–52.

This raised the costs of third-party sellers who wished to sell through non-Amazon channels

because it required these sellers to split their inventory across multiple channels.  *Id.*  In 2015,

Amazon allowed a few sellers to fulfill Prime-eligible orders through the "Seller Fulfilled Prime"

(SFP) program.  *Id.*  To qualify for this program, sellers needed to meet strict criteria related to

shipping speeds and consistency.  *Id.*  SFP was popular with sellers, but in 2019 the program was

shut down because independent fulfillment providers were helping sellers obtain Prime

eligibility for products fulfilled through SFP.  *Id.*  Plaintiffs allege Clark was "losing [his] mind"

after learning UPS advertised that it could fulfill Prime-eligible orders.  *Id.*  And Wilke overruled

some Amazon employees who did not wish to sunset the program.  *Id.*

These generic allegations do not give rise to a strong inference of scienter.  Granted, the

Court previously found "Defendants have essentially admitted that they may have 'indirectly'

favored their own products and FBA products, which contradicts statements such as 'we do not

favor . . . products that use FBA over others.'"  Dkt. # 92 at 19–20.  But this statement is

attributed to Sutton and, from these allegations, it is unclear that Wilke or Clark learned Amazon

"indirectly" favored their own products and FBA products.  *Id.*; *see* Dkt. # 95 at 141.  Nor do

these allegations shed any light on whether Wilke or Clark learned that conditioning Prime

ORDER RE: DEFENDANTS' MOTION TO DISMISS - 24

eligibility on the use of FBA raised the costs of third-party sellers. These allegations do not reflect direct evidence of scienter.

        b.     Capacity Allegations

Likewise, there are no new allegations that any Individual Defendant purportedly learned facts contrary to their challenged statements about Amazon's capacity expansion through particular meetings, calls, or reports. *See* Dkt. # 92 at 27. Plaintiffs allege that "[t]hroughout the Class Period, Defendants repeatedly and consistently told investors that the Company's investments in expanding infrastructure and fulfillment network capacity were sound and appropriate decisions for the long term." Dkt. # 95 at 14. For example, during the 2021 Q1 Earnings Call Fildes said, "[O]ur focus is really squarely on adding capacity to meet the current high customer demand that Brian [Olsavsky] talked about in his opening remarks." *Id.* at 180 (emphasis removed). Later on the same call, Olsavsky added, "on the fulfillment side, there are a number of things. First, we're adding a lot of capacity." *Id.* (emphasis removed). And on the Q3 2021 Earnings Call, Olsavsky noted, "For the year, we expect our 2021 footprint additions to exceed last year's build-out, which was also significant. To put this in perspective, we are on track to double our fulfillment network over the two-year period since the pandemic's early days." *Id.* at 189 (emphasis removed).

Plaintiffs' new capacity allegations in the SAC come from a former employee (FE-3). FE-3 was responsible for the development of Amazon's fulfillment network in North America. *Id.* at 111–12. He confirmed that fulfillment center expansion plans were discussed at C-level meetings at Amazon, and these plans were presented to Olsavsky and ultimately approved by Bezos. *Id.* "FE-3 believed that the plans for expansion in the U.S. were too aggressive and would need to be scaled back." *Id.* He also reported that "Amazon's managers and executives in the fulfilment capacity organization" similarly questioned the company's expansion plans. *Id.*

ORDER RE: DEFENDANTS' MOTION TO DISMISS - 25

The allegations of FE-3 do not support a finding of scienter. FE-3's allegations concern "fulfillment center expansion plans," "plans for the addition of fulfillment centers," and "final approval for the development of any fulfillment centers." Dkt. # 95 at 111–13. But these allegations include no details about the decision to roll expansion plans back. *Id.* It was FE-3, not any Individual Defendant, that believed the expansion plans in the U.S. were too aggressive. *Id.* Similarly, the fact FE-3 and other unnamed Amazon managers and executives in the fulfillment capacity organization began questioning the expansion plan in February 2021 says nothing about the Individual Defendants' states of mind. *Id.* These allegations do not support a finding of scienter against the Individual Defendants.

        3.       Allegations of Circumstantial Evidence of Scienter

Plaintiffs' allegations do not reflect strong circumstantial evidence of deliberately reckless or conscious misconduct. *Glazer Cap. Mgmt.*, 549 F.3d at 745.

        a.       Third-Party Seller Allegations

Plaintiffs allege that letters sent from Senator Blumenthal provide circumstantial evidence of scienter. Dkt. # 95 at 61. But Plaintiffs do not explain how these letters would have informed the Individual Defendants of specific information that rendered their public statements false. *Id.* This is especially so because the letters from Senator Blumenthal were addressed to the DOJ and FTC—not Amazon. *Id.* Amazon's decision, three months later, to drop the contractual provision the Senator was concerned with does provide some limited circumstantial evidence of scienter. But the weight of this evidence is reduced because it does not show that the Individual Defendants knew this contractual provision harmed third-party sellers or that the Individual Defendants were informed of the specific nature of the practices at issue.

Next, Plaintiffs allege that Wilke's repeated statements on the use of third-party seller data contributes to a strong inference of scienter. *See id.* at 38–39. But Wilke's decision to talk

about Amazon's use of third-party seller data does not necessarily imply that he was aware of any particular facts about Amazon employees' use of that data. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009).

Plaintiffs' last allegation about circumstantial evidence is that certain Individual Defendants used the Signal messaging application to conceal their internal communications. *See* Dkt. # 95 at 235. The Court makes the reasonable inference that the Individual Defendants used Signal to hide their communications from the FTC. *Walleri v. Fed. Home Loan Bank of Seattle*, 83 F.3d 1575, 1580 (9th Cir. 1996) ("The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from well-pleaded facts."). The Court can also draw the reasonable inference that the Individual Defendants used Signal to hide evidence of some wrongdoing. *Id.* This is because the FTC explicitly instructed Amazon to preserve its relevant information, and Amazon still destroyed more than two years of internal communications. Dkt. # 95 at 235.

At the same time, the Court must also consider the plausible, nonfraudulent inferences that can be drawn from this. *Tellabs*, 551 U.S. at 323–24. It is plausible the Individual Defendants only continued to use Signal, despite the FTC's directive, because "the Company's business practices have drawn intense public interest on numerous fronts—something that was well-known, or should have been known, to members of senior management, including the Individual Defendants." Dkt. # 95 at 238–39. The plausibility of this inference is enhanced because there are no allegations the Individual Defendants began to use Signal only because they learned they were under investigation by the FTC. *See Herzig v. Ark. Found. for Med. Care, Inc.*, 2019 WL 2870106, *4–5 (W.D. Ark. 2019). Plaintiffs do not allege any of the Individual Defendants deleted Signal from their phones to hide their use of the application. *See Fed. Trade Comm'n v. Noland*, 2021 WL 3857413, at *13 (D. Ariz. Aug. 30, 2021). Nor do Plaintiffs allege

1    the Individual Defendants have ever lied about using Signal, under oath or otherwise.  *See Pable*

2    *v. Chicago Transit Auth.*, 2024 WL 3688708, at *8 (N.D. Ill. Aug. 7, 2024).  So the Court must

3    similarly consider that the Individual Defendants did not use Signal to hide wrongdoing from the

4    FTC in particular and did not use the application to send messages related to the third-party seller

5    allegations.

6         On balance, the Individual Defendants continued use of Signal, despite the FTC's

7    direction to preserve all relevant communications, supports Plaintiffs' scienter allegations.  But

8    based on the lack of information related to why, when, or how the Individual Defendants used

9    the application, the Court cannot conclude this inference is so strong that it overcomes the high

10   bar set by *Tellabs* on its own.

              b.    Capacity Allegations

11        The circumstantial evidence reflected in Plaintiffs' capacity allegations likewise do not

12   give rise to a strong inference of scienter.

13        Plaintiffs claim it would be absurd—or deliberately reckless—for Jassy and Olsavsky to

14   know enough about capacity and consumer demand issues to speak about them publicly but

15   know nothing about those issues for purposes of scienter.  *See id.* at 212–16.  The Court has

16   already determined, however, that Plaintiffs did not allege that Jassy or Olsavsky knew about

17   these issues through specific meetings, calls, or reports.  *See* Section A.2.b, *supra*.  The public

18   statements attributed to Jassy and Olsavsky were generalized and dealt with capacity

19   expansion—not consumer demand issues.  *See* Dkt. # 95 at 212–16.  And there is no sign that

20   either of these defendants were aware of, or referenced, specific information that showed

21   Amazon needed to roll back its capacity expansion plans.  This differentiates this case from those

22   relied on by Plaintiffs, and this theory does not independently establish scienter.

For example, in *Reese v. Malone*, the court found the plaintiffs adequately alleged scienter because the allegations showed a defendant had access to important corrosion data, addressed the data in her public statements, and referenced the data directly.  747 F.3d 557, 572 (9th Cir. 2014) (subsequently overruled on other grounds).  Here, this is no allegation that Jassy or Olsavsky relied on, had access to, or referenced data that showed Amazon needed to roll back its expansion plans.  In *Qualcomm*, the defendants were "directly and extensively involved in" and "participated in and supervised" the practices at issue.  *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019).  Plaintiffs here do not allege that Jassy and Olsavsky were directly involved in or supervised the decision to scale back capacity growth.  The defendant in *Killinger* spoke to investors with "a high degree of specificity" and "represented to investors that he had all of the information necessary to make accurate predictions" about future risks.  *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259–60 (W.D. Wash. 2009).  On the other hand, here, there is no allegation that Jassy and Olsavsky ever spoke to investors with a great deal of specificity about the need to scale back capacity growth.  And the court in *Avon* concluded the plaintiffs adequately alleged scienter only because confidential witnesses confirmed the defendant had access to the information at issue.  *In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019).  To the contrary, here none of the FEs could confirm that Jassy and Olsavsky had access to specific information that showed Amazon would need to scale back its capacity growth.

That there were inconsistencies between the Individual Defendants' public statements and what was "known internally" at Amazon does not support a finding of scienter either.  Dkt. # 95 at 212.  If—as Plaintiffs argue—a defendant's statement supported an inference of scienter because there were differences between the statement and what was known to company employees, there would be no need for Section 10(b) private action plaintiffs to prove both

scienter and a false statement.  *See* Dkt. # 92 at 32.  But this is not the case.  *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008) (listing scienter and a false statement as distinct elements under Section 10(b)).  Instead, Plaintiffs must satisfy the scienter requirement by specifically alleging when, where, and how the Individual Defendants learned of information contradicting their challenged statements.  *Prodanova*, 993 F.3d at 1107.

Finally, Plaintiffs allege the short time between the capacity statements and corrective disclosure bolsters the inference of scienter.  Dkt. #95 at 237–38.  But the Ninth Circuit has consistently found that temporal proximity between allegedly false statements and a corrective disclosure, without more, cannot support a finding of scienter.  *Yourish v. California Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999); *Ronconi*, 253 F.3d at 437.

4.    Holistic Analysis

The Court must also review the allegations holistically when evaluating whether the complaint adequately pleads scienter.  *See Tellabs*, 551 U.S. at 326.  The Court must compare the malicious and innocent inferences that can be drawn from the facts in the complaint and can only allow the complaint to survive the motion to dismiss if the malicious inference is at least as strong as any innocent inference.  *Zucco*, 552 F.3d at 991.

Even considered holistically, Plaintiffs' allegations do not support a strong inference of scienter.

a.    Third-Party Seller Allegations

Plaintiffs' third-party seller allegations do not support an inference of scienter that is as strong—or stronger—than the opposing inference.  The motive allegations are not compelling; they show only that the Individual Defendants' compensation was tied to routine business objectives and that the Individual Defendants did not engage in suspicious stock sales.  There are also no particularized facts that explain when, where, and how the Individual Defendants would

have been exposed to information that contradicted their public statements.  Some allegations of circumstantial evidence—particularly the allegations about Signal—give the Court pause, but these allegations are similarly generic and unsupported by the details that support a strong inference of scienter.  Rather than show any Individual Defendant's knowledge or recklessness about the falsity of their public statements, the more plausible inference from the SAC is that Amazon and the Individual Defendants employed sharp business practices and were single-mindedly focused on increasing corporate profits.

> b.    Capacity Allegations

The capacity allegations are weaker than the third-party seller allegations.  They are also unsupported by a cogent motive and do not explain why the defendants would lie about their capacity expansion plans.  Despite allegations from three different former employees, none of the pleaded facts show when, where, and how the Individual Defendants would have been exposed to information that contradicted their public statements.  And the circumstantial evidence is not compelling enough to give rise to a strong inference of scienter.  It is more plausible that Amazon simply got its capacity expansion plans wrong in the rapidly changing business environment after the pandemic.  Plaintiffs' capacity allegations do not support a finding of scienter.

C.    Section 10(b) and 20(a) of the Exchange Act

Because Plaintiffs have failed to plead scienter with particularity, they fail to state a claim under Section 10(b) of the Exchange Act and Rule 10b-5.  *See Stoneridge*, 552 U.S. at 157.

Likewise, Plaintiffs fail to state a Section 20(a) claim because they have not established a primary violation of the securities laws. *Zucco*, 552 F.3d at 990.[13]

D.    Leave to Amend

Plaintiff were granted leave to amend and have then failed to add the requisite particularity to their claims, so "[t]he district court's discretion to deny leave to amend is particularly broad." *Id.* at 1007. This case was pending for more than 21 months before the SAC was filed, Plaintiffs did not seek further leave to amend their complaint, and Plaintiffs were provided three opportunities to present their initial pleading—and their allegations are still found to be insufficient—so the Court dismisses this matter with prejudice. *See id.*

## IV

### CONCLUSION

For all these reasons, the Court GRANTS the motion and DISMISSES this matter with prejudice.

Dated this 17th day of March, 2025.

John H. Chun
United States District Judge

---

[13] The Court does not address whether the claims against Wilke and Herrington are timely because Plaintiffs have not made the required showing of scienter as to these Defendants. *See* Dkt. # 104 at 25.

ORDER RE: DEFENDANTS' MOTION TO DISMISS - 32